

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC SILVERMAN, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No.   07 C 4507 |
| MOTOROLA, INC., et al. | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Eric Silverman and Macomb County Employees' Retirement System, purchasers of Motorola stock during the alleged class period of July 19, 2006 to January 5, 2007, filed suit on behalf of themselves and a purported class of similarly situated persons against Motorola, Inc. and certain of its officers and directors (collectively "defendants," with individual officers as "defendant officers"), for violations of §§ 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). The individual complaints were consolidated in this court – a lead plaintiff was appointed and a consolidated amended complaint filed. In Count I of their consolidated amended complaint, plaintiffs claim that defendants violated § 10(b) and Rule 10b-5 by artificially inflating the value of Motorola stock when they issued statements omitting important facts and containing material misrepresentations about the company's future. Plaintiffs allege they lost money when the market discovered the falsity of Motorola's statements and the stock price fell from the allegedly artificially inflated prices. In Count II, plaintiffs allege that the individual defendant officers violated § 20(a) by acting as control

persons of Motorola during the class period. Defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted (Fed. R. Civ. Pro. 12(b)(6)), and for failure to plead fraud with specificity, as required by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") (15 U.S.C. § 78u-4 *et seq.*). For the following reasons, we grant defendants' motion.

## BACKGROUND

When deciding a motion to dismiss we take as true all well-pleaded factual allegations in the complaint and make all plausible inferences from those allegations in plaintiff's favor. Levy v. Pappas, 510 F.3d 755, 764 (7th Cir. 2007). The focus is on the complaint. However, the court must consider any written instrument either attached to the complaint or referred to therein, and may take judicial notice of public disclosure documents filed with the SEC. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007). Therefore, the following facts are assumed to be true and are taken from the complaint and the full text of Motorola SEC filings, press releases and conference calls attached to defendants' motion and referenced in plaintiff's complaint. Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 971 (7th Cir. 2002).

Motorola builds, markets, and sells products, services and applications that connect people, information and entertainment through broadband, embedded systems and wireless networks. It has three primary business segments: Mobile Devices, Networks and Enterprise, and Connected Home Solutions.

Defendant Edward Zander served as Motorola's Board Chairman and Chief Executive Officer from 2004 until he was replaced on November 30, 2007. During the period in question, defendant David Devonshire served as Motorola's Executive Vice-President and Chief

Financial Officer. Defendant Ronald Garriques served as Executive Vice-President and President of Motorola's Mobile Devices division. Defendant Gregory Brown served as the President, Chief Operations Officer and Executive Vice-President of the Networks and Enterprises division and succeeded Garriques as President of the Mobile Devices division in February 2007. Defendant Daniel Moloney served as Executive Vice-President and President of the Connected Home Services division. Defendant Richard Nottenburg served as Executive Vice-President and Chief Strategy Officer. Defendant Padmasree Warrior served as Executive Vice-President and Chief Technology Officer.

At issue in this suit is Motorola's development of its cell phone products, specifically, its third generation or "3G" cell phones. These phones are designed to work on new and improved networks, called 3G networks, which are high capacity radio access wireless networks providing users with enhanced data services, improved internet access and increased voice capacity. In December 2005, according to the Global Mobile Suppliers Association, 100 3G networks were operating in 40 countries.

By July 2006, Motorola was behind its competitors in product offerings, since its portfolio did not include the feature-rich 3G phones that were in strong demand by European and American customers. On top of this, Motorola's product line needed revamping because its core product, the original RAZR phone ("RAZR"), was losing cache as competitors introduced comparable products. It was therefore crucial to both Motorola and its investors to introduce its new product portfolio, including the 3G phones, in time for the 2006 holiday selling season, which occurred during Motorola's fourth quarter of 2006. During the class period, defendants issued a number of positive statements about Motorola's financial results,

its financial outlook, the continued success of the RAZR, and the launch of the 3G phones.[1] Also during this time, Motorola stock rose from $18.95 per share at the beginning of the class period to $25.84 per share on October 13, 2006, an increase of 36%.

<u>July 19, 2006, Press Release and Conference Call</u>

On July 19, 2006, Motorola issued its financial results for the second quarter of 2006, showing earnings of $0.55 per share. It also issued a press release in which defendant Zander stated, in pertinent part: "With our strong balance sheet, leading technologies and proven record of growth, Motorola is well-positioned to continue creating value for its shareholders." (cplt. ¶ 66). The company announced its outlook for the third quarter of 2006, estimating sales in the range of $10.9 to $11.1 billion, "driven primarily by continuing momentum in the Mobile Devices business." *Id.*

On the same day, Motorola held a conference call with securities analysts and investors to discuss second quarter results and business operations. In that call, defendant Zander stated that during an annual meeting of analysts, Motorola would be "unveiling several new exciting products." (cplt. ¶ 67). He referred to these products as "very competitive" and "on track." *Id.* He later reiterated that Motorola's UMTS and HSDPA (3G networks) products were "quite on track...quite compelling," and stated, "I think that we will fare quite well on both UMTS and HSDPA devices in the second half of the year." *Id.*

Zander also stated that the RAZR was "stronger than ever." *Id.* He stated that the company had just shipped its 50 millionth RAZR, and that it was still a must-have device. Zander further stated that "we see good things ahead for the wireless segment. We expect the mobile device market to grow by more than 15% for the full year 2006," and reiterated the

---

[1]Specific statements are discussed herein.

press releases estimate of sales in the $10.9 billion range, driven by the Mobile Devices segment. *Id.*

