**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC SILVERSMAN, On Behalf of Himself and All Others Similarly Situated. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 07 C 4507 (Consolidated) |
| MOTOROLA, INC., *et al.*, | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Lead Plaintiff and proposed class representative Macomb County Employees' Retirement System ("Macomb County" or "Lead Plaintiff") and proposed additional class representative St. Clair Shores Police and Fire Pension System ("St. Clair," and collectively, "Plaintiffs") have moved to certify a class of those who purchased publicly-traded securities of Defendant Motorola, Inc. ("Motorola") from July 19, 2006 through January 4, 2007 (the "Class Period"). (*See* R. 85-1, Pls.' Mot. at 6.) Plaintiffs assert violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder. 17 C.F.R. § 240.10b-5. Plaintiffs allege that leading up to the fourth quarter of 2006, certain Motorola executives and officers (the "Individual Defendants") made intentionally false and misleading communications that artificially inflated Motorola's stock price. After corrective information later became public, Motorola's share price fell and members of the putative class allegedly suffered harm. For the following reasons, Plaintiffs' motion for class certification is granted.

## BACKGROUND

This consolidated case arises from three individual cases filed against Motorola, each alleging violations of securities laws.  Judge Moran provided extensive background on this case in his September 23, 2008 Order on Defendants' motion to dismiss.  (R. 60-1; *See Silverman v. Motorola, Inc.*, No. 07-C-4507, 2008 WL 4360648, at *1 (N.D. Ill. Sept. 23, 2008).)[1] Accordingly, the Court recites only the facts relevant to resolution of the present issues and additional background facts that provide helpful context.

## I.     The Parties

Based in Schaumburg Illinois, Motorola designs, manufactures, and markets products relating to broadband, embedded systems, and wireless networks.  (R. 40-1, Consolidated Am. Compl. ¶¶ 2, 16.)  At times relevant to this action, Motorola designed and manufactured mobile phones for use in third generation mobile networks.  (*Id.* ¶ 3.)  Third generation ("3G") networks support enhanced data services, internet access to mobile users, and increased voice capacity. (*Id.*)

The Individual Defendants each served as an officer or director of Motorola during the Class Period.  Defendant Edward J. Zander joined Motorola in 2004 and served as served as Motorola's Board Chairman and Chief Executive Officer from 2004 to 2007.  (*Id.* ¶ 17.)   On November 30, 2007, Defendant Gregory Q. Brown replaced Zander as Chief Executive Officer. (*Id.*)  During the Class Period, Mr. Brown served as Motorola's President, Chief Operating Officer and Executive Vice President of Motorola's Networks and Enterprise division.  (*Id.* ¶

---

[1]      Pursuant to an order of the Executive Committee, this case was transferred to this Court's docket on April 17, 2009.  (R. 92-1.)

20.)  Defendant David W. Devonshire served as Motorola's Executive Vice President and Chief Financial Officer during the Class Period.  (*Id.* ¶ 18.)  Also during the Class Period, Defendant Ronald G. Garriques served as Executive Vice President and President of Motorola's Mobile Devices division, (*id.* ¶ 19), Defendant Daniel M. Moloney served as Executive Vice President and President of Connected Home Solutions division, (*id.* ¶ 21), Defendant Richard N. Nottenburg served as Executive Vice President and Chief Strategy Officer, (*id.* ¶ 22), and Defendant Padmasree Warrior served as Motorola's Executive Vice President and Chief Technology Officer.  (*id.* ¶ 23.)  Plaintiffs assert control person liability pursuant to § 20(a) of the 1934 Exchange Act, 15 U.S.C. § 78t(a)), against each of the Individual Defendants.  (R. 40-1 at 62.)

Lead Plaintiff Macomb County, an institutional investor, claims to have incurred losses totaling $589,647 during the Class Period.  (R. 88-1, Ex. A to Diegel Decl. at 9.)  According to Macomb County's Named Plaintiff Certification, it made three purchases during the Class Period for a total of 90,500 shares.  (*Id*. at 8.)  Macomb County purchased these shares at prices as high as $25.95 per share and sold these shares at a loss later in the Class Period.  (*Id*.)

