# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| ERIC SILVERMAN, On Behalf of Himself and All Others Similarly Situated, | No. 1 :07-cv-04507 **(Consolidated)** |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | Judge St. Eve |
| MOTOROLA, INC., et al., | Magistrate Judge Mason |
| Defendants. | |

## DEFENDANTS' ANSWER TO SECOND AMENDED COMPLAINT

Defendants Motorola, Inc., Edward J. Zander, David W. Devonshire, Ronald G. Garriques, Gregory Q. Brown, Daniel M. Moloney, Richard N. Nottenburg, and Padmasree Warrior (collectively, "the Defendants"), by and through their undersigned counsel, hereby answer the Second Amended Complaint ("Complaint") in the above-captioned action as follows:

In addition to the numbered paragraphs, the Complaint contains various section headings. No response is required to these headings. To the extent a response is required, Defendants deny any allegations contained therein.

Defendants note that on September 23, 2008, this Court issued an order granting, in part, their Motion to Dismiss, and that Order dismisses certain of Plaintiffs' claims and allegations. Defendants answer the Complaint in its entirety, but reserve their right to assert that certain claims or allegations are no longer valid in light of the Court's September 23, 2008 Order.

**COMPLAINT ¶1:**

This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly-traded securities of Motorola, Inc. ("Motorola" or the "Company") from July 19, 2006 through January 4, 2007, inclusive (the "Class Period"), against Motorola and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). On August 25, 2009, the Court certified this case as a class action pursuant to Fed. R. Civ. P. 23, appointing Macomb County Employees' Retirement System and St. Clair Shores Police and Fire Pension System as class representatives (collectively referenced as "plaintiffs").

**ANSWER:**

Defendants admit the allegations of Paragraph 1 of the Complaint.

**COMPLAINT ¶2:**

Plaintiffs allege the following based upon the investigation undertaken by counsel, analysis of publicly available news articles, press releases and analyst reports, U.S. Securities and Exchange Commission ("SEC") filings and other regulatory filings, and other public statements issued by the Company and the defendants regarding Motorola. Allegations of falsity and scienter are based upon documents produced by defendants and various non-parties, as well as sworn deposition testimony obtained during discovery to date. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity to complete discovery.

**ANSWER:**

Defendants lack sufficient information to form a belief as to the truth of the allegations of

Paragraph 2 of the Complaint, which is therefore deemed denied.

**COMPLAINT ¶3:**

Defendant Motorola builds, markets and sells products, services and applications that make connections to people, information and entertainment through broadband, embedded systems and wireless networks. The Company has three primary business segments: Mobile Devices, Networks and Enterprise and Connected Home Solutions. During the Class Period, Mobile Devices was responsible for approximately 70.0% of the Company's revenues and operating earnings. Mobile Devices was responsible for the development and marketing of the Company's "3G" cellular handsets.

**ANSWER:**

Defendants admit the allegations of the first and second sentences of Paragraph 3 of the Complaint, except to state that Motorola's Networks and Enterprise business is now known as Enterprise Mobility Solutions and that its Connected Home Solutions business is now known as Home & Networks Mobility. Defendants deny the allegations of the third sentence of Paragraph 3 of the Complaint. Defendants admit the allegations of the fourth sentence of Paragraph 3 of the Complaint.

**COMPLAINT ¶4:**

"3G" is an industry abbreviation for third-generation networks. These high-capacity radio access wireless networks provide users with enhanced data services, improved Internet access and increased voice capacity. In December 2005, according to the Global Mobile Suppliers Association, 100 3G networks were operating in 40 countries. During 2006, and thereafter, the number of functional 3G networks around the globe has increased dramatically. According to Standard & Poor's Industry Surveys, 2006 was a critical year for the industry's transition to 3G products, as well as handset manufacturers' ability to meet growing demand for high-end mobile devices:

> In 2006, an important technological transition will occur . . . . There will be an estimated 110 million 3G users in the United States, compared with 95 million 1G/2G/2.5G subscribers by year-end. This trend is similar to what has occurred in Japan, Korea and Western Europe.

Defendants knew or recklessly disregarded that Motorola would miss this key inflection point, but failed to inform investors during the Class Period.

**ANSWER:**

Defendants admit the allegations of the first and second sentences of Paragraph 4 of the Complaint. Defendants refer to the referenced and quoted documents for their full and complete contents and deny any allegations of the third, fourth and fifth sentences of Paragraph 4 of the Complaint inconsistent therewith. The sixth sentence of Paragraph 4 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is

required, Defendants deny the allegations of the sixth sentence of Paragraph 4 of the Complaint.

Defendants deny the remaining allegations of Paragraph 4 of the Complaint.

## COMPLAINT ¶5:

Throughout the Class Period, defendants engaged in a fraudulent scheme whereby they issued materially false and misleading statements and omissions regarding the status of Mobile Devices' 3G product portfolio and Motorola's business and financial results. This scheme enabled the Individual Defendants to sell $26.5 million of their personal Motorola stock during the Class Period at artificially inflated prices and to be awarded more than $29.3 million in salary and incentive-based compensation during 2006.

## ANSWER:

Paragraph 5 of the Complaint states legal conclusions and argument to which no response

is required. To the extent a response is required, Defendants deny the allegations of Paragraph 5

of the Complaint.

## COMPLAINT ¶6:

During the relevant time period, the Company's Mobile Devices segment was completely reliant on a single vendor, Freescale Semiconductor, Inc. ("Freescale") for the production of integrated circuits ("ICs" or "chips") for utilization in the Company's new 3G UMTS/HSDPA handsets (hereinafter, "3G handsets"). Motorola spun-off Freescale in December 2004 in an initial public offering. As part of the transaction, Freescale obtained the exclusive right to supply ICs to Motorola for use in the Company's "high-end" 3G handset portfolio. At all relevant times, those chips were the Argon (cancelled in 3Q05), Argon+, ArgonLV, Argon+ POP and ArgonLV POP (collectively, "Argon" or the "Argon chips"). Unbeknownst to investors, however, throughout 2006 the development and manufacturing of the Company's new 3G handsets was plagued by Argon quality and functionality issues and related hardware and software problems.

## ANSWER:

Defendants deny the allegations of Paragraph 6 of the Complaint except admit that

Freescale Semiconductor produced integrated circuits ("ICs" or "chips") for utilization in

Motorola's 3G UMTS/HSDPA handsets, that Motorola spun-off Freescale in December 2004 in

an initial public offering and that Freescale supplied or intended to supply Motorola with chips

called Argon, Argon +, ArgonLV, Argon+ POP and ArgonLV POP.

**COMPLAINT ¶7:**

Beginning in 2005 and throughout the Class Period, Freescale repeatedly failed to deliver commercially viable Argon chips to Motorola on a timely basis.  The consequences were disastrous.  The Argon chip failures and related problems created a "huge product hole" in the Company's critical 3G handset portfolio throughout the year.  For instance, delays to the development and delivery of Argon chips resulted in Motorola failing, three times, to deliver a 3G handset – known as the Carina – to Cingular Wireless for introduction in the North American market during the first three quarters of 2006.

**ANSWER:**

Defendants deny the allegations of Paragraph 7 of the Complaint.

**COMPLAINT ¶8:**

The product hole in the Company's 3G product portfolio during 2006 was a talisman of ill winds blowing in the direction of the Company's ability to consistently deliver record, double-digit operating earnings.  Motorola's competitors, Nokia and Samsung, had already introduced the highly desired 3G handsets in various global markets by May 2006.  Because of the Argon failures and related development problems, Motorola had no new, high-tier handsets to compete with the latest 3G offerings from Nokia and Samsung.  As a result, during 3Q06 and 4Q06, Motorola was forced to manufacture and sell millions of 2G handsets at increasingly lower prices to compensate carriers for the failure to timely deliver the Argon-based 3G handsets and create the appearance of robust handset sales and market share gains.

**ANSWER:**

Defendants deny the allegations of Paragraph 8 of the Complaint.

**COMPLAINT ¶9:**

By June 2006, the weaknesses in the Company's 3G product offering had created an operating earnings "gap" that was internally projected to exceed $1.0 billion during 2H06.  By July 2006, the $1.0 billion operating earnings gap had grown to over $1.1 billion according to Motorola's internal analyses.  By early July 2006, defendants internally discussed how the one-year slip in the Argon chip delivery was a monstrous issue, which had cost the Company hundreds of millions of dollars in the first two quarters of 2006 and from which there would be no relief in 3Q06.  At the same time, defendants knew that it was highly unlikely – *at best* – that the Company's new Argon- based 3G handsets would contribute to earnings in 4Q06 due to Argon unremitting development delays and cost issues.

**ANSWER:**

Defendants deny the allegations of Paragraph 9 of the Complaint.

**COMPLAINT ¶10:**

At the beginning of the Class Period, therefore, it was clear to defendants that the development of the Company's Argon-based 3G handsets was far behind schedule and that Mobile Devices' ability to sustain high quality earnings, based on handset sales, had materially changed for the worse.  In communications with the public, however, defendants continued to assure analysts and investors that the 3G product portfolio was "on track" and that Mobile Devices would deliver record, double-digit operating earnings during 3Q06 and 4Q06 based on increased market share for handset sales, including the purportedly forthcoming high-tier 3G devices.

**ANSWER:**

Defendants deny the allegations of the first sentence of Paragraph 10 of the Complaint.

Defendants refer to the referenced and quoted documents for their full and complete contents, and deny any allegations of the second sentence of Paragraph 10 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 10 of the Complaint.

**COMPLAINT ¶11:**

Repeated Argon functionality and supply problems resulted in the Company's planned 3G handsets – including, but not limited to, the RAZR xx (IZAR), RAZR Maxx (Volans), Scorpius, Rocket, Sagitta, KRZR U, RANA U, Espoo and Carina – not being on track for timely delivery during 2006.  Notably, to allow time for manufacturing to ramp up and get the handsets to the market in time and in volume for critical selling seasons, Motorola originally scheduled most of these handsets to be delivered to key carriers in Europe, North America and Japan between 1Q06 and 3Q06.  The failings of the Argon chips and related development problems foiled that plan and exacerbated the Company's internally projected earnings gap in 3Q06 and 4Q06.  Indeed, the RAZR xx, RAZR Maxx, Scorpius, Rocket and Sagitta handsets were not even on track for timely delivery in sufficient quantities during the 2006 holiday selling season (defined by Motorola as "Selling Season 2 – Major") as a result of the persistent Argon quality and functionality problems.  Making matters worse, continuous Argon failings delayed other critical, late-stage product development schedules.  For instance, in 3Q06 and 4Q06, Argon chip development problems materially delayed the development and integration of a reliable version of Motorola software system, "P2K," upon which the 3G handsets were to operate.

**ANSWER:**

Defendants deny the allegations of Paragraph 11 of the Complaint.

**COMPLAINT ¶12:**

Rather than disclose the truth about the collapse of Motorola's earnings potential, the persistent development problems with the Argon platform or the fact that the Company's new 3G

handset portfolio was not on track, defendants persisted in their fraudulent conduct and covered-up the Company's resulting earnings gap. In the last few days of 3Q06, defendants executed two highly unusual, 98.7% profit, intellectual property ("IP") licensing transactions valued at $440.0 million for the purpose of obfuscating the fact that the Company's 3G portfolio was in tatters and was materially affecting Motorola's handset margins and financial results. Instead of manufacturing and selling Argon-based 3G handsets, moreover, the Company was still spending hundreds of millions of dollars on SG&A and R&D expenses for the new 3G portfolio. The IP licensing transactions dramatically boosted the Mobile Devices segment's and Motorola's consolidated earnings (and revenue) and concealed the impact of problems with the Company's 3G business. In accounting for and disclosing the 3Q06 IP transactions, defendants also violated numerous provisions of U.S. Generally Accepted Accounting Principles ("GAAP"). Without the two IP licensing deals, Motorola's 3Q06 earnings would have been cut by at least 40.0%, exposing the impact of the 3G failures and leading to increased scrutiny of the Company's financial performance.

**ANSWER:**

Defendants admit that Motorola entered into two intellectual property ("IP") transactions in 3Q06 and deny the remaining allegations of the first, second, third, fourth and sixth sentences of Paragraph 12 of the Complaint. The fifth sentence of Paragraph 12 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of the fifth sentence of Paragraph 12 of the Complaint.

**COMPLAINT ¶13:**

With regard to the Company's Argon-based 3G portfolio, defendants' false and misleading Class Period statements, as well as statements and conduct that triggered defendants' duty to disclose the truth about the 3G portfolio, include: (1) *"DO and UMTS/HSDPA"* unit sales are *"up 55% quarter over quarter"*; (2) *"You will see some very competitive second-year [sic] product launches that are on track"*; (3) *"Motorola's UMTS and HSDPA roadmap for the second half of this year . . . is quite on track"*; (4) *"Today . . . the products that you saw get announced are running on [the Argon] platform"*; and (5) *"The big products for us – [RAZR] XX, [RAZR] MAXX, RIZR and the two versions of the MOTOFONE – I feel very good, and don't feel supply constrained ramping those up in Q4."*

**ANSWER:**

Paragraph 13 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 13 of the Complaint.

## COMPLAINT ¶14:

Throughout the Class Period, analysts covering Motorola echoed defendants' false and misleading statements and espoused the importance of the Company's new 3G product portfolio. For instance, on July 25, 2006, Cowen & Company noted, "We walked away from Motorola's 7/24 evening event even more confident in the company's product portfolio, especially in 3G . . . [S]urprises last night included . . . the V3 MAXX and the V3 XX." The same day, Oppenheimer observed, "Motorola unveiled [the] RAZR MAXX [and ] RAZR XX . . . . We believe that these innovative new models will probably extend Motorola's design leadership and will help to solidify the company's 4Q06 earnings." On July 26, 2006, CIBC added:

> In the past, investors were concerned that Motorola's fortunes are linked to a single product – no more.  The RAZR is getting a facelift and [it] will morph in technology (HSDPA) . . . . We now feel comfortable in our shipments targets for the company . . . and believe upside is likely.

## ANSWER:

Defendants deny the allegations of the first sentence of Paragraph 14 of the Complaint. Defendants refer to the quoted documents for their full and complete contents, and deny any allegations of the second, third and fourth sentences of Paragraph 14 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 14 of the Complaint.

## COMPLAINT ¶15:

With regard to the Company's 3Q06 reported operating earnings, defendants' false and misleading Class Period statements include: (1) "*IP and platform licensing . . . this year has grown at the same rate as our sales has grown*"; (2) "*We have grown our revenue from licensing of technologies and platforms, consistent with our revenue growth . . . from last year to this year*." Further, defendants Zander, Garriques and Devonshire repeatedly assured investors that the Company's 3Q06 financial results and, in particular, Motorola's operating earnings, were presented in conformity with GAAP.  These statements, in conjunction with the 3Q06 IP transactions, covered up the fact that the Company's failure to deliver an Argon-based 3G handset to market in 2006 was already having a material impact on Motorola's handset margins and financial results.

## ANSWER:

Defendants deny the allegations of Paragraph 15 of the Complaint.

**COMPLAINT ¶16:**

Analysts were no less impressed with Mobile Devices' reported 3Q06 operating earnings. Reuters said: "One bright spot was . . . wireless profit margins, which rose to 11.9 percent in the third quarter from 11.2 percent in the second quarter. 'It does look like the big concern over margins is placated.'" Bernstein Research added: "Handset margins are the bright spot in the quarter . . . Motorola's 11.9% 3Q06 handset margins . . . were better than we and consensus had anticipated, likely driven by enhanced efficiencies resulting from increased concentration on the RAZR platform."

**ANSWER:**

Defendants lack sufficient information to form a belief as to the truth of the allegations of

the first sentence of Paragraph 16 of the Complaint, which is therefore deemed denied.

Defendants refer to the quoted documents for their full and complete contents and deny any

remaining allegations of Paragraph 16 of the Complaint inconsistent therewith.  Defendants deny

the remaining allegations of Paragraph 16 of the Complaint.

**COMPLAINT ¶17:**

During the Class Period, and at the time defendants made their statements regarding Motorola's Argon-based 3G products and handset operating margins, they knew of, or recklessly disregarded, *inter alia*, the following material adverse facts:

A.    By September 30, 2005, Freescale failed to deliver a commercially viable Argon chip to Motorola, as originally planned.  Freescale's failure to timely deliver a functional Argon chip had a catastrophic effect on Motorola, including, but not limited to, its ability to get Argon-based 3G handsets to customers throughout 2006, the Company's 2006 financial performance and its business relationships with powerful customers who were leading the 2G to 3G market transition during 2006;

B.    On November 16, 2005, Vodafone, Motorola's most important customer in Europe, expressed its concerns about the status of the Company's 3G handset portfolio for 2006.  On that day, Peter Bamford, Vodafone's Chief Marketing Officer, informed defendant Garriques:

> I have now had a debrief from Jens [Schulte-Bockum, Vodafone's Global Director of Terminals] after his discussions with you and your team last week in Chicago. ***I understand that he shared our concerns for the short term, especially the lack of new 3G products coming out***

9

> *in H1 2006, which will weaken Motorola's position with Vodafone.*
>
> <div align="center">*   *   *</div>
>
> I was therefore astonished to hear that you have dropped the Sagitta [Argon-based] from your portfolio without any notice and without any satisfactory explanation or alternative. Frankly, against all our recent discussions, including the one you and I had face to face at the end of October, this decision is neither understandable nor acceptable. We strongly believe that there is a real need for a dedicated music device in our portfolio in addition to the RAZR and KRZR 3G variants.

In response to Mr. Bamford's complaints, Motorola's Account Director for Vodafone, Gary Morrison, lamented: "Jens Schulte-Bockum . . . delivered the same blunt message . . . . *At present our UMTS/Vodafone roadmap for 2006 now consists of only one product: RAZR U [Argon-based] and the low cost HSDPA device RCKT [a/k/a the Argon-based "Rocket"] KRZR U [Argon-based] is a December product and will therefore miss Christmas, and SLVR U [Argon-based] is uncompetitive*."

C.    In January 2006, Vodafone continued to express its deep skepticism regarding the Company's ability to timely deliver 3G handsets during 2006. Specifically, Motorola's Account Director for Vodafone, Gary Morrison, noted that 2005 was "*the third year running we have let [Vodafone] down very badly at Christmas*. This was particularly acute this year as VF have committed to achieving 10M 3G subscribers by March and we essentially missed the Xmas selling season with V3x . . . . *As things stand, VF plan to manage down Motorola's new product volumes in Q4'06 to reduce risk to their financial results*";

Knowing that Motorola did not have a single Argon-based 3G handset to offer its customers during 1H06, Morrison added: "*[Vodafone] are particularly alarmed that all the new 2006 device launches have slipped into Q4* . . . ." Notably, Morrison listed each 3G handset delivery commitment that had recently slipped from 3Q06, as committed to Vodafone, to 4Q06, including the Volans (*i.e.*, the Argon-based RAZR Maxx), and the Argon-based handsets Sagitta, KRZR U and Rocket.

Morrison concluded: "*Furthermore, they feel that introduction of new HW platform in 3G (Argon) presents even more risk to the schedule. In summary, they are extremely concerned that 2006 will proceed as per 2005, and think only huge financial penalties in the form of 50 million bond held in escrow will force us to perform better*";

D.      By April 2006, and continuing through the Class Period, Freescale was at least seven months behind plan in delivering commercially viable Argon chips because of serious operational defects, including silicon warping;

E.      Throughout the Class Period, Motorola kept statistical analyses which indicated that none of the Argon-based handsets, including the RAZR Maxx and RAZR xx, were on track for timely delivery to customers in 3Q06 or 4Q06.  The "Monte Carlo" statistical analyses, which were contained in the Company's "M-Gate" documents, tracked handset development and were available to defendants on the Company's "Compass" document database.  For instance, beginning in July 2006 and throughout the Class Period, Monte Carlo analyses indicated that it was highly unlikely (*e.g.*, 1.0% chance or less) that the Company would be able to deliver the RAZR xx family of handsets to various customers and global markets in time to generate material sales to major customers during the 2006 holiday selling season ("Selling Season 2 – Major") and only a 24.0% probability Motorola would deliver the IZAR Japan to DoCoMo by October 19, 2006;

        According to testimony provided by Paul Smith, Director of Razz xx (IZAR Global), and Kathy Winter, Vice President of P2K Software Products, Motorola continued to use the Monte Carlo analyses throughout the Class Period and through 2009 to determine the probability of the Company timely delivering products, including the Argon-based 3G handsets, to customers.  According to Paul Smith, during the Class Period, he was personally responsible for sensitivity checks ("sense checks") of the Monte Carlo input data for the 3G products he was involved with to ensure that it was not "wildly aggressive" and would produce reasonable outputs for the product and quality teams.  Paul Smith added that during the Class Period his IZAR Global team regularly analyzed the Monte Carlo analyses to "fix the assumptions" and input data to assure the model's reliability;

F.      Throughout the Class Period, Motorola kept documents that tracked the development schedule of each Argon chip and indicated that they were months behind schedule as a result of continuous warping problems.  The "IC PM Slides" reports were available to defendants on the Company's "Compass" document database.  Specifically, beginning in July 2006 and throughout the Class Period, the IC PM slides indicated that the Argon+ POP and ArgonLV POP were classified as "high risk" by Motorola Program Managers and had not been qualified for use in the Company's handsets due to warping and other related problems;

G.      Throughout the Class Period, Motorola kept documents that tracked the status and development of the 3G common circuit-board upon which the Argon chip, other chips manufactured by Freescale (such as the "Atlas") and the Company's P2K software operated (hereinafter, "Argon platform").  These "Weekly Argon Platform Executive Summary" reports were available to defendants and posted weekly to the Compass document database.  The reports indicated that the Argon platform qualifications were months behind schedule throughout 2006, due to

chip warping as well as Argon/Atlas interoperability failures. The reports also indicated that the Argon platforms repeatedly suffered development and qualification delays throughout the Class Period;

H.   On April 20, 2006, defendant Garriques sent an email to one of his direct reports, Bruce Brda, Corporate Vice President of Mobile Devices, instructing him to inform defendant Zander that the Company's 3G product portfolio was an "***F'UP with Freescale***";

I.   In May 2006, defendants Garriques and Zander informed Cingular Wireless that the Company's 3G product portfolio was a "***bust***" across "***all of our product line***s" as a result of Argon chip failings, and that, as a result, the Company would "***very aggressive[ly] pric***e" ***2G handsets to*** "***advantage [Cingular] in the marketplace***" as a concession for 3G delays and problems.

Cingular's senior management immediately noted in response to defendants' May 2006 admission, "I don't know what it would have taken for them to get out of their FreeScale commitment and source an HSDPA chipset from Qualcomm instead. The net result is that they chose not to and ***we are delayed by a full year . . . . Their attitude is that 'there is nothing we can do . . . so let's just move on'***";

J.   By May 2006, Motorola had failed three times to deliver a functional Argon-based 3G handset, known as the "Carina," to Cingular Wireless because of the defective Argon+ chip and related problems. Cingular Wireless planned to begin selling this handset in North America beginning in 1Q06, 2Q06, then in 3Q06, but cancelled the project on May 22, 2006 due to delivery delays and Cingular Wireless' concern that, by the time it could be delivered, the Carina would not be competitive with Nokia and Samsung 3G product offerings currently in the market;

K.   During May 2006, defendants Garriques and Zander discussed and presented the 3G RAZR xx to Cingular Wireless executives knowing there was at least a 50.0% likelihood that Motorola would fail to deliver the Argon-based 3G handset to the North American market by late November 2006, let alone by the target date of October 1, 2006. Defendants Zander and Garriques were also forced to offer RAZR xx to Cingular at a deep discount as a "make-good" for Motorola's repeated failures to deliver an Argon-based 3G handset in 1Q06, 2Q06 and 3Q06.

According to the testimony of several Motorola-related witnesses and numerous documents in this case, the October 1 delivery date was critical. Each day after October 1 that delivery was delayed, unit sales for "Selling Season 2 – Major" (the "holiday selling season") was negatively impacted. Specifically, Kathy Winter, Motorola's Vice President of Software Development, testified that delivery of handsets in 3Q was important for the purpose of maximizing 4Q revenues. Indeed, documents produced by Motorola state that August delivery is optimal for the purpose of maximizing "Selling Season 2 – Major" revenues;

12

L. **On June 5, 2006, Garriques demanded $600.0 million in compensation from Freescale** as a result of late delivery of the Argon chip, as well as for chip cost concessions, in order "**to ensure competitiveness for Motorola and FSL**";

M. By June 2006, because of the problems and delays with the development of Motorola's 3G handset portfolio and the Company's resulting inability to deliver new handsets until late 4Q06, at best, Garriques was informed that Mobile Devices had forecast an operating earnings miss against defendants' public guidance of $450.0 million during 3Q06 and $600.0 million during 4Q06;

N. On July 6, 2006, Garriques internally acknowledged to Mike Hickey, Mobile Devices' European Regional Customer Solutions General Manager, that "**3G [had] lost 365 M dollars since beginning of the year! We must stop the bleeding!**";

O. On July 8, 2006, Garriques discussed 2Q06 financial results with defendants Zander, Devonshire, Brown and Moloney. Garriques' admission to his co-defendants, made two weeks before the beginning of the Class Period, is stunning: "**As you can see the monster issue is the 1 year slip on Freescale UMTS/HSDPA. We have lost 365 M ytd [year to date]**";

P. By July 24, 2006, Mobile Devices' 3Q06 operating earnings gap had ballooned to over $600.0 million because the Company was selling increasingly higher volumes of 2G handsets to make up for its 3G portfolio gap;

Q. On August 10, 2006, Zander and Garriques personally apologized to Ralph de la Vega for having let "**Cingular down in so many areas**." In that email, Zander and Garriques notified Cingular that RAZR xx would not even be ready for Cingular's test acceptance until "late November," assuming that all necessary Argon and software testing in a nine-week testing window went flawlessly.

