# EXHIBIT A



**Public Company Accounting Oversight Board**

1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8430
www.pcaobus.org

# Report on

# 2007 Inspection of KPMG LLP

Issued by the

# Public Company Accounting Oversight Board

**August 12, 2008**

**THIS IS A PUBLIC VERSION OF A PCAOB INSPECTION REPORT**

**PORTIONS OF THE COMPLETE REPORT ARE OMITTED
FROM THIS DOCUMENT IN ORDER TO COMPLY WITH
SECTIONS 104(g)(2) AND 105(b)(5)(A)
OF THE SARBANES-OXLEY ACT OF 2002**

PCAOB RELEASE NO. 104-2008-146


Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146

## Preface to Reports Concerning Annually Inspected Firms

The Sarbanes-Oxley Act of 2002 requires the Public Company Accounting Oversight Board ("PCAOB" or "the Board") to conduct an annual inspection of each registered public accounting firm that regularly provides audit reports for more than 100 issuers. The Board's report on any such inspection includes this preface to provide context for information in the public portion of the report.

A Board inspection includes, among other things, a review of selected audits of financial statements and of internal control over financial reporting. If the Board inspection team identifies deficiencies in those audits, it alerts the firm to the deficiencies during the inspection process. Deficiencies that exceed a certain significance threshold are also summarized in the public portion of the Board's inspection report. The Board encourages readers to bear in mind two points concerning those reported deficiencies.

First, inclusion in an inspection report does not mean that the deficiency remained unaddressed after the inspection team brought it to the firm's attention. Under PCAOB standards, a firm must take appropriate action to assess the importance of the deficiency to the firm's present ability to support its previously expressed audit opinions. Depending upon the circumstances, compliance with these standards may require the firm to perform additional audit procedures, or to inform a client of the need for changes to its financial statements or reporting on internal control, or to take steps to prevent reliance on previously expressed audit opinions. A Board inspection does not typically include review of a firm's actions to address deficiencies identified in that inspection, but the Board expects that firms are attempting to take appropriate action, and firms frequently represent that they have taken, are taking, or will take, action. If, through subsequent inspections or other processes, the Board determines that the firm failed to take appropriate action, that failure may be grounds for a Board disciplinary sanction.

Second, the Board cautions against drawing conclusions about the comparative merits of the annually inspected firms based on the number of reported deficiencies in any given year. The total number of audits reviewed is a small portion of the total audits performed by these firms, and the frequency of deficiencies identified does not necessarily represent the frequency of deficiencies throughout the firm's practice. Moreover, if the Board discovers a potential weakness during an inspection, the Board may revise its inspection plan to target additional audits that may be affected by that weakness, and this may increase the number of deficiencies reported for that firm in



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146

that year. Such weaknesses may emerge in varying degrees at different firms in different years.

During 2007, the Board's inspection process for annually inspected firms addressed the third year of implementation of Auditing Standard No. 2, *An Audit of Internal Control over Financial Reporting Performed in Conjunction with an Audit of Financial Statements* ("AS No. 2"). As described in Appendix B to this report, this process occurred at three levels: (1) meetings with firm leadership, (2) a review of the Firm's methodology and tools, and (3) inspections of certain audits of accelerated filers. The reviews of audits included reviews conducted before the regular practice office field work to follow up on certain matters identified in the previous year's inspection, and reviews conducted during the regular practice office field work of certain audits selected by the inspection team. In general, the Board's inspection teams observed that the firms continued to make improvements in their audits of internal control over financial reporting, and that firms were preparing to implement Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements.*



PCAOB Release No. 104-2008-146

---

### Notes Concerning this Report

1. Portions of this report may describe deficiencies or potential deficiencies in the systems, policies, procedures, practices, or conduct of the firm that is the subject of this report. The express inclusion of certain deficiencies and potential deficiencies, however, should not be construed to support any negative inference that any other aspect of the firm's systems, policies, procedures, practices, or conduct is approved or condoned by the Board or judged by the Board to comply with laws, rules, and professional standards.

2. Any references in this report to violations or potential violations of law, rules, or professional standards should be understood in the supervisory context in which this report was prepared. Any such references are not a result of an adversarial adjudicative process and do not constitute conclusive findings of fact or of violations for purposes of imposing legal liability. Similarly, any description herein of a firm's cooperation in addressing issues constructively should not be construed, and is not construed by the Board, as an admission, for purposes of potential legal liability, of any violation.

3. Board inspections encompass, among other things, whether the firm has failed to identify departures from U.S. Generally Accepted Accounting Principles ("GAAP") or Securities and Exchange Commission ("SEC" or "Commission") disclosure requirements in its audits of financial statements. This report's descriptions of any such auditing failures necessarily involve descriptions of the related GAAP or disclosure departures. The Board, however, has no authority to prescribe the form or content of an issuer's financial statements. That authority, and the authority to make binding determinations concerning an issuer's compliance with GAAP or Commission disclosure requirements, rests with the Commission. Any description, in this report, of perceived departures from GAAP or Commission disclosure requirements should not be understood as an indication that the Commission has considered or made any determination regarding these issues unless otherwise expressly stated.


Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146

### 2007 INSPECTION OF KPMG LLP

In 2007, the Board conducted an inspection of KPMG LLP ("KPMG" or "the Firm"). The Board is today issuing this report of that inspection in accordance with the requirements of the Sarbanes-Oxley Act of 2002 ("the Act").

The Board is making portions of the report publicly available. Specifically, the Board is releasing to the public Part I of the report, Appendix B, and portions of Appendix C. Appendix B provides an overview of the inspection process. Appendix C includes the Firm's comments, if any, on a draft of the report.[1]

The Board has elsewhere described in detail its approach to making inspection-related information publicly available consistent with legal restrictions.[2] A substantial portion of the Board's criticisms of a firm (specifically criticisms of the firm's quality control system), and the Board's dialogue with the firm about those criticisms, occurs out of public view, unless the firm fails to make progress to the Board's satisfaction in addressing those criticisms. In addition, the Board generally does not disclose otherwise nonpublic information, learned through inspections, about the firm or its clients. Accordingly, information in those categories generally does not appear in the publicly available portion of an inspection report.

---

[1] The Board does not make public any of a firm's comments that address a nonpublic portion of the report. In addition, pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(b), if a firm requests, and the Board grants, confidential treatment for any of the firm's comments on a draft report, the Board does not include those comments in the final report at all. The Board routinely grants confidential treatment, if requested, for any portion of a firm's response that addresses any point in the draft that the Board omits from, or any inaccurate statement in the draft that the Board corrects in, the final report.

[2] <u>See</u> Statement Concerning the Issuance of Inspection Reports, PCAOB Release No. 104-2004-001 (August 26, 2004).



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page 2

## PART I

## INSPECTION PROCEDURES AND CERTAIN OBSERVATIONS

Members of the Board's inspection staff ("the inspection team") performed an inspection of the Firm from April 2007 to January 2008. The inspection team performed field work at the Firm's National Office and at 24 of its approximately 90 U.S. practice offices.

Board inspections are designed to identify and address weaknesses and deficiencies related to how a firm conducts audits.[3] To achieve that goal, Board inspections include reviews of certain aspects of selected audits performed by the firm and reviews of other matters related to the firm's quality control system. Appendix B to this report provides a description of the steps the inspection team took with respect to the review of audits of financial statements and of internal control over financial reporting and the review of eight functional areas related to quality control.

In the course of reviewing aspects of selected audits, an inspection may identify ways in which a particular audit is deficient, including failures by the firm to identify, or to address appropriately, respects in which an issuer's financial statements do not present fairly the financial position, results of operations, or cash flows of the issuer in conformity with GAAP.[4] It is not the purpose of an inspection, however, to review all of a firm's audits or to identify every respect in which a reviewed audit is deficient. Accordingly, a Board inspection report should not be understood to provide any assurance that the firm's audits, or its issuer clients' financial statements or reporting on internal control, are free of any deficiencies not specifically described in an inspection report.

---

[3] This focus necessarily carries through to reports on inspections and, accordingly, Board inspection reports are not intended to serve as balanced report cards or overall rating tools.

[4] When the Board becomes aware that an issuer's financial statements appear not to present fairly, in a material respect, the financial position, results of operations, or cash flows of the issuer in conformity with GAAP, the Board's practice is to report that information to the SEC, which has jurisdiction to determine proper accounting in issuers' financial statements.



**PCAOB**
Public Company Accounting Oversight Board

A.      Review of Audit Engagements

The scope of the inspection procedures performed included reviews of aspects of selected audits of financial statements and of internal control over financial reporting performed by the Firm. Those audits and aspects were selected according to the Board's criteria, and the Firm was not allowed an opportunity to limit or influence the selection process. The review of certain audits of accelerated filers included a review of aspects of both the Firm's audit of financial statements and its audit of internal control over financial reporting ("ICFR").

In reviewing the audits, the inspection team identified matters that it considered to be audit deficiencies.[5] Those deficiencies included failures by the Firm to identify or appropriately address errors in the issuer's application of GAAP. In addition, the deficiencies included failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures.

In some cases, the conclusion that the Firm failed to perform a procedure may be based on the absence of documentation and the absence of persuasive other evidence, even if the Firm claims to have performed the procedure. PCAOB Auditing Standard No. 3, *Audit Documentation* ("AS No. 3") provides that, in various circumstances including PCAOB inspections, a firm that has not adequately documented that it performed a procedure, obtained evidence, or reached an appropriate conclusion must demonstrate with persuasive other evidence that it did so, and that oral assertions and explanations alone do not constitute persuasive other evidence.[6] For purposes of the inspection, an observation that the Firm did not perform a procedure, obtain evidence, or reach an appropriate conclusion may be based on the absence of such documentation and the absence of persuasive other evidence.

When audit deficiencies are identified after the date of the audit report, PCAOB standards require a firm to take appropriate actions to assess the importance of the

---

[5]      The discussion in this report of any deficiency observed in a particular audit reflects information reported to the Board by the inspection team and does not reflect any determination by the Board as to whether the Firm has engaged in any conduct for which it could be sanctioned through the Board's disciplinary process.

[6]      See AS No. 3, paragraph 9; Appendix A to AS No. 3, paragraph A28.



**PCAOB**

Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page 4

deficiencies to the firm's present ability to support its previously expressed opinions,[7] and failure to take such actions could be a basis for Board disciplinary sanctions. In response to the inspection team's identification of deficiencies, the Firm, in some cases, performed additional procedures or supplemented its work papers, and in some instances, follow-up between the Firm and the issuer led to a change in the issuer's accounting or disclosure practices or led to representations related to prospective changes.[8]

In some cases, the deficiencies identified were of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential matter to support its opinion on the issuer's financial statements. The deficiencies that reached this degree of significance are described below, on an audit-by-audit basis.

Issuer A

In this audit, the Firm failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

- The Firm failed to test the accuracy of the loan delinquency data and borrower credit score ranges that the issuer had used to estimate its allowance for loan losses. Further, the Firm failed to consider the credit risk associated with the nature of the issuer's loans and the issuer's underwriting policies and to evaluate the reasonableness of the unallocated portion of the allowance, which had not changed in five years.

---

[7]      See AU 390, *Consideration of Omitted Procedures After the Report Date*, AU 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report* (both included among the PCAOB's interim auditing standards, pursuant to PCAOB Rule 3200T), and PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction With an Audit of Financial Statements* ("AS No. 2"), ¶ 197.

[8]      The Board inspection process generally did not include review of such additional procedures or documentation, or of such revised accounting, although future Board inspections of the Firm may, as appropriate, include further review of any of these matters.



