UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ERIC SILVERMAN, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. 1:07-cv-04507 **(Consolidated)** |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | Judge St. Eve Magistrate Judge Mason |
| MOTOROLA, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

REPLY IN FURTHER SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE
PRODUCTION OF DOCUMENTS FROM KPMG, LLP

524302_1

## I.      Introduction

In its opposition to the pending motion to compel, KPMG accuses plaintiffs of a "striking disregard of the burden it is placing on KPMG." *See* Non-Party KPMG LLP's Response to Plaintiff's Motion to Compel (the "Opposition") (Dkt. No. 258) at 12. KPMG's protest, however, rings hollow. The materials that plaintiffs request from KPMG are hardly voluminous and appear to comprise less than 30 binders worth of documents.[1] Moreover, plaintiffs have made several offers of compromise to minimize KPMG's burden, but were rejected at every turn. First, after receiving the initial production of a subset of workpapers, plaintiffs tried to resolve the matter by requesting KPMG stipulate that, *inter alia*, all quarterly review and audit workpapers that "would form the bases for the conclusions KPMG LLP reached regarding whether Motorola's accounting, disclosure and reporting of the 3Q06 IP Transactions were in compliance with GAAP" had been produced. *See* Plaintiffs' Motion, Ex. H. KPMG refused, effectively conceding that its production was incomplete. Next, plaintiffs identified the highly relevant workpapers on KPMG's indices and explained to KPMG's counsel why those workpapers are relevant to this case. Plaintiffs' Motion at 5. KPMG refused to produce the identified workpapers. Finally, plaintiffs offered to conduct a preliminary, "attorneys' eyes only" review of the workpapers to further identify those documents they deem

---

[1]      The Relevant Workpapers include: (a) KPMG's review workpapers for Motorola's Mobile Devices business for 3Q06; (b) KPMG's audit workpapers for Mobile Devices for FY06; and (c) "Company and Business," "Engagement Management," "Completion," "Planning," and "Specific Topics APG" audit files from the consolidated workpapers for Motorola for FY06. *See* Memorandum in Support of Motion to Compel the Production of Documents from KPMG, LLP ("Plaintiffs' Motion") (Dkt. No. 242) at 4 n.6 and Proposed Order. According to documents produced by KPMG, the complete set of audit and review files for Mobile Devices (items "(a)" and "(b)" above, as well as the review files for 1Q06 and 2Q06 not at issue here) comprise just 30 binders. *See* Ex. 1. The Corporate level audit and review binders for 2006 appear to comprise 54 binders. Ex. 2. However, plaintiffs only request the five specific categories from the Corporate level FY06 audit. It is unlikely that such files would constitute more than two or three binders, if that. *See* Plaintiffs' Motion, Ex. A (the Engagement Management, Planning and Completion files for Mobile Devices comprise just 1 binder in total). *Compare* Opposition at 1, 12 (describing the Relevant Workpapers as "voluminous").

524302_1

relevant, thereby limiting KPMG's review process to the documents selected. Although auditing firms have agreed to similar arrangements in the past and courts have endorsed such procedures, KPMG flatly rejected this offer. *See* Plaintiffs' Motion, Exs. I-K; *Behrend v. Comcast Corp.*, 248 F.R.D. 84, 85-87 (D. Mass. 2008) (requesting party's preliminary review will "greatly mitigate[]" non-party's burden). Contrary to KPMG's assertion, plaintiffs have clearly endeavored to minimize KPMG's burden.

In tacit acknowledgement of the limited burden associated with producing the requested documents, KPMG spends the majority of its Opposition arguing that the requested workpapers are irrelevant to the allegations and defenses in this case. Opposition at 7-11. KPMG's argument, however, is premised on the self-serving and incorrect notion that Motorola's 3Q06 IP deals are merely "tangential" to the case. Opposition at 7. In fact, as KPMG is well aware, plaintiffs have specifically alleged that defendants made repeated false and misleading statements and material omissions about the 3Q06 IP deals, artificially boosting Motorola's 3Q06 reported income by over $400 million and covering-up the massive 3G earnings gap at the Company. *See, e.g.*, ¶¶12, 17(P), 17(R).[2] There is no real dispute that the 3Q06 transactions, defendants' use of those transactions to obfuscate burgeoning 3G problems at Motorola, the impact of the IP arrangements on the Company's financial results and defendants' disclosure (or lack thereof) of the deals are central elements of plaintiffs' securities fraud claims. Nor is there any real dispute that the Motorola defendants have asserted an affirmative defense of "good faith" reliance on KPMG, putting the auditor's review and audit, as evidenced in the workpapers, squarely at issue.[3]

---

[2]    Unless otherwise noted, all references to "¶_" or "¶¶__" are to the Second Amended Complaint for Violation of Federal Securities Laws (Dkt. No. 208).

