**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC SILVERMAN, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) | No. 07 C 04507 |
| v. | ) ) | Hon. Amy J. St. Eve |
| MOTOROLA, INC., et al., | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On August 9, 2007, Plaintiffs brought a securities-fraud class action on behalf of all purchasers of the publicly traded securities of Motorola, Inc., against Motorola and certain of its officers ("the individual defendants"). (R. 1.) The Second Amended Complaint, which Plaintiffs filed on May 26, 2010, alleges violations of Section 10(b) of the Securities and Exchange Act of 1934 ("the 1934 Act") and SEC Rule 10b-5 against all defendants, as well as Section 20(a) of the 1934 Act against the individual defendants. (R. 276 at 79-82.)

On September 7, 2010, Defendants Gregory Q. Brown, Daniel M. Moloney, and Richard D. Nottenburg (collectively, "Defendants," for the purpose of this Opinion)—a subset of all the defendants in this case—filed the motion for summary judgment that is now before the Court. (R. 326.) In support of that motion, Defendants argue that there is no evidence that Moloney, Brown, or Nottenburg was a control person for the purpose of Section 20(a) of the Securities and Exchange Act. (R. 327.) Defendants further submit that no evidence would support a finding that Nottenburg is primarily liable under Section 10(b) of the same Act. (*Id.* at 24-27.) For the

reasons discussed below, the Court grants in part and denies in part Defendants' motion for summary judgment.

## BACKGROUND

Plaintiffs' class-action Complaint alleges that Motorola and certain of its directors and officers violated the 1934 Act and seeks recovery on behalf of all persons who purchased or otherwise acquired Motorola's publicly traded securities from July 19, 2006, through January 4, 2007.  (R. 276 at 2.)  The Court certified a class of those who purchased publicly traded securities of Motorola during this period, and appointed Macomb County Employees Retirement System and St. Clair Shores Police and Fire Pension Systems as class representatives.  (R. 140.)

Motorola has three primary business segments: Mobile Devices, Networks and Enterprise, and Connected Home Solutions.  (*Id.*; R. 327 at 7.)  The Second Amended Complaint ("the Complaint") avers that Motorola and its officers engaged in a fraudulent scheme with respect to the Mobile Devices business segment.  (R. 276 at 3.)  According to the Complaint, the Mobile Devices segment relied on its vendor, Freescale Semiconductor, Inc., ("Freescale") for the production of integrated circuits for use in the segment's 3G handsets. (*Id.*)  Allegedly, Freescale repeatedly failed to deliver commercially viable circuits to Motorola on a timely basis, which had "disastrous" consequences.  (*Id.* at 4)  Specifically, those failures allegedly resulted in Motorola's being unable, three times, to deliver a 3G handset for introduction in the North American market during the first three quarters of 2006.  (*Id.*)  The Complaint provides that these problems threatened Motorola's ability consistently to deliver double-digit operating earnings, as the company's competitors, Nokia and Samsung, had already introduced 3G handsets by May 2006.  (*Id.*)

As a result, the Complaint alleges, Motorola suffered an earnings "gap" that grew to over $1.1 billion in July 2006.  (R. 276 at 4-5.)  Further, despite knowing that it was highly unlikely that the 3G handsets would contribute to earnings in 4Q06, Motorola and the defendant officers "continued to assure analysts and investors that the 3G product portfolio was 'on track' and that Mobile Devices would deliver record, double-digit operating earnings during 3Q06 and 4Q06 based on increased market share for handset sales, including the purportedly forthcoming high-tier 3G devices." (*Id.* at 5.)  The Complaint further provides that, "[r]ather than disclose the truth about the collapse of Motorola's earning potential . . ., defendants persisted in their fraudulent conduct and covered-up the Company's resulting earnings gap." (*Id.* at 6.)  Specifically, it avers that Motorola and the defendant officers "executed two highly unusual, 98.7% profit, intellectual property . . . licensing transactions valued at $440.0 million for the purpose of obfuscating the fact that the Company's 3G portfolio was in tatters and was materially affecting Motorola's handset margins and financial results." (*Id.*)

On September 7, 2010, three of the named defendants, Daniel M. Molloy, Gregory Q. Brown, and Richard N. Nottenburg, moved for summary judgment on the ground that no reasonable jury could find them liable for violations of Section 20(a).  (R. 326.)  They submit that the evidence reveals that none of them was in a position of control, and that no evidence exists that Nottenburg—the only one of three alleged to have committed a primary violation—violated Section 10(b) and SEC Rule 10b-5.  (R. 327.)

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary-judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted); *see also* Fed. R. Civ. P. 56(e)(2) (requiring adverse party to "set out specific facts"). "The party opposing summary judgment . . . bears the burden of coming forward with properly supported arguments or evidence to show the existence of a genuine issue of material fact." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006) (citations omitted).

