**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC SILVERMAN, On Behalf of Himself and All Others Similarly Situated, | ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 07 C 4507 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| MOTOROLA, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs have filed a purported class-action lawsuit against Defendants Motorola, Inc. ("Motorola"); Motorola's Board Chairman and CEO, Edward J. Zander ("Zander"); Motorola's Executive Vice President and Chief Financial Officer, David W. Devonshire ("Devonshire"); Motorola's Executive Vice President and President of Motorola's Mobile Devices division, Ronald G. Garriques ("Garriques"); and Motorola's Executive Vice President and Chief Strategy Officer, Richard N. Nottenburg ("Nottenburg").[1] (R. 276.) Defendants have moved for summary judgment, arguing that there is no genuine dispute as to any material fact, and that they are entitled to judgment as a matter of law. (R. 366.) For reasons explained below, the Court denies Defendants' motion.

---

[1] The Second Amended Complaint also named as Defendants Padmasree Warrior, Gregory Brown, and Daniel Moloney. (R. 276.) The Court entered a stipulation and order of voluntary dismissal of all claims against Warrior on November 16, 2010. (R. 348.) On March 15, 2011, it dismissed with prejudice all claims against Brown and Moloney. (R. 360.)

**BACKGROUND**

Plaintiffs allege that Motorola and certain of its directors and officers violated the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* ("Section 10(b)" and "Section 20(a)") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). (R. 276.) They seek recovery on behalf of all persons who purchased or otherwise acquired Motorola's publicly traded securities from July 19, 2006, through January 4, 2007. (*Id.*) The Court certified a class of those who purchased publicly traded securities of Motorola during this period. (R. 140.)

Motorola has three primary business segments: Mobile Devices, Networks and Enterprise, and Connected Home Solutions. (*Id.*; R. 327 at 7.) The Second Amended Complaint ("the Complaint") alleges that Motorola and its officers engaged in a fraudulent scheme with respect to the Mobile Devices business segment. (R. 276 at 3.) According to the Complaint, the Mobile Devices segment relied on its vendor, Freescale Semiconductor, Inc. ("Freescale"), for the production of integrated circuits for use in the segment's 3G handsets. (*Id.*) Plaintiffs contend that Freescale repeatedly failed to deliver commercially viable circuits to Motorola on a timely basis, which had "disastrous" consequences. (*Id.* at 4) Specifically, those failures allegedly resulted in Motorola's being unable, three times, to deliver a 3G handset for introduction in the North American market during the first three quarters of 2006. (*Id.*) The Complaint provides that these problems threatened Motorola's ability consistently to deliver double-digit operating earnings, as the company's competitors, Nokia and Samsung, had already introduced 3G handsets by May 2006. (*Id.*)

As a result, Plaintiffs submit, Motorola suffered an earnings "gap" that grew to over $1.1 billion in July 2006. (R. 276 at 4-5.) Further, despite knowing that it was highly unlikely that

the 3G handsets would contribute to earnings in 4Q 2006, Defendants "continued to assure analysts and investors that the 3G product portfolio was 'on track' and that Mobile Devices would deliver record, double-digit operating earnings during 3Q06 and 4Q06 based on increased market share for handset sales, including the purportedly forthcoming high-tier 3G devices." (*Id.* at 5.) The Complaint further provides that, "[r]ather than disclose the truth about the collapse of Motorola's earning potential . . ., defendants persisted in their fraudulent conduct and covered-up the Company's resulting earnings gap." (*Id.* at 6.) Specifically, it avers that Defendants "executed two highly unusual, 98.7% profit, intellectual property . . . licensing transactions valued at $440.0 million for the purpose of obfuscating the fact that the Company's 3G portfolio was in tatters and was materially affecting Motorola's handset margins and financial results." (*Id.*)

Defendants filed a motion for summary judgment on March 25, 2011. (R. 366.) They argue that the undisputed facts reveal that (1) their statements about Motorola's new 3G phones were truthful and not misleading; (2) they did not act with scienter; (3) their disclosures concerning intellectual-property revenue were not materially misleading; and (4) Plaintiffs cannot carry their burden of establishing loss causation. (R. 366-1 at *passim*.)

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary-judgment motions, "facts must be

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "The party opposing summary judgment . . . bears the burden of coming forward with properly supported arguments or evidence to show the existence of a genuine issue of material fact." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006) (citations omitted).

## ANALYSIS

The elements of a private action under Rule 10b-5 are "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 n.3 (quoting *Stoneridge Inv. Partners, L.L.C. v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

The "materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Furthermore, a misrepresentation must be false when made. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007); *Shushany v. Allwaste, Inc.*,

992 F.2d 517, 524 (5th Cir. 1993); *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992); *In re NeoPharm, Inc. Secs. Litig.*, 705 F. Supp. 2d 946, 966 (N.D. Ill. 2010).

"Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94, & n.12 (1976)). The Supreme Court has also explained that "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." *Stoneridge Inv.*, 552 U.S. at 159. A rebuttable presumption of reliance exists under the fraud-on-the-market doctrine, whereby "reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." *Id.*

The Supreme Court recently explained that the loss-causation requirement means that "the defendant's deceptive conduct caused the investors' claimed economic loss." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011). To satisfy this requirement, a plaintiff must "show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Id.* at 2186 (emphasis in original). "[T]he fact that a stock's 'price on the date of the purchase was inflated because of a misrepresentation' does not necessarily mean that the misstatement is the cause of a later decline in value. . . . [T]he drop could instead be the result of other intervening causes, such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events. If one of those factors were responsible for the loss or part of it, a

plaintiff would not be able to prove loss causation to that extent. This is true even if the investor purchased the stock at a distorted price, and thereby presumptively relied on the misrepresentation reflected in that price." *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

Finally, Section 20(a) of the 1934 Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" 15 U.S.C. § 78t(a). The Seventh Circuit has observed that, "to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws," such as "a violation of § 10(b) and Rule 10b-5." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

## I.     There Is a Genuine Dispute Whether Defendants' Statements About the 3G Phones Were False or Misleading

Plaintiffs allege that Defendants made a number of misrepresentations and omissions that artificially inflated the market price of Motorola's securities during the Class Period. (R. 276 at 81.) Defendants move for summary judgment on the ground that there is no evidence that their alleged misrepresentations were in fact false when made. (R. 366-1 at 12-14.) Each supposed misrepresentation, they submit, effectively conveyed the same point: Motorola's 3G phones would reach the market in Q4 2006. (*Id.* at 12.) In their view, the undisputed evidence reveals that, at the time of each challenged representation or omission, Motorola expected a Q4 2006 release for those phones. (*Id.*) Defendants specifically observe that "Mobile Devices staff reports prepared for Mr. Garriques each week reflected an expected October or November ship date for the initial release of each new 3G phone contemporaneous with the alleged

6

misstatements[.]"  (*Id.*)

According to Defendants, the uncontroverted evidence supported the truthfulness of the July 19, 2006, challenged statements that "product launches . . . are on track" and that the "UMTS and HSDPA roadmap for the second half of this year . . . is quite on track."  (*Id.* at 13.) They contend that a July 18, 2006, report stated an expected shipment date for Volans (Maxx) of October 18, 2006, and a date for Izar Global (xx) of October 20, 2006.  (*Id.*)  Similarly, they argue that there is no genuine dispute as to the accuracy of the July 25, 2006, statements: "UMTS/HSDPA devices that we're launching into Q4"; "We have three additional launches in the second half of this year that are teed up"; and "we're bringing five new products into the Christmas selling season."  (*Id.*)  Defendants observe that a July 26, 2006, report provided for expected shipment dates for Volans (Maxx) of October 18, 2006, for Izar Global (xx) of October 20, 2006, for V1100 (Rocket) of October 19, 2006, for M702iS (Izar Japan) of October 20, 2006, and for M702iG (Scorpius) of October 8, 2006.  (*Id.*)

There is no dispute, in Defendants' view, that the September 6, 2006, representation that "we've got some good products coming out for the Q4 rush . . . [T]he MAX and the XX will ship in Q4.  So, I was told that all our products are going to ship" was accurate when made.  (*Id.*) Defendants point out that a report of the same day provided expected shipment dates of November 6, 2006, for both Volans (Maxx) and Izar Global (xx).  (*Id.*)  Finally, Defendants point out that an October 17, 2006, report, which provided expected shipment dates of November 6, 2006, for both Volans (Maxx) and Izar Global (xx) reveals as true the challenged statements on October 17, 2006, that "I expect these [RIZR, MAXX, XX, and GSM MOTOFONE] to be October and early to mid- November shipments, making sure that we hit that all-important fill

7

the channel for the holiday season" and "[t]he big products for us—XX, MAXX, RIZR and the two versions of MOTOFONE—I . . . and don't feel supply-constrained ramping those up in Q4."[2]  (*Id.*)

        In light of the preceding showing, Plaintiffs "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 255.  According to Defendants, the challenged statements provide only that Motorola would make its 3G phones available for sale in Q4 2006.  (R. 366-1 at 12.)  Plaintiffs dispute that reading, pointing out that the alleged misrepresentations—which include statements to the effect that "[t]hese are their flagship products for the second half of the year" and that the products "are running on a Freescale [Argon] platform"— convey "far more" than what Defendants suggest.  (R. 374 at 20-21.)  Instead—Plaintiffs submit—by these statements Defendants indicated that "the 3G phones were approved and highly anticipated by Motorola's customers ('flagship products' for 'lead operators') and that they would be ramped up and delivered ('launching into') in time for the holiday selling season."  (*Id.* at 20.)

        The Court agrees with Plaintiffs that, construed in the light most favorable to them, the alleged misrepresentations do more than simply state that Motorola's 3G phones would reach the market in Q4 2006.  The challenged statements include: "product launches . . . are on track"; "we're bringing five new products into the Christmas selling season"; "three additional launches in the second half of this year . . . are teed up"; "we've got some good products coming out for

---

[2] Separately, Defendants observe that the 3G phones that are the subject of Plaintiffs' allegations in fact had "first ship acceptance date[s]" in Q4 2006.  (*Id.*)  They do acknowledge, however, that the law considers the truth of a statement at the time it was made.  (*Id.* (citing *Pommer v. Medtest Corp.*, 961 F.2d 620, 625 (7th Cir. 1992).)

the Q4 rush"; "making sure that we hit that all-important fill the channel for the holiday season";

"[t]he big products for us . . . I . . . don't feel supply-constrained ramping those up in Q4";

"[t]hese are their flagship products; and the "UMTS and HSDPA roadmap for the second half of

this year . . . is quite on track."  (R. 366-1 at 13; R. 374 at 20-24.)  A reasonable jury could

construe them as misleading investors into believing that Motorola would be ready to introduce

its 3G phones en masse—that is, on a commercial scale sufficient to satisfy consumer

demand—in time for "the holiday season" and "Q4 rush."  *See Loudermile v. Best Pallet Co.*,

636 F.3d 312, 314 (7th Cir. 2011) ("When ruling on a motion for summary judgment, the party

opposing the motion gets the benefit of all facts that a reasonable jury might find.").  In support

of this reading, Plaintiffs point to Motorola's earnings conference call on April 18, 2006, at

which Motorola's CEO, Zander, announced that there is "lots to come also in the second half

[of] 2006" and "our new strategy is to announce products *when we can ship them*.  But stay

tuned, we've got a lot coming. . . .  I think the second half is also going to be a great product

launch."  (R. 377-89 at 88) (emphasis added.)

