UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ERIC SILVERMAN, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. 1:07-cv-04507 **(Consolidated)** |
| Plaintiff | ) ) | CLASS ACTION |
| vs. | ) ) ) | Judge St. Eve Magistrate Judge Mason |
| MOTOROLA, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AND AWARD OF
ATTORNEYS' FEES AND EXPENSES AND REIMBURSEMENT OF THE PLAINTIFFS'
EXPENSES PURSUANT TO 15 U.S.C. §78u-4(a)(4)

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ..................................................................................2

II.  FACTUAL BACKGROUND...................................................................................9

III.  THE PROPOSED SETTLEMENT MEETS THE SEVENTH CIRCUIT
STANDARD FOR APPROVAL.........................................................................10

    A.  Standard for Judicial Approval of Class Action Settlements................................10

    B.  The Strength of Plaintiffs' Case Compared to the Benefits of the
Settlement ............................................................................................................12

    C.  The Complexity, Length, and Expense of Further Litigation Supports
Approval of the Settlement..................................................................................16

    D.  The Reaction of Class Members Supports the Settlement....................................17

    E.  Class Counsel Endorse the Settlement.................................................................18

    F.  The Stage of the Proceedings and the Amount of Discovery Completed..............19

IV.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD
BE APPROVED ...............................................................................................20

V.  AWARD OF ATTORNEYS' FEES.........................................................................21

    A.  Class Counsel Is Entitled to a Percentage Fee from the Common Fund ...............22

    B.  The Court Should Award Attorneys' Fees Using the Percentage-of-the-
Fund Method........................................................................................................23

    C.  The Requested Fee Is Reasonable and Appropriate as a Percentage of the
Common Fund .....................................................................................................25

        1.  The Requested Fee is Consistent with Percentage Fees Negotiated
Ex Ante in the Private Market for Legal Services ......................................25

        2.  The Contingent Nature of the Litigation Favors an Award of
27.5% of the Settlement Amount................................................................26

        3.  The $200 Million Settlement Here Was Not Likely at the Outset of
the Litigation..............................................................................................29

        4.  The Requested Fee Is Consistent with Seventh Circuit Authority
and Empirical Data Regarding Awards in Cases This Size ........................32

Page

5. Class Counsel Provided the Class with Quality Legal Services that Produced Excellent Benefits ......................................................................36

6. Class Representatives Macomb County and St. Clair Independently Assessed and Approved the 27.5% Fee Request ........................................37

7. The Stakes of the Litigation Favor a 27.5% Fee Award............................37

8. The Reaction of Class Members Supports the Reasonableness of the Requested Award ...................................................................................39

VI. CLASS COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED .................39

VII. THE CLASS REPRESENTATIVES ARE ENTITLED TO REIMBURSEMENT OF REASONABLE COSTS AND EXPENSES ..............................................................41

VIII. CONCLUSION..........................................................................................................42

688392_3

## TABLE OF AUTHORITIES

**Page**

### CASES

*Anderson v. Torrington Co.*,
  755 F. Supp. 834 (N.D. Ind. 1991) ...............................................................11

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) .....................................................................28

*Arenson v. Bd. of Trade*,
  372 F. Supp. 1349 (N.D. Ill. 1974) ..............................................................37

*Armstrong v. Bd. of Sch. Dirs.*,
  616 F.2d 305 (7th Cir. 1980) ...................................................................10, 11

*Backman v. Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990)...........................................................................28

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985).......................................................................................23

*Beecher v. Able*,
  575 F.2d 1010 (2d Cir. 1978)........................................................................20

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ........................................................................26

*Boeing v. Van Gemert*,
  444 U.S. 472 (1980).......................................................................................22

*Class Plaintiffs v. Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ......................................................................20

*Cooper v. IBM Pers. Pension Plan*,
  No. 99-829-GPM, 2005 U.S. Dist. LEXIS 17071
  (S.D. Ill. Aug. 16, 2005) ........................................................................24, 29

*EEOC v. Hiram Walker & Sons, Inc.*,
  768 F.2d 884 (7th Cir. 1985) ........................................................................10

*First Interstate Bank of Nev., N.A. v.*
*Nat'l Republic Bank of Chicago, et al.*,
  No. 80 C 6410, slip op. (N.D. Ill. Feb. 12, 1988) ......................................32

*Florida v. Dunne*,
  915 F.2d 542 (9th Cir. 1990) ........................................................................32

- iii -

**Page**

*Florin v. Nationsbank, N.A.,*
    34 F.3d 560 (7th Cir. 1994) ................................................................23, 24, 29

*Gautreaux v. Pierce,*
    690 F.2d 616 (7th Cir. 1982) ...................................................................10

*Geffon v. Micrion Corp.,*
    249 F.3d 29 (1st Cir. 2001).......................................................................28

*Great Neck Capital Appreciation Inv. P'ship, L.P. v.*
*PricewaterhouseCoopers, L.L.P.,*
    212 F.R.D. 400 (E.D. Wis. 2002) ..................................................... *passim*

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc., et al.,*
    No. 04 C 1107, slip op. (N.D. Ill. July 24, 2006)....................................32

*Greebel v. FTP Software, Inc.,*
    194 F.3d 185 (1st Cir. 1999).....................................................................28

*In re Am. Bank Note Holographics, Inc., Sec. Litig.,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001).....................................................14

*In re Apple Computer Sec. Litig.,*
    No. C-84-20148(A)-JW, 1991 WL 238298
    (N.D. Cal. Sept. 6, 1991) .........................................................................15

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,*
    789 F. Supp. 2d 935 (N.D. Ill. 2011) ................................................ *passim*

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.,*
    792 F. Supp. 2d 1028 (N.D. Ill. 2011) .............................................. *passim*

*In re BankAtlantic Bancorp Sec. Litig.,*
    No. 07-61542-CIV-UNGARO, 2011 U.S. Dist. LEXIS 48057
    (S.D. Fla. April 25, 2011) .................................................................15, 28

*In re Caremark Int'l Inc. Sec. Litig.,*
    No. 94 C 4751, slip op. (N.D. Ill. Dec. 15, 1997)...................................32

*In re Chicken Antitrust Litig. Am. Poultry,*
    669 F.2d 228 (5th Cir. 1982) ...................................................................20

*In re Comverse Tech., Inc. Sec. Litig.,*
    No. 06-CV-1825(NGG)(RER), 2010 WL 2653354
    (E.D.N.Y. June 24, 2010) ........................................................................33

688392_3

**Page**

*In re Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ...........................................................24, 42

*In re Deutsche Telekom AG Sec. Litig.*,
   No. 00-CV-9475(NRB), 2005 U.S. Dist. LEXIS 45798
   (S.D.N.Y. June 14, 2005) .......................................................................34

*In re Digi Int'l, Inc. Sec. Litig.*,
   No. 00-3162, 2001 U.S. App. LEXIS 15095
   (8th Cir. July 5, 2001) ...........................................................................28

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
   No. 97 C 2715, slip op. (N.D. Ill. Apr. 21, 2000) ...................................32

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
   142 F.R.D. 588 (S.D.N.Y. 1992) .......................................................20, 29

*In re Ikon Office Solutions, Inc., Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000).................................................16, 20, 34

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C-02-1486 CW(EDL), 2007 WL 4788556
   (N.D. Cal. Nov. 27, 2007).................................................................15, 28

*In re Luxottica Group S.p.A Secs. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) .............................................................38

*In re Mexico Money Transfer Litig.*,
   164 F. Supp. 2d 1002 (N.D. Ill. 2000),
   *aff'd*, 267 F.3d 743 (7th Cir. 2001) ....................................................17, 18

*In re Michael Milken & Assocs. Sec. Litig.*,
   150 F.R.D. 46 (S.D.N.Y. 1993) ...............................................................38

*In re Nanophase Techs. Corp. Sec. Litig.*,
   No. 98 C 3450, slip op. (N.D. Ill. Mar. 27, 2001)...................................32

*In re Nat'l Student Mktg. Litig.*,
   68 F.R.D. 151 (D.D.C. 1974).................................................................16

*In re Nuveen Fund Litig.*,
   No. 94 C 360, slip op. (N.D. Ill. June 3, 1997).......................................32

688392_3

**Page**

*In re Old CCA Sec. Litig.*,
    No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942
    (M.D. Tenn. Feb. 9, 2001) ........................................................................34

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ....................................................................28

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    No. 1222 (CLB), slip op. (S.D.N.Y. June 12, 2003).................................34

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998).....................................................................17

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) .......................................................34

*In re Silicon Graphics Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ....................................................................28

*In re Soybean Futures Litig.*,
    No. 89 C 7009, slip op. (N.D. Ill. Nov. 27, 1996) ...................................32

*In re Spyglass, Inc. Sec. Litig.*,
    No. 99 C. 0512, slip op. (N.D. Ill. May 23, 2000)...................................32

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ...............................................24, 26, 36, 39

*In re Synthroid Mktg. Litig.*,
    325 F.3d 974 (7th Cir. 2003) ....................................................................24

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003),
    *aff'd, Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)........................................................................29

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985),
    *aff'd*, 798 F.2d 35 (2d Cir. 1986) .......................................................16, 38

*In re Waste Mgmt., Inc. Sec. Litig.*,
    No. 97 C 7709, 1999 U.S. Dist. LEXIS 16566
    (N.D. Ill. Oct. 18, 1999)...........................................................................35

688392_3

**Page**

*In re Worldcom, Inc. Sec. Litig.,*
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)......................................................................23

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1996) ............................................................10, 12, 16, 18

*J.I. Case Co. v. Borak,*
    377 U.S. 426 (1964)..............................................................................................23

*Kirchoff v. Flynn,*
    786 F.2d 320 (7th Cir. 1986) ...............................................................................23

*Levitin v. PaineWebber, Inc.,*
    159 F.3d 698 (2d Cir. 1998)..................................................................................28

*Lewis v. Newman,*
    59 F.R.D. 525 (S.D.N.Y. 1973) ............................................................................12

*Liebhard, et al. v. Square D Co., et al.,*
    No. 91 C 1103, slip op. (N.D. Ill. June 15, 1993)................................................32

*Longman v. Food Lion, Inc.,*
    197 F.3d 675 (4th Cir. 1999) ...............................................................................28

*Mangone v. First USA Bank,*
    206 F.R.D. 222 (S.D. Ill. 2001) ...........................................................................17

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.,*
    834 F.2d 677 (7th Cir. 1987) ...............................................................................10

*Matrixx Initiatives, Inc. v. Siracusano,*
    ___ U.S. ___, 131 S. Ct. 1309 (2011)....................................................................12

*McKittrick v. Gardner,*
    378 F.2d 872 (4th Cir. 1967) ...............................................................................26

*Metro. Hous. Dev. Corp. v. Village of Arlington Heights,*
    616 F.2d 1006 (7th Cir. 1980) .............................................................................10

*Pavlik vs. FDIC,*
    No. 10 C 816, 2011 U.S. Dist. LEXIS 126016
    (N.D. Ill. Nov. 1, 2011)........................................................................................23

*Phillips v. LCI Int'l, Inc.,*
    190 F.3d 609 (4th Cir. 1999) ...............................................................................28

**Page**

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP,*
    No. 97 C 7694, 2001 WL 1568856
    (N.D. Ill. Dec. 10, 2001) ............................................................................12, 15

