1

LEXSEE

**KATHI COOPER, BETH HARRINGTON, and MATTHEW HILLESHEIM, Individually and on Behalf of All Those Similarly Situated, Plaintiffs, vs. THE IBM PERSONAL PENSION PLAN and IBM CORPORATION, Defendants.**

**CIVIL NO. 99-829-GPM**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**2005 U.S. Dist. LEXIS 17071**

**August 16, 2005, Decided
August 16, 2005, Filed**

**SUBSEQUENT HISTORY:** Appeal dismissed by Cooper v. IBM Pers. Pension Plan, 163 Fed. Appx. 424, 2006 U.S. App. LEXIS 2577 (7th Cir. Ill., 2006)
Subsequent appeal at Cooper v. IBM Personal Pension Plan, 2006 U.S. App. LEXIS 20128 (7th Cir. Ill., Aug. 7, 2006)

**PRIOR HISTORY:** Cooper v. IBM Pers. Pension Plan, 2004 U.S. Dist. LEXIS 2415 (S.D. Ill., Feb. 12, 2004)

**COUNSEL:** [*1] For Kathi Cooper, Individually and on Behalf of All Those Similarly Situated, Plaintiff: Douglas R. Sprong, Steven A. Katz, Korein Tillery -- Swansea Generally Admitted, Swansea, IL; Jeffrey N. Young, McTeague, Higbee et al., Topsham, ME; John H. Evans, Robert F. Hill, Hill & Robbins, Denver, CO; William K. Carr, Law Offices of William K. Carr, Denver, CO.

For Beth Harrington, Individually and on Behalf of All Those Similarly Situated, Matthew Hillesheim, Individually and on Behalf of All Those Similarly Situated, Plaintiffs: Jeffrey N. Young, McTeague, Higbee et al., Topsham, ME; John H. Evans, Robert F. Hill, Hill & Robbins, Denver, CO.

For IBM Personal Pension Plan, The, IBM Corporation, Defendants: David H. Remes, Eric R. Sonnenschein, Jeffrey G. Huvelle, Robert D. Wick, Covington & Burling, Washington, DC; Donald J. Rosenberg, Douglas Vetter, IBM Corporation, White Plains, NY; Frederick J. Hess, Lewis, Rice et al., Belleville, IL.

For Objector Barry Gordon, Claimant: Pro se, Rockville, MD.

For Objector Alan L. Berger, Claimant: Pro se, New Bern, NC.

For Objector Kevin L Jones, Claimant: Pro se, Fort Collins, CO.

For Objector Willie Young, Claimant: [*2] Pro se, Aurora, IL.

For Objector John H Collier, Claimant: Pro se, Wilton, CT.

For Objector Rolf M Marsh, Claimant: Pro se, Nine Miles Falls, WA.

For Objector Gary Laski, Claimant: Pro se, Lexington, KY.

For Objector James M Leas, Claimant: Pro se, South Burlington, VT.

For Objector Katie F Jones, Claimant: Pro se, Dallas, TX.

For Objector Roger L Oedewaldt, Claimant: Pro se, Washington, IL.

For Objector Anthony T Arroyo, Claimant: Pro se, Waxhaw, NC.

For Objector Ronald A Linton, Claimant: Pro se, Rhinebeck, NY.

For Objector Hudson G Willis, Claimant: Pro se, Kennesaw, GA.

2005 U.S. Dist. LEXIS 17071, *

For Objector Larry Hanke, Jr., Claimant: Pro se, Round Rock, TX.

For Objector William Myre, Claimant: Pro se, Austin, TX.

For Objector Robert W Brzozowski, Claimant: Pro se, Hopewell Junction, NY.

For Objector Gary L Fellman, Claimant: Pro se, Hughes ACT 2605 Australia.

For Objector David Hauser, Claimant: Pro se, San Jose, CA.

For Objector David Gowdy, Claimant: Pro se, Potomac Falls, VA.

For Objector Karen Travis, Claimant: Pro se, Austin, TX.

For Objector Ronald G Cherveny, Claimant: Pro se, Raleigh, NC.

For Objector Charles [*3] E McKerley, Claimant: Pro se, Houston, TX.

For Objector Rosario J Locascio, Claimant: Pro se, Safety Harbor, FL.

For Objector Douglas E Whitehurst, Claimant: Pro se, Murrells Inlet, SC.

For Objector Charles Balkon, Claimant: Pro se, Prunedale, CA.

For Objector Daniel C Moore, Claimant: Pro se, Montgomery Village, MD.

For Objector Sharon Lewis, Claimant: Pro se, Zebulon, NC.

For Objector Maurice R Duprey, Claimant: Pro se, Spring Hill, FL.

For Objector Robert L Cook, Claimant: Pro se, Greenfield, IN.

For Objector Paul Gromkowski, Claimant: Pro se, Fishkill, NY.

For Objector Richard J Gunthe, Claimant: Pro se, Hopewell Junction, NY.

For Objector Louise M Gunther, Claimant: Pro se, Hopewell Junction, NY.

For Objector George E Beall, Claimant: Pro se, Matthews, NC.

For Objector Gerald L Vantrease, Claimant: Pro se, Chattanooga, TN.

For Objector Mark Megerian, Claimant: Pro se.

For Objector Robert D Breed, Claimant: Pro se, Raleigh, NC.

For Objector George Klopp, Claimant: Pro se, Charlotte, NC.

For Objector Jan T Karels, Claimant: Pro se, Rochester, MN.

For Objector Lawrence L LeClair, Claimant: Pro se, [*4] Tucson, AZ.

For Objector Donna M LeClair, Claimant: Pro se, Tucson, AZ.

For Objector David Lovelace, Claimant: Pro se, San Jose, CA.

For Objector Orest Bula, Claimant: Pro se, Shelburne, VT.

For Objector Ronald C Buszko, Claimant: Pro se, Matthews, NC.

For Objector Daniel A Roth, Claimant: Pro se, Port Ewen, NY.

For Objector Russell Callaway, Claimant: Pro se, Concord, NC.

For Objector Daniel Oklan, Claimant: Pro se, Enosburg Falls, VT.

For Objector William J Costine, Claimant: Pro se, Beacon, NY.

For Objector Sheila Burch, Claimant: Pro se, San Jose, CA.

For Objector Carmellena Jane Straley, Claimant: Pro se, Berlin, MD.

For Objector Harry Wayne Montgomery, Claimant: Pro se, Nicholasville, KY.

For Objector Arthur G Cannon, Claimant: Pro se, Decatur, TX.

For Objector Syverson et al., Claimant: Patrick N. McTeague, McTeague, Higbee et al., Topsham, ME.

For Objector Anton Zanki, Objector Linda Cunningham, Claimants: Charles E. Hamilton, III, Lamothe & Hamilton, New Orleans, LA.

For Objector Gurbachan Singh Khalsa, Claimant: Pro se, West Bloomfield, MI.

**JUDGES:** G. PATRICK MURPHY, Chief United States District Judge.  [*5]

**OPINION BY:** G. PATRICK MURPHY

**OPINION**

**MEMORANDUM AND ORDER**

**MURPHY, Chief District Judge:**

This matter is before the Court on Class Counsel's Motion for Award of Attorneys' Fees, Costs and Incentive Awards ("Fee Request") (Doc. 352). Based upon the entire record in this case, including the objections and other comments filed by the Class Members and the arguments presented at the hearing held on August 8, 2005, the Court finds and orders as follows:

This litigation started November 1, 1999, and will continue for at least another year as the parties continue to litigate two of the central issues before the United States Court of Appeals and potentially the United States Supreme Court. IBM's 1995 implementation of a pension equity formula and its 1999 implementation of a cash balance formula raise six difficult and novel issues. It was clear when this case was filed that it would be hard fought and was likely to be ultimately resolved by the Court of Appeals for the Seventh Circuit or perhaps the United States Supreme Court. In fact, early in the case the Court observed at an oral argument that "I understand . . . whatever I do here will be reviewed *de novo* in the Court [*6] of Appeals. And of the cases I have handled here, I believe that this case has the best chance of ending up in the United States Supreme Court. . . ." Transcript of Oral Arg. at 4:23-5:8 (Dec. 17, 2002).

On September 17, 2001, this Court certified the case as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of three Subclasses. Subclass 1 consists of Class Members who accrued benefits under the Pension Credit Formula adopted by the Plan effective January 1, 1995, but did not accrue any benefits under the Cash Balance Formula adopted by the Plan effective July 1, 1999. Subclass 2 is comprised of Class Members who accrued a benefit under the Cash Balance Formula adopted by the Plan effective July 1, 1999. There are more than 250,000 members of Subclasses 1 and 2. Subclass 3 consists of approximately 15,000 individuals who were participants in the Plan as of July 1, 1999, but did not complete five years of service such that they did not vest in their Plan benefit. The Subclass 3 claims were settled under the terms of a Settlement Agreement approved by the Court on January 10, 2005 *(see* Docs. 287, 288). [*7] IBM subsequently filed an interlocutory appeal challenging the certification of the case as a class action. This appeal was denied by the United States Court of Appeals for the Seventh Circuit. *See Cooper v. IBM*, No. 01-8034 (7th Cir. Nov. 19, 2001).

This Court is familiar with the complex and novel issues involved in this case, as well as the work of Class Counsel in prosecuting the claims for more than five years of this hard-fought litigation. This prosecution has included extensive discovery, expert witness depositions, and voluminous briefing on all of the factual and legal issues, as well as numerous court hearings.

On May 18, 2005, the parties entered into a Settlement Agreement ("Settlement"). Following a hearing on August 8, 2005, the Court approved that Settlement as fair and reasonable and in the best interests of the Class following the required notice to Class Members.

The Settlement requires IBM to amend the Plan to provide additional pension benefits to eligible members of the Class which, when added to the amount of attorneys' fees awarded by the Court to Class Counsel, will total in value $ 314,293,000 as of November 1, 2006. While the Settlement provides that [*8] Defendants will appeal the Court's decision regarding liability on the Cash Balance Claim and the Always Cash Balance Claim, the Settlement resolves the issues regarding the remedies that should be awarded with respect to these claims in the event this Court's rulings are upheld on appeal. IBM agrees that if the Court's liability ruling in favor of the Class on the Always Cash Balance Claim is upheld on appeal, the Plan will be amended to provide additional pension benefits. The additional value of those benefits, including the attorneys' fees awarded by the Court to Class Counsel in connection with that claim, will be $ 620,000,000 (in addition to the guaranteed amount of $ 314,293,000). IBM also agrees that if the Court's liability ruling in favor of the Class on the Cash Balance Claim is upheld on appeal, the Plan will be amended to provide additional pension benefits which, along with the attorneys' fees awarded by the Court to Class Counsel in connection with that claim, will total $ 1,714,293,000.

Notably, the Settlement provides that any benefit provided to a participant as a result of the Settlement Agreement is an independent Plan obligation separate, apart from, and in addition [*9] to any other benefit accrued by a participant before the Settlement Date under the Cash Balance Formula, the Pension Credit Formula, or any formula under any other employee pension benefit plan sponsored by IBM. In addition, any pension benefit a participant would otherwise accrue under any Plan formula, or any other employee pension benefit plan sponsored by IBM based on service after the Settlement Date, will not be reduced or offset by and will not wear away any participant's Settlement Benefit. Finally, IBM waives any defense or right to assert any precedent or policy that might preclude or prohibit the entry of retroactive relief.

Class Counsel seeks fees on a decreasing percentage as follows: (1) an amount equal to 29% of the amount of any Settlement Benefits recovered up to $ 250 million; (2) an amount equal to 25% of the amount of any Settlement Benefits recovered in excess of $ 250 million up to the amount of $ 750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $ 750 million up to the amount of $ 1,250 million; and (4) an amount equal to 17% of any Settlement Benefits recovered in excess of $ 1,250 million. If the Class [*10] prevails on all claims, the blended fee produced by the above percentages is 22.25%. Class Counsel also requests incentive awards of $ 40,000 for Ms. Cooper and $ 20,000 for Ms. Harrington to be paid out of the attorneys' fees and costs award. Class Counsel is not requesting any additional recovery to reimburse them for the expenses they already have incurred or will incur in the future but have agreed to reimburse themselves for those costs out of whatever fees are awarded by this Court.

In considering Class Counsel's Fee Request, this Court is guided by the numerous decisions of the Seventh Circuit requiring the Court to do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) *("Synthroid I")*; *see also Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (directing district court to determine fair attorneys' fees in class action by considering the probability of success at the outset of the litigation); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) [*11] ("The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible."). Where, as here, it is "impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 2005 U.S. App. LEXIS 13310, No. 04-3140, 2005 WL 1560331, at *1 (7th Cir. July 5, 2005).