Analyst Day

On July 26 and 27, 2006, Motorola hosted its annual "Analyst Day" with Wall Street Security Analysts. During that day, Motorola unveiled seven new cell phones, two of which were 3G phones, the RAZRxx ("XX") and the RAZRmaxx ("MAXX"). Defendant Zander called these products "flagship products for the second half of the year." (cplt. ¶ 71). He stated that the new products incorporated Freescale chipsets, which he called "the best platform that we have," and some were using a Linux Java operating system. *Id.* Regarding the Linux Java platform, Zander stated that "it is the right long-term platform. We're glad that we're on it. And now we're starting to build – build momentum." *Id.* He further stated that "Motorola is the fastest-growing high-tech high-cap company here – in the U.S. And the group, if we look a little bit upbeat, we are. I will say we're confident, not arrogant." *Id.*

In response to a question posed by a reporter regarding Motorola's limited use of the Linux Java operating system, defendant Garriques stated that the company has been moving resources over to Linux Java every quarter and by the middle of 2007 "the bulk of everything that we do...will be on Linux Java." (cplt. ¶ 73) Defendant Warrior also made statements about the Linux Java platform, discussing its features and capabilities in general, but not as related to any specific device. Analysts attending the event noted that Motorola stated that most of the new devices would be available in the third quarter of 2006, with the XX and MAXX shipping in the fourth quarter. They stated that the new products "bode[d] well for market share gains and handset margin expansion." (cplt. ¶ 78). Analysts were especially impressed with the unveiling of the 3G phones. With regard to the status of the RAZR,

analysts noted that the handset's price had dropped 60% in 18 months, more than typical phones, but that a spokesman for Motorola said that the price had not declined more than "previous home-run products." (cplt. ¶ 79). Finally, analysts stated that defendant Garriques "has assured [them] that he would beat the division's margins in coming quarters." *Id.*

September 6, 2006, Conference

On September 6, 2006, defendant Zander appeared at Citigroup's 14th Annual Global Technology Conference, where he responded to a question about normal seasonality for the handset industry. Included in his response was the following statement: "[W]e've got some good products coming out for the Q4 rush, so I'm still feeling Okay, but you never know. That's why every week I have a staff meeting, every week I have a call, how are we doing?" (cplt. ¶ 81). He stated that both the XX and the MAXX "will ship in Q4. So, I was told that all our products are going to ship," and later reiterated that statement. *Id.* Following these statements, analysts issued positive reports recommending the purchase of Motorola stock. Analysts "anticipate[d] that the KRZR K1 [a non-3G product] and Motorola's other new models will have a significant impact on the company's 4Q06 results." (cplt. ¶ 83).

October 17, 2006, Press Release and Conference Call

On October 17, 2006, Motorola issued a press release announcing its financial results for the third quarter of 2006. It reported quarterly sales of $10.6 billion and earnings per share of $0.39. The release stated that the Mobile Devices segment sales were up 26% compared with a year ago, and operating earnings increased to $819 million. The segment's operating margin improved 0.7% from the second quarter and 0.9% from the previous year, as a result of product launches and licensing income.

On the same day, Motorola held a conference call with investors and analysts, during

which defendant Zander made the following statement: "As we look ahead to Q4 this year and fiscal 2007, we feel optimistic about our competitive position in our key businesses. With our new portfolio of mobile devices shipping this quarter...we look forward to continued successes in the months and years ahead." (cplt. ¶ 86). He reiterated the third quarter increases in the Mobile Device segment, and stated that "we continue to achieve our goals of year-to-year operating margin improvements and quarter-over-quarter market-share growth." *Id.* Zander discussed "the strategic repositioning of RAZR to the midtier to make way for" two new handsets. *Id.* Regarding the 3G handsets, Zander stated that these "will be shipping this quarter...and should be a definite boost." *Id.* He also offered the following guidance:

> As we look to the fourth quarter of 2006, we expect the market to grow by greater than 15% for full year 2006. We expect typical seasonality and strong demand for new products in the fourth quarter, and we expect Mobile Devices to continue to keep growing market share on a sequential basis, and doing this profitably by expanding OE on a year-over-year basis.

(cplt. ¶ 86). During the conference call, defendant Devonshire stated that the "outlook for fourth quarter is sales between $11.8 billion and $12.1 billion, which is up in the 18% to 21% range versus the fourth quarter of 2005." (cplt. ¶ 88).

In response to a question by an analyst regarding what Motorola needed to become more bullish in the 3G market, defendant Garriques discussed the Freescale platform upon which the 3G phones were built:

> This quarter is about platform change. We took our previous platform, which we built kind of V3x on, and now have transitioned to what we call [Argon LV] from Freescale with new products like XX and MAXX. I do believe this platform in this quarter gets us a very competitive set of products out in the marketplace.

(cplt. ¶ 90). Given that Motorola had previously experienced supply issues with phones, an analyst asked the following question: "[I]t looks like the new products for Q4 are all on track

to launch on time. How should we think about any potential supply constrains?" Defendant Garriques responded: "The big products for us – XX, MAXX, RIZR and the two version of MOTOFONE – I feel very good, and don't feel supply-constrained ramping those up in Q4. From a macro level, I'm not seeing any significant macro problems in the industry, given the platforms that we are building on. So I feel pretty comfortable." *Id.* A second analyst asked about the handsets, including the XX and the MAXX: "Are these going to be late-quarter introductions...or do you expect these to be in meaningful volume perhaps before that November Thanksgiving Weekend holiday sales season?" Defendant Garriques responded: "Across the board, with the exception of the CDMA MOTOFONE, I expect these to be October and early to mid-November shipments, making sure that we hit that all-important fill the channel for the holiday season...[except the MOTOFONE] the rest of them are all solid and ready for the holiday season." *Id.* After the conference call, analysts issued positive guidance on Motorola stock.