Proposed class representative St. Clair is a public pension fund that provides benefits to retired police and fire department employees. (R. 87-1, Haddad Decl. at ¶ 3.)  Like Macomb County, St. Clair is an institutional investor with assets of approximately $74 million.  (*Id.*) According to its Named Plaintiff Certification, St. Clair made five purchases of Motorola stock during the Class Period for a total of 34,200 shares, at prices as high as $24.03, for an approximate total loss of $117,619.25 during the Class Period.  (R. 87-1 at 8–9.)  Together, St. Clair and Macomb claim to have lost more than $700,000.  (R. 85-1 at 6).

## II.     Plaintiffs' Allegations

Plaintiffs' allegations center on a number of statements made during the second, third, and fourth quarters of 2006, as Motorola faced increased competition to its industry-leading RAZR phone and its wireless competitors raced to introduce new feature-rich 3G mobile phones. (R. 40-1 at ¶ 45.)  These statements concerned "new high profit margin 3G products and the Linux/Java operating system" Motorola developed to support the new 3G handsets.  (R. 85-1 at 7.)  Defendants' statements allegedly suggested that "Motorola was coming to market with a supply of new cell phones including 3G cell phones and that its new product offerings would be available for the 2006 Holiday Selling Season."  (*Id.*)  At various times, one or more Defendants stated that Motorola's 3G product development was "on track" and that these products were "running" on the new Linux/Java operating system.

According to Plaintiffs, however, while Motorola was making public statements regarding its upcoming 3G products, the development of these products suffered "hiccup after hiccup" based on a difficult-to-manufacture chip design, issues with software integration, and delays in completing the user interface.  (*Id.* at ¶¶ 46–65.)  These problems eventually prevented Motorola from shipping its Liunx/Java-based 3G designs for the 2006 Holiday Season.

After the market closed on January 4, 2007, Motorola issued a press release announcing a preliminary estimate of its fourth quarter 2006 results.  (*Id*. at ¶ 92.)  The press release described a shortfall in earnings, as compared to previous estimates made on October 17, 2006:

> The shortfall in both sales and earnings occurred in the Mobile Devices segment and is attributed to an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast.  In the fourth quarter, Mobile Devices unit sales were approximately 66 million units, up 23 percent from the third quarter of 2006 and up 48 percent from the fourth quarter of 2005.

(*Id.*)  Motorola's share prices fell the next day, from $20.31 per share to $18.72 per share, or approximately 8%, and further declined in subsequent weeks.  (*Id.* at ¶ 93.)

## III.    Proposed Class

Plaintiffs propose a class of "persons and entities who purchased or otherwise acquired the publicly-traded securities of" Motorola from July 19, 2006 through January 4, 2007.  (*See* R. 85-1, Pls.' Mot. at 6.)  The proposed class excludes: (1) Defendants and their immediate family; (2) any entity in which Defendants have or had a controlling interest; (3) Motorola Officers and Directors; and (4) the legal representatives, heirs, successors, or assigns of any excluded party. Motorola has not objected to the class definition or its proposed scope.

## IV.    Procedural History

On October 16, 2007, Judge Moran consolidated Case Nos. 07 C 4507, 07 C 4782 and 07 C 5004 and appointed Macomb County as Lead Plaintiff, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq*., and named Coughlin Stoia Geller Rudman & Robbins LLP as Lead Counsel and Miller Law LLC as Liaison Counsel.  (R. 36-1 at 2.)  Defendants have not objected to class certification based on the adequacy of lead counsel.

On September 23, 2008, Judge Moran granted in part and denied in part Defendants' motion to dismiss, holding that a number of statements alleged by Plaintiffs to be false were not actionable.  (R. 60-1; *see Silverman*, 2008 WL 4360648, at *9–12.)  The statements Judge Moran excluded were:  (1) statements regarding a price drop on Motorola's RAZR mobile phone products; (2) statements amounting to puffery, such as statements regarding Motorola's "proven record of growth," "upbeat" and "confident" outlook, or its "competitive" and "compelling" mobile products; and (3) forward-looking statements subject to the safe harbor protections of the