In immediate response to Zander and Garriques' apology, Cingular executives provided numerous prescient observations, including, "**Ralph [de la Vega] ha[s] been briefed on the chances (slim) of the IZAR ever making the schedule they are touting**"; "**Ralph [de la Vega] had a lot of concern about IZAR timeline. . . . it doesn't look . . . that they will make it**"; and "**Hope Ed Z. doesn't have expectations that [IZAR] will be our holiday driver**";

R. In the last few days of September 2006, in order to fill Mobile Devices' 3Q06 earnings gap, Motorola entered into two 98.7% profit IP licensing transactions valued at approximately $440.0 million. As a result, Motorola's 3Q06 IP licensing profits spiked approximately 200.0% year-over-year, and 300.0% quarter-over-quarter.

One IP deal, valued at approximately $165.0 million, was with Freescale. Motorola demanded that the vendor execute the transaction and pay nearly all of the $165.0 million "up-front" as partial restitution for ongoing Argon problems. The other deal, valued at approximately $275.0 million, was with QCOM.

13

Qualcomm entered into this deal for the purpose of winning Motorola's high-and low-tier 3G UMTS business and obtaining Motorola's pledge to increase the number of UMTS chips Motorola acquired from Qualcomm, year-over-year, through 2009;

S.   On September 29, 2006, Motorola representatives, including Tony Belkin, Senior Director of 3G Mobile Platform Realization, and Mike Hader, Senior Director 3G Engine Software, met with Freescale representatives to discuss issues with the Argon chip.  During that meeting, Motorola informed Freescale that the most recent Argon chip failure was the:

> *[M]ost severe issue [Motorola] has ever faced this late into a program.  [As a result] MDB has already missed a field testing deadline with Cingular, and are desperate to get an extension…He also said if its [sic] not fixed asap Cingular will refuse phones in Q4 which would be a disaster…. [The MDB team] are required to send daily updates to Ron Gariques [sic].*
>
> *…I just wanted to sensitize you to how serious this issue is and to make sure our management is briefed*;

T.   On November 15, 2006, Cingular Wireless informed Motorola that it had cancelled the RAZR xx for 4Q06.  The following day, Garriques paid a personal visit to Cingular Wireless' senior management and admitted that the Company had failed in its 3G handset delivery commitments throughout 2006, blaming Freescale' s failure to deliver functional Argon chips in a timely fashion;

U.   *On November 27, 2006, Ray Roman, Mobile Devices' Senior Vice President of "Go to Market," confirmed to defendant Garriques that Motorola had been filling a 3G hole with low-profit 2G handsets in the U.S. and European markets during 2006 in order "to make the revenue numbers."*  Mr. Roman further confirmed that Nokia was deploying 3G profits it had earned in Europe (due to the absence of competitive Motorola 3G handsets) to fund average selling prices ("ASPs") cuts in 2G markets and attack Motorola in those 2G markets.  In light of those facts, Mr. Roman stated, *"we only see our way to $500.0 million [of] OE FOR Q4.  THIS IS A DISASTER"*;

V.   On November 28, 2006, Tom Okada, Mobile Devices' Vice President and General Manager Japan, informed Arnie Grever, Mobile Devices' Senior Director of 3G Japan Products, that the Company had placed a stop ship on RAZR xx and Scorpius handsets intended for the Japanese market as a result of ongoing problems with Argon chips.  Mr. Okada noted, "*this Freescale issue [is] a serious show stopper . . . Scorpius [Argon-based] delayed a year and still cannot ship*";

W.   By December 31, 2006, due to abysmal 3G handset revenues, the 3G handset business suffered an $810.0 million operating earnings loss for the year;

X.   On January 2, 2007, with respect to IZAR Japan (*i.e.*, RAZR xx) and Scorpius, Motorola ordered "all Argon chipset based products to [be] quarantined . . . and [to send] parts back to [Freescale] for rescreening"; and

Y.   On January 2, 2007, Motorola internally concluded: ***"We have been undermined in our efforts to get a 3G (UMTS) business going by Freescale's lateness and quality issues. Getting periodic restitution payments is not good for our long term business."***

**ANSWER:**

Paragraph 17 of the Complaint and its subparagraphs A through Y state legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 17 of the Complaint.

**COMPLAINT ¶18:**

Defendants' fraud succeeded in artificially inflating the price of the Company's securities, as well as delaying the truth about the readiness of Motorola's 3G product portfolio and the strength of Mobile Devices' core business. Defendants' fraudulent scheme and its effect on Motorola's stock price during the relevant period is demonstrated in the stock chart attached as Exhibit A.

**ANSWER:**

Paragraph 18 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 18 of the Complaint (including Exhibit A to the Complaint).

**COMPLAINT ¶19:**

Beginning with Motorola's October 17, 2006 3Q06 earnings conference call, investors slowly began to learn the truth about the Company's 3G handset portfolio problems and the impact those problems had on Motorola's results. On that day, defendants reported that the Mobile Devices segment suffered a $500.0 million revenue miss due, in part, to weakness of 3G sales in Europe. Defendants' internal documents confirm that the miss caused by the delays to the Argon-based 3G phones was material. For instance, Motorola's "Q3 Autopsy" indicates that Mobile Devices had forecast the sale of 894,400 units of the Argon-based IZAR Global 3G handset (*i.e.*, RAZR xx) in Europe at an ASP of $300 per unit, but sold none – representing a $268.5 million revenue miss. Mobile Devices' September 2006 Financial Summary identifies that Motorola also forecast the sale of 235,000 units of the Argon-based Carina 3G handset at an ASP of $203 for 3Q06, but actually sold none – representing a $47.7 million loss in revenue. On

the first trading day after defendants' announcement, Motorola's stock dropped by 5.0% on heavy volume.

**ANSWER:**

Defendants admit that Motorola held its quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006, refer to the transcript of that call for its full and complete contents, and deny any allegations of the first and second sentences of Paragraph 19 of the Complaint inconsistent therewith.  Defendants refer to the referenced documents for their full and complete contents and deny any allegations of the third, fourth and fifth sentences of Paragraph 19 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 19 of the Complaint.


**COMPLAINT ¶20:**

To suppress negative investor reaction and allay concerns about the 3G handset business, defendants artificially boosted earnings and handset margins with the 3Q06 IP licensing transactions.  At the same time, during the 3Q06 earnings conference call, defendants assured investors that the next-generation, Argon-based handsets were on track and ramping up for 4Q06 and would contribute to double-digit operating earnings during the quarter.

**ANSWER:**

Defendants deny the allegations of the first sentence of Paragraph 20 of the Complaint.  Defendants refer to the transcript of Motorola's quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006 for its full and complete contents and deny any allegations of the second sentence of Paragraph 20 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 20 of the Complaint.


**COMPLAINT ¶21:**

Beginning in early November 2006, however, there were scattered reports about the lack of Argon-based 3G handsets in various global markets.  For instance, on November 7, 2006, Lehman Brothers reduced its price target on the Company's stock based upon an independent check of the availability of Motorola's RAZR xx and RAZR Maxx handsets in various channels in Europe.  As a result of the Lehman Brothers report, the Company's stock price dropped 6.0%

16

on November 7 and November 8, 2006. Again, defendants moved to blunt the impact of this news and cover-up the problems with the 3G product portfolio. Immediately following the November 7, 2006 Lehman Brothers report, Oppenheimer's analyst Lawrence Harris and Motorola's Investor Relations department (either Ed Gams or Michael Ferraro) had a conversation concerning the Lehman Brothers report and concerns regarding the availability of the Company's new 3G handsets. During that conversation, Motorola assured Mr. Harris that any concerns were "wrong," "don't worry, things are fine" and "we're on track, the quarter is good."[1] On November 10, 2006, based on information provided to Mr. Harris, and only Mr. Harris, by the Company's Investor Relations Department, Oppenheimer issued a report entitled "*Reiterate Buy – New Model Availability Expected to Improve Significantly.*"

**ANSWER:**

Defendants refer to the documents or testimony referred to and/or quoted in Paragraph 21 of the Complaint for their full and complete contents and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of Paragraph 21 of the Complaint (including the footnote).

**COMPLAINT ¶22:**

Ultimately Motorola was only able to ship a fraction of the Argon-based 3G handsets it had planned to in 4Q06 because it had drastically missed the October 1 delivery target necessary to maximize sales during Selling Season 2 – Major, to primary customers in key geographic markets. As a result of the delays and development problems, Motorola failed to deliver a single Argon-based 3G handset to its most important customer in North America, Cingular. By November 30, 2006, Motorola's most important customer in Europe, Vodafone, had received only 11,750 units of RAZR xx. On November 30, 2006, Motorola shipped its first batch – a paltry 2,000 units – of RAZR Maxx to this critical carrier in Europe. During the final weeks of 2006, because European demand for the Company's 3G product offerings was so weak due to the long-delayed roll-out, Motorola began redirecting minor shipments of RAZR Maxx to a much smaller carrier in Australia, Telstra, in a desperate effort to offset lost share in Europe and the U.S. as a result of delivery delays. Even Telstra officials, however, personally complained to defendant Zander that Motorola failed in its delivery commitments and, as a result, suffered market share losses. It was not until December 12, 2006 that Motorola shipped the RAZR xx or Scorpius to DoCoMo, and those handsets were particularly plagued by Argon chip defects. By the end of 2006, as a direct consequence of the collapse in the Company's 3G product portfolio, Motorola was only able to get 725,000 Argon- based 3G handsets into the market. Unbeknownst

---

[1] On November 9, 2006, Motorola Investor Relations officers (*i.e.*, either Ed Gams or Michael Ferraro) privately met with a limited group of Prudential Equities investors to discuss the Company's 3Q06 financial results. During that private meeting, Company representatives admitted that the 3G market share loss in Europe during 3Q06 was the direct result of late delivery of the Argon chip from Freescale, but failed to disclose the impact the Argon delays and related problems had on Motorola's financial results.

to investors, by the end of 2006, the "*bust*" in Motorola 3G product portfolio had cost them $831.0 million dollars in operating earnings losses.

**ANSWER:**

Defendants admit that Motorola shipped units of the RAZR xx and RAZR Maxx to Vodafone in November 2006.  Defendants admit that Motorola shipped units of the RAZR Maxx to Telstra in 2006.  Defendants admit that Motorola shipped units of the Scorpius to DoCoMo in December 2006.  Defendants deny the remaining allegations of Paragraph 22 of the Complaint.

**COMPLAINT ¶23:**

On January 4, 2007, defendants' Class Period scheme continued to unwind.  Following the close of the market, Motorola pre-announced that Mobile Devices had suffered an earnings miss in 4Q06 of approximately $350.0 million.  The Company attributed the miss to "an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast." The following day, several equity analysts reported that Mobile Devices' weak "high-end" 3G product offering caused the Company's ASPs and financial performance to decline.  For example, on January 5, 2007, Lehman Brothers explained, "*[w]hat went wrong for Motorola in 4Q? . . . Slower than expected ramp of 3G products in Europe.*" Lehman Brothers further noted that *the 50.0% difference in Mobile Devices' operating earnings from 3Q06 to 4Q06, was also impacted by 3Q06 IP licensing transactions that did not repeat in 4Q06.*  Credit Suisse attributed the miss to the fact that the Company's *new 3G phones "launched too late in Q4 to benefit from a strong holiday season.*" In the trading days immediately following defendants' January 4, 2007 revelations, Motorola's stock price plunged by more than 10.0% on extremely heavy volume.

**ANSWER:**

Defendants refer to Motorola's January 4, 2007 press release and the quoted analyst statements by Lehman Brothers, Oppenheimer, and Credit Suisse for the full and complete contents thereof and deny any allegations of Paragraph 23 of the Complaint inconsistent therewith.  Defendants refer to publicly available sources for Motorola's stock price in January 2007 and deny the remaining allegations of Paragraph 23 of the Complaint.

**COMPLAINT ¶24:**

On January 19, 2007, defendants announced massive layoffs at Motorola to compensate for disappointing 4Q06 financial results.  *USA Today* reported:

Motorola CEO Ed Zander said Friday the cell-phone maker will cut 3,500 jobs, or about 5 percent of its work force, as it moves to improve operating costs after a disappointing fourth quarter.

\*          \*          \*

"It's funny, I keep reading about Razrs being tired," [Zander] told analysts on an earlier conference call.  "We sold more Razrs in quarter four than in any quarter we ever had.  We now have sold over 75 million Razrs worldwide."

## ANSWER:

Defendants deny the allegations of the first sentence of Paragraph 24 of the Complaint.

Defendants refer to the quoted *USA Today* report for its full and complete contents and deny any

allegations of the second sentence of Paragraph 24 of the Complaint inconsistent therewith.

Defendants deny the remaining allegations of Paragraph 24 of the Complaint

## COMPLAINT ¶25:

Also on January 19, 2007, *Reuters* reported:

Motorola Inc. said on Friday it plans to cut 3,500 jobs and save $400.0 million.

\*          \*          \*

"Our goal is to return to double-digit operating margins in the second half of this year," Chief Executive Ed Zander said during a Webcast of an analysts' conference.

## ANSWER:

Defendants refer to the quoted *Reuters* report for its full and complete contents and deny

any allegations of Paragraph 25 of the Complaint inconsistent therewith.

## COMPLAINT ¶26:

On February 28, 2007, the Company filed its Form 10-K for 2006 with the SEC.  The Form 10-K contained new risk disclosures that were absent from the prior year's Form 10-K, as

well as each Form 10-Q the Company filed in 2006. The new disclosures are set in bold and italics:

> ***Our future operating results may be negatively impacted if we are not successful in licensing our intellectual property***.
>
> ***As part of business strategy, primarily in our Mobile Devices business, we strategically license our intellectual property. Our existing intellectual property may not continue to generate sales and operating earnings at current levels and we may not be successful at licensing new intellectual property***.
>
> Many of our components and products are manufactured by third parties and if third-party manufacturers lack sufficient quality control or if there are significant changes in the financial or business condition of such third-party manufacturers, it may have a material adverse effect on our business.
>
> We rely on third-party suppliers for many of the components used in our products and we rely on third-party manufacturers to manufacture many of our assemblies and finished products. ***If we are not able to engage such manufacturers with the capabilities or capacities required by our business***, or such third parties lack sufficient quality control or if there are significant changes in the financial or business condition of such third parties, it could have a material adverse effect on our business.
>
> We also have third-party arrangements for the design or manufacture of certain products, parts and components. ***If we are not able to engage such parties with the capabilities or capacities required by our business***, or these third parties fail to deliver quality products, parts and components on time and at reasonable prices, we could have difficulties fulfilling our orders and our sales and profits could decline.

As alleged herein, throughout the Class Period, defendants were fully aware that these risks had already materialized and wreaked devastating consequences on the Company's financial performance and prospects.

**ANSWER:**

Defendants admit that Motorola made annual Form 10-K filings and quarterly Form 10-Q filings with the SEC during and for the year ended December 31, 2006. Defendants admit such filings contained risk disclosures. Defendants refer to those Form 10-K and Form 10-Q

documents for their full and complete contents and deny any allegations of the first through third sentences of Paragraph 26 of the Complaint inconsistent therewith.   The fourth sentence of Paragraph 26 of the Complaint states legal conclusions and argument to which no response is required.   To the extent a response is required, Defendants deny the allegations of the fourth sentence of Paragraph 26 of the Complaint.   Defendants deny the remaining allegations of Paragraph 26 of the Complaint.

**COMPLAINT ¶27:**

On March 1, 2007, during the Goldman Sachs Technology Investment Symposium, defendant Zander admitted, that the Company's financial slide in 4Q06 was directly attributable to the failed Argon chips: "[F]reescale cost us big time.  I mean Q4 to me was the inability to execute and have on the shelves at Cingular and Europe the kind of 3G products that they require."

**ANSWER:**

Defendants refer to the transcript of the Goldman Sachs Technology Investment Symposium on or about March 1, 2007 for its full and complete contents and deny any allegations of Paragraph 27 of the Complaint inconsistent therewith.   Defendants deny the remaining allegations of Paragraph 27 of the Complaint.

**COMPLAINT ¶28:**

On March 21, 2007, Motorola disclosed the full extent of the collapse in the Company's 3G business.  On that day the Company pre-announced disappointing 1Q07 revenue and earnings results and projected a loss of $0.07 to $0.09 per share.  Moreover, defendant Zander admitted the Company continued to suffer from problems that were known, but not disclosed, during the Class Period:

> ***[D]elays in some of our newer 3G products, and implementation of our simplified software platform and silicon strategy****. . . .*
> Further, our performance in Europe continues to be below expectations because we had a limited 3G product portfolio.  ***As a result and as you can see in today's press release, Q1 for Mobile Devices will be very difficult and disappointing.  We also anticipate that Q2 will be difficult****.*

\*          \*          \*

*So at the "high end," we need to get our 3G portfolio [out] and
we are starting to ship some products.  It does take a while to
ramp up.*

The artificial inflation caused by defendants' fraud further dissipated from the Company's stock
price in response to these admissions.  In the trading day following March 21, 2007, the
Company's stock price plunged an additional 7.0% on heavy trading volume.

**ANSWER:**

Defendants deny the allegations of the first sentence of Paragraph 28 of the Complaint.

Defendants refer to the referenced press release for its full and complete contents and deny any

allegations of the second sentence of Paragraph 28 of the Complaint inconsistent therewith.

Defendants refer to the quoted document for its full and complete contents and deny any

allegations of the third sentence of Paragraph 28 of the Complaint inconsistent therewith.

Defendants deny the remaining allegations of Paragraph 28 of the Complaint.


**COMPLAINT ¶29:**

On April 2 and 3, 2007, Motorola and Freescale representatives met to discuss numerous
items, including the collapse in the Company's 3G portfolio and demand for Freescale chips.
During that meeting, Motorola informed Freescale that demand for Argon chips, as a result of
Motorola not being able to get competitive 3G handsets to the market in a timely fashion, would
decrease by 33.0%.  Motorola also informed Freescale that it believed it would not recover from
this decrease in demand until 2008, at the earliest.

**ANSWER:**

Defendants deny the allegations of Paragraph 29 of the Complaint.


**COMPLAINT ¶30:**

On April 27, 2007, the *Wall Street Journal* reported:

> *A semiconductor unit Motorola had spun off [i.e., Freescale]
> was having trouble developing new chips for 3G cellphones*.
> [Trouble with the chips] slowed work on [the Company's 3G
> handsets] because Motorola had pledged to buy all cellphone
> chips from the spun-off unit through 2006.  *The deal also meant*

> *Motorola couldn't shop for cheaper chips elsewhere, squeezing profit margins of existing phones.*
>
> *By last summer, executives realized that their hopes of developing a 3G cellphone in a fast two years were probably too ambitious*, it would take at least two quarters longer.  The product wouldn't be available until summer 2007.  *When Cingular Wireless, one of Motorola's biggest customers, launched 3G service . . . Motorola had no handsets to offer*.  Cingular got them from Samsung.  "We let that customer down," Mr. Garriques later said at an analyst meeting.

## ANSWER:

Defendants refer to the quoted *Wall Street Journal* article dated on or about April 27, 2007 for its full and complete contents and deny any allegations of Paragraph 30 of the Complaint inconsistent therewith.

## COMPLAINT ¶31:

The devastation wreaked on Motorola's 3G handset business and quality of earnings throughout the Class Period by Argon chip failures was aptly summarized by Motorola executives on May 3, 2007:

> The Argon chipset was over 1 year late.  It was originally planned to ship around Q3 2005 and did not actually ship until end of 2006.

This caused us to:

> - Totally cancel the Carina project with Cingular which created a huge 3G product hole that created a huge relationship problem that was then fixed by giving them IZAR NA [in 2007] below cost . . . .
>
> - Slip the [DoCoMo] schedule a year which caused lost sales and arguably the whole mess we find ourselves in now.
>
> <p style="text-align:center">*       *       *</p>
>
> *The value of the above is . . . in the 100's of $M.*

**ANSWER:**

Defendants refer to the quoted document for its full and complete contents and deny any allegations of Paragraph 31 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 31 of the Complaint.

**COMPLAINT ¶32:**

Motorola's lack of a competitive, high-end 3G portfolio continued to plague the Company well after the Class Period. On July 12, 2007, *Reuters* reported:

> Market share of the world's top cell phone maker Nokia is rising, industry analysts said, after its closest rival Motorola warned investors of a second-quarter loss and lower sales.
>
> \*       \*       \*
>
> "Motorola's market share is coming down strongly and it could continue . . . As it comes down, Nokia benefits directly from the vacuum in the market left by Motorola," Danske Markets analyst Ilkka Rauvola said.

*"I think this is due to Nokia having ramped up its mid-range and high end products."*

**ANSWER:**

Defendants refer to the quoted *Reuters* article dated on or about July 12, 2007 for its full and complete contents and deny any allegations of Paragraph 32 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 32 of the Complaint.

**COMPLAINT ¶33:**

Indeed, Motorola's failure to timely introduce high-end Argon-based handsets to meet the 3G broadband transition had a devastating impact on the Company and investors. Since 4Q06, not only has Mobile Devices failed to generate a penny of profit, but it has suffered billions of dollars of operating losses.

**ANSWER:**

Defendants deny the allegations of Paragraph 33 of the Complaint.

**COMPLAINT ¶34:**

Since mid-2007, the Company has gone back-and-forth on its decision to spin-off the once highly profitable Mobile Devices segment as Motorola failed to find a purchaser for the segment. On February 11, 2010, Motorola announced its intention to spin-off Mobile Devices as a separate publicly traded business in 1Q11.

**ANSWER:**

Defendants deny the allegations of Paragraph 34 of the Complaint.

**COMPLAINT ¶35:**

The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240. 10b-5).

**ANSWER:**

Paragraph 35 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants admit that the Complaint purports to assert claims under certain provisions of the federal securities laws.

**COMPLAINT ¶36:**

This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

**ANSWER:**

Paragraph 36 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants admit that the Complaint purports to assert jurisdiction under Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

**COMPLAINT ¶37:**

Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

**ANSWER:**

Paragraph 37 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants admit that the Complaint purports to assert venue pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c).

**COMPLAINT ¶38:**

In connection with the acts and conduct alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

**ANSWER:**

Paragraph 38 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 38.

**COMPLAINT ¶39:**

Class Representative Macomb County Employees' Retirement System ("Macomb County") was established to administer pension and retirement benefits for current and former public employees of Macomb County, Michigan.  During the Class Period, Macomb County purchased 90,500 shares of Motorola stock for $2,284,844.35, at artificially inflated prices as high as $25.95 per share.  *See* Dkt. No. 88 (Certification of Macomb County).

**ANSWER:**

Defendants lack sufficient information to form a belief as to the truth of the allegations in the first sentence of Paragraph 39 of the Complaint, which is therefore deemed denied.  The second sentence of Paragraph 39 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the second sentence of Paragraph 39.

**COMPLAINT ¶40:**

Class Representative St. Clair Shores Police and Fire Pension System ("St. Clair") is a pension fund headquartered in St. Clair Shores, Michigan. St. Clair administers pension benefits for current and retired police officers and firefighters. During the Class Period, St. Clair purchased 34,200 shares of Motorola stock for $756,513.86, at artificially inflated prices as high as $24.03 per share. *See* Dkt. No. 87 (Certification of St. Clair).

**ANSWER:**

Defendants lack sufficient information to form a belief as to the truth of the allegations in the first sentence of Paragraph 40 of the Complaint, which is therefore deemed denied. The second sentence of Paragraph 40 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of the second sentence of Paragraph 40.

**COMPLAINT ¶41:**

Defendant Motorola is a manufacturer, marketer and seller of products, services and applications that make connections to people, information and entertainment possible through broadband, embedded systems and wireless networks. Motorola reports its financial results in three separate business segments: (1) Networks and Enterprise; (2) Connected Home Solutions; and (3) Mobile Devices. Motorola's principal executive offices are located at 1303 East Algonquin Road, Schaumburg, Illinois.