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page 5

- The Firm failed to perform sufficient procedures to test the issuer's interest expense related to deposits. Specifically, the Firm's analytical procedures did not meet the requirements for substantive tests, because the Firm's expectation was developed using data from the same system from which the issuer's actual interest expense was derived. The Firm failed to appropriately test that data by, for example, comparing the data to relevant industry data that was similar to the terms and types of the issuer's deposits.

Issuer B

In this audit, the Firm failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

- The issuer estimated its allowance for loan losses using recent historical data. The Firm failed to evaluate whether the issuer's process for developing the estimate captured fully the effects of then-current trends and factors including recent changes in the composition and quality of the loan portfolio, concentrations, increases in loan delinquencies and losses, the results of the issuer's survey of its borrowers, and deteriorating economic conditions. In addition, the Firm failed to adequately test the accuracy and completeness of the data that the issuer had used in its estimate of the allowance because it did not test certain of the necessary controls over the transfer of these data between the issuer's information technology systems, nor did it test the loan delinquency data. Further, the Firm failed to evaluate whether the issuer's process for developing the estimate of the allowance considered all of the effects of the deficiencies that the Firm had identified in the issuer's underwriting approval process.

- The Firm failed to sufficiently test the valuation of the issuer's securities that it considered "hard-to-price." The Firm selected ten of these securities to test by developing an independent estimate of the fair value, for comparison to the issuer's recorded value. For two of the ten securities, the Firm was unable to develop such an estimate. Instead, the Firm's valuation specialists inquired of traders employed by the issuer, who had provided the recorded value, regarding how the traders had determined that value, but failed to test the information provided by the traders.



- The Firm failed to appropriately test the issuer's estimate for two insurance-related reserves. In one instance, the Firm failed to test the premium data that the issuer had used in its actuarial models to estimate the reserve. In the other instance, the Firm failed to evaluate whether the issuer's calculation of the reserve was consistent with the terms of the issuer's contracts.

Issuer C

A significant portion of the issuer's operating earnings for the third quarter was derived from two licensing transactions with different customers that were recorded during the last three days of the quarter. The issuer's business practice is to evidence its licensing transactions with a signed written agreement before recognizing revenue. For one of the above transactions, the final contract was not signed until the early hours of the fourth quarter. According to the work papers, the issuer asserted that a prior version of this contract was signed before midnight, but that all copies of that agreement were destroyed at the insistence of the customer. Although the Firm had discussions with the customer, it did not obtain written evidence from the customer that all the substantive terms of the contract that ultimately was signed had been agreed to in writing by both parties prior to the end of the issuer's third quarter. In these circumstances, the Firm, therefore, failed to obtain persuasive evidence of an arrangement for revenue recognition purposes in the third quarter.

Further, both of the customers also were vendors for whom the issuer was a significant customer and, shortly after year end, the issuer renewed a significant purchase contract with one of these customers. The Firm failed to adequately evaluate and test whether the licensing transactions with these customers were recorded at fair value in light of the ongoing customer-vendor relationships. Specifically, beyond discussions with management and the customer and reading the license agreements, the Firm failed to test the methodologies, assumptions, and underlying data that the issuer had used in its transaction-pricing analyses. Finally, the Firm failed to identify and appropriately address that the issuer had not disclosed its accounting policy for recording sales to customers that also are vendors.

Issuer D

In this audit, the Firm failed to obtain sufficient audit evidence to determine that revenue related to certain licensing arrangements was not recognized prematurely. The issuer entered into time-based licensing arrangements for multiple software products



that provided different start dates for the various products subject to each such arrangement. For example, one arrangement included language that the license period for one product, representing less than 0.04 percent of the contract value of all products in the arrangement, commenced on the last day of a quarter. The arrangement provided start dates for the license periods for the remaining products that were in the middle of the following quarter. For some such arrangements, the start dates for the majority of the licenses were in more than one subsequent quarter or in the subsequent fiscal year. Nonetheless, the issuer asserted that the arrangements provided the customers with the legal right to use all of the products on the earliest start date in the arrangement and that the license revenue for all the products could be recognized in the quarter that included the earliest start date. Despite these circumstances, the Firm failed to obtain corroboration of the issuer's assertions, such as by obtaining an interpretation of the contractual terms from the issuer's outside counsel or by requesting that the issuer's customers confirm the issuer's assertion regarding the terms.

Issuer E

The issuer, a multi-brand international retailer, disclosed that its long-lived assets were grouped and evaluated at the individual store level for purposes of assessing asset impairment. According to the Firm's work papers, however, the issuer evaluated its stores for recoverability at a national level for each of the issuer's store brands, and then, if a possible impairment was identified, determined whether there was an impairment and, if so, the amount of the impairment, by evaluating cash flows at the individual store level. The Firm failed to identify that the issuer's practice for evaluating when to test long-lived assets for recoverability was not in accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets,* which requires that long-lived assets shall be grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities.

Issuer F

The issuer acquired an entity whose CEO, as part of the transaction, became the issuer's CEO. The issuer accounted for the transaction as a business combination and recognized significant goodwill. Except for fulfilling acquired contracts-in-process, the issuer discontinued the acquired business, discontinued its own pre-transaction business, and focused on executing the CEO's pre-existing, yet unexecuted, business plan. There was no evidence in the audit documentation, and no persuasive other



evidence, that the Firm had evaluated, in light of these facts, whether the issuer's accounting for the transaction as a business combination that resulted in significant goodwill was appropriate or whether the recorded goodwill should have been subsequently assessed for impairment.

As part of the transaction, the issuer obtained a non-compete agreement from the CEO, and the issuer treated the agreement as an identifiable intangible asset. The issuer valued the non-compete agreement using projected net discounted cash flows. There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had tested the reasonableness and consistency of certain of the significant assumptions management had used to value the non-compete agreement. In addition, there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had evaluated the apparent inconsistency between the economic life of the non-compete agreement for valuation purposes and that for amortization purposes.

Finally, after the acquisition, the issuer also acquired other companies that had been customers of the originally acquired company. There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had evaluated whether these customer relationships constituted separate identifiable intangible assets that should have been valued and amortized.

Issuer G

Substantially all of the revenue from a significant location of the issuer had been recognized on a bill-and-hold basis, and the inventory subject to this arrangement was shipped periodically to the buyer. At this location, the Firm failed to test that the bill-and-hold inventory at year end physically existed, was complete and ready for shipment, and that delivery dates for this inventory were reasonable and consistent with the buyer's business purpose. In addition, the Firm failed to identify and appropriately address that the issuer had not disclosed that it recognized revenue on a bill-and-hold basis for a major customer.

Also at this location, the issuer determined the reliability of its perpetual inventory records through cycle counts. The Firm failed to perform sufficient procedures to test the existence of inventory at this location, as it observed the count of only one item of inventory.



Issuer H

In this audit, the Firm failed to perform sufficient tests of the claims payable of a managed healthcare company because the Firm failed to test the completeness and accuracy of the claims data that it used to develop its independent estimate of the liability.

Issuer I

The issuer recognized revenue using the residual method for multiple-element software arrangements, some of which included hosting services. The issuer asserted that it had vendor-specific objective evidence ("VSOE") of fair value for its hosting services based upon the renewal rates in its contracts. Although the Firm selected specific contracts to test hosting revenue, it failed to determine, for the transactions it selected, whether the renewal rates in the contracts represented the fair value of the hosting services.

Issuer J

The issuer reported a significant net equity loss from its equity-method investments. The Firm failed to apply, or request that the issuer arrange with the investees to have another auditor apply, appropriate auditing procedures to the financial results of the equity-method investees.

B.      Review of Quality Control System

In addition to evaluating the quality of the audit work performed on specific audits, the inspection included review of certain of the Firm's practices, policies, and procedures related to audit quality. This review addressed practices, policies, and procedures concerning audit performance and the following eight functional areas (1) tone at the top; (2) practices for partner evaluation, compensation, admission, assignment of responsibilities, and disciplinary actions; (3) independence implications of non-audit services; business ventures, alliances, and arrangements; personal financial interests; and commissions and contingent fees; (4) practices for client acceptance and retention; (5) practices for consultations on accounting, auditing, and SEC matters; (6) the Firm's internal inspection program; (7) policies and procedures for staffing audits; and (8) the supervision by U.S. audit engagement teams of the work performed by foreign affiliates on foreign operations of U.S. issuer audit clients. Any defects in, or



criticisms of, the Firm's quality control system are discussed in the nonpublic portion of this report and will remain nonpublic unless the Firm fails to address them to the Board's satisfaction within 12 months of the date of this report.

END OF PART I



**Public Company Accounting Oversight Board**

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page 11

PART II, PART III, AND APPENDIX A OF THIS REPORT ARE NONPUBLIC
AND ARE OMITTED FROM THIS PUBLIC DOCUMENT



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page B–1

**APPENDIX B**

**THE INSPECTION PROCESS**

The inspection process was designed and performed to provide a basis for assessing the degree of compliance of the Firm with applicable requirements related to auditing issuers. This process included reviews of components of selected issuer audits completed by the Firm. These reviews were intended both to identify deficiencies, if any, in those components of the audits and to determine whether the results of those reviews indicated deficiencies in the design or operation of the Firm's system of quality control over audits. In addition, the inspection included reviews of policies and procedures related to certain functional areas of the Firm that could be expected to influence audit quality.

1. Review of Selected Audits

The inspection team reviewed aspects of selected audits, which it chose according to the Board's criteria. The Firm was not allowed an opportunity to limit or influence the engagement selection process or any other aspect of the review.

For each audit engagement selected, the inspection team reviewed the issuer's financial statements and certain SEC filings. The inspection team selected certain higher-risk areas for review and inspected the engagement team's work papers and interviewed engagement personnel regarding those areas. The areas subject to review included, but were not limited to, revenues, fair value, financial instruments, derivatives, income taxes, reserves or estimated liabilities, inventories, consideration of fraud, supervision of work performed by foreign affiliates, and assessment of risk by the engagement team. The inspection team also analyzed potential adjustments to the issuer's financial statements that had been identified during the audit but not recorded in the financial statements. For certain selected engagements, the inspection team reviewed written communications between the Firm and the issuer's audit committee. With respect to certain engagements, the inspection team also interviewed the chairperson of the issuer's audit committee.

When the inspection team identified a potential issue, it discussed the issue with members of the engagement team. If the inspection team was unable to resolve the issue through this discussion and any review of additional work papers or other documentation, the inspection team issued a comment form on the matter and the Firm provided a written response to the comment form.



**PCAOB**

Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page B–2

2.    Implementation of AS No. 2

The inspection team reviewed aspects of the Firm's approach to the implementation of AS No. 2 in light of the provisions of that standard and related Board statements.[9/]  The inspection procedures included meeting with members of the Firm's leadership to hear the Firm's perspective on its implementation of the standard and performance of integrated audits of accelerated filers; reviewing changes to the Firm's methodology, tools, and training; and reviewing aspects of specific internal control audits.  The reviews of specific audits included inspection procedures that were performed before the regular practice office field work to follow up on certain matters identified in the prior year's inspection in one or more of the following areas: (1) integrating the audit of internal control with the audit of the financial statements; (2) using a top-down approach to the audit; (3) using a risk-based approach; and (4) using the work of others.  The reviews of audits also included, for certain audits selected for inspection during the regular practice office field work, an evaluation of aspects of the Firm's audit of internal control.