[3]    While defendants plainly intend to rely on KPMG's review and audit of Motorola's financial results, including the 3Q06 IP deals, they have been working hard to limit plaintiffs' investigation of this affirmative

- 2 -

As Certified Public Accountant Patricia Gleitsmann concluded, to evaluate whether the 3Q06

IP deals and their impact were adequately disclosed (by Motorola to KPMG and by Motorola to

investors) and accounted for, "KPMG would have had to look at the effect of these transactions on

all elements of the financial statements." *See* Declaration of Patricia Gleitsmann in Support of

Plaintiffs' Motion to Compel the Production of Documents from KPMG, LLP (Dkt. No. 243)

("Gleitsmann Declaration"), ¶13.  Ms. Gleitsmann's conclusion is in accord with the American

Institute of Certified Public Accountants, which stresses that workpapers "should be viewed as an

integrated presentation of information." *See* AICPA Auditing and Accounting Manual §6300.02.

While KPMG scoffs at the notion that workpapers are an integrated presentation of an audit and

review, it fails to offer any argument to the contrary and its production to date evidences otherwise.[4]

Despite repeatedly telling plaintiffs and the Court that it has produced "***everything***" related to the

3Q06 IP arrangements, the subset of workpapers turned over to date cross-reference numerous files

and documentation KPMG has refused to provide to plaintiffs.  *See* §III.A.  Moreover, the index of

the quarterly review and annual audit workpapers establishes numerous categories of highly relevant

workpapers that have not been produced to date.  *See* §III.B.

---

defense.  *See* Defendants' Memorandum in Support of Third Party KPMG's Response to Plaintiffs' Motion to
Compel the Production of Documents (Dkt. No. 259).  In large part, defendants' filing merely repeats
KPMG's arguments and appears to be based on the incorrect supposition that "Plaintiffs have not identified
any specific type of additional workpaper that is necessary for their analysis in this case."  *Id*. at 3.  To the
contrary, in their Motion, prior discussions and correspondence with KPMG and herein, plaintiffs have done
just that, identifying the relevance of the specific workpapers KPMG has refused to produce.

[4]     In a desperate attempt to distinguish this case from others in which auditors were required to produce
a complete set of audit or review workpapers, KPMG makes the spurious distinction that in the latter
circumstance, the allegations related to "the overall financial statements" as opposed to a discrete accounting
issue such as the IP licensing revenue alleged here.  Opposition at 11 n.8.  This distinction is illusory.
KPMG's argument has already been tried and tested, and discounted, by the courts.  For example, in *Fein v.
Numex Corporation*, the court was "not persuaded" by an auditing firm's argument that the complaint only
concerned "nondisclosure of operational factors" and thus the auditors should not be required to produce the
complete audit file.  92 F.R.D. 94, 96-97 (S.D.N.Y. 1981). *See also In re Goodyear Tire & Rubber Co. Sec.
Litig.*, No. 1:89-0894X, 1991 WL 172930, at *3 (N.D. Ohio June 21, 1991) (applying *Fein*).

524302_1

KPMG's prolix argument concerning relevance relies largely on mischaracterizations of the facts of this case and provides little in the way of refuting plaintiffs' substantiated contention that the production to date is deficient. The requested workpapers are highly relevant to plaintiffs' claims and defendants' affirmative defense and KPMG should be required to produce the documents without further delay.

## II.     The Workpapers Will Not Place an Undue Burden on KPMG

KPMG's cursory and unsupported claim of burden does not suffice to deny plaintiffs' Motion. As discussed herein, the limited volume of documents at issue and plaintiffs' repeated offers of compromise underscore the flippancy of KPMG's argument. Moreover, as the party objecting to plaintiffs' document requests, KPMG must demonstrate that producing the requested workpapers will actually be **unduly** burdensome. *Hodgdon v. Northwestern Univ.*, 245 F.R.D. 337, 341 (N.D. Ill. 2007). Yet, KPMG has failed to provide any "affirmative and compelling proof" of such burden and "*[i]pse dixits* will not suffice." *See United States v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2005 WL 3111972, at *2 (N.D. Ill. Oct. 21, 2005).