## ANALYSIS

### I.     There Is No Genuine Issue that Defendant Daniel M. Moloney Is not a Control Person for the Purpose of Section 20(a) of the 1934 Act

The Complaint alleges that Defendant Moloney acted as a controlling person of Motorola within the meaning of the Section 20(a) of the 1934 Act and is liable pursuant to that section for violations of Section 10(b) of the same Act and SEC Rule 10b-5. (R. 276 at 82-83.) Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such

controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Defendants argue in their motion for summary judgment that undisputed evidence requires that Moloney is not a "control person" for the purpose of Section 20(a). (R. 327 at 14-20.) They submit that no reasonable jury could find otherwise. (*Id.*) They further contend that there is uncontroverted evidence that Moloney acted in good faith. (*Id.* at 20-21.)

The Seventh Circuit has laid out a two-part test to determine control-person liability. *See, e.g.*, *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994). First, "the 'control person' needs to have *actually* exercised general control over the operations of the wrongdoer." *Id.* at 911 (emphasis in original). Second, "the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Id.* at 911-12; *see also Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1030 (N.D. Ill. 2010); *Premier Capital Mgmt., L.L.C. v. Cohen*, No. 02-CV-5368, 2008 WL 4378300, at *7 (N.D. Ill. Mar. 24, 2008); *accord Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010). Furthermore, good faith is a defense to control-person liability. *Donohoe*, 30 F.3d at 912. In addition, "[l]iability under § 20(a) is obviously derivative of liability under some other provision of the Exchange Act." *Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869, 2876 n.2 (2010).

## A. Undisputed Facts Concerning Defendant Moloney

There is no dispute that Motorola, during the Class Period, was comprised of three separate businesses, each of which reported revenue and operating earnings separately: Mobile Devices, Networks and Enterprise, and Connected Home Solutions. (R. 327-6 at 4, ¶ 22; R. 341

at 3, ¶ 22).  Mr. Edward J. Zander ("Zander") was Motorola's CEO and Chairman of the Board

of Directors during this time.  (R. 327-6 at 2, ¶ 8; R. 341 at 2, ¶ 8.)  The parties agree that, during

the Class Period, Moloney led Connected Home Solutions, and reported to Zander.  (*Id.*)  During

that time period, Moloney was not a member of Motorola's Disclosure committee.  (R. 327-6 at

10, ¶ 47; R. 341 at 7-8, ¶ 47.)  Nor did any corporate accounting, financial, or investor-relations

personnel report to him during that time.  (*Id.*)  No party contends that Moloney made any of the

alleged misstatements in the Complaint.  (R. 327-6 at 10, ¶ 49; R. 341 at 8, ¶ 49.)  Further, there

is no dispute that Defendants Brown, Moloney, and Nottenburg were members of Motorola's

Senior Leadership Team, which reported directly to Zander.  As members of this team,

Defendants were expected to and did regularly participate in Motorola weekly staff and monthly

operations review meetings led by Zander.  (R. 340 at 2, ¶ 3; 352 at 3, ¶ 3.)  The parties agree

that Moloney presented information regarding the Connected Home business at Senior

Leadership Team operations reviews led by Zander, and attended by some, though not

necessarily all, of Zander's direct reports.  (R. 327-6 at 11, ¶ 55.)

In their statement of undisputed facts, Defendants contend that, during the relevant time

period, "Moloney had no managerial oversight over the Mobile Devices business, and took no

part in the development of Mobile Devices products, its forecasts, its accounting for transactions

entered into by the business, or preparation and/or presentation of its financial results or its

portion of any earnings release or Form 10-Q."  (R. 327-6 at 11, ¶ 54.)  They further assert that

"[n]one of the Mobile Devices personnel, including its accounting, financial, intellectual

property, or product development teams, reported to Mr. Moloney."  (*Id.*)  Plaintiffs disagree

with these assertions only "to the extent that during the Class Period Garriques reported to

Moloney regarding the financial results and operations of Mobile Devices prior to and during Senior Leadership Team meetings and defendant Moloney was expected to attend those meetings, as well as be attentive." (R. 341 at 10, ¶ 54.) Ronald G. Garriques was an Executive Vice President and President of Motorola's Mobile Devices business. (R. 327-6 at 3, ¶ 10; R. 341 at 2, ¶ 10.)

### B.  A Reasonable Jury Could Not Find that Moloney Actually Exercised General Control over Motorola's Operations

On the basis of the preceding undisputed evidence, Defendants contend that there is no genuine issue that Moloney lacked general control over Motorola's operations. (R. 327 at 21-22.) Defendants submit that, as head of Connected Home Solutions, Moloney had authority only as to that particular division and had no responsibility for Motorola's financial decisions or other businesses. (*Id.*)

The Seventh Circuit has "long recognized that some indirect means of discipline or influence, although short of actual direction, is sufficient to hold a 'control person' liable." *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996) (citing *Harrison* v. *Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992)). The court has further looked "to whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general." *Id.* (quoting *Harrison*, 974 F.2d at 881).