   This evidence reveals a genuine dispute whether Defendants' alleged misrepresentations

and omissions conveyed information beyond the limited fact that Motorola would launch some

number of its new 3G phones in Q4 2006.  Furthermore, as the Court now explains, Plaintiffs

have introduced sufficient evidence to create a genuine dispute as to the truthfulness of those

statements.

   With respect to the July 19, 2006, Q2 Motorola Earnings Conference Call and the July

25, 2006, Financial Analyst Meeting, Plaintiffs point to contemporaneous evidence of significant

delays within Motorola.  (R. 374 at 21.)  There is no dispute that, "[a]s of mid-July, the ArgonLV

was suffering from development issues that 'smelled like' an all-layer change, or a change in silicon, which was considered critical and would automatically delay the program by six months." (R. 379 at 37.) Nor is there a dispute that, as of July 20, 2006, Motorola had yet to find the root cause of the problem.[3] (*Id.* at 38.)

On July 11, 2006, Harry Almeida of Motorola's 3G Program Management wrote that an Executive Waiver was required for the November 22, 2006, SA (shipping date) for the Izar 3G phone for Cingular "[d]ue to the deviation from the 75% confidence SA date[.]" (R. 377-20 at 78.) Indeed, the revised 75% confidence SA was 84 days after the desired date of November 22, 2006. (*Id.* at 79-80.) Furthermore, and as both parties agree, the Monte Carlo analysis that Motorola conducted on July 12, 2006, confirmed that less than a 1% chance existed that Motorola would deliver Izar to Cingular by November 22, 2006.[4] (R. 376 at 22; R. 379 at 38.)

---

[3] Defendants contend that this evidence is insufficient to create a genuine dispute that precludes summary judgment in their favor because the record establishes that "the Argon chipset, like all new chipsets, exhibited development issues that had to be overcome" and "Defendants were confident that the Argon chipset would be ready to be used in products shipping by the end of 2006." (R. 379 at 38.) The Court disagrees. Construed in the light most favorable to Plaintiffs, the fact that the ArgonLV chipset suffered serious development issues gives rise to a reasonable inference that Defendants' representations or omissions concerning the status of the company's new 3G phones were false or misleading. *See Smeigh v. Johns Manville, Inc.*, -- F.3d --, 2011 WL 2555819, at *4 (7th Cir. June 29, 2011) (observing that, in reviewing a motion for summary judgment, courts construe all "reasonable inferences in the light most favorable to the non-moving party").

[4] Defendants argue that the Izar NA represented "only one variant of the Izar phone and was only intended for one operator, Cingular." (R. 379 at 37.) As a result, Defendants submit, evidence of a delay in the Izar NA does create a triable issue of fact. (*Id.*) They also contend that "Plaintiffs have offered no evidence demonstrating that Defendants made any public statements that all variants of the announced Argon-based 3G phones would be delivered to all operators by the 2006 holiday seasons." (*Id.*) Both of these arguments fail to account for the fact that the Court, in entertaining Defendants' motion for summary judgment, must construe all evidence in the light most favorable to Plaintiffs. A reasonable jury could understand that the challenged statements in July and October 2006 indicated that Motorola was on track to release a

The parties also agree that, between July 19 and July 25, 2006, Motorola performed an additional Monte Carlo analysis of the Izar Global status, which concluded that less than a 1% probability existed that the company would meet an October 19, 2006, "controlled launch." (R. 379 at 40.)

Plaintiffs next direct the Court to a set of Motorola documents, entitled "Mobile Devices Business, Garriques Staff," showing that the "Volana (Europe) - RAZR V6," Rocket - V1100," and "Izar Global (Europe/Asia) - V3s" programs, which had SA dates in 2006 of October 18, 19, and 20, respectively, were status red as of July 26, 2006. (R. 377-86 at 36, 60.) According to those documents, "blue" means "program delivered," "green" represents "on track," "yellow" means "issues but recoverable," and "status red" means "not recoverable without change to program." (*Id.* at 71-74.) Although Defendants point to evidence that "Motorola would typically make changes to its programs . . . in order to achieve SA dates," such that status red on a project did not necessarily mean that the company would miss its target shipping date, construed in the light most favorable to Plaintiffs, the evidence of the Volana, Rocket, and Izar Global projects' being status red close in time to the alleged July 2006 representations calls those representations' truthfulness and/or non-misleading nature into question.

Plaintiffs point to further evidence that runs counter to the July 2006 statements that the "UMTS and HSDPA roadmap for the second half of this year . . . is quite on track" and that Motorola's 3G phones "are teed up underneath embargoes with some of our lead operators in the world. These are their flagship products for the second half of the year." In late July 2006,

_____

full line of 3G phones in commercial volumes in 4Q 2006. Evidence of significant delays as to the IZAR NA is relevant and, combined with the other evidence introduced by Plaintiffs, creates a genuine dispute sufficient to foreclose summary judgment to Defendants on the truthfulness or nonmisleading nature of their challenged representations and omissions.

Cingular was "very concerned about [Motorola's] continued quality challenges and [its] limited 3G portfolio. . . [and] also told [it] that these two issues will have an impact to [*sic*] Motorola's share in 1st Half '07." (R. 377-24 at 4.)

Combined, the evidence relied upon by Plaintiffs creates a genuine dispute as to whether Defendants' July 2006 statements were truthful and not misleading. Although the evidence marshaled by Defendants may well enable it to launch an effective defense at trial, in light of the evidence introduced by Plaintiffs, a reasonable jury could find in favor in the latter's favor.

The same is true of the allegedly untruthful representations made at Motorola's 3Q 2006 earnings conference call on October 17, 2006. The press-release package that Motorola made available prior to the call provided that "MOTORAZR xx [is] on track and ramping for UMTS" and "MOTORAZR maxx on track and ramping for HSDPA[.]" (R. 377-46 at 3-8.) At the conference call itself, Zander stated that, "[a]s we look ahead to Q4 this year and fiscal 2007, we feel optimistic about our competitive position in our key businesses. With our new portfolio of mobile devices shipping in volume this quarter[.]" (R. 366-5 at 17.) He noted that "Europe was a little bit of a challenge in the quarter, largely due to 3G" (*id.* at 19), but immediately continued: "Having said that, RAZR continues as the top seller in western Europe. To drive 3G momentum in Q4, we're launching, of course, our RAZRXX and RAZRMAXX." (*Id.*) He further commented: "Coming this quarter, the XX for UMTS and RAZRMAXX for HSDPA. Speaking of those, the XX is designed for #GE and UMTS. . . This will be shipping this quarter. Also a great, I think, exciting, really exciting product is our MAXX. It is ramping for HSDPA. Both of these products, as I said earlier, will be shipping this quarter and should be a definite boost, especially in the European market." (*Id.* at 20.)

Subsequently, an analyst posed the following question to Garriques: "Ron . . . you don't seem to have nearly the focus on 3G devices as does, say, Nokia or Samsung.  You have been bearish on it in the past.  What do you need to see before you get more bullish here?  Is it going to be higher data ARPUs at the carriers at greater 3G coverage?  Are you looking for a strong uptick in 3G phone sales from others before you kind of plough into it with both legs?"  (*Id.* at 22.)  Garriques responded:

> Thanks for the question, Ed.  I think the predominant—when you think 3G, meaning specifically UMTS, for us, this quarter is about a platform change.  We took our previous platform, which we built kind of V3x on, and now have transitioned to what we call [ArgonLV] from Freescale.  With new products like XX and MAXX, I do believe this platform in this quarter gets us a very competitive set of products out in the marketplace.  I have been relatively bearish about the size of the UMTS market in 2006.  I think that's kind of the way it played out.  I am more bullish on 2007.  I'm also more bullish on our 2007 roadmap, consistent with that stronger market.

(*Id.*).

Subsequently, in response to an analyst question, Zander stated that "we do think this quarter is going to be, with all our new products shipping, a good one for Mobile Devices."  (*Id.* at 24.)  Garriques then commented: "The big products for us—XX, MAXX, RIZR and the two versions of the MOTOFONE—I feel very good, and don't feel supply-constrained ramping those up in Q4."  (*Id.*)

Another analyst later asked: "So . . . looking at the product lineup you have coming with the RIZR, the MAXX, the XX and two versions of the MOTOFONE, are these going to be late quarter introductions, similar to the KRZR last quarter? Or do you expect these to be in meaningful volume perhaps before that November Thanksgiving Weekend holiday sales season?"  (*Id.* at 25.)  Garriques responded: "Across the board, with the exception of the CDMA MOTOFONE, I expect these to be October and early to mid-November shipments, making sure

that we hit that all-important fill the channel for the holiday season. Great thanks to [John Sipola] and Terry Vega on the CDMA MOTOFONE. That's something that we really didn't have . . . targeted until Q1 of next year. With a lot of great work and a lot of great platforming, they were able to pull that into this year. So that one's kind of an end-of-the-year piece, but the rest of them are all solid and ready for the holiday season." (*Id.*)

Plaintiffs have introduced more-than-sufficient evidence to establish the existence of a genuine dispute whether the representations made by Zander and Garriques at the October 17, 2006, earnings conference call were false or misleading.

The parties agree that the Izar NA for Cingular had, by August 28, 2006, "suffered '7 Sev 1s [most severe problems or showstoppers], 80 Sev 2s and approx[imately] 100 Sev 3s.'" (R. 379 at 42.) A Monte Carlo analysis of the same week determined that there was less than a 1% chance that the Izar program would hit its target date. (*Id.*)

Plaintiffs also point to an August, 25, 2006 email from one Motorola employee to another stating that "DoCoMo is now predicting that the service in [*sic*] will be February for Scorpius and March for Izar . . ., which will be a complete disaster (no 2006 business, launching 702 when our competition launches 703 anti-Razr missile.)" (R. 377-32 at 18.) The parties also agree that, in late August 2006, "Freescale acknowledged that due to design and developmental problems with the Argon chipsets, 'Volcans was shut down this week, and we are impacting IZAR as well.'" (R. 379 at 43-44.) In addition, Plaintiffs point to an August 30, 2006, email from Motorola's Chief Quality Officer, Rey More, to Joe Coletta, bearing the subject title "IZAR," that states: "This is worse than I thought possible." (R. 377-21 at 57.)