*Robbins v. Koger Props.,*
    116 F.3d 1441 (11th Cir. 1997) ...........................................................15, 28, 38

*Silver v. H&R Block,*
    105 F.3d 394 (8th Cir. 1997) ...............................................................................28

*Silverman v. Motorola, Inc.,*
    798 F. Supp. 2d 954 (N.D. Ill. 2011) ................................................................13

*Sutton v. Bernard,*
    504 F.3d 688 (7th Cir. 2007) ...............................................................................28

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) ...............................................................................10

*Taubenfeld v. Aon Corp.,*
    415 F.3d 597 (7th Cir. 2005) ...........................................................32, 34, 36

*Trustees v. Greenough,*
    105 U.S. 527 (1882) ...............................................................................................22

*Ward v. Succession of Freeman,*
    854 F.2d 780 (5th Cir. 1988) ...............................................................................28

*Weiner, et al. v. The Quaker Oats Co., et al.,*
    No. 98 C 3123 (RP), slip op. (N.D. Ill. Sept. 14, 2001).................................32

*White v. NFL,*
    822 F. Supp. 1389 (D. Minn. 1993).....................................................................20

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b).......................................................................................................6, 12, 13
    §78t(a)...............................................................................................................6
    §78u-4(a)(4) ............................................................................................. *passim*
    §78u-4(a)(6) ........................................................................................................23

688392_3

**Page**

Federal Rules of Civil Procedure
    Rule 12(b)(6) ............................................................................................26
    Rule 23 ....................................................................................................20
    Rule 23(e) ..................................................................................................1
    Rule 56 ....................................................................................................26

## SECONDARY AUTHORITIES

2 Herbert B. Newberg, Alba Conte, *Newberg on Class Actions* (3d. ed. 1992)
    §11.48 ......................................................................................................17

Brian T. Fitzpatrick, *An Empirical Study of Class Action
Settlements and Their Fee Awards*,
    7 Journal of Empirical Legal Studies, 811 (2010) ....................................33

Dr. Jordan Milev, Robert Patton, and Svetlana Starykh, *Recent
Trends in Securities Class Action Litigation:
2011 Mid-Year Review* (NERA July 2011) ..........................................33, 36

Dr. Jorden Milev, Robert Patton, Svetlana Starykh, Dr. John Montgomery,
*Recent Trends in Securities Class Action Litigation: 2011 Year-End Review,*
(NERA 2011) .............................................................................................15

Ronald I. Miller, Ph.D., Todd Foster, Elaine Buckberg, Ph.D., *Recent
Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements,
is Stabilization Ahead?* (NERA April 2006) ............................................30

Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and
Frederick C. Dunbar, *Recent Trends IV: What Explains
Filings and Settlements in Shareholder Class Actions?*
(NERA Nov. 1996) ..................................................................................32, 33

Susan Chandler, *Sears Restates Its 1st-Half Results, SEC
Discovers Accounting Error; Profit Unchanged*
(Chicago Tribune, Oct. 3, 2002) ...............................................................35

Theodore Eisenburg and Geoffrey P. Miller, *Attorney Fees in
Class Action Settlements: An Empirical Study*,
1 Journal of Empircal Legal Studies, 27 (2004) ......................................40

## LEGISLATIVE HISTORY

Private Securities Litigation Reform Act of 1995, H.R. Conf. Rep.
    No. 104-369 (1995), 1995 WL 709276 .....................................................8

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, class representatives Macomb County Employees' Retirement System ("Macomb County") and St. Clair Shores Police & Fire Retirement System ("St. Clair") (collectively, "Plaintiffs"), respectfully submit this Memorandum of Law in Support of their Motion for Final Approval of Class Action Settlement (on the terms set forth in the Stipulation of Settlement dated as of January 31, 2012 ("Stipulation")[1] filed with the Court on February 2, 2012 (*see* Dkt. No. 445)), the Plan of Allocation, and an Award of Attorneys' Fees and Expenses and Reimbursement of the Plaintiffs' Expenses Pursuant to 15 U.S.C. §78u-4(a)(4).

Through extraordinary legal effort and persistent development of the factual record, Plaintiffs have obtained a proposed settlement of $200 million (the "Settlement Amount") for the benefit of the Class. The settlement achieved in this action is outstanding – the third largest securities class action settlement in the Seventh Circuit – representing approximately 17% of the Class's maximum alleged damages.[2] The settlement should be finally approved by the Court as fair, reasonable, and adequate. Likewise, the Plan of Allocation, which will govern how the claims of Class Members are calculated and the Net Settlement Fund distributed, should be approved. Finally, in light of the appropriate "market rate" for this case, the risks undertaken, the vigorous prosecution of the Litigation and the exceptional result obtained, and with the support of the Plaintiffs, their counsel ("Class Counsel") respectfully move the Court for an award of attorneys' fees in the amount of 27.5% of the Settlement Amount, their litigation expenses of $4,814,298.54 and Macomb County's and St. Clair's requests, $6,450.00 and $4,350.00, respectively, for reimbursement of expenses incurred by them in representing the Class.

---

[1] All capitalized terms not defined herein have the same meaning set forth in the Stipulation.

[2] Only *In re Waste Management, Inc. Sec. Litig.*, No. 97 C 7709 (N.D. Ill.) at $220 million, and *In re Sears Roebuck & Co. Sec. Litig.*, No. 02 C 7527 (N.D. Ill.) at $215 million, surpass the result obtained here.

688392_3

## I.    PRELIMINARY STATEMENT

This settlement provides the Class with a cash benefit of $200 million, which will result in substantial recoveries by Class Members.[3] Plaintiffs and their counsel believe that this settlement is an outstanding result, particularly when viewed in light of the considerable risks of the continued litigation of this case.  As discussed in greater detail in the accompanying Declaration of Tor Gronborg in Support of Class Counsel's Motion for Final Approval of Class Action Settlement, Plan of Allocation, and Award of Attorneys' Fees and Expenses and Reimbursement of the Plaintiffs' Expenses Pursuant to 15 U.S.C. §78u-4(a)(4) ("Gronborg Declaration"), Plaintiffs faced substantial risks in the continued prosecution of this action through trial but have, nonetheless, obtained a superior result for the Class.

As further detailed in the Gronborg Declaration, this settlement is the culmination of four-and-a-half years of hard-fought litigation and protracted settlement negotiations.  The settlement was achieved only after Class Counsel, *inter alia*: (1) conducted detailed investigative interviews of witnesses, including former employees of Motorola, Inc. ("Motorola" or the "Company"); (2) successfully opposed Defendants' motion to dismiss; (3) successfully moved for class certification (which included extensive expert reports and discovery); (4) conducted extensive merits discovery, including procuring, reviewing and analyzing approximately 3.8 million pages of documents produced by Defendants and third parties; (5) deposed or defended the depositions of 50 fact witnesses and 7 experts; (6) responded to discovery propounded by Defendants, including document requests, interrogatories, and requests for admission; (7) successfully litigated numerous complex discovery motions; (8) fully resolved Defendants' motions for summary judgment, which required

---

[3]     The actual amount any Class Member will receive will depend upon a number of factors, including when a Class Member bought and sold Motorola securities, the number of securities bought and sold, and the claim rate.

extensive briefing and the submission of hundreds of exhibits to the Court; (9) completed expert discovery, which included the preparation and review of expert reports, involving 7 testifying experts in the areas of accounting, the mobile handset industry, mobile technology, materiality, loss causation, and damages; (10) fully briefed 7 *Daubert* motions; (11) commenced extensive trial preparation, completing exhibit and witness lists, videotaped deposition designations, preparing motions *in limine*, and jury instructions; (12) participated in multiple mediation sessions with Judge Daniel Weinstein (Ret.), a nationally recognized and highly respected mediator; and (13) negotiated the final terms of the settlement contained in the Stipulation. Indeed, Class Counsel and their paraprofessionals have expended over 38,000 hours in the prosecution and resolution of the Litigation.

Obtaining this multi-million dollar settlement for the Class was the result of the creative and unwavering efforts of Plaintiffs and their counsel. The nature of the alleged fraud was not nearly as apparent as some of the more notorious and well publicized frauds in recent years. Unlike many of these higher profile cases, this case did not involve any restatement of financial results or admissions of impropriety by Motorola and was not accompanied by any government investigation. To this day, Defendants deny any of the wrongdoing alleged in this case. In sum, it was only through Plaintiffs' and their counsel's tenacity and diligence that they were able to uncover and fully comprehend the magnitude and complexity of the alleged fraud, which led to the effective development of the theories of this case.

Following the Court's ruling on Defendants' motion to dismiss, Plaintiffs' surviving allegations concerned Defendants allegedly false and misleading statements and omissions about Motorola's Third Generation ("3G") handset business – namely, the Company's inability to timely introduce new 3G handsets to the market during the 4Q06 holiday selling season, which materially impacted the Company's financial prospects and results. During discovery, Plaintiffs obtained an

- 3 -

enormous number of relevant documents from Defendants and third parties and Class Counsel conducted an extensive and discriminating page-by-page review and analysis of the documents produced. As a result of their assiduous analysis, Class Counsel uncovered facts indicating that the magnitude of the alleged fraud was much greater than Plaintiffs' pre-discovery investigation could have revealed. Although never disclosed to investors, at the end of 3Q06, Defendants entered into two last-minute Intellectual Property ("IP") deals with its chipset suppliers Freescale Semiconductor, Inc. ("Freescale") and Qualcomm, Inc. ("Qualcomm"). The IP deals generated $398.1 million in earnings, or more than 40% of the Company's earnings for 3Q06, and allowed Motorola to meet market expectations for the quarter. Plaintiffs were able to link the IP deals to the alleged misconduct because the transactions served to conceal material operating earnings misses suffered by Motorola's ailing 3G handset business.

Once Class Counsel discovered the IP deals, an in-depth forensic accounting analysis was conducted to determine the nature, extent and financial effect of these arrangements, and further develop the theory of the case. Motorola's disclosures prior to, during and after the Class Period were scrutinized and the Company's contracts with Freescale and Qualcomm, as well as all three entities' financial statements, were examined in meticulous detail with all accounting guidelines evaluated and all critical financial metrics calculated and assessed. Through its extensive investigation, discovery efforts and analysis, Class Counsel concluded that Defendants had not sufficiently disclosed the nature of the 3Q06 IP arrangements and improperly booked the revenue from the deals in 3Q06 in violation of Generally Accepted Accounting Principles ("GAAP"), and that this evidenced Defendants' intent to conceal Motorola's 3G business problems and souring financial condition. Pursuing further discovery on the matter, Class Counsel obtained testimony from securities analysts, who covered Motorola, that the IP deals would have been important to their evaluation of the Company, helping to demonstrate materiality.

- 4 -

The details of Defendants' IP arrangements with Freescale and Qualcomm and their relationship to the alleged fraud were far from apparent. The crucial aspects of the deals that permitted Plaintiffs to unravel Defendants' fraud were buried in lengthy, detailed contracts written in highly technical and arcane language, and involved intricate accounting issues related to unreported financial metrics. As such, the magnitude of Defendants' alleged fraud regarding the 3G handset business and associate operating earnings drag associated with Argon chip development problems could have easily gone undiscovered had Class Counsel been even slightly less tenacious in their pursuit of Plaintiffs' claims. When Plaintiffs amended their complaint to include these allegations, it considerably strengthened the case and, Class Counsel believe, contributed substantially to the $200 million settlement for the Class.