Based on the evidence before the Court regarding the market for class counsel in cases of this type and a long line of ERISA decisions, it is appropriate to award Class Counsel a percentage of recovery fee in this case. *Florin*, 34 F.3d at 563; Mark Berlind, Attorney's Fees under ERISA: When is an Award Appropriate?, 71 Cornell L.Rev. 1037, 1060-61 (1986) ("Applying the common benefit doctrine reflects the statute's purpose. . . . Nothing in ERISA indicates that Congress intended to preempt the common benefit doctrine. [*12] "). As the Ninth Circuit stated in *Staton v. Boeing Company*, 327 F.3d 938, 967 (9th Cir. 2003), "We conclude, as have the two other circuits that have addressed the issue, that there is no preclusion on recovery of common fund fees where a fee-shifting statute applies." *Citing Brytus v. Spang & Co.*, 203 F.3d 238, 246-247 (3rd Cir. 2000); *Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998). This reasoning is appropriate here, where an award of attorneys' fees under ERISA's fee-shifting statute is not automatic and depends upon a variety of factors. *See, e.g., Quinn v. Blue Cross & Blue Shield Ass'n.*, 161 F.3d 472, 478 (7th Cir. 1998).

The Seventh Circuit has indicated that "the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court." *Florin*, 34 F.3d at 566. In exercising that discretion, the Seventh Circuit has noted that in common fund/benefit cases, "the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case." *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000); [*13] *see also In re Continental Illinois Securities Litig.*, 985 F.2d 867 (7th Cir. 1992). Thus, "the approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class," particularly where that percentage of the benefit approach replicates the market. *Williams v. General Elec. Capital Auto Lease, No.* 1995 U.S. Dist. LEXIS 19179, 94-C-7410, 1995 WL 765266, *9 (N.D. Ill. Dec. 26, 1995); *see also Long v. Trans World Airlines, Inc.*, 1993 U.S. Dist. LEXIS 5063, 1993 WL 121824, *1 (N.D. Ill. Apr. 19, 1993). Here, a percentage of the benefit approach clearly best replicates the market.

The uncontested evidence in this case is that Plaintiffs could not afford to retain counsel on any basis other than a contingent fee. Cooper Dec. at P 3. Class representative Kathi Cooper attests that she would not have

hired Class Counsel on an hourly basis. *Id.* There is no reason to believe that any other Class Member would have been willing to pay hourly fees in the hope that the case would be successful and the fees paid ultimately recovered from IBM. Class Counsel, nationally recognized experts in ERISA pension benefit cases, attest that they have not [*14] and would not accept a similar case on any basis other than a contingency fee basis. Sprong Aff. at P 6. The record before the Court establishes that no other capable counsel was willing to take the case on any basis. Cooper Dec. at P 5; Carr Dec. at PP 8-14; Lewis Dec. at PP 11-14. Thus, the undisputed evidence is that the market for legal services for this litigation is a contingency fee. In fact, even the vast bulk of the objectors do not disagree that a percentage of the recovery approach is appropriate in this case, they merely dispute the appropriate percentage.

In determining what an appropriate percentage should be in the unique circumstances of this case, the Court has considered a number of factors. Class Counsel submitted affidavits and briefs setting forth a large number of other large ERISA class actions in which counsel have been awarded fees similar to or greater than the percentages requested here. In addition, this Court is personally familiar with fees in a significant number of relatively similar cases that have been awarded in this District, and the Fee Request in this case is below the amount in many of those cases in spite of the fact that this case involved [*15] similar -- or in all likelihood far more-risk.

While not dispositive, attorneys' fees from analogous class action settlements are indicative of what the market is for such representation and, therefore, what an appropriate fee should be here. As this Court noted in awarding Class Counsel 29% of the recovery in connection with the settlement of the claims on behalf of the Subclass 3 members, "we have a pretty substantial body of case law now built up on these complex cases and it seems as if 30 percent is just about the bench mark." Transcript of Final Approval Hearing, Subclass 3, at 4:9-11 (Jan. 1, 2005). Similarly, the Court notes that the Affidavit of Jeffrey Lewis, a nationally recognized expert in prosecuting complex ERISA litigation, indicates that his firm has regularly been awarded fees in the neighborhood of 25% of the recovery. Lewis Dec. at P 17. Importantly, as Mr. Lewis's affidavit makes clear, those awards occurred in cases with substantially less risk than here. As Mr. Lewis attests, due to the extreme risk in this case, his firm declined to bring it or any other case raising these issues until after this Court's July 31, 2003 Order. Lewis Dec. at P 14. The Court has [*16] reviewed the Declaration of Stephen Susman, a prominent trial counsel with vast experience in complex litigation, who attests that if he had been asked to undertake this case for an individual client or group of clients on a nonclass basis, he would have done so only if they had agreed to pay his expenses and also his standard 33 1/3 contingent fee. Susman Dec. at P 6.

The Seventh Circuit's recent decision in *Taubenfeld v. Aon* indicates that it is also appropriate to consider the "quality of legal services rendered and the contingent nature of the case." *Taubenfeld*, No. 04-3140, 2005 U.S. App. LEXIS 13310, 2005 WL 1560331, at *3. The quality of the legal work of all counsel in this case has been exemplary. The quality of Class Counsel's legal work both in and out of the courtroom is ably demonstrated by the benefits conferred on the Class as a result of the Settlement. Even if the Class were to lose both of the issues on appeal, the Settlement would be one of the largest pension settlements in the nation's history. And in the event that the Class prevails on either or both of the issues on appeal, the Settlement is likely to be the largest pension settlement in history.

It is clear that [*17] the Settlement represents a solid achievement in terms of the benefits it provides Class Members compared to what they could have achieved by further litigation. For example, as noted by Defendants in their moving papers seeking approval of the Settlement, Class Counsel not only achieved record-breaking additional benefits for the Class but also achieved a "valuable guarantee that plaintiffs could not have obtained in litigation -- an assurance from defendants that they will not offset or wear away' the supplemental benefits provided by the Settlement against pension benefits earned for future service to IBM." *(See* Doc. 353 -- Defendants' Memorandum in Support of Joint Motion for Approval of Settlement -- at 6.) While it is an extremely valuable benefit to the Class Members, it is not, as a mathematical matter, reflected in the value of the recovery, but it warrants consideration.

The degree of risk of nonpayment in this case was high at the outset. It is undisputed that at the time Class Counsel initiated this action no other qualified counsel in the country would do so. When this case was commenced in 1999, only two courts had considered legal challenges to cash balance plans, [*18] and both decisions were summary judgment orders rejecting the plaintiffs' claims. *See Esden v. Retirement Plan of the First National Bank of Boston*, 182 F.R.D. 432 (D. Vt. 1999); *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 66 F.Supp.2d 1328 (N.D. Ga. 1999). Shortly after this case was filed, another district court rejected a claim that cash balance plans violate ERISA § 204(b)(1)(H). *See Eaton v. Onan Corp.*, 117 F.Supp.2d 812 (S.D. Ind. 2000). To date, Class Counsel are the only attorneys in the country who have prevailed on the claim that a pension equity formula or a cash balance plan formula violates ERISA § 204(b)(1)(H).

The Court is also aware from the voluminous briefing in this case that there was not only a high degree of risk in the litigation context, but there was also considerable additional risk that either regulatory or legislative action might eliminate any potential for success in the courtroom. In short, there can be no question that the risk of nonpayment in this case was extraordinarily high, much higher than in the other large pension cases of which this Court is aware. In addition to facing [*19] an uphill legal and political battle, it was equally clear that anyone representing Plaintiffs would be required to overcome a well-financed adversary and prominent defense counsel with abundant financial and legal resources at their disposal.

In determining an appropriate percentage of the recovery to award, this Court is mindful of the directive in *Synthroid I* that,

> the district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed). The best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low). This is what happens in actual markets. Individual clients and their lawyers *never* wait until after recovery is secured to contract for fees.

*Synthroid I*, 264 F.3d at 718 (emphasis in original).

All of the evidence before the Court indicates that in the event the IBM employees had been required as a group to negotiate the terms of a [*20] fee contract with Class Counsel at the outset of the case, the fee percentage contained in the resulting contract would have been equal to -- and more likely higher than -- the Fee Request before this Court.

This Court has also considered data from so-called class-counsel auctions. The Court notes that in *In re: Synthroid Marketing Litig.*, 325 F.3d 974 (7th Cir. 2003) *("Synthroid II")*, the Seventh Circuit indicated that the sophisticated third-party payors (the insurance companies) in that case negotiated a flat 22% rate even after the risk of the litigation had passed and a recovery was assured. 325 F.3d at 976, 978 (explaining the 22% rate was agreed to "after a good deal of the risk had been dissipated" and that the TPPs still "had to offer 22% to sign up lawyers on a contingent fee."). To apply the rationale

of that case to the circumstances of this case, the Court must take into consideration the notable differences between the auctions conducted in the securities field where literally dozens of skilled and experienced law firms battle each other to represent the class and typically base their cases on long established legal precedents and the [*21] situation present here.

As nationally known pension lawyer Jeffrey Lewis attests, there are only a handful of lawyers in the country who have the expertise and background to practice in this area (compared to the thousands of attorneys who practice securities litigation), and none of them was willing to undertake the risk of pursuing cases challenging cash balance plans in 1999 or for years thereafter. Lewis Dec. at PP 12-14. The evidentiary record also demonstrates that several of the best and most prominent employment firms in the country specifically refused to take the case on behalf of the IBM employees on any terms. Carr Dec. at PP 8-13. Similarly, Mr. Susman attests that "if the Court had held an auction at the beginning of this case for qualified counsel to undertake this litigation, no qualified firm would have proposed a fee structure below what Class Counsel is requesting in this case." Susman Dec. at P 8; *see also* Carr Dec. at P 14.

Based on all the evidence and testimony, the Court concludes that if an "auction" had in fact taken place, Class Counsel would have been the only bidder and, in light of the risk then involved, would have extracted a far higher fee that [*22] they are now requesting. Thus, the undisputed evidence before this Court indicates that under the standards enunciated in *Synthroid I and Synthroid II*, Class Counsel's Fee Request (inclusive of costs) is at or below what application of an "auction" scenario would have determined.

Class Counsel will be required to continue to litigate the two central issues in this case for an indefinite period of time. Not only will that involve additional time and expense, but it also involves additional risk. This is a unique factor in this case and merely emphasizes the reasonable nature of the Fee Request, as any counsel negotiating a fee contract at the outset of the litigation would certainly have taken the potential for appellate litigation into consideration in setting a fee in light of the very novel issues involved in this case.

In analyzing the appropriate fee to be awarded to Class Counsel, the Court has also given careful consideration to the objections that have been filed with the Court regarding the Fee Request. The most notable aspect of those objections is how few were filed. Although more than 272,000 potential Class Members were notified by first class mailing, only 45 objected [*23] to the Fee Request in any fashion. This is particularly remarkable in light of the sophistication of the Class Members

and the high degree of interest in this litigation by the Class Members as evidenced by the fact that the website IBM established to provide additional information regarding the Settlement to Class Members received more than 38,000 visits. A significant number of the objections to the Fee Request (33 out of the total of 45) are individuals who have filed letters indicating that they agree with a longer statement of objection filed by Mr. Leas. Apparently Mr. Leas's statement was widely circulated on the internet in an effort to solicit additional objections agreeing with his point of view.

Putting aside the mischaracterizations and inaccuracies regarding both the Class claims and the Settlement in Mr. Leas's objection, his objection ignores any consideration of the controlling Seventh Circuit authority. Instead, it relies almost totally on information Mr. Leas selectively culls from a law review article reporting on a statistical study of class action fee awards. Putting aside the limitations of that study and the potential for distortion when one tries to apply it [*24] to arrive at an appropriate fee in this case under the proper Seventh Circuit standards, when one closely examines the article for cases in the category applicable here (the over $ 190 million decile), the mean fee percentage was 16.4%, the median was 17.6%, and the standard deviation was 9.6%. Applying those percentages here, a fee award of 26% on a $ 929 million recovery would be presumptively reasonable, and an award of up to 35.6% potentially could be reasonable, depending on the complexity of the case and the risks involved. The study supports the reasonableness of the Fee Request, considering the risk and complexity of this case.

It is plain to see that Class Counsel greatly benefit from a contingent fee scheme. But this case could have ended differently in which event Counsel would have toiled for years having fronted the costs of the litigation for no reward whatsoever. In that event no one would argue that a contingent fee agreement along the lines approved here was unreasonable.