Unbeknownst to investors, Motorola was experiencing problems in the manufacture of its 3G phones; problems that would eventually delay the launch of the phones and cause Motorola to not have sufficient inventory for the 2006 holiday selling season. For example, the company that manufactured the chipset to be used in the 3G phones, Freescale Semiconductor, Inc., was experiencing significant design, production and quality issues. In addition, Motorola was experiencing problems with the development of a new Linux-based software operating system for its 3G phones, which further delayed the phones' development and manufacture. In support of these allegations, plaintiff offers the statements of eight

confidential witnesses ("CW").[2]

According to CW4, CW5, CW6 and CW7, Motorola and Freescale collaborated in the design of the Argon chipsets to be used for the 3G phones, and the chipset design, in which two chips were mounted on top of the other, was creating quality issues resulting in poor manufacturing yields. In the process of mounting the chips, the chipset warped, causing the defect. It also required Freescale to consume more silicone than originally planned. According to CW4 Motorola first discovered the defect in the chipset design in late 2005, but since Motorola was contractually bound to procure chips from Freescale, they worked directly with Freescale to resolve the problem. CW4 stated that Motorola engineers worked extremely long hours during the second half of 2006 to resolve the quality issues. CW4 also stated that the problems with the chipsets materially delayed the launch of Motorola's 3G phones until sometime in late November or early December 2006. CW4 stated that the delayed launch negatively impacted Motorola's fourth quarter financial results because there was not sufficient time to get the phones through the distribution channels in time for critical fourth quarter sales. According to CW4, the phones were not available by the day after Thanksgiving, and likely not available to consumers until well into December 2006.

---

[2]CW1 is a former Connectivity Department manager in Motorola's Mobile Devices segment and was employed from 1999 until April, 2007. During 2006 and 2007, CW1 was primarily responsible for managing the development of software for connectivity functions that were being integrated with the new Linux Java platform Motorola was developing for its 3G phones. CW2 is a former Business Operations manager in the 3G unit of Motorola's Mobile Devices segment and was employed from 1999 until June 2007. CW3 is a former Program Manager for a third party software applications company employed by Motorola during the class period. Plaintiffs do not attribute any statements to CW3. CW4 is a former Senior Baseband Engineer employed by Motorola from 2005 through September 2007. CW5 is a former employee of both Motorola and Freescale. CW5 began working for Motorola in 1982 and served as Freescale Division Controller from 2002 through late 2006. Thereafter, CW5 was responsible for Freescale's strategic financial planning until June 2007. CW6 is a former Freescale Financial Controller and was employed in the company's manufacturing group until April 2007. CW7 is a former Freescale customer supply analyst who was initially hired by Motorola in 1991. CW7 was assigned to Motorola's account after Freescale was spun off by Motorola in 2004, and was employed there through May 2007. CW8 is a former Motorola Senior Software Engineer employed in the company's Mobile Devices division during the class period. CW8 was responsible for the software design and development associated with Motorola's 3G and GSM phones.

The confidential witnesses also discussed software problems. CW4 stated that the software showed bugs during testing. After the bugs were resolved, issues emerged with the hardware that were undetectable without the updated software. CW5 confirmed that the chipset issues could not be separated from the other software issues that Motorola was experiencing, because whenever Motorola changed elements of its software it had to publish "errata" specifying changes in the code, which then affected the design of the chipsets. Other multimedia software also caused delay, according to CW1, because developers failed to adequately test certain functions. CW8 stated that the development of the software "user interface," which was to be incorporated into the MAXX phone, fell two months behind schedule during July and August 2006. As a result, the launch of that phone was at least two months behind schedule.

There were also problems with the Linux Java platform on which the 3G phones were to run. CW1 stated that directors of each software engineering group assigned to the Linux Java development, held weekly meetings with various company department vice-presidents to inform them about the status of the project. CW1 stated that at the beginning of 2006, the company had set customer trials for the new Linux Java-based 3G phones for June 2006, followed by shipment to customers during the fourth quarter 2006. However, by April 2006, it was widely known within Motorola that the trials would not take place until fourth quarter 2006, and the first shipments would not occur prior to the end of first quarter 2007. Problems arose with the guidelines people are required to follow when using such open source code as Linux Java, requiring the rewriting of code and the reprogramming of the platform. CW1 stated that by September 2006, the delivery schedule had slipped again, with customer trials pushed to sometime in 2007, and shipments to sometime after. CW2 confirms the "slippage"

in the delivery schedule because of the platform change. As a result of these problems, the 3G phones launched during fourth quarter 2006 were in fact re-spins of prior models that did not offer consumers the functionality or features Motorola had promised. CW8 stated that the XX and MAXX phones operated on the company's proprietary P2K platform, instead of the Linux Java platform, because the latter was too unstable at the time of product launch.

Plaintiffs allege that defendants knew or recklessly disregarded this information in making their positive statements in press releases and on conference calls during the class period. Plaintiffs also allege that defendants made misstatements about the continued success of the RAZR, since they knew or recklessly disregarded the fact that Motorola had reduced the price of the RAZR. Furthermore, in light of the problems with 3G phones and the reduction in price of the RAZR, plaintiffs allege defendants issued fraudulent guidance on Motorola's third and fourth quarter sales and income forecasts.