5

PSLRA.  (2008 WL 4360648, at *9–12.)  Judge Moran also held that Plaintiffs could proceed as to certain statements—specifically statements regarding the status of product development and operations relating to Motorola's then-planned 3G mobile products.  In particular, Judge Moran declined to dismiss at the Rule 12(b)(6) stage certain statements referencing that Motorola's 3G products were "on track," "quite on track," or "keyed up," as well as statements that Motorola was then "on" the Freescale platform and was at the time "on" or "had been moving resources over to the Linux Java platform."  (*Id.* at *10.)  In addition, Judge Moran found that omissions relating to the problems that plagued Motorola's 3G product rollout in 2006 may have been misleading if full disclosure would have been necessary to ensure the truthfulness of certain statements, such as the statement that Motorola's 3G products were not, at the time, "supply-constrained."  (*Id.*)

Following reassignment of this case to the Court's docket on April 17, 2009, Plaintiffs filed their current motion for class certification.  In their Response, Defendants object because: (1) Plaintiffs rely on statements previously dismissed from the case by Judge Moran; (2) Lead Plaintiff is not an appropriate class representative and St. Clair cannot serve as a *de facto* lead plaintiff; (3) Plaintiffs cannot show price inflation, reliance, and materiality; and (4) Plaintiffs cannot establish loss causation because the statements previously dismissed by Judge Moran were the only possible cause of any loss.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23(a) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the

class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Failure to meet any of these Rule 23(a) requirements precludes class certification. *See id.*; *see also Pruitt v. City of Chicago*, 472 F.3d 925, 926–27 (7th Cir. 2006).

In addition to satisfying the requirements under Rule 23(a), a party seeking class certification must also establish that the proposed class satisfies one of the requirements set forth in Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *Oshana*, 472 F.3d at 513. In this case, Plaintiffs request certification of the proposed class pursuant to Rule 23(b)(3), which applies when "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *see also Amchem Prods.*, 521 U.S. at 615–16. Rule 23(b)(3) includes a list of factors for courts to consider regarding the predominance and superiority criteria:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Amchem Prods., Inc.*, 521 U.S. at 615–16 (emphasis added); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974) (Rule 23(b)(3) manageability requirement "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit.").

7

The party seeking class certification has the burden of establishing that certification is proper. *See Oshana*, 472 F.3d at 513; *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). In determining whether a party has carried that burden, a court need not accept all of the complaint's allegations as true. *See Szabo v. Bridgeport Mach., Inc*., 249 F.3d 672, 675 (7th Cir. 2001). Rather, in deciding whether to certify a class, the court "should make whatever factual and legal inquiries [that] are necessary under Rule 23." *Id*. at 676. Nonetheless, on a motion for class certification, the court's inquiry is limited to whether the requirements of Rule 23 have been satisfied, and "a court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002) (citing *Eisen*, 417 U.S. at 178, 94 S. Ct. at 2152; *Szabo*, 249 F.3d at 677). District courts have broad discretion in determining motions for class certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S. Ct. 2326, 2334, 60 L. Ed. 2d 931 (1979); *Payton v. County of Carroll*, 473 F.3d 845, 847 (7th Cir. 2007).

## ANALYSIS

### I.   Statements that Remain At Issue

Defendants first argue that Plaintiffs continue to rely on statements that Judge Moran previously found not to be actionable. Judge Moran held that a number of the alleged misstatements asserted in Plaintiffs' Consolidated Amended Complaint, statements such as earnings forecasts, were "forward-looking" statements that fell within the "safe harbor" provisions of the PSLRA. Section II.B. of Plaintiffs' Memorandum in Support of their Motion for Class Certification details the statements that form the basis for Plaintiffs' claims, and these statements comply with Judge Moran's previous order. Specifically, Plaintiffs identify a July 19,

2006 conference call with analysts and investors in which Defendant Zander stated that certain product launches were "on track." (R. 85-1 at 5.) Plaintiffs also identify a statement made later in July describing Motorola's forthcoming 3G handsets and their supporting platform as "the best platform we have that the products you saw get announced are running on a Freescale [memory chip] platform," (*id.*) and statements made later in the Class Period to the effect that "Motorola's new wireless handsets would be driven by the Linux/Java operating system during the second half of 2006 and throughout 2007." (*Id.* at 6.) Although the Court agrees that Judge Moran's September 23, 2008 decision narrowed the case, Defendants' assertions that Plaintiffs have ignored this decision are without merit.