**ANSWER:**

Defendants admit the allegations of Paragraph 41 of the Complaint, except to state that its Networks and Enterprise business is now known as Enterprise Mobility Solutions and that its Connected Home Solutions business is now known as Home & Networks Mobility.

**COMPLAINT ¶42:**

Defendant Edward J. Zander ("Zander") served as Motorola's Board Chairman and CEO during the Class Period. Throughout the Class Period, Zander regularly participated in "Operations Review" meetings with defendants Devonshire, Garriques, Brown, Moloney, Nottenburg and Warrior, during which the business, operations and finances of the Company's Mobile Devices business was discussed. During 2006, Zander collected $12.5 million in incentive- based pay, much of it dependent upon the Company's operating earnings results, as well as $1.5 million in salary. On November 30, 2007, Motorola announced that Zander had

resigned as CEO and would be replaced as CEO by Greg Brown.  As *The Economist* reported on December 8, 2007, "Motorola . . . failed to invest enough in phones for third-generation (3G) networks . . . .  Its sales fell, and Samsung overtook it as the industry's number two . . . .  So Mr. Zander's resignation did not come as a surprise."

**ANSWER:**

Defendants admit the allegations of the first sentence of Paragraph 42 of the Complaint. Defendants admit that Defendant Zander discussed the business, operations and finances of the Mobile Devices business with company executives during the Class Period and deny the remaining allegations of the second sentence of Paragraph 42 of the Complaint.  Defendants refer to Motorola's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed with the SEC on March 15, 2007 for Defendant Zander's compensation during 2006 and deny any allegations of the third sentence of Paragraph 42 of the Complaint inconsistent therewith.  Defendants admit the allegations of the fourth sentence of Paragraph 42 of the Complaint.  Defendants refer to the quoted *Economist* article for its full and complete contents and deny any allegations of the fifth sentence of Paragraph 42 of the Complaint inconsistent therewith.  Plaintiffs deny the remaining allegations of Paragraph 42 of the Complaint.

**COMPLAINT ¶43:**

As part of his duties as Chairman and CEO, Zander was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the Company's Mobile Devices business.  As Chairman and the only senior executive on Motorola's Board of Directors, Zander was required to keep himself informed of the Company's day-to-day business and finances, but also to keep Motorola's non-management directors apprised of the status of the Company's business and finances.  As "senior management" of the Company, each quarter defendant Zander was required to discuss with the Audit Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements." Accordingly, Zander was required to discuss the accounting and disclosure of the 3Q06 IP licensing transactions with the Company's Audit Committee prior to the Company reporting any of its financial results for 3Q06.

**ANSWER:**

Defendants admit that Defendant Zander was Chairman and CEO of Motorola, refer to the Motorola bylaws and Audit and Legal Committee Charter in effect for 2006 for Defendant Zander's job responsibilities and deny any allegations of Paragraph 43 of the Complaint inconsistent therewith.   Defendants deny the remaining allegations of Paragraph 43 of the Complaint.

**COMPLAINT ¶44:**

During the Class Period, Zander participated in the issuance of false and misleading statements and failed to disclose material information about Motorola's business and financial status, including the development of the Company's 3G handsets.  ¶¶83-87, 93-98, 108-115, 122-123, 130- 131.  Zander prepared and signed SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors and represented himself as one of the primary persons with knowledge about Motorola's business and financial status.  On November 2, 2006, in conjunction with Motorola's filing of its 3Q06 Form 10-Q with the SEC, Zander signed a certification pursuant to §302 of the Sarbanes-Oxley Act of 2002, stating that he had reviewed the contents of the filing for accuracy and attesting that it did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." To assure the veracity of his certification, Zander was required to and did further confirm that he, along with defendant Devonshire, was responsible for establishing and maintaining Motorola's disclosure controls and procedures, had designed such controls to assure that material information relating to Motorola's business was promptly made known to Zander, Devonshire and the Company's senior executives and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.

**ANSWER:**

Defendants deny the allegations of the first sentence of Paragraph 44 of the Complaint. Defendants deny the allegations of the second sentence of Paragraph 44 of the Complaint. Defendants refer to the referenced documents for their full and complete contents and deny any allegations of the third and fourth sentences of Paragraph 44 of the Complaint inconsistent therewith.   Defendants deny the remaining allegations of the third and fourth sentences of Paragraph 44 of the Complaint.

**COMPLAINT ¶45:**

Defendant David W. Devonshire ("Devonshire") served as Motorola's Executive Vice President and Chief Financial Officer during the Class Period. Throughout the Class Period, Devonshire regularly participated in "Operations Review" meetings with the other Individual Defendants, during which the business, operations and finances of the Company's Mobile Devices segment was discussed. While in possession of material adverse information about Motorola's business, Devonshire sold 225,730 shares of Motorola stock for insider selling proceeds approximating $5.0 million. During 2006, Devonshire also collected $3.1 million in incentive-based pay, much of it dependent upon the Company's operating earnings results, as well as $625,000 in salary. On March 22, 2007, the Company announced Devonshire's retirement amidst a personnel shakeup intended to reverse Motorola's collapse. *CFO.com* reported that "Devonshire's departure may have been hastened by demands from billionaire activist investor Carl Icahn that the struggling technology company boost returns to shareholders."

**ANSWER:**

Defendants admit the allegations of the first sentence of Paragraph 45 of the Complaint.

Defendants deny the allegations of the second sentence of Paragraph 45 of the Complaint.

Defendants deny the allegations of the third sentence of Paragraph 45 of the Complaint.

Defendants refer to Motorola's Proxy Statement Pursuant to Section 14(a) of the Securities

Exchange Act of 1934, filed with the SEC on March 15, 2007 for Defendant Devonshire's

compensation and deny any allegations of the fourth sentence of Paragraph 45 of the Complaint

inconsistent therewith. Defendants deny the allegations of the fifth sentence of Paragraph 45 of

the Complaint. Defendants refer to the quoted *CFO.com* article for its full and complete contents

and deny any allegations of the sixth sentence of Paragraph 45 of the Complaint inconsistent

therewith. Defendants deny the remaining allegations of Paragraph 45 of the Complaint.

**COMPLAINT ¶46:**

As part of his duties as CFO, Devonshire was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the Company's business, including the Mobile Devices segment. As CFO, Devonshire was required to keep himself informed of the Company's day-to-day business and finances. As "senior management" of the Company, each quarter defendant Devonshire was required to discuss with the Audit

Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements." Accordingly, Devonshire was required to discuss the accounting and disclosure of the 3Q06 IP licensing transactions with the Company's Audit Committee prior to the Company reporting any of its financial results for 3Q06.

**ANSWER:**

Defendants admit that Defendant Devonshire was CFO of Motorola, refer to the Motorola bylaws and Audit and Legal Committee Charter in effect for 2006 for Defendant Devonshire's job responsibilities and deny any allegations of Paragraph 46 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 46 of the Complaint.

**COMPLAINT ¶47:**

During the Class Period, Devonshire participated in the issuance of false and misleading statements and failed to disclose material information about Motorola's business and financial status, including the development of the Company's 3G handsets.  ¶¶83-87, 93, 95-98, 102, 108-115, 122-123.  Devonshire prepared and signed SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, and represented himself as one of the primary persons with knowledge about Motorola's business and financial status.  On November 2, 2006, in conjunction with Motorola's filing of its 3Q06 Form 10-Q with the SEC, Devonshire signed a certification pursuant to §302 of the Sarbanes-Oxley Act of 2002, stating that he had reviewed the contents of the filing for accuracy and attesting that it did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." To assure the veracity of his certification, Devonshire was required to and did further confirm that he, along with defendant Zander, was responsible for establishing and maintaining Motorola's disclosure controls and procedures, had designed such controls to assure that material information relating to Motorola's business was promptly made known to Devonshire, Zander and the Company's senior executives and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.

**ANSWER:**

Defendants deny the allegations of the first sentence of Paragraph 47 of the Complaint.

Defendants deny the allegations of the second sentence of Paragraph 47 of the Complaint.

Defendants refer to the referenced documents for their full and complete contents and deny any allegations of the third and fourth sentences of Paragraph 47 inconsistent therewith. Defendants deny the remaining allegations of the third and fourth sentences of Paragraph 47 of the Complaint. Defendants incorporate their responses to Paragraphs 83-87, 93, 95-98, 102, 108-115 and 122-123 of the Complaint.

**COMPLAINT ¶48:**

Defendant Ronald G. Garriques ("Garriques") served as the Company's Executive Vice President and President of Motorola's Mobile Devices division during the Class Period. Throughout the Class Period, Garriques regularly participated in "Operations Review" meetings with the other Individual Defendants, during which the business and operations of the Company's Mobile Devices segment was discussed. While in possession of material adverse information about Motorola's business, Garriques sold 244,779 shares of Motorola stock for insider selling proceeds approximating $5.7 million. During 2006, Garriques also collected $4.7 million in incentive-based pay, much of it dependent upon the Company's operating earnings results, as well as $726,923 in salary. In February 2007, shortly after Motorola's Board of Directors concluded that Garriques and the management of Mobile Devices had placed Motorola "at risk" during 3Q06, he voluntarily resigned his position at the Company. Pursuant to the terms of Garriques' termination, he forfeited over $10.0 million in 2006 stock, option and restricted stock unit awards.

**ANSWER:**

Defendants admit the allegations of the first sentence of Paragraph 48 of the Complaint. Defendants admit that Defendant Garriques discussed the business, operations and finances of the Mobile Devices business with company executives during the Class Period and deny the remaining allegations of the second sentence of Paragraph 48 of the Complaint. Defendants deny the allegations of the third sentence of Paragraph 48 of the Complaint. Defendants refer to Motorola's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed with the SEC on March 15, 2007 for Defendant Garriques's compensation and deny any allegations of the fourth sentence of Paragraph 48 of the Complaint inconsistent therewith. Defendants deny the allegations of the fifth sentence of Paragraph 48 of the Complaint.

Defendants refer to the referenced document for its full and complete contents and deny any

allegations of the sixth sentence of Paragraph 48 of the Complaint inconsistent therewith.

Defendants deny the remaining allegations of Paragraph 48 of the Complaint.

**COMPLAINT ¶49:**

As part of his duties as President of the Mobile Devices division, Garriques was responsible for directing the business segment's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the segment, as well as Motorola on a consolidated basis. As President of the Mobile Devices division, Garriques was required to keep himself informed of the Company's day-to-day business and finances. As "senior management" of the Company, each quarter defendant Garriques was required to discuss with the Audit Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements." Accordingly, Garriques was required to discuss the accounting and disclosure of the 3Q06 IP licensing transactions with the Company's Audit Committee prior to the Company reporting any of its financial results for 3Q06.

**ANSWER:**

Defendants admit that Defendant Garriques was President of the Mobile Devices

division, refer to the Motorola bylaws and Audit and Legal Committee Charter in effect for 2006

for Defendant Garriques's job responsibilities and deny any allegations of Paragraph 49 of the

Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 49 of

the Complaint.

**COMPLAINT ¶50:**

During the Class Period, Garriques participated in the issuance of false and misleading statements and failed to disclose material information about Motorola's business and financial status, including the development of the Company's 3G handsets. ¶¶84-87, 93, 96-98, 102, 110-115, 121, 126-127. Garriques assisted in the preparation of SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, and represented himself as one of the primary persons with knowledge about Motorola's business and financial status. On November 2, 2006, in connection with Motorola's filing of its 3Q06 Form 10-Q with the SEC, Garriques performed certification review procedures pursuant the Sarbanes-Oxley Act of 2002, for the purpose of corroborating Zander' s and Devonshire's public

pronouncement that the Company's 3Q06 Form 10-Q did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

**ANSWER:**

Defendants deny the allegations of the first sentence of Paragraph 50 of the Complaint.

Defendants deny the allegations of the second sentence of Paragraph 50 of the Complaint.

Defendants refer to the referenced and quoted documents for their full and complete contents and

deny any allegations of the third sentence of Paragraph 50 of the Complaint inconsistent

therewith.   Defendants deny the remaining allegations of Paragraph 50 of the Complaint.

Defendants incorporate their responses to Paragraphs 84-87, 93, 96-98, 102, 110-115, 121, 126-

127 of the Complaint.


**COMPLAINT ¶51:**

Defendant Gregory Q. Brown ("Brown") served as the Company's President, Chief Operating Officer ("COO") and Executive Vice President of Motorola's Networks and Enterprise during the Class Period.  Throughout the Class Period, Brown regularly participated in "Operations Review" meetings with the other Individual Defendants, during which the business and operations of the Company's Mobile Devices segment was discussed.  While in possession of material adverse information about Motorola's business, Brown sold 208,367 shares of Motorola stock for insider selling proceeds of over $4.7 million.  During 2006, Brown also collected $5.4 million in incentive- based pay, much of it dependent upon the Company's operating earnings results, as well as $726,923 in salary.  Brown now serves as Motorola's Co-CEO.

**ANSWER:**

Defendants admit that Defendant Brown was Executive Vice President of Motorola's

Networks and Enterprise division during the Class Period and deny the remaining allegations in

the first sentence of Paragraph 51 of the Complaint.   Defendants deny the allegations of the

second sentence of Paragraph 51 of the Complaint.   Defendants deny the allegations of the third

sentence of Paragraph 51 of the Complaint.   Defendants refer to Motorola's Proxy Statement

Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed with the SEC on March 15, 2007 for Defendant Brown's compensation and deny any allegations of the fourth sentence of Paragraph 51 of the Complaint inconsistent therewith.  Defendants admit the allegations of the fifth sentence of Paragraph 51 of the Complaint.  Defendants deny the remaining allegations of Paragraph 51 of the Complaint.

**COMPLAINT ¶52:**

As part of his duties as COO, Brown was responsible for directing the finances and business affairs of the Networks and Enterprise segment and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the segment, as well as Motorola on a consolidated basis.  As COO, Brown was required to keep himself informed of the Company's day-to-day business and finances.

**ANSWER:**

Defendants deny the allegations of Paragraph 52 of the Complaint.

**COMPLAINT ¶53:**

During the Class Period, Brown participated in the issuance of false and misleading statements and failed to disclose material information about Motorola's business and financial status, including the development of the Company's 3G handsets.  ¶¶83-87, 93, 95-98, 102, 108-115, 121.  Brown assisted in the preparation of SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, and represented himself as one of the primary persons with knowledge about Motorola's business and financial status.

**ANSWER:**

Defendants deny the allegations of Paragraph 53 of the Complaint.  Defendants incorporate their responses to Paragraphs 83-87, 93, 95-98, 102, 108-115 and 121 of the Complaint.

**COMPLAINT ¶54:**

Defendant Daniel M. Moloney ("Moloney") served as Motorola's Executive Vice President and President of Connected Home Solutions division during the Class Period.  Throughout the Class Period, Moloney regularly participated in "Operations Review" meetings with the other Individual Defendants, during which the business and operations of the

Company's Mobile Devices segment was discussed.  While in possession of material adverse information about Motorola's business, Moloney sold 176,468 shares of Motorola stock for insider selling proceeds of over $4.0 million.[2] On February 22, 2010, Motorola announced that Moloney had decided to leave the Company.

**ANSWER:**

Defendants admit the allegations of the first sentence of Paragraph 54 of the Complaint.

Defendants deny the allegations of the second sentence of Paragraph 54 of the Complaint.

Defendants deny the allegations of the third sentence of Paragraph 54 of the Complaint.

Defendants admit the allegations of the fourth sentence of Paragraph 54 of the Complaint.

Defendants deny the remaining allegations of Paragraph 54 of the Complaint.


**COMPLAINT ¶55:**

As part of his duties as Executive Vice President and President, Moloney was responsible for directing the Company's finances and business affairs of the Connected Home Solutions Segment and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the segment, as well as Motorola on a consolidated basis.  As Executive Vice President and President, Moloney was required to keep himself informed of the Company's day-to-day business and finances.

**ANSWER:**

Defendants admit that Defendant Moloney was an Executive Vice President and

President of Connected Home Solutions, refer to the Motorola bylaws in effect for 2006 for

Defendant Moloney's job responsibilities and deny any allegations of Paragraph 55 of the

Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 55 of

the Complaint.


**COMPLAINT ¶56:**

During the Class Period, Moloney participated in the issuance of false and misleading statements and failed to disclose material information about Motorola's business and financial status, including the development of the Company's 3G handsets.  ¶¶83-87, 93, 95-98, 102, 108-

---

[2] Motorola did not publicly report 2006 compensation for defendant Moloney.

115, 121.  Moloney assisted in the preparation of SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, and represented himself as one of the primary persons with knowledge about Motorola's business and financial status.

**ANSWER:**

Defendants deny the allegations of Paragraph 56 of the Complaint.  Defendants incorporate their responses to Paragraphs 83-87, 93, 95-98, 102, 108-115 and 121 of the Complaint.

**COMPLAINT ¶57:**

Defendant Richard N. Nottenburg ("Nottenburg") served as Motorola's Executive Vice President and Chief Strategy Officer ("CSO") during the Class Period.  Throughout the Class Period, Nottenburg regularly participated in "Operations Review" meetings with the other Individual Defendants, during which the business and operations of the Company's Mobile Devices segment was discussed.  While in possession of material adverse information about Motorola's business, defendant Nottenburg sold 95,369 shares of Motorola stock for insider selling proceeds of over $2.1 million.[3] Upon defendant Warrior's resignation in December 2007, Nottenburg became Motorola's Chief Technology Officer ("CTO").  Six months later, in May 2008, and in light of activist investor Carl Icahn's strengthening influence at the Company, Nottenburg resigned.

**ANSWER:**

Defendants admit the allegations of the first sentence of Paragraph 57 of the Complaint.  Defendants deny the allegations of the second sentence of Paragraph 57 of the Complaint.  Defendants deny the allegations of third sentence of Paragraph 57 of the Complaint.  Defendants admit the allegations of the fourth sentence of Paragraph 57 of the Complaint.  Defendants admit that Defendant Nottenburg left Motorola in May 2008 and deny the remaining allegations of the fifth sentence of Paragraph 57 of the Complaint.  Defendants deny the remaining allegations of Paragraph 57 of the Complaint.

---

[3] Motorola did not publicly report 2006 compensation for defendant Nottenburg.

**COMPLAINT ¶58:**

As part of his duties as CSO, Nottenburg was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that he was fully aware of the operational and financial status of the Company's business. As CSO, Nottenburg was required to keep himself informed of the Company's day-to-day business and finances. As "senior management" of the Company, each quarter Nottenburg was required to discuss with the Audit Committee, pursuant to the Company's Audit and Legal Committee Charter, all "significant financial reporting judgments made in connection with the preparation of the Company's financial statements, including the analysis of the effects of alternative GAAP methods on the financial statements." Accordingly, defendant Nottenburg was required to discuss the accounting and disclosure of the 3Q06 IP licensing transactions with the Company's Audit Committee prior to the Company reporting any of its financial results for 3Q06.

**ANSWER:**

Defendants admit that Defendant Nottenburg was CSO of Motorola, refer to the Motorola bylaws and Audit and Legal Committee Charter in effect for 2006 for Defendant Nottenburg's job responsibilities and deny any allegations of Paragraph 58 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 58 of the Complaint.

**COMPLAINT ¶59:**

During the Class Period, Nottenburg participated in the issuance of false and misleading statements and failed to disclose material information about Motorola's business and financial status, including the development of the Company's 3G handsets. ¶102. Nottenburg helped prepare SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, and represented himself as one of the primary persons with knowledge about Motorola's business and financial status.

**ANSWER:**

Defendants deny the allegations of Paragraph 59 of the Complaint. Defendants incorporate their responses to Paragraph 102 of the Complaint.

**COMPLAINT ¶60:**

Defendant Padmasree Warrior ("Warrior") served as Motorola's Executive Vice President and CTO during the Class Period. Throughout the Class Period, Warrior regularly participated in "Operations Review" meetings with the other Individual Defendants, during which the business and operations of the Company's Mobile Devices segment was discussed.

38

While in possession of material adverse information about Motorola's business, Warrior sold 226,611 shares of Motorola stock for insider selling proceeds approximating over $5.0 million.[4] On December 3, 2007, shortly after it became public that defendant Zander would be stepping down, Warrior's employment with Motorola was terminated.  On December 3, 2007, *Cnet.com* reported "Motorola was unable to come up with a second act that would have kept the business rolling . . . . That would have been Warrior's responsibility, as head of Motorola Labs and the company's 'early-stage accelerators,' which were responsible for coming up with new ideas."

**ANSWER:**

Defendants admit the allegations of the first sentence of Paragraph 60 of the Complaint.

Defendants deny the allegations of the second sentence of Paragraph 60 of the Complaint.

Defendants deny the allegations of the third sentence of Paragraph 60 of the Complaint.

Defendants admit that Defendant Warrior left Motorola employment on or about December 3, 2007 and deny the remaining allegations of the fourth sentence of Paragraph 60 of the Complaint.   Defendants refer to the quoted *Cnet.com* article for its full and complete contents and deny any allegations of the fifth sentence of Paragraph 60 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 60 of the Complaint.

**COMPLAINT ¶61:**

As part of her duties as CTO, Warrior was responsible for directing the Company's finances and business affairs and, during conference calls with analysts and investors, represented that she was fully aware of the operational and financial status of the Company's business.  As CTO, Warrior was required to keep herself informed of the Company's day-to-day business and finances.

**ANSWER:**

Defendants admit that Defendant Warrior was CTO of Motorola, refer to the Motorola bylaws in effect for 2006 for Defendant Warrior's job responsibilities and deny any allegations of Paragraph 61 of the Complaint inconsistent therewith.   Defendants deny the remaining allegations of Paragraph 61 of the Complaint.

---

[4] Motorola did not report 2006 compensation for defendant Warrior.

**COMPLAINT ¶62:**

During the Class Period, Warrior participated in the issuance of false and misleading statements and failed to disclose material information about Motorola's business and financial status, including the development of the Company's 3G handsets.  ¶¶93, 95-99, 102.  Warrior helped prepare SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, and represented herself as one of the primary persons with knowledge about Motorola's business and financial status.

**ANSWER:**

Defendants deny the allegations of Paragraph 62 of the Complaint.    Defendants incorporate their responses to Paragraphs 93, 95-99 and 102 of the Complaint.

**COMPLAINT ¶63:**

The Motorola officers and directors named in ¶¶42, 45, 48, 51, 54, 57, 60 are referred to herein as the "Individual Defendants." Motorola and the Individual Defendants are referred herein collectively as "defendants."

**ANSWER:**

No response is required to Paragraph 63 of the Complaint.

**COMPLAINT ¶64:**

Throughout the Class Period, the Individual Defendants were each subject to Motorola's insider trading prohibitions pursuant to Company Policy G-17.  The policy stated:

> The Motorola Code of Business Conduct states that Motorolans are not allowed to trade in securities based on knowledge that comes from their jobs, if that information has not been reported publicly.

> In addition to the Code of Business Conduct, Rule 10b-5 of the . . . securities laws prohibits trading securities while in possession of inside information.  ***The purpose of Rule 10b-5 is to keep insiders from exploiting information not available to the public for their own gain***.  Under Rule 10b-5, individuals are prohibited from buying or selling securities (or recommending to others to do so) while in possession of material information that is not yet publicly available.  This information is commonly referred to as "inside information." . . .

> Motorola employees are not permitted to trade or recommend others do so while in possession of inside information.  This is the case regardless of your position at Motorola.
>
> \*          \*          \*
>
> ***What is "inside information" and who can have it?***
>
> Inside information is material nonpublic information that, if known, would affect a reasonable investor's decision to buy, sell or hold securities . . . . ***For example, knowledge about earnings and changes in earnings or competitive position is likely to be inside information***.

As alleged herein, each of the Individual Defendants who sold their Motorola stock during the Class Period were in possession of "inside information" and, thus, were in violation of the Company's internal policies regarding the trading of Company stock, as well the federal securities laws and Rule 10b-5.  Indeed, each Individual Defendant who sold their Motorola stock during the Class Period, was under a duty to first disclose the adverse material facts as alleged herein.  ¶¶17A-17Y, 74-81.

## ANSWER:

Defendants refer to Motorola's insider trading policy in effect during the alleged class period for its full and complete contents and deny any allegations of the first and second sentences of Paragraph 64 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 64 of the Complaint.  Defendants incorporate their responses to Paragraphs 17 and 74-81 of the Complaint.

## COMPLAINT ¶65:

By virtue of the Individual Defendants' positions at Motorola, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects *via* internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.  Specifically, each Individual Defendant had direct access to a wealth of reports and documents on the Company's Compass document database that showed the Company's 3G handsets were not on track for timely delivery in 2006 as a result of Argon chip failures, as well as related software and hardware problems.

**ANSWER:**

Defendants deny the allegations of Paragraph 65 of the Complaint.

**COMPLAINT ¶66:**

By virtue of their high level positions with the Company, the Individual Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company and were privy to confidential proprietary information concerning the Company and its business, the status of 3G programs, IP licensing revenue streams and Motorola's operations, growth and financial statements, as alleged herein. The defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

**ANSWER:**

Paragraph 66 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 66 of the Complaint.