3.    Review of Eight Functional Areas

The inspection team reviewed the eight functional areas both to identify possible defects in the Firm's system of quality control and, where applicable, to update the Board's knowledge of the Firm's policies and procedures in the functional areas.

a.    Review of Partner Evaluation, Compensation, Admission, Assignment of Responsibilities, and Disciplinary Actions

The objective of the inspection procedures was to assess whether the design and application of the Firm's processes related to partner evaluation, compensation, admission, assignment, termination, and disciplinary actions could be expected to encourage an appropriate emphasis on audit quality and technical competence, as compared to marketing or other activities of the Firm.  The inspection team interviewed members of the Firm's leadership, as well as audit partners in practice offices, regarding

---

[9/]    See PCAOB Release No. 2005-009, *Policy Statement Regarding Implementation of [AS No. 2]* (May 16, 2005); PCAOB Release No. 2005-023, *Report on the Initial Implementation of [AS No. 2]* (Nov. 30, 2005); see also Staff Questions and Answers, *Auditing Internal Control Over Financial Reporting* (May 16, 2005).



PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page B–3

Public Company Accounting Oversight Board

these topics. In addition, the inspection team reviewed a sample of partners' personnel files, including files of partners who resigned or took early retirement, and partners who had significant negative inspection results from recent internal and PCAOB inspections. Also, the inspection team interviewed audit partners regarding their time and responsibilities and interviewed practice office leadership regarding the performance of the partners being inspected, the evaluation and compensation process, any disciplinary actions, and any situations where client management requested a change in the lead audit partner.

      b.     Review of Independence Policies

The objective of the inspection procedures in this area was to evaluate the Firm's policies and procedures for compliance with the independence requirements applicable to its audits of issuers. To accomplish this objective, the inspection team reviewed the Firm's policies, procedures, and guidance; reviewed the Firm's monitoring of compliance with its policies and procedures; discussed with National Office personnel the Firm's existing business ventures, alliances, and arrangements, as well as the Firm's process for establishing such enterprises; interviewed numerous National Office and practice office personnel regarding the Firm's independence policies, practices, and procedures; and, for a sample of the audits reviewed, tested compliance with the Firm's policies and applicable independence requirements.

      c.     Review of Client Acceptance and Retention Policies

The objectives of the inspection procedures in this area were to evaluate whether the Firm appropriately considers and addresses the risks involved in accepting and retaining clients in the particular circumstances. Toward those objectives, the inspection team reviewed the Firm's policies, procedures, and forms related to client acceptance and continuance; interviewed members of the Firm's leadership; and for a sample of the engagements reviewed, assessed whether the audit procedures included the specific actions, if any, contemplated in response to any risks identified in the client acceptance or retention process.

      d.     Review of Practices for Consultations

The objective of the inspection procedures in this area was to assess the effectiveness of the Firm's consultation process. Toward this objective, the inspection team gained an understanding of and evaluated the Firm's policies and procedures



relating to its consultation process, and reviewed a sample of consultations that occurred during the inspection period to evaluate the Firm's compliance with its policies and procedures, whether the conclusions were in accordance with professional standards, and whether the engagement teams acted in accordance with the conclusions.

      e.      Review of Internal Inspection Program

The objective of the inspection procedures in this area was to evaluate the effectiveness of the Firm's internal inspection program in enhancing audit quality. To meet this objective, the inspection team reviewed policies, procedures, guidance, and forms; documentation of the results of the current year's internal inspection program; and steps the Firm took in response to those results. The inspection team also interviewed the Firm's leadership concerning the process and effectiveness of its internal inspection program. In addition, the inspection team reviewed certain audits that the Firm had inspected and compared its results to those from the internal inspection.

      f.      Review of Policies and Procedures for Staffing Audits

The objectives of the inspection procedures in this area were to understand and evaluate the Firm's policies and procedures for allocating, monitoring, and managing its personnel resources. Toward those objectives, the inspection team interviewed the responsible persons at the National Office and a sample of the practice offices regarding the Firm's processes for allocating its personnel resources and its policies and procedures and their implementation.

      g.      Review of Policies Related to Foreign Affiliates

The objective of the inspection procedures in this area was to evaluate the processes the Firm uses to ensure that the audit work that its foreign affiliates perform on the foreign operations of U.S. issuers is effective and in accordance with applicable standards. With one exception, the inspection team did not inspect the audit work of foreign affiliates; rather, the procedures were limited to the supervision and control exercised by the U.S. engagement team over such work. To accomplish its objective, the inspection team reviewed the Firm's policies and procedures related to its supervision and control of work performed by foreign affiliates on the operations of U.S. issuer clients, reviewed available information relating to the most recent foreign affiliated firms' internal inspections, interviewed members of the Firm's leadership, and reviewed



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page B–5

the U.S. engagement teams' supervision and control procedures concerning the audit work that the Firm's foreign affiliates performed on a sample of audits.

      h.     Review of Tone at the Top

The objective of the review of the Firm's "tone at the top" was to assess whether actions and communications by the Firm's leadership demonstrate a commitment to audit quality. Toward that end, the inspection team interviewed members of the Firm's national, regional, and local leadership to understand their perspectives on the Firm's culture and the messages being conveyed by leadership. In addition, the inspection team reviewed documents and had discussions with Firm leadership relating to measuring and monitoring audit quality; the duties of, and relationships between and among, staff and leadership; and internal and external communications from management.


Public Company Accounting Oversight Board

PCAOB Release No. 104-2008-146
Inspection of KPMG LLP
August 12, 2008
Page C–1

**APPENDIX C**

**RESPONSE OF THE FIRM TO DRAFT INSPECTION REPORT**

Pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(a), the Firm provided a written response to a draft of this report. Pursuant to section 104(f) of the Act and PCAOB Rule 4007(b), the Firm's response, minus any portion granted confidential treatment, is attached hereto and made part of this final inspection report.[10]

---

[10]  In any version of an inspection report that the Board makes publicly available, any portions of a firm's response that address nonpublic portions of the report are omitted. In some cases, the result may be that none of a firm's response is made publicly available.



757 Third Avenue
New York, N.Y. 10017
10th Floor

Telephone 212-909-5600
Fax 212-909-5692

July 30, 2008

Mr. George H. Diacont
Director
Division of Registration and Inspections
Public Company Accounting Oversight Board
1666 K Street, N.W.
Washington, DC 28006

Re: Response to Public Company Accounting Oversight Board (PCAOB) Draft Report on 2007 Inspection of KPMG LLP

Mr. Diacont:

We appreciate the opportunity to read and comment upon the PCAOB's Draft Report on the 2007 Inspection of KPMG LLP dated June 30, 2008 ("Draft Report"). We know that we share a common objective – serving our capital markets by performing high quality audits – and believe that the PCAOB's inspection process provides valuable input for our consideration.

We acknowledge the continued professionalism and commitment of the PCAOB inspection staff and the important role the PCAOB plays in improving audit quality. We would also like to recognize the people of KPMG and the effort they expend to perform high quality audits in an increasingly challenging environment.

Just as auditors use their judgment to determine the auditing procedures to be performed, the PCAOB inspection staff members' observations are based upon their assessment of audit risk and financial statement materiality. We may have differing views as to the nature and extent of necessary auditing procedures, resulting conclusions, and/or required documentation in specific circumstances. However, we recognize that judgments are involved in both the performance of an audit and the subsequent inspection process, and we view the PCAOB's comments as helpful and give each careful and thoughtful consideration.

As we have previously communicated to the PCAOB, we conducted a thorough review of the matters identified in the Draft Report and addressed the engagement-specific findings in a manner consistent with PCAOB auditing standards and KPMG policies and procedures. Based on this review, in some cases, we performed additional audit procedures and/or supplemented our audit documentation; in other cases, we determined that no remediation of any type was necessary.

None of the matters identified by the PCAOB required the reissuance of any of our previously issued reports.

In the past several years, we have further strengthened our commitment to quality, made fundamental changes to our operating and risk management structure, and put cultural and governance reforms into effect that reflect the highest ethical standards. We are committed to creating an environment in which every individual feels a personal responsibility to uphold our core values and to do the right thing, in the right way. We have taken these actions mindful of our responsibility to the capital markets. We are committed to continually improving our firm and the profession and working constructively with the PCAOB to improve audit quality.

Very truly yours,



KPMG, LLP, a U.S. limited liability partnership, is the U.S.
member firm of KPMG International, a Swiss cooperative.

# EXHIBIT B

**Trig Smith**

| | |
|---|---|
| **From:** | Rizzo, David G [dgrizzo@KPMG.com] |
| **Sent:** | Thursday, April 01, 2010 11:59 AM |
| **To:** | Trig Smith |
| **Subject:** | RE: Motorola |

Can you send me a copy of the amended complaint?

David G. Rizzo
Assistant General Counsel
KPMG LLP
Tel. 212.909.5658

**Privileged & Confidential**
**Attorney-Client Privileged**
**Attorney Work Product**

---

**From:** Trig Smith [mailto:TrigS@rgrdlaw.com]
**Sent:** Thursday, April 01, 2010 2:51 PM
**To:** Rizzo, David G
**Cc:** Chris Yurcek
**Subject:** RE: Motorola

David:

Thanks, we'll call you at 11:30 am eastern on Wednesday. If that is not workable, we are available on Thursday as well. Below is a listing of proposed topics for discussion.

As an initial matter, the discussion would be focused on the production of hard-copy workpapers associated with 3Q06 review and 2006 audit. It would also include production of documents related to the updates of 3Q06 review and 2006 audit workpapers associated with the PCAOB analysis/investigation of KPMG's audit/review procedures.

With regard to the 3Q06 review and 2006 audit hard-copy documents, we would like to discuss the overall scope of KPMG's production. On March 30, 2010, defendants answered the Second Amended Complaint (which includes allegations of accounting/disclosure fraud) versus moving to dismiss. In their answer, defendants have asserted reasonable reliance on the advice of professionals employed or retained by Motorola as an affirmative defense with respect to the accounting for and disclosure of the 3Q06 transactions. Because defendants have asserted this defense, plaintiffs believe that a broader set of review and audit workpapers are now relevant.

Plaintiffs also wish to make the depositions of KPMG personnel as efficient as possible (we anticipate needing 2 to 3 depos). To that end, during depositions plaintiffs wish to avoid obtaining testimony such as "I'd have to reference or have access to the workpapers to answer that question" or "those documents should be/are in the workpapers", but there is not a broader set of workpapers available to plaintiffs for the purpose of testing such responses.

We propose that the most expedient resolution to these concerns would be for KPMG to produce a full set of the hard-copy 3Q06 review and FY06 workpapers for the Mobile Devices business segment. We

would also request the production of KPMG's review and audit procedure policies as they stood between September 2006 and February 2007.  Naturally, we understand our obligation to minimize burden on KPMG, but also understand that these documents are readily accessible and, therefore, may be produced on relatively short order.

Finally, we would like to discuss specific parts of the workpapers associated with KPMG's initial production that plaintiffs believe should be produced.   For instance, With regard to the PCAOB analysis/investigation, we would like to discuss the production of hard-copies of PCAOB/KPMG correspondence, as well as desk file materials, regarding the adequacy of the 3Q06 and 2006 audit procedures as they relate to the QCOM and Freescale 3Q06 transactions.