KPMG first claims that it should not be required to produce workpapers because they constitute "proprietary documents" that will be inadequately guarded under the Protective Order. Opposition at 12. This argument carries no weight and has been repeatedly rejected. *See In re Mercury Fin. Co. of Ill.*, No. 97 C 3035, 1999 WL 495903, at *6 (N.D. Ill. July 12, 1999) (KPMG's argument that its audit manuals are trade secrets is an "[in]sufficient reason to prevent production" because the court has already entered a protective order that prevents disclosure); *Robin v. Doctors Officenters Corp.*, No. 84 C 10798, 1986 WL 8054, at *2 (N.D. Ill. July 16, 1986) (finding that non-party auditor's "concern over disclosure of the [proprietary] material can be resolved by a protective order"). Moreover, KPMG has not provided any evidence or argument suggesting that its proprietary information will be misappropriated – conduct which the Protective Order expressly

- 4 -

524302_1

forbids.  *See* Protective Order, §3.  Indeed, KPMG has already produced a subset of the workpapers

pursuant to the Protective Order.

KPMG also bemoans the effort and cost of reviewing "voluminous" documents for privilege,

but fails to specify the volume of documents to be reviewed or the expense likely to be incurred.  *See*

Opposition at 1, 12-13; *Amerigroup*, 2005 WL 3111972, at \*2 (non-party must provide "affirmative

and compelling proof" of undue burden).[5]  As discussed herein, the requested workpapers only

comprise approximately 30 binders worth of documents.  And, this small set of documents is

unlikely to contain any privileged material.[6]  Furthermore, KPMG has flatly rejected plaintiffs'

offers to mitigate the burden associated with a privilege review, rendering KPMG's argument

disingenuous.  While KPMG dismissed plaintiffs' offer to conduct a preliminary "attorneys'-eyes-

only" relevance review of the requested documents at KPMG's facility, such an arrangement is not

unusual and several auditing firms have agreed to similar procedures.  *Id*., Ex. I-K.  Indeed, courts

have endorsed this precise arrangement.  In *Behrend*, the court ordered a non-party to produce

responsive documents on the condition that the requesting party would conduct a preliminary review

of the 400-500 disorganized boxes of documents at issue, "greatly mitigat[ing]" the non-party's

---

[5]     When courts have determined that production would place an undue burden on a non-party, such determinations were made based on specific demonstrations of fact.  *See In re Subpoenas to Wis. Energy Corp.*, No. 10-MC-7, 2010 WL 715429, at \*2 (E.D. Wis. Feb. 24, 2010) (finding undue burden because production was irrelevant, cumulative and would cost non-party more than $1,000,000); *Whitlow v. Martin*, 263 F.R.D. 507, 512 (C.D. Ill. 2009) (finding compliance unduly burdensome where search would take two years and cost "hundreds of thousands of dollars"); *Amerigroup*, 2005 WL 3111972, at \*3 (eighteen weeks of man-power required to retrieve email from backup tapes placed undue burden on non-party).

[6]     By definition, auditor workpapers address accounting matters, not legal matters.  Accordingly, the workpapers are unlikely to contain any privileged communications with KPMG's counsel or attorney work product.  Plaintiffs' contention is borne out by the fact that neither KPMG nor defendants' counsel identified a single page of privileged material in the subset of workpapers produced to date.

524302_1

burden.  *Behrend*, 248 F.R.D. at 85-87.[7]  KPMG's vague and unsubstantiated assertions do not and

cannot establish that producing the workpapers would subject it to undue burden.  KPMG should be

required to produce the requested documents.