In an attempt to establish a genuine issue of material fact, Plaintiffs point to Moloney's participation in meetings of the Senior Leadership Team, which provided updates on each business segment to Zander. (R. 337 at 13.) Plaintiffs submit that "the primary purpose of the Senior Leadership Team meetings was to evaluate the current state of Motorola's overall business and ensure that each Senior Leadership Team member understood the overall business

performance of each other's reporting segments." (*Id.*) They contend further that, "as CEO, Zander articulated his expectation that Brown, Moloney and Nottenburg would attend the regularly recurring meetings, during which '***all aspects***' of the corporation were discussed." (*Id.* (emphasis in original).)

Evidence of Moloney's participation in this manner in the Senior Leadership Team's operations is, without more, insufficient to establish a triable issue of fact. Even viewed in the light most favorable to Plaintiffs, evidence of Moloney's role on that team does not support a reasonable jury finding that he exercised general control over Motorola. This is because Plaintiffs proffer no evidence that Moloney's contribution to the all-aspects-of-the-corporation discussions went beyond the business segment for which he was responsible. Moloney's being privy to discussions concerning "all aspects" of the company's operations, and the overall business performance of each reporting segment, does not in itself support a finding of general control. *Cf. Lustgraaf v. Behrens*, 619 F.3d 867, 878 (8th Cir. 2010) (following the Seventh Circuit' approach and holding that the relevant "allegations show, at most, KCL's ability to control Behrens. They fail . . . to show that KCL actually exercised control over Behren's general operations.") The requisite issue is "control," rather than "knowledge." *Cf. Monieson v. Commodity Futures Trading Comm'n*, 996 F.2d 852, 859-60 (7th Cir. 1993) ("In its opinion the CFTC decided that Monieson was a controlling person because he made management and hiring decisions and often instructed Arditti and Breitfelder on day-to-day matters. That evidence is certainly sufficient to support a finding that Monieson 'exercised general control' over GNP."). Ultimately, Plaintiffs' proffered evidence of "discussions" falls short of evidence that Moloney

actually *exercised control* over the operations of Motorola as a whole.[1]

Plaintiffs further submit that there is evidence that Moloney, Brown, and Nottenburg "collaborated" with each other, and Garriques and Devonshire, to solve problems at Motorola. (R. 337 at 13.) They also contend that Defendants reviewed and approved Motorola's earnings releases as a group. (*Id.*) These contentions, if supported by evidence, could raise a genuine issue of material fact as to Moloney's general control of Motorola's operations.

With respect to their assertion that Defendants collaborated with each other, and Garriques and Devonshire, to solve problems at Motorola, Plaintiffs reference five sources of evidence in their Rule 56.1 statement of additional facts. (R. 340 at 3, ¶ 5.[2]) This evidence consists of excerpts of Garriques's deposition, Devonshire's deposition, and Nottenburg's deposition, as well as a July 25, 2006, analyst meeting at Motorola, and a message from

---

[1] Plaintiffs also point to the audit & legal committee charter, which allegedly required Defendants' active involvement in the preparation and presentation of the company's SEC filing. (R. 337 at 15.) Even if the charter purports to require Defendants' involvement in Motorola's SEC-filing process, however, such evidence would be distinct from evidence of Defendants' actual involvement. As noted, "general control" requires the actual exercise of influence over the relevant company's operations. *Donohoe*, 30 F.3d at 911-12. Plaintiffs do not proffer evidence showing that Moloney's or the other Defendants' mere participation in the audit & legal committee carried with it authority over Motorola's general affairs sufficient to establish "general control." (R. 337.) As to Moloney, the undisputed evidence in the record reveals that his substantive contribution in preparing Motorola's Forms 10-Q and 10-K was limited to the business segment for which he was responsible, Connected Home Solutions. (R. 327-2 at 28-39, 31-32, 35.) Although there is evidence that Moloney reviewed and commented on drafts of Motorola's SEC filings (R. 341 at 9, ¶ 52), that does not in itself evidence general control. Finally, the record demonstrates that Defendants did not generally attend audit-committee meetings. (R. 351 at 9.)

[2] Although Plaintiffs also cite Paragraph 4 of their Rule 56.1 statement of additional facts in support of this assertion, the evidence in that paragraph goes to Defendants', Garriques', and Zander's discussing "all aspects" of Motorola's business. As explained above, this evidence is insufficient to create a genuine issue of material fact as to Moloney's general control of Motorola.

Garriques, which carbon copied Moloney ("the July 8, 2006 email"). (*Id.*) None of this evidence, however, supports Plaintiffs' assertion.

First, the cited aspects of Garriques's deposition reveal that he discussed "the financial implications of an effort to monetize IP at . . . [one or more] of the monthly meetings." (R. 340-2 at 61.) Garriques could not recall at which meetings he discussed the Freescale contract, though he did engage in conversations with his "peers"[3] about getting the Freescale deal done. (*Id.*) With respect to another IP deal with Qualcomm, Garriques did not recall speaking about it at a meeting. (*Id.* at 62.) He did "not recall speaking with Mr. Moloney on either deal." (*Id.*) The cited testimony merely reveals that, "at the followup [*sic*] [meeting,] we always did a review of the previous quarter . . . it would be consistent with previous presentations to have discussed what the final outcome of both contracts was with [his] peer set at the monthly meeting." (*Id.*) Finally, it reveals that Garriques made Moloney and Brown aware of "the monster issue" concerning the Argon chipset. (*Id.* at 340-2 at 68; *see also* R. 340-2 at 74.) This deposition testimony, however, simply demonstrates that Moloney—and Defendants generally—were privy to information, perhaps after the fact, concerning the outcome of these deals. It does not support a finding, or raise an inference of fact, that Defendants exercised general control over Motorola's operations.