Plaintiffs point to evidence that Motorola in September 2006 continued to encounter

problems, including a September 11, 2006, email from Curtis Mroz, an electrical engineer for

Motorola, providing that "[w]e have a serious show stopper in the qualification of the ArgonLV

POP with respect to Warpage." (R. 377-21 at 78.) A September 20, 2006, email, bearing the

subject line "IZAR Hardware Changes," from Jeffrey Howard to Michelle Freeman at Cingular

Wireless stated that, "Motorola reviewed these HW [hardware] changes in detail yesterday . . . .

They have stated that the changes are to improve manufacturing yields. . . . If they don't deliver

until 11/2 then this means that we will have to test through the month of November

(Thanksgiving week . . . will be understaffed due to vacations). Earliest TA in my opinion will

be the first week in December. This means an in-store date of Mid-December best case." (R.

377-22 at 2.) Plaintiffs also proffer a Freescale October 1, 2006, email, which stated:

> According to Mike Hader [identified by Plaintiffs as Senior Director on
> Motorola's 3G program] this is the most severe issue they have ever faced this
> late into a program. MDB released a new s/w load Wednesday to their test sights
> around the world. This caused several phones (Izar Global / IZAR NA and
> Volans) to go into a panic mode every 10-15 minutes then lock up. After a day of
> this all field testing was stopped pending a solution. A temporary work around
> was put in place Saturday morning but this causes the phone to draw 15% more
> power. This is not a production solution. MDB has already missed a field testing
> deadline with Cingular, and are desperate to get an extension. Mike . . . said if its
> [*sic*] not fixed asap Cingular will refuse phones in Q4 which would be a disaster. .
> . . They are suspecting this has something to do with the CCM module in the
> Argon LV chip. It is unknown if this is chip related or s/w related.

(R. 377-35 at 55.) In addition, a Motorola report of October 9, 2006, indicated that delivery

dates for all new 3G handsets were flagged red, which according to the report meant "not

recoverable." (R. 377-25 at 11.) Plaintiffs also proffer an internal Motorola email of October

17, 2006, entitled "status of 3G platform (Volans, Izar, Rocket) - no improvements." (R. 377-20

at 16.) That email provided that "[t]odays [*sic*] situation . . . is causing huge doubts within

Vodafone about launching these devices in time for Xmas 06." (*Id.*)

Defendants vigorously dispute the import of this evidence, which they argue to be of more limited relevance than Plaintiffs maintain. (R. 366-1; R. 378; R. 379.) They also contend that their representations at the October 17, 2006, earnings conference call were entirely truthful. (*Id.*) Although the evidence introduced at trial may vindicate them in this respect, Defendants are not entitled to summary judgment in light of Plaintiffs' showing that there is a genuine dispute as to a number of material facts. It will be for the jury to resolve the dispute.

II.     **There Is a Genuine Dispute Whether the 3G Phones Were Material to Investors or to Motorola's Financial Results**

In order to succeed on a Section 10(b) claim, Plaintiffs "must show that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 131 S. Ct. at 1318 (quoting *Basic, Inc. v. Levinson*, 426 U.S. 224, 238 (1988)). The "materiality requirement is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* (quoting *TSC Indus.*, 426 U.S. at 449); *see also Searls v. Glasser*, 64 F.3d 1061, 1065-66 (7th Cir. 1995). Materiality is usually a question for the jury. *See, e.g.*, *Wehrenberg v. Fed. Signal Corp.*, No. 06-CV-487, 2008 WL 2787438, at *6 (N.D. Ill. Apr. 29, 2008) ("[S]ummary judgment is appropriate on the issue of materiality only if the information in question is 'so obviously important or so obviously unimportant to an investor[] that reasonable minds cannot differ on the questions.'") (collecting cases); *see also Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003) ("Ordinarily, materiality is a question of fact for the jury[.]"); *Searls*, 64 F.3d at 1066 (observing that the determination of whether a statement is material "is a highly fact-dependent analysis"); *In re Metris Cos., Inc. Secs. Litig.*, 428 F. Supp. 2d 1004, 1010 (D. Minn. 2006) ("Materiality is typically a question of fact for a

16

jury.").

Defendants claim that they are entitled to summary judgment because their alleged misstatements were relevant neither to investors nor to Motorola's Q4 2006 financial results. (R. 362-1 at 14-16.) In this respect, they make a number of unavailing arguments why there is no genuine dispute that the challenged representations were immaterial. They submit that their alleged misstatements amounted to nothing more than representations that the new 3G phones were "on track," which they were. (R. 362-2 at 14-15.) For reasons explained above, this argument fails at the summary-judgment juncture.

Defendants' second argument is that "Motorola's executives expressly informed the market . . . that Motorola was 'bearish' on the 3G market in 2006." (*Id.* at 15.) Defendants submit that "[t]hese statements are the opposite of any indication to the market that Motorola expected the new 3G phones to be material to its financial performance during the Class Period." (*Id.*) This argument fails for a number of reasons. As an initial matter, by "Motorola's executives," Defendants in fact refer only to Garriques, who throughout the period from late 2005 to October 2006 indicated that he was not exuberant about the 3G market. (R. 366-2 at 3-5, 12.) More significantly, however, none of the cited remarks provided, let alone suggested, that the 3G market would be immaterial to Motorola's financial performance in 2006. Garriques's comments only concerned the impact of 3G on the industry as a whole, as distinct from on Motorola. (*Id.*) This interpretation is evident from Garriques's comments, and indeed is unavoidable when the Court construes those comments, as it must, in the light most favorable to Plaintiffs. Furthermore, the one remark that Garriques seemed to direct specifically at Motorola hardly supports Defendants' claim that 3G phones were immaterial to the company in 2006.

Garriques stated: "When I am looking to the market going forward, September, October, November, December, I believe that across the board there is [*sic*] going to be lots of different devices, 2.5G, 2.75G, 3G, all doing well in the marketplace.  I think it is good to have a foothold in this.  I do not believe it is unbelievably material for the second half of this year in order to be successful in the marketplace."  (*Id.* at 5.)  His assertion that 3G is not going to be "unbelievably material" is not synonymous with a statement that 3G was going to be immaterial to Motorola's financial performance.

Next, Defendants submit that Motorola's new 3G phones were immaterial to Motorola's internal forecasts, which indicated that those phones would constitute only 2.2% of the Mobile Devices overall unit sales and 3.2% of the overall segment gross margin.  (R. 362-2 at 15-16.)  Such percentages, Defendants submit, are immaterial as a matter of law.  (*Id.* at 16.)  The problem with this position, however, is that the expert report of D. Paul Regan squarely contradicts it, thus creating a genuine dispute requiring trial.  (R. 377-50 at 7, 9-12.)  Consistent with Regan's analysis, Plaintiffs point out that, in making this argument, Defendants "look at only the internal forecasts and estimates that were generated in 2006 after it had become increasingly clear that the new phones were not 'on track' for the holiday selling season[.]"  (R. 374 at 18 n.11) (emphasis omitted.)

Finally, Plaintiffs have introduced considerable evidence of the materiality of 3G to Motorola and hence to its investors.  They refer to various statements of Defendants to the effect that the 3G phones are "flagship products" for "some of our lead operators in the world," that they would be "shipping in volume" and "hit that all-important . . . channel for the holiday season," which would "be a definite boost, especially in the European market."  (R. 374 at 14-

15.)  Plaintiffs point to documents in which Motorola acknowledges the concerns of its customer, Cingular, as well as the importance of the 3G phones to Defendant company, and the negative financial repercussions of delays in developing the same.  (*Id.* at 15-17.)  In addition, Plaintiffs observe that analyst and investor inquiries about Motorola's 3G portfolio induced the alleged misstatements, which demonstrates the materiality of the company's 3G phones.  (*Id.* at 18-19.)

Furthermore, Plaintiffs point to Garriques's July 8, 2006, email to Mike Hickey, a Senior Vice President in Europe, that "3G has lost 365 M dollars since beginning of the year!  We must stop the bleeding!"  (R. 377-47 at 2.)  On the same day, Garriques wrote to Zander and Devonshire that "As you can see the monster issue is the 1 year slip on Freescale UMTS/HSDPA.  We have lost 365 M ytd."  (R. 377-39 at 30.)  Philip Gilchrist, Garriques's lead platform engineer, sent an email to the effect that "[t]he considerable consequences will be our stock price sinking because we are losing our ass on 3G products.  Nothing we can do to FSL will change that."  (R. 377-21 at 71.)

Defendants cannot prevail, therefore, on their argument that the undisputed evidence entitles them to summary judgment on account of the alleged misrepresentations' purported immateriality.

III.    **The Evidence Does Not Entitle Defendants to Summary Judgment Regarding the Intellectual-Property Transactions Either for Lack of Scienter or on the Ground that Motorola's Disclosures Were Not Misleading**

Defendants submit that the law entitles them to summary judgment on Plaintiffs' claim that they violated Section 10(b) of the Exchange Act and Rule 10b-5 by entering into, and not disclosing, two IP-licensing transactions in September 2006.  (R. 362-2 at 17-27.)  Defendants

present two distinct arguments why summary judgment is appropriate in their favor on this claim: First, the undisputed evidence reveals that they followed a "robust process" in determining the proper accounting and disclosure for the IP transactions, which negates any reasonable inference of scienter. (*Id.* at 17.) Second, the evidence establishes beyond genuine dispute that Motorola's disclosures were not misleading. (*Id.*) Neither of these arguments is convincing, and so the Court declines to grant Defendants summary judgment on this basis.

### A. There Is Sufficient Evidence of Defendants' Scienter to Support a Jury Verdict in Plaintiffs' Favor

Liability under Section 10(b) and Rule 10b-5 "requires proof of the defendant's 'scienter,' which is to say proof that [the defendant] either knew the statement was false or was reckless in disregarding a substantial risk that it was false." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). *See generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The Seventh Circuit has recognized that a "popular definition of recklessness in this context is 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (citation omitted.)