Class Counsel exhibited the same tenacity in investigating Motorola's 3G business problems and delivery delays as they did in uncovering the related IP disclosure and accounting improprieties. Plaintiffs served more than one hundred document requests or subpoenas on Defendants and third parties deposed or defended the depositions of 50 party and third party fact witnesses in an effort to obtain information relevant to Plaintiffs' claims. The disputes that arose out of Plaintiffs' discovery efforts were many. In addition to the thousands of hours counsel spent negotiating Plaintiffs' discovery requests, no fewer than 15 discovery motions were raised with the Court, many of which were resolved in Plaintiffs' favor. As a result of Class Counsel's efforts, Plaintiffs obtained critical documents and witness testimony establishing that Defendants' alleged misrepresentations and omissions concerning Motorola's 3G handset business were material and made with the requisite scienter.

The settlement was negotiated by counsel for the parties with the assistance of Judge Daniel Weinstein (Ret.), a highly-qualified and respected mediator. Counsel in the Litigation have vast experience and expertise in litigating and resolving complex class actions and possessed a firm

- 5 -

understanding of the strengths and weaknesses of the parties' respective claims and defenses. The parties participated in several formal, lengthy and contentious settlement mediation sessions with Judge Weinstein during the course of the Litigation. Plaintiffs prepared comprehensive mediation presentations and expended substantial efforts in connection with these mediations, which included Judge Weinstein hiring an independent economics expert to assist him in evaluating the parties' claims and defenses. As the scheduled trial date approached, and pursuant to this Court's October 24, 2011 Order, the parties engaged in another mediation session on December 14, 2011. Subsequent to this mediation, Judge Weinstein issued a mediator's proposal to settle the Litigation for $200 million, which the parties accepted on December 19, 2011.

In reaching the determination to settle the Litigation for $200 million, Plaintiffs and their counsel considered the relative strength of the parties' claims and defenses and the risks inherent in proceeding to trial. Even though Plaintiffs and their counsel believe that the claims asserted have substantial merit, the Litigation involved complex legal and factual issues and difficult issues of proof regarding the essential elements of falsity, scienter, causation and damages, as well as Defendants' defenses thereto. The risks inherent in complex actions in general, and Plaintiffs' case in particular, materialized throughout the course of the litigation. The documents and testimony obtained through Class Counsel's exhaustive discovery efforts did not always support Plaintiffs' theories. For example, after a comprehensive review of the evidence, Plaintiffs voluntarily stipulated to the dismissal of Individual Defendant Padmasree Warrior. Additionally, despite Plaintiffs' belief that the evidence produced in the Litigation would establish liability against the remaining Defendants, at summary judgment, the Court dismissed Individual Defendant Richard N. Nottenburg with respect to Plaintiffs' §10(b) claim and Individual Defendants Gregory Q. Brown and Daniel M. Moloney with respect to Plaintiffs' §20(a) claim.

688392_3

Accordingly, in reaching the settlement, Plaintiffs compared the witness testimony and documents they believed to be supportive of their allegations with the evidence that Defendants believed undercut those allegations and evaluated Defendants' characterizations and interpretations of the evidence in this case, including the opinions offered by numerous experts in the fields of economics, accounting and telecommunications. Although, in Plaintiffs' view, the evidence supported their claims, there could be no way of predicting which interpretations, inferences, or testimony a jury would accept. Additionally, Defendants' arguments in motions and in settlement discussions highlighted the fact that there were numerous legal issues that were unsettled and which could be adversely decided against Plaintiffs and the Class at both the trial and appellate level. Plaintiffs were thus mindful of the fact that if they proceeded to trial, the range of possible outcomes encompassed those unfavorable to the Class, including a jury finding that Defendants were not liable or that the Class suffered no or minimal damages as a result of the claimed wrongdoing. All of these issues, and the risks attendant to them, were considered by Plaintiffs in deciding to settle this action on the agreed terms.

The $200 million settlement is an exceptional recovery. It is one of the larger settlements of a securities class action in the post-Private Securities Litigation Reform Act of 1995 ("PSLRA") era and the third largest ever in the Seventh Circuit. Class Counsel, who are very experienced in prosecuting securities class actions, have taken into account the substantial monetary recovery when weighed against the risks presented by continued litigation, and have concluded that the settlement is a highly favorable result for the Class. Moreover, Plaintiffs, who were actively involved in the Litigation and participated in the settlement negotiations, also believe that the settlement is in the best interest of the Class. *See* the accompanying Declaration of Peter M. Provenzano in Support of Motion for Final Approval of Class Action Settlement, Award of Attorneys' Fees and Expenses and Reimbursement of Reasonable Expenses Incurred by Macomb County Employees' Retirement

System Pursuant to 15 U.S.C. §78u-4(a)(4) ("Provenzano Decl."), ¶¶2-3; Declaration of James Haddad in Support of Motion for Final Approval of Class Action Settlement, Award of Attorneys' Fees and Expenses and Reimbursement to the Class Representatives Pursuant to 15 U.S.C. §78u-4(a)(4) ("Haddad Decl."), ¶¶3-5. Accordingly, Plaintiffs respectfully request that the Court approve the settlement.

As compensation for their efforts, Class Counsel request the Court to award a percentage fee of 27.5% of the $200 million Settlement Amount, plus the $4,814,298.54 in expenses reasonably incurred in the prosecution of the Litigation.[4] Significantly, both Macomb County and St. Clair – institutional investors with significant financial stakes in the outcome of the Litigation – independently assessed the issue of attorneys' fees and approved of Class Counsel seeking a 27.5% fee award.[5] *See* Provenzano Decl., ¶3; Haddad Decl., ¶5. Both Plaintiffs have concluded that the percentage award requested by Class Counsel falls within the range of reasonableness and that a 27.5% fee appropriately reflects the risks undertaken, work accomplished, and results obtained by Class Counsel. *See* Provenzano Decl., ¶4; Haddad Decl., ¶5.

Plaintiffs were actively involved in all aspects of the Litigation, including participating in, or keeping themselves informed of, difficult and protracted settlement discussions. Because of this

---

[4]   The amount awarded will compensate Lead Counsel and may also be used to compensate counsel who have advised or worked with one or more of the Plaintiffs for the benefit of the Class or other counsel who contributed to the initiation, prosecution or resolution of the Litigation. The amount requested includes all compensation for attorneys involved in the Litigation.

[5]   Congress enacted the PSLRA in large part to encourage sophisticated institutional investors to assume control of securities class actions and "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." *See* Private Securities Litigation Reform Act of 1995, H.R. Conf. Rep. No. 104-369, 731 (1995), 1995 WL 709276, at *32. Congress believed that institutions would be in the best position to monitor the ongoing prosecution of litigation and to assess the reasonableness of counsel's fee request.

688392_3

involvement, Plaintiffs were familiar with the strengths and weaknesses of this case, including the risks of litigation and other impediments to a recovery. Accordingly, Plaintiffs are in a unique position to evaluate the work of counsel and the effort required to obtain this multi-million dollar result and to determine, as they have, that the fee request is fair and reasonable and should be awarded. In any event, as sophisticated and experienced entities, Plaintiffs recognize that the decision as to the appropriate level of attorneys' fees is ultimately a question committed to the sound discretion of the Court. By independently assessing and approving a 27.5% fee request, however, Plaintiffs recognize that Class Counsel should be fairly compensated for their extraordinary efforts in obtaining this result for the Class.

For the reasons discussed herein and in the Gronborg Declaration, it is respectfully submitted that the settlement is fair, reasonable and adequate to the Class, and should be approved by the Court. Additionally, the Plan of Allocation, which was developed in consultation with Plaintiffs' damage expert and tracks Plaintiffs' damage theory, should also be approved. Class Counsel also respectfully submit that the requested attorneys' fees are fair and reasonable under the applicable legal standards and should be awarded by the Court, along with Class Counsel's expenses which were reasonably and necessarily incurred in the prosecution of the Litigation. Finally, the Plaintiffs should be reimbursed for their reasonable expenses pursuant to the PSLRA, which encourages institutional investors to participate in securities class actions.

## II.    FACTUAL BACKGROUND

The Court is respectfully referred to the Gronborg Declaration for a detailed description of the history of the Litigation, the claims asserted, the investigation and discovery undertaken, the motion practice engaged in, the preparation for trial, the negotiation and substance of the settlement and the substantial risks and uncertainties presented by and overcome in this Litigation, all of which

- 9 -

demonstrate that the settlement, the Plan of Allocation, and the application for attorneys' fees and expenses should be approved.

## III. THE PROPOSED SETTLEMENT MEETS THE SEVENTH CIRCUIT STANDARD FOR APPROVAL

### A. Standard for Judicial Approval of Class Action Settlements

Settlement of class action litigation is favored by federal courts. *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) ("*AT&T Mobility I*") (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985); *Metro. Hous. Dev. Corp. v. Village of Arlington Heights*, 616 F.2d 1006, 1013 (7th Cir. 1980). In deciding whether a class action settlement should be approved, courts must determine whether the proposed settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1196; *Hiram Walker*, 768 F.2d at 889; *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982). Courts in this Circuit consider the following factors in evaluating the fairness of a class action settlement: (1) the strength of plaintiffs' case compared to the amount of settlement; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the opinion of counsel; and (5) the stage of the proceedings and discovery completed. *See AT&T Mobility I*, 789 F. Supp. 2d at 958 (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)).

The proceedings to approve a settlement, however, should not be transformed into an abbreviated trial on the merits. *See, e.g.*, *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 314-15 (7th Cir. 1980). Therefore, the judgment of the litigants and their counsel as to the merits of the settlement is given great deference, and the court is not required to substitute the parties' judgment with its own. As the Seventh Circuit has written:

688392_3

> Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel.

*Armstrong*, 616 F.2d at 315.

Finally, "[a] strong presumption of fairness attaches to a settlement agreement when it is the result of this type of [arm's-length] negotiation." *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (settlement reached after two-day mediation) (citing *Anderson v. Torrington Co.*, 755 F. Supp. 834, 838 (N.D. Ind. 1991)). Here, the settlement was negotiated at arm's-length during several mediation sessions between Class Counsel and counsel for Defendants and their insurers, with the substantial assistance of Judge Weinstein. Moreover, the attorneys who conducted the negotiations for the Class, as well as those for Defendants, are among the most highly regarded in the country, have many years of experience in conducting complex securities litigation and were thoroughly conversant with the strengths and weaknesses of the case. Counsel's decision to settle on the terms presented, therefore, should be given deference. *Armstrong*, 616 F.2d at 315.

As explained below and in the Gronborg Declaration, when examined under the applicable criteria, the settlement is an outstanding result for the Class and should be approved by the Court. Class Counsel believe that there are serious questions as to whether a more favorable result could or would be attained after trial and the inevitable post-trial motions and appeals. The settlement achieves a substantial recovery for Class Members and is unquestionably superior to the distinct possibility that, were this Litigation to proceed to trial, there might be no recovery at all. Analysis of the relevant factors demonstrates that the proposed settlement merits this Court's approval.