The Fee Request is unreasonable only if the result was likely from the outset, which is not the case. The motion for attorneys' fees, costs, and incentive awards (Doc. 352) is **GRANTED.** The [*25] Plan shall pay Class Counsel fees as an administrative cost of the Plan in accordance with the Settlement Agreement and calculated on a decreasing percentage as follows: (1) an amount equal to 29% of the amount of any Settlement Benefits recovered up to $ 250 million; (2) an amount equal to 25% of the amount of any Settlement Benefits recovered in excess of $ 250 million up to $ 750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $ 750 million up to the amount of $ 1,250 million; and (4) an amount equal to 17% requested of any Settlement Bene-

fits recovered in excess of $ 1,250 million. Class Counsel shall pay incentive awards of $ 40,000 to Ms. Cooper and $ 20,000 to Ms. Harrington out of the attorneys' fees paid by the Plan and shall also reimburse themselves for any expenses they already have incurred or will incur in the future out the attorneys' fees awarded by this Court.

Finally, for the reasons set forth on the record at the August 8, 2005 hearing, the final motion for settlement approval (Doc. 351) is **GRANTED,** and the Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: [*26] August 16, 2005

G. PATRICK MURPHY

Chief United States District Judge

**JUDGMENT IN A CIVIL CASE**

**DECISION BY COURT.** This matter came before the Court on cross motions for summary judgment and a Class Action Settlement Agreement with Respect to Subclasses 1 and 2 ("Settlement Agreement"). The issues having been duly heard and a decision having been duly rendered,

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of the members of Subclasses 1 and 2 on their claim that the Cash Balance Formula violates ERISA § 204(b)(1)(H). These Class Members are entitled to relief for the violation as provided in the Settlement Agreement.

**IT IS FURTHER ORDERED AND ADJUDGED** that judgment is entered in favor of the members of Subclasses 1 and 2 on their claim that the Always Cash Balance Formula violates ERISA § 204(b)(1)(H). These Class Members are entitled to relief for the violation as provided in the Settlement Agreement.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Plan shall pay Class Counsel fees as an administrative cost of the Plan in accordance with the Settlement Agreement and calculated on a decreasing percentage as follows: (1) an amount [*27] equal to 29% of the amount of any Settlement Benefits recovered up to $ 250 million; (2) an amount equal to 25% of the amount of any Settlement Benefits recovered in excess of $ 250 million up to the amount of $ 750 million; (3) an amount equal to 21% of the amount of any Settlement Benefits recovered in excess of $ 750 million up to the amount of $ 1,250 million; and (4) an amount equal to 17% requested of any Settlement Benefits recovered in excess of $ 1,250 million. Class Counsel shall pay incentive awards of $ 40,000 to Ms. Cooper and $ 20,000 to Ms. Harrington out of the attorneys' fees paid by the Plan and

2005 U.S. Dist. LEXIS 17071, *

shall also reimburse themselves for any expenses they already have incurred or will incur in the future out of the attorneys' fees awarded by this Court.

**IT IS FURTHER ORDERED AND ADJUDGED** that the claims of Subclass 3 were dismissed pursuant to a Rule 54(b) judgment entered on January 10, 2005. All other claims asserted by Plaintiffs in this action are now **DISMISSED with prejudice** pursuant to the terms of the Settlement Agreement and in exchange for the consideration provided therein.

**DATED:** August 16, 2005

2

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FIRST INTERSTATE BANK OF NEVADA,       )
N.A., as Administrator of the          )
ESTATE OF JOHANNA W. NELSON,           )
and as representative of a             )
bondholder class,                      )
                                       )        NO. 80 C 6401
                Plaintiffs,            )
                                       )        JUDGE PLUNKETT
        vs.                            )
                                       )
NATIONAL REPUBLIC BANK OF              )
CHICAGO, et al.,                       )
                                       )
                Defendants.            )

## ORDER REGARDING FEES AND COSTS

The Court has reviewed plaintiffs memorandum in support
of counsel's verified applications for attorneys' fees and
costs, the affidavit of Sachnoff Weaver & Rubenstein, Ltd.
for fees and expenses and its accompanying exhibits, and the
declaration of R. Alan Stotsenburg in support of fees and costs.
In addition, the Court has reviewed the narrative description
of Sachnoff Weaver & Rubenstein, Ltd.'s fees and expenses as
well as the description of R. Alan Stotsenburg, P.C. of his
fees and expenses. The Court notes that the fees of the Sachnoff
firm, at historical rates, total $1,158,517.40, while the fees
of the Stotsenburg firm at historical rates total $657,596.

Based on its review, the Court finds that the fees of
$893,000 for Sachnoff Weaver & Rubenstein, Ltd. and $507,000

for the Stotsen g firm are reasonable an constitute a discount of their lodestar fees at historical rates. The Court further finds that these fees constitute less than 40 percent of the $3,575,000 settlement figure, and that this percentage of fees is within the generally accepted range of fee awards in class action securities lawsuits.

Finally, the Court finds that the notice to the class apprising the class members of the settlement terms stated that counsel's fees were approximately $1,400,000, and that not one class member has objected to these fees.

WHEREFORE, THE COURT ORDERS that the escrow agent execute checks payable to Sachnoff Weaver & Rubenstein, Ltd. for $893,000 in fees, and R. Alan Stotsenburg, P.C. for $507,000 in fees.

FURTHER ORDERED that the escrow agent execute checks payable to Sachnoff Weaver & Rubenstein, Ltd. for $32,633.83 as reimbursement of its remaining cash expenses, and to R. Alan Stotsenburg, P.C., for $15,122.26 as reimbursement of its remaining expenses.

DATED: FEB 12 1988

JUDGE PAUL E. PLUNKETT

- 2 -

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREATER PENNSYLVANIA CARPENTERS PENSION FUND, On Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 04 C 1107 |
| v. | ) ) | |
| WHITEHALL JEWELLERS, INC., et al., | ) ) | |
| Defendants. | ) ) | |

## ORDER AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

THIS MATTER having come before the Court on July 24, 2006, on the application of

Lead Counsel for an award of attorneys' fees and reimbursement of expenses incurred in the

Litigation; the Court, having considered all papers filed and proceedings conducted herein,

having found the settlement of this Litigation to be fair, reasonable and adequate and otherwise

being fully informed in the premises and good cause appearing therefor:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.       All of the capitalized terms used herein shall have the same meanings as set forth

in the Stipulation of Settlement dated as of April 17, 2006 (the "Stipulation").

2.       This Court has jurisdiction over the subject matter of this application and all

matters relating thereto, including all Members of the Settlement Class who have not timely and

validly requested exclusion.

3.       The Court hereby awards Lead Counsel attorneys' fees of 30% of the Settlement

Fund and reimbursement of expenses in an aggregate amount of $438,896.69 together with the

interest earned thereon for the same time period and at the same rate as that earned on the

Settlement Fund until paid. Said fees shall be allocated by Lead Counsel in a manner which, in

their good-faith judgment, reflects each counsel's contribution to the institution, prosecution and

resolution of the Litigation. The Court finds that the amount of fees awarded is fair and

reasonable under the "percentage-of-recovery" method.

4.     The awarded attorneys' fees and expenses, and interest earned thereon, shall be

paid to Lead Counsel from the Settlement Fund immediately after the date this Order is executed

subject to the terms, conditions, and obligations of the Stipulation and in particular ¶6.2 thereof,

which terms, conditions, and obligations are incorporated herein.

IT IS SO ORDERED.

Date:  July 24, 2006

ENTERED

AMY J. ST. EVE
United States District Court Judge

4

Westlaw.

Page 1

Not Reported in F.Supp., 1991 WL 238298 (N.D.Cal.), Fed. Sec. L. Rep. P 96,252
**(Cite as: 1991 WL 238298 (N.D.Cal.))**

United States District Court, N.D. California.
In re APPLE COMPUTER SECURITIES LITIGA-
TION.

No. C–84–20148(A)–JW.
Sept. 6, 1991.

WARE, District Judge.

OPINION

**\*1** The Court accepts the Special Verdict of the jury with respect to defendants John Couch and Steven Jobs. Pursuant to Rule 58, Fed.Rules Civ.Proc., judgment shall be entered in favor of defendants Couch and Jobs, based upon the Special Verdict of the jury.

The Court has considered the motions of defendants John Vennard and A.C. Markkula for Judgment Notwithstanding the Verdict. The standard applicable to a judgment n.o.v. motion is whether the evidence and its inferences, taken as a whole and viewed in a light most favorable to the plaintiffs, are sufficiently substantial to support the jury's verdict. Applying this standard to this case, the Court concludes that under the Court's instructions to the jury, no reasonable jury could have found defendants Vennard and Markkula liable for directly violating Rule 10b–5. There was no substantial evidence that these individual defendants made false or misleading statements knowing that the statements were false and misleading or with reckless disregard that the statements were false or misleading. Accordingly, pursuant to Rule 50(b), Fed.Rules Civ.Proc., judgment shall be granted in favor of these defendants in accordance with the motion by these defendants for a directed verdict.

Pursuant to Rule 50(c), the Court conditionally grants the motion of defendants Vennard and Markkula for a new trial on the ground that the Special Verdict indicates that the jury was confused and the Special Verdict is internally inconsistent and it would be unjust to enter judgment against these two defendants on the basis of the Special Verdict. This conditional grant of a new trial will not go into effect unless the entry of judgment n.o.v. is reversed on appeal, if any is taken.

The Special Verdict found no liability on the part of defendant Apple Computer Inc. Plaintiffs have made a motion for the court to enter judgment against defendant Apple on the ground that since the jury found that officers of Apple were liable for securities fraud, this finding should be construed as a finding against defendant Apple as a matter of law. As a corporation Apple can only act through its authorized officials and employees. Under the facts of this case, the verdict that Apple is not liable is irreconcilable with a determination that two of Apple's officials made intentionally false or misleading statements in violation of federal securities laws. Although the Court finds no substantial evidence that the named individuals made the statements, nevertheless, the statements were made on behalf of Apple Computer, Inc. However, because the jury exonerated defendant Apple, the verdict against the individuals can not be construed as tantamount to a finding that defendant Apple made intentionally false or misleading statements. The Court is not persuaded to grant judgment in favor of plaintiffs as a matter of law. Accordingly plaintiffs' motion is denied.

Pursuant to Rule 59(a) and (d), on its own initiative, the Court orders a new trial on the issues of liability and damages on the ground that the special verdict is inconsistent and evidences confusion on the part of the jury. The parties to the new trial will be the plaintiff class and defendant Apple Computer, Inc.

**\*2** The Court does not wish its ruling to be taken as a criticism of the jury or of jury trials. This is a complex case. The jury was faced with a complex matrix of responsibility and a confusing damage calculation. The questions and conflicts could

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 238298 (N.D.Cal.), Fed. Sec. L. Rep. P 96,252
**(Cite as: 1991 WL 238298 (N.D.Cal.))**

have been avoided, perhaps, if the Court had sup-
plied the jury with a more comprehensive set of In-
terrogatories.

A scheduling conference shall take place on
October 11, 1991 at 9:00 a.m.

INTERLOCUTORY JUDGMENT
Pursuant to this Court's Order of September 6,
1991, accepting the Special Verdict with respect to
defendants John Couch and Steven Jobs and condi-
tionally granting judgment n.o.v. with respect to de-
fendants John Vennard and A.C. Markkula,

IT IS HEREBY ORDERED, ADJUDGED
AND DECREED as an Interlocutory Judgment in
this action, judgment is entered in favor of defend-
ants John Couch, Steven Jobs, John Vennard and
A.C. Markkula.

N.D.Cal.,1991.
In re Apple Computer Securities Litigation
Not Reported in F.Supp., 1991 WL 238298
(N.D.Cal.), Fed. Sec. L. Rep. P 96,252

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

5

LEXSEE

IN RE BANKATLANTIC BANCORP, INC. SECURITIES LITIGATION

CASE NO. 07-61542-CIV-UNGARO

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
FLORIDA

2011 U.S. Dist. LEXIS 48057

April 25, 2011, Decided

**PRIOR HISTORY:** In re BankAtlantic Bancorp, Inc.,
2010 U.S. Dist. LEXIS 142547 (S.D. Fla., Sept. 8, 2010)

**COUNSEL:** [*1] For Joseph C. Hubbard, individually
and on behalf of all others similarly situated, Plaintiff:
David Reich Chase, LEAD ATTORNEY, David R
Chase PA, Fort Lauderdale, FL; Jules Brody, LEAD
ATTORNEY, Stull Stull & Brody, New York, NY; Julie
Prag Vianale, Kenneth J. Vianale, LEAD ATTORNEYS,
Vianale & Vianale, Boca Raton, FL; Adam Michael
Schachter, Stearns Weaver Miller Weissler Alhadeff &
Sitterson, Miami, FL; Ronald D. Shindler, Fowler White
Burnett, Miami, FL.