<u>January 4, 2007, Press Release</u>

On January 4, 2007, Motorola issued a press release reporting disappointing financial results for the fourth quarter of 2006. The press release stated: "The shortfall in both sales and earnings occurred in the Mobile Devices segment and is attributed to an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast." (cplt. ¶ 92). In response to this announcement, the price of Motorola stock fell from $20.31 to $18.72 a share, a drop of 8%.

On January 19, 2007, Motorola issued its final results for the fourth quarter 2007. On that same day it conducted a conference call with analysts and investors in which defendant Zander attributed the disappointing numbers to the fact that the 3G products began to ship in the December time frame and therefore Motorola "did not get the benefit of some of the

increase in 3G markets." He also attributed the results to the price decrease on the RAZR.

On February 21, 2007, defendant Devonshire spoke at a Bank of America Technology Conference and stated that the 3G phone development was negatively impacted by problems with the chipset: "3G, we were a little hampered all year long because the chipset coming from our sole supplier...was a little late, so it's out there now." He also stated that the company did reduce the price of the RAZR.

On March, 1, 2007, defendant Zander spoke at a Goldman Sachs Technology Investment Symposium and he noted that both the chipset and Linux Java software contributed to the problems with the 3G rollout: "We've got to get platforms LINUX/JAVA done and implemented. We've got a couple of products that are now coming out with LINUX/JAVA...We just totally messed that up with our designs and lateness and with our semiconductor partners and got behind the 3G curve." (cplt. ¶ 99).

On February 16, 2007, Motorola announced that defendant Garriques had "resigned, effective immediately." On March 21, 2007, defendant Devonshire retired. On November 30, 2007, defendant Zander was replaced as CEO by defendant Brown.

## ANALYSIS

### I.  Section 10(b) and Rule 10(b)-5 Claims

Section 10(b) of the Securities and Exchange Act forbids the use of any manipulative or deceptive practice in connection with the purchase or sale of any registered security. 15 U.S.C. § 78j(b). Rule 10b-5 states that it is "unlawful for any person...[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

To state a claim under these provisions, plaintiff must adequately allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e. a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation;' (5) 'economic loss;' and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (internal citations omitted).

Allegations of fraud must be pleaded with particularity in accordance with Rule 9(b). This means the plaintiff must identify "the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." Vicom, Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777 (7th Cir. 1994) (internal citations and quotations omitted). However, the standard plaintiffs are held to under the Private Securities Litigation Reform Act ("PSLRA") is more stringent than Rule 9(b), requiring plaintiffs to (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed;" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2). A complaint will survive only if a "reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." Tellabs, 127 S. Ct. at 2511.

In this case plaintiffs have alleged a "fraud-on-the-market" theory. Under such a theory, "[w]here the security involved is traded in an open and efficient market, the plaintiff need not show individual and specific reliance on the misrepresentation of a defendant; he may

instead rely on the...theory and allege only that he suffered injury in his capacity as a purchaser or seller in such a market." Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992).

A. Materiality

Information is material if "a reasonable investor would have considered [it] a reason to buy (or not sell, if he already owned) stock." Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997). "The disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." Lindelow v. Hill, 2001 U.S. Dist. LEXIS 10301, *11 (N.D. Ill. July 20, 2001). "The relevant question is whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Takara Trust v. Molex Inc., 429 F. Supp. 2d 960, 972 (N.D. Ill. 2006) (quoting Makor Issues & Rights, Ltd. v. Tellabs Inc., 437 F.3d 588, 595 (7th Cir. 2006) ("Makor I") rev'd on other grounds 127 S. Ct. 2499 (2007)).

Plaintiffs argue that materiality cannot be decided on a motion to dismiss because it is an issue of fact. See, e.g., Tatz v. Nanophase Tech. Corp., 2002 U.S. Dist. LEXIS 19467, *14-*16 (N.D. Ill. Oct. 9, 2002). However, courts can and have decided materiality as a matter of law when the facts allow. In re Midway Games Inc. Sec. Litig., 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004)(collecting cases).

Plaintiffs' complaint highlights certain statements offered in the context of other statements, which they allege were materially false and misleading. As we understand the complaint, plaintiffs are not alleging that the entire paragraphs are false, but only the highlighted statements, though we read those statements in context. See Davis v. SPSS, Inc., 385 F. Supp. 2d 697, 708-09 (N.D. Ill. 2005). As such, we do not understand plaintiffs as challenging true statements of historical fact, such as Motorola's financial results from the

second or third quarter, and therefore we do not address those. The statements and omissions plaintiffs allege are misleading, can be broken down into two categories: (1) 3G product rollout, (2) drop in the price of the RAZR. We address the second category first.

Plaintiffs allege that defendants made material misstatements about the continued success of the RAZR, and intentionally omitted the fact that Motorola slashed the price of the RAZR during the third quarter of 2006. However, defendants point out that plaintiffs' own complaint contains the following statements by defendant Zander, made during the October 17, 2006, conference call: "During the quarter, Mobile Devices did have lower average selling prices. This was given by...the strategic repositioning of RAZR to the midtier to make way for KRZR and RIZR...." (cplt. ¶ 86). Thus, defendants did not mislead investors by making misstatements or by omitting relevant facts regarding the RAZR's price – they specifically mentioned the reduction in price, albeit in executive jargon, at the same press conference plaintiffs cite to support other allegations of fraud. "Where the facts and circumstances allegedly omitted or represented have actually been disclosed...there will be no liability under the securities laws." In re Next Level Systems, Inc., 1999 U.S. Dist. LEXIS 5653, *25 (N.D. Ill. March. 31, 1999). Therefore, any allegations of fraud based on statements regarding the RAZR price decrease are dismissed.