## II.    Class Certification Analysis

Plaintiffs have defined a class that joins hundreds and perhaps thousands of investors and thus meets the numerosity requirement. Given the shared issues of fact—all purchasers relying on market information regarding Motorola's 3G products—and securities law, Plaintiffs have met their initial burden as to commonality, as well. Defendants have not disputed either element.

Defendants oppose class certification on three grounds: (1) Macomb County is not an appropriate class representative because it fails the typicality requirement and is otherwise inadequate; (2) St. Clair cannot replace Macomb County as a Lead Plaintiff without violating the procedures required by the PSLRA; (3) Plaintiffs cannot meet the predominance requirement of Rule 23(b)(3) because they have failed to establish reliance, materiality, and loss causation. *See Steen v. Myers,* 486 F.3d 1017, 1020 (7th Cir. 2007) (absence of discussion in briefs amounts to abandonment of claim). Many of these arguments raise issues that Defendants could have raised in a Rule 12(b)(6) motion, and others reach deep into the merits of Plaintiffs' claims. Class

certification is not a vehicle to raise issues that are properly raised in a Rule 12(b)(6) motion or during the summary judgment stage. Although the Court must "make whatever factual and legal inquiries are necessary under Rule 23," *Szabo*, 249 F.3d at 675, *Szabo* does not permit the Court to decisively consider the final merits and thus remove from the parties the benefit of summary judgment or trial. *Id.* (court may consider "whether plaintiff is asserting a claim which, assuming its merit, will satisfy the requirements of Rule 23 as distinguished from an inquiry into the merits of plaintiff's particular individual claim"); *see also West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (On class certification, "[t]ough questions must be faced and squarely decided.").[2] The Court will therefore limit its factual and legal inquiries to those necessary to determine whether Plaintiffs have met Rule 23's requirements.

### A.    Typicality

Defendants first argue that both Macomb County and St. Clair fail the typicality requirements of Rule 23(a). Under Rule 23(a)(3), "the typicality requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596–97 (7th Cir. 1993); *see also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ("plaintiff's claim is typical if it arises from the same event or

---

[2] Other courts considering similar issues in securities cases have generally refused to decide such factual issues on the merits at the class certification stage. *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 291 (S.D.N.Y. 2008) ("given the inherently factual nature of these types of disputes, courts repeatedly have refused to shorten a class period based on alleged inquiry notice"); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527(DLC), 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003) ("Class certification of a broader class period is appropriate when questions of fact remain as to whether a purportedly curative press release effected a complete cure of the market or was itself fraudulent").

practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."). In particular, Defendants claim that (1) Macomb County cannot prove loss causation; (2) Macomb County and St. Clair cannot prove reliance because they purchased stock after the Class Period closed; and (3) both Macomb County and St. Clair rely on investment advisors and thus cannot prove reliance.

### 1.    Loss Causation

Relying on the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005), Defendants argue that Macomb County fails the typicality requirement because it sold shares before the alleged corrective disclosures and is thus an "in and out trader" that suffered no harm. (R. 102-1, Defs.' Resp. at 12.) In *Dura*, the Supreme Court held that investors cannot establish loss causation solely by pointing to an inflated share price—investors must prove that the alleged misrepresentations caused their loss. (*Dura*, 544 U.S. at 345, 125 S. Ct. at 1633 ("if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."); *see also Roth v. Aon Corp.*, 238 F.R.D. 603, 609 (N.D. Ill. 2006) ("an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." (citing 125 S. Ct. at 1631)). Analogizing to this Court's opinion in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 597 (N.D. Ill. 2009), Plaintiffs argue that it is premature to find that Macomb County cannot prove loss causation because Macomb County sold at a loss during the Class Period but after Motorola "first hinted of a weakness in the Company's 3G product portfolio in Europe." (R. 122-1 at 9.)[3]