**COMPLAINT ¶67:**

As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's 3G product portfolio and financial condition, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**ANSWER:**

Paragraph 67 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 67 of the Complaint.

**COMPLAINT ¶68:**

The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board of Director membership or executive and managerial positions for Motorola, each of the Individual Defendants had actual knowledge of and access to the adverse undisclosed information about the Company's 3G handset portfolio and Motorola's operating earnings "gap" as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered positive representations made by or about Motorola materially false and misleading.

**ANSWER:**

Paragraph 68 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 68 of the Complaint.

**COMPLAINT ¶69:**

The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. As such, each of the defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

**ANSWER:**

The first and third sentences of Paragraph 69 of the Complaint state legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of the first and third sentences of Paragraph 69 of the Complaint. Defendants deny the allegations of the second sentence of Paragraph 69 of the Complaint.

**COMPLAINT ¶70:**

Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Motorola securities by disseminating materially false and misleading statements and/or concealing material adverse

facts. The scheme: (i) deceived the investing public regarding Motorola's business and operations, as well as the intrinsic value of Motorola securities; (ii) enabled Motorola insiders to collect more than $29.3 million in salary and incentive-based compensation in 2006 and sell more than $26.5 million of their personal holdings of Motorola securities at artificially inflated prices during the Class Period.

**ANSWER:**

Paragraph 70 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 70 of the Complaint.

**COMPLAINT ¶71:**

Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. On August 25, 2009, the Court certified the following Class:

> All persons and entities who purchased or otherwise acquired the publicly-traded securities of Motorola, Inc. from July 19, 2006 through January 4, 2007, excluding (1) Defendants and their immediate family; (2) any entity in which Defendants have or had a controlling interest; (3) Officers and Directors of Motorola, Inc.; and (4) the legal representatives, heirs, successors, or assigns of any excluded party.

*See* Dkt. No. 140 (August 25, 2009 Memorandum Opinion and Order). The Court appointed Macomb County and St. Clair as Class Representatives and approved their selection of Coughlin Stoia Geller Rudman & Robbins LLP as class counsel. *Id.*

**ANSWER:**

Defendants admit that Plaintiffs purport to bring this action as a class action. Defendants refer to the court order certifying the class and appointing class counsel and deny any allegations of Paragraph 71 of the Complaint inconsistent therewith.

**COMPLAINT ¶72:**

In December 2004, Motorola spun-off Freescale in an initial public offering. As consideration for the spin-off, Motorola shareholders received approximately .11 shares of Freescale common stock for every share of Motorola stock they owned. Similarly, holders of Motorola "restricted stock units" ("RSUs") also received .11 shares of Freescale common stock for every Motorola RSU they owned. Each of the Individual Defendants in this action was the

beneficial owner of significant amounts of Motorola common stock and Motorola RSUs. Combined, the Individual Defendants received hundreds of thousands of shares of Freescale in connection with the December 2004 spin-off.

**ANSWER:**

Defendants admit that Motorola spun off Freescale in an initial public offering in or around December 2004, that Motorola shareholders received approximately .11 shares of Freescale common stock for every share of Motorola stock or Motorola "restricted stock unit" ("RSU") that they owned and deny the remaining allegations of the first, second and third sentences of Paragraph 72 of the Complaint.  Defendants admit that, to the extent Individual Defendants owned Motorola common stock and/or RSUs, they received Freescale stock in the Freescale spinoff.  Defendants deny the remaining allegations of the third and fourth sentences of Paragraph 72 of the Complaint.

**COMPLAINT ¶73:**

On April 18, 2006, during the Motorola 1Q06 earnings conference call, defendants informed investors that Mobile Devices would deliver record operating earnings growth during 2H06.  Garriques stated:

> I think I'll just hit with – the message that I gave all of you last year is that year over year, we would expand operating earnings percent while gaining share.  That's the exact same message for this year.  And if you look at Q3 and Q4 of last year, we were in the 11% range.
>
> So to increase operating earnings year over year, we would actually have to be above 11%, okay, to some extent, in the second half of this year.  This will be a balanced approach as we go trying to pick up a little bit of share each quarter sequentially in 2006 while making sure our operating earnings percent is greater last year over this year.

**ANSWER:**

Defendants admit that Motorola held its quarterly earnings conference call for the first quarter of 2006 on or about April 18, 2006, refer to the transcript of that call for its full and

complete contents, and deny any allegations of Paragraph 73 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 73 of the Complaint.

## COMPLAINT ¶74:

In contrast to his external statements, on April 20, 2006, Garriques instructed Motorola executives, including Bruce Brda and Raymond Roman, to inform Zander during the internal "Zander – America's Ops Review" that: "*Yes we have problems.  UMTS F'UP with Freescale. . . . Having said that . . . Let me tell you what we are doing, [s]elling 2007 and making sure the product guys execute it*."

## ANSWER:

Defendants refer to the quoted April 20, 2006 email for its full and complete contents and deny the allegations of Paragraph 74 of the Complaint.

## COMPLAINT ¶75:

On May 22, 2006, Garriques and Zander sent an email to Cingular Wireless' CEO, Ralph de la Vega, admitting that 3G was a "bust" and that Motorola was already filling a 3G hole with 2G handsets:

> *Our combined busts in EDGE and UMTS silicon has made this impossible . . . . This is evident in all of our product lines including the Q as we have discussed. . . . We are doing everything we can do to hit very aggressive price points on 2.5 and 2.75 G in the short and medium term to advantage you in the marketplace*.

## ANSWER:

Defendants refer to the quoted May 22, 2006 email for its full and complete contents and deny the allegations of Paragraph 75 of the Complaint.

## COMPLAINT ¶76:

Later in the day, de la Vega and his direct reports exchanged an email discussing Garriques' and Zander's admission of the bust in Motorola's 3G portfolio across product lines:

> Apparently they have a very restrictive [chip] sourcing commitment with FreeScale. . . . *I don't know what it would have taken for them to get out of their FreeScale commitment*

> *and source an HSDPA chipset from Qualcomm instead.  The*
> *net result is that they chose not to and we are delayed by a full*
> *year from [the competition].  Their attitude is "there is nothing*
> *we can do about [it] so let's just move on."*

**ANSWER:**

Defendants refer to the quoted document for its full and complete contents and deny the

allegations of Paragraph 76 of the Complaint.

**COMPLAINT ¶77:**

On May 24, 2006, during the JP Morgan 34th Annual Technology Conference, Garriques
informed investors that Mobile Device customers were excited about the Company's 3G product
roadmap:

> We're really excited about the feedback we're getting from the
> devices.  Obviously, we're taking a different tack of showing
> devices before we ship, given some of the things from a market
> perspective in copying going on the market.  But what I can tell
> you is the operators who saw what we're bringing out not only
> this year but next year, it was a pretty positive set of
> computations over the last 10 days.

To the contrary, on May 22, 2006, Cingular Wireless, the Company's most important North
American customer, informed Zander and Garriques that it would scrap the 3G Argon-based
Carina handset for sale in North America because of program delays.

**ANSWER:**

Defendants refer to the transcript of the JP Morgan 34th Annual Technology Conference

for its full and complete contents and deny any allegations of the first sentence of Paragraph 77

of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of

Paragraph 77 of the Complaint.

**COMPLAINT ¶78:**

On June 22, 2006, Garriques received an email from Raymond Roman, entitled "2nd Half
Game Plans." The facts were clear:

> Team . . . [t]he second half looks tough and we are not making
> the bold moves to make the numbers.  We have set a growth

47

> expectation (market share and OE) in the marketplace that we can
> not back off of.  Here is the situation:
>
> *        *        *
>
> **OE is $450M off in Q3 and $600 off in Q4. $1B!!!!!!!**

**ANSWER:**

Defendants refer to the quoted June 22, 2006 email for its full and complete contents and

deny any allegations of Paragraph 78 of the Complaint inconsistent therewith.  Defendants deny

the remaining allegations of Paragraph 78 of the Complaint.

**COMPLAINT ¶79:**

Two weeks later, on July 8, 2006, Garriques sent an email to Mike Hickey stating, "***3G
has lost 365 M dollars since beginning of the year! We must stop the bleeding!***" The same day,
Garriques informed co-defendants Zander, Devonshire, Brown and Moloney of the same fact,
blaming the $365.0 million operating earnings miss on the one-year delay in the Argon chip.

**ANSWER:**

Defendants refer to the quoted email for its full and complete contents and deny any

allegations of the first sentence of Paragraph 79 of the Complaint inconsistent therewith.

Defendants deny the remaining allegations of Paragraph 79 of the Complaint.

**COMPLAINT ¶80:**

On July 11, 2006, Philip Gilchrist, Motorola's Vice President of 3GSM Platform
Reference Design Engineering, and Robert Cash, Vice President of Supply Chain Semiconductor
Category, engaged in the following exchange while Mr. Cash was attempting to obtain cost
concessions from Freescale as a result of Argon chip issues, among other things:

> [Cash] I now believe we will get practically nothing as previously
> expected.  Specifically, [Freescale] now consider the Argon LV
> price expectations as pretty comical expectations. . . . I don't plan
> on letting this stay this way without a considerable consequence.
>
> [Gilchrist] **The "considerable consequence" will be our stock
> price sinking because we are losing our ass on 3G products.
> Nothing we can do to FSL will change that**.

48

**ANSWER:**

Defendants refer to the quoted July 11, 2006 emails for their full and complete contents and deny any allegations of Paragraph 80 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 80 of the Complaint.

**COMPLAINT ¶81:**

On July 16, 2006, in preparation for the Company's 2Q06 earnings conference call, Garriques engaged in a discussion with Ed Tharp, Director of Financial Planning and Analysis, and Alan Buddendeck, a Public Relations Officer for Mobile Devices.  Specifically, Garriques, Tharp and Buddendeck discussed "talking points" for the 2Q06 conference call:

> [Garriques:] ***The only thing we do not have in here is 3G.  If we just put together . . . DO and UMTS.  Like we did [in 2Q06]***.  How do we look Q over Q and Y over Y on combined 3G. . . .  ***The CDMA business being so strong . . . could be an indication that UMTS and or GSM is weak***.
>
> [Tharp:] ***UMTS by itself [is down] 12% QoQ*** . . . UMTS + CDMA DO looks like this: QoQ units up 55%.
>
> [Garriques:] ***I think 3G up 55% Q on Q is good***.

**ANSWER:**

Defendants refer to the quoted July 16, 2006 emails for their full and complete contents and deny any allegations of Paragraph 81 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 81 of the Complaint.

**COMPLAINT ¶82:**

Indeed, by the beginning of the Class Period, defendants were fully aware that the Company's 3G portfolio was a "bust" and were actively engaged in a fraudulent scheme to ensure that investors were kept in the dark.

**ANSWER:**

Paragraph 82 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 82 of the Complaint.

**COMPLAINT ¶83:**

On July 19, 2006, the first day of the Class Period, Motorola conducted its 2Q06 earnings conference call.  Participating in the call were defendants Zander, Devonshire, Garriques, Moloney and Brown.  Not only were these defendants under a duty to speak truthfully and fully when they spoke about the Company's 3G products and Motorola's business results during the 2Q06 earnings conference call, but they had a duty to correct any falsehoods, misstatements or material omissions made by any other defendant participating in the call.

**ANSWER:**

Defendants admit that Motorola held its quarterly earnings conference call for the second quarter of 2006 on or about July 19, 2006, refer to the transcript of that call for its full and complete contents, and deny any allegations of Paragraph 83 of the Complaint inconsistent therewith.  The third sentence of Paragraph 83 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the third sentence of Paragraph 83 of the Complaint.

**COMPLAINT ¶84:**

During the Motorola 2Q06 earnings conference call, Zander said: "***In 3G, we continue to grow with units up 55% quarter over quarter***."

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the second quarter of 2006 on or about July 19, 2006 for its full and complete contents and deny any allegations of Paragraph 84 of the Complaint inconsistent therewith.

**COMPLAINT ¶85:**

During the 2Q06 earnings conference call, Garriques engaged in the following Q&A with JP Morgan analyst Ehud Gelblum:

> Gelblum: First of all, you said . . . 3G units this quarter were up 55%. . . . just want to make sure I understand what is in that unit of 3G?
>
> Garriques: *That is a combination of EV-DO and UMTS/HSDPA units*.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the second quarter of 2006 on or about July 19, 2006 for its full and complete contents and deny any allegations of Paragraph 85 of the Complaint inconsistent therewith.


**COMPLAINT ¶86:**

During the call, Garriques further assured investors that Mobile Device's 3G UMTS/HSDPA portfolio was *"quite compelling"* and *"quite on track"* for sales during 2H06.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the second quarter of 2006 on or about July 19, 2006 for its full and complete contents and deny any allegations of Paragraph 86 of the Complaint inconsistent therewith.


**COMPLAINT ¶87:**

During the call, Zander also assured investors that all of Motorola's 2H06 handsets, including the Company's Argon-based 3G devices, were "on track":

> Europe – shipments were up 10% year over year.  We continue to enjoy strength across Western Europe.  And we are working to enhance our position throughout the region by building our brand reputation amongst consumers across price tiers. . . . UMTS we have to improve upon.  *And I think you will see some very competitive second-year [sic] product launches that are on track*.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the

second quarter of 2006 on or about July 19, 2006 for its full and complete contents and deny any

allegations of Paragraph 87 of the Complaint inconsistent therewith.

**COMPLAINT ¶88:**

As of July 19, 2006, the handsets that were supposed to be launched in the 3G portfolio
were the Argon-based RAZR Maxx, RAZR xx, Rocket, Scorpius and Sagitta, as the other 3G
handsets had already been cancelled or pushed into 2007.  Garriques reminded analysts and
investors that he would present the Company's 2H06 3G handset portfolio the following week
during the Company's annual financial analyst meeting ("FAM").

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the

second quarter of 2006 on or about July 19, 2006 for its full and complete contents and deny any

allegations of Paragraph 88 of the Complaint inconsistent therewith.  Defendants deny the

remaining allegations of Paragraph 88 of the Complaint.

**COMPLAINT ¶89:**

Despite knowing that Mobile Devices had an operating earnings gap in excess of $1.0
billion for 3Q06 and 4Q06, defendants assured investors that the segment's quality of earnings
were certain.  Garriques stated:

> The only guidance I have given, and I won't give any additional
> guidance today, is that year over year, our OE percent would
> expand.  If you look at the second half of last year, I averaged
> over 11% in both quarters.  I will beat that in Q3 and Q4 of this
> year, at the same time expanding market share in both of those
> quarters.

Unknown to investors, however, the 2H06 $1.0 billion operating earnings gap was caused by the
fact that Mobile Devices' 3G product portfolio was a "bust . . . across all product lines" and was
forcing the Company to fill a "huge" 3G "product hole" with increasing volumes of discounted
2G handsets.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the second quarter of 2006 on or about July 19, 2006 for its full and complete contents and deny the allegations of Paragraph 89 of the Complaint.

**COMPLAINT ¶90:**

In response to defendants' false and misleading statements during the 2Q06 earnings conference call, between July 19, 2006 and July 20, 2006, the price of Motorola's stock increased from $19.25 per share to $20.60 per share.

**ANSWER:**

Defendants deny the allegations of Paragraph 90 of the Complaint.

**COMPLAINT ¶91:**

Defendants' statements during the 2Q06 earnings conference call were materially false and misleading when made because defendants failed to disclose:

(a)     Defendants' combined EV-DO and UMTS/HSDPA unit sales in reporting to analysts and failed to disclose the fact that 3G UMTS/HSDPA unit sales were, in fact, down 12.0% quarter-over-quarter.  ¶81.

(b)     Defendants failed to disclose that the Company's 3G portfolio was an "F'UP with Freescale" and a "bust . . . across all product lines" as a result of Freescale's failure to timely deliver functional, commercially viable Argon chips.  ¶¶17H, 74

(c)     Motorola's 2H06 3G product portfolio was not on track and defendants had omitted material information about the development of the Argon-based handsets:

(i)     On May 22, 2006, Cingular Wireless cancelled the 3G Carina handset due to Argon chip failures.  Cingular Wireless had originally planned to market the Carina in the North American market beginning in 1Q06, but, after the handset was delayed at least two quarters, Cingular Wireless cancelled its order.  ¶¶17J, 77;

(ii)    During May 2006, Garriques and Zander presented and discussed the already delayed RAZR xx NA (a/k/a IZAR NA) delivery schedule with Cingular Wireless executives.  At the time,

Garriques and Zander had been told that there was at least a 50.0% likelihood that Mobile Devices would fail to deliver a commercially viable Argon-based 3G handset in North America even by the delayed November 22, 2006 deadline. ¶17K;

(iii)   Between July 12 and 19, 2006, Motorola's Monte Carlo analyses showed that there was "less than 1%" probability that the Company could deliver a commercially viable Argon-based 3G handset in North America by November 22, 2006. To be "on target," handset programs were supposed to have at least a 75.0% confidence of hitting the deadline date. ¶17E;

(iv)   On July 17, 2006, Motorola's Monte Carlo analyses also showed that there was "less than 1%" probability that the Company could deliver a commercially viable Argon- based RAZR xx Global (a/k/a IZAR Global) in the European market by the customer-required October 19, 2006 delivery date. *Id.*;

(v)   On July 9, 2006, Motorola's Monte Carlo analyses showed that there was only a 24.0% probability that the Company could deliver a commercially viable Argon-based RAZR xx Japan (a/k/a IZAR Japan) in Japan by the customer-required October 25, 2006 delivery date. As of July 30, 2006, the 76.0% likelihood of failure remained unchanged. *Id.* Moreover, at this time, Motorola was already nearly a year late in delivering an Argon-based 3G handset to its biggest customer in Japan, DoCoMo. ¶¶17V, 31.

(vi)   Motorola's IC PM Slides identified that, as of July 19, 2006, the Argon+ POP and ArgonLV POP chips were at least nine months behind plan due to severe warping. These chips were supposed to have been completed for utilization in the RAZR Maxx, RAZR xx, Sagitta and Rocket handsets. ¶17F;

(vii)   Motorola's IC PM Slides identified that, as of July 19, 2006, the Argon+ POP and ArgonLV POP chips continued to repeatedly fail operational requirements, including "Motorola Qualification" for use in the Company's products. *Id.*;

(viii)   Motorola's IC PM Slides identified that, as of July 19, 2006, the Argon+ POP and ArgonLV POP chips were classified as high risk ("red lighted") by Motorola program managers for use in the Company's 4Q06 handsets. *Id.*; and

(ix)   Motorola's Argon Platform Executive Summaries identified that, as of July 17, 2009, the scheduled completion date of Freescale's operational qualification of the Argon+ POP and ArgonLV POP

would slip materially – approximately two months – due to chip failures.  ¶17G.

**ANSWER:**

Paragraph 91 of the Complaint and its subsections (a) through (c)(ix) state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 91 of the Complaint.

**COMPLAINT ¶92:**

By choosing to speak about the purported readiness of the Company's 3G Argon-based handset portfolio, defendants were under a duty, pursuant to the federal securities laws, to fully disclose all material adverse facts, including those stated in ¶¶17A-17O, 74-81.

**ANSWER:**

Paragraph 92 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 92 of the Complaint.  Defendants incorporate their responses to Paragraphs 17 and 74-81 of the Complaint.

**COMPLAINT ¶93:**

On July 24 and July 25, 2006, Motorola conducted its 2006 Financial Analyst Meeting or "FAM." On July 24, Zander and Garriques announced various new 3G handsets, including the RAZR Maxx and RAZR xx, to equity analysts during an informal evening session.  During the July 24, 2006 event, Garriques and Zander wore what they referred to as "magic jackets," which had pockets specifically fitted for each 3G handset defendants showed to analysts.  On July 25, defendants made formal and comprehensive presentations to analysts and investors throughout the day.  Participating in the July 25 FAM presentations were defendants Zander, Devonshire, Garriques, Moloney, Brown and Warrior.

**ANSWER:**

Defendants refer to the transcript of the 2006 Financial Analyst Meeting on July 24 and July 25, 2006 for its full and complete contents and deny any allegations of Paragraph 93 of the Complaint inconsistent therewith.  Defendants admit that Defendants Zander and Garriques

announced various new 3G handsets at the 2006 Financial Analyst Meeting, including the RAZR

Maxx and RAZR xx and that Zander and Garriques made presentations to analysts and investors.

Defendants deny the remaining allegations of Paragraph 93 of the Complaint.


**COMPLAINT ¶94:**

> During the July 24 FAM evening session, defendants Garriques and Zander showed analysts mock-ups of the RAZR Maxx and RAZR xx, and referenced three 3G handsets (*i.e.*, Rocket and Sagitta (for Vodafone in Europe), and Scorpius (for DoCoMo in Japan)) that were supposedly "embargoed" by the carriers, and informed analysts that the five handsets were "on track" for delivery to customers during the 4Q06 holiday selling season.

**ANSWER:**

Defendants admit that Defendants Garriques and Zander showed analysts mock-ups of

the RAZR Maxx and RAZR xx and referenced three other 3G handsets.  Defendants refer to the

transcript of the 2006 Financial Analyst Meeting on July 24 and July 25, 2006 for its full and

complete contents and deny any allegations of Paragraph 94 of the Complaint inconsistent

therewith.  Defendants deny the remaining allegations of Paragraph 94 of the Complaint.


**COMPLAINT ¶95:**

> Not only were these defendants under a duty to speak truthfully and fully when they chose to speak about the status of the Company's 3G products and Motorola's business results during FAM, but they had a duty to correct any falsehoods, misstatements or omissions made by any other defendant participating in FAM.

**ANSWER:**

Paragraph 95 of the Complaint states legal conclusions and argument to which no

response is required.  To the extent a response is required, Defendants deny the allegations of

Paragraph 95 of the Complaint.


**COMPLAINT ¶96:**

> During the July 25 FAM session, defendants reiterated their statements from the prior evening that Motorola was on track to deliver five new 3G handsets at the 2006 holiday selling

season.  As Garriques noted, "***When I look at the five new [3G] UMTS/HSDPA devices that we're launching into Q4, the significant markets that those are launching into are Europe and the U.S. market***." Again, defendants showed the RAZR Maxx and RAZR xx to analysts and investors.  The other 3G handsets Motorola did not show were the Rocket, Sagitta and Scorpius. Like the RAZR Maxx and RAZR xx, the Rocket, Sagitta and Scorpius were to utilize the Argon chip.

**ANSWER:**

Defendants admit that Defendants Zander and Garriques showed the RAZR Maxx and RAZR xx to analysts and investors.  Defendants refer to the transcript of the 2006 Financial Analyst Meeting on July 24 and July 25, 2006 for its full and complete contents and deny any allegations of Paragraph 96 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 96 of the Complaint.

**COMPLAINT ¶97:**

With respect to each of the five new 3G handsets, Garriques confirmed that Motorola was on track for delivery during the holiday selling season:

> Tim Long: I just want to hit on the UMTS market a little bit.  You have two new products there [*i.e.,* the RAZR Maxx and RAZR xx] that you've been highlighting for the second half . . . . So the question is will those two new products be enough to really enjoy the holiday season, particularly in Europe?
>
> Garriques: From a product launch perspective, I showed you two. ***We're actually launching five, three of the ones I did not disclose inside of the meeting . . . we're bringing five new products into the Christmas selling season***.

**ANSWER:**

Defendants refer to the transcript of the 2006 Financial Analyst Meeting on July 24 and July 25, 2006 for its full and complete contents and deny any allegations of Paragraph 97 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 97 of the Complaint.

**COMPLAINT ¶98:**

During the July 25 FAM session, Garriques added:

> *Today, the best platform that we have and the products that you saw get announced are running on a Freescale [i.e., Argon] platform.*
>
> . . . As you know, [we] work really, really closely with the carriers out in the
> market.
>
> *We have three additional launches [i.e., Rocket, Sagitta and Scorpius] in the second half of this year that are teed up underneath embargoes with some of our lead operators in the world. These are their flagship products for the second half of the year . . . .*

**ANSWER:**

Defendants refer to the transcript of the 2006 Financial Analyst Meeting on July 24 and

July 25, 2006 for its full and complete contents and deny any allegations of Paragraph 98 of the

Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 98 of

the Complaint.

**COMPLAINT ¶99:**

On July 25, defendants also reminded investors about the importance of Mobile Devices' ability to deliver record operating earnings. Garriques stated:

> So if you look at our operating earnings percent, which is really the measure and the quality of earnings, and Q1 to Q1, Q2 to Q2, Q3 to Q3, we've expanded those. . . . So what I believe is we will continue to gain share at the rate we have, at least through the end of 2007 and I believe that we will expand our OE from quarter last year to quarter this year.

**ANSWER:**

Defendants refer to the transcript of the 2006 Financial Analyst Meeting on July 24 and

July 25, 2006 for its full and complete contents and deny any allegations of Paragraph 99 of the

Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 99 of the Complaint.