Regards,


Trig R. Smith
ROBBINS GELLER RUDMAN & DOWD LLP
655 W. Broadway, Suite 1900
San Diego, CA  92101
Tel:  619.231.1058
Fax:  619.231.7423
trigs@rgrdlaw.com

---

**From:** Rizzo, David G [mailto:dgrizzo@KPMG.com]
**Sent:** Thursday, April 01, 2010 10:20 AM
**To:** Trig Smith
**Cc:** Chris Yurcek
**Subject:** RE: Motorola

Sure – Earliest I could do is Wednesday next week, any time after 10 eastern, as I am out Monday and Tuesday.  Could you give me a brief preview of the matters you'd like to discuss?
David

David G. Rizzo
Assistant General Counsel
KPMG LLP
Tel. 212.909.5658

**Privileged & Confidential**
**Attorney-Client Privileged**
**Attorney Work Product**

---

**From:** Trig Smith [mailto:TrigS@rgrdlaw.com]
**Sent:** Thursday, April 01, 2010 1:15 PM
**To:** Rizzo, David G
**Cc:** Chris Yurcek
**Subject:** Motorola

David:

Please let us know when you have 30 minutes or so to discuss KPMG document production matters.  Early next week would be great if you can work it into your schedule.

Regards,

Trig R. Smith
ROBBINS GELLER RUDMAN & DOWD LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
Tel: 619.231.1058
Fax: 619.231.7423
trigs@rgrdlaw.com

PLEASE NOTE: Our name has changed to Robbins Geller Rudman & Dowd LLP, and our domain name for web and email is RGRDLaw.com

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

*********************************************************************

The information in this email is confidential and may be legally privileged.

It is intended solely for the addressee. Access to this email by anyone else is

unauthorized. If you are not the intended recipient, any disclosure, copying,

distribution or any action taken or omitted to be taken in reliance on it, is

prohibited and may be unlawful. When addressed to our clients any opinions or

advice contained in this email are subject to the terms and conditions

expressed in the governing KPMG client engagement letter.

*********************************************************************

PLEASE NOTE: Our name has changed to Robbins Geller Rudman & Dowd LLP, and our domain name for web and email is RGRDLaw.com

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

********************************************************************

The information in this email is confidential and may be legally privileged.
It is intended solely for the addressee. Access to this email by anyone else is
unauthorized. If you are not the intended recipient, any disclosure, copying,
distribution or any action taken or omitted to be taken in reliance on it, is
prohibited and may be unlawful. When addressed to our clients any opinions or
advice contained in this email are subject to the terms and conditions
expressed in the governing KPMG client engagement letter.

********************************************************************

EXHIBIT C

## Tor Gronborg

| | |
|---|---|
| **From:** | Leise, Elizabeth [Elizabeth.Leise@APORTER.COM] |
| **Sent:** | Wednesday, May 12, 2010 5:45 PM |
| **To:** | Tor Gronborg |
| **Cc:** | Sacks, Stephen; Thomas, James |
| **Subject:** | RE: Motorola |

Tor:

I am writing regarding the various issues raised in your May 8, 2010 email.

With regard to item 1, as discussed last week, we will get you some proposed language regarding the limited scope of issues on which we will consider waiving privilege. We intend to do so no later than the beginning of next week. We do not anticipate that the limited waiver of privilege we are proposing will result in many additional documents being produced, and we will be able to do so quickly once we agree on language.

Further, with respect to reliance on other professionals, as discussed, we do not believe that any additional information from Motorola is necessary to resolve this issue. The record is clear that both accountants and employees within the Mobile Devices business and at the corporate level participated in the accounting and disclosure decisions related to the third quarter licensing transactions. The record is also clear that there were various processes in place at Motorola to consider the accounting and disclosure decisions related to the third quarter licensing transactions, such as the Audit & Legal Committee review of the earnings press release and 10-Q, the Disclosure Committee review of the 10-Q, and the review of Motorola's external auditor. Motorola and the individual defendants relied on these personnel and processes to be comfortable that the accounting and disclosure decisions related to the third quarter licensing transactions were correct and complied with applicable laws and regulations. The identities of these individuals are well-known to plaintiffs from the documents produced to date and testimony, including, e.g., MOT/SIL 818033 (Audit & Legal Committee minutes); MOT/SIL 818034-81 (MDb Disclosure Committee presentation); MOT/SIL 786614, 821372, 819849-51, 821403, 821358, 821360 (identifying certification/Disclosure Committee processes and participants in that process); KPMG workpapers produced at KPMG 00001 - 430; KPMG 00136-40, MOT/SIL1 1406516-21, MOT/SIL1-1406501-03, MOT/SIL1-1406572 (accounting memo to file regarding FSL transaction and drafts thereof and internal discussions related thereto); KPMG 00036, MOT/SIL1-1406565-66 (accounting memo to file regarding QCOM transaction and internal discussions related thereto). (Additional such materials will be produced this week as well.)

With regard to item 2 regarding interrogatories to Motorola, our goal is to provide you an informal response to No. 10 and responses to Nos. 14-16 and 22 early next week, recognizing that the timeframe could move a bit to get the responses finalized and confirmed with the client. With regard to item 2 regarding the interrogatory to the individual defendants regarding the cost basis for their shares, we are willing to provide that information in the limited instances where a defendant's transactions during the class period were something other than an exercise and sale of stock options. If you agree, we can endeavor to provide that information before the end of May, though it will involve contacting the individual defendants and gathering appropriate documentation, which may take some time.

With regard to item 3, we continue to work on identifying the appropriate witness(es) on accounting and disclosure issues. As you previously discussed with Steve, we are open to having those depositions occur outside the close of fact discovery once we have made all necessary determinations regarding defendants' limited advice of counsel defense. In any event, given the current deposition schedule, such deposition(s) would not take place until the latter part of June. As raised by separate email to Trig

yesterday, Mr. Cash is available for deposition on June 17 in Chicago. We will make him available for testimony limited to the licensing agreements with Qualcomm and Freescale and to matters arising from plaintiffs' third and fourth motions to compel. The deposition will be limited to 4 hours.

With regard to item 4, Liz has now sent you the conference call recordings that we have; you should receive them tomorrow. With regard to item 5, the materials from the program management files were sent out last week for delivery this past Monday May 10, as you referenced in your email last night. With regard to item 6, we are working expeditiously to produce these as soon as possible, but are not in a position to provide a date certain at this time given our significant and ongoing efforts to review and produce materials responsive to plaintiffs' other requests.

With regard to item 7, we will complete production from the files of Mr. Briskman and about half the files of Mr. Lutman this week. We plan to complete the production from Mr. Lutman and Mr. Strobel by the end of next week and send these materials out to you no later than May 21. With regard to item 8, as stated during our call on this topic on April 12, 2010, Motorola does not maintain documents from the files of Pat Dempsey, Mike Ferraro, Sherry White, Chris Belter, Eric Staaf, Oksana Mindyuk or Leslie Dance, all of whom are no longer employed by Motorola.

With regard to item 9 and plaintiffs' request No. 64, 66, and 68, we intend to produce additional documents relevant to those requests this week. With respect to request no. 73 on Monte Carlo analyses, we continue to look into the matter with our client. Our understanding from our call last week was that plaintiffs are particularly interested in understanding the inputs to the analyses, and that is where our efforts are focused. There does not appear to be a central repository of such analyses, so tracking them down has proved burdensome.

With regard to item 10, we question the need for such a stipulation concerning the calls/meetings for which we have produced recordings. However, as previously discussed, we are in broad agreement with respect to a stipulation, although the best answer to the question of whether any individual has a different recollection from what is reflected in a transcript is to ask them at their deposition, rather than this approach. In any event, we will provide you our edits to your proposed language by the end of the week.

Best,
Liz

---

**From:** Tor Gronborg [mailto:TorG@rgrdlaw.com]
**Sent:** Tuesday, May 11, 2010 9:16 PM
**To:** Thomas, James
**Cc:** TorG@rgrdlaw.com; Sacks, Stephen; Leise, Elizabeth
**Subject:** Re: Motorola

Thank you.

On May 11, 2010, at 7:51 PM, "Thomas, James" <James.Thomas@APORTER.COM> wrote:

> We will be responding to your weekend missive tomorrow. Most of those items are resolvable or already resolved.

---

James W. Thomas, Jr.

Arnold & Porter LLP
555 Twelfth Street, NW
Washington, DC 20004-1206

Telephone: +1 202.942.6421
Cell Phone: 202-247-1055
James.Thomas@aporter.com
www.arnoldporter.com

---

**From:** Tor Gronborg <TorG@rgrdlaw.com>
**To:** Tor Gronborg <TorG@rgrdlaw.com>; Sacks, Stephen; Thomas, James
**Sent:** Tue May 11 20:44:25 2010
**Subject:** RE: Motorola

We have received the Program Management/QRB file production, but I believe the rest of these issues remain open.  Let me know when you want to discuss.

---

**From:** Tor Gronborg
**Sent:** Sat 5/8/2010 4:22 PM
**To:** 'Sacks, Stephen'; Thomas, James
**Subject:** RE: Motorola

Believe me, no more fun to write than read over the weekend.  Talk to you guys on Monday.

---

**From:** Sacks, Stephen [mailto:Stephen.Sacks@APORTER.COM]
**Sent:** Saturday, May 08, 2010 3:21 PM
**To:** Tor Gronborg; Thomas, James
**Subject:** Re: Motorola

Saturday night? how about monday morning before I read this. James and I are traveling together monday. We will discuss it and call.

---

**From:** Tor Gronborg <TorG@rgrdlaw.com>
**To:** Sacks, Stephen; Thomas, James
**Sent:** Sat May 08 17:37:30 2010
**Subject:** Motorola

Steve and James, while we have worked to resolve a number of the discovery disputes over the last week and taken steps to address claims of burden, there are a significant number of issues that still need to be resolved:

(1)     We have had several discussions regarding the sufficiency of defendants' answer and affirmative defenses, defendants' FRCP 26 disclosures and the basis for plaintiffs' interrogatories requesting the identification of management/outside entities/professionals that defendants' relied on in making the statements and omissions identified in the complaint.  The offer to allow plaintiffs to take discovery after the June 30th cutoff should defendants assert that they relied on any Motorola personnel not previously identified in defendants' FRCP disclosures only partially resolves the issue.  Specifically:
        (a)      With regard to an advice of counsel defense, I understand that you are resolving whether such a claim will be made.  Given the limited discovery window and the fact that the depositions of individual defendants has already begun, please give us a date certain by which defendants will confirm whether or not they relied on advice of counsel, provide the identification of the counsel (in-house or external) any of the defendants purported to rely on and will complete production of those documents related to the defense (including, documents previously withheld as privileged);
        (b)      With regard to third parties, we maintain that whether through an amendment to the answer, responding to the outstanding interrogatories or some other means, defendants must identify any "outside consultants☐ or "professionals☐ they will assert they relied upon.  Frankly, your

refusal to even acknowledge that defendants will assert a reliance on KPMG seems to be more about gamesmanship than any effort to minimize burden. While we're open to other means of resolving this issue, absent a suggestion we request that the individual defendants each answer Interrogatory No. 1 directed to them with respect to the identification of any outside consultants, professionals or other non-Motorola personnel or entity relied upon in making any of the identified statements or omissions. While the date for responding to the interrogatories is past due, given that we have been discussing resolution of this issue, we request that the individual defendants' responses, as identified above, be served by no later than May 19, 2010.