**III.     KPMG's Withheld Workpapers Are Highly Relevant to the Allegations of
           Securities Fraud and Affirmative Defenses Plead in this Case**

KPMG's (and defendants') repeated protests that this is merely a "fishing expedition" cannot

refute the fact that the workpapers sought by plaintiffs are directly relevant to the allegations

regarding Motorola's 3Q06 IP deals, defendants' use of those deals to dramatically inflate

Motorola's reported financial results and cover-up the losses being suffered as a result of the 3G

fiasco and the affirmative defense of "good faith" reliance asserted by defendants.  The suggestion

that KPMG has already produced all of the workpapers relating to these allegations and affirmative

defenses is simply false.  Both workpapers referenced in the documents KPMG produced and those

identified in the index of the Motorola review and audit work demonstrate that KPMG has

improperly withheld highly relevant documents.

**A.     KPMG's Limited Production References Workpapers that Have Not
        Been Produced**

Despite KPMG's bold assurances that it has produced all workpapers related to the 3Q06 IP

deals, the limited set of workpapers and other documents that have been produced to date prove

otherwise.  Plaintiffs' counsel have identified specific workpapers that clearly relate to the 3Q06 IP

and related allegations and defenses that KPMG has refused to produce, including:

---

[7]     Given plaintiffs' offer to conduct a preliminary relevance review of KPMG's workpapers, the
argument that "investigation of irrelevant topics" during depositions will add to KPMG's burden is similarly
unavailing.  *See* Opposition at 13.  Perhaps more importantly, KPMG already admitted that the workpapers as
a whole, the vast majority of which have not been produced to plaintiffs, are "a topic for depositions."
Opposition at 6.

524302_1

**Workpapers H-650 and H-601**: Workpaper H-661.2, entitled "Qualcomm Royalty Transaction," concerns the 3Q06 deal with Qualcomm and refers to workpapers H-650 and H-601 for additional support and analysis. Ex. 3 at 2 (Item No. 7), 3 (Procedure #33). KPMG, however, has not produced workpapers H-650 and H-601.

**Workpapers H-630 and Q3-5**: In its May 14, 2010 electronic production, KPMG produced drafts of workpapers H-630 and Q3-5, "Royalty Process" memoranda memorializing efforts to understand Motorola's "calculation and recording process of royalty income" and the "reasonableness" of that income. *See* Ex. 4 at 1; Ex. 5 at 1. Notably, the 3Q06 IP deal earnings were called "royalty income." KPMG's production, however, failed to include the final H-630 and Q3-5 workpapers.

**Workpaper C1**: The workpaper entitled "Completion Document – Integrated," includes audit procedures and findings related to the 3Q06 IP deals. *See* Ex. 2. Handwritten notations on that document direct the reader to workpaper C1 in the Engagement Binder. *Id*. at 113. Workpaper C1, however, was not produced by KPMG.

**Motorola's "fair value analysis" and related testing**: The same Completion Document discussing the audit procedures for the 3Q06 IP arrangement also refers to a "fair value analysis" prepared by Motorola regarding the Qualcomm deal. *Id.* at 122. Neither Motorola's analysis nor KPMG's analysis or testing of any such analysis for the Qualcomm deal has been produced.

**Workpaper Q4-15-1**: The workpaper entitled "Motorola, Freescale ID," discussing Motorola's proposed accounting treatment for the 3Q06 Freescale deal, contains a handwritten notation indicating that a summary of KPMG's "findings and conclusions" concerning the deal are to be found at workpaper Q4-15-1. Ex. 6 at 136. Despite the claims that all relevant workpapers have been produced, KPMG has failed to produce workpaper Q4-15-1.

524302_1

**Workpapers A-1, D-1 and D-2**: The workpaper Q3-19-1, entitled "Qualcomm Patent License Agreement Amendment," references procedures memorialized in workpapers "A-1 . . . D-1 and D-2," that were apparently utilized to evaluate whether the Qualcomm transaction should have been recorded in 3Q06. Ex. 7 at 38. Again, KPMG has failed to produce these highly relevant workpapers.

**ER series workpapers**: A copy of Motorola's 3Q06 earnings press release in KPMG's production, which includes language relating to the contribution of licensing income to operating margins, contains a handwritten note directing the reader to "testwork and quarterly procedures" that KPMG performed in the "ER series" workpapers. Ex. 8. The ER series workpapers, however, have not been produced to date.