Second, the cited portions of Nottenburg's deposition merely reveal that "earnings was [*sic*] discussed at operations reviews" of the Senior Leadership Team "[f]rom time to time." (R. 340-2 at 48.) Evidence that the Senior Leadership Team occasionally discussed earnings does

---

[3] Garriques identified his "peers" are Richard Nottenburg, Padmasree Warrior, Peter Lawson and Zander, a group which did not include Moloney or Brown. (R. 340-2 at 61.)

not support an inference that Moloney's involvement in those discussions encompassed more than Connected Home Solutions. For that reason, evidence of the Senior Leadership Team's discussions does not amount to general control, absent evidence that the parties privy to those discussions exercised some influence or discipline over the company's actions.

Third, Devonshire's deposition testimony observed that "Brown is in charge of network enterprise and Mr. Moloney is in charge of connected home" and that Zander "liked the guys to share information with the other two as emphasis for, hey, we need an all-out effort to achieve the goals and objectives and this is just to inform you here is where it is." (R. 340-2 at 78.) Viewing this evidence in the light most favorable to Plaintiffs, the mere sharing of information does not support Plaintiffs' argument that Moloney exercised general control over Motorola. Indeed, Devonshire further testified that "the organization was really decentralized in nature, so Mr. Brown was responsible for network and enterprise. He had a vice president of HR. He had a CF. He had a vice president of engineering. He had operations people, as did Mr. Garriques, and Mr. Moloney had a similar type organization. They were really independent. So it was a very high level here is what's going on, more of an informational type of communication" (*Id.* at 79.).

Fourth, the July 25, 2006, analyst meeting merely refers to Defendants' working together on Enterprise phones, which, as Defendants point out, are not at issue in the present case. (*Id.* at 82; R. 352 at 5.) This evidence does not create a genuine issue of material fact sufficient to preclude the Court's entering summary judgment in Defendants' favor. *See generally Alliant Energy Corp. v. Bie*, 277 F.3d 916, 919 (7th Cir. 2002) ("In response to a summary judgment motion . . . the plaintiff . . . must 'set forth' by affidavit or other evidence 'specific facts,' which

for purposes of the summary judgment motion will be taken to be true."); *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 609-10 (7th Cir. 2005) (noting that the law does not require the Court to search the record for evidence sufficient to defeat a motion for summary judgment).

Fifth, Plaintiffs place significant reliance of the July 8, 2006, email from Garriques to Zander and Devonshire, carbon copying Moloney and Brown. (R. 337 at 13.) In that correspondence, Garriques stated that "the monster issue is the 1 year slip on Freescale. . . . We have lost 36 M ytd." (R. 340-2 at 74.) Nothing in that email, however, suggests that Moloney had general control over Motorola's operations. Indeed, Garriques merely carbon copied Moloney and the body of the email made no reference to him. (*Id.*) Furthermore, there is no evidence that Moloney took any actions in response to the email.

Plaintiffs' final assertion is that Defendants reviewed and approved Motorola's earnings releases as a group. (R. 337 at 13.) In support, Plaintiffs point to Ms. Erickson's deposition. That deposition, however, reveals that, in finalizing press releases, "[t]he presidents for the business units would sign off on their section of the press release and in a review session or one of the last meetings . . . we would go through it and everybody would agree that as a group that the press release is final." (R. 340-3 at 4.)[4] This evidence reveals that Moloney's control was limited to Connected Home Solutions.

Plaintiffs' only other evidence, which Defendants do not dispute (R. 352 at 6), shows that "Zander expected that Brown, Moloney and Nottenburg would participate in Motorola earnings

_____

[4] Ms. Erickson also testified that Nottenburg would "occasionally sit in" as "chief strategy officer for the company." (*Id.*)

release preparation processes together." (R. 340 at 3.)  The evidence, however, merely reveals

that each Defendant's responsibilities were limited to the business segment with which each was

charged. (R. 340-3 at 6-17.)

In sum, given the evidence in the record, no reasonable jury could find that Moloney had

general control over Motorola's operations.

### C.     No Reasonable Jury Could Find that Moloney Exercised Specific Control over the Activity that Plaintiffs Allege Gave Rise to Liability

As there is no genuine issue as to Moloney's general control over Motorola's operations

during the Class period, the Court need not consider whether he had specific control.  *See*

*Donohoe*, 30 F.3d at 911-12 (outlining the two-part test).  Nevertheless, no reasonable jury could

find that Moloney "had the power or ability—even if not exercised—to control the specific

transaction or activity that is alleged to give rise to liability."  *Id.*  For this reason, too, Moloney

is entitled to summary judgment.