According to Plaintiffs, Defendants "knew" that the Freescale and Qualcomm transactions required appropriate disclosure, and "accounting rules required separate disclosure concerning the 3Q06 IP licensing transactions in the Company's, [*sic*] October 17, 2006 Form 8-K earnings press release, as well as the 3Q06 financial statements and management discussion and analysis . . . section in the Company's November 2, 2006 Form 10-Q." (R. 276 at 61, 66, 71.) Plaintiffs contend that Defendants failed to follow Generally Accepted Accounting Procedures ("GAAP"). (*Id.*)

In moving for summary judgment, Defendants argue that "[t]he process followed by Motorola to determine whether and how to disclose the IP Transactions and the Mobile Devices segment's Q3 2006 intellectual property revenue demonstrates good faith and the lack of scienter, even if reasonable people could disagree about whether Motorola's revenue recognition was correct or its disclosures sufficient." (R. 362-2 at 17-18.) They point to evidence that (1) Motorola relied on a "Corporate Disclosure Committee" (which would determine whether disclosures were required for a particular period), (2) the Audit and Legal Committee of Motorola's Board of Directors (which would approve Forms 10-Q and 10-K), and (3) KPMG (which reviewed draft disclosures and observed the Corporate Disclosure Committee's process). (*Id.* at 18; R. 375 at 49-50.) The record, Defendants submit, establishes that Motorola followed this process in its Form 10-Q for Q3 2006 and in its Form 10-K for the year ended December 31, 2006. (R. 362-2 at 19-20.) Arguing that it was not reckless for them to rely on this process, Defendants submit that, "[a]t most, Plaintiffs are left with a factual dispute about whether disclosure of the IP Transactions was consistent with GAAP[,]" and point out that a failure to comply with GAAP does not create a genuine dispute as to scienter. (*Id.* at 20-21.) Defendants contend that this undisputed evidence reveals that Plaintiffs cannot prove scienter for either the disclosures of, or accounting for, the IP transactions. (*Id.* at 21-22.)

These arguments fail. First, and as a general matter, determinations as to a lack of scienter are typically—though not categorically— inappropriate at the summary-judgment stage. *See P.H. Glatfelter Co. v. Voith, Inc.*, 784 F.2d 770, 774 (7th Cir. 1986) ("[R]esolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible.") (quotation omitted); *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996)

("Generally, scienter should *not* be resolved by summary judgment.") (emphasis in original); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59 (2d Cir. 1984) (concluding with respect to scienter in a Section 10(b) action that "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment"). *Cf. Secs. & Exch. Comm'n v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) ("Even where a party's subjective beliefs are critical to liability, it is not always true that the case cannot be decided on summary judgment[.]"). The Court could grant Defendants summary judgment on this ground only "if no reasonable jury could conclude that the requisite scienter exists[.]" *In re Miller Indus., Inc.*, 120 F. Supp. 2d 1371, 1383 (N.D. Ga. 2000).

Second, Defendants' contention that the law entitles them to summary judgment on account of their lack of scienter effectively amounts to an argument of good-faith reliance.[5] (R. 366-1 at 17-22.) Their reliance on Motorola's accounting and reporting mechanisms, Defendants submit, negated any possible intent or recklessness on their part. (*Id.*) If Defendants knew that (or were reckless as to whether) Motorola's disclosure or accounting was false or misleading, however, then the fact that the company employed substantial processes aimed at ensuring accurate accounting would not establish that Defendants lacked scienter. *See United States v. Erickson*, 601 F.2d 296, 305 (7th Cir.), *cert. denied*, 444 U.S. 979 (1979) ("If a

---

[5] Importantly, Plaintiffs do not rely on a purported GAAP violation alone to reveal a genuine dispute as to whether Defendants acted with the requisite scienter. The law is well established that such a violation does not suffice to create a genuine dispute as to scienter. *See, e.g.*, *Norfolk Cnty. Ret. Sys. v. Ustian*, No. 07-CV-7014, at *13 (N.D. Ill. July 28, 2009) ("GAAS and GAAP violations alone are not enough to compel an inference of scienter[.]"); *see also Ruth v. AON Corp.*, No. 04-CV-6835, 2008 WL 656069, at *7 (N.D. Ill. Mar. 7, 2008) ("Although allegations of GAAP violations, standing alone, are insufficient to raise a strong inference of scienter, GAAP violations may support the inference when coupled with additional circumstances[.]").

company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance."); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly complete is classic evidence of scienter."); *see also In re Vivendi Universal, S.A. Secs. Litig.*, -- F. Supp. 2d --, 2011 WL 590915, at *25 (S.D.N.Y. Feb. 17, 2011) ("Vivendi argues that it was the Kingdom of Morocco, not Vivendi, that insisted that the agreement to purchase the additional 16% not be disclosed, as if to suggest that this fact, if true, would negate a finding of scienter. But if Hannezo and Messier knew that it would be materially misleading not to disclose the agreement and went along with a cover-up anyway, or acted recklessly in making statements that failed to disclose that agreement, the fact that they did so at somebody else's bequest would not negate their own scienter.").

Furthermore, even if there were no genuine dispute that Defendants relied on Motorola's accounting and reporting mechanisms, it is not clear that such a fact would dispose of the question of scienter. The weight of authority suggests that evidence of reliance is merely relevant to the question whether a defendant acted with the requisite scienter. *See, e.g.*, *Secs & Exch. Comm'n v. McNamee*, 481 F.3d 451, 455 (7th Cir. 2007) ("[A]dvice of counsel *may* show that a person lacked a culpable intent[.]") (emphasis added); *Howard v. Secs. & Exch. Comm'n*, 376 F.3d 1136, 1147 (D.C. Cir. 2004) ("[R]eliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter."); *Markowski v. Secs. & Exch. Comm'n*, 34 F.3d 99, 104-05 (2d Cir. 1994)

("Markowski's reliance upon advice of his counsel is misplaced.  To invoke this principle, Markowski has to show that he made complete disclosure to counsel, sought advice as to the legality of his conduct, received advice that his conduct was legal, and relied on that advice in good faith.  Even where these prerequisites are satisfied, such reliance is not a complete defense, but only one factor for consideration.") (internal citations omitted); *Secs. & Exch. Comm'n v. Huff*, 758 F.2d 459, 467 (9th Cir. 1985); *cf. Provenz*, 102 F.3d at 1491 (distinguishing a case in which the court had found insufficient evidence to raise a reasonable inference of scienter on the ground that the defendants had "provided unrebutted evidence showing that their accountants had full knowledge of the disputed transactions.  Here, there is evidence suggesting defendants failed to disclose material information to their accountant.  If it is true that defendants withheld material information from their accountants, defendants will not be able to rely on their accountant's advise as proof of good faith") (emphasis omitted) (internal citations omitted); *Secs. & Exch. Comm'n v. Johnson*, 174 Fed App'x 111, 114-15 (3d Cir. 2006).

Regardless, Plaintiffs have introduced evidence that creates a genuine dispute whether Motorola's accounting and reporting processes had occasion meaningfully to scrutinize the IP transactions.  (R. 374 at 1.)  Motorola's chief accounting officer, Laurel Meissner, testified that she was not aware of anyone who took the position that the company should disclose the two IP deals to investors in light of the fact that half of the Mobile Device's earnings for the quarter were related to the same.  (R. 377-53 at 164.)  She further testified that she did not think that anyone on the disclosure committee considered disclosing the dollar amount of the IP transactions.  (*Id.* at 168.)  The parties dispute the extent to which KPMG—an external auditor—was involved in auditing the relevant financial statements.  (R. 379 at 60-61.)

Thus, evidence that Defendants relied on Motorola processes does not foreclose a reasonable jury finding that Defendants acted intentionally or recklessly to mislead investors in disclosing and accounting for the IP transactions. Defendants' sole argument why they are entitled to summary judgment—namely that the "process followed by Motorola in determining how to account for the IP Transactions . . . and how to disclose the related revenue to the public believes any suggestion of recklessness"—therefore fails. (R. 378 at 10-12.)

Third, Plaintiffs have introduced sufficient evidence to establish a genuine dispute as to Defendants' scienter, which necessitates trial and precludes summary judgment. In this respect, Plaintiffs seek to rely on evidence that Defendants engaged in knowing and reckless conduct and had the motive and opportunity to mislead investors. (R. 374 at 34-38.)

Regarding motive, Plaintiffs submit that Motorola faced a "massive earnings gap as a result of the massive 'bleeding' of earnings caused by delays to the Argon-based 3G handsets." (R. 374 at 36.) This shortfall, Plaintiffs contend, "motivated [Defendants] to mislead investors in order to obfuscate delays and development problems with Motorola's new 3G handsets and meet expectations for the Company's and Mobile Devices' earnings." (*Id.*)

Construed in the light most favorable to Plaintiffs, the evidence reveals that Motorola knew that there would be a shortfall in Q3 2006, thus evidencing a motive for Defendants to increase revenue to meet earnings expectations.[6] Garriques testified in his deposition that the

---

[6] Defendants contest the relevance of this evidence, submitting that some of the cited statements do not in fact relate to Motorola's Argon-based handsets. (R. 379 at 30-31.) While the jury may ultimately vindicate Defendants' explanation of the evidence in this respect, it is nevertheless true that, at the summary-judge stage, the Court must construe all evidence in the nonmoving parties' favor. Plaintiffs' proffered evidence, construed in its entirety and in their favor, creates a genuine dispute.

Qualcomm deal "was a component of making our Q3 financial plan," which "the team wanted to be able to make[.]" (R. 377-52 at 125.) He testified that the Qualcomm and Freescale deals were "important" and "significant" in making the plan, and that collectively "they had significant impact on the Q3 earnings." (*Id.* at 126-27.) Indeed, there is no dispute that the "3Q06 QCOM and FSL arrangements accounted for 48.6% of Mobile Devices' reported 3Q06 earnings of $819 million[,]" and that those "agreements accounted for 41.3% of Motorola's reported consolidated earnings of $968 million." (R. 379 at 56.) Nor is there a dispute that total IP licensing increased by $371 million, or 317.6%, over the prior quarter, 2Q06. (*Id.*) Consistent with this, the parties are in accord that "Mobile Devices' financial personnel internally characterized [these IP-licensing transactions] as 'Mega Deals,'" which were the only such deals that Motorola entered into in 2006. (*Id.* at 57.) The parties also agree that, prior to Motorola's publishing its 3Q06 Form 10-Q, KPMG reported to the company's audit and legal committee that the Freescale and Qualcomm IP-licensing deals were "significant/unusual transactions." (*Id.* at 56-57.)