688392_3

B. **The Strength of Plaintiffs' Case Compared to the Benefits of the Settlement**

The "strength of plaintiff's case on the merits balanced against the amount offered in the settlement" supports final approval. *AT&T Mobility I*, 789 F. Supp. 2d at 964; *see also Isby*, 75 F.3d at 1196. When analyzing this factor, courts consider whether the proposed amount is reasonable in light of the risks of proceeding with the litigation. *See AT&T Mobility I*, 789 F. Supp. 2d at 959, 961, 963-64. Here, the $200 million recovery obtained for the benefit of the Class is, by any measure, well within the range of reasonableness and is especially so in light of the risks of continued litigation. It constitutes approximately 17% of the maximum damages that Plaintiffs believe were possible at trial, and is an extraordinary recovery in light of Defendants' consistent position that Plaintiffs and the Class suffered no damages at all.

In the context of approving class action settlements, courts have long recognized "that stockholder litigation is notably difficult and notoriously uncertain." *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973); *see also Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97 C 7694, 2001 WL 1568856, at *2 (N.D. Ill. Dec. 10, 2001) ("[s]ecurities fraud litigation is long, complex and uncertain"). In order to prevail on its §10(b) claim, Plaintiffs would have the burden of demonstrating to the satisfaction of the jury and the Court that: (1) the Defendants made false statements or omissions; (2) of material fact; (3) with scienter; (4) in connection with the purchase of Motorola securities; (5) upon which the Class justifiably relied; and (6) the false statements proximately caused the Class's damages, *i.e.*, loss causation. *See Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 131 S. Ct. 1309, 1317-18 (2011). Although Plaintiffs believe their case to be compelling and that the Class would ultimately prevail in establishing both liability and damages, experience demonstrates that the outcome of a trial is extremely uncertain.

688392_3

Defendants have adamantly denied any culpability throughout the Litigation and mounted aggressive defenses that could have potentially barred any Class recovery. Although Plaintiffs firmly believe that the evidence they intended to offer at trial fully supported their claims, there could be no way of predicting which interpretations, inferences or testimony a jury would accept. If the jury sided with Defendants on just one of its defenses, the Class would recover nothing.

For example, as set forth in their motions for summary judgment on Plaintiffs' §10(b) claim, Defendants demonstrated that they were prepared to argue aggressively at trial that the alleged misrepresentations were not false, misleading or material, and that they were not made with the requisite intent. In ruling on summary judgment, while finding that "construed in the light most favorable to Plaintiffs" there is a genuine dispute as to falsity, the Court noted that "the evidence marshaled by Defendants may well enable it to launch an effective defense" and "vindicate them" at trial. *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 962-63, 965 (N.D. Ill. 2011). Although Plaintiffs believe they had sufficient documentary evidence to demonstrate that the alleged misrepresentations were false, Defendants were ready to establish that such documents were never seen by the Individual Defendants and that the reports they did see established the truth of their statements, undermining falsity and scienter. Defendants also intended to argue that the alleged misrepresentations were not material because the 3G handsets at issue constituted just a fraction of Motorola's planned and actual handset sales in 4Q06 and, thus, had an immaterial impact on the Company's financial results for that quarter. According to this Court's summary judgment ruling, Plaintiffs' ability to overcome this defense turned on the testimony of Plaintiffs' accounting expert. *Id.* at 966. Prior to reaching the settlement, however, Defendants had moved to exclude his testimony and, in the event the Court found in favor of Defendants, or the jury discounted the expert's testimony, Plaintiffs would be hard-pressed to establish materiality. These issues of proof as to liability posed a substantial risk to recovery at trial.

Even if Plaintiffs were successful in proving liability, a major risk going forward related to Plaintiffs' ability to prove loss causation and damages. Defendants' expert would testify that there were no "corrective" disclosures that were related to any of the misstatements or omissions alleged by the Plaintiffs that caused Motorola's stock price to drop during the Class Period. Indeed, Defendants were prepared to mount an aggressive truth-on-the-market defense, demonstrating that the truth was known to investors and could not have caused their losses. Even if Plaintiffs were able to demonstrate loss causation, Defendants intended to introduce evidence that significant amounts of the Company's stock price declines were caused by factors other than the alleged fraud, which could have eviscerated Plaintiffs' damages estimates.

The determination of loss causation and damages, in particular, is a complicated and uncertain process which necessarily requires expert testimony. Here, each side retained nationally-recognized experts to testify regarding causation and damages. However, shortly before the parties reached the proposed settlement, Plaintiffs were faced with a *Daubert* motion by Defendants seeking to preclude their damages expert's testimony and, thus, risked a decision that Plaintiffs' expert's testimony might not be admissible at trial. Assuming Plaintiffs' expert survived the *Daubert* challenge, at trial the loss causation and damage assessments of Plaintiffs' and Defendants' experts would vary substantially, and, in the end, this crucial element would be reduced to a "battle of experts." One cannot predict which testimony or methodology might be accepted by the jury or which might be rejected as speculative or unreliable. The reaction of a jury to such expert testimony is highly unpredictable and "[i]n such a battle, [Lead] Counsel recognize the possibility that a jury could be swayed by experts for Defendants," and find that there were no damages or only a fraction of the amount of damages Plaintiffs' contended. *See In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001). If a jury agreed with Defendants, Plaintiffs' damages would be significantly reduced or their claims would fail altogether as a matter of law.

- 14 -

688392_3

While Class Counsel believe that they would have succeeded in establishing Plaintiffs' claims, they are mindful of the great risk of proceeding to trial. Indeed, many securities fraud cases "have been lost at trial, on post-trial motion or appeal." *Retsky*, 2001 WL 1568856, at *2; *see also In re JDS Uniphase Corp. Sec. Litig.*, No. C-02-1486 CW(EDL), 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (after a lengthy trial, the jury returned a verdict against plaintiffs and the action was dismissed). Furthermore, even a favorable jury verdict does not eliminate the risk to a class. *See, e.g., In re BankAtlantic Bancorp Sec. Litig.*, No. 07-61542-CIV-UNGARO, 2011 U.S. Dist. LEXIS 48057 (S.D. Fla. April 25, 2011) (granting defendants' motion for judgment as a matter of law after jury rendered verdict in favor of plaintiffs); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (court entered judgment, notwithstanding the verdict, for the individual defendants and ordered a new trial with respect to the corporation); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict).

The settlement eliminates all of these risks. Moreover, the $200 million Settlement Amount represents approximately 17% of the aggregate damages the Class could have recovered had their theory of the case and damages completely prevailed at trial. That is well in excess of what the average percentage of recovery has been in securities class action settlements. *See, e.g.*, Dr. Jorden Milev, Robert Patton, Svetlana Starykh, Dr. John Montgomery, *Recent Trends in Securities Class Action Litigation: 2011 Year-End Review,* at 23 (NERA 2011) (finding that the median securities class action settlement amount as a percentage of estimated damages, where such estimates exceed $250 million, is between 1.0% and 3.0%). Accordingly, this settlement is an extraordinary result and warrants approval.

688392_3

C.     **The Complexity, Length, and Expense of Further Litigation Supports Approval of the Settlement**

In determining the fairness of a settlement, courts also consider "the likely complexity, length and expense of the litigation." *Isby*, 75 F.3d at 1199. There is no doubt that this securities class action involves complex factual and legal issues. As discussed above, the various obstacles that the Class necessarily confronted "flow from the complexities and difficulties inherently involved in shareholder securities fraud litigation." *In re Nat'l Student Mktg. Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974); *see also Great Neck Capital*, 212 F.R.D. at 409 ("Shareholder class actions are difficult and unpredictable, and skepticism about optimistic forecasts of recovery is warranted."). This is especially true "in the wake of the PSLRA." *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000).

A six-week trial of the Litigation was scheduled to commence in April 2012, and would require a huge amount of additional time and expense given the complexity of the case, the involvement of numerous attorneys, witnesses, experts and the introduction of substantial documentary evidence. Even if Plaintiffs were successful at trial, Defendants would undoubtedly appeal, leading to additional delay and expense. Plaintiffs were certainly not guaranteed victory at trial, but even if the Class were to recover a larger judgment after trial, the additional delay, through post-trial motions and appeals, would deny the Class any recovery for years. *See AT&T Mobility I*, 789 F. Supp. 2d at 961 ("[w]ere the Class Members required to await the outcome of a trial and inevitable appeal . . . they would not receive benefits for many years, if indeed they received any at all").[6] By contrast, the settlement secures a substantial and certain benefit for the Class in this

---

[6]     *See also In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 747-48 (S.D.N.Y. 1985) ("Even a victory at trial is not a guarantee of ultimate success. If plaintiffs were successful at trial and obtained a judgment for substantially more than the amount of the proposed settlement, the defendants would appeal

complex and contested litigation, undiminished by further expense and without the delay, risk and uncertainty of continued litigation. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court").

### D.      The Reaction of Class Members Supports the Settlement

To further support approval of a settlement, courts look to the class's reaction to the settlement. *AT&T Mobility I*, 789 F. Supp. 2d at 958. Of course, the fact that some class members object to a settlement does not by itself prevent the court from approving the agreement. *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) (collecting cases in which courts approved settlements despite class member objections); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1020-21 (N.D. Ill. 2000) (approving settlement over 25 formal and 42 informal objections made by class members), *aff'd*, 267 F.3d 743 (7th Cir. 2001). Moreover, a relatively small number of class members who object is an indication of a settlement's fairness. *Mexico Money Transfer*, 164 F. Supp. 2d at 1020; *see also* 2 Herbert B. Newberg, Alba Conte, *Newberg on Class Actions* §11.48 (3d. ed. 1992). Commencing on February 27, 2012, notices explaining the terms of the settlement, the Plan of Allocation, and the request for attorneys' fees and expenses were sent to over 679,000 potential Class Members and nominees.[7] The Notice further advised Class Members of their right to object and explained that this right needed to be exercised by April 2, 2012. To date,

---

such judgment. An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself."), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

[7]      *See* ¶¶3-10 to the accompanying Declaration of Carole K. Sylvester Re A) Mailing of the Notice of Proposed Settlement of Class Action and the Proof of Claim and Release Form, B) Publication of the Summary Notice, and C) Internet Posting.

- 17 -

no objections to the settlement, the Plan of Allocation, or the fee and expense request have been received. If there are any objections, counsel will respond to them on or before April 17, 2012 in accordance with the Court's Order Preliminarily Approving Settlement and Providing for Notice (Dkt. No. 450).

### E.   Class Counsel Endorse the Settlement

The view of the attorneys who prosecuted the case and conducted the settlement negotiations are entitled to significant weight. *See, e.g.*, *Isby*, 75 F.3d at 1200 (district court entitled to give consideration to the opinion of competent counsel that the settlement was fair, reasonable, and adequate); *Mexico Money Transfer*, 164 F. Supp. 2d at 1020 ("The court places significant weight on the unanimously strong endorsement of these settlements by Plaintiffs' well-respected attorneys."). This is especially true where, as here, the stage of the proceeding is such that counsel and the court are fully capable of evaluating the merits of plaintiffs' case and the probable course of future litigation.

As set forth above and in the Gronborg Declaration, Class Counsel have conducted a thorough investigation, reviewed and analyzed more than 3.8 million pages of documents, completed fact and expert discovery, took or defended the depositions of 50 fact witnesses and 7 experts, resolved two summary judgment motions, fully briefed 7 *Daubert* motions and substantively prepared for trial. Having fully evaluated that record and the risks of continued litigation, Class Counsel believe the $200 million Settlement Amount is an extraordinary recovery that confers a substantial benefit to Class Members.