For State-Boston Retirement System, Lead Plaintiff,
Plaintiff: Benjamin J. Hinerfeld, LEAD ATTORNEY,
PRO HAC VICE, Andrew L. Zivitz, Mark S. Danek,
Michelle M. Newcomer, Nichole T. Browning, PRO
HAC VICE, Barroway Topaz Kessler Meltzer & Check
LLP, Matthew Mustokoff, Radnor, PA; Jonathan Louis
Alpert, LEAD ATTORNEY, The Alpert Law Firm PA,
Miami Beach, FL; Mark S. Arisohn, LEAD ATTOR-
NEY, PRO HAC VICE, Jonathan Gardner, Labaton
Sucharow LLP, New York, NY; Michael W. Stocker,
Serena W. Hallowell, LEAD ATTORNEYS, Labaton
Sucharow LLP, New York, NY; Adam Michael
Schachter, Stearns Weaver Miller Weissler Alhadeff &
Sitterson, Miami, FL; Mindy Dolgoff, PRO HAC VICE,
Labaton Sucharow, LLP, New York, NY; Ronald D.
Shindler, Fowler White [*2] Burnett, Miami, FL.

For BankAtlantic Bancorp, Inc., James A. White, Valerie
C. Toalson, Jarett S. Levan, Alan B. Levan, Defendants:
Eugene E. Stearns, LEAD ATTORNEY, Adam Michael
Schachter, Cecilia Duran Simmons, Gordon McRae
Mead, Jr., Richard Bryan Jackson, Stearns Weaver
Miller Weissler Alhadeff & Sitterson, Miami, FL; An-
drea Naomi Nathan, Stearns Weaver Miller et al., Miami,
FL.

**JUDGES:** URSULA UNGARO, UNITED STATES
DISTRICT JUDGE.

**OPINION BY:** URSULA UNGARO

**OPINION**

### ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL

THIS CAUSE is before the Court upon Defendants'
Motion for Judgment as a Matter of Law and Defendants'
Motion for New Trial. (D.E. 666 & 669.) Plaintiffs filed
Responses in Opposition to both Motions, and Defen-
dants filed Replies in Support of both Motions. (D.E.
674-75, 677 & 679.) Both Motions are ripe for disposi-
tion.

THE COURT has considered the Motions and the
pertinent portions of the record and is otherwise fully
advised in the premises.

AS SET FORTH BELOW, the Court will GRANT
Defendants' Motion for Judgment as a Matter of Law and
will CONDITIONALLY DENY Defendants' Motion for
New Trial. Defendants are entitled to judgment in their
favor as to all of Plaintiffs' claims.

### I. [*3] Procedural Background

Plaintiffs are the class of individuals who purchased
the common stock of Defendant BankAtlantic Bancorp,
Inc. (Bancorp) between November 9, 2005 and October
25, 2007 (the Class). [1]

> 1   On February 4, 2008, the Court appointed
> State-Boston Retirement System as the Lead
> Plaintiff. (D.E. 45.) State-Boston is an institu-
> tional investor claiming to have purchased shares

in Bancorp during the class period and to have suffered over $1.8 million in losses. (D.E. 45.) On October 19, 2009, the Court named State-Boston and Erie County Employees Retirement System as Co-Class Representatives. (D.E. 153.)

Bancorp is the publicly traded parent company of BankAtlantic, a federally chartered bank offering consumer and commercial banking and lending services throughout Florida. The remaining Defendants are current and former officers and directors of Bancorp: (1) James A. White, the former Executive Vice President and Chief Financial Officer (CFO) of Bancorp and former CFO of BankAtlantic; (2) John E. Abdo, the Vice-Chairman of the Board of Directors for Bancorp and BankAtlantic; (3) Valerie C. Toalson, CFO of Bancorp and Executive Vice President and CFO of BankAtlantic; (4) Jarett Levan, [*4] the President of BankAtlantic, and from January 16, 2007, the President of Bancorp and the Chief Executive Officer (CEO) of BankAtlantic; and, (5) Alan Levan, the former Chairman of the Board and CEO of Bancorp and former Chairman of the Board and President and CEO of BankAtlantic.

Plaintiffs contend that Defendants misrepresented and concealed the true quality and consequent value of certain assets in BankAtlantic's loan portfolio in violation of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78a *et seq.*, and caused Plaintiffs to suffer a loss when the truth was revealed.

### A. *Pleadings & Class Certification*

Plaintiffs filed their initial Complaint on October 29, 2007 and their Consolidated Amended Complaint on April 22, 2008. On December 12, 2008, the Court dismissed the Consolidated Amended Complaint without prejudice pursuant to Defendants' motion and Federal Rules of Civil Procedure 9(b) and 12(b)(6). On January 12, 2009, Plaintiffs filed their First Amended Consolidated Complaint. And on May 12, 2009, the Court denied Defendants' motion to dismiss the First Amended Consolidated Complaint.

In the First Amended Consolidated Complaint, Plaintiffs sought damages under [*5] §§ 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) & 78t-1. (D.E. 80.)

In Count I, Plaintiffs alleged that, throughout the class period, Defendants knowingly made materially false and misleading statements, in violation of § 10(b) of the Exchange Act as implemented by Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, regarding the value of its loan portfolio. Plaintiffs' Rule 10b-5 claims fell into three broad categories: misrepresentations and non-disclosures of the poor or deteriorating credit quality of BankAtlantic's land loan portfolio; misrepresentations

and non-disclosures of its poor underwriting practices; and misrepresentations and non-disclosures of the adequacy of its loan loss reserves and the accuracy of its financial statements. The claims were further divided into two separate periods of damage ending with respective stock-price declines on April 26, 2007 and October 26, 2007.

In Count II, Plaintiffs alleged that the individual Defendants were control persons of Bancorp and as such were liable for its Rule 10b-5 violations under § 20(a) of the Exchange Act. And in Count III, Plaintiffs alleged that Defendants Abdo and Alan Levan profited from the [*6] sale of Bancorp stock while in the possession of material, non-public information in violation of § 20A of the Exchange Act.

On October 20, 2009, after Defendants stated their non-opposition to Plaintiffs' motion to certify, the Court certified the Class. [2] (D.E. 147 & 153.) At that time, the case had been pending for two years, the discovery deadline was May 21, 2010, and trial was scheduled to begin on August 16, 2010. (D.E. 148.)

> 2  Defendants later reversed their position and moved to decertify the class at trial. (D.E. 529.) The Court denied the motion. (D.E. 694.)

Nevertheless, on April 22, 2010, nine months after the deadline to amend the pleadings and less than a month before the close of discovery, Plaintiffs moved to amend their complaint. (D.E. 208 & 210.) Plaintiffs offered three reasons for the amendment: shortening the class period to begin on October 19, 2006; discontinuing the insider trading claims under § 20A; and identifying additional public statements which all "relate[d] to Plaintiffs' original theory of liability, *i.e.*, fraudulent misrepresentations regarding the true risk of BankAtlantic's land loan portfolio." (D.E. 210.) The Court denied the motion.

In denying the [*7] motion, the Court agreed with Defendants to the extent they argued that shortening the class period and abandoning the § 20A claims would unfairly deny them a final adjudication of those issues. Further, the Court was unconvinced the remaining amendments were necessary as Plaintiffs had argued the additional statements were substantively indistinguishable from the claims in the First Amended Consolidated Complaint and offered no authority supporting the proposition that identification of the additional statements was required to state a legally sufficient claim. Moreover, the Court observed that, if required, Federal Rule of Civil Procedure 15(b) would allow for amendment of the pleadings at trial to conform to the evidence; in that regard, the Court stated "Defendants have been put on notice of these additional misstatements and

omissions." (D.E. 242.) Accordingly, the case proceeded on the First Amended Consolidated Complaint.

### B. *Motions for Summary Judgment & to Exclude Expert Testimony*

In June 2010, the parties filed cross-motions for summary judgment. Defendants moved for summary judgment on all claims. And Plaintiffs moved for summary judgment only on the narrow issues of the falsity [*8] of four statements made by Alan Levan in a July 25, 2007 conference call. In its August 18, 2010 Omnibus Order, the Court granted Defendants' motion in part and Plaintiffs' partial motion in full. *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 142499, 2010 WL 6397500 (S.D. Fla. Aug. 18, 2010.) In that order, the Court also granted in part Defendants' motion to exclude the proposed testimony of Plaintiffs' loss causation and damages expert, Candace Preston. *Id.*

The order entitled Defendants to final summary judgment on the claims Plaintiffs previously attempted to abandon: the claims from the first year of the class period (pre-October 19, 2006) and the claims under § 20A of the Exchange Act. *Id.* The order also entitled Defendants to final summary judgment on claims arising from any statements regarding BankAtlantic's loan loss reserves and on claims of damages caused by Bancorp's October 29, 2007 stock-price decline. *Id.* Collectively, these rulings shortened the class period to October 19, 2006 through October 26, 2007, and finally adjudicated the claims of insider trading and accounting fraud in Defendants' favor. *Id.*

As to the balance of Plaintiffs' claims, Defendants strongly emphasized Plaintiffs' [*9] failure to produce credible, reliable evidence regarding loss causation and damages. [3] To that end, Defendants also moved to exclude Preston's testimony. The Court granted the motion to exclude in part; what survived from Preston's testimony was, in the Court's view, sufficient to create a genuine issue of fact as to loss causation and damages. [4]

> 3    Defendants also sought summary judgment based on the forward-looking-statement safe harbor under § 27A of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-5. The Court denied that portion of the motion because "Defendants fail[ed] to identify any particular statement that falls within the protection of the safe harbor." (D.E. 411.)
>
> 4    The order allowed Preston's expert opinions on the following: the importance of information regarding a bank's credit and borrower quality to its valuation; the company-specific price declines to Bancorp stock following its April and October 2007 press releases and conference calls; the

amount of the April 26, 2007 residual decline attributable to the disclosure of previously undisclosed negative information on April 25 and 26, 2007, and her belief that the entire October 26, 2007 residual decline was [*10] attributable to the disclosure of previously undisclosed negative information regarding BankAtlantic's land loan portfolio. *In re BankAtlantic*, 2010 U.S. Dist. LEXIS 142499, 2010 WL 6397500.

Finally, the order entitled Plaintiffs to summary judgment as to the narrow issue of the objective falsity of four statements made by Alan Levan during a July 25, 2007 earnings conference call. The four statements at issue concerned the extent to which Alan Levan perceived weakness in certain portions of its loan portfolio. Plaintiffs presented undisputed evidence that those statements were objectively false. And Defendants came forward with no evidence that raised a genuine issue of material fact as to the objective falsity of the statements; rather Defendants focused their argument on the immateriality of the statements and the applicability of the forward-looking safe harbor of § 27A of the Private Securities Litigation Reform Act (the Reform Act), 15 U.S.C. § 78u, neither of which were at issue in Plaintiffs' Motion. Accordingly, the Court granted summary judgment in Plaintiffs' favor on the narrow issue of objective falsity; the Court did not address the materiality of the statements, whether they were made with scienter, [*11] or whether they came within the protection of the safe harbor.

### C. *Pretrial & Trial*

Before trial the parties filed pre-trial stipulations, proposed jury instructions, and proposed verdict forms. In their joint pre-trial stipulation supplement, [5] each side framed the issues of fact to be litigated at trial. (D.E. 473.) Plaintiffs framed the issues as the elements of a Rule 10b-5 claim as they related to each of twenty-nine alleged misstatements and the individual Defendants' controlling-person status under § 20(a) with respect to each of those statements. Plaintiffs identified the twenty-nine alleged misstatements in a document attached to the supplement as Exhibit A and titled "Misstatements and Omissions Alleged by Plaintiffs." It separately listed the twenty-nine statements and, for each statement, the date on which it was made, the document or conference call in which it was made, and the Defendants responsible for the statement.

> 5    The parties' initial joint pre-trial stipulation failed to conform to the requirements of the Court's trial order, and on September 1, 2010, the Court ordered the parties to supplement the filing. (D.E. 470.)