The second category of statements requires a more in-depth analysis. Defendants argue that all of the alleged misstatements are immaterial as a matter of law because they are either corporate "puffery" or are forward-looking statements protected by the PSLRA's safe-harbor provision.

### B. Puffery

"Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" In re Midway, 332 F. Supp. 2d at 1164 (quoting Shaw v. Digital Equipment Corp., 82 F. 3d 1194, 1217 (1st Cir. 1996)). "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994). "Scrutiny of vaguely optimistic statements...is 'especially robust' in cases involving a fraud-on-the-market theory of liability, such as this one, because the hypothetical 'reasonable investor,' by reference to whom materiality is gauged, is 'the market' itself." In re Midway, 332 F. Supp. 2d at 1164 citing Shaw, 82 F. 3d at 1218.

Defendants are correct that a number of the statements plaintiffs allege to be misleading, are in fact merely corporate puffery. Statements regarding Motorola's "strong balance sheet...and proven record of growth," making "Motorola [ ] well-positioned to continue creating value," is so vague and unspecific that no reasonable investor would rely on it (cplt. ¶ 66). The same can be said for statements that Motorola is "upbeat," "confident," "the fastest-growing high-tech high-cap company," or statements touting the benefits of the new Freescale or Linux Java platforms (cplt. ¶¶ 67, 71, 73, 75). Statements that the new products are "competitive" or "compelling" are similarly broad and undetailed (cplt. ¶¶ 86). Such statements are immaterial as a matter of law (see also cplt. ¶¶ 79, 81, 84).

However, defendants go too far in lumping large groups of statements together. Among the puffery lies certain specific statements of present fact that could be considered material.

The fact that the "competitive" products are "on track," "quite on track," or "keyed up," would be material if in fact defendants knew that those products were not on track (cplt. ¶¶ 67, 73). And statements that Motorola was "on" the Freescale platform, and was "on" or "[had] been moving" resources over to the Linux Java platform, could be material if that was not, in fact, the case (cplt. ¶ 73). The materiality of these statements is supported by the fact that an analyst specifically asked if the 3G products were on track or were supply-constrained, and defendant Garriques answered that they were on track and he did not feel supply-constrained (cplt. ¶ 90); Makor I, 437 F.3d at 597 (direct response to analyst inquiry about possible decline in sales not mere puffery).

### C. Omissions

Additionally, plaintiffs argue that defendants misled investors by omitting facts about the extensive problems and delays associated with the 3G rollout. This court has previously discussed the relationship between misstatements and omissions:

> Whether a fact is material and whether a statement omitting it is misleading are closely intertwined. The more important a fact would be to investors, the more likely its omission will mislead them. Consequently, materiality is more like a continuum than a simple yes or no, material or immaterial. On one extreme, some facts are so important they independently demand disclosure. Silence on the issue is itself misleading. On the other extreme are direct misstatements. Because investors rely on them, inaccurately reporting even the most marginally material facts will likely mislead. This case, alleging that existing statements triggered the duty to disclose additional information, rests between these poles. Discussing an issue, while withholding specific facts, can mislead. Merely mentioning a topic, however, does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important. If omitting the fact would make the statement so incomplete as to be misleading, the company must disclose it. But omitting smaller details, even if investors might care about them, is not necessarily misleading.

Anderson v. Abbott Laboratories, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001) (footnote omitted).

We agree with plaintiffs that given the apparent significance of the facts allegedly omitted,

defendants' omissions regarding the problems plaguing the 3G rollout may have rendered misleading their statements that the rollout was "on track" and that the company was not "supply constrained." Taking the CW statements as true, "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the mix of information." In re Next Level, 1999 U.S. Dist. LEXIS 5653, *22.

### D. Forward-looking Statements

Defendants also argue that the alleged statements are forward-looking and protected by the PSLRA's safe harbor provision. The PSLRA provides a safe harbor for class actions based on forward-looking statements, so long as those statements are accompanied by "meaningful cautionary statements," are "immaterial." or were not made "with actual knowledge" of the falsity or misleading nature of the statement. 15 U.S.C. § 78u-5(c)(1)(A)(i)–(B)(i). Forward-looking statements include statements (1) "containing a projection of revenues," or other financial items; (2) "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" (3) "of future economic performance;" or (4) "of the assumptions underlying or relating" to the aforementioned statements. 15 U.S.C. § 78u-5(i)(1)(A)–(D).

We agree with defendants that the alleged misstatements referring to projected sales and revenue, as well as those discussing the roll-out of the 3G products, constitute forward-looking statements under this definition. However, similar to their argument regarding puffery, defendants have stated broadly what they believe qualifies as a forward-looking statement, to include statements both of future and present fact. Defendants include some of the statements we deemed material above. We disagree that any of those statements are

forward-looking, as that term is defined by the statute; rather, they are statements of present fact. Simply because they are located among forward-looking statements does not qualify them as such. <u>Makor Issues & Rights, Ltd v. Tellabs, Inc.</u>, 513 F.3d 702, 705 (7th Cir. 2008) ("Makor II") ("a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."). We agree with defendants that the other alleged misstatements are forward-looking and we must determine whether they are protected under the safe-harbor provision of the PSLRA. Defendants argue that the statements were both accompanied by meaningful cautionary language and were not made with actual knowledge of their falsity.