---

[3]    In support of the claim that "defendants first hinted of a weakness in the Company's 3G portfolio in Europe," Plaintiffs point to an October 17, 2006 analyst conference

The Second Circuit recently issued an opinion relevant to this issue. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, --- F.3d ---, Nos. 07-4017-cv (L), 07-4025-cv (CON), 2009 WL 2169197, at *9 (2d Cir. July 22, 2009).[4]  In *Flag*, one of the proposed representatives, an in-and-out purchaser, advanced a similar theory and argued that it was premature, at the class certification stage, to exclude in-and-out purchasers from the class.  The district court relied on *Roth*, 238 F.R.D. at 607–08, upon which *Makor* also relied, and refused to exclude in-and-out traders at the class certification stage because they could conceivably prove loss causation by showing that the truth "leaked" out before they sold their shares.  *See In re Flag Telecom*

_____

call.  (R. 122-1 at 9 (citing Consolidated Am. Compl. ¶¶ 86, 91.)  Having reviewed the transcript of this conference call, (R. 104-11), however, the Court sees no such reference.  Instead, the transcript quotes Defendant Zander as stating, "I do want to take a moment and explain why our sales were below the midpoint of our guidance range by about 3.5%.  About half of our shortfall is due to lower-than-expected GSM infrastructure sales in our EMEA—or Europe, Middle East and Africa—region.  Primarily, customers delayed capital spending, plain and simple."  (R. 104-11 at 109.)  This statement relates to GSM infrastructure—nothing in this statement suggests design and supply problems with Motorola's 3G handsets.  GSM refers to a family of mobile communications standards that currently operates in both second and third generations.  GSM Edge is often seen as the bridge between 2G and 3G ("2.5G," so to speak), while GSM/UMTS is commonly referred to as "3G" and HSDPA as "3.5G" or "3G" plus.  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 304 (3d Cir. 2007) ("The standard used in current generation GSM-path networks is the third generation ("3G") standard created for the GSM path, and is known as the Universal Mobile Telecommunications System ('UMTS') standard.").  The Court has reviewed a number of conference call transcripts filed by the parties in this case.  Throughout these transcripts, Motorola executives routinely used the acronym "UMTS" when referring to Motorola's 3G GSM-compliant products—not merely "GSM."  (*See, e.g.*, R. 104-11 at 112 ("Coming this quarter, the XX for UMTS and RAZRMAXX for HSDPA. . . . [T]he XX is designed for 3GE and UMTS.").  In other words, Plaintiffs' argument appears to conflate GSM infrastructure with 3G handsets.  "Counsel must remember that they are not only advocates for their clients; they are also officers of the court and are expected to assist the court in the administration of justice, particularly in difficult cases involving complex issues of law and technology."  *Exergen Corp. v. Wal-Mart Stores, Inc.*, --- F.3d. ---, 2009 WL 2366535, at *16, n.2 (Fed. Cir. 2009) (quoting *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1356 (Fed. Cir. 2002).

[4]    This opinion issued after the parties completed their class certification briefing.

*Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 167–68 (S.D.N.Y. 2007) ("[I]n-and-out purchasers

should not be excluded from the proposed class at this time, particularly in light of the fact that

discovery is still incomplete and plaintiffs intend to further develop their leakage theory.").  The

Second Circuit reversed this aspect of the district court's decision and held that because the

plaintiffs had presented insufficient evidence to support their leakage theory, the district court

should have addressed loss causation and excluded the in-and-out trader.  Specifically, the

Second Circuit focused on the fact that the corrective disclosure identified by the plaintiffs in

support of their leakage theory was the very same alleged misstatement that formed the bases of

their securities fraud claim.  *In re Flag Telecom*, 2009 WL 2169197, at *10 ("Plaintiffs cannot

have it both ways.  They cannot allege that Defendants made certain misstatements, namely, that

Flag was doing well compared to its competitors, and simultaneously argue that the misstatement

itself constituted a corrective disclosure, that is, the fact that the other companies were not doing

well exposed the public to the truth about Flag's misstatements.").