**COMPLAINT ¶100:**

Defendants' false and misleading statements during Motorola's July 2006 FAM had the intended effect of artificially inflating the price of the Company's securities.  Between July 21, 2006 and July 26, 2006, the Company's stock priced increased from $20.40 per share to $21.85 per share.

**ANSWER:**

The first sentence of Paragraph 100 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the first sentence of Paragraph 100 of the Complaint.  Defendants refer to publicly available sources for Motorola's stock price between July 21 and July 26, 2006.

**COMPLAINT ¶101:**

Defendants' statements regarding Motorola having five Argon-based 3G handsets "on track" for the Christmas selling season, "teed up" and "running on a Freescale platform" were materially false and misleading when made for the same reasons stated in ¶91.

**ANSWER:**

Defendants deny the allegations of Paragraph 101 of the Complaint.  Defendants incorporate their response to Paragraph 91 of the Complaint.

**COMPLAINT ¶102:**

Between July 27 and August 9, 2006, Individual Defendants Brown, Devonshire, Garriques, Moloney, Nottenburg and Warrior sold 908,281 shares of their Motorola stock for over $20.3 million.  Brown, Devonshire, Garriques, Moloney, Nottenburg and Warrior failed in their duty, pursuant to Company policy and the federal securities laws, to either disclose the material adverse facts stated in ¶¶17A-17P, 74-81 before selling their stock, or to abstain from trading.

**ANSWER:**

Defendants refer to Forms 3, 4 and 5 as publicly filed with the SEC for the Individual Defendants' stock trades and deny any allegations of the first sentence of Paragraph 102 of the Complaint inconsistent therewith. The second sentence of Paragraph 102 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of the second sentence of Paragraph 102 of the Complaint and incorporate their responses to Paragraphs 17 and 74-81 of the Complaint.

**COMPLAINT ¶103:**

On September 6, 2006, Zander participated in the Citigroup 13th Annual Global Technology Conference Call. During the call, Zander confirmed for investors that he was fully aware of the operational status of the Company's new 3G handset portfolio for the 2006 holiday selling season: "We've got some good products coming out for the Q4 rush, so I'm still feeling okay. . . . That's why every week I have a staff meeting, every week I have a call, how we doing?" Indeed, documents obtained during discovery corroborate that Zander was fully aware of all aspects of the Company's Argon-based 3G handsets. ¶¶17E-17I, 17K, 17O, 17Q, 17T, 42-44, 74-77.

**ANSWER:**

Defendants admit Defendant Zander participated in a Citigroup 13th Annual Global Technology Conference Call on or about September 6, 2006, refer to the transcript of the call for its full and complete contents, and deny the remaining allegations of Paragraph 103 of the Complaint. Defendants incorporate their responses to Paragraphs 17, 42-44 and 74-77 of the Complaint.

**COMPLAINT ¶104:**

During the September 6, 2006 call, Zander was under a duty to speak truthfully and fully when he chose to speak about the status of the Company's 3G products and Motorola's business results.

**ANSWER:**

Paragraph 104 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 104 of the Complaint.

**COMPLAINT ¶105:**

During the September 6, 2006 call, Zander confirmed that the Company's new Argon-based 3G handsets were on track for delivery during the "*Q4 rush*" – or 2006 holiday selling season – and noted: "*[T]he MAX and the XX will ship in Q4*." Accordingly, when Zander stated that the Company's 3G handsets were ready for the "*Q4 rush*," he was under a duty to disclose the facts stated at ¶¶17A-17Q, 75-77.

**ANSWER:**

Defendants refer to the transcript of the Citigroup 13th Annual Global Technology Conference Call for its full and complete contents and deny any allegations of the first sentence of Paragraph 105 of the Complaint inconsistent therewith.  The second sentence of Paragraph 105 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the second sentence of Paragraph 105 of the Complaint.  Defendants incorporate their responses to Paragraphs 17 and 75-77 of the Complaint.

**COMPLAINT ¶106:**

Defendants' false and misleading statements during the September 6, 2006 Citigroup Annual Global Technology Conference had the intended effect of maintaining the artificially inflated price of the Company's securities.  Indeed, following the September 6, 2006 statements, the Company's stock price continued to trade at artificially inflated prices above $23 per share.

**ANSWER:**

Defendants refer to publicly available sources for Motorola's stock price as of September 6, 2006 and deny the allegations of Paragraph 106 of the Complaint.

## COMPLAINT ¶107:

Defendants' statements during the September 6, 2006 Citigroup 13th Annual Global Technology Conference Call were materially false and misleading when made for the same reasons stated in ¶¶91, 17Q.

## ANSWER:

Paragraph 107 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 107 of the Complaint. Defendants incorporate their responses to Paragraphs 91 and 17 of the Complaint.

## COMPLAINT ¶108:

On October 17, 2006, the Company issued its Form 8-K 3Q06 earnings press release and conducted its 3Q06 earnings conference call. Defendants Zander, Devonshire, Garriques, Moloney and Brown participated in the 3Q06 earnings conference call.

## ANSWER:

Defendants admit that Motorola issued its quarterly earnings press release for the third quarter of 2006 and held its quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006, refer to that document and the transcript of that call for their full and complete contents, and deny any allegations of Paragraph 108 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 108 of the Complaint.

## COMPLAINT ¶109:

Not only were Zander, Devonshire and Garriques under a duty to speak truthfully and fully when they spoke about the Company's Argon-based 3G products and Motorola's business results, but they had a duty to correct any falsehoods, misstatements or material omissions made by any other defendant speaking in the Company's 3Q06 earnings press or participating in the 3Q06 earnings conference call.

**ANSWER:**

Paragraph 109 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 109 of the Complaint.

**COMPLAINT ¶110:**

With regard to the Mobile Devices business, the 3Q06 earnings press release positively reported:

> *Operating earnings increased $819 million . . . compared with operating earnings of $593 million in the year-ago quarter. . . . [T]he segment's operating margin improved to 11.9 percent versus 11.2 percent in the second quarter of 2006 and 11.0 percent in the year-ago quarter, as a result of new product launches, supply chain cost reductions and higher technology and platform licensing-related income*.

The Company's October 17, 2006 press release, however, omitted to disclose, as required by GAAP, the nature and financial effects of two unusual IP licensing transactions with Freescale and Qualcomm valued at $440.0 million.  ¶¶17R, 152-179.

**ANSWER:**

Defendants admit that Motorola issued its quarterly earnings press release for the third quarter of 2006 on or about October 17, 2006 and refer to that document for its full and complete contents.  The remaining allegations of Paragraph 110 of the Complaint state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the remaining allegations of Paragraph 110 of the Complaint.  Defendants incorporate their responses to Paragraphs 17 and 152-179 of the Complaint.

**COMPLAINT ¶111:**

During the 3Q06 earnings conference call, Garriques confirmed that the Company's new Argon-based 3G handsets would be shipping in "*October and early to mid-November*" in order to make sure Motorola "*hit that all-important fill . . . channel for the holiday season*." During the call, Garriques also stated, "*The big products for us – XX, MAXX, RIZR and the two*

*versions of MOTOFONE – I feel very good, and don't feel supply-constrained ramping those up in Q4*."

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006 for its full and complete contents. Defendants deny the remaining allegations of Paragraph 111 of the Complaint.

**COMPLAINT ¶112:**

During the 3Q06 conference call, Garriques positively commented on Motorola's 4Q06 "transition" to Freescale's Argon platform. Defendants failed to disclose, however, the substantial manufacturing and quality issues Motorola continued to experience with Argon, as well as the fact that delivery of a commercially viable 3G Argon chip was one year behind plan and had created a massive operating earnings gap:

> *[W]hen you think 3G, meaning specifically UMTS, for us, this quarter is about a platform change. We took our previous platform, which we built kind of V3x on, and now have transitioned to what we call [Argon LV] from Freescale [w]ith new products like XX and MAXX, I do believe this platform in this quarter gets us a very competitive set of products out in the marketplace*.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006 for its full and complete contents. Defendants deny the remaining allegations of Paragraph 112 of the Complaint.

**COMPLAINT ¶113:**

During the 3Q06 conference call, Zander made the following statement concerning the Company's new portfolio of products, including the new Argon-based 3G handsets:

> As we look ahead to Q4 this year and fiscal 2007, we feel optimistic about our competitive position in our key businesses. ***With our new portfolio of mobile devices shipping in volume this quarter***, investments in WiMAX and Wi4 technologies, leadership positions in video, IP set-top boxes and fixed mobile conversions and our new focus on enterprise mobility with the

planned acquisition of Symbol Technologies, we look forward to
continued successes in the months and year ahead.

During the 3Q06 conference call, Zander added, "[b]oth of these products [*i.e.*, the RAZR xx and
RAZR Maxx] should be a definite boost, especially in the European Market."

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the

third quarter of 2006 on or about October 17, 2006 for its full and complete contents.

Defendants deny the remaining allegations of Paragraph 113 of the Complaint.

**COMPLAINT ¶114:**

During the 3Q06 conference call, Garriques participated in the following Q&A
concerning Mobile Devices' operating earnings and IP licensing revenue:

> [Ehud Gelblum – JP Morgan] But my question had more to do
> with the operating margin.  11.9% up from 11.2% – did gross
> margin improve[] this quarter?  Is that what drove it?  I know the
> Stu Reed stuff was definitely in there.  But was that a lot of the
> driving force, or was it more OpEx?
>
> [Garriques] I'll take a shot at this. . . . . The first part it had is we
> brought out some pretty exciting products – the KRZR and KRZR
> M. . . .  The second thing – again, thanks to Stu and the supply
> chain – is we saw very significant cost-downs. . . . In addition to
> that, we – we talked about it at the financial analyst meeting.  *We
> have grown our revenue from licensing of technologies and
> platforms, consistent with our revenue growth in the industry
> from last year to this year*.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the

third quarter of 2006 on or about October 17, 2006 for its full and complete contents.

Defendants deny the remaining allegations of Paragraph 114 of the Complaint.

**COMPLAINT ¶115:**

Later during the call, Garriques reiterated that the growth in Mobile Devices' IP licensing
revenue was the "same" as the growth of Mobile Devices during the year:

[Tim Long – Bank of America] Ron, you mentioned the platforms and the licensing.  Can you just go into a little more detail as to what is driving this? . . . [A]nd is it growing faster than the overall business?

\*         \*         \*

[Garriques] Oh, I'm sorry.  ***The team has reminded me***.  From an IP perspective, I think the way you ought to think about the IP and the platform licensing – ***IP and platform licensing this year has grown at the same rate as our sales has grown***.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006 for its full and complete contents.  Defendants deny any remaining allegations of Paragraph 115 of the Complaint.

**COMPLAINT ¶116:**

As a result of defendants' false and misleading statements during the October 17, 2006 3Q06 earnings conference call, the Company's securities continued to trade at artificially inflated prices above $23 per share.

**ANSWER:**

Paragraph 116 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 116 of the Complaint.

**COMPLAINT ¶117:**

Defendants' statements during the 3Q06 earnings conference call, concerning the status of the Company's new Argon-based 3G handsets, including whether Motorola's 3G handsets were suffering from any supply constraints, were materially false and misleading when made for the same reasons stated in ¶¶91, 101, 107, 17R-17S.  In addition:

(a)     Each week during October 2006 (and throughout the Class Period for that matter), defendant Garriques received *via* email a report entitled "3GSM Weekly Report and Program Status." This report contained a section entitled "SA Summary Report," which tracked the delivery status, or ship acceptance ("SA"), of each new handset Motorola was to introduce to the market during 2H06.  Each October 2006 weekly report defendant Garriques received prior to the October 17, 2006 earnings conference call indicated that delivery of Volans (RAZR

Maxx), IZAR Global (RAZR xx), IZAR Japan, Rocket and Scorpius would not happen in October 2006.  Indeed, the report Garriques received on October 16, 2006 highlighted each Argon-based handset slated for delivery in 4Q06 in bright red because they suffered "issues" deemed by Garriques' product managers as "Not Recoverable" in time for October 2006 deliveries.  Further, the report Garriques received on October 16, 2006 was devoid of any reference to the Argon-based Sagitta handset as it had already been eliminated from the Company's 4Q06 3G product roadmap;

(b)     By October 12, 2006, a "New 3G Chipset Supply vs. Demand" document sent from Freescale to Motorola confirmed that there were cumulative supply shortages of Argon chips of 293,000 units and 245,000 units during October 2006 and November 2006, respectively;

(c)     On August 29, 2006, Paul Smith, Motorola's Global IZAR product manager, observed, "[C]an you please get the story on why FSL shorted us this week? We need to highlight that they have impacted customer shipments, [test] cycles, and possibly delivery schedules with this shortage."  Smith testified that RAZR xx development cycle product shortages were exacerbated by delays in software development, which were caused by Argon chip shortages.  Indeed, one month earlier, Arnie Grever had discussed with Smith the negative impact of the product shortages in the IZAR Global program; and

> If we miss that date [due to a shortage of displays], all bad things will happen (customer orders will be low because they will have no confidence without samples, testing teams will be delayed, ramp volumes will be affected because the recipe will still be wrong, etc, etc.)

(d)     According to an August 11, 2006 email authored by Paul Smith, Motorola had placed orders for 3.3 million Argon chips for 4Q06, but Freescale would only be able to deliver 2.5 million chips to the Company.  Paul Smith later testified: "therefore, we had a shortage" for "[a]ll Argon phones."

## ANSWER:

Paragraph 117 of the Complaint and subparagraphs (a) through (d) state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants refer to the referenced and quoted documents and testimony for their full and complete contents and deny the remaining allegations of Paragraph 117 of the Complaint.  Defendants incorporate their responses to Paragraphs 91, 101, 107 and 17.

**COMPLAINT ¶118:**

Defendants' statements in the October 17, 2006 Form 8-K earnings release, as well as those made during the 3Q06 earnings conference call, concerning Motorola's financial results, were materially false and misleading when made because defendants failed to disclose:

(a)     Between September 26 and September 29, 2006, Motorola entered into two, 98.7% profit IP licensing transactions with Freescale and Qualcomm valued at $440.0 million in order to fill Mobile Devices' $450.0 million "earnings gap";

(b)     According to an internal Motorola report entitled "Q3 Autopsy," the rate of IP licensing revenue growth year-over-year (*i.e.*, 3Q05 versus 3Q06) was 192.0%.  The rate of IP licensing operating earnings growth year-over-year was 198.7%.  The rate of IP licensing revenue and operating earnings growth quarter-over-quarter (*i.e.*, 2Q06 versus 3Q06) was 299.0% and 318.0%, respectively;

(c)     In contrast, according to the "Q3 Autopsy," Mobile Devices' overall revenue growth year-over-year and quarter-over-quarter was 25.5% and -1.5%, respectively;

(d)     According to the "Q3 Autopsy," Mobile Devices' IP licensing transactions generated $163.0 million in operating earnings in 3Q05 compared to $488.0 million in 3Q06.  In fact, 41.0% of Mobile Devices' total operating earnings for 3Q06 was generated by just the Freescale and Qualcomm transactions;

(e)     As detailed at ¶¶152-179, defendants' accounting for and disclosure of the 3Q06 IP licensing transactions failed to comply with GAAP; and

(f)     Defendants failed to disclose that the one-year delay in Freescale's delivery of the Argon chip had already created a massive earnings gap.  ¶¶17M-17P.

**ANSWER:**

Paragraph 118 of the Complaint and its subparagraphs (a) through (f) state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 118 of the Complaint.

**COMPLAINT ¶119:**

Despite the fact that Motorola had engaged in the two unusual IP licensing transactions with Freescale and Qualcomm at the eleventh-hour of 3Q06, on October 17, 2006, Garriques again assured investors that Motorola was on track to deliver record earnings in 4Q06:

> When I took this role two years ago, I had a pretty simple message – that . . . year over year that we would expand OE. That's really what I'm sticking to, is we're going to expand OE percent this Q4 over last Q4.  Clearly, it's an internal goal for my team to continue to drive it sequentially as well.  However, our stated objective, and what we're committing to, is year-over-year OE percent increases.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006 for its full and complete contents. Defendants deny the remaining allegations of Paragraph 119 of the Complaint.

**COMPLAINT ¶120:**

Despite the Company's disclosure that it had suffered weakness in 3G sales in Europe during 3Q06, defendants assured analysts and investors that record 4Q06 operating earnings would be supported by sales of the Company's new 3G handsets.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006 for its full and complete contents. Defendants deny the remaining allegations of Paragraph 120 of the Complaint.

**COMPLAINT ¶121:**

Immediately following their false statements and omissions, between October 20 and 23, 2006, Individual Defendants Garriques, Brown and Moloney sold 269,043 shares of their Motorola stock for insider trading proceeds of $6.3 million.  Garriques, Brown and Moloney failed in their duty, pursuant to Company policy and the federal securities laws, to either disclose the material adverse facts stated in ¶¶17A-17S, 74-81, 153, 159-161, 163, 169-173, 176-179 before selling their stock, or to abstain from trading.

**ANSWER:**

Paragraph 121 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants refer to Forms 3, 4 and 5 as publicly filed with the SEC for Individual Defendants' stock trades and deny the remaining

allegations of Paragraph 121 of the Complaint. Defendants incorporate their responses to Paragraphs 17, 74-81, 153, 159-161, 163, 169-173 and 176-179 of the Complaint.

## COMPLAINT ¶122:

On November 2, 2006, Motorola filed its Form 10-Q for the period ended September 30, 2006. The 3Q06 Form 10-Q stated:

> *The segment's operating earnings increased to $819 million in the third quarter of 2006, compared to operating earnings of $593 million in the third quarter of 2005. The 38% increase in operating earnings was primarily due to an increase in gross margin, driven by: (i) increased savings from supply chain cost- reduction initiatives, (ii) the 39% increase in unit shipments, and (iii) increased income from technology and platform licensing, partially offset by: (i) the 12% decline in ASP, and (ii) an unfavorable shift in product mix*.

## ANSWER:

Defendants admit that Motorola made a Form 10-Q filing with the SEC for the quarter ended September 30, 2006 on or about November 2, 2006. Defendants refer to that Form 10-Q document for its full and complete contents and deny any allegations of Paragraph 122 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 122 of the Complaint.

## COMPLAINT ¶123:

On November 2, 2006, Zander and Devonshire submitted certifications to the SEC, pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, along with the Company's Form 10-Q. Zander and Devonshire certified, *inter alia*:

- Motorola's 3Q06 Form 10-Q "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*"; and

- They had "*[d]esigned . . . internal control over financial reporting . . . to provide reasonable assurance regarding the*

*reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP].*"

**ANSWER:**

Defendants admit that Motorola made a Form 10-Q filing with the SEC for the quarter ended September 30, 2006. Defendants refer to that Form 10-Q document for its full and complete contents and deny any allegations of Paragraph 123 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 123 of the Complaint.

**COMPLAINT ¶124:**

As a result of defendants' false and misleading statements in the Company's 3Q06 Form 10-Q and associated Sarbanes-Oxley certifications, the Company's securities continued to trade at artificially inflated prices.

**ANSWER:**

Paragraph 124 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 124 of the Complaint.

**COMPLAINT ¶125:**

Defendants' statements in the 3Q06 Form 10-Q and Sarbanes-Oxley certifications were materially false and misleading when made for the same reasons stated in ¶¶17R, 152-179. Further, the Form 10-Q failed to disclose the true nature and financial effects of each of the Freescale and Qualcomm 3Q06 IP licensing transactions as required by GAAP. *Id.*

**ANSWER:**

Paragraph 125 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 125 of the Complaint. Defendants incorporate their responses to Paragraphs 17 and 152-179 of the Complaint.

**COMPLAINT ¶126:**

On November 15, 2006, following the filing of Motorola's Form 10-Q, Garriques participated in the UBS Technology Conference in New York City.  During his presentation, Garriques presented a slide comparing Mobile Devices' operating earnings performance versus Nokia, LG, Samsung and SEMC.  ***The slide showed Mobile Devices' operating earnings to be approximately 11.0% for 3Q06 and asserted that operating earnings were presented on a "GAAP Basis."***

**ANSWER:**

Defendants admit Defendant Garriques participated in a UBS Technology Conference in

New York City on November 15, 2006 and deny the remaining allegations of Paragraph 126 of

the Complaint.

**COMPLAINT ¶127:**

By choosing to speak about Mobile Devices' 3Q06 operating earnings performance, as well as the fact that those results were presented in conformity with GAAP, defendants were under a duty pursuant to the federal securities laws to fully disclose the material adverse facts stated in ¶¶17R, 153, 159-161, 163, 169-173, 176-179, including the earnings gap created by delays to the Argon-based 3G product portfolio and defendants' efforts to cover-up that gap with the Freescale and Qualcomm licensing transactions.

**ANSWER:**

Paragraph 127 of the Complaint states legal conclusions and argument to which no

response is required.  To the extent a response is required, Defendants deny the allegations of

Paragraph 127 of the Complaint.  Defendants incorporate their responses to Paragraphs 17, 153,

159-161, 163, 169-173 and 176-179 of the Complaint.

**COMPLAINT ¶128:**

As a result of defendants' false and misleading statements concerning the Company's 3Q06 operating earnings performance, as well as the fact that defendants assured that those results were presented in conformity with GAAP, the Company's securities continued to trade at artificially inflated prices above $22 per share.

**ANSWER:**

Paragraph 128 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 128.

**COMPLAINT ¶129:**

Defendants' statements during the November 15, 2006 UBS Technology Conference were materially false and misleading when made for the same reasons stated in ¶118.

**ANSWER:**

Paragraph 129 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 129 of the Complaint. Defendants incorporate their response to Paragraph 118 of the Complaint.

**COMPLAINT ¶130:**

On November 30, 2006, Ed Zander participated in the Credit Suisse Annual Technology Conference, during which he continued to assure investors that the Company's new 3G *RAZR Maxx and RAZR xx were "not late."*

**ANSWER:**

Defendants admit Defendant Zander participated in a Credit Suisse Annual Technology Conference on November 30, 2006, refer to the transcript of that event for its full and complete contents, and deny any allegations of Paragraph 130 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 130 of the Complaint.

**COMPLAINT ¶131:**

Not only were defendants under a duty to speak truthfully and fully when they spoke about the Company's 3G products, but were under a duty pursuant to the federal securities laws to fully disclose the material adverse facts stated in ¶¶17A-17V, 74-81.

**ANSWER:**

Paragraph 131 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 131 of the Complaint. Defendants incorporate their responses to Paragraphs 17 and 74-81 of the Complaint.

**COMPLAINT ¶132:**

As a result of defendants' false and misleading statements concerning the 3G products at the Credit Suisse Annual Technology Conference, the Company's securities continued to trade at artificially inflated prices.

**ANSWER:**

Paragraph 132 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 132 of the Complaint.

**COMPLAINT ¶133:**

Defendants' statements during the November 30, 2006 Credit Suisse Annual Technology Conference were materially false and misleading when made for the same reasons stated in ¶¶91, 101, 107, 117, 17U-17V. In addition:

(a)     On November 15, 2006, Cingular Wireless informed Motorola that it was not going to market the RAZR xx in North America in 4Q06 and imposed a $50.0 million liquidated damages penalty as a result of Motorola's failure to deliver the handset on a timely basis. The next day, Garriques paid a personal visit to Cingular Wireless and admitted Motorola had failed in its 2006 3G product delivery obligations because of Freescale; and

(b)     On November 28, 2006, Motorola placed a stop ship on all RAZR xx and Scorpius handsets shipments to Japan. At the time, Motorola management internally noted "this Freescale issue [is] a serious show stopper . . . Scorpius delayed a year and still cannot ship."

**ANSWER:**

Paragraph 133 of the Complaint and its subparagraphs (a) and (b) state legal conclusions and argument to which no response is required. To the extent a response is required, Defendants

deny the allegations of Paragraph 133 of the Complaint.  Defendants incorporate their responses

to Paragraphs 91, 101, 107, 117 and 17 of the Complaint.

## COMPLAINT ¶134:

Moreover, by choosing to speak about the purported readiness of the Company's new 3G
handset portfolio, defendants were under a duty pursuant to the federal securities laws to fully
disclose the material adverse facts stated in ¶¶17A- 17V, 74-81.

## ANSWER:

Paragraph 134 of the Complaint states legal conclusions and argument to which no

response is required.  To the extent a response is required, Defendants deny the allegations of

Paragraph 134 of the Complaint.  Defendants incorporate their responses to Paragraphs 17 and

74-81 of the Complaint.