(2)     While we have stayed Motorola's response to Interrogatory Nos. 8-9, 11-13 and 17-21 based on the agreement that plaintiffs could request responses or move to compel responses, if necessary, after the individual defendants' depositions and after the June 30, 2010 discovery cutoff, we have requested:
        (a)     An informal response to Interrogatory No. 10 identifying those people who drafted, reviewed and/or approved Motorola's January 4, 2007 and March 21, 2007 press releases. Please let me know by what date we will have defendants' response;
        (b)     Responses to Interrogatory Nos. 14-16 and 22. The deadline for defendants' responses has past. Please let me know by what date we will have defendants' response;
        (c)     Responses to the interrogatory served on the Individual Defendants regarding the cost basis of their Motorola shares. Again, the deadline for defendants' responses has past. While there is not an immediately pressing need for a response to this interrogatory and we would be happy to provide an extension for the individual defendants' response, we would like a date certain by which this interrogatory will be answered.

(3)     We are still waiting on a date for the FRCP 30(b)(6) deposition concerning the accounting/disclosure of the 3Q06 IP arrangements. We appreciate that you are working on identifying an appropriate representative(s), but we do need to get this set in the next week. We are also still waiting on a date for the deposition of Bob Cash.

(4)     Previously, you acknowledged that defendants had located certain audio or video tapes from conference calls. Once again setting aside the fact that there has been no explanation as to why materials plainly called for in plaintiffs' October 20, 2008 document requests are not being produced until the last two months of discovery, we would like a date certain by which these materials will be produced.

(5)     Please provide us with a date certain by which we will received the production of all program management files and QRB files from Compass. We had understood from our call on Tuesday, May 4th, that these documents were to have been produced by the end of last week.

(6)     Please provide us with a date certain by which we will receive the electronic versions of the Garriques weekly staff reports.

(7)     Please provide us with a date certain by which defendants will complete the production of documents from the files of Neil Briskman, William Lutman and Steve Strobel. In particular, as you have noted, the production of documents from the files of Mr. Lutman may resolve outstanding issues regarding defendants' efforts/need to search for Strategy & Business Intelligence/eagle.mot.com documents responsive to plaintiffs' requests.

(8)     We are still waiting for written confirmation from you that Motorola has no electronic or hard copy documents from the relevant time period for Pat Dempsey, Mike Ferraro, Sherry White, Chris Belter, Eric Staaf, Oksana Mindyuk or Leslie Dance;

(9)     As discussed on Tuesday, May 4th, we need to resolve any disputes (or identify those matters that need to be brought to the Court's attention) and complete the production of documents responsive to Request Nos. 64 and 66 (accounting manual/policies procedures (see e.g. MOT/SIL 810254)), 68 (documents provided to KPMG regarding the 3Q06 IP arrangements) and 73 (Monte Carlo analyses) in the near term. We have requested that you prioritize the response/production to these requests.

(10)    On April 29th I sent you proposed language for a stipulation regarding the authenticity and admissibility of conference call transcripts identified in the operative complaint and have not heard back from you on the proposal.  We have stayed defendants' obligation to respond to RFAs 1-57 on the basis that we would reach an agreement on such a stipulation.

Many of the above items have been outstanding for a considerable time and the discovery schedule no longer allows for vague assurances that they are being looked into or that you'll get back to us shortly.  I'm available Monday to discuss any of the above issues and we continue to be willing to work with you to address potential issues of burden, but we need to get these matters resolved.

## Tor Gronborg
<u>Attorney</u>

655 West Broadway, Suite 1900
San Diego, CA 92101
Tel     619 231 1058
Fax     619 231 7423
TorG@rgrdlaw.com
rgrdlaw.com

PLEASE NOTE: Our name has changed to Robbins Geller Rudman & Dowd LLP, and our domain name for web and email is RGRDLaw.com

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here:
http://www.arnoldporter.com

PLEASE NOTE: Our name has changed to Robbins Geller Rudman & Dowd LLP, and our domain name for web and email is RGRDLaw.com

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting. marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged. confidential or exempt from disclosure. If you are not the intended recipient. please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here:
http://www.arnoldporter.com

PLEASE NOTE: Our name has changed to Robbins Geller Rudman & Dowd LLP,
and our domain name for web and email is RGRDLaw.com

NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges. Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.

U.S. Treasury Circular 230 Notice

Any U.S. federal tax advice included in this communication (including any attachments) was not intended or written to be used, and cannot be used. for the purpose of (i) avoiding U.S. federal tax-related penalties or (ii) promoting. marketing or recommending to another party any tax-related matter addressed herein.

This communication may contain information that is legally privileged. confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution. or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter LLP, click here:
http://www.arnoldporter.com

5/17/2010

# EXHIBIT D

1

```
                    IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION


ERIC SILVERMAN, on behalf of himself  ) Docket No. 07 C 4507
and all others similarly situated,    )
et al.                                )
                          Plaintiffs,)
                                      )
            vs.                       )
                                      )
MOTOROLA, et al.,                     ) Chicago, Illinois
                                      ) May 6, 2010
                          Defendants.) 8:30 o'clock a.m.


            TRANSCRIPT OF PROCEEDINGS - STATUS & MOTION
              BEFORE THE HONORABLE AMY J. ST. EVE


APPEARANCES:


For the Plaintiffs:        ROBBINS, GELLER, RUDMAN & DOWD
                           BY:  MR. TRIG R. SMITH,
                                   via teleconference
                           655 West Broadway, Suite 1900
                           San Diego, California  92101

                           MILLER LAW, LLC
                           BY:  MS. LORI ANN FANNING
                           115 S. LaSalle St., Suite 2910
                           Chicago, Illinois  606063


For the Defendant:         ARNOLD & PORTER
                           BY:  MR. JAMES W. THOMAS,
                                   via teleconference
                           555 Twelfth Street, N.W.
                           Washington, D.C.  20004

                           SHEFSKY & FROELICH
                           BY:  MS. ERIN K. LYNCH
                           111 East Wacker Drive, Suite 2800
                           Chicago, Illinois  60601
```

2

```
 1    APPEARANCES (Cont'd):

 2
      For KMPG, Dennis Pratt       SIDLEY AUSTIN, LLP
 3    & Dennis Parrott:           BY:  MR. JEFFREY C. SHARER
                                   One South Dearborn Street
 4                                 Chicago, Illinois  60603

 5                                 FIGLIULO & SILVERMAN
                                   BY:  MS. STEPHANIE D. JONES
 6                                 10 S. LaSalle St., Suite 3600
                                   Chicago, Illinois  60603
 7
 8    Court Reporter:             MR. JOSEPH RICKHOFF
                                   Official Court Reporter
 9                                 219 S. Dearborn St., Suite 1232
                                   Chicago, Illinois  60604
10                                 (312) 435-5562

11                * * * * * * * * * * * * * * * *

12                        PROCEEDINGS RECORDED BY
13                       MECHANICAL STENOGRAPHY
                    TRANSCRIPT PRODUCED BY COMPUTER
14

15

16

17

18

19

20

21

22

23

24

25
```

5

1   yesterday.  So, everybody has the moving papers in hand.

2            THE COURT:  All right.

3            So, the non-public version -- which everybody but the

4   Court has the moving papers in hand.  I do not have that

5   either.  So, please make sure --

6            MR. SHARER:  We have a courtesy copy here, your

7   Honor.

8            THE COURT:  That is great.  You can either file it or

9   a courtesy copy is fine.  You can give that to Katie.

10           Why do you not file by tomorrow, if you would,

11  please --

12           MR. SHARER:  Okay.

13           THE COURT:  -- your non-public version.  If you get

14  it today, that is fine.

15           MR. SHARER:  Okay.  We can do that.

16           THE COURT:  Otherwise, the public version by

17  tomorrow.

18           MR. SHARER:  Okay.

19           And, your Honor, in going through our papers and

20  determining which portions to file publicly, completely agree,

21  many of the exhibits are public documents or Westlaw and the

22  like, that will not be a problem.  The sensitivity here is

23  simply to the assertion that plaintiffs make, expressly or

24  implicitly, in some of their correspondence and their

25  subpoenas regarding certain facts about the PCAOB's inspection

6

1  of KPMG's audit practice.

2      And the PCAOB, consistent with the statutory

3  privilege in Sarbanes, takes the position that even matter --

4  even the identity of the issuers as to which it comments are

5  subject to the Section 105(b)(5)(A) privilege.  And, so, we'll

6  need to be mindful of that in filing our papers.  But we will

7  absolutely do our best to narrow as much as possible the

8  redactions.

9      THE COURT:  I certainly understood the thrust of your

10  request to file under seal.

11      MR. SHARER:  Okay.

12      THE COURT:  But many times counsel do not -- there is

13  a Seventh Circuit law that we have to follow here --

14      MR. SHARER:  Absolutely.

15      THE COURT:  -- which says that not everything can be

16  under seal.

17      MR. SHARER:  Absolutely.

18      THE COURT:  So, please be mindful of that when you

19  are filing because if it is over-sealed, it is my job to let

20  you know.

21      MR. SHARER:  Absolutely understood.  And thank you,

22  your Honor.

23      THE COURT:  Response, as you requested, will be due

24  May 10th.  Please provide a courtesy copy to me, if you would,

25  please.

13

1   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

2

3

    /s/ Joseph Rickhoff                          May 11, 2010
4   Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E



CENTER FOR AUDIT QUALITY
*Serving Investors, Public Company Auditors & the Markets*
*Affiliated with the American Institute of CPAs*

| Home | About Us | Resources | Events | Newsroom |

> FAQs    >Governing Board    > Staff Directory    > Brochure    > CAQ Careers

Sign up for CAQ Newsletters
>> submit

# GOVERNING BOARD

The Center for Audit Quality is led by a Governing Board that comprises leaders from the public company auditing firms, the American Institute of CPAs and the investor and issuer communities. Board members are committed to the concept that a robust public company auditing profession is fundamental to the public interest and the capital markets.

## Governing Board Chair

James S. Turley, Chairman and CEO, Ernst & Young LLP

## Governing Board Co-Vice Chairs

Michele J. Hooper, President and CEO, The Directors' Council
Barry Melancon, President and CEO, American Institute of CPAs

## Governing Board Members

Charles M. Allen, CEO, Crowe Horwath LLP
Stephen M. Chipman, CEO and Executive Partner, Grant Thornton LLP
Harvey J. Goldschmid, Former Commissioner, U.S. Securities and Exchange Commission
Robert E. Moritz, Chairman and Senior Partner, PricewaterhouseCoopers LLP
Lynn S. Paine, Professor of Business Administration and Senior Associate Dean, Director of Faculty Development, Harvard Business School
Barry Salzberg, CEO, Deloitte LLP
David R. Scudder, Managing Partner, McGladrey & Pullen, LLP
John B. Veihmeyer, CEO, KPMG LLP
Jack Weisbaum, CEO, BDO Seidman, LLP

**CAQ Leadership**

**Executive Director**
Cynthia Fornelli

**Board Members**
Charles M. Allen
Stephen M. Chipman
Barry Melancon
Robert E. Moritz
Barry Salzberg
David R. Scudder
James S. Turley
John B. Veihmeyer
Jack Weisbaum

**Public Board Members**
Harvey J. Goldschmid
Michele J. Hooper
Lynn S. Paine

**Perspectives**
Read Governing Board members' perspectives on audit-related issues.

©2007 - 2010 The Center for Audit Quality
Privacy Policy | Contact Us

EXHIBIT F



# PCAOB OVERSEES
## THE AUDITORS OF PUBLIC COMPANIES TO PROTECT INVESTORS

The PCAOB is a private sector, nonprofit corporation, created by the Sarbanes-Oxley Act of 2002, to oversee the auditors of public companies in order to protect the interests of investors and further the public interest in the preparation of informative, fair and independent audit reports.