These are direct examples taken from KPMG's limited production of workpapers related to the 3Q06 IP deals that have not been produced to plaintiffs. Obviously, these documents are relevant to the claims and defenses here and to an accurate understanding of what was, and was not, done by KPMG with regard to the 3Q06 deals. Indeed, the cross-referenced (but not produced) workpapers reinforce the fact that KPMG's workpapers are "interdependent and make up a single, integral whole," and should be produced as such. *Goodyear*, 1991 WL 172930, at \*3; *see also* Gleitsmann Decl., ¶¶20-22.

### B. KPMG Has Failed to Produce Relevant Portions of the Workpapers

In addition to the examples of specifically referenced workpapers that KPMG has refused to produce, it is clear that substantial portions of the Motorola Mobile Devices and Corporate workpapers relevant to the claims and defenses in this case have been improperly withheld. Based on plaintiffs' review of the indices of workpapers and plaintiffs' counsel and their consultants' familiarity with KPMG's audit procedures and required documentation, it is readily apparent that

- 8 -

workpapers related to the 3Q06 IP deals, the impact of those deals on Motorola's reported results and defendants' "good faith" reliance defense have not been produced.  These workpapers include:

**Engagement Management Workpapers**:[8]  Engagement Management workpapers should contain correspondence and reporting documents exchanged between KPMG, Motorola management and the Company's Audit Committee and evidence Motorola's representations to KPMG. Obviously, Motorola's representations (or lack thereof) to KPMG are highly relevant to the "good faith" reliance defense because whether defendants reasonably relied on their auditors' opinion turns on the accuracy and completeness of their representations to KPMG.  *See United States v. Whyte*, 699 F.2d 375, 380 (7th Cir. 1983) (elements of the reliance defense include "full disclosure of all pertinent facts" and "good faith reliance on the accountant's advice").  Engagement Management Workpapers at the Corporate level are equally important.  Because KPMG did not issue an opinion on Mobile Devices separately from Motorola, the extent to which Motorola's licensing revenue, including the 3Q06 IP deals, was discussed at the Corporate level bears directly on materiality. Additionally, the Corporate level Engagement Management Workpapers will contain complete copies of Motorola's quarterly 10-Q and annual 10-K reports, annotated by KPMG and tying-out important disclosures to specific workpapers.  *See, e.g.*, Ex. 9 (Email with attached 2Q06 10-Q containing handwritten notes by KPMG indicating concern about insufficient disclosure concerning IP licensing revenue and margins).  Whether KPMG did, or did not, comment on the sufficiency of Motorola's licensing disclosures in the 3Q06 10-Q and the FY06 10-K, particularly given the impact the IP deals had on the Company's financial results, goes directly to materiality, scienter and the

---

[8]     The "Engagement Management," "Planning," "Completion," "Accounts Payable," "Inventory," "Accounts Receivable," "Revenue," and "Financial Reporting" workpapers discussed herein correspond to categories of workpapers identified in the 12/31/06 audit index produced by KPMG. *See* Plaintiffs' Motion, Ex. A.  Although KPMG's quarterly workpapers are not organized according to the same system, the quarterly workpapers will contain documents that fall within these categories.

524302_1

applicability of defendants' affirmative defense.   Accordingly, the full set of Engagement

Management Workpapers for Mobile Devices and Corporate for the 3Q06 review and the FY06

audit is relevant and should be produced.

**Planning and Completion Workpapers**:  KPMG's Planning and Completion workpapers

are intended to identify and provide the analysis of any unusual and significant changes in

Motorola's business since KPMG's last engagement.  Obviously, it would be expected that the 200%

year-over-year and 300% quarter-over-quarter spike in licensing revenue and gross margins resulting

from the 3Q06 IP deals would be just such an unusual and significant change.  ¶¶17(R), 152-179.

Indeed, the 3Q06 IP deals represented not just 50% of the reported Mobile Devices' earnings, but

42% of Motorola's total corporate earnings.  For 3Q06 KPMG's intended and actual analysis of this

highly unusual, but undisclosed, one time spike in IP earnings, and how that analysis compares to

the review of other unusual events at Motorola is directly relevant to the allegations of

misstatements, including defendant Ron Garriques' false claim that IP revenue in 3Q06 grew at the

"same rate" as Motorola's sales.  *See, e.g.*, ¶¶114-115, 118(a)-(c); *see also* Gleitsmann Decl., ¶17(a),

(c).