There is no dispute that the allegedly misleading statements relate to the Mobile Devices

business.  (R. 327 at 17; R. 337 at 11.)  The evidence—even viewed in the light most favorable

to Plaintiffs—does not support a finding that Moloney had the ability to control the statements.

The parties agree that Moloney did not make any of the statements at issue.  (R. 327-6 at 10, ¶

49; R. 341 at 8, ¶ 49.)  Plaintiffs disagree that Moloney only had authority to speak for

Motorola's Connected Home Solutions business.  (R.341 at 8, ¶ 48.)  In support, they direct the

Court to two sources of evidence—excerpts of Ms. Carol Forsyte's deposition and Motorola's

"Ethics and Code of Business Conduct."  (R. 341-3 at 21-22, 24, 26.)  Even construed in the

light most favorable to Plaintiffs, neither source supports a reasonable jury finding that Moloney

had authority to speak on behalf of Motorola or the Mobile Devices business.

13

Plaintiffs assert that "Moloney was not prohibited from speaking regarding any facet of Motorola's business during the Company's earnings conference calls or during reviews of earnings releases prior to their issuance." (R. 341 at 8, ¶ 48.) To support this assertion, Plaintiffs rely on Forsyte's testimony. (*Id.*) Forsyte merely testified, however, that she "wasn't aware of anyone being prohibited from commenting" on the earnings release. (R. 341-3 at 24.) She also testified that she was not "aware of any prohibition on any of the business leaders discussing the contents of the earnings release." (*Id.*) Even viewing this deposition testimony in the light most favorable to Plaintiffs, Moloney's ability to offer his view at a meeting or conference call does not translate into his having the ability or authority to articulate or control the official position of Motorola or the Mobile Devices Business.

Plaintiffs also rely on Motorola's "Ethics & Code of Business Conduct" to establish Moloney's specific control. (R. 341 at 8, ¶ 48.) According to Plaintiffs, this code purports to require Moloney, as an Executive Vice President, "to diligently look for indications that unethical or illegal conduct has occurred and report it." (*Id.*) Furthermore, Plaintiffs contend, the code required Moloney "to report all of Motorola's business information accurately to shareholders." (*Id.*) Defendants acknowledge this reading of the company's ethics code, but only "to the extent that the Code applied to all Motorola employees and does not create a particular duty for Defendants." (R. 352 at 11.)

The ethics code does not constitute evidence sufficient to support a jury finding that Defendants, including Moloney, had specific control over the transactions at issue in this case. The code purports to apply to every person in the company's employment. (R. 340-5 at 18.) If the code created a genuine issue of fact in itself, then every single Motorola employee during the

14

class period would have possessed such control. That cannot be the case. Furthermore, a "company's essentially mandatory adoption of a code of ethics simply does not imply that all of its directors and officers are following that code of ethics. . . . a code of ethics is inherently aspirational." *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685-86 (D. Colo. 2007); *see also Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 858-59 (N.D. Ill. 2009). More generally, courts have not found a connection between a company's code of conduct and control. *See, e.g.*, *Cellini v. Harcourt Brace & Co.*, 51 F. Supp. 2d 1028, 1034-35 (S.D. Cal. 1999) (holding that, in determining that a parent company did not "control" its subsidiary, the fact that the parent company issued a code of conduct that applied to the subsidiary's employees, even coupled with other factors, "was not sufficient to demonstrate that the parent company exercised any control over the subsidiary's day-to-day employment decisions").

Thus, no genuine issue exists regarding the fact that Moloney lacked specific control over the Mobile Devices business's allegedly misleading statements. As such, the Court grants Moloney summary judgment on this alternative basis.[5]

## II.    There Is No Genuine Issue that Defendant Gregory Q. Brown Is not a Control Person for the Purpose of Section 20(a) of the 1934 Act

Defendant Brown is entitled to summary judgment for many of the same reasons that Moloney is. There is no dispute that Brown led Motorola's Networks and Enterprise Business, and reported to the company's CEO, Zander. (R. 327-6 at 12, ¶¶ 57, 59; R. 341 at 11, ¶ 57, 59.)

---

[5] Moloney is entitled to summary judgment because he lacked both general control over Motorola and specific control over the Mobile Devices business segment's allegedly misleading statements and omissions. Therefore, the Court need not consider his good-faith argument.

Nor is there any dispute that Brown was not a member of Motorola's disclosure committee. (R. 327-6 at 12, ¶ 60; R. 341 at 11, ¶ 60.) Defendants submit that Brown, like Moloney, had authority to speak on Motorola's behalf only with respect to his business and had no responsibility for accounting or financial decisions for either Motorola generally or its other businesses, including its Mobile Devices unit. (R. 327 at 21.) Defendants further contend that Brown had no responsibility for preparing filings for the SEC other than for the Networks and Enterprise business. (*Id.*) On the basis of this evidence, Defendants argue that there is no genuine issue that Brown had neither general control over Motorola nor specific control as to Motorola's alleged misstatements regarding its Mobile Devices business segment. (*Id.* at 21-23.) The Court agrees.