Further, Plaintiffs direct the Court to a May 3, 2006, email from Garriques to the effect that "[i]f we have upside, I would not lose the UMTS business. I think we are dead if we do with these guys. I also think we will not get our Platorm [*sic*] in. And we will never get back in." (R. 377-39 at 3-4.) On July 20, 2006, Garriques responded to an email congratulating him on "the fantastic results [that] . . . MDB recorded sales of $7.14B, up 46 YoY" by writing: "You guys helped a lot. If it were not for you our number would have been below 11.2 and we would have gotten a lot of questions." (R. 377-47 at 4.) On the basis of considered analysis, D. Paul Regan's expert report opines that "Motorola's Mobile devices business did not meet management's plan and was forecasted to suffer material operating earnings losses during Q3

2006 and Q4 2006." (R. 377-50 at 7-12.)[7]

This evidence would support a reasonable jury verdict that motive met opportunity when Motorola entered into the Qualcomm and Freescale IP-licensing deals. Viewing this and the preceding evidence in the light most favorable to Plaintiffs, there is a genuine dispute whether Defendants had the requisite scienter in their role in approving, and accounting for, the IP transactions.

In addition to submitting evidence that Defendants had the motive and opportunity to mislead investors by entering into the Freescale and Qualcomm IP transactions, Plaintiffs also submit that "the evidence of Defendants' knowing and reckless conduct . . . compels denial of summary judgment." (R. 374 at 36.) Plaintiffs are less than forthcoming, however, in describing just what this evidence is and why it is probative of scienter. The only evidence that Plaintiffs point to in support of this assertion is that Defendants knew of, and were involved in approving, the Freescale and Qualcomm IP-licensing deals. (*Id.* at 35-36.) That Defendants were involved

---

[7] According to Plaintiffs, evidence of insider trading also supports an inference of scienter. This argument applies only to Garriques, as Zander made no trades during the Class Period and Devonshire made only a single trade on July 27, 2006, which was several weeks before the challenged IP transactions. (R. 366-2 at 25; R. 375 at 58.) On August 9, 2006, Garriques exercised 172,644 options and then sold the acquired shares and, on October 23, 2006, Garriques exercised 55,800 options, which he then sold. (R. 375 at 59-61.) Defendants argue that this is not evidence of scienter because Plaintiffs have failed to introduce evidence showing that Garriques' sales of shares were out of line with his prior practice of selling shares when they vested. (R. 378 at 14-15.) The Seventh Circuit has held that "insider trading may be sufficient circumstantial evidence of scienter" if plaintiffs "show that the sale of stock is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 604 (7th Cir. 2006), *vacated on other grounds*, *Tellabs*, 551 U.S. at 308. The Court need not consider whether evidence of Garriques's alleged insider trading creates a genuine dispute as to scienter, however, because—for reasons explained below—other evidence proffered by Plaintiffs reveals a genuine dispute as to Defendants' scienter with respect to Motorola's reporting and accounting of the Qualcomm and Freescale IP-licensing deals.

in the IP transactions, however, is distinct from whether they "knew" that Motorola's disclosure or accounting of those transactions was false or misleading or whether they were "reckless"as to whether that disclosure or accounting was false or misleading.  Plaintiffs do not explain how one leads to the other.

Nevertheless, there is a genuine dispute whether Motorola's October 17, 2006, 3Q06 earnings press release, Defendants' contemporaneous statements, and Motorola's Form 10-Q for 3Q06, were false or misleading with respect to their reporting and accounting of the Freescale and Qualcomm IP-licensing transactions.  In other words, a reasonable jury could find that those statements were false or misleading.  In light of evidence that Defendants were variously familiar with, involved in approving, and involved in the accounting of the relevant IP transactions, as well as the evidence that Defendants had an opportunity and motive to cover up a shortfall in 3Q06, it is a reasonable inference that Defendants possessed the requisite intent to mislead investors with respect to Motorola's subsequent accounting of the IP transactions.  *See Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011) (observing that, in ruling upon a motion for summary judgment, "[t]he facts are viewed in the light most favorable to the non-moving party and all reasonable inferences are drawn in her favor").

### B.  There Is a Genuine Dispute Whether Motorola's Disclosures Were Misleading

Defendants seek summary judgment on the ground that Motorola's disclosures concerning the Qualcomm and Freescale IP-licensing transactions were not materially misleading.  (R. 366-1 at 24-26.)  There is no dispute that Motorola's Mobile Devices business included licensing IP.  (R. 375 at 42-43.)  The company's public filings disclosed this fact.  (R.

362-6 at 138.)  Defendants point out that "Motorola's Q3 2006 earnings press release . . . and its later Form 10-Q . . . both disclosed that the Mobile Devices segment had higher intellectual property income during the third quarter[,] . . . [which was] indisputably correct."  (R. 366-1 at 24.)  They submit that the disclosure was sufficient to inform a reasonable investor that non-handset revenue had a significant impact on the Q3 2006 margin for the Mobile Devices business, and contend that "[b]y performing basic mathematical calculations . . . a reasonable investor could readily determine that there was almost $400 million in third quarter 2006 Mobile Device segment revenues attributable to non-handset sales and, accordingly, that the operating margin for handsets in the third quarter of 2006 was approximately 6%."  (*Id.* at 24-25.) Defendants observe that Plaintiffs concede that Motorola securities traded in an efficient market, which would be capable of performing such mathematical calculations.  (*Id.* at 25-26.)  They also point out that their Q3 2006 earnings release, and other disclosures, revealed "the risk that intellectual property revenue was variable from period to period—in other words that the segment's intellectual property revenue may not repeat."  (*Id.* at 26.)  Finally, Defendants point to an October 18, 2006, Lehman Brothers report by analyst Jeffrey Kvaal to the effect that Motorola had "strong," "increased [intellectual property] royalties" in Q3 2006 and that Motorola expected "lower [intellectual property] collections" in the fourth quarter, which may "temper [margin] improvement."  (*Id.*)

Construed in the light most favorable to Plaintiffs, however, the evidence in the record precludes summary judgment on the question whether the 3Q 2006 IP-licensing transactions were materially misleading.

First, Jeffrey Kvaal's deposition testimony belies Defendants' argument that his October 16, 2006, analyst report revealed that the market understood the role of licensing income on the Mobile Devices business's third-quarter margin. Kvall testified in his deposition that, at the time that he wrote his October 16 report, he did not know that two nonrecurring IP deals had added $400 million to the company. (R. 377-53 at 37-38.) He explained that he would have wanted to know this information because "I'm pretty sure that 400 million would have represented a sizeable percentage of the operating profits in that quarter." (*Id.* at 38.) He observed that this information would have been relevant to his financial modeling and that he would have reported the same to his investors. (*Id.*) He explained:

> The size of that intellectual property transaction would have been so large as for us to realize it was not a recurring item. It was non-recurring, and therefore that would have been [*sic*] major implications—well, would have had major implications for their third quarter operating margin because they would have missed their target by a very wide margin. And that in turn would have led us to question their operating margin profit in future quarters.

(*Id.* at 38-39.)

Second, although it is true that Motorola's 3Q 2006 press release and Form 10-Q for the same period both disclosed that technology licensing was a partial cause of the company's increased earnings, construed in the light most favorable to Plaintiffs, this fact does not establish that this disclose was not materially misleading. The press release explained the increase in earnings due to "new product launches, supply chain cost reductions and higher technology and platform licensing-related income." (R. 379 at 10-11.) Form 10-Q for 3Q 2006 explained the increase due to "(i) increased savings from supply chain cost-reduction initiatives, (ii) the 39% increase in unit shipments, and (iii) increased income from technology and platform licensing." (*Id.* at 15.) Defendants concede that "Motorola's regular disclosure practice . . . was to identify

items that made significant contributions to a segment's margin in order of importance[.]" (R. 366-1 at 20.) There is, therefore, no dispute that Motorola presented the three factors disclosed in its press release and Form 10-Q as an ordinal ranking, such that the company presented technology and platform licensing as the least important of the three disclosed factors.

The evidence, viewed in the light most favorable to Plaintiffs, reveals a genuine dispute whether this disclosure was materially misleading. The IP-licensing deals accounted for 48.6% of the Mobile Devices business's reported 3Q 2006 earnings of $819 million, and represented 41.3% of Motorola's reported consolidated earnings of $968 million. (R. 379 at 56.) Defendants do not explain how the Qualcomm and Freescale licensing deals, constituting 48.6% of the Mobile Devices business's earnings and 41.3% of the company's consolidated earnings for 3Q 2006, could constitute the third-most-significant factor in driving either earnings or increased earnings. With respect to the former, if IP licensing were only the third-most-significant factor, that means that the other two factors each accounted for more than 48.6% of the Mobile Devices's business's earnings, such that the three factors would collectively make up more than 100%—an impossibility. If referring to an *increase* in earnings—Motorola's 3Q 2006 Form 10-Q reported that "operating earnings increased to $819 million . . . compared to operating earnings of $593 million in the third quarter of 2005" on account of the three named factors—then it is hardly possible that the $398.1 million in earnings represented by the Qualcomm and Freescale IP-licensing deals could be the third-largest contributor to the $226 million increase in total earnings ($819 million - $593 million). Defendants effectively backtrack in reply, noting that, although "Plaintiffs protest that the IP Transactions could not have had the third-largest impact on margins for the quarter[,] . . . [i]t is undoubtedly correct . . .

that the IP Transactions were not the largest margin driver during the quarter." (R. 378 at 12 n.5.)

Further evidence exists that Motorola's disclosure as to the IP-licensing transactions was materially misleading. At the October 17, 2006, earnings conference call, in which Zander, Devonshire, and Garriques participated, Garriques informed analysts that "IP and platform licensing this year has grown at the same rate as our sales has [*sic*] grown." (R. 362-6 at 27.) In response to a question for clarification: "the operating margin. 11.9% up from 11.2%—did gross margin improved [sic] this quarter? Is that what drove it?", Garriques explained the improvement on the following grounds:

> When you think about the operating earnings expansion in the Mobile Device business, it really had several parts. The first part it had is we brought out some pretty exciting products—the KRZR and the KRZR M. We got nice volume in this quarter, thanks to Stu and the supply chain, and we were able to hit into multiple regions.
> The second thing . . . is we saw very significant cost-downs, as we now leverage our closer relationship with our operators, the narrowing of the number of suppliers that we use, as well as the ability to be better about forecasting where we are going. So you saw nice takedowns.
> In addition to that, we—we talked about it at the financial analyst meeting. We have grown our revenue from licensing of technologies and platforms, *consistent with our revenue growth in the industry from last year to this year*. We are quite tenacious about protecting our IP, about making sure that we collect value for it. Those three things helped us continue to expand operating earnings on a year-over-year basis now for eight-plus quarters in a row.