Importantly, the settlement is the product of good faith, arm's-length negotiations with the assistance of a highly regarded mediator. Class Counsel have many years experience in litigating securities class actions and have negotiated many other class action settlements which have been approved throughout the country. Defendants were represented primarily by Stephen M. Sacks and

- 18 -

688392_3

James W. Thomas of Arnold & Porter LLP and Robert J. Kopecky, Ann M. Sidrys and Daniel E. Laytin of Kirkland & Ellis LLP, highly capable and experienced counsel, who zealously defended their clients. As set forth in the Gronborg Declaration, the settlement was reached after lengthy negotiations by experienced counsel on both sides, each with a comprehensive understanding of the strengths and weaknesses of each party's respective claims and defenses. Accordingly, this factor weighs in favor of approval.

### F.     The Stage of the Proceedings and the Amount of Discovery Completed

To ensure that a plaintiff has had access to sufficient information to evaluate both its case and the adequacy of the settlement proposal, courts in the Seventh Circuit consider the stage of the proceedings and the discovery taken. *AT&T Mobility I*, 789 F. Supp. 2d at 958. Here, both the knowledge of Class Counsel and the proceedings themselves reached a stage where an intelligent and fully informed evaluation of the Litigation and propriety of settlement could be made. As discussed herein and in the Gronborg Declaration, at the time the settlement was reached, the Litigation had been ongoing for more than four years and the parties were on the eve of trial. As a result, Plaintiffs and Class Counsel were in an excellent position to evaluate the strengths and weaknesses of their allegations against Defendants, the defenses raised thereto, as well as the risks of continued litigation, and to conclude that the settlement provides a fair, adequate, and reasonable recovery in the best interest of the Class. Having sufficient information to properly evaluate the Litigation, Plaintiffs and their counsel settled the Litigation on terms very favorable to the Class without the substantial additional expense, risk, and uncertainty of proceeding to trial. This factor also weighs in favor of this Court's approval of the settlement.

## IV.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

Plaintiffs also seek approval of the Plan of Allocation of the settlement proceeds. The Plan of Allocation was set forth in the Notice mailed to Class Members. Assessment of a plan of allocation in a class action under Federal Rule of Civil Procedure 23 is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair and reasonable. *See Great Neck Capital*, 212 F.R.D. at 410; *Ikon*, 194 F.R.D. at 184; *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992). District courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *accord In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

The objective of a plan of allocation is to provide an equitable basis upon which to distribute the settlement fund among eligible class members. Here, the Plan of Allocation was developed with the assistance of Class Counsel's economics expert, Dr. John Finnerty of Fordham University, and it reflects an assessment of the damages that could have been recovered under the theories asserted by the Plaintiffs in the case. The Plan of Allocation will result in a fair and equitable distribution of the proceeds among Class Members who submit valid claims. As a result, Plaintiffs and Class Counsel believe that the Plan of Allocation is fair, reasonable, and equitable to all Members of the Class and should be approved.

## V.    AWARD OF ATTORNEYS' FEES

On behalf of Plaintiffs and the Class, Lead Counsel have recovered $200 million in settlement of the claims advanced in this action.  The $200 million recovery is the third largest obtained in a settlement of securities class action in the Seventh Circuit.  Given that the total recovery represents 17% of the Class's maximum potential damages at trial and involved very significant risks, it would not be an understatement to recognize this case as one of the most successful securities class actions in the post-PSLRA era.  Indeed, the result achieved here is especially notable because this action was not accompanied by any Department of Justice, Securities and Exchange Commission ("SEC") or other governmental investigation, Motorola did not restate its historic SEC filings to correct material accounting errors, and there was no admission of wrongdoing by Defendants.  Moreover, Class Counsel was the only firm to initiate and prosecute the claims on behalf of the Class.

As the Court is aware, Class Counsel zealously represented the Class throughout the course of the case, advanced unique and effective theories of liability and presented the Court with several key disputes that shaped the result Class Counsel obtained for the Class.  It is against this background that the Plaintiffs, both of which are large, sophisticated institutional investors, respectfully request that Class Counsel be awarded attorneys' fees of 27.5% of the Settlement Amount.  *See* Provenzano Decl., ¶4; Haddad Decl., ¶5.

Class Counsel's request for an award of fees of 27.5% of the Settlement Amount is fair and reasonable for the following reasons:  (1) the requested fee is consistent with fee percentages negotiated *ex ante* in the private legal marketplace (*see* the accompanying Report of Professor Charles Silver on Attorneys' Fees ("Silver Report"), at 26-41) and is otherwise reasonable under Seventh Circuit criteria (*id.*); (2) this complex litigation was prosecuted entirely on a contingent basis and Class Counsel's investment in time and money was substantial and always at risk of non-

- 21 -

payment; (3) the $200 million Settlement Amount obtained by Class Counsel was not likely from the outset of the Litigation and represents a remarkable result in terms of both dollar amount and the percentage of damages recovered; (4) the percentage requested here is in the range of comparable percentages awarded in other cases with significant recoveries for a class; (5) the Class and Defendants were represented by counsel of the highest caliber who performed high quality work; and (6) the Plaintiffs, sophisticated institutional investors who have experience serving as lead plaintiffs and representatives of classes in securities cases, have both evaluated the work performed and the result obtained and have concluded that a fee of 27.5% is fair and should be awarded by the Court.

In addition, Class Counsel's litigation expenses should be awarded in full as they were reasonably and necessarily incurred in the prosecution of the Litigation and the Plaintiffs should be reimbursed for their reasonable expenses pursuant to the PSLRA, which encourages institutional investors to participate in securities class actions.

## A.    Class Counsel Is Entitled to a Percentage Fee from the Common Fund

The Supreme Court has long recognized the "common fund" exception to the general rule that a litigant bears his or her own attorneys' fees. *Trustees v. Greenough*, 105 U.S. 527 (1882). The underlying logic for the common fund was explained in *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980), as follows:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole . . . . Jurisdiction over the fund involved in the litigation allows a court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

Likewise, the Seventh Circuit has held "[w]hen a case results in the creation of a common fund for the benefit of the plaintiff class, the common fund doctrine allows plaintiffs' attorneys to petition the

- 22 -

court to recover its fees out of the fund." *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 563 (7th Cir. 1994). *See also Pavlik vs. FDIC*, No. 10 C 816, 2011 U.S. Dist. LEXIS 126016, at *6 (N.D. Ill. Nov. 1, 2011). The common fund doctrine both prevents unjust enrichment and encourages counsel to protect the rights of those who have very small claims. To those ends, the Supreme Court has observed that private securities fraud actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [Securities and Exchange] Commission action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).

The text of the PSLRA also supports awarding attorneys' fees in securities cases using the percentage method, as it provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount" recovered for the class. 15 U.S.C. §78u-4(a)(6). *See also In re Worldcom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) (the PSLRA contemplates that "the percentage method will be used to calculate attorneys' fees in securities fraud class actions").

B.      **The Court Should Award Attorneys' Fees Using the Percentage-of-the-Fund Method**

While the Seventh Circuit has noted that "the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court," it has recognized the advantages of applying the percentage-of-the-recovery method, including its relative objectivity and ease of administration. *See Florin*, 34 F.3d at 566. The percentage-of-the-fund method is also consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *See, e.g., Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the market rate.'") (emphasis in original). In determining the appropriate fee percentage in common

- 23 -

fund cases, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"); *see also In re Synthroid Mktg. Litig.*, 325 F.3d 974, 975 (7th Cir. 2003) ("*Synthroid II*") ("A court must give counsel the market rate for legal services."). The Seventh Circuit has made clear that the "market rate" is "as we have been at pains to stress, [what] the lawyer . . . would have gotten in the way of a fee in an arms' length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).

Indeed, in the court's role of acting as a fiduciary of the class to determine the reasonableness of the fee requested in light of the market rate, *see Cont'l Ill.*, 962 F.2d at 572, it must consider "the risk of nonpayment a firm agrees to bear . . . the quality of [the firm's] performance . . . the amount of work necessary to resolve the litigation, and . . . the stakes of the case." *Synthroid I*, 264 F.3d at 721. Also relevant to this inquiry is an assessment of "the riskiness of the litigation by measuring the probability of success of this type of case at the outset of the litigation." *Florin*, 34 F.3d 565 (emphasis omitted); *see also Cooper v. IBM Pers. Pension Plan*, No. 99-829-GPM, 2005 U.S. Dist. LEXIS 17071, at *24 (S.D. Ill. Aug. 16, 2005) (awarding a 28.5% fee on a $231 million settlement fund and holding that "[t]he Fee Request is unreasonable only if the result was likely from the outset").

Further, in determining the reasonableness of attorneys' fee applications courts within the Seventh Circuit consider the unique circumstances of the case to be relevant. *See, e.g., In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 (N.D. Ill. 2011) ("*AT&T Mobility II*") ("[t]his case requires the Court to determine reasonable attorneys' fees in decidedly unique circumstances") and at 1035-40 (applying the circumstance of the case in making its reasonableness finding); *Great Neck Capital*, 212 F.R.D. at 411 (noting courts "increasingly use the

- 24 -

percentage of fund approach after consideration of the specified guidelines under the particular circumstances involved"). As demonstrated herein, the unique circumstances of this case militate in favor of the Court granting the 27.5% fee request.

For the reasons set forth below, those contained in the Declarations of Peter M. Provenzano, James Haddad and Tor Gronborg, and in the Silver Report, Class Counsel respectfully submit that the exceptional results achieved, in conjunction with the contingent nature and risks of the Litigation, and the quality and extent of work Class Counsel delivered to the Class in generating the proposed $200 million settlement, justify a fee award of 27.5%.

**C.    The Requested Fee Is Reasonable and Appropriate as a Percentage of the Common Fund**

   **1.    The Requested Fee is Consistent with Percentage Fees Negotiated Ex Ante in the Private Market for Legal Services**

As Professor Silver notes at the outset of his report:

> The Seventh Circuit has repeatedly held that lawyers representing plaintiff classes are entitled to be compensated at market rates, meaning rates class members would have agreed to pay them at the start of litigation had face-to-face bargaining been possible. Fees actually paid by clients whose own money is on the line provide the best evidence of market rates.

Silver Report at 1 (footnote omitted). To address this issue, Professor Silver has provided the Court with extensive information regarding fees negotiated in private cases at the outset of representation. Silver Report at 26-41. For the sake of brevity, that information is not repeated here. However, based on his survey, Professor Silver concludes that, whether in "mass" actions, conventional personal injury cases, or complex, high-dollar private business disputes, plaintiffs negotiate percentage fees consistent with or higher than the percentage sought here, even when the potential recovery approaches or exceeds the result obtained here. *Id.*

### 2.    The Contingent Nature of the Litigation Favors an Award of 27.5% of the Settlement Amount

As noted by the Seventh Circuit in *Synthroid I*, "[t]he market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear." 264 F.3d at 721.[8] Despite their success in bolstering the case through zealous prosecution of Plaintiffs' claims, Class Counsel assumed a significant risk that Defendants would successfully defend this case during motions to dismiss, class certification, summary judgment, pre-trial *Daubert* proceedings and trial and the Class (and Class Counsel) would recover nothing.