Defendants objected to Plaintiffs' framing of the [*12] issues, stating:

> Plaintiffs' statement of the issues to be tried reflected in their Exhibit A is entirely inconsistent with the issues framed by the Court as remaining to be tried in the Court's Omnibus Order, is outside the pleadings, and is inconsistent with what remains of Plaintiffs' damages expert's testimony.

(D.E. 473.) Defendants sought to frame the issues around the assumptions of Plaintiffs' damages expert, Candace Preston, without reference to any particular misrepresentations. [6]

> 6 Preston, in her expert report, did not analyze or reference any specific fraudulent statements. Instead, Plaintiffs's counsel asked her to generally assume that Defendants misrepresented the true quality and value of the assets in BankAtlantic's commercial real estate portfolio, as follows:
>
> > a. At least from the beginning of, and throughout the Class Period, Defendants knew or recklessly disregarded the true state of the land loan portion of BankAtlantic's commercial real estate ("CRE") portfolio.
> >
> > b. At least from the beginning of, and throughout the Class Period, Defendants were aware of, misrepresented and failed to disclose the credit quality of their borrowers and the quality of the land loans in [*13] the land loan portion of the CRE portfolio.
> >
> > c. During the Class Period Defendants provided the public with false and/or misleading information or omitted material information necessary to make other statements not misleading concerning the quality of the assets in the land loan portion of the company's CRE portfolio, the "conservative" nature of its underwriting, and the collateral supporting the loans.
> >
> > d. By November 29, 2006 Defendants should have disclosed

> that, contrary to their assertions that they were unaware of any upcoming credit quality trends or problems and that they were comfortable with their borrowers, they were seeing an increase in problem loans
>
> ....
>
> > e. By April 26, 2007, Defendants should have disclosed that:
> >
> > > I. contrary to their assertions that their land bank portfolio presented risks not present in other segments of their CRE portfolio, the problem and potential problem loans were, in actuality, distributed throughout the land loan portion of the CRE portfolio;
> > >
> > > ii. the number and dollar value of the land loan portion of the CRE problem loans on the loan watch list ("LWL") and the potential problem loans as of April 26, 2007; and
> > >
> > > iii the trends and concerns expressed by [*14] management as of the date, representative samples of which are detailed below.

(D.E. 365, Ex. B, pp. 5-6.) The Court discusses Preston's trial testimony and the consequence of her reliance on these general assumptions below in the discussion of the Motion for Judgment as a Matter of Law. See infra Part III.

The Court held an initial pre-trial conference on September 10, 2010 in which the supplemental stipulation was briefly discussed. (D.E. 483.) At the conference, Plaintiffs stated: "Our case is essentially 29 misstatements," and Defendants complained: "There's no complaint that says 29 instances." (D.E. 483, pp. 41 & 44.) The issue was raised again at a follow-up pre-trial conference on October 5, 2010. (D.E. 518.) At that conference the Court attempted to understand Defendants' position on the twenty-nine statements and asked whether Defendants were highlighting a problem with new statements not contained in the First Amended Consolidated Complaint. Defendants made clear that they were not objecting to the twenty-nine statements because some were not in the pleadings, but because they did not conform to Preston's assumptions:

It isn't a question whether they're new or old. There are [*15] some new ones. But that isn't really [our] point.

Candace Preston, who's their damage expert, was asked to make certain factual assumptions. None of those statements were in her factual assumptions ....

(D.E. 518, p. 15.) Defendants argued that Plaintiffs were precluded from proving their Rule 10b-5 claims based on any individual statement, but were instead required to prove the fraud generally articulated by Preston in her assumptions. Ultimately, the Court ruled that Plaintiffs could prove their Rule 10b-5 claims based on individual statements so long as the fraud proven by the individual statements fit with Preston's assumptions and overall opinion on loss causation and damages. At bottom, an action under Rule 10b-5 requires that the defendant made some *statement* which is misleading or is rendered misleading by the omission of further information. *See, e.g.,* § 78u-4(b)(1); *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26-7 (1st Cir. 1987).

Trial began on October 12, 2010. (D.E. 528 & 531.) Plaintiffs rested their case on October 28, 2010, and Defendants moved for judgment as a matter of law. (Tr. 2747.) During oral argument on the motion, Defendants reiterated their position that "this is [*16] not a case about 29 separate factual statements. This is a case based on Candace Preston's broad-brush assumptions." (Tr. 2758.) The Court reserved ruling on the motion, but during the course of the arguments, Plaintiffs withdrew seven of the twenty-nine alleged misstatements. (Tr. 2776-77, 87, 99 & 2857.)

Defendants next presented their evidence and rested their case on November 3, 2010. (Tr. 3638-39.) Because the Court and the parties had not completed drafting the jury instructions and verdict form, the Court instructed the Jury to return on a later date.

The ensuing charge conference was protracted due mainly to the Reform Act's requirements that the Jury allocate proportionate liability at the levels of primary and secondary liability depending upon its determinations of scienter with respect to each statement. Both parties had submitted proposed verdict forms, but neither adequately addressed the intricate demands of the Reform Act as they applied to this case--a numerous-statement, varying-defendant, Rule 10b-5 class action involving two separate damage periods atop which was layered a varying-defendant § 20(a) class action. Plaintiffs' proposed verdict form was structured around [*17] nineteen individual statements taken from the list of twenty-nine misstatements submitted as part of their pre-trial stipulation. [7] (D.E. 593.) It asked the Jury to determine: whether each statement was a material misrepresentation on the part of any Defendant to whom it was attributed; the amount of per-share price inflation caused by any misrepresentation on each day of the class period; and, the controlling person status of each Defendant under § 20(a) of the Exchange Act. Defendants' proposed verdict form contained no reference to any particular misstatement. (D.E. 593.) Instead, it asked the Jury to determine, for each period of damage, whether Plaintiffs proved Candace Preston's assumptions and, if so, to determine the earliest date on which any misrepresentation was made and the extent of each Defendant's liability. Defendants' form also asked the jury to determine, for each period, the amount of per-share price inflation caused by any misstatement, but not on a daily basis. [8]

7  Plaintiffs had effectively withdrawn an additional three statements of the original twenty-nine when they filed their proposed verdict form on November 1, 2010. (D.E. 593.)
8  Defendants' proposed verdict [*18] form was unworkable because it failed to address the Reform Act's requirement that the jury make specific findings as to each Defendant's responsibility for each statement or omission. *See* 15 U.S.C. § 78u-4(f).

On November 9, 2010, the Court finalized the jury instructions and verdict form. The final jury instructions were lengthy, but not remarkably complex. (D.E. 635.) The final verdict form, on the other hand, was both lengthy and complex--it was 75 pages long and contained over 150 questions. (D.E. 632.) In the final verdict form, the Court adopted some components of both parties' proposals. (D.E. 599.) The form divided the case into two separate periods as proposed by Defendants. But with respect to each period, rather than ask the Jury to determine the existence of some general type of fraud as

assumed by Plaintiffs' damages expert, the form listed, in chronological order, each of the alleged misstatements (from Plaintiffs' list of nineteen). For each statement the Jury was asked a series of special interrogatories relating to the allocation of primary (Rule 10b-5) and secondary (§ 20(a)) liability under the Reform Act. Lastly, with respect to damages, the Court adapted Defendants' [*19] proposal that damages, if any, be assessed from the earliest date a misrepresentation was found to have been made; the verdict form instructed the Jury to determine, for each period, the damages, if any, resulting from the first misrepresentation it found to have been made in violation of Rule 10b-5. [9]

> 9  Defendants objected to the final verdict form in its entirety and in particular that no single alleged misstatement could support a damages finding given the assumptions on which Preston's opinion relied.

On November 10, 2010, the parties delivered their closing arguments, and the Jury began its deliberations. (D.E. 641 & 643.) After five days of deliberations, on November 18, 2010, the Jury returned a verdict mainly in Defendants' favor. (D.E. 665.) The Jury found no liability as to any Defendant for the first period n10 and no liability as to Defendants Abdo, White and Jarrett Levan for the second. The Jury, however, found liability and damages as to Defendants Alan Levan and Bancorp for the second period; the Jury found that Statement 7, made by Alan Levan during the April 26, 2007 earnings conference call, violated § 10(b) and that the violation proximately caused damages of $2.41 [*20] per share. The Jury further found Statements 10, 13 through 17, and 19 to have been made in violation of § 10(b); all were attributed to Alan Levan (and Bancorp) except for Statement 19 which was attributed to Alan Levan and Toalson (and Bancorp).

The Jury's special findings as to Statement 7, however, were inconsistent with both the general finding of liability and each other. The Jury specially found that Alan Levan "acted knowingly with respect to that statement" but also found that Alan Levan "acted in good faith and did not directly or indirectly induce the Section 10(b) violation" as a § 20(a) controlling person of Bancorp. The relevant portion of the verdict as to Statement 7 liability was as follows:

> Question 7(a): With respect to Statement 7, do you find that Alan Levan (and therefore Bancorp) violated Section 10(b)?
>
> Yes [x] No

> Question 7(b): Do you find that Alan Levan acted knowingly with respect to that statement?
>
> Yes [x] No
>
> * * *
>
> Question 7(d): For each Defendant for whom you answered "yes" in Question 7(e) [re Section 20(a) controlling person status], do you find that such Defendant acted in good faith and did not directly or indirectly induce the Section 10(b) [*21] violation?
>
> Alan Levan: Yes [x] No

(D.E. 665.) And the verdict as to damages was as follows:

> Question II(B): What is the amount of damages per share proximately caused by the first Section 10(b) violation you found during the period from April 26, 2007 through October 26, 2007?
>
> $ *2.41* per share

(D.E. 665.)

The Court recognized the inconsistency and addressed the issue with the parties before accepting the verdict. (Tr. 4348-49.) The Court suggested that the inconsistency was potentially irrelevant because the Jury also found Alan Levan and Bancorp liable for Statement 10--a statement from the same April 26, 2007 conference call--and because the damage finding reasonably could be applied to that statement. *Id.* The Court then stated its intention to accept and publish the verdict unless there was some objection. *Id.* No party objected, and the Court summoned the Jury. [10] *Id.* The Court published the verdict and discharged the Jury without either party requesting clarification from the Jury or otherwise objecting. (Tr. 4359-72.)

> 10  The relevant exchange was as follows:
>
> THE COURT: [I]n terms of taking the verdict, there's only one place where I see that it's a little confusing. But I don't really  [*22] think it matters. So that's on statement 7. So statement 7 is the April 26, '07 conference call. The next statement that they find to be associated with a 10(b) violation is from the same conference call.
>
> So the way the case was conceptualized was if they found a 10(b) violation, it would be the

first 10(b) violation in the period that damages would relate to, or relate back to. So, both those statements, statement 7 and statement 10, are both from the April 26th conference call.

The response to the questions, the series of questions that relate to 7, I think are difficult to reconcile, but, again, I don't think it matters in light of the fact that the jury found that the fraud entered the market on April 26th.

\* \* \*

Okay. So, let's just bring the jury in. Unless there's something somebody wants me to do about this problem associated with the questions related to statement 7, my suggestion would be let's bring the jury in.

[No objections]

(Jury returns at 10:50 a.m.)

(Tr. 4348-49.)

## II. Pending Judgment

The parties agree on most of the judgment compelled by the verdict--all Defendants are entitled to judgment in their favor for the first period and Defendants Abdo, Jarett Levan, and White are [*23] entitled to judgment in their favor for the second. The parties dispute only the proper judgment regarding Defendants Bancorp, Alan Levan, and Toalson as to the second period.

The threshold issue is the effect of the inconsistent verdict as to Statement 7. For the reasons set forth below, the Court will disregard the liability finding for Statement 7 and attach the damages finding to the liability finding for Statement 10.

The resolution of verdict inconsistencies is governed by Federal Rule of Civil Procedure 49. Rule 49 separates verdict forms into two categories: special verdicts under Rule 49(a) and general verdicts, with or without special interrogatories, under Rule 49(b). The verdict form in this case is a general verdict form accompanied by special interrogatories under Rule 49(b). [11] *See Mason v. Ford Motor Co.*, 307 F.3d 1271, 1273-76 (11th Cir. 2002). As explained above, while the Jury generally found Alan Levan (and Bancorp) violated § 10(b) as to Statement 7 and specially found that he did so knowingly, it also specially found that he acted in good faith as a controlling person as to the violation. The two special findings are inconsistent with each other, and the latter [*24] is inconsistent with the general finding. [12]

11 Defendants argue it is a special verdict form under Rule 49(a). The Court disagrees. The ver-

dict form asked the jury to make conclusory findings which involved application of the law to the facts, such as whether "Alan Levan (and therefore Bancorp) violated Section 10(b)" and to respond to special interrogatories as required by the Reform Act. *See* § 78u-4(f)(3). Accordingly, the verdict form is appropriately characterized as a general verdict form accompanied by special interrogatories under Rule 49(b). *See Mason v. Ford Motor Co.*, 307 F.3d 1271, 1273-76 (11th Cir. 2002).