E. <u>Cautionary Language</u>

"To be effective, the cautionary language 'must be substantive and tailored to the specific future projections, estimates or opinions' that are alleged to be misleading." <u>Lindelow</u>, 2001 U.S. Dist. LEXIS 10301, *14–*15 (quoting <u>Harden v. Raffensperger, Hughes & Co., Inc.</u>, 65 F.3d 1292, 1404 (7th Cir. 1995)). The warnings should be "more than boilerplate" and should "convey substantive information about factors that could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." <u>Stavros v. Exelon Corp.</u>, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003)(citations omitted). "If a statement is accompanied by meaningful cautionary language, the defendant's state of mind is irrelevant." <u>Harris v. Ivax Corp.</u>, 182 F.3d 799, 803 (11th Cir. 1999) (citing H.R. Conf. Rep. 104-369, at 44 (1995)); <u>In re Midway</u>, 332 F. Supp. 2d at 1168.

Plaintiffs argue that defendants' statements are not protected by the PSLRA's safe harbor because they are accompanied only by "boilerplate" cautionary language, not warnings

specifically tailored to the risks Motorola could face. Defendants' press releases and conference calls were accompanied by cautionary language specifically detailing between 18 and 20 risk factors which might change the outcome of such predictions, including "(2) the company's ability to continue to increase profitability and market share in its wireless handset business ... (4) the company's ability to introduce new products and technologies in a timely manner; (5) the company's ability to purchase sufficient materials, parts and components to meet customer demands." (def. exh.3, p.4; def. exh.4, p.4-5; see also similarly specific language def. exh.6, p.19; def. exh.7, p.19).   This is sufficient. The statute requires only that the language mention "important factors that could cause actual results to differ materially from those in the forward-looking statement." Harris, 182 F.3d at 807 citing 15 U.S.C. § 78u-5(c)(1)(A)(i). It does not require that defendant list *every* factor, and that "failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." Harris, 182 F.3d at 807 quoting H.R. Conf. Rep. 104-369, at 44 (1995); Stavros, 266 F. Supp. 2d at 843. This court previously determined that much less specific language satisfied the PSLRA's requirements for invoking safe harbor. *See* Davis, 285 F. Supp. 2d at 711.[3]

Only defendants' September 6, 2006, statements at the Citigroup Conference were accompanied by less specific language, which could be considered boilerplate. However, the cautionary language in that statement specifically refers readers to "important factors and risks, which are more specifically identified in the companies' [sic] most recent SEC filings" (def.exh. 8, p.13). The Seventh Circuit has yet to rule on whether meaningful cautionary

---

[3]In Davis, we determined sufficient language that "warned that some of the statements in the release were forward-looking and that such variables as market conditions, changes in demand, competition, product release schedules and currency fluctuations could cause actually company results to differ from predictions."

language must "accompany" the statement by being found within the same document as the statement. The Tenth Circuit, discussing the analogous "bespeaks caution" doctrine, has answered in the negative, noting that although "remote statements are less likely effective" because the focus is on the "total mix of information available" to the investor at the time of the statement, cautionary language found in the company's other documents, including SEC filings, may be considered. Grossman v. Novell, Inc., 120 F.3d 1112, 1122-23 (10th Cir. 1997); see also San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996). The Sixth and Ninth Circuits, specifically discussing the PSLRA, agree. Miller v. Champion Enters., Inc., 346 F.3d 660, 677 (6th Cir. 2003) (cautionary language found in 10-K form sufficient to protect letter under safe harbor); Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1133 (9th Cir. 2004) (language in 10-K protects statements made in conference call).

At least two district courts in this circuit have taken this approach. See Stavros, 266 F. Supp. 2d at 843; In re Midway, 332 F. Supp. 2d at 1167. Similar to here, the Stavros court noted that "the documents containing the projections at issue specifically reference other factors listed in Exelon's filings with the SEC." Id. at 844. The risk factors found in Motorola's SEC 10-K filings are extensive and specific, extending beyond eight pages. They discuss in great detail past and potential issues with quality relating to design and manufacture of products, pricing of new products and the timing of their introduction, the ability to purchase a sufficient amount of materials, and reliance on problems related to reliance on third party manufacturers, among other things (def. exh.2, pp.19-21). This is more than

sufficient to satisfy the safe harbor requirements.[4]  Therefore, the allegations of Count I that rest on statements that are forward-looking in nature are dismissed with prejudice.

F.  Scienter

"In order to allege scienter in a private securities action for money damages, the PSLRA requires that 'the complaint shall, with respect to each act of omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Miller v. Champion Enters., Inc., 346 F.3d 660, 671-72 (6th Cir. 2003) (quoting 15 U.S.C. § 78u-4(b)(2)).  A "strong inference" is one that is both "cogent" and "at least as compelling as any opposing inference." Tellabs, 127 S. Ct. at 2510; Makor II, 513 F.3d at 705.  Because we have held that defendants' forward-looking statements are accompanied be meaningful cautionary language, we need only address the state of mind required for statements of material present or past fact.  For such statements, plaintiffs are required to plead with particularity "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Makor I, 437 F.3d at 600.