    The Second Circuit, however, did not reject the leakage theory *per se*.  Furthermore, the

allegations here include the theory that share price inflation diminished concurrent with

Motorola's failure to ship 3G products at any point during the 2006 holiday season.  *See, e.g.*, *In*

*re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006) ("it is also conceivable

that the inflationary effect of a misrepresentation might well diminish over time, even without a

corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove

loss causation.").  In the September 23, 2008 Order on Defendants' Motion to Dismiss, for

example, Judge Moran observed that "in light of the importance Motorola had placed on the 3G

phones" throughout the Class Period, "[i]t is not unreasonable to assume that the market was

aware of the absence of 3G phones in retail outlets during the all-important holiday season."
2008 WL 4360648 at *15.  Similarly, Plaintiffs' expert opined that store shelves devoid of 3G
handsets would have suggested Motorola's inability to ship its products in time for the fourth
quarter 2006.  (R. 104-3 at 32, Finnerty Dep. Tr. at 121:4–13.)[5]  In addition, Macomb purchased
90,500 shares during the Class Period and sold these shares at a loss.  (R. 88-1, Ex. A to Diegel
Decl. at 8.)

Whether Defendants' alleged misrepresentations caused this loss is one of the ultimate
issues in this case and the Court cannot decide it until the parties have had the full benefit of
discovery—which does not end for approximately eight months.  The question in considering
class certification is whether Macomb County is subject to unique defenses that destroy
typicality.  Based on the facts currently before the Court, Defendants have not established that
Macomb County is atypical.

Accordingly, for purposes of determining class certification, the Court adopts the
approach of *Makor*, *Roth* and a number of other cases that have included "in-and-out" traders in
the proposed class yet limited class membership to those who suffered damage as a result of their
purchase of Motorola stock during the Class Period.  *See Roth*, 238 F.R.D. at 609 ("disputes
about loss causation concern factual questions not appropriate at the class certification stage of
the game."); *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. at 544.  Defendants are free to
renew this argument at the summary judgment stage, after both parties have had a full and fair

---

[5]    "The fact that the phones were not available in certain stores could very well have
been known beforehand.  So perhaps in that case the price of Motorola stock would have drifted
down.  I didn't test for that.  Sometimes it happens that information becomes reflected in the
stock price over a long period of time, more than one day, and we could observe the stock price
drifting out."  (R. 104-3 at 32.)  Plaintiffs still have eight months left in discovery to obtain
additional support for their "leakage" theory.

opportunity to complete discovery.

### 2.    Post-Class Period Purchases

Defendants raise similar concerns regarding both St. Clair's and Macomb County's post-Class Period purchases of Motorola Stock.  In particular, Defendants contend that such purchases subject Macomb County to a unique defense that precludes it from serving as a class representative.  (R.102-1 at 14.)  In support, Defendants cite to *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 135–36 (S.D.N.Y. 2007) as summarily holding that post-Class Period purchasers are necessarily excluded from serving as class representatives.  *Rocco* involved allegations of securities fraud based on accounting manipulation.  The named plaintiff alleged two instances of fraud—one involving a failure to note a charge against the defendant company's goodwill, and a later instance of fraud relating to an improper writeback of inventory that led to a further overstatement on the company's next financial statement.  The court found the named plaintiff atypical because he made no less than four purchases of stock after the Class Period, after he became aware of the alleged inventory fraud and before any public disclosure of correction.  "The fact that Ward is alleging this second fraud and still made his post-class purchases while this ongoing issue was known to him makes him subject to potential unique defenses at trial," namely, nonreliance.  *Rocco*, 246 F.R.D. at 136.

Under facts closer to this case, however, many courts have held that post-Class Period purchases alone will not automatically disqualify class representatives:

> As numerous courts have held, the fact that a putative class representative purchased additional shares in reliance on the integrity of the market after the disclosure of corrective information has no bearing on whether or not [the representative] relied on the integrity of the market during the class period, that is, before the information at issue was corrected or changed.  In other words, the fact that an investor purchased additional shares upon learning the new information

15

> does not mean that he or she did not rely on the integrity of the market in purchasing shares before the new information was known. The post-disclosure purchase of the additional shares therefore will not necessarily present individual issues of reliance that render the investor atypical or inadequate to represent class members who did not purchase such additional shares.