## COMPLAINT ¶135:

As alleged herein, defendants acted with scienter in that they knew or recklessly
disregarded and failed to disclose material adverse facts at the time they made their materially
false and misleading Class Period statements to investors and the market.  ¶¶17A-17Y, 74-81,
84-87, 91, 96-98, 101, 110-115, 117-118, 122-123, 125-127, 129, 131, 133, 152-179.  Indeed,
defendants Zander and Garriques were acutely aware of the undisclosed problems with the
Company's Argon- based 3G handsets.  For instance, throughout the Class Period, Zander and
Garriques participated in regular "Executive Reviews" with Cingular's top management team,
including Cingular's CEO, Ralph de la Vega.  The topics of these meetings included Cingular's
disappointment with the Company's failure to deliver a competitive Argon-based 3G handset in
1Q, 2Q, 3Q or 4Q06.  Vodafone, moreover, repeatedly complained to Zander and Garriques that
Motorola would not have the new 3G products slated for the European market ready for 1Q, 2Q
or 3Q06.  Throughout the Class Period, Zander and Garriques personally received complaints
from customers regarding late deliveries of the Argon-based 3G handsets, as well as the risks
inherent in the Company's 2006 3G product portfolio, not only from Cingular and Vodafone, but
also from carriers such as DoCoMo and Telstra.

## ANSWER:

The first and second sentences of Paragraph 135 of the Complaint state legal conclusions

and argument to which no response is required.  To the extent a response is required, Defendants

deny the allegations of the first and second sentences of Paragraph 135 of the Complaint.

Defendants refer to the referenced documents for their full and complete contents and deny any allegations of the third through sixth sentences of Paragraph 135 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of the third through sixth sentences of Paragraph 135 of the Complaint. Defendants incorporate their responses to Paragraphs 17, 74-81, 84-87, 91, 96-98, 101, 110-115, 117-118, 122-123, 125-127, 129, 131, 133 and 152-179 of the Complaint.

## COMPLAINT ¶136:

Each of the defendants knew that each Class Period misstatement would be issued to the investing public, and knowingly and substantially participated or acquiesced in the issuance of such misstatements in violation of federal securities laws. The Individual Defendants, as evidenced by Motorola's document production in this case to date, as well as their Class Period pronouncements of knowledge, knew of or recklessly disregarded each of the material adverse facts alleged herein at the time they made their Class Period statements and omissions. *Id.*

## ANSWER:

Paragraph 136 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 136 of the Complaint. Defendants incorporate their responses to Paragraphs 17, 74-81, 84-87, 91, 96-98, 101, 110-115, 117-118, 122-123, 125-127, 129, 131, 133 and 152-179 of the Complaint.

## COMPLAINT ¶137:

Because of their executive and managerial positions with Motorola, the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of Motorola particularized herein *via* access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management meetings and committees thereof and/or *via* reports and other information provided to them in connection therewith. ¶¶17A-17Y, 42-61, 74-81.

**ANSWER:**

Defendants deny the allegations of Paragraph 137 of the Complaint. Defendants incorporate their responses to Paragraphs 17, 42-61 and 74-81 of the Complaint.

**COMPLAINT ¶138:**

In addition to the strong motivation provided by lucrative insider selling alleged below, the Individual Defendants were highly motivated by the terms of their employment agreements, which tied their compensation directly to Motorola's reported operating earnings and the performance of the Company's stock. In addition to maintaining their employment positions, the personal wealth of each of the Individual Defendants was dramatically enhanced by defendants' false statements and material omissions regarding Motorola's business and financial performance. Motorola awarded defendant Zander more than $14.0 million in total salary and incentive-based compensation in 2006. Zander's 2006 compensation also included $350,999 for personal use of Motorola's company aircraft, $55,810 for a personal car and driver and additional costs for financial planning, a home security system and spousal business travel. Defendant Garriques was awarded over $5.4 million in total salary and incentive-based compensation in 2006. Defendant Brown was awarded over $6.1 million and defendant Devonshire was awarded more than $3.7 million. *In total, the Individual Defendants were awarded more than $29.3 million in salary and incentive-based compensation during 2006.*

**ANSWER:**

Defendants deny the allegations of the first and second sentences of Paragraph 138 of the Complaint. Defendants refer to Motorola's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed with the SEC on March 15, 2007 for Zander, Garriques, Brown and Devonshire's compensation and deny any allegations of the third through seventh sentences of Paragraph 138 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of the third through seventh sentences of Paragraph 138 of the Complaint.

**COMPLAINT ¶139:**

According to Motorola's 2006 Proxy Statement, the Board of Directors established "Executive Compensation Guiding Principles." Among the guiding principles specific to executive compensation was the institution of a "strong link between pay and performance." Indeed, according to Motorola's 2007 Proxy Statement, "more than two-thirds of our senior executives' targeted total compensation is 'at risk' . . . and is dependent upon Motorola's results."

**ANSWER:**

Defendants refer to Motorola's 2006 Proxy Statement for its full and complete contents, and deny any allegations of Paragraph 139 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 139 of the Complaint.

**COMPLAINT ¶140:**

According to Motorola proxy statements, the Company's compensation program had several performance-based components, including a short-term, cash-based incentive under the Motorola Incentive Plan ("MIP") and a Motorola Long-Range Incentive Plan ("LRIP") that ensured Motorola executives received "pay-for-performance." Motorola measured and accrued MIP awards on a quarterly basis based on a formula that considered the Company's operating earnings, operating cash flow and revenue growth, among other metrics.  The fraudulent 3Q06 IP licensing transactions dramatically increased the Company's operating earnings and cash flow and, thus, contributed to the total accrual for the Individual Defendants' potential cash based 2006 MIP award.

**ANSWER:**

Defendants refer to the referenced proxy statements for their full and complete contents and deny any allegations of the first and second sentences of Paragraph 140 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of the first and second sentences of Paragraph 140 of the Complaint.  Defendants deny the allegations of the third sentence of Paragraph 140 of the Complaint.

**COMPLAINT ¶141:**

The LRIP required Motorola's senior executives to "maintain prescribed levels of Motorola stock ownership." Specifically, defendant Zander was required to maintain common stock valued at four times his base salary.  Executive vice presidents were required to maintain the lesser of 50,000 shares or three times base salary, while senior vice presidents were required to maintain the lesser of 25,000 shares or two times base salary.

**ANSWER:**

Defendants refer to the Motorola Long Range Incentive Plan for its full and complete

contents and deny any allegations of Paragraph 141 of the Complaint inconsistent therewith.

Defendants deny the remaining allegations of Paragraph 141 of the Complaint.

**COMPLAINT ¶142:**

As the charts below demonstrate, Zander and the other Individual Defendants were
rewarded well beyond their base salaries as a result of their role at Motorola during 2006 and the
Class Period.

| FY 2006 Executive Compensation[5] | | | | | | |
|---|---|---|---|---|---|---|
| Individual Defendant | Salary | Stock Awards | Options Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total Compensation |
| Zander | $1,500,000 | $2,528,100 | $7,751,046 | $1,265,000 | $979,257 | $14,023,403 |
| Brown | $726,923 | $2,002,835 | $2,847,391 | $500,000 | $31,420 | $6,108,569 |
| Garriques | $726,923 | $1,886,504 | $2,191,681 | $0 | $627,087 | $5,432,195 |
| Devonshire | $625,000 | $50,120 | $2,647,231 | $300,000 | $123,164 | $3,745,515 |
| Total | $3,578,846 | $6,467,559 | $15,437,349 | $2,065,000 | $1,760,928 | $29,309,682 |

**ANSWER:**

Defendants refer to Motorola's Proxy Statement Pursuant to Section 14(a) of the

Securities Exchange Act of 1934, filed with the SEC on March 15, 2007, for Defendants Zander,

Garriques, Devonshire and Brown's compensation and deny the allegations of Paragraph 142 of

the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph

142 of the Complaint.

---

[5] Compensation information for defendants Zander, Brown, Garriques and Devonshire was obtained from relevant
Motorola proxy statements. Motorola did not publicly report compensation information for defendants Nottenburg,
Moloney or Warrior for 2006.

## COMPLAINT ¶143:

In addition to the non-salary components of the Individual Defendants' 2006 compensation noted above, on March 6, 2006, Motorola awarded defendants Garriques and Brown each with $7.7 million of restricted stock units ("RSU"), at a zero cost-basis.[6] The purpose of this award was to incentivize defendants Garriques and Brown to remain on board as presidents of their respective business segments.

## ANSWER:

Defendants refer to Motorola's Proxy Statement Pursuant to Section 14(a) of the

Securities Exchange Act of 1934, filed with the SEC on March 15, 2007, for Defendants Brown

and Garriques's compensation and deny the allegations of Paragraph 143 of the Complaint

inconsistent therewith.   Defendants deny the remaining allegations of Paragraph 143 of the

Complaint.

## COMPLAINT ¶144:

Defendants' Class Period misstatements and omissions enabled the Individual Defendants to unload 1.17 million shares of their Company stock at artificially inflated prices for proceeds exceeding $26.5 million.  As detailed further herein, the Individual Defendants' insider trades were timed to take advantage of immediate artificial inflation of Motorola's stock price, at the expense of unwitting investors.

| LAST NAME | FIRST NAME | DATE | SHARES | PRICE | PROCEEDS | % SOLD |
|---|---|---|---|---|---|---|
| BROWN | Gregory | 07/27/2006 | 44,800 | $22.10 | $990,080 | |
| | | 07/27/2006 | 37,090 | $22.12 | $820,431 | |
| | | 07/27/2006 | 8,900 | $22.08 | $196,512 | |
| | | 07/27/2006 | 7,000 | $22.09 | $154,630 | |
| | | 10/20/2006 | 42,000 | $23.30 | $978,600 | |
| | | 10/20/2006 | 12,000 | $23.32 | $279,840 | |
| | | 10/20/2006 | 10,000 | $23.27 | $232,700 | |
| | | 10/20/2006 | 7,700 | $23.35 | $179,795 | |
| | | 10/20/2006 | 6,040 | $23.36 | $141,094 | |

---

[6] Upon defendant Garriques' February 16, 2007 termination of employment, he was forced to forfeit all stock ($1.9 million), options ($2.2 million) and RSUs ($7.7 million), awarded to him by Motorola as compensation for 2006.

| LAST NAME | FIRST NAME | DATE | SHARES | PRICE | PROCEEDS | % SOLD |
|---|---|---|---|---|---|---|
| | | 10/20/2006 | 5,000 | $23.34 | $116,700 | |
| | | 10/20/2006 | 5,000 | $23.31 | $116,550 | |
| | | 10/20/2006 | 4,000 | $23.28 | $93,120 | |
| | | 10/20/2006 | 900 | $23.26 | $20,934 | |
| | | 10/23/2006 | 16,500 | $23.25 | $383,625 | |
| | | 10/23/2006 | 1,437 | $23.26 | $33,425 | |
| | | | 208,367 | | $4,738,036 | 29.19% |
| DEVONSHIRE | David | 07/27/2006 | 75,200 | $22.10 | $1,661,920 | |
| | | 07/27/2006 | 57,300 | $22.12 | $1,267,476 | |
| | | 07/27/2006 | 40,000 | $22.08 | $883,200 | |
| | | 07/27/2006 | 23,800 | $22.11 | $526,218 | |
| | | 07/27/2006 | 22,030 | $22.13 | $487,524 | |
| | | 07/27/2006 | 7,400 | $22.09 | $163,466 | |
| | | | 225,730 | | $4,989,804 | 80.05% |
| GARRIQUES | Ronald | 08/092006 | 90,081 | $23.15 | $2,085,375 | |
| | | 08/092006 | 51,700 | $23.13 | $1,195,821 | |
| | | 08/092006 | 46,000 | $23.12 | $1,063,520 | |
| | | 10/23/2006 | 25,098 | $23.60 | $592,313 | |
| | | 10/23/2006 | 11,200 | $23.63 | $264,656 | |
| | | 10/23/2006 | 8,900 | $23.64 | $210,396 | |
| | | 10/23/2006 | 4,300 | $23.66 | $101,738 | |
| | | 10/23/2006 | 3,400 | $23.67 | $80,478 | |
| | | 10/23/2006 | 2,600 | $23.65 | $61,490 | |
| | | 10/23/2006 | 1,300 | $23.62 | $30,706 | |
| | | 10/23/2006 | 200 | $23.61 | $4,722 | |
| | | | 244,779 | | $5,691,215 | 35.06% |
| MOLONEY | Daniel | 07/27/2006 | 43,400 | $22.10 | $959,140 | |
| | | 07/27/2006 | 16,100 | $22.08 | $355,488 | |
| | | 07/27/2006 | 11,600 | $22.12 | $256,592 | |
| | | 07/27/2006 | 3,900 | $22.09 | $86,151 | |
| | | 10/20/2006 | 35,000 | $23.40 | $819,000 | |
| | | 10/20/2006 | 23,800 | $23.43 | $557,634 | |
| | | 10/20/2006 | 20,000 | $23.42 | $468,400 | |
| | | 10/20/2006 | 15,000 | $23.41 | $351,150 | |
| | | 10/20/2006 | 4,668 | $23.45 | $109,465 | |
| | | 10/20/2006 | 3,000 | $23.46 | $70,380 | |
| | | | 176,468 | | $4,033,400 | 55.22% |
| NOTTENBURG | Richard | 07/27/2006 | 45,100 | $22.12 | $997,612 | |
| | | 07/27/2006 | 27,500 | $22.10 | $607,750 | |
| | | 07/27/2006 | 17,069 | $22.13 | $377,737 | |
| | | 07/27/2006 | 5,700 | $22.09 | $125,913 | |
| | | | 95,369 | | $2,109,012 | 49.80% |

| LAST NAME | FIRST NAME | DATE | SHARES | PRICE | PROCEEDS | % SOLD |
|-----------|------------|------|--------|-------|----------|--------|
| WARRIOR | Padmasree | 07/27/2006 | 226,611 | $22.00 | $4,985,442 | |
| | | | 226,611 | | $4,985,442 | 69.28% |
| | | **Total:** | **1,177,324** | | **$26,546,908** | |

## ANSWER:

Defendants deny the allegations of the first and second sentences of Paragraph 144 of the Complaint.  Defendants refer to Forms 3, 4 and 5 as publicly filed with the SEC for the Individual Defendants' stock trades and deny any allegations of the chart contained in Paragraph 144 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 144 of the Complaint.

## COMPLAINT ¶145:

Defendants' insider trading was unusual and suspicious for at least the following reasons:

(a)     Each of the sellers sold a material portion of their Motorola common stock holdings;

(b)     The insider selling followed after the issuance of materially false and misleading statements, as well as the fact that at the time each Individual Defendant sold their stock, they had knowledge or access of material adverse facts concerning the Company's business; and

(c)     The insider trading occurred at high prices relative to where the price of Motorola's stock traded when the full truth concerning defendants' Class Period fraud was disclosed.

## ANSWER:

Paragraph 145 of the Complaint and its subparagraphs (a) through (c) state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 145 of the Complaint.

## COMPLAINT ¶146:

Specifically, Motorola's stock price was artificially inflated at all times during the Class Period when the Individual Defendants sold their stock due to defendants' false statements and omissions regarding Motorola's Argon-based 3G product portfolio and the Company's business and financial results.  *See* Stock Chart attached hereto as Exhibit A.  At the time of these false statements and material omissions, however, defendants knew, *inter alia*, that 3G UMTS/HSDPA unit sales, from 1Q06 to 2Q06, were actually down 12.0% and, that the 3G portfolio was an "F'UP with Freescale" and otherwise a "bust . . . across all product lines." Defendants were aware that the Company's Argon-based 3G handset portfolio was not on track. At the time defendants sold their stock, it was also clear that Mobile Devices was facing an operating earnings gap exceeding $1.0 billion for 2H06, versus the operating earnings guidance defendants had provided investors in April 2006.  Further, at the time the Individual Defendants sold their stock, Garriques had already informed them that the "***monster issue***" was the one-year slip in Argon chip delivery and the associated operating earnings loss of $365.0 million.  With knowledge of these facts, between July 27 and August 9, 2006, several of the Individual Defendants sold approximately $20.0 million of their Motorola stock.

## ANSWER:

The first sentence of Paragraph 146 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the first sentence of Paragraph 146 of the Complaint.  Defendants refer to publicly available sources for Motorola stock price and deny the allegations of the second sentence of Paragraph 146 of the Complaint and the Stock Chart attached as Exhibit A to the Complaint.  Defendants deny the remaining allegations of Paragraph 146 of the Complaint.

## COMPLAINT ¶147:

As detailed herein, defendants entered into two last-minute IP transactions to fill the massive operating earnings gap Mobile Devices had in 3Q06.  Neither of these transactions were appropriately accounted for during the Class Period.  Defendants' failure to appropriately or adequately disclose the nature and financial effect of each transaction, together with defendants' false statements and omissions regarding the 3G products, provided the opportunity for Garriques, Brown and Moloney to sell another $6.5 million of their stock between October 20 and 23, 2006 at artificially inflated prices.

**ANSWER:**

Defendants admit that Motorola entered into two intellectual property transactions in

3Q06 and deny the remaining allegations of Paragraph 147 of the Complaint.

**COMPLAINT ¶148:**

The Individual Defendants, because of their positions with Motorola, controlled the contents of the Company's public statements, press releases and quarterly and annual reports disseminated throughout the Class Period.  Each Individual Defendant was provided with or had access to copies of the reports and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, including unrestricted access to the Company's Compass document database, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Motorola's corporate statements and are therefore responsible and liable for the representations contained therein.

**ANSWER:**

Defendants deny the allegations of the first and second sentences of Paragraph 148 of the

Complaint.  The third and fourth sentences of Paragraph 148 of the Complaint state legal

conclusions and argument to which no response is required.  To the extent a response is required,

Defendants deny the allegations of the third and fourth sentences of Paragraph 148 of the

Complaint.

**COMPLAINT ¶149:**

Defendants Motorola, Zander, Garriques, Devonshire and Nottenburg are liable as primary violators in making false and misleading statements and omissions, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Motorola's securities during the Class Period.

**ANSWER:**

Paragraph 149 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 149 of the Complaint.

**COMPLAINT ¶150:**

As alleged herein, the defendants acted with scienter in that each such defendant knew or recklessly disregarded that the public documents and statements, issued or disseminated by or in the name of the Company, were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued to the investing public, and knowingly and substantially participated or acquiesced in the issuance of such statements or documents as primary violators of the federal securities laws.

**ANSWER:**

Paragraph 150 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 150 of the Complaint.

**COMPLAINT ¶151:**

The defendants, by virtue of their receipt of information reflecting the true facts regarding Motorola and its products and business practices, their control over and/or receipt of Motorola's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Motorola, were active and culpable participants in the fraudulent scheme alleged herein.  The defendants knew of, or recklessly disregarded, the false and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent schemes described in this complaint could not have been perpetuated over a substantial period of time, without the knowledge and complicity of the Individual Defendants.

**ANSWER:**

Paragraph 151 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 151 of the Complaint.

**COMPLAINT ¶152:**

By the beginning of the Class Period, defendants knew that Mobile Devices' internal forecasts indicated that the segment would fall $450.0 million short of the 3Q06 operating earnings guidance provided to investors in April 2006 as a result of the failure to timely launch new 3G handsets, among other factors.  As of July 24, 2006, Mobile Devices' internal "Q3 Playbook" showed that the 3Q06 operating earnings "gap" had ballooned to over $600.0 million and specifically identified IP transactions as a "lever" the Company could pull to close the gap.  However, the two IP transactions Motorola executed in late 3Q06 were unusual in that they were extremely large, and did not represent core or repeatable business revenue.  Accordingly, accounting rules required separate disclosure concerning the 3Q06 IP licensing transactions in the Company's, October 17, 2006 Form 8-K earnings press release, as well as the 3Q06 financial statements and management discussion and analysis ("MD&A") section in the Company's November 2, 2006 Form 10-Q.

**ANSWER:**

Defendants deny the allegations of the first, second and third sentences of Paragraph 152 of the Complaint.   The fourth sentence of Paragraph 152 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the fourth sentence of Paragraph 152 of the Complaint.

**COMPLAINT ¶153:**

Earlier, in June 2006, Motorola's corporate accounting department questioned whether an IP transaction with Freescale as small as $50.0 million would comply with GAAP if the nature and financial effects of the deal were not disclosed in the Company's SEC filings.  As noted by Henry Goldberg, Motorola's Finance Manager of Strategic Projects, a $50.0 million deal may:

> *[Require us] to "call out" this item in our earnings report as a one-time or unusual transaction[.] We could still take the revenue if it triggered a "call out," but it would raise more questions from the external analysts as to condition of our "core" business*.

Despite this internal acknowledgment of GAAP disclosure requirements, as well as the informational effect a disclosure would have on the market, defendants failed to disclose the nature and financial effect of either the Freescale and Qualcomm 3Q06 IP transactions, which far exceeded $50.0 million, in blatant violation of GAAP and SEC rules.

**ANSWER:**

Defendants refer to the quoted document for its full and complete contents and deny any allegations of Paragraph 153 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 153 of the Complaint. The second sentence of Paragraph 153 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of the second sentence of Paragraph 153 of the Complaint.

**COMPLAINT ¶154:**

GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

**ANSWER:**

Defendants refer to the referenced regulations for their full and complete contents and deny any allegations of Paragraph 154 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 154 of the Complaint.

**COMPLAINT ¶155:**

Additionally, FASB Statements of Financial Accounting Concepts Nos. 1 and 2 establish the fundamental objectives and principles of financial reporting. Defendants also violated at least the following key FASB Concepts by failing to disclose the Freescale and Qualcomm 3Q06 IP transactions, and, accordingly failed to present its 3Q06 financial statements in accordance with GAAP:

- The principle that financial reporting should be complete, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

- The principle that financial reporting should provide information that is useful to present and future investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶34);

- The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42); and

- The principle that financial reporting should be reliable in that it represents what it purports to represent.  This notion is central to financial accounting (FASB Statement of Concepts No. 2, ¶¶58-59).

**ANSWER:**

Defendants refer to the referenced FASB Statements of Financial Accounting Concepts for their full and complete contents, and deny any allegations of the first sentence of Paragraph 155 of the Complaint inconsistent therewith.  The second sentence of Paragraph 155 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants refer to the referenced statements for their full and complete contents and deny the allegations of the second sentence of Paragraph 155 of the Complaint.

**COMPLAINT ¶156:**

There is additional evidence of defendants' motivation to violate GAAP and further conceal the nature and financial effect of each 3Q06 IP transaction to investors.  For example, when defendants were asked by financial analysts during the October 17, 2006 conference call whether the growth rate of 3Q06 IP licensing was greater than the growth rate of Mobile Devices' revenues year-over-year, defendants falsely assured investors that the growth rate was the same.  Defendants' conduct concealed the fact that the Company's 3G business was in shambles, was causing hundreds of millions of dollars in operating losses and, therefore, Mobile Devices' long history of producing double-digit operating earnings as a percentage of revenue had come to an abrupt end in 3Q06.

**ANSWER:**

Defendants refer to the transcript of Motorola's quarterly earnings conference call for the third quarter of 2006 on or about October 17, 2006 for its full and complete contents and

deny any allegations of Paragraph 156 of the Complaint inconsistent therewith. Defendants deny

the remaining allegations of Paragraph 156 of the Complaint.

## COMPLAINT ¶157:

Pursuant to sworn testimony provided by a Prudential Equity analyst who covered Motorola throughout the Class Period, it would have been critical for investors to know whether the Company had engaged in these transactions during 3Q06:

> Q:    Two deals doubled the earnings, that would have been important to you?
>
>                      * * *
>
> A:    *Yes, I think that would be material*.
>
> Q:    And why is that?
>
> A:    *Well, the question would be about how repeatable are they. The question would be whether it would change the future earning stream from the handsets, whether it was changing the structure of the business in some way*.

## ANSWER:

Defendants refer to the quoted testimony for its full and complete contents and deny any

allegations of Paragraph 157 of the Complaint inconsistent therewith. Defendants deny the

remaining allegations of Paragraph 157 of the Complaint.

## COMPLAINT ¶158:

Indeed, the SEC has also weighed in on this topic and requires registrants to provide disclosures in their public filings that would allow investors to understand how current operating results impact prospects for the future. In 1989 the SEC published interpretive release, Financial Reporting Release No. 36, *MD&A; Certain Investment Company Disclosures* ("FRR 36"). FRR 36 states that the MD&A should:

> [G]ive investors an opportunity to look at [a company] through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with particular emphasis on the registrant's prospects for the future.

**ANSWER:**

Defendants refer to Financial Reporting Release No. 36 for its full and complete contents

and deny any allegations of Paragraph 158 of the Complaint inconsistent therewith.  Defendants

deny the remaining allegations of Paragraph 158 of the Complaint.

**COMPLAINT ¶159:**

But for the two 3Q06 IP licensing transactions valued at $440.0 million, Mobile Devices' $819.0 million of reported operating earnings would have been cut by 41.0%.  Moreover, the imputed margins for Motorola's handsets would have dropped from 11.9% to 7.0%.  Had defendants disclosed the financial impact and nature of each transaction during Motorola's 3Q06 earnings conference call on October 17, 2006, analysts and investors would have discounted the IP transactions as "one-time" events and the degradation of the Company's quality of earning and shrinking handset margins due to the lack of high-tier 3G handsets would have been immediately exposed.