**INFORMATION FOR**
- Auditors
- Educators
- Government
- Investors
- Media
- Public Companies

**FEATURED ISSUES**
- Fair Value
- Internal Control
- International Oversight
- Small Business

### REGISTRATION & REPORTING
- Registered Firms
- Firm Filings
- Auditors of Nonpublic Broker-Dealers
- Rules

### STANDARDS
- Auditing
- Ethics and Independence
- Quality Control
- Attestation
- Guidance
- Current Activities
- SAG
- Rules

### INSPECTIONS
- Firm Reports
- Firms that Failed to Address QC Criticisms Satisfactorily
- Board Public Reports
- Rules

### ENFORCEMENT
- Disciplinary Orders
- Termination of Bars
- Tip Center
- Rules

### OPEN FOR PUBLIC COMMENT

Proposed Auditing Standard on Communications with Audit Committees and Related Amendments to Certain PCAOB Auditing Standards »

### RULEMAKING RELEASES & COMMENTS

Rulemaking Docket >>

**NEWS & EVENTS**

**News Releases**

PCAOB Solicits Nominations For Standing Advisory Group »

PCAOB Announces Investor Advisory Group Inaugural Meeting on May 4, 2010 »

**Speeches & Statements**

**Events & PCAOB Meetings**

**Webcasts**

**REMINDERS**

Nominations for the Standing Advisory Group are being accepted through June 17 »

Annual fees are due on July 31 »

© Copyright 2003 - 2010 Public Company Accounting Oversight Board. All Rights Reserved.

EXHIBIT G

File No. PCAOB-2003-06 Page 105



1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8430
www.pcaobus.org

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| PROPOSED RULES ON INVESTIGATIONS ) | PCAOB Release No. 2003-012 |
| AND ADJUDICATIONS ) | July 28, 2003 |
| ) | |
| ) | PCAOB Rulemaking |
| ) | Docket Matter No. 005 |
| ) | |
| ) | |
| ) | |

Summary: The Public Company Accounting Oversight Board ("Board" or "PCAOB") has proposed rules on investigations and hearings in disciplinary proceedings, pursuant to Section 105 of the Sarbanes-Oxley Act of 2002 ("Act"), and hearings on registration applications pursuant to Section 102 of the Act. The proposal consists of 64 rules (PCAOB Rules 5000 through 5501), plus certain definitions that would appear in Rule 1001. The Board invites public comment on the proposed rules and will consider all comments received, modify its proposal as it deems appropriate, and submit final rules to the Securities and Exchange Commission ("Commission") for approval pursuant to Section 107 of the Act. The Board's rules will not take effect unless and until approved by the Commission.

Public
Comment: Interested persons may submit written comments to the Board. Such comments should be sent to Office of the Secretary, PCAOB, 1666 K Street, N.W., Washington, D.C. 20006-2803. Comments may also be submitted by e-mail to comments@pcaobus.org or through the Board's Web site at www.pcaobus.org. All comments should refer to PCAOB Rulemaking Docket Matter No. 005 and should be received by the Board no later than 5:00 PM (EDT) on August 18, 2003.



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 2003-012
July 28, 2003
Page 2

Board
Contacts:     Samantha Ross, Chief of Staff (202/207-9093; rosss@pcaobus.org);
Michael Stevenson, Associate General Counsel (202/207-9054;
stevensonm@pcaobus.org).

\*          \*          \*

The Board has proposed, and is seeking comment on, rules relating to investigations and adjudications. Section 105 of the Act grants the Board broad investigative and disciplinary authority over registered public accounting firms and persons associated with such firms. To implement this authority, Section 105(a) directs the Board to establish, by rule, fair procedures for the investigation and discipline of registered public accounting firms and associated persons of such firms.

Under the proposed rules, the Board and its staff may conduct investigations concerning any acts or practices, or omissions to act, by registered public accounting firms and persons associated with such firms, or both, that may violate any provision of the Act, the rules of the Board, the provisions of the securities laws relating to the preparation and issuance of audit reports and the obligations and liabilities of accountants with respect thereto, including the rules of the Commission issued under the Act, or professional standards. The Act provides the Board authority to require registered public accounting firms and their associated persons to cooperate with Board investigations. The Act also permits the Board to seek information from other persons, including clients of registered firms.

When violations are detected, the Board will provide an opportunity for a hearing, and in appropriate cases, impose sanctions designed to prevent a repetition and to enhance the quality and reliability of future audits. These sanctions may include temporarily or permanently prohibiting a firm or associated person from participating in audits of public companies or from being associated with a registered public accounting firm. Sanctions may also require special remedial measures, such as training, new quality control procedures, and the appointment of an independent monitor.

The Board may also hold hearings on registration applications, pursuant to Section 102 of the Act. Under the Board's registration rules, if the Board is unable to determine that a public accounting firm has met the standard for approval of an application, the Board may provide the firm with a notice of a hearing, which the firm may elect to treat as a written notice of disapproval for purposes of making an appeal to



PCAOB Release No. 2003-012
July 28, 2003
Page 3

the Commission under Section 107.  If such a firm chooses to request a hearing, the Board would, in appropriate circumstances, afford the firm a hearing pursuant to the proposed rules.

The proposed rules on investigations and adjudications consist of 64 rules (PCAOB Rules 5000 through 5469 and 5500 through 5501), plus certain definitions that would appear in Rule 1001.  Appendices 1 and 2 to this release contain, respectively, the text of these proposed rules and a section-by-section analysis of the rules.  Section A of this release provides an overview of the operation of the proposed rules.  Section B of this release requests comments and describes how they may be submitted to the Board.

A.    <u>Operation of the Proposed Rules on Investigations and Adjudications</u>

1.    <u>Rules on Inquiries and Investigations</u>

Section 105(b)(1) of the Act provides the Board the authority to conduct investigations relating to the conduct and practices of registered public accounting firms and their associated persons.  The Board's rules implement that authority by providing for two types of Board investigative matters – informal inquiries and formal investigations.  Proposed Rules 5100 through 5112 would provide for the Board and its staff to undertake such matters.

a.    <u>Informal Inquiries</u>

Under proposed Rule 5100, the staff of the Board would be authorized to undertake informal inquiries, without a formal vote of the Board.  Informal inquiries may be based on matters uncovered during inspections, matters brought informally to the attention of the Board's staff by other regulators, informants, members of the public or news reports, among other things.  In an informal inquiry, the staff may request information from, or interview, any person, including registered public accounting firms and their clients, and associated persons and employees of such entities.[1]  Decisions to open or close such inquiries, or to recommend that the Board authorize a formal investigation into the same matter, will be made by the Board's Division of Enforcement and Investigations.

---

[1]    <u>See</u> Rule 5100(b).



PCAOB Release No. 2003-012
July 28, 2003
Page 4

      b.    <u>Formal Investigations</u>

Section 105(b)(2) of the Act authorizes the Board, in conducting investigations relating to the conduct of registered public accounting firms and persons associated with such a firm, to –

- Require the testimony of the firm, or of any person associated with a registered public accounting firm, with respect to any matter that the Board considers relevant or material to an investigation;

- Require the production of audit work papers and any other document or information in the possession of a registered public accounting firm or any associated person thereof that the Board considers relevant or material to the investigation, and to inspect the books and records of such firm or associated person to verify the accuracy of any documents or information supplied; and

- Request testimony of, and production of any document in the possession of, any other person, including any client of a registered public accounting firm that the Board considers relevant or material to a Board investigation, with appropriate notice.

When it appears that a violation of any provision of the Act, the rules of the Board, the provisions of the securities laws relating to the preparation and issuance of audit reports or the obligations and liabilities of accountants with respect thereto, including the rules of the Commission issued under the Act, or professional standards, may have occurred, the Board may, by a vote of the Board, issue an order of formal investigation.[2]  Such an order will empower members of the Board's staff to issue written demands or requests for testimony or production of documents (an "accounting board demand" or an "accounting board request") to any person pursuant to Section 105(b)(2), to the extent the information sought is relevant to the matters described in the Board's order of formal investigation.[3]  While the proposed rules would not delegate the power to open and close formal investigations to the staff, they would provide for the

---

    [2]    <u>See</u> Rule 5101(a).

    [3]    <u>See</u> Rule 5101(a)(2).



PCAOB Release No. 2003-012
July 28, 2003
Page 5

Board's issuance of orders authorizing the staff to issue accounting board demands and requests once an investigation has been opened.[4]

Proposed Rules 5102 through 5105 would implement the Board's authority under Section 105(b)(2) of the Act to seek testimony and documents. Specifically, Rule 5102 provides for the taking of testimony pursuant to an accounting board demand. Among other things, Rule 5102 provides for appropriate notice of an accounting board demand and for testimony to be taken on the record and under oath or affirmation. Board investigations will not be public. Accordingly, proposed Rule 5102 also identifies those persons who may be present in Board examinations, and it excludes all persons other than the person being examined and his or her counsel, the Board and its staff, a court reporter, and in appropriate circumstances, such other persons as the Board or its staff permit.[5] Rule 5103 provides for accounting board demands to require the production of audit workpapers and other documents by registered public accounting firms and persons associated with such firms, and Rule 5104 provides for a Board examination of the books and records of any registered public accounting firm or associated person to verify the accuracy of any documents or information produced pursuant to Rule 5102 or Rule 5103. Failure to comply with an accounting board demand, or any other refusal to cooperate with a Board investigation, may result in the commencement of a disciplinary proceeding on noncooperation with an investigation, after which a registered public accounting firm or person associated with such a firm may be subject to sanction.[6]

As a corollary, proposed Rule 5105 would provide for accounting board requests for testimony or production of documents from persons not associated with a registered public accounting firm. A person's failure to comply with an accounting board request

---

[4]     See Rule 5101(b).

[5]     See Rule 5102(c)(4). In no event, however, shall a person other than the deponent who has been, or is reasonably likely to be, examined in the investigation be permitted to be present. This provision is consistent with attorney ethics rules. See, e.g., Code of Prof. Responsibility (New York) DR 5-102 (Lawyers as Witnesses).

[6]     See Rule 5110. In order to encourage efficient and thorough investigations, proposed Rule 5110 provides for certain special and expedited procedures to determine whether a sanction for noncooperation with an investigation is appropriate.



PCAOB Release No. 2003-012
July 28, 2003
Page 6

may result in the Board seeking a Commission subpoena for the requested testimony, documents or other information, pursuant to proposed Rule 5111. [7]

Proposed Rule 5106 would set forth a framework for the assertion of a claim of privilege as an objection to an accounting board demand. This rule would require the recipient of an accounting board demand to identify the nature of the privilege and to provide a privilege log, as is typically required in federal courts and other tribunals. [8] Consistent with Section 105(b)(5) of the Act, proposed Rule 5108 provides for confidential treatment of investigatory records. Under Section 105(b)(5) of the Act, confidential documents described in Rule 5108 "shall be confidential and privileged as an evidentiary matter (and shall not be subject to civil discovery or other legal process) in any proceeding in any federal or State court or administrative agency, and shall be exempt from disclosure, in the hands of an agency or establishment of the federal government, under the Freedom of Information Act (5 U.S.C. 552a), or otherwise, unless and until presented in connection with a public proceeding or released in accordance with" a disciplinary proceeding under Section 105(c) of the Act.

Proposed Rule 5109 provides for certain rights of witnesses in inquiries and investigations, including a right to review an order of formal investigation, a right to be represented by counsel, a right to inspect and copy the official transcript of one's own testimony, and a right to submit to the Board a written statement setting forth one's interests and positions in regard to the subject matter of the investigation.