Planning and Completion workpapers should also set forth and analyze materiality thresholds

used to determine whether a particular transaction is material for purposes of disclosure.  Whether

KPMG did or did not evaluate the materiality of Motorola's licensing revenue in general, and the

3Q06 IP deals in particular, is highly relevant.  Indeed, prior to the Class Period, Motorola's internal

Finance Manager of Strategic Projects provided that a $50 million deal may have to be specifically

identified in the Company's earnings report.  *See* ¶153.  Whether and what KPMG identified as a

materiality threshold (whether or not specifically in the context of the 3Q06 IP deals) is critical to an

analysis of the sufficiency of defendants' disclosures.  Indeed, KPMG's materiality and disclosure

analysis of transactions other than the IP deals is crucial to understanding the sufficiency of the

- 10 -

review of the 3Q06 arrangements and whether the failure to disclose those arrangements was warranted. Again, the Planning and Completion workpapers at the Corporate level are also relevant. KPMG did not issue an audit opinion for Mobile Devices separately, but for Motorola as a whole. Thus, the extent to which the 3Q06 IP deals or Mobile Devices' licensing revenue issues did or did not impact KPMG's materiality analysis at the Corporate level goes directly to the element of materiality in this case, as well as to defendants' "good faith" reliance on KPMG. Given their relevance, the Planning and Completion workpapers for both Mobile Devices and Corporate for the 3Q06 review and the FY06 audit should be produced by KPMG without further delay.

**Accounts Receivable and Revenue Workpapers**: As discussed in §II.A., specific workpapers related to Accounts Receivable and Revenue are relevant because the subset of workpapers produced by KPMG to date concerning the 3Q06 IP deals contain specific cross-references to the Accounts Receivable and Revenue documentation. Moreover, the Mobile Devices Accounts Receivable and Revenue workpapers as a whole are highly relevant because they will evidence Motorola's treatment of licensing transactions other than the Freescale and Qualcomm transactions, demonstrating the unusual nature and treatment of the Freescale and Qualcomm deals (or, supporting defendants' claims that the 3Q06 deals were treated appropriately). Plaintiffs have specifically alleged that the IP deals were unusual, covered up the earnings gap caused by Motorola's 3G phone problems and were required to be disclosed in the Company's 3Q06 earnings press release and 10-Q. ¶¶152-153, 162-163, 173-174. The Accounts Receivable and Revenue workpapers go to the heart of these allegations. *See* Gleitsmann Decl., ¶¶5(b), 13, 17(e). The workpapers should also contain comparisons of revenue and profit margins by product line (including 3G products) and demonstrate the impact of the 3Q06 licensing deals on reported results. The relevance of the Accounts Receivable and Revenue workpapers is beyond question and KPMG should be forced to produce them.

524302_1

**Financial Reporting Workpapers**:   Financial Reporting workpapers test Motorola's

financial reporting process and will contain documentation, or reveal a lack of documentation,

regarding what KPMG indicated should or should not have been disclosed in the Company's 3Q06

10-Q and FY06 10-K SEC filings.   Motorola's decision not to disclose the 3Q06 IP deals or the

impact those deals had on the Mobile Devices earnings and phone sale margins is central to

plaintiffs' allegations.  *See, e.g.*, ¶¶152-153, 162-163, 173-174.   Accordingly, KPMG should be

compelled to produce the Financial Reporting workpapers for Mobile Devices.  *See* Gleitsmann

Decl., ¶5(a).

**Accounts Payable, Inventory and Subsequent Events Workpapers**:  Documents produced

by defendants in this litigation reveal that the 3Q06 IP transaction with Freescale involved a quid pro

quo arrangement whereby Motorola agreed to purchase more than $100 million of "strategic

inventory" from Freescale.  As internally admitted by Motorola, strategic inventory was "stuff we

don't need now but agree to take anyway." *See* Ex. 10.  In other words, the 3Q06 IP deal was crucial

for Motorola to cover up losses on its 3G portfolio and hit revenue and margin targets and Freescale

did not have the resources to pay for the IP deal, so Motorola agreed to purchase $106 million in

"strategic inventory," funneling money to Freescale that was returned in the IP deal.  Evidence that

Motorola sought to conceal these deals with Freescale, and whether these deals were disclosed to or

approved by KPMG, goes directly to defendants' state of mind with respect to financial reporting of

the 3Q06 deals in particular and the Company's business and financial results in general.  The