Plaintiffs respond with many of the same arguments, lumping all three Defendants together. Plaintiffs contend that Brown exercised general control over Motorola by virtue of his participation in the company's Senior Leadership Team. (R. 337 at 12-13.) As explained above, Zander's expectation that Defendants would regularly attend meetings and discuss "all aspects" of the corporation does not, in itself, create a genuine issue of fact concerning Defendants' general control. Plaintiffs also argue that Defendants, including Brown, reviewed and approved Motorola's earnings release as a group. (*Id.* at 13.) The uncontested evidence reveals, however, that Brown substantively participated only with respect to the business segment for which he was responsible. (R. 340-3 at 4.) Thus, for the same reasons as those previously discussed in detail, no reasonable jury could find that Brown had general control over Motorola.

With respect to the issue of specific control, Plaintiffs again make largely the same arguments with respect to the three Defendants. Plaintiffs submit that Garriques's informing

Defendants of the "monster issue" relating to "Freescale's inability to deliver a functional Argon chipset" evidences their specific control. (R. 337 at 14.) As explained above, however, one person's informing another of a fact alone does not demonstrate that the latter exercises control over the subject matter of the communication. Awareness is not necessarily synonymous with control. Plaintiffs' argument that Defendants had specific control because they received drafts of the company's 10-Q and 10-K filings for review also fails because Plaintiffs do not submit evidence that Brown's contribution to, or review of, those filings entailed more than Motorola's Networks and Enterprise business. For the reasons discussed above, the same holds true with respect to Plaintiffs' assertion that the company did not prohibit Defendants from influencing how it reported its results of operations and financial performance, as well as Plaintiffs' reliance on Motorola's code of conduct and audit & legal committee charter. (*Id.* at 14-15.) These arguments do not raise a genuine issue of material fact as to specific control.

In addition to the preceding arguments, Plaintiffs also direct certain arguments at Brown specifically. (R. 337 at 15-16.) They submit that Brown admitted that "he had the power during the Class Period to influence how the Company disclosed its financial results and to report any inaccuracies to appropriate personnel at Motorola *before* those results were disseminated to investors." (*Id.* at 15) (emphasis in original).[6] In support of this argument, Plaintiffs rely on Brown's deposition testimony. That testimony, however, provides that "[t]he only review that

---

[6] Plaintiffs argue that Brown failed to exercise that power over the "3G 'monster issue'" and the "3Q06 earnings cover-up to the attention of investors" and that he "remained silent." (R. 337 at 15-16.) For the purpose of determining whether Brown had specific control, however, Plaintiffs' argument that Brown failed to exercise a power is irrelevant. The pertinent issue is whether Brown actually had the power or ability to exercise such control. *Donohoe*, 30 F.3d at 911-12.

we had responsibility for and me specifically was my individual business." (R. 340-2 at 24.) He continued, in response to a question whether he had the opportunity to get the full release and look at it before it was issued, that "I wouldn't say it was a review. I think it was an FYI. . . . Sometimes it would come out literally hours before." (*Id.*) When asked whether he reviewed the full press release before it was made public, Brown answered: "Sometimes yes, sometimes no because I was most interested in the accuracy of the networks and enterprise business. I couldn't speak to what Dan Moloney or Ron were saying in their area because I didn't know. So there was no point in me [sic] weighing in." (*Id.*) When then asked whether he would tell somebody if he saw something that he thought was inaccurate, Brown testified: "If I had the knowledge and I thought it was inaccurate, sure." (*Id.*) Viewing the cited portions of deposition testimony in the light most favorable to Plaintiffs, they do not create a genuine issue of fact whether Brown had specific control.

Plaintiffs further contend that Brown provided comments to Zander with respect to the 3Q06 earnings conference call. (R. 337 at 16.) Plaintiffs explain that, after Zander asked for comments on that call, Zander's remarks "were revised in response to 'revisions/input' from Brown." (R. 340 at 4.) Plaintiffs do not indicate the nature of the relevant revisions, and so it is unclear whether they were substantive or merely stylistic, and—if the former—whether the edits were limited to the Networks and Enterprise Business. This evidence does not create a genuine issue of material fact.

Finally, Plaintiffs point to evidence that the company was grooming Brown "to be the next CEO." (R. 337 at 16.) This fact, however, cannot in itself create a genuine issue as to Brown's specific control over Motorola's operations that give rise to the alleged violations in

this case.  Without some evidence of the responsibilities and authority such grooming would bestow upon a person, the Court cannot determine whether the fact of such grooming evidences control.

For these reasons, no reasonable jury could find that Brown had specific control.[7]

### III.    As No Reasonable Jury Could Find that Defendant Richard N. Nottenburg Is Either Primarily Liable or a Control Person under the 1934 Act, He Is Entitled to Summary Judgment

Of the three Defendants implicated by the instant motion, Nottenburg is the only one who, the Complaint alleges, is directly liable under Section 10(b) of the 1934 Act, as well as derivatively liable under Section 20(a).  (R. 276 at 79-83.)  Defendants contend that Nottenburg is entitled to summary judgment on both grounds of liability.  (R. 327 at 24-27.)