(*Id.* at 23) (emphasis added). Plaintiffs have introduced evidence that these representations were false or misleading. They point to an internal Motorola document, entitled "Q3 Autopsy," which revealed that IP earnings grew at 198.7% year-over-year and 317.6% quarter-over-quarter compared to the Mobile Device business's overall revenue growth of 25.% and -1.5%. (R. 377-21 at 4, 25.)

Finally, Defendants assert that Motorola's financial disclosures, construed collectively, conveyed sufficient information to inform the market that approximately $400 million of the Mobile Devices business' revenues in 3Q 2006 were "attributable to non-handset sales[.]" (R. 366-1 at 24-25.) Defendants observe that the company's earnings releases for 2Q and 3Q 2006 disclosed the Mobile Devices business's sales, as well as the number of units sold, for each quarter. (R. 366-1 at 25 n.21.) They also point out that the company's 10-Q for 3Q 2006 disclosed that the average selling price had decreased by 10% sequentially from 2Q 2006. (*Id.*) Even though none of Motorola's disclosures revealed the average selling price for 2Q 2006, Defendants submit that a reasonable investor could calculate that figure by dividing the overall sales by the number of units sold. (*Id.*) Defendants thus argue that such an investor, having determined the average selling price for 2Q 2006, would decrease that figure by 10%, multiply the overall number of units sold in 3Q 2006 by that average selling price, compare that amount to overall Mobile Devices business sales, and thus discover "that there was approximately $388 million in non-handset sales and then to calculate the approximate handset-only margin." (*Id.*)

This argument fails at the summary-judgment stage. In the first place, Defendants introduce no evidence that any investor or analyst in fact carried out this mathematical calculation. Nor do they submit any expert testimony to the effect that reasonable investors or analysts would typically undertake such a computation. More seriously still, Defendants encounter a significant problem when they suggest that an analyst would be able to calculate the average selling price by simply dividing the overall sales by the number of units sold, (R. 366-1 at 25 n.21,) because the Mobile Devices business's overall sales are comprised of more than sales from handsets. As Motorola's public filings make clear, the Mobile Devices business also

generates revenue from the sale and service of accessory products, as well as royalty and licensing fees. (R. 379 at 50.) Even putting this infirmity aside, in the absence of any evidence (as opposed to argument) that investors were capable of conducting, and in fact did conduct, the relevant calculus, the Court would have to draw an impermissible inference in favor of Defendants to credit their argument and grant them summary judgment.

In light of the preceding evidence, a reasonable jury could find that Motorola's 3Q 2006 earnings press release and Form 10-Q did not disclose that non-handset revenue had a significant impact on the Q3 2006 margin for the Mobile Devices business.

## IV.  Plaintiffs Have Introduced Sufficient Evidence of Loss Causation

"To prevail on the merits in a private securities fraud action, investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Erica P. John Fund*, 131 S. Ct. at 2183. To establish the same, a plaintiff must demonstrate that "a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Id.* at 2186 (emphasis in original). The Supreme Court has explained that a "higher purchase price will *sometimes* play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchased price suggests that the misrepresentation . . . 'touches upon' a later economic loss. But, even if that is so, it is insufficient. To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (emphasis in original). Instead, a plaintiff must prove proximate causation. *Id.* at 346. As the Seventh Circuit has explained, loss causation "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to

blame." *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007).

A.    **Plaintiffs Have Introduced Sufficient Evidence to Support a Reasonable Jury Finding that the Alleged Misstatements Artificially Inflated Motorola's Stock Price**

Defendants' expert economist, Dr. Kenneth M. Lehn, has examined the circumstances surrounding Motorola's earnings report of July 19, 2006, and Defendants' allegedly false or misleading statements of the same day.  (R. 366-17 at 107-09.)  He observes that Motorola released its 2Q 2006 earnings at 4 p.m., after the stock market closed.  (*Id.* at 107.)  The company reported earnings of 33 cents per share, "which exceeded the consensus analyst forecast of $.31 per share."  (*Id.*)  According to Dr. Lehn, the conference call began at 5 p.m.  (*Id.* at 108.)  In the hour between the stock market's closure at 4 p.m. and just before Motorola's conference call began at 5 p.m., Dr. Lehn observes that the company's stock price had increased by 7.01% from $19.25 at 4 p.m. to $20.60.  (*Id.*)  He also points out that Motorola's stock price closed on July 20, 2006, at the same price that it held immediately before the conference call at which Defendants made the allegedly false or misleading representations.  (*Id.*)

On the basis of Dr. Lehn's analysis and what they claim to be Plaintiffs' lack of evidence to the contrary, Defendants submit that they are entitled to summary judgment because the alleged misstatements did not inflate Motorola's stock price.  (R. 366-1 at 29.)  Defendants further contend that "Dr. Finnerty has made no attempt to disaggregate the inflationary impact of the allegedly fraudulent information from the indisputably accurate information introduced to the market on the same day—notably that the Mobile Devices segment had just announced record second quarter sales and that Motorola had exceeded consensus estimates for earnings per share."  (*Id.* at 29-30.)

This argument fails.  As Plaintiffs correctly point out, this case concerns omissions to the effect that Defendants allegedly failed to disclose not only the actual status of Motorola's new 3G handsets, but the fact and nature of the Qualcomm and Freescale IP-licensing transactions in 3Q 2006.  (R. 374 at 47.)  The fact that Motorola's stock price did not increase in value after the July 19, 2006, conference call is therefore of no moment.  Defendants' statements may have comported with investors' expectations, such that the company's stock price remained unchanged.  The relevant change in stock price occurs when the information is revealed to the market.  *See Dura*, 544 U.S. at 347 (observing that, to allege loss causation, a complaint must allow that "share price fell significantly *after* the truth became known") (emphasis added); *Lentell v. Merrill Lynch, Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) ("[T]o establish loss causation, a plaintiff must allege . . . that the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the security.") (emphasis added); *see also In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282 (N.D. Ala. 2009) ("'[T]he mere absence of a statistically significant *increase* in the share price in response to fraudulent information does not 'sever the link' between the material misstatements and the price of the stock.  Rather, price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not.'") (quoting *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1340-41 (N.D. Ga. 2007)) (emphasis in original).

**B.** **There Is a Genuine Dispute Whether the November 7, 2006, and January 4, 2007, Purported Corrective Disclosures Revealed that the Prior Statements Were False or Misleading**

Defendants next argue that they are entitled to summary judgment because the evidence does not support a finding that a corrective disclosure occurred. (R. 366-1 at 30-36.) They contend that the alleged disclosures that took place on November 7, 2006, January 4, 2007, and March 21, 2007, corrected neither a prior misstatement nor an omission. (*Id.* at 30.) As a result, Defendants submit, Plaintiffs cannot prove loss causation. (*Id.* at 30-36.)

Plaintiffs contest this argument on two grounds. First, they submit that, under Seventh Circuit law, Defendants must "establish that, as a matter of undisputed fact, the depreciation in the value of the security could not have resulted from the alleged false statement or omissions" to prevail on summary judgment. (R. 374 at 43 (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649-50 (7th Cir. 1997).) They argue that Defendants have failed to satisfy this burden. (*Id.* at 43-46.) Second, Plaintiffs contend that, even if Defendants have met their burden under *Caremark*, there is more-than-sufficient evidence to create a genuine dispute whether the November 7, 2006, January 4, 2007, and March 21, 2007, events constituted corrective disclosures. (*Id.* at 48-55.)

**1.** ***Caremark* Governs the Parties' Respective Burdens with Respect to Defendants' Motion for Summary Judgment on the Ground of Loss Causation**

The parties dispute the relevant law that applies to a motion for summary judgment in a securities-fraud case on the issue of loss causation. Defendants maintain that the Supreme Court's opinion in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) controls this question, and requires *Plaintiffs* to "demonstrate[] a link between the alleged fraud and the decline in

Motorola's stock price[.]"  (R. 366-1 at 30, 36.)  *Dura*, Defendants contend, "require[s] the plaintiffs to provide evidence of the specific decline in stock price attributable to disclosure of the alleged fraud[.]"  (*Id.* at 36.)  Plaintiffs strenuously disagree as to their burden in opposing summary judgment.  (R. 374 at 43.)  They submit that Seventh Circuit law is clear to the effect that parties moving for summary judgment must "establish that, as a matter of undisputed fact, the depreciation in the value of the security could not have resulted from the alleged false statement or omission[.]"  (*Id.* (quoting *Caremark*, 113 F.3d at 649-50.)

It is true, of course, that *Dura* held that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."  *Dura*, 544 U.S. at 338.  This holding, however, does not alter the well-established law regarding the parties' respective burdens at the summary-judgment stage.  Defendants, in moving for summary judgment, bear the initial burden of establishing that the evidence does not support a finding that the allegedly false or misleading representations or omissions caused the fall in Motorola's stock price.  The Seventh Circuit made this clear when it observed:

> Our holding does not preclude [the defendant] from submitting, at the summary judgment stage, that [the plaintiff] cannot prove the loss causation that it has alleged in this complaint.  At summary judgment, this burden usually is met by establishing that the decline in the value of the security is attributable to some other factor.  To defeat [the plaintiff's] claim at summary judgment, therefore, [the defendant] would have to establish that, as a matter of undisputed fact, the depreciation in the value of the notes could not have resulted from the alleged false statement or omission of the defendant.

*Caremark*, 113 F.3d at 649-50.

These remarks would be without significance to the present case if the Supreme Court had superceded *Caremark* in its subsequent decision in *Dura*.  Yet, it did not do so, and the Seventh Circuit's account of the law controls.  In *Dura*, the Supreme Court reversed a Ninth

Circuit determination that a private plaintiff in a securities-fraud lawsuit can satisfy the loss-causation requirement by alleging and subsequently establishing that the relevant misrepresentation inflated the price of the security. *Dura*, 544 U.S. at 338. The Supreme Court held that plaintiffs "need to *prove* proximate causation and economic loss[,]" such that the plaintiffs' failure to allege that the company's share price "fell significantly after the truth became known" rendered their "complaint legally insufficient." *Id.* at 346-48 (emphasis in original). Nothing in the Supreme Court's opinion addresses the respective burdens faced by moving and nonmoving parties for summary judgment on the issue of loss causation. *Dura* simply holds that, to state a plausible claim for relief and ultimately to prevail at trial, plaintiffs in fraud-on-the-market cases need to prove loss in the form of a disclosure-specific decline in share price. *Dura*, 544 U.S. at 347.