One of the greatest attributes of Robbins Geller is its ability to conduct a diligent investigation and prosecution of any case from inception to trial despite the risk that the Class's claims, while viable, may not prevail. In this case, Class Counsel devoted thousands of hours of work and millions of dollars to the factual investigation and discovery of the Class's claims, drafted two operative complaints, took or defended the depositions of 50 fact witnesses and 7 experts, defended three dispositive motions pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56, and diligently prepared the Class's case for an April 2012 trial. Few law firms could have, or would have, devoted such time and financial resources to this case. Indeed, no other firm even sought to be appointed as lead counsel for the Class, and no governmental body investigated or prosecuted any claims against Defendants. Had Plaintiffs been unable to settle this action or otherwise prevail on the merits during the April 2012 trial, the loss of time, money and effort by Class Counsel would have been enormous. In prosecuting this action to the eve of trial, Class Counsel expended

---

[8]    *See also McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967) ("The effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services."); *Blackie v. Barrack*, 524 F.2d 891, 899 n.15 (9th Cir. 1975) ("For what it is worth, however, the empirical evidence indicates that a relatively high proportion of class actions are not settled, but disposed of in defendant's favor on preliminary motions.").

38,522.75 hours of attorney, paralegal and paraprofessional time, generating a "lodestar" of $17,274,354.50 and litigation expenses of $4,814,298.54, all of which were subject to the real risk of total loss.

After expending significant resources in this case during nearly two full years of active fact discovery, the Class faced two motions for summary judgment (*see* Dkt. Nos. 326, 366), one of which Defendants substantially prevailed upon, and one of which was denied in its entirety. Despite the Court's July 25, 2011 denial of Defendants' second motion for summary judgment, Defendants remained steadfast in their position that Plaintiffs would be unable to meet their burden on the element of loss causation. *See* Dkt. No. 382. Had Defendants prevailed on this critical issue at the *Daubert* stage of this case or at trial, the Class and Class Counsel faced the real risk of recovering nothing. Thus, at every stage of this case, success was far from guaranteed.

Even after the Court had resolved Defendants' motions for summary judgment, Class Counsel still faced the substantial burden of proving to a jury, *inter alia*, that each of the Defendants was responsible for an omission or misstatement that was material, that each Defendant acted with the requisite intent to deceive and that Defendants' conduct was the legally cognizable cause of the Class's losses. Defendants, however, remained resolute in their defense that they did nothing wrong and offered substantial factual evidence and expert testimony to support their positions. Even if Class Counsel were able to prove liability at trial, the Class would have faced significant risks in proving both loss causation and damages. Despite these risks, Class Counsel never waivered from committing time and resources to the prosecution of this action, and the proposed settlement is a testament to that dedication.

Further, Class Counsel are aware of numerous hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of a case or a decision following a trial on the merits, the excellent and highly-skilled efforts of

- 27 -

members of the plaintiffs' bar yielded no fee. For instance, there are numerous appellate decisions affirming summary judgment and directed verdicts for defendants in securities class actions.[9] It is axiomatic that lawyers who specialize in contingent matters operate in a legal environment fraught with uncertainty and the fact of the matter is, winning cases must, in large part, pay for meritorious, but otherwise unsuccessful efforts. Clearly, the risks associated with this contingent litigation were many and in determining whether the requested fee of 27.5% of the Settlement Amount is consistent with Seventh Circuit precedent, the Court should take this dynamic into account. *See, e.g.*, *Sutton v. Bernard*, 504 F.3d 688, 694 (7th Cir. 2007) ("Because the district court failed to provide for the risk of loss, the possibility exists that Counsel, whose only source of a fee was a contingent one, was undercompensated.").

In sum, the only certainties regarding this case were that each element of the Class's claims would have been vigorously disputed by Defendants at trial and on appeal, and the risk of recovering nothing was all too real. Clearly, the higher litigation risk here is a circumstance that justifies the 27.5% fee. *AT&T Mobility II*, 792 F. Supp. 2d at 1032; *Great Neck Capital*, 212 F.R.D. at 411.

---

[9]     *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Digi Int'l, Inc. Sec. Litig.*, No. 00-3162, 2001 U.S. App. LEXIS 15095 (8th Cir. July 5, 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). Moreover, even plaintiffs who proceed to trial may not prevail or find a favorable verdict overturned on appeal. *See BankAtlantic Bancorp*, 2011 U.S. Dist. LEXIS 48057 (granting defendants' motion for judgment as a matter of law after jury rendered verdict in favor of plaintiffs); *JDS Uniphase*, 2007 WL 4788556 (jury verdict in favor of all defendants); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning verdict in favor of plaintiffs after a decade of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' verdict for securities fraud); *Robbins*, 116 F.3d 1441 (same).

### 3. The $200 Million Settlement Here Was Not Likely at the Outset of the Litigation

In consideration of the reasonableness of the requested contingency fee, the Court should assess the probability that the result obtained – a $200 million settlement – was likely from the outset of the litigation. *Florin*, 34 F.3d at 565; *IBM Pers. Pension Plan*, 2005 U.S. Dist. LEXIS 17071, at *24. Here, the $200 million settlement obtained by Class Counsel was not likely from the outset of the litigation, which militates in favor of finding the 27.5% fee request reasonable under the circumstances.

First, from the outset of the litigation in August 2007, no other plaintiffs or law firms moved to compete for appointment as lead plaintiff and lead counsel under the PSLRA. Class Counsel are confident that other firms evaluated this case during the pendency of the lead plaintiff notice period, but, evidently, no other plaintiff or law firm believed the case to be worthy of the time or expense necessary to prosecute the claims.[10] Further, courts generally recognize that an enhanced fee award is justified where, as here, the class does not "free ride" on the efforts of a prior or contemporaneous governmental enforcement proceeding, but rather proves the violation on its own. *See, e.g., In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 523 (E.D.N.Y. 2003) (holding that attorneys are deserving of "higher compensation, particularly where, as here, Lead Counsel did not benefit from any previous or simultaneous government litigation"), *aff'd, Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005). As Judge Mukasey stated in *Gulf Oil/Cities Serv.*, 142 F.R.D. at 597, and equally applicable here, "[t]his is not a case where plaintiffs' counsel can be cast

---

[10]     Two other individuals, Mark Segal and Katherine Acheson, filed related securities fraud complaints against defendants. *See Segal v. Motorola, Inc., et al.*, 07-cv-4782 (N.D. Ill.) (filed Aug. 23, 2007); *Acheson v. Motorola, Inc., et al.*, 07-cv-5004 (N.D. Ill.) (filed Sept. 5, 2007). However, neither Mr. Segal nor Ms. Acheson, nor their counsel, moved for appointment as lead plaintiff or lead counsel, and neither appears to have expended any resources in the prosecution of this case.

as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own." The lack of any governmental investigation, and the attendant powers of the government to procure evidence and admissions, made the risks in prosecuting this litigation far higher and the result all the more remarkable. *See* Ronald I. Miller, Ph.D., Todd Foster, Elaine Buckberg, Ph.D., *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?* at 8 (NERA April 2006) ("*Recent Trends, April 2006*") ("When allegations of a suit are subject to official investigation, for example by the SEC . . . [such] outside evidence of the merits of a case leads to an approximately 25% increase in expected settlement value."). Here, an important factor militating in favor of awarding a 27.5% fee is that Plaintiffs and their counsel uncovered and prosecuted the alleged fraud wholly on their own. Counsel did not "free ride" on the efforts of the government or anyone else.

Second, it was not until December 2009, over two years after the Litigation was commenced and over a year after the Court denied Defendants' motion to dismiss the first amended complaint, that Class Counsel discovered evidence of significant IP transactions. The 3Q06 IP arrangements, in Plaintiffs' view, demonstrated how significant 3G earnings losses were concealed from investors by Defendants' alleged failure to comply with GAAP and SEC regulations in disclosing and accounting for the IP arrangements with Freescale and Qualcomm. At the time this evidence was discovered, the operative complaint did not contain any allegations of accounting or disclosure fraud. *See Recent Trends, April 2006* at 8 ("The presence of allegations regarding accounting issues will raise average settlement values by approximately 20%. Settlements in cases in which accounting irregularities are admitted increase by a further half."). The accounting and disclosure allegations were only developed and added to the complaint after numerous discovery disputes with Defendants, prevailing on motions to compel and consulting with, and analysis by, in-house and outside forensic

- 30 -

accountants. Given the absence of any allegations regarding disclosure and accounting fraud at the commencement of the Litigation, the magnitude of the settlement achieved was highly unlikely.

Third, on March 8, 2010, Plaintiffs first notified the Court of their intention to seek leave to amend the first amended complaint to conform the pleading to evidence adduced regarding the Company's inability to deliver commercial quantities of 3G handsets to customers in 4Q06, as well as to add the newly discovered and related allegations concerning the 3Q06 IP licensing arrangements. Class Counsel's successful navigation of the amendment process significantly altered the landscape of the Litigation. Indeed, had Class Counsel and Plaintiffs not taken the risk of amending the Class's pleading to include the disclosure and accounting fraud claims, as well as identifying a partial disclosure of the alleged fraud during the Class Period, Defendants would have been armed with a potent loss causation argument at summary judgment and trial. The amendments to the operative pleading, which were based on substantial discovery and analysis prior to March 2010, significantly increased the maximum recoverable damages and directly addressed Defendants' anticipated primary loss causation and damages defenses.

Fourth, as indicated in the Plaintiffs' declarations in support of Class Counsel's motion for attorneys' fees, each Plaintiff, independent of Class Counsel, separately deliberated regarding whether they believe the 27.5% request is reasonable and, ultimately, found such request reasonable and agreed that Class Counsel could submit an appropriate application with the Court. *See* Provenzano Decl., ¶¶3-4; Haddad Decl., ¶5. Further, each Plaintiff considered the pecuniary benefit to the Class reflected by the $200 million settlement, the immediacy of recovery, significant litigation risks, including those associated with a trial, in reaching their conclusion concerning Class Counsel's fee request. Class Counsel delivered quality legal services, which maximized the recovery of the Class. Absent the effort by Class Counsel, there is no indication that the Class would have recovered anywhere near the proposed $200 million cash settlement. All of these

- 31 -

circumstances weigh in favor of the Court granting the 27.5% fee request. *See AT&T Mobility II,* 792 F. Supp. 2d at 1032-40; *Great Neck Capital,* 212 F.R.D. at 411; *Florida v. Dunne,* 915 F.2d 542, 545 (9th Cir. 1990).