12 There is no question the findings are inconsistent. The jury instructions required at least a finding of severe reckless disregard as to the falsity of the statement in order to find a § 10(b) violation. (D.E. 635.) One cannot act either knowingly or with severe reckless disregard as to the falsity of a statement and at the same time act in good faith as a controlling person with respect to the same act.

Rule 49(b)(4) addresses the resolution of such inconsistencies as follows:

> *Answers Inconsistent with Each Other and the Verdict.* When the answers are inconsistent with [*25] each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial.

Under this rule, the Court and the parties have two options: further deliberation or new trial. But a party that raises no objection to the inconsistency under Rule 49(b) prior to the discharge of the jury waives the objection. *E.g., Austin-Westshore Constr. Co. v. Federated Dep't Stores*, 934 F.2d 1217, 1226 (11th Cir. 1991). And if the objection is waived the district court is no longer constrained by the two options contained in Rule 49(b). [13] *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 726 (4th Cir. 1999) *cited in* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2513 (3d ed. 2008).

> 13 If this was not the case, the rule of waiver would be meaningless and its goal of efficient trial procedure would not be achieved because the Court would be left with no option but new trial. *See Coralluzzo v. Educ. Mgmt. Corp.*, 86 F.3d 185, 186 (11th Cir. 1996).

The parties waived the objection in this case, and so the Court is unconstrained by Rule 49(b)(4) in [*26]

resolving the inconsistency. Constrained only by reason and equity, the Court finds that the most fair and reasonable resolution is what the Court suggested at trial before the parties waived their objection--the Court will disregard the Statement 7 liability finding and, subject to the remaining Rule 50(b) and Rule 59 challenges, construe the Jury's verdict as finding $2.41-per-share damages caused by Statement 10.

This resolution is more fair than a new trial both because it is essentially what the parties agreed to and also because granting a new trial (and selecting and swearing a new jury) now, when all the parties had to do was ask that the jury clarify the inconsistency, would unnecessarily protract the final resolution of this complex, lengthy, and expensive dispute. *See Coralluzzo v. Educ. Mgmt. Corp.*, 86 F.3d 185, 186 (11th Cir. 1996) ("To allow a new trial after the objecting party failed to seek a proper remedy at the only time possible [*i.e.*, before the jury is discharged] would undermine the incentives for efficient trial procedure and would allow the possible misuse of Rule 49 procedures ... by parties anxious to implant a ground for appeal should the jury's opinion prove [*27] distasteful to them.") (modification in original). And this resolution is reasonable for the reasons explained at trial regarding the conceptualization of the verdict form and the similarities of Statements 7 and 10, including the fact that Alan Levan made both in the same conference call. [14]

14   It is no impediment to this resolution that Statement 10 was not identified in the First Amended Consolidated Complaint. When Plaintiffs first submitted their list of twenty-nine statements as part of the pretrial stipulations, Defendants did note that some of the statements were not included in the First Amended Complaint. But when questioned further about their resistance to the twenty-nine statements, Defendants clarified that they were not concerned with the fact that statements were not pled, but that they were concerned about Preston's failure to reference any individual statement in her expert opinion. Most importantly, at no point did Defendants identify Statement 10 as a statement which was not pled or object to the inclusion of Statement 10 on the verdict form on that basis. Accordingly, regardless of whether or not the finding as to Statement 10 was sufficient to support a damages [*28] finding, it was at issue and properly submitted to the Jury. *See* Fed. R. Civ. P. 15(b)(2).

Having resolved the inconsistency, much of the remaining dispute as to the second period is now moot, *e.g.*, the disagreements regarding Statement 7 and the absence of a damages finding attached to Statement 10.

And much of the remaining issues will become moot as the discussion below ensues. The Court begins with a discussion of Defendants' Motion for Judgment as a Matter of Law and then addresses the Motion for New Trial. Any argument not addressed in this order is rejected by the Court.

### III. Motion for Judgment as a Matter of Law

Defendants make numerous arguments in support of their Motion for Judgment as a Matter of Law. Among other arguments, Defendants contend that Plaintiffs failed to put forth sufficient evidence at trial to support any of the elements of a Rule 10b-5 claim as to Statement 10 (or any other statement) and that Statement 10 falls within the forward-looking safe harbor of the Reform Act. The Court focuses its discussion on whether the evidence supported a finding that Statement 10 was an actionable misrepresentation or omission and, if so, whether the evidence supported a finding [*29] of loss causation or damages as to Statement 10. And because the Court agrees that the evidence of loss causation or damages was insufficient as to Statement 10, it does not address Defendants' remaining arguments.

### A. Rule 50(b) Standard

Rule 50(a) allows a party, prior to the submission of the case to the jury, to move for judgment in its favor on the basis "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." If the Court does not grant the motion under Rule 50(a), a party may renew the motion under Rule 50(b) after the jury has returned a verdict.

"Regardless of timing, ... a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). "The question before the district court regarding a motion for judgment as a matter of law remains whether the evidence is 'legally sufficient to find for the party on that issue,' regardless of whether the district court's analysis is undertaken before or after submitting the case to the jury." *Id.* (citations omitted). Generally, "any renewal of a motion for judgment as a matter [*30] of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004).

"[I]n entertaining a motion for judgment as a matter of law, the court should review all the evidence of record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). "In so doing, however, the court must draw all

reasonable inferences in favor of the nonmoving party, and it may *not* make credibility determinations or weigh the evidence." *Id.* (emphasis added). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "That is, the court should give credence to evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from a disinterested witness." *Id.* (internal quotations omitted).

But "the non-movant must put forth more than a mere scintilla of evidence suggesting [*31] that reasonable minds could reach differing verdicts." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1210 (11th Cir. 2006). "[T]he court should deny a motion for judgment as a matter of law if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." *Id.*

## B. Section 10(b) & Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." § 78j(b). In turn, Rule 10b-5 makes it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Courts have long recognized the implicit private right of action created by § 10(b) and Rule 10b-5, "which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) (citations [*32] omitted). For cases involving publicly traded securities and purchases or sales in a public securities markets, the elements of the action include: (1) *a material misrepresentation (or omission)*; (2) *scienter, i.e.*, a wrongful state of mind; (3) *a connection with the purchase or sale of a security*; (4) *reliance*, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) *economic loss*; and (6) *loss causation, i.e.*, a causal connection between the material misrepresentation and the loss. *Id.* at 341-42 (citations omitted).

## C. Actionable Misrepresentation or Omission

Like all banks, BankAtlantic's income is substantially dependent on its borrowers' ability to make loan interest payments. And internal information that its bor-

rowers might likely default on their obligations is highly relevant to BankAtlantic's prospects for future income and the value of Bancorp's stock. Plaintiffs contend that, in late 2006 and early 2007, Defendants had significant indications that the land loan portion of its construction loan portfolio would experience widespread defaults and collateral devaluations, but fraudulently misrepresented or concealed [*33] the true extent of this risk from investors. The Court agrees that a jury could have found Statement 10 to have been an actionable concealment of that risk under Rule 10b-5. The following facts are taken from the evidence introduced at trial and viewed in the light most favorable to Plaintiffs.

In 2006 and 2007, BankAtlantic's commercial real estate loan (CRE) portfolio, valued at $1.2 to $1.3 billion dollars, was a major portion of its total loan portfolio. Included within the CRE portfolio was a portfolio of "land loans" valued at $400 to $500 million. (Tr. 272 & 1051-52; DX 5.)

At that time, BankAtlantic had several policies for the approval and monitoring of its CRE loans, including the land loan portfolio. (Tr. 275.) First, BankAtlantic's Major Loan Committee had to approve the initial grant and any modifications to loans in excess of $5 million. [15] (Tr. 285.) Second, BankAtlantic monitored its loan portfolio through an internal loan-grading system in which loans were graded 1 through 13. [16] (PX 151.) Grades 1 through 7 were passing; grade 10 loans were "specially mentioned assets," which have "potential weaknesses that deserve management's close attention"; and, grade 11 loans [*34] were "substandard," meaning that the "asset is inadequately protected by the current sound worth and paying capacity of the obligor or the collateral pledged, if any." [17] (PX 151; Tr. 317-19.) Additionally, if BankAtlantic determined that a borrower most likely would not repay his loan according to the terms of the original agreement, that loan was deemed "non-accrual," regardless of the assigned grade. (Tr. 338.) Finally, BankAtlantic created a monthly report called the Loan Watch List to help management track significant potential problem loans. (Tr. 336.) The list included all loans risk-graded 10 or 11 and all non-accrual loans and was distributed monthly to BankAtlantic's senior management. (Tr. 329-30.)

15  Alan Levan and Abdo were members of the Major Loan Committee, and Alan Levan's approval was required for each loan presented to the committee. (Tr. 285 & 3523.)
16  The loan's sponsoring officer assigns a grade to each loan at the time it is made. (PX 151; Tr. 319-20.) After closing, the loan officer or Chief Credit Officer may adjust a loan's grade to reflect changes to its level of risk. (PX 151; Tr. 321-22.)

17    BankAtlantic employees testified inconsistently at trial as to whether [*35] loans graded 10 and higher or loans graded 11 and higher were considered "classified" assets. (*See* Tr. 319, 335, 471-74 & 2924.)

By early 2007, Defendants began to take notice of negative performance trends within the land loan portfolio. From January through March 2007, the Major Loan Committee approved payment extensions and modifications for at least nine land loans. (PX 122, 217, 340, 341, 342, 343, 344, 348; Tr. 1171-72 & 1175; DX 15.) On March 14, 2007, Alan Levan sent an email to members of the committee, referencing "a parade of land loans coming in for extentions [*sic*] recently." (PX 138.) He stated:

> I'm not sure what the purpose of the extentions [*sic*] are other than hoping that more time will solve their problems (and ours). Experience tells us that in these markets, it is better to force a resolution early rather than wait for the market to further deteriorate.... Later, with pressure from all the banks, the borrower will not be able to accommodate us.
>
> * * *
>
> I believe we are in for a long sustained problem in this sector.

(PX 138.) On March 20, 2007, Marcia Snyder, BankAtlantic's former chief of commercial real estate lending, sent an email to BankAtlantic's loan officers, noting [*36] that the Major Loan Committee had "significant concerns" about the land loan portfolio. (PX 124, Tr. 458-61.) Snyder informed the loan officers that the Bank would conduct a review of all the loans in the land loan portfolio.[18] (PX 124.)

18    As a result of that review, BankAtlantic determined that many of the land loans had depleted interest reserves which is an indication that the borrower will not be able to continue to pay down the loan. (Tr. 461-62, 1226-28 & 3563.)

The Loan Watch List for March 31, 2007 indicated that two land loans aggregating $20.2 million were on non-accrual status and another $21.3 million loan was risk-grade 11. (PX 350; Tr. 342.) On April 7, 2007, seven additional land loans aggregating approximately $93.2 million were adjusted to grade 10 or 11 and added to subsequent Loan Watch Lists. (DX 15; PX 351 & 356; Tr. 343-47.) In response to concerns over land loans, in the first quarter of 2007, BankAtlantic created a special Land Loan Committee, which met twice monthly to monitor land loans. (Tr. 454.) In early April, Alan Levan authorized a "full legal review" of all the loans in the land loan portfolio, because of the possibility that the Bank would have "legal [*37] issues" with the entire portfolio. (Tr. 3563-64.)

As the deadline for filing the 2007 first-quarter financial results approached, [19] BankAtlantic began to distinguish between what came to be called the "builder land bank" or "BLB" loans and the remainder of the land loan portfolio. (Tr. 1071, 3390.) The BLB land loans were loans made to developers to acquire and develop parcels of land into finished lots; these borrowers, who had option contracts for the "take down" of the finished lots with large regional or national homebuilders, relied on the homebuilders to exercise the options on schedule in order to provide the borrowers with revenue to meet their loan obligations to BankAtlantic on a timely basis. (DX 6, p. 18.) The remaining, non-BLB land loans were made to developers to acquire land, develop it into finished lots, and sometimes build residential developments, but did not involve option contracts with national homebuilders. (Tr. 357-59; DX 6, p. 18.)