In an attempt to meet the scienter requirement, plaintiffs first plead actual knowledge. They point to the fact that all of the defendants, save defendant Zander, sold large amounts of stock during the class period.  "Insider trading alone does not raise an inference of scienter." Davis, 385 F. Supp. 2d at 714.  "The sale must be suspicious in scope or timing to

---

[4]We are unsure if any cautionary language accompanied defendant Garriques statements in the "Heard on the Street" column of the Wall Street Journal. However, since we hold that the detailed cautionary language found in Motorola's 10-K form should be considered as "part of the total mix of information" available to the investor, the forward-looking statements made in that article are protected by the PSLRA's safe harbor.

support an inference of scienter." *Id.* at 715. Plaintiffs allege that the sales were suspicious in scope because they represented between 29% and 80% of each defendant's holdings, and suspicious in timing because they came during the class period, and shortly after several of the statements plaintiffs allege were misleading. What plaintiffs have not alleged is that defendants' sale of stock was out of line from their previous trading history. Defendants have provided this court with their trading history for 2005 into 2006, which demonstrates that the sales made during the class period were not unusual, either in scope or in timing, when compared with previous sales, negating an inference of scienter (def. exh., pp.11-16). *See* Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 759 (7th Cir. 2007); Davis, 385 F. Supp. 2d at 713-16. Furthermore, each defendant who sold stock during the class period had, on May 3, 2006, received an employee stock option of between 200,000 and 350,000 shares, making a later large sale not appear as suspicious (def. exh. 11, p.22; exh. 12, p.17; exh. 13, p.14; exh. 14, p.11; exh. 15, p.16, exh. 16, p.29). Finally, the fact that defendant Zander, who is alleged to have made a majority of the misleading statements, did not sell any stock during this period, further negates any inference of scienter based on the sale of stock. Davis, 385 F. Supp. 2d at 713-16.

        Plaintiffs next argue that because defendants were in high-ranking positions within the company, it is clear that they "should have known" about the problems with the 3G phones and the effect those problems would have on Motorola's fourth quarter forecast. This argument falls flat from the start with regard to defendants Brown and Moloney. While both were executive vice-presidents, neither was connected with the Mobile Devices division. Both were in charge of other divisions within Motorola, and plaintiffs have alleged no facts to infer that even if problems were communicated to the upper levels of management, those facts

reached defendants in entirely separate divisions. In addition, the fact that neither Brown nor Moloney is alleged to have made any statements or omissions, supports the conclusion that neither defendant had knowledge of or was reckless in disregarding the 3G situation. <u>Roth v. Officemax, Inc.</u>, 527 F. Supp. 2d 791, 800 (N.D. Ill. 2007) (plaintiffs failed to allege that defendant made false or misleading statements, and allegations of duty to disclose failed for lack of facts giving rise to a strong inference of scienter).

Plaintiffs' inference of scienter is stronger against the remaining defendants. Zander, Devonshire, Nottenburg and Warrior were all corporate executives. Garriques was the executive in charge of the Mobile Devices Division during the period in question. As such, it is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch in the division that accounted for the largest share of sales in the company. Zander himself stated that he had a staff meeting or call "every week" to monitor the status of the 3G phones.

Defendants argue that scienter cannot be presumed from a defendant's executive position, and cite to a number of cases where courts decline to make such a presumption. These cases all relate to various failures to follow generally accepted accounting principles in preparing financial statements. *See* <u>Roth</u>, 527 F. Supp. 2d 791; <u>In re Career Educ. Corp.</u>, 2007 WL 1029092 (N.D. Ill. Mar. 29, 2007); <u>In re Bally</u>, 2006 WL 3714708 (N.D. Ill. July 12, 2006); <u>Selbst v. McDonald's Corp.</u>, 432 F. Supp. 2d 777 (N.D. Ill. 2006); <u>Davis v. SPSS, Inc.</u>, 385 F. Supp. 2d 697 (N.D. Ill. 2005). This case is different, it is about an operations problem, not an accounting deficiency.

Furthermore, plaintiffs also rely on the statements of the eight CWs. With perhaps a few exceptions, the CWs are in a position to testify about the problems associated with the 3G

phones. CW1 stated that the directors of each software engineering group assigned to the Linux Java development, held weekly meetings with various company department vice-presidents, and that it was "widely known" within Motorola that Linux Java-based phones would not ship prior to the end of the first quarter of 2007. CW4 stated that Motorola engineers were working extremely long hours to rectify the chipset problems. CW1, CW2 and CW8 all discuss the continual delay in the testing and delivery schedules. We recognize that general statements such as this, by themselves, are not enough to create a "strong inference" of scienter. *See*, *e.g.*, <u>Malin v. XL Capital Ltd.</u>, 499 F. Supp. 2d 117, 140-42 (D. Conn. 2007) (confidential witness allegations that accounting deficiencies were "well known" in industry and company not sufficient); <u>Druskin v. Answerthink, Inc.</u>, 299 F. Supp. 2d 1307, 1333 (S.D. Fla. 2004) (confidential witness allegations that problems were "generally known," insufficient). As stated above, there is more in this case. The material misstatement here is related to a production problem in an important new product line, not an accounting issue that may have flown under the radar of some executives.

We recognize that the Seventh Circuit has held that information from confidential witnesses "must be discounted" and "usually that discount will be steep." <u>Higginbotham</u>, 495 F.3d at 757. Despite this broad pronouncement, the court later held, in <u>Makor II</u>, that confidential witnesses could help generate a strong inference of scienter where they were sufficiently described, and had first-hand knowledge of the information about which they would testify. 513 F.3d at 712. The fact that the information was corroborated by multiple sources contributed to the court's conclusion. *Id.* We find that those requirements are met in this complaint and that the inference that the corporate executives and Garriques were aware of the production problems, while still making statements that the 3G rollout would proceed

on schedule, is at least as cogent and compelling as any plausible opposing inference, and therefore plaintiffs' complaint adequately alleges scienter.