*See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132 (S.D.N.Y. 2008) (quoting *In re Salomon Analyst Metromedia*, 236 F.R.D. 208, 216 (S.D.N.Y. 2006), vacated and remanded on other grounds, 544 F.3d 474 (2d Cir. 2008)); *see also In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464, at *3 (S.D.N.Y. 2003) (rejecting atypicality argument where plaintiff purchased stock "well after the alleged 'fraud' was 'exposed'"); *Fry v. UAL Corp.*, 136 F.R.D. 626, 632 (N.D. Ill. 1991) ("Because subsequent purchases by the plaintiffs are irrelevant to the liability of UAL with regard to alleged misrepresentations effecting the earlier sales of securities by the plaintiffs, such purchases do not render the claims of Fry and Dwyer atypical."). The facts of *Rocco* are distinguishable from these cases—*Rocco* involved an investor capitalizing on uncorrected and on-going fraud. Here, Defendants have offered no explanation why St. Clair or Macomb County's additional purchases of stock outside of the Class Period raise unique defenses that preclude them from surviving as class representatives.

### 3.    Reliance on investment managers

The final basis Defendants raise for atypicality is that both Macomb County and St. Clair—institutional investors—"gave full discretion to [their respective] investment managers to invest on [their] behalf and provided no input as to the purchase or sale of specific stocks, including Motorola" and thus cannot prove that they relied on the alleged misstatements in the purchase of stock. (R. 102-1 at 14.) Given Plaintiffs' reliance on the fraud-on-the-market

theory, this argument appears to relate more to adequacy than typicality. Regardless, the cases

cited by Defendants involved individual investors rather than institutional investors. In cases

involving institutional investors, such as the pension funds here, courts have noted:

> Under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§
> 78u-4 *et seq.*, Congress "anticipated and intended" large institutional investors to
> oversee securities cases. Because Operating Engineers is a pension fund, it lacks
> investment expertise and, more likely than not, its fiduciary duties would preclude
> it from making investment decisions on behalf of its beneficiaries. Thus, to
> prohibit such an institutional investor from serving as a class representative
> merely because it delegated investment responsibilities to a money manager
> would appear be in tension with the PSLRA.

*In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 567 (N.D. Ill. 2004) (internal citations

omitted); *see also In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) (noting

that institutional investors "are likely to use advisors ... to invest conservatively in securities they

consider undervalued by the market" and thus precluding institutions from participating in

securities class actions would contravene the PSLRA's purpose to "increase the likelihood that

institutional investors will serve as lead plaintiffs."). Regardless, Defendants have offered no

evidence that Plaintiffs' respective investment managers relied on information about Motorola

other than that publicly available. "There is no suggestion that any of the named plaintiffs had

access to non-public information and learned that there was a fraud afoot and decided

nonetheless to invest." *Worldcom*, 219 F.R.D. at 282. Nor are institutional investors oblivious

to the actions of their investment managers merely because they are not intimately involved in

every investment decision, as Defendants suggest. Indeed, Plaintiffs presented evidence that

they monitor investment managers through periodic reports and meetings. (*See, e.g.*, R. 104-5 at

24–5, Diegel Dep. at 23–4; 104-7 at 6, 58; 104-7 at 42–3.) Based on these facts, Defendants

have failed to establish that Plaintiffs' use of professional investment managers is unlikely to

subject them to a unique reliance defense.

### B.    Adequacy

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625. To establish that they will fairly and adequately protect the interests of the class, class representatives must show that: (1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "[T]he burden in demonstrating that the class representative meets this standard is not difficult . . . An understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient to meet this standard." *Makor*, 256 F.R.D. at 601 (quoting *Murray v. New Cingular Wireless Servs., Inc*., 232 F.R.D. 295, 300 (N.D. Ill. 2005).