**ANSWER:**

To the extent the allegations of the first and second sentences of Paragraph 159 of the

Complaint are based on documents, Defendants refer to those documents for their full and

complete contents and deny any allegations of the first and second sentences of Paragraph 159 of

the Complaint inconsistent therewith.  Defendants deny the remaining allegations of the first and

second sentences of Paragraph 159 of the Complaint.  Defendants deny the allegations of the

third sentence of Paragraph 159 of the Complaint.

**COMPLAINT ¶160:**

On or about September 28, 2006 – just two days before quarter end, Motorola and Freescale entered into an agreement in which Motorola granted Freescale a "perpetual license" for the use of any Motorola software that was partially or fully compliant with 3GPP R5, 3GPP R6, 3GPP R7 and 3GPP LTE (*i.e.*, various releases of the 3G mobile phone system specifications as determined by the International Telecommunications Union, the suite of releases referred to in the industry as "3GPP1").  According to Motorola's document production to date, the purpose of this deal was highly unusual.  Indeed, the purpose of the agreement was for Motorola to purportedly sell an IP licensing package to Freescale valued at $165.0 million and, in exchange, Motorola would also release product supply and cost reductions claims it held against Freescale. The title of the contract that Motorola and Freescale signed is "2G/UMTS SOFTWARE AND

WAMMO LICENSE AGREEMENT" (referred to herein as "3Q06 Freescale IP Licensing Transaction").

**ANSWER:**

Defendants refer to the referenced agreement for its full and complete contents and deny any allegations of Paragraph 160 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 160 of the Complaint.

**COMPLAINT ¶161:**

Motorola's product supply and cost reduction claims against Freescale were significant and included those for late delivery of the Argon chips, as well as other chips that were to be included in the Company's older 3G and 2G handsets.  In early June 2006, Garriques informed Freescale's CEO, Michel Mayer, that Motorola believed the chip-maker's development and delivery failures would cost Motorola in excess of $600.0 million through 2007.  In its essence, one of the primary purposes of the 3Q06 Freescale IP Licensing Transaction was to allow Freescale to settle Motorola's claims regarding Argon chip cost, quality and delivery failures at a significant discount, and, in exchange, it enabled Motorola to partially fill the giant 3Q operating earnings gap created by Freescale's failings.

**ANSWER:**

Defendants deny the allegations of Paragraph 161 of the Complaint.

**COMPLAINT ¶162:**

GAAP requires separate disclosure of certain types of transactions, including their nature and financial effect on a Company's financial statements.  Specifically, Accounting Principles Board Opinion No. 30 ("APB 30"), ¶26, provides:[7]

> ***Disclosure of Unusual or Infrequently Occurring Items***
>
> A material event or transaction that is unusual in nature or occurs infrequently, but not both, and therefore does not meet both criteria for classification as an extraordinary item, . . . shall be reported as a separate component of income from continuing

---

[7] On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, The FASB Accounting Standards Codification[TM] and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162. FASB Accounting Standards Codification[TM] ("ASC") will become the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC. These allegations use the historical references to U.S. GAAP, as such references existed during the Class Period.

operations.  ***The nature and financial effects of each event or transaction should be disclosed on the face of the income statement or, alternatively, in notes to the financial statements***.

**ANSWER:**

Defendants refer to the quoted document for its full and complete contents and deny any allegations of Paragraph 162 of the Complaint inconsistent therewith.  The remaining allegations of Paragraph 162 of the Complaint state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the remaining allegations of Paragraph 162 of the Complaint.

**COMPLAINT ¶163:**

Defendants knew that the Freescale transaction was both material and "unusual or infrequent" and, as such, required separate disclosure in Motorola's 3Q06 public financial statements.  First, Motorola understood it was highly unusual or infrequent to settle a $600.0 million product supply claim by packaging and cloaking it as an "IP transaction." Second, the Freescale transaction was unusual in that it was a significantly large, one-time transaction that did not represent Motorola's core or repeatable business, but was used to fill a massive earnings shortfall.  Third, it was unusual for Motorola to sell the type of technology contemplated in the 3Q06 Freescale IP Transaction.

**ANSWER:**

Paragraph 163 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 163 of the Complaint.

**COMPLAINT ¶164:**

Documents produced to date demonstrate the unusual and unique nature of the 3Q06 Freescale IP Licensing Transaction.  Indeed, internally, ***on January 3, 2007, defendants Garriques, Zander and Devonshire received an analysis of the 53.5% slide in operating earnings between 1H06 and 2H06, which specifically "backed out" and excluded the IP transactions with Freescale and Qualcomm***.  Garriques, Zander and Devonshire received this analysis so that they could make an accurate comparison of the actual earnings performance for Mobile Devices between 1H06 and 2H06 immediately before disclosing disappointing 4Q06 operating earnings.  The investing public, however, were never afforded the luxury of this material information during the Class Period.

**ANSWER:**

Defendants refer to the referenced document for its full and complete contents and deny any allegations of Paragraph 164 of the Complaint inconsistent therewith.  Defendants deny the remaining allegations of Paragraph 164 of the Complaint.

**COMPLAINT ¶165:**

For these reasons, among others, GAAP required that Motorola separately disclose the nature and financial effects of the 3Q06 Freescale IP Licensing Transaction in the Company's October 17, 2006 Form 8-K earnings press release, as well as the Company's November 2, 2006 Form 10-Q.  *See* APB 30, ¶26; FASB Statement of Concepts No. 1, ¶34; FASB Statement of Concepts No. 2, ¶79; FASB Statement of Concepts No. 2, ¶¶58-59; and FRR 36.

**ANSWER:**

Defendants deny the allegations of Paragraph 165 of the Complaint.

**COMPLAINT ¶166:**

Not only was the 3Q06 Freescale IP Licensing Transaction unusual or infrequent, but numerous facts demonstrate that the Company inappropriately recognized the revenue associated with the deal in order to conceal the earnings gap caused by Motorola's 3G product delays.

**ANSWER:**

Defendants deny the allegations of Paragraph 166 of the Complaint.

**COMPLAINT ¶167:**

 AICPA Statement of Position 97-2, *Software Revenue Recognition* ("SOP 97-2"), ¶8, dictates that full delivery must occur ***before any revenue can be recognized***.



**ANSWER:**

Defendants refer to the referenced and quoted documents for their full and complete contents and deny any allegations of Paragraph 167 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of Paragraph 167 of the Complaint.

**COMPLAINT ¶168:**



**ANSWER:**

Defendants refer to the quoted agreement for its full and complete contents and deny any allegations of the first sentence of Paragraph 168 of the Complaint inconsistent therewith. The second sentence of Paragraph 168 of the Complaint states legal conclusions and argument to

which no response is required.   To the extent a response is required, Defendants deny the

allegations of the second sentence of Paragraph 168 of the Complaint.   Defendants deny the

remaining allegations of Paragraph 168 of the Complaint.

## COMPLAINT ¶169:

Further, the substance and value of the Freescale deal was, in large part, remuneration for
the settlement of the Argon chip delays and other product supply claims, not legitimate revenue
from an IP deal.   Accordingly, the transaction ought not have been considered revenue from a
sale of IP under GAAP, regardless of the form the transaction was papered to appear to take.
GAAP requires that the economic substance of a transaction must be considered and reported as
opposed to merely its legal form.[8]   The purpose of this principle is to ensure that a transaction is
both recorded and reported in a manner that is true to the transaction's underlying purpose and
intent, and that the financial statements incorporating the subject transaction are fairly presented.

## ANSWER:

Defendants deny the allegations of the first sentence of Paragraph 169 of the Complaint.

The remaining allegations of Paragraph 169 of the Complaint state legal conclusions and

argument to which no response is required.   To the extent a response is required, Defendants

deny the remaining allegations of Paragraph 169 of the Complaint.

## COMPLAINT ¶170:

Further, the Freescale deal consisted of multiple elements, including existing technology,
specified and unspecified future technology upgrades, and post-contract support ("PCS").   When
software arrangements contain multiple elements, GAAP dictates that ***revenue may not be
recognized up-front*** for any of the elements ***unless*** the different elements of the deal can be
separately and objectively valued in accordance with specific criteria referred to as "vendor-
specific objective evidence of fair value" ("VSOE").   *See* SOP 97-2.   In other words, GAAP
prohibited any revenue recognition on the Freescale deal in 3Q06 unless each of the multiple
elements included in the transaction could be separately and objectively valued in accordance
with specific criteria set forth in SOP 97-2.

---

[8] *See* Statement of Financial Accounting Concepts No. 2, ¶¶59, 160, AICPA Codification of Statements on Auditing
Standards *The meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles*, §411.06
("AU41 1.06"), AU 334.02.

**ANSWER:**

Defendants refer to the referenced documents for their full and complete contents and deny any allegations of Paragraph 170 of the Complaint inconsistent therewith.  The fourth sentence of Paragraph 170 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the fourth sentence of Paragraph 170 of the Complaint.  Defendants deny the remaining allegations of Paragraph 170 of the Complaint.

**COMPLAINT ¶171:**

VSOE, however, did not exist to value most, if not all, of the separate elements of the 3Q06 IP Freescale Licensing Transaction and, accordingly, GAAP prohibited revenue recognition in 3Q06.  Despite this fact, and in order to recognize virtually all of the lion's share of all profits upfront during 3Q06, when they were needed to obfuscate the 3G product problems and earnings gap, defendants knowingly or recklessly valued the multiple elements using spurious methodology unsupported by GAAP.  Specifically:

(a)     VSOE was not established for the technology in the Freescale transaction because a material portion of the value of the deal was attributable to settlement of Motorola's claims regarding the development and supply problems with Argon and other chips, and had nothing to do with the fair value of the actual technology Motorola licensed.  In fact, Motorola's documents show that the IP part of the deal was originally valued at approximately $15.0 million, but Motorola used the value of the chip claims to increase the value of the transaction to $165.0 million;

(b)     Rather than objectively valuing the individual deal elements separately as required by accounting rules, Motorola arbitrarily assigned a value to the overall transaction (again, improperly including the value of the Argon and chip claims) by selecting a round number of $165.0 million.  Prior to booking the transaction, defendants then improperly pulled a second arbitrary value of 10.0% out of thin air to represent the portion of the total deal that would then be assigned to the PCS renewal fee elements.  The difference between the arbitrary $165.0 million and 10.0% reduction for PCS elements was then assigned to represent the value of the existing technology license fee, for which revenue would be recognized upfront;

(c)     Certain technology specified in the contract, particularly OFDM capabilities included in 3GPP LTE (a/k/a "3GPP Release 8"), did not yet exist at the Effective Date of the contract, but were new features of 3GPP technology Motorola agreed to provide Freescale as an "update" over the course of the perpetual license.  On September 25, 2006, however, Robert Cash informed defendant Garriques – and the Company's accounting department – that: "[Freescale] somehow assured [you] that the OFDM related stuff is not a

landgrab. . . . '*We have never agreed to include anything beyond R6 [i.e., 3GPP Release 6] and if we did it does not yet have a value or licensing program to go with it and putting it in might give us recognition issues*'"; and

(d)    Because 3GPP LTE included numerous new features, including OFDM, Motorola's IP obligation with respect to 3GPP LTE should have been "*accounted for separately from the PCS*" element of the transaction "as an element of [the] multiple element arrangement." SOP 97-2, ¶39; *see also* SOP 97-2, ¶48.  GAAP is clear, *if VSOE "does not exist*, [¶] 12 of this SOP *requires that all revenue from the arrangement be deferred until the earlier of the point at which (a) such sufficient [VSOE] does exist (b) all elements of the arrangement have been delivered*." *Id.*, ¶41.  Because Motorola could not determine VSOE of 3GPP LTE, none of the 3Q06 Freescale IP Licensing Transaction revenue should have been recognized in September 2006.

**ANSWER:**

Paragraph 171 of the Complaint and its subparagraphs (a) through (d) state legal

conclusions and argument to which no response is required.  To the extent a response is required,

Defendants deny the allegations of Paragraph 171 of the Complaint.

**COMPLAINT ¶172:**

On or about September 29, 2006, just one day before quarter end, Motorola and Qualcomm entered into an agreement in which Motorola granted Qualcomm "pass through rights" for CDMA and WCDMA technologies valued at $275.0 million.  Two weeks earlier, on September 13, 2006, Garriques and Qualcomm representatives (including Sanjay Jha, then Qualcomm's Group President of CDMA, and Steve Altman) met in Denver, Colorado.  During that meeting, Motorola and Qualcomm expressed that the underlying purpose of the agreement was to "offer [Motorola] a lower royalty rate [on CDMA chipsets manufactured by Qualcomm] *in exchange* for pass through rights."  Notably, it was also agreed that Motorola would allow Qualcomm to compete for chip design awards for use in Motorola's high-end 3G UMTS/HSDPA handsets – *in direct competition with Freescale* – between 2007 and 2009.  In essence, the 3Q06 Qualcomm agreement was a "pay-to-play" agreement allowing Qualcomm to supplant Freescale (and its Argon chip) as the Company's primary 3G chip supplier, and served as a prepaid discount on Motorola's future CDMA royalty obligations.  Critically, the timing of 3Q06 Qualcomm deal further enabled Motorola to fill the 3Q06 earnings gap created by delays to the Argon chip and Freescale's failings.

**ANSWER:**

Defendants refer to the referenced and quoted documents for their full and complete

contents and deny any allegations of Paragraph 172 of the Complaint inconsistent therewith.

Defendants deny the remaining allegations of Paragraph 172 of the Complaint.

**COMPLAINT ¶173:**

Motorola knew that the Qualcomm transaction was also unusual or infrequent and, as such, GAAP and SEC rules required its appropriate disclosure.  First, Motorola understood it was highly unusual to take a massive cash advance representing a reduction of Motorola's future royalty obligations to Qualcomm, but package and cloak the agreement as revenue from an IP transaction.  Second, the Qualcomm IP Transaction was unusual in that it was a one-time event that did not represent core or repeatable business, but it was used, along with the 3Q06 Freescale IP Licensing Transaction, to fill the massive earnings shortfall.  Third, the transaction was unusual because it was coupled with a separate agreement committing Motorola to replace Freescale and acquire specific percentages of UMTS chips from Qualcomm over the next three years.

**ANSWER:**

Defendants deny the allegations of Paragraph 173 of the Complaint.

**COMPLAINT ¶174:**

For these reasons, among others, GAAP required that Motorola separately disclose the nature and financial effects of the 3Q06 Qualcomm IP Licensing Transaction in the Company's October 17, 2006 Form 8-K earnings press release, as well as the Company's November 2, 2006 Form 10-Q.  *See* APB 30, ¶26; FASB Statement of Concepts No. 1, ¶34; FASB Statement of Concepts No. 2, ¶79; FASB Statement of Concepts No. 2, ¶¶58-59; and FRR 36.

**ANSWER:**

Paragraph 174 of the Complaint states legal conclusions and argument to which no

response is required.  To the extent a response is required, Defendants deny the allegations of

Paragraph 174 of the Complaint.

**COMPLAINT ¶175:**

Numerous facts indicate that the Company inappropriately recognized the revenue associated with the 3Q06 Qualcomm IP Licensing Transaction.

**ANSWER:**

Defendants deny the allegations of Paragraph 175 of the Complaint.

**COMPLAINT ¶176:**



**ANSWER:**

Defendants refer to the quoted document for its full and complete contents and deny any allegations of Paragraph 176 of the Complaint inconsistent therewith.   Defendants deny the remaining allegations of Paragraph 176 of the Complaint.

**COMPLAINT ¶177:**



**ANSWER:**

Defendants refer to the quoted emails for their full and complete contents and deny any allegations of Paragraph 177 of the Complaint inconsistent therewith.   Defendants admit the

---

[9] Mr. Jha is currently the Co-CEO of Motorola, along with defendant Brown, and serves as the CEO of the Mobile Devices segment.

allegations of footnote 9 to Paragraph 177 of the Complaint.  The third sentence of Paragraph

177 of the Complaint states legal conclusions and argument to which no response is required.  To

the extent a response is required, Defendants deny the allegations of the third sentence of

Paragraph 177 of the Complaint.  Defendants deny the remaining allegations of Paragraph 177 of

the Complaint.

## COMPLAINT ¶178:

Motorola also had placed unreasonable limitations on Qualcomm's right to use the IP it had "purchased" in the 3Q06 deal.  On September 26, 2006, Garriques confirmed the parties' understanding of the broader purposes of the "QCOM Deal" in an email to Robert Cash and various members of Motorola's accounting department, including Henry Goldberg.  In doing so, Garriques stated that it was his understanding that Qualcomm ***will also port our [software] to their chipset and sell back to us and only us. . . . Sell to us and no one else.  Turn on and off modems and price accordingly when selling to us***." These types of contractual conditions are improper under GAAP because the purchaser must have "free reign" to do whatever they want with the IP.  This GAAP principle was confirmed by Henry Goldberg in May 2006, when he remarked to Robert Cash "if all [the purchaser] could do with it was to sell stuff back to us, that might have been problematic" with respect to up-front revenue recognition.

## ANSWER:

Defendants deny the allegations of the first sentence of Paragraph 178 of the Complaint.

Defendants refer to the quoted September 26, 2006 email for its full and complete contents and

deny any allegations of the second sentence of Paragraph 178 of the Complaint inconsistent

therewith.  The third sentence of Paragraph 178 of the Complaint states legal conclusions and

argument to which no response is required.  To the extent a response is required, Defendants

deny the allegations of the third sentence of Paragraph 178 of the Complaint.  Defendants refer

to the quoted May 19, 2006 email for its full and complete contents and deny any allegations of

the fourth sentence of Paragraph 178 of the Complaint inconsistent therewith.  Defendants deny

the remaining allegations of Paragraph 178 of the Complaint.

**COMPLAINT ¶179:**

Lastly, in order to recognize revenue up-front on the 3Q Qualcomm IP Licensing Transaction, SOP 97-2 required Motorola to identify and use VSOE to derive the value of the technology that Motorola licensed.  Motorola's documents confirm that this did not happen.  Indeed, the value of the transaction was arrived at *via* estimations concerning reductions in Motorola's ***future*** royalty obligations to Qualcomm, as well as increases in UMTS chip purchases from Qualcomm through 2009.  Not only were these contingencies impossible to value with any reasonable degree of certainty, but they had absolutely no relation to the CDMA technology licensed to Qualcomm.

**ANSWER:**

The first sentence of Paragraph 179 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of the first sentence of Paragraph 179 of the Complaint.  Defendants deny the remaining allegations of Paragraph 179 of the Complaint.

**COMPLAINT ¶180:**

During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Motorola's stock price and operated as a fraud or deceit on Class Period purchasers of that stock by misrepresenting the Company's past and future business prospects.  Defendants achieved this façade of success, growth and strong future business prospects by making the false and misleading statements and material omissions detailed herein.  As defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Motorola's stock price fell precipitously as the prior artificial inflation came out of the price of the Company's securities.  As a result of their purchase or acquisition of Motorola stock during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws, when the artificial inflation came out of the price of Motorola's securities.

**ANSWER:**

Paragraph 180 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 180 of the Complaint.

**COMPLAINT ¶181:**

As a direct result of disclosures regarding Motorola's high-tier, 3G product portfolio and the impact of the previously undisclosed problems and delays to that portfolio, following each of October 17, 2006, November 7, 2006, January 4, 2007 and March 21, 2007, the price of Motorola securities dropped precipitously. Indeed, from October 17, 2006 through March 21, 2007, Motorola's common stock price dropped from over $25 per share to only $17.50 per share, a decline of more than 30.0%. As detailed below, Motorola's stock price suffered statistically significant declines in the immediate aftermath of the disclosures on October 17, 2006, November 7, 2006, January 4, 2007 and March 21, 2007.

**ANSWER:**

Paragraph 181 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants refer to publicly available sources for Motorola's stock price and deny the remaining allegations of Paragraph 181 of the Complaint.

**COMPLAINT ¶182:**

Following the close of the market on October 17, 2006, Motorola announced that the Company's 3Q06 financial results would miss revenue expectations by approximately $500.0 million and reduced top-line guidance for 4Q and FY 2006. The shortfall was attributed, in part, to the lack of competitive 3G handsets in the critical European market. While defendants covered-up the earnings gap caused by the problems and delays with the 3G product portfolio and falsely reassured investors that Motorola's, Argon-based 3G products were still "on track" for shipping and would be a "definite boost" for 4Q06, the Company's stock price dropped $1.21 per share to close at $23.64 on October 18, 2006. A regression analysis establishes that Motorola's stock price drop following the October 17, 2006 disclosure was the result of Company-specific disclosures and not caused by any industry or macro-economic factors. Indeed, the stock price decline is statistically significant at the 1.0% level, meaning that there is less than a 1.0% chance that the decline could be attributed to market and sector factors or random volatility. Moreover, Motorola's internal documents demonstrate that the revenue miss disclosed by Motorola was substantially caused by the undisclosed problems with the Company's Argon-based 3G product portfolio. For example, an internal "Q3 Autopsy" following the October 17, 2006 disclosure identified Motorola's failure to get competitive 3G handsets to the market in 3Q06, and, in particular, the inability to bring the IZAR Global 3G handset to market, as a primary cause of the Company's revenue miss. A Mobile Devices' Financial Summary further provides that Motorola's forecast sales of 235,000 Argon-based Carina 3G phones, in 3Q06, but failed to get the handset to market. The failure to timely bring the IZAR Global or Carina handsets to market, by themselves, resulted in a $316.2 million dollar revenue miss in 3Q06.

**ANSWER:**

Defendants refer to the referenced announcement for its full and complete contents, and deny any allegations of the first and second sentences of Paragraph 182 of the Complaint inconsistent therewith. Defendants deny the remaining allegations of the first and second sentences of Paragraph 182 of the Complaint. Defendants deny the allegations of the third sentence of Paragraph 182 of the Complaint. Defendants lack sufficient information to form a belief as to the truth of the allegations of the fourth and fifth sentences of Paragraph 182, which are therefore deemed denied. Defendants deny the allegations of the sixth through ninth sentences of Paragraph 182 of the Complaint.

**COMPLAINT ¶183:**

Thereafter, on the morning of November 7, 2006, Lehman Brothers issued a research report titled "Early Challenges in October," commenting that "[i]n Europe, our checks suggest new W-CDMA [3G] handsets from Motorola (RAZR XX and RAZR MAXX) this quarter have not yet arrived which could suggest our higher end unit estimates may be aggressive." As a result, Lehman Brothers lowered its target price for Motorola stock. The market reacted promptly to the concerns expressed about Motorola's 3G product portfolio, and, on November 7, the Company's stock price fell an additional $0.91 per share. A regression analysis confirms that the stock price decline on November 7, 2006 was in response to the Company-specific news in the Lehman Brothers report and was statistically significant at the 1.0% level. As detailed in ¶21, defendants swiftly tried to counter the disclosure in the Lehman Brothers report and limit the decline in Motorola's stock price, urging another analyst to issue a report claiming that the Argon-based 3G products were still "on time."

**ANSWER:**

Defendants refer to the quoted Lehman Brothers research report for its full and complete contents, and deny the allegations of the first and second sentences of Paragraph 183 of the Complaint inconsistent therewith. Defendants refer to publicly available sources for Motorola's stock price and deny the remaining allegations of the second sentence of Paragraph 183 of the Complaint. Defendants lack sufficient information to form a belief as to the truth of the allegations of the fourth sentence of Paragraph 183 of the Complaint, which is therefore deemed

denied.  Defendants deny the allegations of the fifth sentence of Paragraph 183 of the Complaint.

Defendants deny the remaining allegations of Paragraph 183 of the Complaint.  Defendants

incorporate their responses to Paragraph 21 of the Complaint.

## COMPLAINT ¶184:

By January 4, 2007, defendants could no longer maintain their charade and were forced to disclose the truth about the impact of the delays and failures with Motorola's 3G product portfolio.  Following the close of the market, defendants were forced to preannounce dismal results for 4Q and FY 2006, missing earnings expectations by $0.13-0.16 per share and revenue expectations by $200.0-$400.0 million.  According to defendants, the "shortfall in both sales and earnings occurred in the Mobile Devices segment and is attributed to an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast." Defendants had, in fact, failed to get any of the high-tier, Argon-based 3G handsets to market in North America and had only gotten limited quantities of such phones (and with serious defect problems) to carriers in Europe and Japan.  As a result of the delays to the Argon-based 3G product programs, and the long- known inability to get these handsets to key carriers in critical markets in time for the holiday selling season, defendants had been forced to compensate carriers and fill the handset void with low-tier, low margin 2G handsets.  Investors reacted swiftly and severely to defendants' disclosure.  On extremely high volume, Motorola's stock price dropped $1.61 per share in the immediate aftermath of the January 4, 2007 disclosure and fell below $20.00 per share for the first time since the start of the Class Period.  Again, a regression analysis establishes that this stock price decline was the result of defendants' Company-specific disclosure and is statistically significant at the 1.0% level.