Finally, proposed Rule 5112 would provide for coordination between the Board and the Commission and for referring investigations to the Commission, and as directed by the Commission, to the Attorney General of the United States or one or more states, or any other appropriate state regulatory authority.

---

[7]     Neither a failure to comply with a request, nor a request itself, is, however, a prerequisite to the Board seeking a Commission subpoena. The Board may seek a Commission subpoena at any time, with or without notice to the person to whom the Board seeks to direct the subpoena.

[8]     See, e.g., Local Civil Rule 26.2 of the Southern District of New York. Rule 5107 also sets forth uniform definitions for use in accounting board demands and requests.


**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 2003-012
July 28, 2003
Page 7

2.     Rules on Disciplinary Proceedings

Most of the Board's disciplinary proceedings will likely involve apparent violations of the securities laws, or of the Board's rules and professional standards, that are discovered as a result of Board inspections or investigations. The Board's disciplinary process, however, will also address two other situations – the failure of registered public accounting firms and their associated persons to cooperate with Board investigations and the failure of registered public accounting firms or their supervisory personnel reasonably to supervise associated persons who have committed violations.

Proposed rules 5200 through 5207 would govern the Board's disciplinary proceedings. Specifically, proposed Rule 5200 would codify in the Board's rules the three types of disciplinary proceedings the Board will conduct, as described above. Proposed Rule 5201 would provide for the Board to issue an order instituting proceedings, providing notice to registered firms or associated persons subject to such proceedings of the nature of the allegations against them. In most cases, as soon as practicable after the Board has issued an order instituting proceedings, the Secretary of the Board will assign a hearing officer to preside over the proceeding.[9] Consistent with Section 105(c) of the Act, proposed Rule 5202 provides for a record of every hearing to be kept, and proposed Rule 5203 provides for hearings to be nonpublic, unless otherwise ordered by the Board. In disciplinary proceedings, consistent with Section 105(c)(2) of the Act, the Board will order a hearing to be public only upon a showing of good cause and the consent of the parties to the hearing. Proposed Rule 5204 provides for determinations in Board disciplinary proceedings to be made on the basis of an initial decision prepared by a hearing officer, which may be appealed to the Board within a specified time period.[10]

---

[9]      See Rule 5200(b).

[10]      Proposed Rule 5450 provides for initial decisions in proceedings based on violations of the securities laws or the Board's rules, on failure to supervise, or on whether an application for registration should be approved, to be appealable by the respondent or the Board's staff within 30 days after service of the initial decision. Initial decisions in proceedings based on noncooperation with an investigation would be appealable within 10 days after service of the initial decision.



PCAOB Release No. 2003-012
July 28, 2003
Page 8

Proposed Rule 5205 provides for settlement of disciplinary proceedings, based on offers of settlement that may be submitted by respondents in such proceedings. This Rule would establish a procedure for considering such offers that would be consistent with the Commission's practice.[11/]

Absent settlement, any final disciplinary action taken by the Board will be subject to Commission review under Section 107(c) of the Act. Under Section 105(e) of the Act, application to the Commission for review (or the institution by the Commission of review) will stay imposition of any Board sanction. To provide for an orderly resolution of such Commission review, Rule 5207 would, consistent with Section 105(e) of the Act, provide for an automatic stay of any final disciplinary action until the later of (a) Commission action to dissolve the stay, or (b) the expiration of the period during which, on its own motion, or upon application pursuant to Section 19(d)(2) of the Exchange Act, the Commission may institute review of the action.

3.    Rules on Sanctions

Under Section 105(c)(4) of the Act, the Board may impose disciplinary or remedial sanctions if the Board finds that a registered public accounting firm, or a person associated with such a firm, has engaged in any act or practice, or omitted to act, in violation of the Act, the rules of the Board, the provisions of the securities laws relating to the preparation and issuance of audit reports and the obligations and liabilities of accountants with respect thereto, including the rules of the Commission issued under the Act, or professional standards. Section 105(c)(4) sets forth certain sanctions, including suspension or revocation of a firm's registration, a suspension or bar of an associated person, certain civil money penalties, censure, and required professional education or training. In addition, Section 105(c)(4) permits the Board to impose "any other appropriate sanction provided for in the rules of the Board." Proposed Rule 5300 would codify those sanctions specifically described in Section 105(c)(4) and would add four additional sanctions related to appointment of an independent monitor to observe and report on compliance, appointment of counsel or another consultant to design policies to effectuate compliance, requiring adoption or implementation of certain policies or other undertakings, and requiring a firm to obtain an independent review and report on one or more audit engagements. Rule 5300 would also include sanctions based on disciplinary proceedings relating to noncooperation with an investigation, pursuant to Section 105(b) of the Act, including

---

[11/]    See Commission Rule of Practice 240.



PCAOB Release No. 2003-012
July 28, 2003
Page 9

suspension or revocation of a firm's registration, a suspension or bar of an associated person, certain civil money penalties, a censure, appointment of a special master or independent monitor to monitor and report on compliance accounting board demands, and authorization for a hearing officer to retain jurisdiction to monitor compliance with accounting board demands and to rule on future disputes.

Proposed Rule 5301 would address the effect of sanctions on persons and on registered firms, consistent with Section 105(c)(7)(A) of the Act. Specifically, Rule 5301(a) would provide that "[n]o person that is suspended or barred from being associated with a registered public accounting firm, or has failed to comply with any sanction pursuant to Rule 5300, may willfully become or remain associated with any registered public accounting firm, without the consent of the Board, pursuant to Rule 5302, or the Commission." Thus, a person who is suspended or barred from being associated with a registered public accounting firm would not be permitted, in connection with the preparation or issuance of any audit report, (i) to share in the profits of, or receive compensation in any other form from, any registered public accounting firm, or (ii) to participate as agent on behalf of such a firm in any activity of that firm.[12] A Note to the Rule explains that this prohibition includes receiving any salary, and any bonus, profit or other remuneration that results directly or indirectly from any audit fees that might have been earned during the period of the suspension or bar.

As a corollary to proposed Rule 5301(a), proposed Rule 5301(b) would provide that "[n]o registered public accounting firm that knows, or, in the exercise of reasonable care should have known, of the suspension or bar of a person may permit such person to become or remain associated with it, without the consent of the Board, pursuant to Rule 5302, or the Commission." In order to provide assurance that a firm that employs or continues to employ a barred person has not permitted the person to perform the activities of an associated person, the Board will consider, in connection with reporting requirements that it expects to develop in the future, whether to require such firms to provide regular reports on the activities and role within the firm of the barred person.

---

[12] <u>See</u> Rule 1001(p)(i).



PCAOB Release No. 2003-012
July 28, 2003
Page 10

4.    Rules of Board Procedure for the Conduct of Hearings

Proposed Rules 5400 through 5469 would govern hearings in Board disciplinary proceedings, as well as hearings on whether an application for registration should be approved or disapproved.   These proposed rules include general rules, prehearing rules, rules on the conduct of hearings, and rules on appeals to the Board.

The general rules in the Board's proposed Rules of Board Procedure would, among other things, provide for parties or their counsel to file notices of appearance[13] and prohibit parties and their counsel from engaging in ex parte communications with hearing officers.  The general rules would also provide for the form, method and timing of filing papers, including motions, in Board proceedings.[14]   The Board intends to establish an electronic docketing system that will facilitate management of and access to dockets and filings.  Because the Board expects that most of its hearings will be nonpublic,[15] in most cases the Board will restrict access to dockets and filings to parties and their counsel, who will receive user ID's and passwords.

The prehearing rules in the Board's proposed Rules of Board Procedure would, among other things –

- provide for registered firms and associated persons subject to orders instituting proceedings to file answers (voluntarily or as required by the Board);[16]

- provide for the Board's staff to make available to such firms and persons certain documents, including witness statements, consistent with the spirit of the Jencks Act (18 U.S.C. § 3500);[17]

---

[13]    See Rule 5401.

[14]    See Rules 5404 – 5408 and 5410 and 5411.

[15]    Section 105(c)(2) of the Act provides that hearings under Section 105 "shall not be public, unless otherwise ordered by the Board for good cause shown, with the consent of the parties to such hearing."

[16]    See Rule 5421.



PCAOB Release No. 2003-012
July 28, 2003
Page 11

- provide for assembling hearing witnesses and testimony through the use of accounting board demands and Commission subpoenas to appear at a hearing, prehearing depositions to preserve testimony for presentation at a hearing, and prior sworn statements of unavailable witnesses;[18]

- provide for any party to make a motion for summary disposition of a proceeding without an evidentiary hearing;[19] and

- provide for the Commission and certain other governmental authorities to seek leave to participate in a Board proceeding in order to seek a stay of a Board hearing during a Commission investigation or proceeding, or a federal or state criminal investigation or proceeding, arising out of the same facts that are at issue in the Board proceeding.[20]

The Board intends that presiding hearing officers will have the discretion to conduct hearings as appropriate in each proceeding. Nevertheless, proposed Rules 5440 through 5445 would provide certain broad principles and requirements to govern hearings. Specifically, proposed Rule 5440 would provide for a record of the hearing to be kept. Under proposed Rule 5444, the scope and form of evidence, including rebuttal evidence, if any, and cross-examination, if any, would be determined by the Board or the hearing officer in each proceeding, although proposed Rules 5441 through 5443 would establish a general framework on the admissibility of evidence, objections and offers of proof, and the presentation of testimony under oath or affirmation. Finally, proposed Rule 5445 would provide parties the opportunity to submit post-hearing briefs and other appropriate submissions, although the Rule would permit a hearing officer in a proceeding on noncooperation with an investigation, in his or her discretion, to render an initial decision without allowing for post-hearing submissions or after having allowed for such submissions on an expedited schedule.

---

[17]    See Rules 5422 and 5423.

[18]    See Rules 5425 – 5427.

[19]    See Rule 5428.

[20]    See Rule 5420.



PCAOB Release No. 2003-012
July 28, 2003
Page 12

Proposed Rule 5460 through 5466 would provide for procedures in appeals of initial and other hearing officer decisions to the Board. Specifically, proposed Rule 5460 would govern the filing of petitions for review of initial decisions and Board review of such decisions on its own initiative. Proposed Rule 5461 would permit interlocutory review of hearing officer decisions other than initial decisions in limited circumstances.[21/] Proposed Rule 5462 would provide for a briefing schedule order that, in most cases, would require opening briefs to be filed within 40 days of the date of the order, opposition briefs to be filed within 30 days thereafter, and reply briefs to be filed within 14 days after opposition briefs. The proposed Rule would also govern the contents and length of briefs. Under proposed Rule 5463, the Board would be able, on its own motion or the motion of a party, to order oral argument with respect to any matter. The Board expects that such motions will be granted unless exceptional circumstances make oral argument impractical or inadvisable. Proposed Rules 5464 and 5465 would govern the record before the Board, which in exceptional cases could include additional evidence not submitted in the hearing, if the proponent of the evidence were able to show with particularity that such additional evidence is material and that there were reasonable grounds for failure to adduce it previously. Finally, proposed Rule 5466 would provide for motions to reconsider a final order issued by the Board, in certain limited situations.

Under Section 107(c) of the Act, any final sanction of the Board will be subject to Commission review, and under Section 25 of the Exchange Act of 1934, Commission decisions on Board sanctions will be appealable to the U.S. Courts of Appeals. In the event of such appeals, proposed Rule 5467 would require a registered firm that has filed a petition for Commission or court review, or that is associated with a person who has filed such a petition, to file a notice and copy of the petition with the Secretary of the Board.