"strategic inventory" arrangement with Freescale would necessarily implicate Mobile Devices'

accounting for Accounts Payable and Inventory.  *See* Gleitsmann Decl., ¶¶5(b), 13, 17(b).  In fact,

Motorola negotiated unique, extended payment terms for the "strategic inventory," essentially

allowing payment to be delayed until Motorola was paid for the IP deal.  Any analysis of these

unique terms and the strategic inventory (or lack thereof) should be included in the Accounts

524302_1

Payable and Inventory workpapers.  Moreover, because Motorola and Freescale finalized the "strategic inventory" arrangement shortly after the third quarter closed, the Subsequent Events workpapers should be produced as well.[9]

With the close of fact discovery quickly approaching, plaintiffs have already been prejudiced by KPMG's unwillingness to produce the requested workpapers.  Not only is it important to view and evaluate the 3Q06 review and 4Q06 audit workpapers as a whole, but production of the complete set of workpapers is the least burdensome, most expeditious means of resolving this dispute.

## IV.  Conclusion

Given the lack of burden, the ease of production and the substantial prejudice to plaintiffs of further delay, KPMG should be ordered to produce the requested workpapers within 5 days.

DATED:  May 24, 2010                    Respectfully submitted,

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        MICHAEL J. DOWD
                                        TOR GRONBORG
                                        SUSAN G. TAYLOR
                                        TRIG R. SMITH
                                        JENNIFER L. GMITRO


                                            S/ JENNIFER L. GMITRO
                                        _____
                                            JENNIFER L. GMITRO

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

---

[9]    Subsequent Events workpapers test significant transactions that take place after the quarter in question has closed, but before the auditors have completed their audit or review work.

- 13 -

524302_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiffs

524302_1

CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2010, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on May 24, 2010.

s/ JENNIFER L. GMITRO
JENNIFER L. GMITRO

ROBBINS GELLER RUDMAN
&  DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  jgmitro@rgrdlaw.com

# Mailing Information for a Case 1:07-cv-04507

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John Joseph Barber**
  jbarber@tdrlawfirm.com,edocket@tdrlawfirm.com

- **David K. Cole**
  courtnotification@mayerbrown.com

- **Michael J. Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J. Timothy Eaton**
  teaton@shefskylaw.com,sfdocket@shefskylaw.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **James R. Figliulo**
  jfigliulo@fslegal.com

- **Michael David Frisch**
  courtnotification@mayerbrown.com

- **Jennifer L. Gmitro**
  JGmitro@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **Mark H Horwitch**
  mhorwitch@tdrlawfirm.com,edocket@tdrlawfirm.com

- **Stephanie D. Jones**
  sjones@fslegal.com

- **M. Sean Laane**
  sean.laane@aporter.com

- **Scott R. Lassar**
  slassar@sidley.com,efilingnotice@sidley.com

- **Kim Ann Leffert**
  courtnotification@mayerbrown.com

- **Elizabeth Leise**
  elizabeth_leise@aporter.com,john_massaro@aporter.com

- **Erin K. Lynch**
  elynch@shefskylaw.com

- **Richard A. Maniskas**
  sradcliffe@glancylaw.com

- **John C Massaro**
  john_massaro@aporter.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Matthew P Montgomery**
  mattm@csgrr.com

- **David A Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Joseph Russello**
  jrussello@csgrr.com

- **Stephen M Sacks**
  stephen_sacks@aporter.com

- **Jeffrey Charles Sharer**
  jsharer@sidley.com,efilingnotice@sidley.com

- **Michael P. Sheehan**
  msheehan@shefskylaw.com,sfdocket@shefskylaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan G Taylor**
  SusanT@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James W. Thomas , Jr**
  james.thomas@aporter.com

- **Matthew E Van Tine**
  mvantine@millerlawllc.com,mvt@vantine.us

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Joseph I. Goldstein
LeClairRyan
1101 Connecticut Avenue, NW
Washington, DC 20036

Jerry A Isenberg
LeClairRyan
1101 Connecticut Avenue, NW
Washington, DC 20036

D Seamus Kaskela
Schiffrin Barroway Topaz & Kessler LLP
```

```
280 King of Prussia Road
Radnor, PA 19087
```

**Michael Kelley**
```
Sidley and Austin
555 West Fifth Street
40th Floor
Los Angeles, CA 90013
```