#### A.    Nottenburg Is Entitled to Summary Judgment on the First Claim for Violation of Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful "for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe."  15 U.S.C. § 78(j)(b).  Rule 10b-5, in turn, provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud

---

[7] As there is no genuine issue that Brown did not possess general or specific control during the Class Period, the Court need not consider his good-faith defense.

or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. The Supreme Court has held that, to maintain a private-damages action under Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Mgmt. Co. v. Mayer Brown L.L.P.*, 552 U.S. 148, 157 (2008) (citations omitted).

Defendants argue that the evidence in the record does not support a finding that Nottenburg made a material misrepresentation or omission. (R. 327 at 24-27.) The Court agrees. A number of uncontested facts entitle Nottenburg to summary judgment on the Section 10(b) claim. In the first place, the parties agree that Nottenburg did not make any of the alleged misstatements in the Second Amended Complaint. (R. 327-6 at 14, ¶ 73; R. 341 at 15, ¶ 73.) Second, the parties do not contest that Nottenburg did not speak at, and was not present for, earnings conference calls in 2006 or January 2007, including the second-quarter call on July 19, 2006, the third-quarter call on October 17, 2006, and the fourth-quarter call on January 19, 2007. (R. 327-6 at 14, ¶ 74; R. 341 at 15, ¶ 74.) Third, the parties do not dispute that Nottenburg did not speak at the event that Motorola hosted for financial analysts in July 2006. (R. 327-6 at 14, ¶ 75; R. 341 at 15-16, ¶ 75.) Finally, there is no dispute that Nottenburg did not certify any of Motorola's SEC disclosures, including 10-Qs and the 2006 10-K. (R. 327-6 at 15, ¶ 76; R. 341 at 15-16, ¶ 76 (agreeing only "to the extent that Nottenburg did not provide investors a written certification, which was attached to the Company's Forms 10-Q or 10-K pursuant to Sarbanes-Oxley," but failing to point out any evidence justifying any disagreement with Defendants'

statement of undisputed fact Paragraph 76.)

In light of the preceding, undisputed evidence, there is no genuine issue that Nottenburg did not himself make any of the alleged misrepresentations or omissions. Plaintiffs effectively concede this point because they do not refute it in their response. (R. 337.) Instead, Plaintiffs focus on a single argument, which is that, because "Nottenburg sold Motorola stock while in the possession of undisclosed material facts," he committed insider trading. (R. 337 at 21.) Plaintiffs point out that insider trading constitutes a primary violation of Section 10(b) and Rule 10b-5. (*Id.* (citing *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 651 (7th Cir. 2006), *Sec. & Exch. Comm'n v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995).)

The problem with this argument, however, is that, although the Complaint alleges that, "[w]hile in possession of material averse information about Motorola's business, defendant Nottenburg sold 95,369 shares of Motorola stock for insider selling proceeds of over $2.1 million," (R. 276 at 29), the "first count" as to "Individual Defendants' primary liability" under Section 10(b) and Rule 10b-5 violations does not include any allegation or inference that put Defendants on notice that Plaintiffs were pursuing an insider-trading theory against Nottenburg. (R. 276 at 79-82.) Specifically, the first count directed at Nottenburg alleges that his "primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and

misleading." (*Id.* at 80-81.)

Plaintiffs cannot raise a new theory of liability in opposition to a motion for summary judgment. *See, e.g.*, *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 606-07 (7th Cir. 2000); *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010) ("As a threshold matter, courts generally do not consider claims or completely new theories of liability asserted for the first time in opposition to summary judgment."); *Torres v. City of Madera*, 655 F. Supp. 2d 1101, 1128 (E.D. Cal. 2009) ("A plaintiff cannot raise a new theory of liability in the plaintiff's opposition to a motion for summary judgment.").

Nottenburg is therefore entitled to summary judgment on the first claim. The Court further observes that, even if it were to consider the merits of Plaintiffs' argument with respect to Nottenburg's alleged insider trading, it would still grant summary judgment in favor of Defendants. Nottenburg's exercise of Motorola stock options and related sale of stock on July 27, 2006, does not in itself constitute sufficient evidence of scienter to create a genuine issue of material fact. *See, e.g.*, *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 604 (7th Cir. 2006) ("While insider trading may be sufficient circumstantial evidence of scienter, plaintiffs must show that the sale of stock is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"), *vacated by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (rejecting the Seventh Circuit's formulation of the "strong-inference" standard and holding that "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent") (quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)); *Miss. Public Employees' Ret. Sys. v. Boston Scientific Corp.*,

523 F.3d 75, 92 (1st Cir. 2008) ("Insider trading cannot establish scienter on its own, but it can be used to do in combination with other evidence. Insider evidence in suspicious amounts or at suspicious times may be probative of scienter."); *Sawant v. Ramsey*, No. 07-CV-980, 2010 WL 3937403, at *25 (D. Conn. Sept. 28, 2010) ("In order to sustain their claim for insider trading, the circumstantial evidence presented by the Plaintiffs must be more than mere speculation."). This is particularly so when the majority of Nottenburg's stock sales involved options that had vested only days earlier, and so was not out of line with his prior trading practices. (R. 351 at 14.)