This Court is not alone in concluding that *Dura* does not change the law in the Seventh Circuit governing motions for summary judgment in securities-fraud cases on the issue of loss causation. A court in this district has similarly observed that *Dura* "did not address what loss causation requires of a securities fraud plaintiff beyond the pleading stage." *In re Motorola Secs. Litig.*, 505 F. Supp. 2d 501, 550 (N.D. Ill. 2007); *accord In re Scientific Atlanta, Inc. Secs. Litig.*, 754 F. Supp. 2d 1339, 1373 (N.D. Ga. 2010) ("The Court agrees that *Dura*, which centered on the adequacy of pleading, did not establish any clear standard with respect to summary judgment[.]"). Although a number of courts outside of the Seventh Circuit have adopted a standard contrary to *Caremark— see, e.g.*, *In re Williams Secs. Litig.-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009); *In re Vivendi Universal, S.A. Secs. Litig.*, 605 F. Supp. 2d 586, 604-05 (S.D.N.Y. 2009)—this Court is bound by Seventh Circuit precedent.

Nevertheless, Defendants argue that the Seventh Circuit's post-*Dura* decisions in *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991 (7th Cir. 2007) and *Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010) call *Caremark* into question because they "place the burden of proving loss causation at the summary judgment stage on Plaintiffs." (R. 366-1 at 37.) Nothing in *Ray* suggests, however, that the Seventh Circuit meant to repudiate its holding in *Caremark*—indeed, the court in *Ray* cited *Caremark* with approval. *Ray*, 482 F.3d at 995.

*Ray* did speak in terms of the evidence, or lack of the same, that Plaintiffs had introduced on the question of loss causation. *E.g.*, *id.* at 994-96 ("On appeal, plaintiffs have pointed to evidence in the record that, they believe, [establishes loss causation]. . . . Plaintiffs similarly have not introduced enough evidence to go forward on a fraud-on-the-market theory. . . . The approach that comes closest to satisfying plaintiffs' burden is the 'risk-free' idea."). This discussion does not suggest, however, that a plaintiff has the initial burden to introduce evidence of loss causation to successfully oppose a motion for summary judgment. The Seventh Circuit's analysis in *Ray* is consistent with the well-established principle that a nonmoving party must introduce evidence of an issue, on which it bears the burden of proof at trial, only *after* the moving party has pointed to an absence of supportive evidence in the record. *See Celotex*, 477 U.S. at 323. Indeed, the Seventh Circuit noted that the defendants in *Caremark* had introduced expert evidence that market forces resulted in the loss in stock value, yet "Plaintiffs have offered nothing to rebut that theory—no expert testimony suggesting that the collapse was caused by the lack of the fraudulently promised contracts and financing[.]" *Ray*, 482 F.3d at 995. *Dura* only holds that a plaintiff alleging securities fraud has the burden of proof at trial to establish loss causation. *Dura*, 544 U.S. at 338, *passim*. It does not purport to create an exception to the long-

established rules governing parties' respective burdens in bringing, and responding to, a motion for summary judgment.

Finally, as Defendants concede, *Schleicher* concerned a plaintiff's burden at the class-certification stage. (*Id.* at 37.) *Schleicher* does not describe a plaintiff's evidentiary burden as to loss causation in responding to a defendant's motion for summary judgment. 618 F.3d at 679, *passim*.

Thus, to prevail on the issue of loss causation at summary judgment, Defendants must demonstrate an absence of evidence that "the depreciation in the value of the notes . . . resulted from the alleged false statement or omission of the defendant." *Caremark*, 113 F.3d at 649-50. It is only upon such a showing that Plaintiffs must introduce evidence of loss causation sufficient to establish a genuine dispute as to the same.

### 2. Defendants Have Failed to Establish an Absence of Evidence Supporting a Finding of Loss Causation

Defendants argue that "none of the information disclosed to the market on November 7, 2006, January 4, 2007 or March 21, 2007 demonstrates a link between the alleged fraud and the decline in Motorola's stock price[.]" (R. 366-1 at 30.) There are a number of undisputed facts that make it difficult for Defendants to prevail on this ground. As to each of the alleged disclosure dates, the parties agree on the following facts:

> (1) The negative abnormal return following each alleged disclosure cannot be explained by general economic conditions, stock-market-wide factors, macro-economic factors, industry-specific factors, or by disclosures regarding Motorola's Networks and Enterprise or Connected Home Solutions business segments or any other part of Motorola's business other than Mobile Devices.

> (2) The negative abnormal return on each relevant date was due to disclosures regarding Motorola's Mobile Devices business.

(3) The ensuing negative abnormal return on each relevant date was statistically significant.

(R. 379 at 68-76.)  Notwithstanding these facts, Defendants submit that none of the alleged disclosures revealed information to the market concerning the allegedly false or misleading statements or omissions.  (R. 366-1 at 30-36.)  Plaintiffs have revealed sufficient evidence, however, to create a genuine dispute as to loss causation.

### a.    The November 7, 2006, Alleged Disclosure

On November 7, 2006, Lehman Brothers issued an analyst report on Motorola, entitled "Change of Price Target" and "Early Challenges in October."  (R. 362-19 at 2-8.)  The report cited a variety of negative factors, which included: "In Europe, our checks suggest new W-CDMA handsets from Motorola (RZAR XX and RAZR MAXX) this quarter have not yet arrived which could suggest our higher end unit estimates may be aggressive."  (*Id.* at 3.)  According to Defendants, this evidence fails to satisfy the required proof of loss causation under *Dura* because the report did not reveal any new information.  (R. 366-1 at 31.)  In light of the fact that Zander's and Garriques's alleged misrepresentations were only to the effect that the new 3G phones were "on track" "for the second half of the year" and "launching into Q4," Defendants argue that the Motorola report disclosed no information inconsistent with those representations.

This argument ignores the question of scale.  As explained above—construed in the light most favorable to Plaintiffs, and drawing all inferences in their favor—Defendants' alleged misrepresentations and omissions would support a reasonable jury finding that investors understood Defendants' communications to mean that Motorola was on track to launch its new 3G phones en masse to meet consumer demand in Q4 2006.  So construed, there is indeed a jury

question whether the November 7 report revealed that Defendants' representations to that effect were misleading because the report revealed that "higher end unit estimates may be aggressive." (R. 362-19 at 3.)  Defendants' argument that the early-November Lehman report could not have "corrected" their alleged misrepresentations concerning new 3G phones' shipment in "mid-November" fails for the same reason.  A jury could understand the report to reveal information calling into question the realism of a mid-November large-scale launch.  In this respect, Plaintiffs point to the deposition testimony of analyst Jeffrey Kvaal that "we had expected to see [the new W-CDMA models] in the stores by [November 7] and didn't."  (R. 377-53 at 43.) Kvaal further testified that "we did not feel that Motorola was on a trajectory to hits its fourth-quarter estimates[.]"  (*Id.* at 45.)  Thus, construed in the light most favorable to Plaintiffs, the November 7 report did not simply amount to "[c]onfirmation of information already in the market[.]"  (R. 366-1 at 33.)

Ultimately, Defendants have failed to demonstrate that "the decline in the value of the security is attributable in total to some other factor."  *Caremark*, 113 F.3d at 649-50.

### b.     The January 4, 2007, Alleged Disclosure

On January 4, 2007, Motorola issued a press release entitled "Motorola Announces Preliminary Estimates of Fourth Quarter 2006 Results."  (R. 366-5 at 64-65.)  The company announced that the estimated sales and GAAP earnings per share for 4Q 2006 were below earlier forecasts.  (*Id.* at 64.)  The press release explained that "[t]he shortfall in both sales and earnings occurred in the Mobile Devices segment and is attributed to an unfavorable geographical and product-tier mix of sales as compared to the company's internal forecast."  (*Id.*)

Although it explained the earnings shortfall on a variety of factors, a Lehman Brothers report the next day observed that "Motorola's new RAZR XX and RAZR MAXX handsets are just beginning to ramp this quarter." (R. 377-32 at 3.) A later Lehman report of the same day identified as one of "the main contributors" to "[w]hat went wrong for Motorola in 4Q": "[s]lower than expected ramp of 3G products in Europe: Motorola's new RAZR XX and RAZR MAXX handsets are just beginning to ramp this quarter." (*Id.* at 9-10.) Also, on January 5, 2007, a Cowen report observed that "weakness in the company's core North American handset markets led to a shortfall in both the top and bottom lines in 4Q06 at MOT." (R. 377-7 at 2.) It identified "GSM mix shift [and] weak 3G positioning" as "additional headwinds[.]" (*Id.*) On the same, RBC Capital Markets issued a report to the effect that Motorola's quarter was "a goat." (*Id.* at 7.) It observed that "European weakness may be related to a limited WCDMA offering[.]" (*Id.*)

Notwithstanding this evidence that Motorola's January 4 press release indicated that problems with the company's new 3G products were at least partially responsible for the lower-than-forecast sales and earnings, Defendants argue that they are entitled to summary judgment because "[t]he text of the January 4 press release . . . makes no reference to the new 3G phones or Motorola's 3G portfolio more generally" and because it made no reference "to the IP Transactions or more generally to Motorola's revenue from intellectual property licensing in Q4 1006 or otherwise." (R. 366-1 at 33-34.) They further submit that this Court granted summary judgment in comparable circumstances in another case for failure to satisfy loss causation "related to near-identical press releases announcing earnings misses." (*Id.* at 34 (citing *Tellabs*, 735 F. Supp. 2d at 908).)

The Court disagrees. Plaintiffs have introduced ample evidence to support a reasonable jury verdict that the January 4 press release disclosed information that Defendants' statements or omissions concerning Motorola's new 3G phones and Defendants' accounting and reporting of the Freescale and Qualcomm IP-licensing transactions were false or misleading. Defendants cannot prevail simply by pointing out that the January 4 disclosure did not speak directly to either the IP transactions or the new 3G phones. It is well settled that "a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity." *Tellabs*, 735 F. Supp. 2d at 906-07 (quoting *Motorola*, 505 F. Supp. 2d at 540). Of course, "the standard cannot be so lax that every announcement of negative news becomes a potential 'corrective disclosure.'" *Motorola*, 505 F. Supp. 2d at 546. For that reason, "an earnings warning, *standing alone*, is not a 'corrective disclosure' because the resulting share price decline does not necessarily dissipate the particular price inflation caused by the alleged fraud." *Id.* (emphasis in original). Instead, "if a plaintiff shows . . . that significant aspects of the still-concealed fraud in fact provided the catalyst for an anticipated failure to meet earnings forecasts, then the share price decline following an earnings warning might indeed dissipate the fraudulent price inflation; in such circumstances, there is no good reason why the earnings warning should not serve as a disclosure in which 'the relevant truth begins to leak out." *Id.*; *see also Tellabs*, 735 F. Supp. 2d at 908 ("[I]n order to demonstrate loss causation Plaintiffs must show a 'link' between the concealed information and the motivation to make the disclosure.").