**4.     The Requested Fee Is Consistent with Seventh Circuit Authority and Empirical Data Regarding Awards in Cases This Size**

Fee awards of 25% or more are fairly common in the context of securities fraud class actions and Class Counsel's request for attorneys' fees of 27.5% is within the range of prior percentage awards made in this District and Circuit, as well as by courts throughout this country.[11] The requested fee falls below the average of fee awards in a series of class action studies conducted by National Economic Research Associates ("NERA") experts Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar as reflected in the publication entitled *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996) ("Regardless of case size, fees average approximately 32 percent of the settlement."). In this report, NERA examined 433 settlements, 18 of which were in the Seventh Circuit where the associated attorneys' fees as a percentage of the settlements analyzed averaged 31.8%. *Id.* at Table 12b. Here, the 27.5% fee requested falls below that average. The fee requested in the Litigation is also consistent with the empirical findings in a recent NERA survey of securities class action settlements

---

[11]     *See Taubenfeld v. Aon Corp.,* 415 F.3d 597, 599 (7th Cir. 2005) (30% of settlement fund); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc., et al.,* No. 04 C 1107, slip op. (N.D. Ill. July 24, 2006) (30% of settlement fund); *Weiner, et al. v. The Quaker Oats Co., et al.,* No. 98 C 3123 (RP), slip op. (N.D. Ill. Sept. 14, 2001) (33%); *In re Nanophase Techs. Corp. Sec. Litig.,* No. 98 C 3450, slip op. (N.D. Ill. Mar. 27, 2001) (33%); *In re Spyglass, Inc. Sec. Litig.,* No. 99 C. 0512, slip op. (N.D. Ill. May 23, 2000) (33%); *In re First Merchs. Acceptance Corp. Sec. Litig.,* No. 97 C 2715, slip op. (N.D. Ill. Apr. 21, 2000) (33%); *In re Caremark Int'l Inc. Sec. Litig.,* No. 94 C 4751, slip op. (N.D. Ill. Dec. 15, 1997) (33%); *In re Nuveen Fund Litig.,* No. 94 C 360, slip op. (N.D. Ill. June 3, 1997) (33%); *In re Soybean Futures Litig.,* No. 89 C 7009, slip op. (N.D. Ill. Nov. 27, 1996) (33%); *Liebhard, et al. v. Square D Co., et al.,* No. 91 C 1103, slip op. (N.D. Ill. June 15, 1993) (33%); *First Interstate Bank of Nev., N.A. v. Nat'l Republic Bank of Chicago, et al.,* No. 80 C 6410, slip op. (N.D. Ill. Feb. 12, 1988) (39%).

for the time period of 1996 through 2011. *See* Dr. Jordan Milev, Robert Patton, and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review* (NERA July 2011) ("*NERA Mid-Year 2011*"). That study found that median attorneys' fees in securities class actions settling for between $25 and $100 million was 27.3%, and the median fees for cases settling between $100 and $500 million was 22.2%. *Id.* at 27.

Class Counsel's fee request is also consistent with the empirical findings contained in Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies, 811, 839 (2010) ("Fitzpatrick Article"). In Fitzpatrick's article, he found that mean and median fee awards in securities class actions during the time period of 2006 through 2007 to be 24.7% and 25.0%, respectively. *Id.* at 835.[12] For securities class action settlements in the Seventh Circuit, Fitzpatrick found the mean and median fee awards to be 27.4% and 29.0%, respectively. *Id.* at 836.[13]

In addition, the requested fee of 27.5% of the $200 million Settlement Amount is reasonable when set in the context of analogous fee awards in securities fraud class actions where the settlement fund ranged between $100 million and $300 million. *See, e.g., In re Comverse Tech., Inc. Sec.*

---

[12]    When analyzing the mean of fee awards between $100 million and $250 million, however, Fitzpatrick does not provide data regarding the mean and median fee awards for securities class actions, but combines fee awards for all federal class action subject matters. *See* Fitzpatrick Article at 839.

[13]    Professor Silver notes an important caveat to the conclusions reached in the Fitzpatrick Article (as well as others) with respect to "mega-fund" fee awards. As he states:

> Although the studies are excellent, the manner in which they present their findings reflects and implicitly legitimizes the mega-fund rule. They do this by breaking out fee percentages by the amount of the recovery and showing that, as recoveries increase, fee percentages decline. ***Because both the private market and Seventh Circuit cases reject the mega-fund rule, the documented tendency of many judges to apply that rule has no bearing on what the fee should be in this case.***

Silver Report at 47 (emphasis added).

*Litig.*, No. 06-CV-1825(NGG)(RER), 2010 WL 2653354, at *6 (E.D.N.Y. June 24, 2010) (awarding 25% fee on $225 million settlement fund even though outcome of litigation was clear at outset); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475(NRB), 2005 U.S. Dist. LEXIS 45798, at *12-*13 (S.D.N.Y. June 14, 2005) (awarding a 28% fee on $120 million settlement fund); *In re Oxford Health Plans, Inc. Sec. Litig.*, No. 1222 (CLB), slip op. (S.D.N.Y. June 12, 2003) (awarding 28% fee on $300 million settlement fund); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) (concluding that a 25% fee on $193 million settlement fund is "eminently reasonable" in light of Professor John R. Coffee, Jr.'s survey showing that the average percentage fee award in cases settling between $100 million and $200 million to be 25%); *In re Old CCA Sec. Litig.*, No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001) (awarding 30% fee on $104 million settlement fund); *Ikon*, 194 F.R.D. at 194 (awarding 30% fee on $111 million settlement fund and finding it "particularly noteworthy [that] class counsel did not have the benefit of an SEC or other regulatory agency investigation and so prosecuted the case without assistance"). These cases are relevant to the Court's inquiry here and support the reasonableness of Class Counsel's application. *See Taubenfeld*, 415 F.3d at 600 ("attorneys' fees from ***analogous*** class actions settlements are indicative of a rational relationship between the record in this similar case and the fees awarded by the district court") (emphasis added); *see also AT&T Mobility II*, 792 F. Supp, 2d at 1039-40.

As noted above, the Settlement Amount is the third largest in the history of the Seventh Circuit, behind only *In re Waste Management, Inc. Sec. Litig.*, No. 97 C 7709 (N.D. Ill.) ($220 million); and *In re Sears Roebuck & Co. Sec. Litig.*, No. 02 C 7527 (N.D. Ill.) ($215 million). The result obtained in this Litigation, when compared to the circumstances leading to the recoveries obtained in *Waste Management* and *Sears Roebuck*, further justifies the Court awarding the fee sought by Class Counsel.

- 34 -

In *Waste Management*, the court awarded attorneys' fees of 20%, or approximately $44 million. *See In re Waste Mgmt., Inc. Sec. Litig.*, No. 97 C 7709, 1999 U.S. Dist. LEXIS 16566, at *10 (N.D. Ill. Oct. 18, 1999). On July 28, 1998, the plaintiffs in *Waste Management* filed their consolidated amended complaint against the company, certain of its officers and directors, as well as Waste Management's auditor, Arthur Andersen LLP, based on the company's February 24, 1998 restatement of its financial statements. *In re Waste Management, Inc. Sec. Litig.*, No. 97 C 7709 (N.D. Ill. July 9, 2010), Dkt. No. 297 at 4. Notably, by the time the operative complaint had been filed in that case, defendants had already admitted that Waste Management's prior financial statements required a massive $1.7 billion restatement. A mere five months later, in December 1998, after no apparent discovery, the parties reached the $220 million settlement. *Id.* Here, in contrast, Plaintiffs and Class Counsel pressed allegations concerning disclosure and accounting fraud only after engaging in years of intense and risky discovery efforts and motion practice. Class Counsel also advanced the new disclosure and accounting violation claims without the benefit of any admission by Defendants of falsity (as forced, for example, by the SEC) and even though Defendants strenuously disputed whether the Class could prove these claims during trial.

In *Sears Roebuck*, the court granted an attorneys' fee request of approximately 15% of the settlement fund, or $31.3 million. *See In re Sears Roebuck & Co. Sec. Litig.*, No. 02-C-7527 (N.D. Ill. Jan. 8, 2007), Dkt. No. 289, ¶13. Importantly, however, that case was only commenced *after* the SEC forced Sears to restate its 2002 financial statements to account for a $300 million write-off of uncollectible credit card accounts. *See* Susan Chandler, *Sears Restates Its 1st-Half Results, SEC Discovers Accounting Error; Profit Unchanged* (Chicago Tribune, Oct. 3, 2002); *In re Sears Roebuck & Co. Sec. Litig.*, No. 02-cv-7527 (N.D. Ill. Oct. 18, 2002), Dkt. No. 1 (original complaint filed on October 18, 2002). In contrast, Plaintiffs and Class Counsel here never had the benefit of an SEC investigation that publicly identified the alleged wrongdoing prior to commencement of the

- 35 -

action. Nor did Plaintiffs or Class Counsel here have the benefit of a financial restatement or other roadmap to the fraud. Not only were the risks undertaken by Class Counsel far greater than in *Sears Roebuck*, but the effort needed to achieve a recovery (and for a higher percentage of the alleged damages) was significantly greater. Accordingly, the 27.5% fee requested is reasonable and will fairly reward Class Counsel in the Litigation for a higher level of litigation risk.

### 5.   Class Counsel Provided the Class with Quality Legal Services that Produced Excellent Benefits

In evaluating a fee request, the Seventh Circuit has held that the trial court may consider the "quality of legal services rendered" by plaintiffs' counsel. *Taubenfeld*, 415 F.3d. at 600; *Synthroid I*, 264 F.3d at 721. Robbins Geller Rudman & Dowd, LLP, is a nationally recognized leader in complex securities litigation class actions. *See* Silver Report at 16-17. In this case, the recognized skills of Class Counsel were called upon to obtain an impressive result for the Class. As noted above, this case required an in-depth, extensive investigation, focused efforts to understand nearly 4 million pages of dense and highly technical documents produced by Defendants and various third parties, as well as the skill to respond to a host of legal and factual issues raised by highly capable counsel representing Defendants.

In addition, during multiple mediation sessions, Plaintiffs and Class Counsel demonstrated their willingness to continue to litigate the merits of this action all the way to trial, rather than accept a settlement that was not in the best interest of the Class. As a result of Class Counsel's diligent efforts on behalf of the Class and their skill and expertise, Class Counsel was able to negotiate a very favorable result for the Class, representing approximately 17% of the maximum recoverable damages. This recovery is all the more impressive in light of empirical evidence demonstrating that, on average, cases like this typically settle for 2% or less of investor losses. *See NERA Mid-Year*

- 36 -

*2011* at 28-29. Clearly, the quality of Class Counsel's work on this case is reflected in the $200 million Settlement Amount obtained for the Class.

The quality of opposing counsel is also an important factor in evaluating the work performed by Class Counsel. *Arenson v. Bd. of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974). Class Counsel was opposed in this case by the nationally known and highly capable law firms of Kirkland & Ellis LLP and Arnold & Porter LLP, who spared no effort in their zealous defense of the Litigation. In the face of this formidable opposition, Class Counsel developed the Litigation so as to persuade Defendants to settle the case on terms favorable to the Class. The ability of Plaintiffs to obtain a favorable result for the Class while litigating against these powerful defense firms further evidences the quality of Class Counsel's work and weighs in favor of the Court granting the request sought here.

### 6.    Class Representatives Macomb County and St. Clair Independently Assessed and Approved the 27.5% Fee Request

Both Plaintiffs, who worked with counsel throughout the Litigation and were able to directly evaluate the quality and effectiveness of Class Counsel, have approved the fee request sought here. *See* Provenzano Decl., ¶3; Haddad Decl., ¶3. Both Macomb County and St. Clair have independently assessed the issue of attorneys' fees and, based on the risks incurred, the quality of the work performed and the results obtained, believe that a 27.5% fee is reasonable and should be awarded by the Court. *See* Provenzano Decl., ¶4; Haddad Decl., ¶¶4-5.