19    Each quarter, Bancorp publishes its quarterly financial results. The results are first announced in an 8-K press release filed with the Securities and Exchange Commission and are then discussed in an investor conference call. (Tr. [*38] 3318.) Conference calls are open to public participation; investment analysts participate in these calls and ask questions of management regarding its quarterly results. (Tr. 3312.) Conference calls provide management an opportunity to speak to investors and analysts and provide more information than is available in the quarterly financial results. (Tr. 3312.) After the conference call, the Company files a 10-Q quarterly earnings report with the Commission. (Tr. 3318.)

The problems Defendants observed in the land loan portfolio were not limited to either the BLB or non-BLB land loans--they were spread throughout the portfolio: the Major Loan Committee had approved extensions for both BLB and non-BLB land loans (PX 122, 217, 340, 341, 342, 343, 344 & 348; DX 15; Tr. 1171-72 & 1175); Marcia Snyder did not distinguish the categories of land loans in her email (PX 124, Tr. 458-61); both BLB and non-BLB land loans had depleted interest reserves (Tr. 461-62, 1226-28 & 3563); the March 31, 2007 Loan Watch List included one non-accrual BLB land loan and one non-accrual non-BLB land loan (PX 350; Tr. 342.); and the April 7, 2007 Loan Watch List additions included three BLB land loans and four [*39] non-BLB land loans (DX 15; PX 356; Tr. 343-47).

On April 26, 2007, Bancorp filed its first quarter 2007 financial results in an 8-K press release, which reported that BankAtlantic earned $5.7 million net income for the quarter. (DX 4.) Bancorp also announced an increase in non-accrual loans of $19.6 million from the first quarter of 2006, which related to loans in its CRE loan portfolio. (DX 4.) The release warned:

> The current environment for residential land acquisition and development loans is a concern, particularly in Florida, and represents an area where we remain very cautious in our credit management. In view of market conditions, we anticipate we may experience further deterioration in the portfolio over the next several quarters as the market attempts to absorb an oversupply of available lot inventory.

(DX 4.)

The same day, Bancorp held its first-quarter earnings conference call. (DX 5.) In preparing for the call, Alan Levan asked James White, the then-CFO, to focus his discussion only on the BLB land loans. [20] (PX 139; Tr. 1673-76 & 3565-66.) And during the call, Alan Levan emphasized the risks of the BLB land loans to the exclusion of the remaining land loans. He discussed a [*40] $19.6 million increase in non-accrual loans, which he attributed to two loans in the "land banking portfolio," and described that portfolio as follows:

> ... those very simply are loans that we made to land developers, people that buy land in anticipation of selling that land to national developers, national or local developers. Generally at the time of borrowing, the borrower or developer had contracts with builders to buy a significant or a substantial portion of the property, which would have been used to pay down the loan in the normal course. As we all recognize, the housing market in the-- nationally, but particularly in Florida, is suffering some economic distress. And the amount of deposits that homebuilders nationally in Florida that have walked away from these deposits is pretty high.

(DX 5, p. 4.) This was the first time Alan Levan or Bancorp publicly distinguished the BLB portfolio from the remainder of the land loan portfolio. [21] (Tr. 3328-29 & 3568; DX 5, p. 23.) Alan Levan noted that this "portfolio" consisted of $140 to $160 million in loans and ex-

plained that it was a subject of concern because the national homebuilders had "slowed their takedown of lots" and many of the [*41] borrowers were requesting extensions "to give the builders more time to ultimately take down the lots." (DX 5, pp. 5 & 24.)

20  In preparation for the first quarter 2007 conference call, Defendant Jim White, then Bancorp's Chief Financial Officer, had prepared to discuss concerns with entire land loan portfolio. (Tr. 1666-73.)

21  Coincidental with the announcement of the first quarter losses and the discussion of Bancorp's concerns with the BLB land loans, Bancorp's stock price declined $0.56 on April 26, 2007. (Tr. 2558.)

On May 10, 2007, Bancorp filed its 10-Q for the first quarter of 2007. The Company noted that the residential real estate market, both in Florida and nationally, "continued to deteriorate during the first quarter of 2007." (DX 6, p. 18.) The report identified the BLB portfolio as comprising $140 million of the $562 million "commercial real estate acquisition and development portfolio." (DX 6, p. 18.) With respect to the non-BLB loans in the portfolio, it stated:

> The loans ... in this category are generally secured by residential and commercial real estate which will be fully developed by the borrower or sold to third parties. These loans generally involve property with [*42] a longer investment and development horizon and are guaranteed by the borrower or individuals and/or secured by additional collateral such that it is expected that the borrower will have the ability to service the debt under current conditions for a longer period of time.

(DX 6, p. 18.)

Alan Levan also stated as to the remainder of the CRE portfolio: "The portfolios that are buying land for their own development, those are proceeding in the normal course. We're not really seeing any difference in that portfolio than we've seen in the billion-and-a-half dollar portfolio." (DX 5, p. 24.) And when an investment analyst asked Alan Levan a question regarding the composition of the land loan portfolio, the following exchange ensued:

[ANALYST]: Hi. So just to follow up on the last set of questions, is it right to infer that your construction portfolio apart from the land bank is about $250 million? Is that the right inference, the construction loan portfolio?

* * *

ALAN LEVAN: I think we--if we--we'd probably have to get back to you on that. By deduction, that would certainly seem likely. If it's a $400 million portfolio and $140 million to $160 million is in this one, probably the rest of it is [*43] in some stage of development to our borrower. The answer to that is probably yes, but perhaps we can get back to you (unintelligible)...

[ANALYST]: Okay, but that--I mean, that $400 million number that was referenced before would encompass all construction-related loans generally speaking?

ALAN LEVAN: No, no, no. Other--I mean, the entire portfolio is $1.4 billion, $1.5 billion. So there's lots of construction in our portfolio. And Valerie noted today, she'll tell you as soon as I stop talking, we're--we'll have to tell you offline, there's a certain designation when we finance a land acquisition with the anticipation of a building going on that. It tends to get into this land portfolio. And it may recharacterize as we start to build, but lots of our portfolio is a construction portfolio that we're not in any way concerned about.

(DX 5, p. 29.) The last portion of the exchange is what Plaintiffs identified as Statement 10: "But lots of our portfolio is a construction portfolio that we're not in any way concerned about."

Given the context of the statement, a jury could have found that when Alan Levan professed a lack of concern as to "lots of our portfolio," he was essentially stating that [*44] he was only concerned with the BLB land loans and *not* with the entire land loan portfolio. Indeed, Plaintiffs argued to the Jury in closing that Statement 10 was misleading with respect to the non-BLB land loans *only.* (Tr. 4093-94.) And a jury also could have found that Alan Levan's professed lack of concern about the balance of the land loan portfolio was untrue.

But not every untrue statement is actionable under Rule 10b-5. Generally, a misstatement or omission is actionable under the Rule if it is of a definite factual nature. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991). And, under certain circumstances, management statements couched as conclusory beliefs can be actionable. *Id.* "Such statements are factual in two senses: as statements that [managers] do hold the belief stated and as statements about the subject matter of the ... belief expressed." *Id.* at 1092. A statement of conclusory belief is actionable as a misrepresentation if a plaintiff demonstrates *both* the managers' disbelief and the falsity of the underlying facts. *Id.* at 1093-96.

In this case, the evidence supports a finding that Statement 10 is actionable. A jury could have found that Alan Levan was [*45] in fact concerned about the entire land loan portfolio and that certain of the same justifications he identified as the basis of his concern for the BLB loans existed (and were concealed) with respect to the remainder of the land loan portfolio.

With respect to the first point, Plaintiffs presented evidence that Alan Levan internally expressed undifferentiated concern regarding the entire land loan portfolio prior to the conference call. As detailed above, in a March 2007 email, Alan Levan stated that the land loan portfolio was facing "a long sustained problem," and in another March 2007 email, Marcia Snyder stated that the Major Loan Committee had "significant concerns" about both the BLB and non-BLB land loans. (PX 138 & 124.) Further, by the time of the conference call, BankAtlantic had created a special Land Loan Committee to review and address concerns regarding the entire land loan portfolio--twenty-nine loans were under review, nearly half of which were non-BLB land loans. Based on this evidence a jury could have found that Alan Levan falsely professed a lack of concern about the remainder of the land loan portfolio.

With respect to the second point, the stated justification for [*46] his relative lack of concern was the distinction between the BLB and non-BLB land loans, namely the involvement of national homebuilders in the BLB loans. Alan Levan explained that the BLB loans were made to borrowers whose business model depended on the sale of lots to these national home builders. According to Alan Levan, because of a softening residential real estate market, these builders were not "taking down" lots from the borrowers as scheduled which, in turn, was causing the borrowers to request payment extensions and in a few instances causing the borrowers to miss payments, resulting in non-accrual classifications. Another distinction was that for some BLB loans, the equity component was comprised of a letter of credit from the national home builder as opposed to a cash deposit. In

the conference call, Alan Levan claimed these character-istics were unique to the BLB loans.

Plaintiffs put forth evidence, however, that certain of these characteristics were not confined to the BLB loans and were present throughout the land loan portfolio. A jury could have found that, by the time of the conference call, one non-BLB land loan was also on non-accrual status--in fact, it could have [*47] found that one of the two non-accrual BLB loans Alan Levan identified during the conference call was actually a non-BLB land loan. And a jury could have found that eight of the nine land loan extensions and modifications the Major Loan Committee had approved by March 2007 were non-BLB land loans. (PX 122, 217, 340, 341, 342, 343, 344, 348; Tr. 1171-72 & 1175; DX 15.) In short, a jury could have found Statement 10 to be an actionable concealment of the risk of substantial losses to the non-BLB land loans.

### D. *Loss Causation & Damages*

Plaintiffs contend that they suffered an actual loss when the true level of risk concealed by Statement 10 (the risk of substantial losses to the non-BLB land loans) was revealed on October 25 and 26, 2007 and the price of Bancorp's stock fell by $2.93. The issue therefore is whether Plaintiffs put forth sufficient evidence that their damages, if any, were "caused" by the concealment of this risk.

On October 25, 2007, Bancorp announced its third quarter 2007 financial results in a press release filed as an 8-K on October 26, 2007. (DX 11.) Bancorp suffered a loss from continuing operations of $29.6 million or $0.52 per diluted share and BankAtlantic suffered [*48] a net loss for the quarter of $27.1 million. The press release stated that BankAtlantic's loss:

> was driven by increased loan loss provi-sions and impairments of real estate owned and held for sale. Other factors contributing to the decline included net interest margin compression and costs as-sociated with opening new stores, offset in part by an increase in non-interest in-come.

(DX 11.)

Bancorp further announced that BankAtlantic's loan loss provision for the quarter was $48.9 million. [22] (DX 11.) The provision was required by an increase in non-performing loans; Bancorp specifically noted the place-ment of eleven commercial real estate loans on non-accrual status during the quarter. (DX 11, p. 2.) In the 8-K, Bancorp did not specify what amounts of the $48.9

million loan loss provision were attributable to specific, qualitative, or quantitative reserves, nor did it break down the provision across the various segments of its loan portfolio. However, for the first time, Bancorp de-tailed the deterioration across the entire land loan portfo-lio. The release stated:

> "The categories within this 'Commercial Residential' portfolio where we believe we have exposure to the declines in the real estate [*49] market are as follows:
>
> o Builder land bank loans [BLB land loans]: This category of 13 loans ag-gregates $149.3 million, of which five loans totaling $81.1 million are non-accrual and an additional three loans totaling $28.7 million were considered classified assets at quarter-end.
>
> o Land acquisition and development loans [non-BLB land loans]: This category of 37 loans ag-gregates $218.5 million, of which three loans totaling $13.2 million are non-accrual and an additional five loans totaling $19.7 million were considered classified assets at quarter end.
>
> o Land acquisition, development and construc-tion loans [non-BLB land loans]: This category of 24 loans aggregates $165.3 million, of which seven loans totaling $62.0 mil-lion are non-accrual and an additional four loans total-ing $41.9 million were considered classified assets at quarter end.

(DX 11.) The "classified" loans Bancorp disclosed in this 8-K included those graded 10 and 11. (Tr. 714-16.)