### G. Loss Causation

To prevail in their action, plaintiffs must also allege and prove that defendants' misrepresentation proximately caused their economic loss. Dura, 544 U.S. at 345-46 (citing 15 U.S.C. § 78u-4(b)(4)). In this circuit, "loss causation" is treated as a restatement of the rule in common law fraud actions requiring a plaintiff to show that "but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." Bastian, 892 F.2d at 683, 685. The Supreme Court's recent opinion in Dura, for the most part confirmed this approach. See, e.g., Ray v. Citigroup Global Markets, Inc., 482 F.3d 991, 995 (7th Cir. 2007) (noting that the Seventh Circuit made the same point about loss causation "years before Dura," in Bastian v. Petren Resources Corp., 892 F.2d 680, 683 (7th Cir. 1990)); see also Dura, 544 U.S. at 340 (citing Bastian, 892 F.2d at 685). Plaintiffs cannot rely merely on an allegation that they suffered damages from purchasing securities at a price artificially inflated due to defendants' misrepresentations. Dura, 544 U.S. at 347. However, the loss causation requirement "ought not place unrealistic burdens on the plaintiff at the initial pleading stage." Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997).

Defendants contend that plaintiffs have not adequately pleaded loss causation because the alleged material misrepresentations concern the delay in bringing Motorola's 3G cell phones to market, and that the January 4, 2007, press release that preceded the drop in stock price "says nothing about Motorola's 3G cellular phones, much less that their delayed launch caused Motorola to miss its sales projections" (def.'s mot. at 24). The first disclosure that references the delay in bringing to market the 3G phones appeared on January 19, 2007. The

defendants also assert that the documents referenced in the complaint demonstrate that Motorola faced multiple challenges in the Mobile Devices division in the second half of 2006, which are at least as likely, if not more likely, to have caused Motorola to miss its earnings projections.

We believe that the defendants read the loss causation requirement too narrowly. The possibility that other forces can contribute to a decline in value of the plaintiff's securities always exists. There is no requirement at the pleading stage that a plaintiff "affirmatively rule out those other factors in its complaint; rather that burden arises at trial." <u>Ong ex rel. Ong v. Sears, Roebuck & Co.</u>, 459 F. Supp. 2d 729, 748-49 (N.D. Ill. 2006). At this early stage, we find that plaintiffs have met their burden. The price of the stock dropped after the earnings warning issued on January 4, 2007. Although this warning did not single out the delay in marketing the 3G phones as the cause, it did indicate that below forecasted sales and earnings were a problem primarily in the Mobile Devices division. It is not unreasonable to assume that the market was aware of the absence of 3G phones in retail outlets during the all-important holiday season which had just ended, and attributed some or all of the weak sales to the 3G phones, particularly in light of the importance Motorola had placed on the 3G phones in earlier phone calls. <i>See, e.g.,</i> <u>In re Motorola Securities Litigation</u>, 505 F. Supp. 2d 501, 546 (N.D. Ill. 2007) (holding that earnings disclosure in case of still-concealed fraud could serve as a corrective disclosure in which "the relevant truth begins to leak out").

## II. <u>Control Person Liability</u>

Section 20(a) creates vicarious liability for a person who actually or potentially controlled the primary violator's acts. 15 U.S.C. § 78t(a); <u>Harrison v. Dean Witter Reynolds, Inc.</u>, 974 F.2d 873, 880-81 (7th Cir. 1992). In this case, Motorola is the controlled "person."

*See* In re Stone & Webster, Inc. Securities Litigation, 424 F.3d 24, 27 (1st Cir. 2005) (allowing corporate officers to be held secondarily liable under section 20(a) for primary violations of the corporation). So in order to state a section 20(a) claim, plaintiffs must allege the following: (1) a primary securities violation; (2) each of the defendant officers exercised general control over Motorola's operations; and (3) each of the defendant officers "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." Harrison, 974 F.2d at 881. As we discussed above, plaintiffs have successfully pleaded a primary violation under § 10(b). We now examine the remaining requirements.

Defendants argue that this count should be dismissed because a control person liability claim must meet the heightened pleading standards of Rule 9(b), and plaintiffs' generalized allegations of control are insufficient. The Seventh Circuit has yet to speak directly on whether control must be alleged with particularity, and the courts in this district are divided on the issue. We agree that the primary violation must be pleaded with particularity–if it were not, then the underlying § 10(b) count would be dismissed–but we are not convinced that the allegations of control are also subject to the heightened standards. *See* In re Sears Roebuck & Co. Securities Litigation, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("§ 20(a) has neither a scienter requirement nor a heightened pleading requirement."); *see also* Central Laborers' Pension Fund v. SIRVA, Inc., No. 04 C 7644, 2006 WL 2785720, at *25 (N.D. Ill. Sept. 22, 2006); Lawrence E. Jaffe Pension Plan v. Household Int'l Inc., No. 02 C 5893, 2004 WL 574665, at *16 (N.D. Ill. Mar. 22, 2004).

The complaint alleges that the individual defendants exercised control over Motorola by virtue of their position as senior executives in the company. That for now is enough. At

trial, plaintiffs will still have the burden of sustaining the charge of control person liability. That burden may be difficult as to Brown and Moloney, for reasons we have already discussed. Defendants, in turn, will have the opportunity to defeat the charge by proving they acted in good faith.

III. **Motion for Oral Argument**

The parties filed a joint request for oral argument on defendants' motion to dismiss. We took that motion under advisement. Because we are satisfied that we were able to resolve the motion solely on the briefs, the motion for oral argument is denied.

## CONCLUSION

For the forgoing reasons, Count I is dismissed as to defendants Brown and Moloney. The remainder of the defendants' motion to dismiss is denied.

_____
JAMES B. MORAN
Senior Judge, U. S. District Court

_Sept. 23_, 2008.