Defendants claim that both Macomb County and St. Clair are professional plaintiffs who have surrendered control of the litigation to counsel. As the Court noted in *Makor,* however, "it is well established that in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected.'" *Makor*, 256 F.R.D. at 601 (quoting *Wagner v. Barrick Gold Corp*., 251 F.R.D. 112, 118 (S.D.N.Y. 2008) (collecting cases)). The testimony of Plaintiffs' principals exhibits that the representatives have an adequate understanding of both the case allegations and Plaintiffs' fiduciary duties to the class. (*See, e.g.*, R. 104-4, Haddad Dep. at 57–61; 104-5, Diegel Dep. at 83–85.) Plaintiffs thus have demonstrated that they are "aware of the basic facts underlying the lawsuit and not likely to

18

abdicate [their] obligations to fellow class members." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (quoting *Wagner*, 251 F.R.D. at 118).

Nor have Defendants supported the suggestion that Plaintiffs are merely "professional" plaintiffs. Buried in a footnote, Defendants cite *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC*, 616 F. Supp. 2d 461, 466 (S.D.N.Y. 2009), to argue that Plaintiffs' monitoring agreements with counsel provide an additional basis for finding them to be inadequate class representatives. Although *Iron Workers* expressed concern over the monitoring agreements used by plaintiffs in that case, the court eventually appointed as lead plaintiff a state pension system that participated in numerous such monitoring agreements. "[A]s many courts have noted, the provision of the PSLRA restricting the use of professional plaintiffs was largely directed at private individuals, and courts have routinely waived the restriction in the case of qualified institutional investors." *Id.* at 467 (collecting cases). The Court thus rejects Defendants' argument.

As the Court has concluded that both Macomb County and St. Clair are adequate class representatives, it need not address Defendants' arguments that St. Clair cannot replace Macomb County as a Lead Plaintiff without violating the PSLRA—Macomb County remains the Lead Plaintiff.

## C.     Predominance

Defendants also argue that Plaintiffs cannot meet their burden of establishing share price inflation, reliance, materiality, and loss causation. Although not couched in terms of the predominance requirement of Rule 23(b)(3), Defendants are essentially arguing that Plaintiffs cannot establish the predominance of common issues of fact. To the extent that these arguments relate to the final merits of Plaintiffs' claims, these arguments are more appropriately raised at

the summary judgment stage.

As Defendants note, "class members need not prove reliance on an individualized basis—class reliance will be presumed—'if plaintiffs can show that the alleged misrepresentation was material and publicly transmitted into a well-developed market.'" *Makor*, 256 F.R.D. at 595 (quoting *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008). From this, Defendants argue that Plaintiffs cannot proceed as a class without first demonstrating share price inflation, materiality, and reliance, (R. 102-1 at 19–20), and for similar reasons, loss causation. (*Id.* at 24.) In support, Defendants cite two cases dealing with a motion to dismiss for failure to state a claim, and a motion for judgment on the pleadings. *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 827 (7th Cir. 2007); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645 (7th Cir. 1997).

Although Defendants have correctly stated the law, these arguments do not suggest that class certification is inappropriate. Defendants essentially argue that Motorola's alleged misstatements were not material and did not produce share price inflation, and thus Plaintiffs cannot rely on the fraud-on-the-market theory of class-based reliance or establish that the alleged misstatements caused Plaintiffs' loss. These defenses are not unique to Plaintiffs—they apply to the class as a whole. In other words, Defendants' arguments demonstrate that common issues of law and fact *do* predominate and that class certification is proper. Practically speaking, these arguments preview Defendants' likely arguments at the summary judgment stage. Whatever the difficulties with Plaintiffs' case, however, "a court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits." *Loeb Indus.*, 306 F.3d at 480. Plaintiffs thus have met their burden of establishing that class certification is appropriate.

20

**CONCLUSION**

For the foregoing reasons, the Court grants Plaintiffs' motion for class certification.

Pursuant to Rule 23, the Court certifies the following class:

> All persons and entities who purchased or otherwise acquired the publicly-traded securities of Motorola, Inc. from July 19, 2006 through January 4, 2007, excluding (1) Defendants and their immediate family; (2) any entity in which Defendants have or had a controlling interest; (3) Officers and Directors of Motorola, Inc.; and (4) the legal representatives, heirs, successors, or assigns of any excluded party.

DATED:   August 25, 2009                    **ENTERED**:

                                            _____
                                            AMY J. ST. EVE
                                            United States District Court Judge

21