## ANSWER:

Defendants deny the allegations of the first and second sentences of Paragraph 184 of the

Complaint.  Defendants refer to the quoted Motorola press release of January 4, 2007 for its full

and complete contents and deny the remaining allegations of the third sentence of Paragraph 184.

Defendants deny the allegations of the fourth and fifth sentences of Paragraph 184 of the

Complaint.  Defendants refer to publicly available sources for Motorola's stock price and deny

the remaining allegations of the sixth and seventh sentences of Paragraph 184 of the Complaint.

Defendants lack sufficient information to form a belief as to the truth of the allegations in the

eighth sentence of Paragraph 184 of the Complaint, which is therefore deemed denied.

Defendants deny the remaining allegations of Paragraph 184 of the Complaint.

## COMPLAINT ¶185:

In the immediate aftermath of the January 4, 2007 disclosure, defendants confirmed that the earnings and revenue miss (due to the "unfavorable geographical and product-tier mix") were the result of the previously undisclosed problems with the Argon-based 3G handset programs. For example, an internal comparison of Motorola's 1H06 versus 2H06 financial results identified at least $505.0 million in operating earnings were lost due to the failure to timely launch and ramp up 3G handsets in Europe and failure to deliver any Argon-based 3G handsets to Cingular. As defendant Zander admitted after the end of the Class Period, "*[w]e just totally messed this up with our designs and lateness and with our semiconductor partners and got behind the 3G curve*." Zander further conceded that "*[F]reescale cost us big time. I mean, Q4 to me was the inability to execute and have on the shelves at Cingular and Europe the kind of 3G products they require. I mean you can just add the numbers up times the revenue times the ASPs times the profits. A lot of Q4 would have been right there*."

## ANSWER:

Defendants refer to the quoted and referenced documents for their full and complete contents and deny any allegations of Paragraph 185 of the Complaint inconsistent therewith.

Defendants deny the remaining allegations of Paragraph 185 of the Complaint.

## COMPLAINT ¶186:

Finally, following the Class Period, on March 21, 2007, Motorola preannounced disappointing 1Q07 revenue and earnings results, further disclosing the negative impact of the delays and failure with the Argon-based 3G portfolio. According to defendants, Motorola's "*performance in Europe continues to be below expectations because we had a limited 3G product portfolio. As a result . . . Q1 for Mobile Devices will be very difficult and disappointing. We also anticipate that Q2 will be difficult*." At the same time, Zander acknowledge that "at the 'high end,' we need to get our 3G portfolio and we are starting to ship some products. It does take awhile to ramp up." In response to these Company-specific disclosures regarding the 3G portfolio, Motorola's stock price fell another $1.24 per share to below $18.00, a drop that is statistically significant at the 1.0% level. As defendants have admitted, *the 3G "Argon chipset was over 1 year late. It was originally planned to ship around Q3 2005 . . . . This caused us to . . . [t]otally cancel the [3G] project for Cingular which created a huge 3G product hole [and] [s]lip[ped] the [Izar Japan] schedule a year which caused . . . the whole mess we find ourselves in now*." Motorola's stock price has never recovered and, in the aftermath of defendants' fraud, has continued to slide down to below $8.00 per share.

## ANSWER:

Defendants refer to the quoted documents for their full and complete contents and deny any allegations of Paragraph 186 of the Complaint inconsistent therewith. Defendants refer to

publicly available sources for Motorola's stock price and deny the remaining allegations of

Paragraph 186 of the Complaint.  Defendants incorporate their response to Paragraph 31 of the

Complaint.

## COMPLAINT ¶187:

The price drops following the October 17, 2006, November 7, 2006, January 4, 2007 and
March 21, 2007 disclosures removed the inflation from Motorola's stock price, causing real
economic loss to investors who had purchased the stock during the Class Period.  They were a
direct result of the nature and impact of defendants' prior false statements and material omissions
being revealed to investors and the market.  Accordingly, the economic loss, *i.e.*, damages,
suffered by plaintiffs and other members of the Class, was a direct result of defendants'
fraudulent scheme to artificially inflate the price of Motorola securities and maintain the price at
artificially inflated levels and the subsequent decline in the value of Motorola securities when
defendants' prior misrepresentations and omissions were revealed.

## ANSWER:

Paragraph 187 of the Complaint states legal conclusions and argument to which no

response is required.  To the extent a response is required, Defendants deny the allegations of

Paragraph 187 of the Complaint.

## COMPLAINT ¶188:

At all relevant times, the market for Motorola's securities was an efficient market for the
following reasons, among others:

(a)     Motorola's common stock met the requirements for listing, and was listed
and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a public company, Motorola filed periodic public reports with the SEC;

(c)     Motorola regularly communicated with public investors *via* established
market communication mechanisms, including through regular disseminations of press releases
on the national circuits of major newswire services and through other wide-ranging public
disclosures, such as communications with the financial press and other similar reporting services;
and

(d)     Motorola was followed by several securities analysts employed by major
brokerage firms who wrote reports which were distributed to the sales force and certain
customers of their respective brokerage firms.  Each of these reports was publicly available and
entered the public marketplace.

**ANSWER:**

Paragraph 188 and its subparagraphs (a) through (d) of the Complaint state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 188 of the Complaint, which is therefore deemed denied.

**COMPLAINT ¶189:**

As a result of the foregoing, the market for Motorola's securities promptly digested current information regarding Motorola from publicly available sources and reflected such information in Motorola's stock price.  Under these circumstances, all purchasers of Motorola securities during the Class Period suffered similar injury through their purchase of Motorola securities at artificially inflated prices and a presumption of reliance applies.

**ANSWER:**

Paragraph 189 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 189 of the Complaint and further deny that any purchaser of Motorola securities during the Class Period suffered injury.

**COMPLAINT ¶190:**

The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Motorola who knew that those statements were false when made.

**ANSWER:**

Paragraph 190 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 190 of the Complaint.

**COMPLAINT ¶191:**

Defendants failed to provide any meaningful discussion of the risks which, throughout the Class Period, were materially and adversely impacting the Company's operations.

**ANSWER:**

Paragraph 191 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 191 of the Complaint.

**COMPLAINT ¶192:**

Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**ANSWER:**

Defendants incorporate their responses to the allegations of Paragraphs 1 through 191 of the Complaint.

**COMPLAINT ¶193:**

During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Motorola's securities; and (c) cause lead plaintiffs and other members of the Class to purchase Motorola's securities at artificially inflated prices and, as a result, suffer economic losses when the truth about defendants' fraud was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

**ANSWER:**

Paragraph 193 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 193 of the Complaint.

**COMPLAINT ¶194:**

Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Motorola's securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

**ANSWER:**

Paragraph 194 of the Complaint and its subparagraphs (a) through (c) state legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 194 of the Complaint.

**COMPLAINT ¶195:**

In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, participation in the making of affirmative statements and reports to the investing public, or selling Motorola stock while in possession of material inside information, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §§210.01, *et. seq.*, and Regulation S-K, 17 C.F.R. §§229.10, *et. seq.*, and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, revenue and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

**ANSWER:**

Paragraph 195 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 195 of the Complaint.

**COMPLAINT ¶196:**

Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Motorola as specified herein.

**ANSWER:**

Paragraph 196 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 196 of the Complaint.

**COMPLAINT ¶197:**

These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Motorola's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Motorola and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Motorola's securities during the Class Period.

**ANSWER:**

Paragraph 197 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 197 of the Complaint.

**COMPLAINT ¶198:**

The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

**ANSWER:**

Paragraph 198 of the Complaint and its subparagraphs (a) through (c) state legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 198 of the Complaint.

**COMPLAINT ¶199:**

The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing Motorola's financial results, operating condition and business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements and omissions regarding the Company's financial results and operations throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

**ANSWER:**

Paragraph 199 of the Complaint states legal conclusions and argument to which no response is required. To the extent a response is required, Defendants deny the allegations of Paragraph 199 of the Complaint.

**COMPLAINT ¶200:**

As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Motorola's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Motorola's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Motorola securities during the Class Period at artificially inflated prices and were damaged thereby.

**ANSWER:**

Paragraph 200 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 200 of the Complaint.

**COMPLAINT ¶201:**

At the time of said misrepresentations and omissions, lead plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Motorola, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Motorola securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

**ANSWER:**

Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 201 of the Complaint, which is therefore deemed denied.  Defendants further state that Motorola's stock price was not artificially inflated.

**COMPLAINT ¶202:**

By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**ANSWER:**

Paragraph 202 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 202 of the Complaint.

**COMPLAINT ¶203:**

As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**ANSWER:**

Paragraph 203 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 203 of the Complaint.

**COMPLAINT ¶204:**

Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**ANSWER:**

Defendants incorporate their responses to the allegations of Paragraphs 1 through 203 of the Complaint.

**COMPLAINT ¶205:**

The Individual Defendants acted as controlling persons of Motorola within the meaning of §20(a) of the Exchange Act as alleged herein.  Motorola controlled all of its employees and each of the Individual Defendants.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the statements issued by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:**

Paragraph 205 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 205 of the Complaint.

**COMPLAINT ¶206:**

In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

**ANSWER:**

Paragraph 206 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 206 of the Complaint.

**COMPLAINT ¶207:**

As set forth above, Motorola and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Motorola and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**ANSWER:**

Paragraph 207 of the Complaint states legal conclusions and argument to which no response is required.  To the extent a response is required, Defendants deny the allegations of Paragraph 207 of the Complaint.

\*       \*       \*

Plaintiffs' prayer for relief and demand for judgment contain no allegations to which a response is required. To the extent a response may be deemed required, Defendants deny that Plaintiffs are entitled to any of the relief requested in subparagraphs A through D.

All allegations that are not expressly admitted above are denied, and Defendants reserves the right to withdraw, amend, or modify their answers to the Complaint as later circumstances may warrant.

## AFFIRMATIVE DEFENSES

Defendants set forth below their affirmative defenses to the Complaint. By setting forth these defenses, Defendants do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff and/or the purported class members. Moreover, nothing stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject matter is relevant to the allegations of Plaintiff and/or the purported class members.

## FIRST DEFENSE

The Complaint fails to allege sufficient facts to state a claim against Defendants upon which relief can be granted.

## SECOND DEFENSE

The Complaint fails to comply with the Private Securities Litigation Enforcement Act of 1995 ("PSLRA").

## THIRD DEFENSE

The Complaint fails to plead its claims against Defendants with particularity, as required by Federal Rule of Civil Procedure 9(b).

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs lack standing to pursue the claims alleged against Defendants.

## FIFTH DEFENSE

Defendants are not liable to Plaintiffs because they did not act with the required state of mind regarding any of the alleged conduct on which the Complaint is based.

## SIXTH DEFENSE

The claims alleged in the Complaint are barred, in whole or in part, to the extent that they seek to impose upon Defendants disclosure obligations that are inconsistent with, or in excess of, those imposed pursuant to the federal securities laws, including the Securities Act of 1933 (the "1933 Act"), the Securities Exchange Act of 1934 (the "1934 Act"), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission.

## SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs seek to hold Defendants liable for statements made or actions taken by persons or entities other than Defendants, who were not acting as authorized agents of Defendants and to further the Defendants' interests.

## EIGHTH DEFENSE

To the extent the Complaint asserts claims against Defendants based on any statements attributable to them, such statements were made in good faith, in the belief that such statements were full, that there was no omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, and that such statements were proper in all respects.

## NINTH DEFENSE

To the extent the Complaint challenges any statements attributable to Defendants that were forward-looking statements, Plaintiffs' claims are barred, in whole or in part, because such statements are protected by the Safe Harbor provisions of the PSLRA and/or by the bespeaks caution doctrine.

## TENTH DEFENSE

To the extent the Complaint challenges any statements attributable to Defendants that were forward-looking statements, such statements were made without actual knowledge that the statement was false or misleading and were accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

## ELEVENTH DEFENSE

Plaintiffs are not entitled to any recovery from Defendants for Plaintiffs' claims asserted under Section 10(b) of the 1934 Act because, at all relevant times, Defendants did not have actual knowledge that any of the alleged misstatements were false or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

## TWELFTH DEFENSE

To the extent the Complaint asserts claims against the Individual Defendants based on any alleged misstatements in financial statements published by Defendant Motorola, or summaries or discussions of such financial statements, the Individual Defendants had, after reasonable investigation, reasonable ground to believe and did believe, that the financial statements and their contents and any discussion thereof were full and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, and that such statements were proper in all respects.

## THIRTEENTH DEFENSE

Defendants acted at all times in good faith and with reasonable care, and they reasonably relied upon, among other things, management and outside consultants.

## FOURTEENTH DEFENSE

The Individual Defendants acted at all times in good faith and did not directly or indirectly induce any act by Motorola or any other defendant alleged to constitute a violation of the 1934 Act.

## FIFTEENTH DEFENSE

With respect to the alleged violation of Section 20(a) of the 1934 Act, the Individual Defendants did not control or have the ability to control Motorola or any other person or entity that may be held liable under Section 10(b) of the 1934 Act.

## SIXTEENTH DEFENSE

With respect to the alleged violation of Section 20(a) of the 1934 Act, the Individual Defendants did not culpably participate in any act by Motorola or any other person alleged to give rise to liability under Section 10(b) of the 1934 Act.

## SEVENTEENTH DEFENSE

With respect to the alleged violation of Section 20(a) of the 1934 Act, the Complaint's claims against the Individual Defendants under Section 20(a) of the 1934 Act fail because Motorola or any other person alleged to give rise to liability under Section 10(b) of the 1934 Act is not liable under Section10(b) of the 1934 Act in the Complaint.

## EIGHTEENTH DEFENSE

To the extent the Complaint challenges any statements attributable to Defendants, such claims fail to the extent that the alleged statements constitute expressions of honest opinion or corporate optimism.

### NINETEENTH DEFENSE

To the extent Motorola's financial statements in the Form 10-K annual reports, Reports on Form 10-Q, or other documents that Motorola filed with the U.S. Securities and Exchange Commission ("SEC") may have contained any errors, such errors were not material.

### TWENTIETH DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or in part, because the public filings and other public statements made by Motorola and/or attributed to Defendants and which Plaintiffs allegedly relied upon did not contain any material misrepresentations or omissions or because the misrepresentations or omissions allegedly relied upon by Plaintiffs were not material.

### TWENTY-FIRST DEFENSE

In making their decisions to purchase Motorola securities, Plaintiffs did not actually or justifiably rely upon any alleged misstatements or omissions by Defendants.

### TWENTY-SECOND DEFENSE

Plaintiffs' claims are barred, in whole or part, to the extent that Plaintiffs failed to exercise due care or otherwise acted recklessly with respect to the purchase of the Motorola securities on which their claims are premised.

### TWENTY-THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that they would have purchased Motorola securities even with full knowledge of the facts that they allege were misrepresented or omitted.

## TWENTY-FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot prove reliance upon any alleged misrepresentation or omission contained in any of the public filings and other public statements allegedly made by or attributable to Defendants which are at issue.

## TWENTY-FIFTH DEFENSE

Plaintiffs are not entitled to any recovery from Defendants because the actions or inactions of Defendants were not the sole or partial cause of any decision by any Plaintiffs to purchase or sell Motorola securities.

## TWENTY-SIXTH DEFENSE

To the extent that Plaintiffs relied, in purchasing Motorola securities, on the market price of Motorola securities as an indication of the value or worth of such securities, Plaintiffs' claims are barred, in whole or in part, as such reliance was negligent, reckless and unjustified.

## TWENTY-SEVENTH DEFENSE

To the extent that Plaintiffs relied, in purchasing Motorola securities, on the market price of Motorola's securities as an indication of the value or worth of such securities, Plaintiffs' claims are barred, in whole or in part, to the extent those Motorola securities did not trade in an efficient market.

## TWENTY-EIGHTH DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or part, to the extent that any facts Plaintiffs now contend were concealed from or misrepresented to them in the public filings and other public statements allegedly made by or attributable to Defendants which are at issue had been publicly disclosed prior to Plaintiffs' alleged purchase of Motorola securities.

### TWENTY-NINTH DEFENSE

To the extent Plaintiffs seek to establish reliance based on a "fraud on the market" presumption of market efficiency, such a presumption is inapplicable to the extent the markets for the Motorola securities upon which Plaintiffs base their claims were not efficient.

### THIRTIETH DEFENSE

Plaintiffs assumed the risk that the market value of the Motorola securities they purchased might decline as a result of unforeseeable events beyond the control of Defendants.

### THIRTY-FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, because of the lack of transaction causation and/or loss causation.

### THIRTY-SECOND DEFENSE

Plaintiffs are not entitled to any recovery from Defendants because the actions or inactions of Defendants were not the sole or partial cause of any damages or loss Plaintiffs allegedly suffered.

### THIRTY-THIRD DEFENSE

Plaintiffs are not entitled to any recovery from Defendants because the actions or inactions of Defendants were not the sole proximate cause, or the joint proximate cause, of any damages or loss Plaintiffs allegedly suffered.

### THIRTY-FOURTH DEFENSE

Plaintiffs' claims against Defendants are barred, in whole or in part, because the injuries, if any, sustained by Plaintiffs as alleged in the Complaint were not caused by Defendants but were instead caused by the actions or inactions of other persons and/or entities over whom none of the Defendants had any control or by economic, market, or other events that were outside the

control of Defendants. These actions, inactions, and events were intervening or superseding causes of the alleged injuries.

### THIRTY-FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they assumed the risks disclosed in the public filings and other public disclosures allegedly made by or attributable to Defendants that are at issue and those risks came to fruition to cause Plaintiffs' alleged losses. Plaintiffs, who purchased with knowledge of these risks, or knowledge of adverse events at Motorola, likewise assumed the risks that there would be further deterioration in the price or value of Motorola securities, such that their damages are not recoverable as a matter of law.

### THIRTY-SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they have failed to mitigate their alleged damages and failed to exercise due diligence in an effort to mitigate alleged damages.

### THIRTY-SEVENTH DEFENSE

The claims asserted in the Complaint are barred to the extent that they have been settled, compromised, released, or otherwise discharged.

### THIRTY-EIGHTH DEFENSE

To the extent that Plaintiffs sustained any damage, loss, or injury, they are barred from any recovery in whole or in part by reason of their own negligence and/or recklessness, or by their disregarding actual knowledge of any misrepresentations and omissions by any defendant alleged in the Complaint.

### THIRTY-NINTH DEFENSE

While Defendants deny any wrongdoing or fault of any kind whatsoever, or that Plaintiffs incurred any damages or losses as a result of any conduct by Motorola, in the event that Defendants, or any of them, is found liable for any damages pursuant to Plaintiffs' claim under

Section 10(b) of the 1934 Act, Defendants are not jointly and severally liable for the conduct of any other defendant or for damages caused by any other defendant or person.

## FORTIETH DEFENSE

While Defendants deny any wrongdoing or fault of any kind whatsoever, or that Plaintiffs incurred any damages or losses as a result of any conduct by Defendants, in the event that Defendants, or any of them, is found liable for any damages pursuant to Plaintiffs' claim under Section 10(b) of the 1934 Act, each of the Defendants is entitled to have his liability eliminated or diminished due to the culpable conduct of other persons or entities.

## FORTY-FIRST DEFENSE

To the extent Plaintiffs sustained any damage, loss, or injury, any portion or all of such damages resulting from statements or conduct of a particular Defendant or Defendants, such portion or all such damages shall not be recoverable from the other Defendants.

## FORTY-SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that the damages sought exceed those permitted under the 1933 Act, the 1934 Act, or any other applicable rule or regulation promulgated thereunder.

## FORTY-THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs have recovered, through dividend distribution, sale, tender, liquidation or any other means, all or some of the amounts they supposedly expended to acquire the Motorola securities at issue.

## FORTY-FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs sold, during the alleged class period, any Motorola securities purchased prior to the start of the alleged class period and thereby benefited from the alleged inflated market price of the Motorola securities.

## FORTY-FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs benefited in any manner from the alleged inflated market price of the Motorola securities.

## FORTY-SIXTH DEFENSE

Plaintiffs are not entitled to attorneys' fees under any act or theory upon which the Plaintiffs' claims are based.

## FORTY-SEVENTH DEFENSE

Any award of punitive or exemplary damages would violate the procedural and/or substantive due process safeguards provided under the Fifth, Sixth, Eighth and/or Fourteenth Amendments to the Constitution of the United States and/or under the Constitution of the State of Illinois and/or various federal and state statutes and regulations.

## FORTY-EIGHTH DEFENSE

The Complaint fails to allege facts sufficient to support a claim for attorneys' fees.

## FORTY-NINTH DEFENSE

Plaintiffs' claims for equitable relief are barred, in whole or in part, because Plaintiffs have adequate remedies at law.

## FIFTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by various doctrines, including estoppel, unclean hands, *in pari delicto,* waiver, laches, undue delay, ratification and affirmance.

## FIFTY-FIRST DEFENSE

Plaintiffs' claims cannot be maintained as a class action because Plaintiffs have not complied with the requirements of Rule 23 of the Federal Rules of Civil Procedure.

## FIFTY-SECOND DEFENSE

Defendants' disclosures regarding, among other things, the risks of bringing 3G phones to market and/or Motorola's financial forecasts, were adequate, and Motorola had no duty to disclose any further information beyond what it disclosed to the public, and therefore there was no failure to disclose a material fact in light of the numerous disclosures Motorola made regarding these issues in its public statements, including but not limited to Motorola's Form 10-Ks, Form 10-Qs, Proxy Statements and press releases.

## FIFTY-THIRD DEFENSE

Defendants' decisions to conduct its business, including its launch of phones and issuance of financial forecasts, are protected by the business judgment rule and therefore such decisions cannot form the basis for a cause of action.

## FIFTY-FOURTH DEFENSE

To the extent that the PSLRA applies and Plaintiffs seek to hold Defendants liable for violations of the 1934 Act, they are barred from recovery to the extent that the damages claimed exceed the limitation on damages contained in the PSLRA, specifically 15 U.S.C. § 78u-4(e), which provides that where the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market, with the exception that if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1) of the abovereferenced statutory section, the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the

security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

### FIFTY-FIFTH DEFENSE

Plaintiffs had a duty to take reasonable action to minimize any damage, injury, or loss allegedly sustained as a result of the conduct alleged in the Complaint, and they are barred from recovering any damages that might have been reasonably avoided, including those that may have been avoided by the unnecessary and precipitous purchase or sale of Motorola securities. Defendants reserve the right to amend their Answer to add any additional defenses, crossclaims, and third-party claims not asserted herein of which they may become aware through discovery or other investigation.

### FIFTY-SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

### FIFTY-SEVENTH DEFENSE

Motorola accounted for and/or disclosed all material transactions consistent with generally accepted accounting principles and the requirements of the Securities and Exchange Commission.

### FIFTY-EIGHTH DEFENSE

Defendants reasonably believed that all financial information was accurately accounted for and/or disclosed in reliance upon professionals employed or retained by Motorola.

\*        \*        \*

WHEREFORE, Defendants each pray for entry of judgment in their favor and against Plaintiffs as follows:

1.      That the Court enter judgment in favor of Defendants, dismissing each and every

claim for relief of the Complaint as to them with prejudice;

2.      That Plaintiffs take nothing by reason of the Complaint herein;

3.      That Defendants recover their expenses, costs, and attorneys' fees in connection

with this lawsuit; and

4.      For such other and further relief as this Court deems just and proper.

Dated: March 30, 2010                          Respectfully submitted,

                                               /s/ Elizabeth Leise
                                               Stephen M. Sacks
                                               John C. Massaro
                                               Elizabeth Leise
                                               ARNOLD & PORTER LLP
                                               555 Twelfth Street, NW
                                               Washington, DC 20004
                                               (202) 942-5000 (telephone)
                                               (202) 942-5999 (facsimile)
                                               *Lead Counsel for Defendants*

                                               J. Timothy Eaton
                                               Michael P. Sheehan
                                               SHEFSKY & FROELICH LTD.
                                               111 East Wacker Drive
                                               Suite 2800
                                               Chicago, IL 60601
                                               (312) 527-4000 (telephone)
                                               (312) 527-4011 (facsimile)
                                               msheehan@shefskylaw.com
                                               ARDC No. 6238081
                                               *Local Counsel for Defendants*

EXHIBIT A



# Motorola, Inc.

## Indexed vs. S&P Communications Equipment Index

### April 3, 2006 - April 11, 2007



**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2010, a copy of the foregoing Defendants' Answer to

Second Amended Complaint was filed electronically and served by mail on anyone unable to

accept electronic filing.  Notice of this filing will be sent be e-mail to all parties by operation of

the Court's electronic filing system or by mail to anyone unable to accept electronic filing as

indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's

CM/ECF system.

<div style="margin-left: 40%;">

s/ Elizabeth Leise

Elizabeth Leise, Esq.

(admitted pro hac vice)

ARNOLD & PORTER LLP

555 Twelfth Street, N.W.

Washington, DC 20004

(202) 942-5000 (phone)

(202) 942-5999 (fax)

</div>