5.    Hearings on Disapprovals of Registration Applications

In addition to proceedings pursuant to proposed Rule 5200(a), the Board will provide an opportunity for a hearing before disapproving the registration application of a public accounting firm. Under Rule 2106(b), the Board will provide an applicant for

---

[21/]    In addition, proposed Rule 5468 and 5469 would govern appeals to the Board of actions made pursuant to delegated authority.



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 2003-012
July 28, 2003
Page 13

whom it is unable to determine that the standard for approval has been met a notice of hearing, which the applicant may elect to treat as a written notice of disapproval in order to be able to make an immediate appeal to the Commission. Consistent with the Board's Rule 2106(b), under proposed Rule 5500, the Board would commence a proceeding to determine whether to approve or disapprove a registration application when the applicant has elected not to treat the notice as a written notice of disapproval and instead has requested a hearing.

In the event that an applicant requests such a hearing, proposed Rule 5501 would provide that the proceeding would be governed by the procedures described in Parts II and IV of Section 5 of the Board's Rules, which includes the Rules of Board Procedure for hearings described above.

    6.    <u>Special Issues Relating to Non-U.S. Firms</u>

The rules proposed today apply to investigations and disciplinary proceedings concerning registered public accounting firms. Non-U.S. public accounting firms are not required to be registered until April 19, 2004. As the Board has previously announced, the nature and scope of the Board's oversight over non-U.S. accounting firms that audit the financial statements of U.S. public companies will be the subject of dialogue between the Board and its foreign counterparts. The Board is committed to finding ways of accomplishing the goals of the Act without subjecting non-U.S. firms to unnecessary burdens or conflicting requirements. The Board's proposed rules are not intended in any way to signal that the Board has already determined how its oversight should operate as to those firms, or to preclude any adjustments to the rules that may be appropriate in light of those discussions.

B.    <u>Opportunity for Public Comment</u>

Interested persons are encouraged to submit their views to the Board. Written comments should be sent to Office of the Secretary, PCAOB, 1666 K Street, N.W., Washington, D.C. 20006-2803. Comments may also be submitted by e-mail to comments@pcaobus.org or through the Board's Web site at www.pcaobus.org. All comments should refer to PCAOB Rulemaking Docket Matter No. 005 in the subject or reference line and should be received by the Board no later than 5:00 PM (EST) on August 18, 2003.



PCAOB Release No. 2003-012
July 28, 2003
Page 14

\*　　　\*　　　\*

On the 28th day of July, in the year 2003, the foregoing was, in accordance with the bylaws of the Public Company Accounting Oversight Board,

ADOPTED BY THE BOARD.

/s/ J. Gordon Seymour
Acting Secretary

July 28, 2003

APPENDICES –

    1.    Proposed Rules Relating to Investigations and Adjudications

    2.    Section-by-Section Analysis of Proposed Rules Relating to Investigations and Adjudications



PCAOB Release No. 2003-012
July 28, 2003
Appendix 1 – Rules
Page A1-xviii

> **(d)     Rules of Construction**
>
> The following rules of construction apply to all discovery requests –
>
> > **(1)     All/Each**
> >
> > The terms "all" and "each" shall be construed as all and each.
> >
> > **(2)     And/Or**
> >
> > The connectives "and" and "or" shall be construed either conjunctively or disjunctively as necessary to bring within the scope of the request for information all responses that might otherwise be construed outside of its scope.
> >
> > **(3)     Number**
> >
> > The use of the singular form of any word includes the plural and vice versa.

**Rule 5108.   Confidentiality of Investigatory Records**

Unless otherwise ordered by the Board or the Commission, informal inquiries and formal investigations, and any documents, testimony or other information prepared or received by or specifically for the Board or the staff of the Board in connection with such inquiries and investigations, shall be confidential in the hands of the Board, unless and until presented in connection with a public proceeding or released in accordance with Section 105(c) of the Act, and the Board's Rules thereunder; <u>provided</u>, <u>however</u>, that the Board may make such information available –

> (a)     to the Commission; and
>
> (b)     in the discretion of the Board, when determined by the Board to be necessary to accomplish the purposes of the Act or to protect investors, to the following –


**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 2003-012
July 28, 2003
Appendix 1 – Rules
Page A1-xix

        (1)     the Attorney General of the United States;

        (2)     the appropriate Federal functional regulator (as defined in section 509 of the Gramm-Leach-Bliley Act), other than the Commission, with respect to an audit report for an institution subject to the jurisdiction of such regulator;

        (3)     State attorneys general in connection with any criminal investigation; and

        (4)     any appropriate State regulatory authority.

Note: Under Section 105(b)(5) of the Act, the documents described in Rule 5108 "shall be confidential and privileged as an evidentiary matter (and shall not be subject to civil discovery or other legal process) in any proceeding in any federal or State court or administrative agency, and shall be exempt from disclosure, in the hands of an agency or establishment of the federal government, under the Freedom of Information Act (5 U.S.C. 552a), or otherwise, unless and until presented in connection with a public proceeding or released in accordance with subsection (c)" of Section 105 of the Act.

Note: The Director of Enforcement and Investigations may engage in and may authorize members of the Board's staff to engage in discussions with persons identified in Rule 5108, or their staff, concerning information obtained in an informal inquiry or a formal investigation.

**Rule 5109.   Rights of Witnesses in Inquiries and Investigations**

**(a)     Review of Order of Formal Investigation**

        Any person who is compelled to testify or produce documents pursuant to a subpoena issued pursuant to Rule 5111, or who testifies or produces documents pursuant to an accounting board demand or request, shall, upon request, be shown the Board's order of formal investigation. In the discretion of the Director of Enforcement and Investigations, a copy of the order of formal investigation may also be furnished to such a person for his or her retention.



## Appendix 1 – Proposed Rules Relating to Investigations and Adjudications

### TABLE OF CONTENTS

SECTION 1. GENERAL PROVISIONS ........................................................ v

    1000. [Reserved] ................................................................. v

    1001. Definitions of Terms Employed in Rules ..................................... v

SECTION 5. INVESTIGATIONS AND DISCIPLINARY PROCEEDINGS.................... viii

    5000. General ............................................................. viii

Part 1 – Inquiries and Investigations........................................................ viii

    5100. Informal Inquiries ................................................... viii

    5101. Commencement and Closure of Investigations ......................... ix

    5102. Testimony of Registered Public Accounting Firms and Associated Persons . x

    5103. Production of Audit Workpapers and Other Documents in Investigations..... xii

    5104. Examination of Books and Records in Aid of Investigations .................. xiii

    5105. Requests for Testimony or Production of Documents from Persons Not Associated With Registered Public Accounting Firms ........................................ xiii

    5106. Assertion of Claim of Privilege .............................................. xiv

    5107. Uniform Definitions in Demands and Requests for Information .............. xvi

    5108. Confidentiality of Investigatory Records.............................. xviii

    5109. Rights of Witnesses in Inquiries and Investigations ...............................xix

    5110. Non-cooperation with an Investigation...................................... xxi

    5111. Requests for Issuance of Commission Subpoenas in Aid of an Investigation ............................................................... xxi

    5112. Coordination and Referral of Investigations ........................... xxii

Part 2 – Disciplinary Proceedings........................................................ xxiii

    5200. Commencement of Disciplinary Proceedings ........................ xxiii

    5201. Notification of Commencement of Disciplinary Proceedings.................. xxv

    5202. Record of Disciplinary Proceedings ................................. xxviii

    5203. Public and Private Hearings............................................ xxx

    5204. Determinations in Disciplinary Proceedings........................... xxx

    5205. Settlement of Disciplinary Proceedings Without a Determination After Hearing ................................................................ xxxii



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 2003-012
July 28, 2003
Appendix 1 – Rules
Page A1-ii

5206.    Automatic Stay of Final Disciplinary Actions ......................................... xxxiv

Part 3 – Disciplinary Sanctions ........................................................................ xxxiv

5300.    Sanctions ......................................................................................... xxxiv

5301.    Effect of Sanctions ............................................................................ xxxvii

5302.    Applications for Relief From, or Modification of, Revocations and Bars .. xxxviii

5303.    Use of Money Penalties ........................................................................ xli

5304.    Summary Suspension for Failure to Pay Money Penalties ....................... xli

Part 4 – Rules of Board Procedure ...................................................................... xlii

GENERAL ....................................................................................................... xlii

5400.    Hearings .......................................................................................... xlii

5401.    Appearance and Practice Before the Board ............................................ xlii

5402.    Hearing Officer Disqualification and Withdrawal ................................... xliv

5403.    Ex Parte Communications .................................................................. xliv

5404.    Service of Papers by Parties ............................................................... xlv

5405.    Filing of Papers With the Board: Procedure .......................................... xlv

5406.    Filing of Papers: Form ....................................................................... xlvi

5407.    Filing of Papers: Signature Requirement and Effect ............................... xlvi

5408.    Motions .......................................................................................... xlvii

5409.    Default and Motions to Set Aside Default ............................................ xlviii

5410.    Time Computation ............................................................................ xlix

5411.    Modifications of Time, Postponements and Adjournments ...................... xlix

5412. – 5419.    [Reserved] ............................................................................ xlix

PREHEARING RULES ........................................................................................ l

5420.    Leave to Participate to Request a Stay .................................................. l

5421.    Answer to Allegations ........................................................................ li

5422.    Availability of Documents For Inspection and Copying ............................ lii

5423.    Production of Witness Statements ....................................................... lvi



PCAOB Release No. 2003-012
July 28, 2003
Appendix 1 – Rules
Page A1-iii

5424.    Accounting Board Demands and Commission Subpoenas.....................lvii

5425.    Depositions to Preserve Testimony for Hearing.........................lix

5426.    Prior Sworn Statements of Witnesses in Lieu of Live Testimony ...............lx

5427.    Motion for Summary Disposition ................................................lxi

Rules 5428. – 5439.    [Reserved].......................................................lxii

CONDUCT OF HEARINGS.................................................................lxii

5440.     Record of Hearings ..............................................................lxii

5441.    Evidence:  Admissibility .........................................................lxiii

5442.    Evidence:  Objections and Offers of Proof .............................lxiii

5443.    Evidence:  Presentation Under Oath or Affirmation ................lxiv

5444.    Evidence:  Presentation, Rebuttal and Cross-examination....................lxiv

5445.    Post-hearing Briefs and Other Submissions ...........................lxiv

5446. – 5459.  [Reserved] ...................................................................lxv

APPEALS TO THE BOARD ...............................................................lxv

5460.    Board Review of Determinations of Hearing Officers...............................lxv

5461.    Interlocutory Review ...............................................................lxvi

5462.    Briefs Filed with the Board ...................................................lxviii

5463.    Oral Argument Before the Board ...........................................lxix

5464.    Additional Evidence ................................................................lxx

5465.    Record Before the Board .......................................................lxx

5466.    Reconsideration .....................................................................lxxi

5467.    Receipt of Petitions for Commission or Judicial Review .......................lxxii

5468.    Appeal of Actions Made Pursuant to Delegated Authority ...................lxxiii

5469.    Board Consideration of Actions Made Pursuant to Delegated Authority lxxiii

5470. – 5499.    [Reserved] ..............................................................lxxiv



PCAOB Release No. 2003-012
July 28, 2003
Appendix 1 – Rules
Page A1-iv

Part 5 – Hearings on Disapproval of Registration Applications .............................. lxxiv

    5500.    Commencement of Hearing on Disapproval of a Registration Application.. lxxiv

    5501.    Procedures for a Hearing on Disapproval of a Registration Application..... lxxv