As the Supreme Court has made clear, an inference of scienter must be at least as compelling as any opposing inference of nonfraudulent intent. *Makor*, 551 U.S. at 308 (citations omitted). Plaintiffs have not raised any issue of material fact that Nottenburg's sale of stock was unusual or suspicious or "dramatically out of line with prior trading practices." *Wade v. Wellpoint, Inc.*, -- F. Supp. 2d --, 2010 WL 3766324, at *15 (S.D. Ind. 2010) (quoting *In re Silicon Graphics. Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)). Plaintiffs have failed to identify any other evidence to support this theory.

## B. Nottenburg Is Not Entitled to Summary Judgment on the Second Claim for Violation of Section 20(a)

It is undisputed that, during the relevant time period, Nottenburg was Motorola's chief strategy officer and that he reported to Zander. (R. 327-6 at 14, ¶ 69; R. 341 at 14, ¶ 69.) The parties also agree that, during the Class Period, Nottenburg was not a member of Motorola's disclosure committee and that no corporate accounting, financial, or investor-relations personnel reported to him. (R. 327-6 at 14, ¶ 71; R. 341 at 15, ¶ 71.) There is no dispute that the Mobile Devices business had its own chief-strategy officer and strategy organization. (R. 327-6 at 15, ¶

780; R. 341 at 16, ¶ 80.)

Plaintiffs advance a variety of arguments why Nottenburg had general control over Motorola and specific control over the alleged misrepresentations and omissions.  (R. 337 at 12-18.)  They argue that: (1) Nottenburg was an executive vice president, second in authority only to Zander; (2) he was on the senior leadership team, which discussed "all aspects" of the corporation; (3) he reviewed the company's earning release; (4) Garriques had informed him of the "monster issue" Motorola faced in light of Freescale's inability to deliver a functional Argon chipset; (5) according to Zander, there were "no excuses" for Nottenburg not to bring his influence and discipline to Motorola's financial reporting and disclosure process; (6) during the Class Period, he was neither prohibited from, nor denied the opportunity to influence, how Motorola reported its results of operations and financial performance; (7) the company's audit & legal committee charter required his active involvement in the preparation and presentation of the company's SEC filings; and (8) Motorola's Ethics & Code of Business Conduct required him to look diligently for unethical or illegal conduct.  (*Id.*)

The preceding evidence is insufficient, in itself, to establish a genuine issue of fact as to whether Nottenburg possessed general and/or specific control.[8]  With respect to Nottenburg specifically, however, Plaintiffs accurately point to his deposition testimony that he "certainly spoke on behalf of the company."  (R. 337 at 17; R. 340-2 at 44.)  They also appeal to Ms. Jennifer Erickson's deposition testimony that Nottenburg would sometimes sit in on earnings

---

[8] Indeed, the eight preceding arguments that Plaintiffs direct at Nottenburg are the same as those they make with respect to Moloney and Brown.  For the reasons explained in detail above, these arguments would not support a reasonable jury finding that Defendants had general control over Motorola or specific control over the statements and omissions that Plaintiffs allege give rise to liability.

24

meetings or reviews and "would give as our chief strategy officer . . . input." (R. 337 at 17; R. 340-3 at 4.) Finally, Plaintiffs submit that "Nottenburg was regularly asked to approve the release of important intellectual property" and contend that, "[i]n the final days of September 2006, Nottenburg was required to approve the release of 3GPP LTE technology, including OFDM technologies, to Freescale as part of the 3Q06 IP licensing transaction." (R. 340 at 6, ¶ 24.) It also bears noting that the undisputed evidence, unlike with Moloney and Brown, does not reveal that Nottenburg's responsibilities were limited to a particular business segment.

The preceding evidence, viewed in the light most favorable to Plaintiffs, creates a genuine issue as to Nottenburg's general control over Motorola's operations. Drawing all reasonable inferences in Plaintiffs' favor, Nottenburg's speaking on behalf of the company, involvement in earnings meetings, and approval of the release of intellectual property would support a reasonable jury finding that Nottenburg exercised general control over the company's operations.

This evidence also creates a genuine issue as to Nottenburg's ability to control the specific activities in the Mobile Devices business segment that gave rise to the alleged misrepresentations and omissions. As the Seventh Circuit has pointed out, one need not actually have exercised control over a particular activity in order to possess specific control. *Donohoe*, 30 F.3d at 911-12. It is sufficient that a defendant have the ability to control the relevant activity. *Id.* In light of the preceding evidence, a reasonable jury could find that Nottenburg possessed such power over Motorola's Mobile Devices business.

**CONCLUSION**

For the preceding reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.

Dated: February 16, 2010

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**