Although the Court granted summary judgment in *Tellabs* on the ground of loss causation, that case is distinguishable. In *Tellabs*, "[p]laintiffs [had] not pointed to any evidence

that Tellabs issued the . . . announcements regarding revenue concerns due to the company's alleged channel stuffing activities." *Id.* at 907. In the present case, beyond the evidence pointed to above, Plaintiffs have introduced evidence that the IP arrangements and the problems with the new 3G phones informed Motorola's reference to "an unfavorable geographical and product-tier mix of sales." A January 5, 2007, Lehman Brothers report observed that "Motorola [had] preannounced a substantial 4Q miss" and explained that "Motorola . . . benefited from a royalty payment in 3Q06 that we do not believe repeated." (R. 377-32 at 2-3.) J.P. Morgan observed that "[w]e calculate handset op. margin cratered roughly 700 bps to 5.2% from a royalty-induced 11.9% in Q3[.]" (R. 377-6 at 15.) At a March 1, 2007, conference call, Motorola's CEO and Chairman, Zander, explained that "Q4 to me was the inability to execute and have on the shelves at Cingular and Europe the kind of 3G products that they require." (R. 377-47 at 38.) He also stated: "We were the first in 3G. We just totally messed that up with our designs and lateness and with our semiconductor partners and got behind the 3G curve." (*Id.* at 35-36.) Plaintiffs also point to Zander's comments on a conference call on January 19, 2007, to the effect that "[w]e did not have the products, frankly, in Q4." (R. 366-5 at 87.) Zander also mentioned on that call that "some of the newer products that came in shipped—started ramping in the quarter and we had some mix issues with that. . . . And you get off a little bit on this thing and it can multiply very quickly. We are now starting to ship 3G products." (*Id.* at 88.) Plaintiffs also direct the Court to an internal Motorola document noting that, "[i]n 2H 06 [OE%] has declined precipitously (when significant IP deals in Q3 are 'ignored')." (R. 377-25 at 13.) That document also provides that, "[i]n effect, BGM management has effectively 'hidden' the decrease in core profitability[.]" (*Id.*)

Viewed in the manner appropriate to summary judgment, the evidence reveals a genuine dispute whether January 4, 2007, press release satisfies a showing of loss causation.

<strong>c.      The March 21, 2007, Alleged Disclosure</strong>

The parties agree that, on March 21, 2007, Motorola issued a press release entitled "Motorola Announces Revised Guidance for First Quarter and Actions to Improve Profitability and Shareholder Value" and held a conference call with analysts and investors.  (R. 379 at 74.) The press release disclosed that the company would miss 1Q 2007 revenue and earnings expectations due to "lower than anticipated sales and operating earnings at the company's Mobile Devices business."  (*Id.*)  During the conference call, Zander explained that "about a month ago there was a change in management in Mobile Devices.  After that change it became apparent that the actions that we outlined in January were not progressing fast enough, if at all. These included . . . continued delays in some of our newer 3G products."  (R. 362-6 at 121.)  He continued: "our performance in Europe continues to be below expectations because we had a limited 3G product portfolio.  As a result and as you can see in today's press release, Q1 for Mobile Devices will be very difficult and disappointing."  (*Id.*)  He further commented that "we need to get our 3G portfolio and we are starting to ship some products.  It does take a while to ramp up."  (*Id.* at 125.)  In addition, he observed that "UMTS in Europe, especially . . . is . . . a big source of the profit pools.  It's beginning to happen here in the U.S.  And there we just need more products."  (*Id.* at 129.)

Defendants argue that the law entitles them to summary judgment because the March 21 press release and ensuing conference call did not introduce any new information concerning the allegedly false or misleading representations during the class period.  (R. 366-1 at 35.)  They rely

47

on *In re Retek Inc. Secs. Litig.*, where the U.S. District Court for the District of Minnesota observed that, "[g]enerally, a re-characterization of previously disclosed news cannot be a corrective disclosure for loss causation purposes."  621 F. Supp. 2d 690, 705 (D. Minn. 2009). They contend that it is undisputed that "the new 3G phones launched in Q4 consistent with what Mr. Garriques and Mr. Zander had represented" and that, "prior to March 21, Motorola had disclosed to the market that its 3G sales were slow and its 3G portfolio needed improvement." (R. 366-1 at 35.)  Defendants also submit that the market knew that Motorola lacked a competitive 3G portfolio, pointing to a January 19, 2007, CIBC analyst report, which stated that "we believe the 3G lineup needs to be beefed up beyond the current V3xx and MAXX phones before much headway can be made in Europe."  (R. 366-19 at 2.)

This argument fails at the summary-judgment stage, where the Court must view all evidence in the light most favorable to the nonmoving parties.  Zander's March 21, 2007, comments about Motorola's new 3G phones made the extent of the company's problems clear. The statistically significant decline in Motorola's share price after the March 21, 2007, press release and conference call is evidence of new information regarding Motorola's 3G problems and creates a genuine dispute.  Although it is true that the market already knew of shortcomings in Motorola's bringing its new 3G phones to market, there is a genuine dispute whether the March 21, 2007, disclosure revealed new information as to the extent and seriousness of those shortcomings.  Viewed in the light most favorable to Plaintiffs, the evidence does not compel a finding that the March 21 press release and conference call merely revealed previously disclosed information, such that they could not constitute a corrective disclosure sufficient to establish loss causation.  *See, e.g.*, *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1172 (C.D.

Cal. 2008) ("Where, as here, a plaintiff alleges a complex series of misrepresentations and omissions . . ., it is likely that some information came to the market, but the full extent of the decline attributable to the misrepresentations and omissions were not priced into the security until later, more significant disclosures."); *In re Bristol Myers Squibb Co. Secs. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008) ("It is also clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events."). Furthermore, in arguing that the March 21 press release and conference call did not reveal any new information about Motorola's Argon-based 3G phones, Defendants do not point to evidence to explain the statistically significant stock-price decline. *See, e.g.*, *In re Vivendi Universal, S.A. Secs. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) ("Defendants also fail to point to any unaddressed competing causes . . . . While defendants argue that Deutsche Bank transaction was announced prior to June 21, 2002, and therefore that the market had already absorbed the news, they can point to no reason why the stock declined. . . . The court concludes that there is a genuine issue of material fact[.]").

C.     **Defendants Have Submitted Sufficient Evidence Concerning the Amount of Inflation Specifically Related to the Alleged False or Misleading Statements**

Finally, Defendants move for summary judgment on the ground that Plaintiffs have failed to disaggregate the stock-price decline that the alleged fraud caused from the non-fraud causes of that harm. (R. 366-1 at 36-40.) They observe that Plaintiffs' expert, Dr. John D. Finnerty, contends that Defendants' allegedly misleading statements were purely responsible for Motorola's stock-price decline. (*Id.* at 38.) Defendants point out, however, that the alleged corrective disclosures on November 7, 2006, and March 21, 2007, conveyed negative information unrelated to Motorola's new 3G phones. (*Id.* at 39.) They argue, in particular, that

disclosures concerning the KRZR phone and "modest iDEN recovery" may have had a negative impact. (*Id.*) Defendants thus conclude that, "[a]bsent the necessary expert testimony disaggregating the tangle of factors, Plaintiffs cannot satisfy their loss causation burden." (*Id.* at 40.)

There are a number of problems with Defendants' argument. In the first place, there is a genuine dispute whether factors beyond the allegedly false or misleading representations caused Motorola's stock-price decline. Plaintiffs point out that Defendants failed to introduce evidence in support of their contention that disclosures regarding KRZR and iDEN bore some responsibility for the stock-price decline. (R. 374 at 56.) In addition, the parties agree that "[t]he negative abnormal return on November 7, 2006 was due to disclosures regarding Motorola's Mobile Devices business." (R. 379 at 69.) They also agree that "[t]he negative abnormal return on November 7, 2006 cannot be explained by industry-specific factors" or "disclosures regarding Motorola's Networks and Enterprise or Connected Home Solutions business segments or any other part of Motorola's business other than Mobile Devices." (*Id.* at 68.) Furthermore, Plaintiffs proffer the expert report of Dr. Finnerty, who in addition to undertaking an event-study analysis, articulated a reasonable basis for his opinion why the November 7, 2006, Lehman Brothers report's discussion of KRZR and iDEN would not "cause a statistically significant decline in Motorola's stock price." (R. 362-16 at 48.) Construed in the light most favorable to Plaintiffs, the evidence does not support Defendants' assertion that "Plaintiff[s] cannot prove the damages resulting from the alleged fraud." (R. 366-1 at 40.)

More fundamentally, however, Defendants' argument that the law entitles them to summary judgment on account of Plaintiffs' failure to proffer expert testimony disaggregating

fraud-caused from non-fraud-caused harm is contrary to controlling law. In *Caremark*, the Seventh Circuit did not believe that the plaintiff's claim was "rendered infirm because its alleged injuries equally could have been caused by factors which [the defendant] did disclose." *Caremark*, 113 F.3d at 649. Defendants cite *Ray* for its assertion that the plaintiffs' expert had "considered only the amount of their damages, not the cause of those damages." (*Id.* (quoting *Ray*, 482 F.3d at 995).) Yet, *Ray* did not hold that, to survive a motion for summary judgment, a defendant must "disaggregate the harm flowing from fraud-related factors from nonfraud-related factors[.]" (R. 366-1 at 36.) Indeed, *Ray* characterized "loss causation" as "the fact that the defendant's actions had *something* to do with the drop in value[.]" *Id.* at 994-95 (emphasis added). Plaintiffs in this case have introduced considerable evidence that Defendants' alleged misrepresentations were a cause of Motorola's stock-price declines. (R. 376 at 36-39, 41.)

The Court therefore declines to grant Defendants summary judgment on this basis.

## V.     Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Section 20(a) Claims

Defendants' last argument is that, "[b]ecause Plaintiffs cannot prevail on their claims under Section 10(b) against [Zander, Garriques, and Devonshire], summary judgment must also be granted as to the control person claims." (R. 366-1 at 40-41.) Because a genuine dispute precludes summary judgment in favor of Defendants on Plaintiffs' Section 10(b) claims, Defendants' argument as to Plaintiffs' Section 20(a) claims fails.

## CONCLUSION

For the preceding reasons, Defendants' motion for summary judgment is denied.

Dated: July 25, 2011

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**