### 7.    The Stakes of the Litigation Favor a 27.5% Fee Award

As the Litigation advanced through discovery, the stakes of this action only became larger. Not only would Class Counsel have not received a single penny of compensation if they failed to prevail at trial, then they would have been forced to write off thousands of hours of highly capable attorneys and support staff time, as well as millions of dollars in expert and consulting fees and other

- 37 -

expenses. And, even if Plaintiffs prevailed at trial, Defendants would have had the opportunity to appeal any judgment obtained and derail the favorable resolution of a major securities class action or delay it for years. As the court stated in *Warner Commc'ns*:

> Even a victory at trial is not a guarantee of ultimate success. If Lead Plaintiffs were successful at trial and obtained a judgment for substantially more than the amount of the proposed settlement, the defendants would appeal such judgment. As appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself.

618 F. Supp. at 747-48 (citing numerous examples); *see Robbins*, 116 F.3d at 1446-49 (reversing $81 million jury verdict for plaintiffs in securities class action after five years of litigation); *In re Luxottica Group S.p.A Secs. Litig.*, 233 F.R.D. 306, 316 (E.D.N.Y. 2006) ("'Victory – even at the trial stage – is not a guarantee of ultimate success.' Delay at the trial stage and through post-trial motions and the appellate process might have forced class members to wait years longer for any recovery. This would have increased the amount of fees payable to plaintiffs' counsel and reduced the value of any award to the class.") (quoting *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993)).

Lead Counsel's experience in *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 02-cv-5893 (N.D. Ill.), is illustrative of the risks and delays inherent in litigation such as this, even after a jury verdict in favor of plaintiffs and the class. On May 7, 2009, following a six-week trial, the jury in *Household* returned a verdict finding that the defendants had violated the federal securities laws and that members of the class suffered damages of up to $23.00 per share. *See Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 02-cv-5893 (N.D. Ill. May 7, 2009), Dkt. No. 1611. The jury also found no liability for the first 19 months of the class period. *Id.* Subsequently, there has been numerous post-verdict motions and extensive motion practice and discovery related to class members' claims. As a result, nearly three years after a favorable verdict, judgment has yet to be entered in *Household*, no class member has recovered any damages suffered,

- 38 -

and counsel have not been awarded fees or expenses. Indeed, Defendants have vowed that even after judgment is entered, they will appeal, and counsel and class members will face more years of delay and further risk of nonpayment, despite the successful liability trial of the *Household* claims.

In addition, the legal and factual issues argued by both sides in connection with Defendants' summary judgment motions, and as reflected in the parties' subsequent *Daubert* briefing, only confirms the significant complexity and high-cost nature of securities class actions involving a company the size of Motorola. These factors weigh in favor of approving the requested 27.5% fee.

### 8. The Reaction of Class Members Supports the Reasonableness of the Requested Award

Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice (Dkt. No. 450), the mailing of notice of the settlement to some 679,000 potential Class Members and nominees commenced on February 27, 2012. Class Members were informed in the Notice that Class Counsel would apply for attorneys' fees of 27.5% of the Settlement Amount, plus expenses not to exceed $4,950,000, and were advised of their right to object to Class Counsel's fee and expense request. While the date to file objections has not yet passed, to date, no Class Member has objected to the application for attorneys' fees and expenses. This is significant, especially considering the huge size of the Class and the increasing trend of investor activism in securities class actions.

Accordingly, the factors discussed above weigh in favor of the fee award requested by Class Counsel and the Court should grant counsel's application.

## VI. CLASS COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Class Counsel also request an award of their litigation expenses in connection with the prosecution of the Litigation. Class Counsel have submitted separate declarations herewith attesting to the amount and accuracy of their expenses. *See Synthroid I*, 264 F.3d at 722 (should counsel submit sufficiently detailed expense reports and records, "a federal court should not require more"

- 39 -

for purposes of determining the reasonableness of the request for reimbursement). Class Counsel's litigation expenses total $4,814,298.54. An empirical study of the cost and expense of class actions finds that 4% of the relief obtained for a class is the average request for expenses. *See* Theodore Eisenburg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empircal Legal Studies, 27, 70 (2004). *See also* Silver Report at 20-21. Here, 4% of the $200 million Settlement Amount equates to $8 million. Under this criteria above, Class Counsel's request for expenses (approximately 60% of the average expense request, or 2.4% of the Settlement Amount) is reasonable. *See, e.g.*, *AT&T Mobility II*, 792 F. Supp. 2d at 1040-41 (finding that a fee request of 2.5% of maximum recovery reasonable in light of the Eisenburg and Miller study). As such, the Court should approve Class Counsel's request for their expenses.

Notably, significant components of Class Counsel's expenses (over 75%) were for experts, consultants and investigators, and conducting discovery. Class Counsel identified and retained four leading experts in the field of loss causation and damages, accounting, disclosure requirements and materiality, as well as experts in the fields of the mobile handset industry and 3G and 4G technologies.[14] The experts and consultants worked closely with Class Counsel throughout the Litigation and were instrumental in assisting Class Counsel to achieve the result obtained for the Class.

In the post-PSLRA era, the use of investigators to gather detailed specific information from percipient witnesses in order to plead complaints that will survive motions to dismiss is vital. Class Counsel's investigators conducted substantial work on behalf of the Class in identifying and locating

---

[14] Further information regarding these experts, consultants, and investigators is contained in the Gronborg Declaration and the Declaration of Keith F. Park Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses.

numerous witnesses with knowledge of the alleged fraud prior to the filing of the first amended complaint and during discovery. Class Counsel were also required to travel extensively in prosecuting this litigation, including travel required to participate in 57 fact and expert depositions, conduct numerous witness interviews, meet with experts and consultants, meet with clients and Class Members, to appear before the Court for hearings, and attend mediation sessions with Judge Weinstein. Class Counsel are also seeking payment of other expenses that were necessarily incurred in the prosecution of this litigation, including expenses for the publication of early notice as required by the PSLRA, deposition and Court hearing transcripts, mailing and publication of notice of pendency of a certified class, photocopying, filing and witness fees, postage and overnight delivery, and telephone expenses. Other expenses include the cost of computerized research and computerized management of discovery. Because all of the above-noted expenses were reasonably incurred by Class Counsel in prosecuting the Litigation, they should be reimbursed.

## VII.  THE CLASS REPRESENTATIVES ARE ENTITLED TO REIMBURSEMENT OF REASONABLE COSTS AND EXPENSES

Pursuant to the PSLRA, the Court has discretion to reimburse "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15. U.S.C. §78u-4(a)(4). Class Representatives, Macomb County and St. Clair, request reimbursement of $6,450.00 and $4,350.00, respectively. *See* Provenzano Decl., ¶5; Haddad Decl., ¶6. As set forth in the Provenzano Declaration and the Haddad Declaration, each Plaintiff devoted substantial time to the oversight of, and participation in, the Litigation, including reviewing pleadings, preparing for depositions, complying with Defendants' discovery requests and consulting with Class Counsel regarding the same, and participating in mediation. *See* Provenzano Decl., ¶¶3, 5, Ex. A; Haddad Decl., ¶¶3, 6, Ex. A. The amounts requested will only reimburse the Plaintiffs for their expenses (including lost wages) directly relating to their representation of the

- 41 -

Class. Not only are such reimbursements appropriate under the PSLRA, they are also recognized as appropriate within the Seventh Circuit. *AT&T Mobility II*, 792 F. Supp. 2d at 1041 (citing *Cont'l Ill.*, 962 F.2d at 571).

## VIII. CONCLUSION

For all the foregoing reasons, the Plaintiffs, on behalf of the Class, respectfully request that the Court approve the settlement and Plan of Allocation as fair, reasonable and adequate, and in the best interests of the Class, and approve Class Counsel's application for attorneys' fees and expenses, together with interest thereon at the same rate and for the same time as earned on the Settlement Amount, as well as the reimbursement of expenses sought by the Plaintiffs pursuant to the PSLRA.

DATED: March 19, 2012                Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
KEITH F. PARK
MICHAEL J. DOWD
TOR GRONBORG
SUSAN G. TAYLOR
TRIG R. SMITH
JENNIFER L. GMITRO
IVY T. NGO


                              s/ Tor Gronborg
_____
                              TOR GRONBORG

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Liaison Counsel

- 42 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: 312/332-3400
312/676-2676 (fax)

Class Counsel for Plaintiffs

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 19, 2012.

s/ Tor Gronborg
TOR GRONBORG

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail:TorG@rgrdlaw.com

688392_3

# Mailing Information for a Case 1:07-cv-04507

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John Joseph Barber**
  jbarber@tdrlawfirm.com,edocket@tdrlawfirm.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David K. Cole**
  courtnotification@mayerbrown.com

- **Michael J. Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J. Timothy Eaton**
  teaton@shefskylaw.com,sfdocket@shefskylaw.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **James R. Figliulo**
  jfigliulo@fslegal.com

- **Jennifer L. Gmitro**
  JGmitro@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **David Hall**
  dhall@rgrdlaw.com

- **Mark H Horwitch**
  mhorwitch@tdrlawfirm.com,edocket@tdrlawfirm.com

- **Stephanie D. Jones**
  sjones@fslegal.com

- **Robert J. Kopecky**
  rkopecky@kirkland.com

- **M. Sean Laane**
  sean.laane@aporter.com

- **Scott R. Lassar**
  slassar@sidley.com,efilingnotice@sidley.com

- **Daniel E. Laytin**
  dlaytin@kirkland.com

- **Kim Ann Leffert**
  courtnotification@mayerbrown.com

- **Erin K. Lynch**
  elynch@shefskylaw.com,sfdocket@shefskylaw.com

- **Richard A. Maniskas**
  sradcliffe@glancylaw.com

- **John C Massaro**
  john_massaro@aporter.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,JRamirez@millerlawllc.com

- **Matthew P Montgomery**
  mattm@csgrr.com

- **Ivy T Ngo**
  ingo@rgrdlaw.com

- **Keith F. Park**
  keithp@rgrdlaw.com

- **David A Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Joseph Russello**
  jrussello@csgrr.com

- **Stephen M Sacks**
  stephen_sacks@aporter.com

- **Jeffrey Charles Sharer**
  jsharer@sidley.com,efilingnotice@sidley.com

- **Michael P. Sheehan**
  msheehan@shefskylaw.com,sfdocket@shefskylaw.com

- **Anne J. Sidrys**
  anne.sidrys@kirkland.com,kimberly.love@kirkland.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan G Taylor**
  SusanT@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James W. Thomas , Jr**
  james.thomas@aporter.com,elissa.spencer@aporter.com,matthew.roessing@aporter.com

- **Matthew E Van Tine**
  mvantine@millerlawllc.com,mvt@vantine.us

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Joseph        I. Goldstein**
Murphy & McGonigle
555 13th Street, N.W.
#410 W
Washington, DC 20004

**Jerry         A Isenberg**
Murphy & McGonigle
555 13th Street, N.W.
#410 W
Washington, DC 20004

**D             Seamus Kaskela**
Schiffrin Barroway Topaz & Kessler LLP
280 King of Prussia Road
Radnor, PA 19087

**Michael       Kelley**
Sidley and Austin
555 West Fifth Street
40th Floor
Los Angeles, CA 90013