22    BankAtlantic reserves funds for potential loan losses; the reserves are counted as losses against BankAtlantic's income in the quarter in which they are taken. (Tr. 2937.) Loan loss reserves include three components: specific reserves, qualitative [*50] reserves, and quantitative reserves. (Tr. 539-541.) Specific reserves are provisions for individual, large-balance loans. When BankAtlantic downgrades to a risk grade of 10 or 11 a loan whose balance exceeds a set amount, it may then determine that it is necessary to take a specific reserve for that loan. (Tr. 540-41.) BankAtlantic takes quantitative and qualitative reserves, when necessary, for groups of loans with similar characteristics. Quantitative reserves are determined based on the historic performance of the group of loans. (Tr. 539 & 2930.) Qualitative reserves are based on current and expected economic factors that may affect the repayment of a given group of loans. (Tr. 539-40 & 2931.) When BankAtlantic determines that it will not be able to collect all or a portion of a loan, it charges off that amount. (Tr. 2964-65.) If a specific reserve was previously taken for that loan, the reserved amount is applied to the charge off. (Tr. 2967-68.) If the specific reserve is insufficient to cover the charge off, the difference between the charge off and the reserve is counted as a loss against BankAtlantic's income. (Tr. 2967-68 & 3003-04.)

On October 26, 2007, Bancorp held its third [*51] quarter 2007 earnings conference call. (DX 12.) During the call, Alan Levan reiterated the results announced in the 8-K. Toalson noted that the loans placed on non-accrual status necessitated a specific reserve of $27.9 million and additional general reserves. Id. p. 12. She also noted that the value of BankAtlantic's real estate owned decreased by $6.7 million. Id. Coincidental with the announcement of third-quarter losses, Bancorp's stock price declined by $2.93 on October 26, 2007. (Tr. 2560.)

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted). In order to prove loss causation in a fraud-on-the-market case, a plaintiff must show: (i) that the fraudulently concealed truth was revealed to the market and (ii) that the revelation caused, at least in substantial part, a decline in the market-price of the security. See Dura, 544 U.S. at 342-345; Robbins v. Koger Props., Inc., 116 F.3d 1441, 1448-49 (11th Cir. 1997). Based on the evidence at trial, a jury could have found the first part of the showing to have been satisfied, but [*52] not the second. The Court discusses both below.

(i) *Revelation of the Fraud*

In this case, Plaintiffs contend that Alan Levan, when he made Statement 10, concealed the risk of losses to the entire land loan portfolio by misrepresenting that the risk of significant losses was limited to the BLB loans and that this concealed risk was revealed to the market on October 25 and 26, 2007 when it materialized in the form of significant losses throughout the land loan portfolio. The materialization-of-the-risk theory is not new. Although the Eleventh Circuit has not expressly recognized the theory, [23] numerous courts have recognized that a concealed risk can be revealed when the risk materializes. See, e.g., Schleicher v. Wendt, 618 F.3d 679, 683 (7th Cir. 2010); In re Vivendi Universal S.A. Sec. Litig., 765 F. Supp. 2d 512, 2011 U.S. Dist. LEXIS 17514, 2011 WL 590915, **35-36 (S.D.N.Y. Feb. 17, 2011); In re Scientific Atlanta Sec. Litig., 754 F. Supp. 2d 1339, 2010 U.S. Dist. LEXIS 122828, 2010 WL 4793386, **24-26 (N.D. Ga. Nov. 18, 2010). Its general purpose is to allow defrauded investors to prove loss causation and recover under Rule 10b-5 even where the defendant does not publicly correct his fraud, but instead the fraud is revealed through some other [*53] event. See, e.g., Scientific Atlanta, 2010 U.S. Dist. LEXIS 122828, 2010 WL 4793386 at *26 (citing Alaska Elec. Pension Fund v. Flowserve Grp., 572 F.3d 221, 230 (5th Cir. 2009)). With this purpose in mind, the Court agrees with those decisions recognizing the theory and adopts it here.

> 23    The Eleventh Circuit has acknowledged the concept of the materialization-of-the-risk theory, but has not explicitly adopted it. See La Grasta v. First Union Sec., Inc., 358 F.3d 840, 851 (11th Cir. 2004); Huddleston, 640 F.2d 534.

Further, the Court agrees that the evidence supports a finding that the disclosures on October 25 and 26, 2007 revealed that the risk of substantial losses was not limited to the BLB loans but existed throughout the entire land loan portfolio. In the 8-K, for instance, Bancorp announced that an almost equal amount of BLB and non-BLB land loans ($81.1 and $74.2 million, respectively) were in non-accrual and also that the majority of the classified land loans at the end of the third quarter were non-BLB land loans. A jury could have found that these announcements revealed information about the risk to the entire land loan portfolio that had been concealed by Alan Levan when he made Statement 10. See Vivendi, 2011 U.S. Dist. LEXIS 17514, 2011 WL 590915 at *36.

(ii) [*54] *Price Decline Caused by the Revelation*

Plaintiffs next contend that the revelation of this risk was the sole cause of the $2.93 decline in Bancorp's stock price on October 26, 2007. Plaintiffs argue that the market-price of Bancorp's stock was artificially inflated by Alan Levan's concealment of the risk to the non-BLB portion of the land loan portfolio and that when the concealed risk was revealed to the market, the market-price corrected and the inflation was removed. And it was the market's release of this inflation which Plaintiffs claim caused the price decline on October 26, 2007. Plaintiffs rely exclusively on the unrebutted trial testimony of their expert, Candace Preston, to establish that the price decline resulted from the revelation.

At trial, Preston testified to the results of an "event study" she used to analyze the cause of the October 26, 2007 price decline. Preston began her event study by identifying two stock indices she thought best represented the general market and banking industry--the S & P 500 Index and the NASDAQ Bank Index. (Tr. 2550.) Preston explained that she first looked to these indices because Bancorp itself used them as benchmarks for market and industry [*55] performance comparisons in its public filings. (Tr. 2550-54.) Preston then confirmed that these indices historically had a "statistical fit" with the market-price of Bancorp's stock. (Tr. 2551.) In other words, through statistical regression analysis Preston confirmed a correlation between the general market and industry indices and the market-price of Bancorp's stock. *Id.*

Using this model, Preston was able to identify, on a daily basis, movements in Bancorp's stock price which were "statistically significant" because they did not correlate with the performance of the general market and industry indices. (Tr. 2557.) According to Preston, this statistical significance was a strong indication that the movement in Bancorp's stock price was caused by some Bancorp-specific event or information and not general market or industry information. (Tr. 2557-59.) Further according to Preston, the $2.93 decline in Bancorp's stock price on October 26, 2007 was statistically significant and, when measured against the expected market-price movement as predicted by the indices, represented a "residual decline" of $3.15. *Id.* Thus, Preston concluded that the decline was attributable to Bancorp-specific [*56] information. [24]

> 24  In reaching this conclusion, Preston also examined the trading volume of Bancorp stock, which, on October 26, 2007, soared above Bancorp's standard trading volume. (Tr. 2562.) Preston opined that this was further indication that Bancorp-specific information caused the $2.93 decline. *Id.*

Preston next discussed her opinion that the entire decline was caused by the October 25, and 26, 2007 announcement in the 8-K and conference call of new, negative information regarding the land loan portfolio. (Tr. 2595-96.) Preston noted that on October 25 and 26, 2007 Bancorp published an 8-K with its third-quarter results and held a teleconference regarding those results. (Tr. 2594.) Preston further identified Bancorp's announcement of a significant increase in non-accrual and classified assets across the BLB and non-BLB portions of the land loan portfolio as the negative information to which the market reacted. [25] (Tr. 2595.) Preston explained that she reviewed over a hundred analyst reports, many of which identified the negative information about the land loan portfolio as a surprise. (Tr. 2599-608.) She referenced one analyst report which stated that, though some stress was expected, [*57] "a provision of this magnitude is, in our view, a surprise." (PX 632; Tr. 2600.) The analyst further noted that Bancorp's announcement that many of its land loans were classified assets suggested "the possibility of migration into nonaccruals in the coming quarter." (PX 632; Tr. 2601.) Another analyst report noted that the "pipeline of potential nonperforming loans implies more pain ahead." (PX 630; Tr. 2606.)

> 25  Specifically, Preston identified the information contained in the "three bullet points" on "page 3" of the 8-K as the information regarding non-accruals and classified assets which caused the price decline. (Tr. 2594-95.)

Preston acknowledged that Bancorp also announced other information that might have affected the stock price on October 26, 2007, including net interest margin compression, the curtailment of BankAtlantic's branch expansion, and changes in the performance of home equity loans; but she maintained that this other news did not contribute to the residual decline of Bancorp's stock price on October 26, 2007. (Tr. 2608-10.) Preston based this opinion on the analysts' overwhelming focus on the deterioration of the land loans; the fact that Bancorp attributed the net [*58] interest margin compression to challenges it faced in its land loan portfolio; and, the analysts' positive reaction to the curtailment of the branch expansion. *Id.*

Finally, Preston concluded that the $3.15 residual decline on October 26, 2007, which she opined was caused by the negative information regarding the land loan portfolio, represented the amount by which Bancorp's stock price was inflated, beginning on April 26, 2007, *i.e.*, "the amount that investors overpaid as a result of [the fraud]." (Tr. 2527 & 2620-22.) Preston also concluded that "the decline due to the release of inflation on October 26th was ... $3.15." (Tr. 2547-48.)

Defendants contend that neither Preston's testimony nor any other evidence is sufficient to support a finding of loss causation or damages. With respect to Preston's testimony, Defendants argue that Preston's underlying assumption of fraud relating to both the BLB and non-BLB land loans was rejected by the Jury's findings and, therefore, that the Jury could not have relied on her opinion. And even if a jury could have relied on her opinion, Defendants argue that it was insufficient to support a finding that the revelation of the fraudulently concealed [*59] risk caused the price decline because Preston failed to disaggregate the non-fraud effects of other negative information, including information regarding the risk to the BLB loans which was already known to the market.

These arguments are not new. Defendants consistently raised them since the filing of their motions for summary judgment and to exclude Preston's testimony. And the Court first discussed them in its Omnibus Order addressing those motions:

> With respect to the company-specific decline of $3.15 per share on October 26, 2007, Preston opines that 100% of the decline is attributable to information regarding the credit quality of the entire land loan portfolio. Essentially, Preston's opinion is that there was no other bad news to disaggregate from the information regarding the credit quality of the land loan portfolio and, therefore, that 100% of the residual decline is attributable to the negative land loan information.

> Defendants argue that this opinion is inadmissible because Preston fails to disaggregate the confounding, non-fraudulent factors from the October announcements. Specifically, Defendants contend that Preston failed to disaggregate the loss related to BLB loans, [*60] the loss related to the increase in general reserves, and the loss attributable to market forces.

> In her affidavit, Preston explains that her opinion does not purport to focus only on the non-BLB land loans, but instead the entire land loan portfolio: "Defendants claim that the allegations are somehow limited to [LAD] and [LADC] loans--at the exclusion of the BLB loans. I am advised by Counsel that this is incorrect." Accordingly, the Defendants' arguments regarding the failure to disaggregate the BLB loan information do not go to the reliability of Preston's opinion because Pre-

ston is explicitly offering an opinion on the residual decline attributable to information regarding the entire land loan portfolio, including the BLB loans.

*In re BankAtlantic*, 2010 U.S. Dist. LEXIS 142499, 2010 WL 6397500 at *17 (footnotes and citations omitted). The Court went on to note: "However, the Court will revisit this issue should it become apparent that Plaintiffs have put forth insufficient evidence to support a fraud claim relating to the BLB loans which extends past the April 2007 disclosures." 2010 U.S. Dist. LEXIS 142499, [WL] at *17 n.26.

The Court did revisit the issue at trial in connection with Defendants' motion for judgment as a matter of law, but determined [*61] that as there was sufficient evidence in the record to support a finding of BLB fraud after April 2007, the Jury would have to decide the issue. (Tr. 3044.) But, again, the Court noted that it would reconsider the issue post-verdict if the Jury found no such BLB fraud:

> Now, in the end, though, I suspect that the Court is not going to be able to rule as a matter of law that there was BLB fraud after April 26th; that the jury is going to have to decide that.

> ... There is an issue down the road ... of what should the jury be told about its decision as to whether there was BLB fraud after April 26th and what to do if they find there is no BLB fraud after April 26th.

(Tr. 3045.)

As it turns out, the verdict hinges on Statement 10 which, under *Virginia Bankshares*, does not support a finding of BLB fraud, but only a finding that the risk to the *remainder* (*i.e.*, the non-BLB portion) of the land loan portfolio was fraudulently concealed. *See* 501 U.S. at 1092-94. The Jury effectively rejected Preston's assumption, and so her testimony is--at best--incomplete because she failed to disaggregate the effect of the earlier disclosed negative BLB information on Bancorp's stock price.

As the Supreme Court [*62] noted in *Dura*, even if a defrauded plaintiff sells his shares at a lower price after the truth of the fraud is revealed to the market "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts,