conditions, or other events, which taken separately or together account for some or all of that lower price." 544 U.S. at 343. Accordingly, where a fraud is revealed contemporaneously with the announcement of other negative, but non-fraud-related information, plaintiffs bear the burden of disaggregating the effect of the unrelated negative information on the stock price. Simply, establishing that the price reacted in some statistically significant way "to the *entire bundle* of negative information ... suggests only market efficiency, not loss causation, for there is no evidence linking the *culpable* disclosure to the stock-price movement." *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007) (emphasis in original).

In this case, there is no question that Bancorp announced a bundle of negative information on October 25 and 26, 2007, some of it [*63] fraud-related and some of it not fraud-related. Preston herself testified that Bancorp announced negative information in addition to that regarding the land loans, but she claimed this information had no effect on the stock price. (Tr. 2609.) However, the negative information regarding the land loans was itself a bundle of information. For instance, in its October 25, 2007 8-K, Bancorp did not simply announce an increase in non-accrual and classified assets within the land loan portfolio, it announced the particular increases in each portion of the land loan portfolio. Preston freely admitted at trial that she did not attempt to disaggregate this bundle of negative land loan information because she assumed that it was all fraud related, *i.e.*, that the fraud related to the entire land loan portfolio, including the BLB loans. [26] (Tr. 2691.) Preston did qualify this admission by claiming that such a disaggregation could only have been conducted using information which was not publicly disclosed as of October 26, 2007--Preston claims that Bancorp did not publicly disclose the breakdown of the negative land loan information between BLB and non-BLB loans. (Tr. 2710-11.) This claim is simply [*64] untrue, and no jury could have found otherwise. Although there may have been some items of negative news which were not publicly broken down (*e.g.*, the $48.9 million loan loss provision), as explained above, the negative news to which Preston explicitly attributed the price decline in her direct testimony--*i.e.*, the three bullet points in the 8-K announcing the increase in non-accrual and classified assets--was publicly broken down, *in the 8-K*, into its BLB and non-BLB components.

---

[26]  In fact, on cross-examination, Preston testified that, without a finding supporting her assumption of continuing BLB fraud after April, her opinion was basically irrelevant:

Q. And those, in fact, are the assumptions that if those are true, you then rendered your opinion based on those facts?

A. That's correct.

Q. And if those opinions [*spoken error*] are not true, then your opinion on damages, I think you would agree, isn't of much moment?

A. Correct. If there is no liability, the there are no damages.

\* \* \*

Q. So in other words, if the jury finds that the company did adequately warn of the risk of the builder land bank portfolio then your opinion as to the damages in October is wrong, correct?

A. The jury would [*65] not find liability, so they would not find damages.

\* \* \*

Q. So we are perfectly clear, if the jury finds no fraud with the BLB portfolio from April to October, then your entire opinion dies?

A. In [*sic*] the jury finds no fraud related to the assumptions I have made regarding the land bank portfolio ..., then they not will find liability and than there will be no damages.

(Tr. 2691, 2713.) Preston may have avoided answering with a clear "yes," but her own assessment of the opinion is clear--without a finding in support of her assumption, it was not of much moment.

Moreover, the fact that neither Bancorp nor any analysts precisely quantified the effects of the negative BLB loan information versus the negative non-BLB information did not relieve Plaintiffs of the burden to disaggregate--the very nature of the task presumes that the competing factors will not always lend themselves to a mathematically precise disaggregation analysis. *See Dura*, 544 U.S. at 343. And Preston testified at trial that she was capable of a disaggregation analysis where the competing factors were not quantified. With respect to

the first period, Preston claimed she was able to disaggregate from the $0.55 residual price [*66] decline on April 26, 2007, the effect of non-fraudulent information even though "that wasn't quantified by anyone"--not Bancorp and not the analysts. (Tr. 2588.) For that period, Preston arrived at a "conservative" estimate of $0.37 per share after disaggregation. (Tr. 2582-93.) Preston offered no explanation why a similar analysis would not have been possible to disaggregate the effects of the negative BLB loan information on the October 26, 2007 price decline.

Given that a jury could not have found Statement 10 to include BLB fraud and Preston's admitted failure to disaggregate the effect of the negative information regarding the BLB loans, the Court agrees with Defendants that a jury could not have relied on her opinion--at least not with respect to Statement 10. See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). This [*67] is fatal to the Jury's verdict because there is no other evidence from which a jury could have found loss causation.

Without Preston's opinion, a jury would be left with no more than the text of the 8-K and the conference call--both jumbles of qualitative and quantitative financial information--and several independently admitted analyst reports which point to the negative information regarding the land loan portfolio as a whole as the most important news. (PX 630, 632 & 638.) This evidence, however, was insufficient to allow the Jury to conclude that the fraud-related (i.e., non-BLB information) affected the stock price. See, e.g., Oscar, 487 F.3d at 270-71 (holding that evidence of "analyst commentary" is "little more than well-informed speculation" as to whether a price decline is attributable to one piece of negative information or another). "[A]nalyst speculation about materiality, while better informed than a layman, more closely resembles the latter." Id. at 271. Expert testimony may not be required to prove loss causation in every Rule 10b-5 case, but where a tangle of fraud and non-fraud factors affect a stock's price, it usually is?and this case is no exception. See, e.g., Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co., 597 F.3d 330, 341 (5th Cir. 2010) [*68] ("This showing of loss causation is a 'rigorous process' and requires both expert testimony and analytical research or an event study that demonstrates a linkage between the culpable disclosure and the stock-price movement.") (citations omitted).

Further, even if a jury could have relied on Preston's opinion up to a point--the point where she opined that the

entire decline was attributable to the negative land loan information--it could not have completed the analysis and disaggregated the effects of the BLB information on its own. As explained above, the negative land loan information was itself a bundle of negative news--some regarding the BLB loans, some regarding the non-BLB loans, and some regarding both. Any attempt to attribute some price decline to one particular piece without expert testimony would also be impermissible speculation. See id. While it may be true that the negative land loan news was spread equally between the BLB and non-BLB portions, any inference that each had an equal effect on the stock price is only speculation. See, e.g., Fener v. Operating Eng'rs Constr. Indus., 579 F.3d 401, 410 (5th Cir. 2009) ("[F]raudulent practices could have resulted in 90% of the circulation [*69] decline, but if the stock price fell because the market was concerned with only the reason for the other 10%, loss causation could not be proven."). Accordingly, a jury could not have found loss causation with respect to Statement 10, and judgment as a matter of law will be entered for Defendants.

In concluding that Plaintiffs failed to produce sufficient evidence from which the jury could find loss causation, this Court readily concedes that reasonable minds can differ on the nature and extent of a plaintiff's burden in proving loss causation in a fraud-on-the-market-case under Rule 10b-5.

In Dura, the Supreme Court rejected the Ninth Circuit's view that a securities plaintiff adequately pled and proved loss causation by proving that he purchased stock at an inflated price due to fraud and subsequently suffered a loss. While such a showing might show that the misrepresentation "touches upon" a later economic loss, it does not, according to Justice Breyer's opinion, adequately account for the "tangle of factors affecting stock price" such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" taken [*70] separately or together. Dura, 544 U.S. at 343. However, in describing the plaintiff's burden, Justice Breyer merely stated: "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the economic loss and proximate cause that the plaintiff has in mind." Id. at 347. He further stated: "We need not, and do not, consider other proximate cause or loss-related questions." Id. at 346. Yet, the greater weight of authority as reflected in many of the circuit and district court opinions that have followed Dura and are cited herein, is that a securities-fraud plaintiff can satisfy his burden of proving loss causation only by producing the testimony of an expert who has completed a reliable multiple-regression analysis, event study, and financial analysis in order to

quantify the extent to which the claimed losses are the result of the alleged fraud.

Whether *Dura* actually requires this level of statistical and econometric analysis to prove loss causation is, in the view of this Court, a debatable proposition, and notwithstanding the conclusion herein that Plaintiffs' proof of loss causation failed, this Court has endeavored [*71] to apply a less rigorous standard in its consideration of Candace Preston's testimony and any other evidence relevant to the issue presented at trial. The evidence, however, ultimately failed in this case because Preston, on whose testimony proof of loss causation hinged, wholly failed to consider that the Jury would reject the assumption--the assumption that she was asked by Plaintiffs' counsel to make--that the BLB fraud persisted after April 26, 2007. The Jury therefore was left to impermissibly speculate as to the relative market effects of the various pieces of qualitative and quantitative land loan data contained in the 8-K and conference call. *See, e.g., Oscar*, 487 F.3d at 271 ("[P]laintiffs must, in order to establish loss causation ..., offer some empirically based showing that the corrective disclosure was more than just present at the scene. And this burden cannot be discharged by opinion bereft of the analysis plaintiff's own expert conceded was necessary."); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1142-43 (10th Cir. 2009).

Further, Preston's testimony, even if sufficient to support a finding of loss causation, was insufficient to support a finding of damages--an essential element [*72] of Plaintiffs' claim. *See Dura*, 544 U.S. at 342. Where a plaintiff proves loss causation by demonstrating that the disclosure of the fraud was a substantial contributing cause of his loss, to prove damages, a more rigorous showing is required, because by the express terms of the Exchange Act, a plaintiff's recovery is limited to "actual damages on account of the act complained of." *See* § 78bb(a). And as stated by the Eleventh Circuit in *Robbins v. Koger Properties*: "as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement. But in determining recoverable damages, these contributing forces must be isolated and removed. This is often done ... with the help of an expert witness." *Robbins*, 116 F.3d at 1447 n.5; *accord Miller v. Asensio & Co., Inc.*, 364 F.3d 223 (4th Cir. 2004) (requiring a more rigorous disaggregation analysis to prove damages than loss causation).

Preston's testimony on damages fails for the same reasons as it does with respect to loss causation; she fails to adequately isolate the damages caused by the fraud. Without Preston's testimony, Plaintiffs [*73] failed to produce sufficient evidence for the Jury to find both the fact of proximately caused damage and the amount of proximately caused damage. *See In re Williams Sec.*

*Litig.*, 496 F. Supp. 2d 1195, 1276 (N.D. Okla. 2007) (plaintiffs' failure to prove fact and amount of damages fatal to claims). Thus, even had Plaintiffs made a sufficient showing of loss causation, they did not produce sufficient evidence to support an award of damages in any amount.

### D. *Remaining Statements*

Having determined that the verdict, which rested on Statement 10, was not supported by the evidence at trial, the question arises as to what should be done with the remaining statements for which the Jury found liability but was not asked to assess damages. [27] The simple answer is that these findings cannot support any judgment for Plaintiffs because there is no finding of damages attached to them. [28] Accordingly, the Court will enter a final judgment for Defendants as to all claims and statements. However, because the Court anticipates that Plaintiffs will move for a new trial on damages as to these remaining statements, the Court will also address under Rule 50(b), the insufficiency of the evidence supporting [*74] the liability findings as to these statements.

27   In addition to Statement 10, the jury found that Statements 13 through 17 and 19, were made in violation of Rule 10b-5 by certain Defendants, including Bancorp, Alan Levan, and Toalson.

28   Plaintiffs argue that "while the jury [was] asked to determine the first statement from which damages flowed, it was understood that any finding of damages would be constant and extend to any subsequent actionable misstatements and omissions." (D.E. 675, p. 26.) The Court disagrees. The verdict form *only* asked the Jury to attach damages to "the first Section 10(b) violation [they] found," and, consequently, the Jury only found the amount of damages caused by the first Section 10(b) violation. (D.E. 665; Tr. 3951, 62.) In fact, the initial draft of the verdict form instructed the Jury to skip the remaining statements once the first violation was found in each damage period. (Tr. 3934-35.) Plaintiffs requested that the Jury be asked to adjudicate each statement regardless of whether they found a prior violation in case the first violation the Jury found was disregarded on appeal or in a post-trial motion. *Id.* And the Court accommodated the request. Also, [*75] the record is clear that Defendants never agreed that the Jury's finding of damages as to the first violation would automatically shift to the next violation if the first failed. (The resolution of the inconsistency as to Statement 7, on the other hand, was a completely separate is-

sue governed by Rule 49 and for which their was a waiver by both parties. *See* Part II *supra*.)

As with Statement 10, these remaining statements do not fit with Preston's assumptions about the nature of the fraud. The result is a similar failure of proof regarding the causal relationship between the statements and any decline in the price of Bancorp's stock--*i.e.*, loss causation and damages.

Statements 13 through 17 are excerpts of comments made by Alan Levan during the July 25, 2007 second-quarter earnings conference call. (DX 8.) During the call, Alan Levan reiterated his concern for the BLB loans and his relative lack of concern for the remainder of the land loan portfolio. [29] *Id.*

> 29  As with the third-quarter earnings conference call, the transcript of the entire second-quarter earnings conference call was admitted into evidence at trial. The following are the relevant portions of Alan Levan's comments, embracing [*76] Statements 13 through 17:

> [ANALYST]: Basically what I'm trying to--ask you is the $135 million in the land loans that you are concerned about, are there other portfolios (unintelligible) focus you on the construction portfolio that you feel there might be some risk down the road as well.

> ALAN LEVAN: There are no asset classes that we are concerned about in the portfolio as an asset class. You know, we've reported all of the delinquencies that we have, which actually I don't think there are any other than the ones that we've, you know, that we've just reported to you.

> So the portfolio has always performed extremely well, continues to perform extremely well. And that's not to say that, you know, from time to time there aren't some issues as there always have, even though we've never taken losses in that--we've not taken--I won't say ever taken any losses, because that's probably never going to be a correct statement, but that portfolio has performed extremely well.

The one category that we just are focused on is this land loan builder portfolio because, you know, just from one day to the next, the entire homebuilding industry, you know, went into a state of flux and turmoil and is impacting [*77] that particular class. But to our knowledge and in--just in thinking through, there are no particular asset classes that we're concerned about other than that one class.

\* \* \*

> [ANALYST]: ... If I can just question you about the commercial portfolio for a second, for the construction portion of that, which I think you said was 63% of the portfolio, can you give us some sense of what the various delinquency buckets on that portion of the portfolio looks like at the end of June and how that's changed since the beginning of the year?

> ALAN LEVAN: I could be wrong, but I think it's zero. I don't think we have any delinquency in that portfolio, in the entire portfolio.

\* \* \*

> Other than the non-accruals we've reported to you, there is, you know, there is no--there are no other delinquencies in that portfolio.

> And again, I'm--I could be--don't take it as an absolute, but I'm just telling you to date we have?we do not have any concern about the balance of the portfolio.

\* \* \*

> Brian, we've confirmed that--while we were talking, somebody checked and to our knowledge, at this moment we have no delinquencies in the balance of the portfolio ... in the commercial portfolio.

(DX 8, pp. 20-21, 32-33.)

Thus, apart [*78] from the fact that these statements were made some three months after the April 26, 2007 conference call each of these statements, like Statement 10, is at best a fraudulent concealment of the risk to the non-BLB portion of the land loan portfolio. And like Statement 10, a jury could not have found them to be actionable misrepresentations or omissions regarding the BLB loans. Accordingly, Preston's opinion and the other evidence of loss causation and damages fails for the same reason: Preston's failure to disaggregate the non-fraudulent negative information related to the BLB loans from the bundle of negative information announced on October 25 and 26, 2007.

The sole remaining statement for which the Jury found liability, Statement 19, is different from the other misstatements submitted to the Jury. It is not taken from an earnings conference call but from the text of Bancorp's 2007 second quarter 10-Q, published on August 9,

2007. (DX 9.) It is also not a general statement about levels of risk or management concern regarding the land loan portfolio. Instead, it is a discrete statement about the amount of "Total Potential Problem Loans," i.e., a statement that the amount of "Total Potential [*79] Problem Loans" amounted to $8.35 million. [30] Id. p. 23. At trial, Plaintiffs contended this figure was a fraudulent misrepresentation because one of its components, the amount of "Performing impaired loans" was greatly understated at $4.6 million. According to Plaintiffs, all of BankAtlantic's then-classified assets met the stated definition of performing impaired loans and should have been disclosed as such. The true amount of performing impaired loans, Plaintiffs argued, was tens of millions of dollars higher, as was revealed by the October 25 2007 8-K. (DX 9, p. 23; PX 151; Tr. 4107-08.)

30   The amount was listed in the following table:

|  | June 30, |
|---|---|
|  | 2007 |
| NON PERFORMING ASSETS |  |
| Non-accrual: |  |
| Tax Certificates | $ 711 |
| Loans | 21,806 |
| Total non-accrual | 22,517 |
| Repossessed Assets: |  |
| Real estate owned | 23,886 |
| **Total nonperforming assets, net** | $ 46,403 |
| Allowances |  |
| Allowances for loan losses | $ 54,754 |
| Allowances for tax certificate loses [sic] | 3,829 |
| **Total allowances** | $ 58,583 |
| **POTENTIAL PROBLEM LOANS** |  |
| Contractually past due 90 days or more | $ 164 |
| Performing impaired loans | 4,596 |
| Restructured loans | 3,588 |
| TOTAL POTENTIAL PROBLEM LOANS | $ 8,348 |

(DX 9, p. 23.)

Assuming this was an actionable misrepresentation, there is insufficient evidence to connect [*80] it to any decline in the price of BankAtlantic's stock. While it may be true that a jury could have found Statement 19 to be a misrepresentation of the amount of potential problem loans across the land loan portfolio, including the BLB portion, Preston offered no opinion on such a fraud. Preston's opinion was based on the assumption that Bancorp

broadly misrepresented or concealed the risk of significant losses throughout the land loan portfolio *as of April 26, 2007,* not on the assumption that Bancorp concealed *only* the total amount of classified assets by failing to report them as "performing impaired loans" months later on August 9, 2007. [31] (D.E. 365 Ex. B, p. 6.)

31   Indeed, it should be of no surprise that Preston's assumptions do not fit with Statement 19 because Statement 19 was not plead in the First

Consolidated Amended Complaint--the pleading Preston claimed to have reviewed in formulating her opinion. (D.E. 365 Ex B., p. 4.) Preston's expert report predated Plaintiffs' motion to amend the complaint to include fraudulent understatement of the total potential problem loans in the 2007 second quarter 10-Q. (D.E. 210 & 365 Ex. B.) The importance of this point should not be understated; [*81] Preston herself testified at trial when asked why she reviewed the legal complaint: "I've [sic] just had to review the complaint, see what the allegations were .... I had to make sure I understand what the allegations are so I don't and up saying, without any basis, oh, the whole decline is related to that." (Tr. 2545.)

As with the previous statements, the divergence between Statement 19 and Preston's assumption about the fraud is fatal to her disaggregation analysis. Without accurate assumptions as to the nature, scope and duration of the fraud, Preston had no way of distinguishing fraudulent information from non-fraudulent information, much less disaggregating their effects on the stock price. [32] In the end, the Jury is left to unreasonably speculate as to whether Preston's disaggregation opinion based on the assumed fraud is equally applicable to some other fraud. *See Brooke*, 509 U.S. at 242. The October 25, 2007 8-K for instance announced increases in classified assets, non-accrual assets, and loan loss reserves relating to the entire land loan portfolio, but Statement 19 concealed only the true amount of total potential problem loans (or classified assets)--the total amount of non-accruals [*82] were separately disclosed in the 10-Q and was not found to have been false. *See* Table, *supra* note 31; (DX 9.) And Preston's opinion is silent as to why the increases in either the non-accrual assets or loan loss reserves did not require disaggregation.

32      Jeffrey Mindling, BankAtlantic's Chief Credit Officer, testified at trial that many of the loans that were risk-graded 11 were accounted for in the same table in the category "Allowance for loan losses." (Tr. 611-20.) This, then, is an example of the type of information that arguably should have been considered as part of the disaggregation analysis if liability flowed from Statement 19.

Moreover, even if Statement 19 could be construed as an actionable misrepresentation or concealment of the general risk to the entire land loan portfolio, it is hard to conceive how a jury could find it to be a *material* misrepresentation as to the BLB portion, considering Bancorp's numerous warnings of risk and concern regarding the BLB loans up to that point. [33] *See Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). Thus, the original problem of Preston's failure to disaggregate the negative BLB information persists.

33      Bancorp continued to warn of the [*83] risk to the BLB loans in the 10-Q:

Conditions in the residential real estate market nationally and in Florida in particular continued to deteriorate during the six months fo 2007. ... The "builder land bank loan" segment, at approximately $135 million, consists of twelve land loans to borrowers who have or had option agreements with regional and/or national home builders. These loans were originally underwritten based on projected sales of the developed lots to the builders/option holders and timely repayment of the loans is primarily dependent upon the acquisition of the property pursuant to the options. If the lots are not acquired as originally anticipated, BankAtlantic anticipates that the borrower may not be in a position to service the loan with the likely result being an increase in nonperforming loans and loan losses in this category.

(DX 9, p. 22.)

For the foregoing reasons, the Court will enter final judgment as a matter of law in favor of Defendants as to all claims and statements. [34]

34      Under § 20(a) of the Exchange Act, every person who directly or indirectly controls any person liable for a § 10(b) violation shall also be liable jointly and severally to the same extent as [*84] such controlled person. Because liability under § 20(a) is derivative upon liability under § 10(b), the failure to produce sufficient evidence to support a § 10(b) violation is necessarily fatal to a § 20(a) claim. *See Edward J. Goodman Life Income Trust v. Jabil Cir., Inc.*, 594 F.3d 783 (11th Cir. 2010). Accordingly, because all Defendants are entitled to judgment as a matter of law in their favor on all Plaintiffs' claims under § 10(b) and Rule 10b-5, they are likewise entitled to judgment in their favor as to Plaintiffs' claims under § 20(a).

## IV. Motion for New Trial

Along with their Motion for Judgment as a Matter of Law, in the alternative, Defendants move for a new trial pursuant to Federal Rule of Civil Procedure 59. Federal Rule of Civil Procedure 50(c) provides that, if the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. Accordingly, the Court addresses whether Defendants would be entitled to a new trial, should the judgment for Defendants be vacated or reversed. [35] For the reasons stated below, the undersigned [*85] finds that, should the Court of Appeals reverse the Court's determination that Plaintiffs failed to put forth sufficient evidence of loss causation, Defendants would not be entitled to a new trial.

> 35  Specifically, the Court examines whether Defendants would be entitled to a new trial should the Court of Appeals reverse the Court's judgment for Defendants and hold that the evidence of loss causation was sufficient to support a finding of liability against Alan Levan and Bancorp with respect to Statement 10.

The Court first addresses Defendants' arguments regarding evidentiary errors. The Court then discusses Defendants' argument that the Court failed to properly instruct the Jury on various points of law and to utilize their proposed verdict form. Finally, the Court discusses Defendants' argument that the Court's instruction on the falsity of Alan Levan's July 25, 2007 statements was prejudicial error.

### A. *Rule 59 Standard*

Rule 59 provides that "the court may, on motion, grant a new trial on all or some of the issues ... after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court." A party may seek a new trial by arguing that "the [*86] verdict is against the great weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940); *Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1081 (11th Cir. 2003). But under Federal Rule of Civil Procedure 61, the court must disregard all errors and defects that do not affect any party's substantial rights.

### B. *Evidentiary Errors*

Defendants argue that the Court made several evidentiary errors and that they are entitled to a new trial as a result. First, they argue that the exclusion of their proposed expert witnesses' testimony was erroneous. Second, Defendants argue that the Court improperly excluded testimony concerning disclosures made by other financial institutions. Finally, Defendants argue that the Court wrongly admitted various statements made in emails by a BankAtlantic employee, Perry Alexander.

The admissibility of evidence is committed to the broad discretion of the trial court. *Walker v. NationsBank of Fla.,* 53 F.3d 1548, 1554 (11th Cir. 1995). [*87] A new trial is not warranted due to evidentiary error unless the error substantially prejudiced the affected party. Fed. R. Civ. P. 61; *Peat, Inc. v. Vanguard Research, Inc.,* 378 F.3d 1154, 1162 (11th Cir. 2004).

### (i) *Exclusion of Proposed Expert Testimony*

Prior to trial, Plaintiffs moved to exclude the proposed testimony of Defendants' three independent expert witnesses: Stephen Morrell, Jack DeWitt, and Michael Keable. (D.E. 312, 315 & 321.) Upon careful consideration of the Motions, the Court excluded all of Morrell's and DeWitt's proposed testimony and the majority of Keable's proposed testimony. (D.E. 466, 479 & 460.) Defendants contend that the Court's rulings on these matters constitute prejudicial error warranting a new trial.

In the instant Motion for New Trial, Defendants largely reargue issues raised in their responses to Plaintiffs' motions to exclude. (D.E. 366, 369 & 367.) The Court considered and addressed those arguments in its prior rulings and incorporates those findings in the instant order. (*See* D.E. 466, 479 & 460.) Below, the Court addresses only those additional arguments raised in Defendants' Motion for New Trial related to the Court's exclusion of their proposed [*88] experts. [36]

> 36  Because Defendants raise no new issues with respect to DeWitt's testimony, the Court incorporates by reference and relies on the rulings made and reasons provided in its Order on Motion to Exclude Expert Testimony of Jack DeWitt. (D.E. 479.)

### a. *Stephen Morrell*

Defendants argue that the exclusion of the proposed testimony of Stephen Morrell was erroneous and warrants a new trial. Defendants incorporate by reference the arguments from their Response to Plaintiffs' Motion to Exclude Morrell's testimony and further argue that the exclusion of Morrell's testimony affected their substantial rights, "because Morrell would have explained how the decline in Bancorp's stock price was driven by a de-

pression in the Florida real estate market." (D.E. 666, p. 25.)

The Court did not err in excluding Morrell's proposed testimony. In his report, Morrell offered two broad opinions: first, that the recession in Florida began earlier, lasted longer, and was more severe than that suffered in the rest of the nation; and second, that, few, if any, economists or analysts could have foreseen the depth and breadth of the recession in Florida while it was happening. (D.E. 313, Ex. A ¶¶ 1 & 16.) These [*89] opinions were based on Morrell's comparison of a variety of economic measures for Florida and the United States as a whole over dates ranging from 2006 through 2010.

The Court excluded Morrell's proposed testimony under Federal Rules of Evidence 401, 402, 702 and the standards provided by *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). First, the Court found that Morrell failed to explain the connection between his opinions and the raw economic data cited in his report. (D.E. 466, pp. 5 & 7). Second, the Court found that Morrell's opinions would not assist the trier of fact in determining a fact in issue. (D.E. 466, pp. 6 & 8.) His data and the conclusory opinions derived therefrom related to the economic recession in Florida from 2006 through 2010. Such testimony was both too broad temporally to relate to the instant action and not sufficiently connected to the question of whether Defendants' alleged misrepresentations concerning BankAtlantic's land loans caused Bancorp's stock price to decline in 2007.

Though Defendants argue that Morrell would have explained that Bancorp's share price decline was driven by the collapsing Florida real estate market, Morrell offered no opinion [*90] to that effect in his expert report. In fact, Morrell's expert report concerned itself with the Florida real estate market only in the most limited way. He stated that "[h]ousing markets in Florida are experiencing a depression versus a severe United States recession." (D.E. 313, Ex. A ¶ 13.) This opinion was apparently based on two measures: a comparison of the number of building permits for new housing units issued in Florida in 2005 and the number issued in 2009; and a comparison of housing price indices for the Miami and Tampa regions from 2006 through January 2010 against a nationwide index. *Id.* These data and Morrell's resultant opinion were not sufficiently connected to the facts in this case to meaningfully assist the trier of fact. *See Boca Raton Comty. Hosp., Inc. v. Tenet Healthcare Corp.*, 582 F.3d 1227, 1233-34 (11th Cir. 2009). The Court, thus, committed no error in excluding Morrell's proposed testimony.

b. *Michael Keable*

Defendants argue that the exclusion of the proposed expert testimony of Michael Keable was erroneous and warrants a new trial. Defendants offered Keable as an expert on loss causation and damages to counter Preston's testimony. Prior to trial, [*91] the Court determined that the bulk of Keable's opinions were inadmissible because they were insufficiently supported or explained and were not helpful to the trier of fact in deciding a question in issue. (*See* D.E. 460.) However, the Court ruled that Keable could offer at trial his "opinion regarding the false sense of precision in Preston's calculation of a $0.37 residual decline on April 26, 2007 attributable to negative information regarding the BLB loans." (D.E. 460, p. 8.) Nonetheless, Defendants elected not to call Keable to testify at trial.

In their Motion for New Trial, Defendants raise no new arguments regarding the admissibility of Keable's testimony but argue that the Court's rulings on Keable's testimony "affected Defendants' substantial rights by eliminating their most direct answer to Candace Preston's damages analysis and exposing them to the argument made in closing that Alan Levan could not provide testimony to rebut her analysis because he was not an independent, third party expert." (D.E. 666, p. 27.) To the extent that Defendants' argument addresses parts of Keable's testimony previously deemed inadmissible, the Court incorporates its earlier rulings. And insofar [*92] as Defendants chose not to present Keable's admissible testimony, any prejudice they suffered as a result is wholly self-inflicted and does not warrant a new trial.

(2) *Evidence of Other Banks' Disclosures*

Defendants argue that the Court erroneously excluded evidence and testimony that "few, if any, of the institutions included in the NASDAQ Bank Index made the sort of disclosure that Plaintiffs claimed should have been made here." (D.E. 666, p. 27.) Specifically, Defendants sought to introduce evidence that other banks did not disclose the number or amounts of loans on internal watch lists or those rated special mention or substandard. The Court previously articulated its reasons for excluding such testimony at some length, both from the bench and in a written order. (*See* Tr. 3631-33; D.E. 527.) The Court incorporates those rulings here.

In sum, the Court excluded such evidence because of its limited probative value and its potential to confuse the Jury. Plaintiffs did not claim that Defendants had an independent duty to disclose loans on internal watch lists; rather, they contended that Bancorp intentionally misrepresented the true quality and performance of its land loans, as reflected [*93] in the volume of land loans downgraded to special mention or substandard risk grades. Accordingly, evidence of what other banks disclosed would be irrelevant in the absence of a full pres-

entation to the Jury of the types of loans made by those banks, how the loans were performing, and what representations those banks made regarding those assets, which would have required no less than a trial within a trial regarding the practices of unrelated banking institutions. The Court rightly excluded such evidence in light of its potential to confuse and mislead the jury. *See* Fed. R. Evid. 401 & 403.

Moreover, the evidence and testimony Defendants sought to introduce on this subject was incompetent. Defendants failed to lay a proper foundation for the testimony of any BankAtlantic employee who could have testified to a "consensus" among financial institutions regarding disclosure requirements. (*See* D.E. 526-3 & 527.) And Defendants sought to introduce a letter concerning regulatory disclosure requirements issued years after the end of the class period. (*See* D.E. 474, pp. 15-16 & Tr. 3631-33.) The Court committed no error in excluding this evidence.

### (3) *Perry Alexander Emails*

Defendants argue that [*94] the Court erroneously allowed the introduction of statements contained in eight email exchanges sent by a BankAtlantic employee, Perry Alexander, and that the admission of such evidence warrants a new trial. Defendants contend that the statements were inadmissible hearsay and Plaintiffs did not meet their burden of showing that they fell within an exclusion or exception to the general rule against hearsay. [37]

> 37 Defendants do not articulate their objections to specific emails in their Motion for New Trial nor do they specify the basis for their objection; rather, they incorporate by reference the arguments they raised in a pretrial Motion *In Limine* to exclude the emails of Alexander. In that Motion, Defendants argued that the emails were neither business records excepted from the hearsay rule under Federal Rule of Evidence 803(6) nor admissions by a party-opponent under Federal Rule of Evidence 801(d)(2)(D). (D.E. 298.) The Court denied the Motion without prejudice, as it failed to indicate which of Alexander's emails were the subject of the Motion. (D.E. 457.)

Hearsay evidence is generally inadmissible, except as provided by the Federal Rules of Evidence. Fed. R. Evid. 802. Rule 801(d) [*95] excludes several categories of statements from the definition of hearsay. A statement is not hearsay if it is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. Fed. R. Evid. 801(d)(2)(D). Whether a statement falls under Rule 801(d)(2)(D) depends not on whether the statement was made in the scope of the declarant's agency or employment but on whether the statement concerns matters within the scope of the agency or employment. *Wilkinson v. Carnival Cruise Lines*, 920 F.2d 1560, 1565 (11th Cir. 1991).

The statements in question were admissible against Bancorp as admissions by a party-opponent. Alexander's statements concerned the credit quality and performance of various land loans coming before BankAtlantic's Major Loan Committee for approval, review, or modification. Alexander was employed as a loan officer and market manager for BankAtlantic from 1995 through 2008 and served on the committee from the second quarter of 2004 through June 2007. (Tr. 1389-90, 1395 & 3525-26.) His position as a member of that committee required him to review the details [*96] of the loans that came before it for approval or modification. (Tr. 1396-1400.) Alexander's service on the committee covered the period when many of the land loans in question were first approved and the period when the committee approved extensions and term modifications of many of those loans. His contemporaneous comments on the performance of those land loans as well as the processes by which they were approved and reviewed, thus, concerned matters within the scope of his employment. *See Wilkinson*, 920 F.2d at 1565-66.

Though Alexander was employed by BankAtlantic rather than Bancorp, the statements in the subject emails were nonetheless admissible against Bancorp. Statements made by employees of a subsidiary may be attributed to its corporate parent when the parent dominates the activities of the subsidiary. *Big Apple BMW, Inc. v. BMW of N. Am.*, 974 F.2d 1358, 1372 (3d Cir. 1992). There was no dispute before or during trial that BankAtlantic is the wholly owned subsidiary of Bancorp and that Bancorp is a holding company, the primary asset of which is BankAtlantic. (*See* DX 3, pp. 1 & 7-8.) And Plaintiffs laid a sufficient foundation for the Court to find that Bancorp dominates BankAtlantic's [*97] activities. [38] (D.E. 358.)

> 38 Though the statements in issue may only have been admissible against Bancorp and not against the individual Defendants, no Defendant requested a limiting instruction from the Court to that effect.

Defendants contend that Alexander's emails include "profanity, slang, gossip, and every other indication of unreliability imaginable." (D.E. 666, p. 29.) The admissibility of statements by party-opponents as non-hearsay under Rule 801(d)(2) is the product of the adversary system, rather than the satisfaction of the conditions of the hearsay rule, such as the reliability of the statement. Fed. R. Evid. 801(d)(2)(D) advisory committee's note. Thus, no guarantee of trustworthiness is required in the case of

an admission. *Id.* That Alexander's out-of-court statements may have included profanity and slang does not affect their admissibility under Rule 801(d)(2)(D).

Defendants' arguments that the statements should have been excluded as irrelevant and unduly prejudicial also fail. Alexander's statements concerned the underwriting, credit quality, and deterioration of land loans in BankAtlantic's portfolio, matters relevant to the Jury's determination of whether the alleged [*98] misstatements constituted material misrepresentations. And though he used colorful and sometimes profane language in expressing his observations and opinions, his manner of expression did not render the statements unduly prejudicial or confusing to the Jury. *See* Fed. R. Evid. 403. In any event, the Court required the redaction of several of Alexander's email exchanges to prevent the introduction of irrelevant and prejudicial material. (*See* Tr. 1376-85.)

Finally, even where Alexander's statements improperly admitted, Defendants fail to demonstrate that they are entitled to a new trial on this basis. Plaintiffs presented sufficient evidence, independent of Alexander's emails, for the Jury to find Alan Levan (and therefore Bancorp) liable for violating Rule 10b-5 with respect to Statement 10. The introduction of Alexander's statements was, thus, not vital to Plaintiffs' case and any error in admitting the statements was harmless. *Cf. Wilkinson,* 920 F.2d at 1564.

## C. *Jury Instructions*

Defendants argue that the Court's failure to give several of their requested jury instructions constituted prejudicial error warranting a new trial. Specifically, Defendants argue that the Court should have submitted [*99] to the Jury a special interrogatory regarding Preston's assumptions and that the Court improperly instructed the Jury on: causation in a collapsing market; corrective disclosure and length of inflation; disaggregation and damages; and, the claimed amount of damages.

The failure of a court to give a requested instruction is error only if the requested instruction is correct, is not adequately covered by the charge given, and deals with a point so important that the failure to give the instruction seriously impaired the defendant's ability to present an effective defense. *See Adams v. Sewell,* 946 F.2d 757, 767 (11th Cir. 1991). A litigant is entitled to have the jury instructed on its theory of the case, so long as there was competent evidence to support the theory and the instruction is properly requested. *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.,* 849 F.2d 1336, 1349 (11th Cir. 1987). However, the Court need not give the requested instruction in the exact language requested. *Id.*

If the jury charge, as a whole, correctly instructs the jury on the law, no reversible error has been committed, even if a portion of the charge is technically imperfect. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir. Jul. 23, 1981). [*100] So long as the instructions accurately reflect the law, the court has wide discretion as to the style and wording. *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 (11th Cir. 1996).

### (1) *Preston's Assumptions*

Defendants argue that the Court should have submitted to the Jury a question as to whether Plaintiffs proved by a preponderance of the evidence the factual assumptions on which Preston premised her testimony. Defendants provide no legal support for the proposition that a jury must ratify an expert's assumptions via special findings in order to consider that expert's testimony. [39]

> 39    The only legal support Defendants cite in their Motion is *Brooke Grp.,* 509 U.S. 209, 113 S. Ct. 2578, 125 L. Ed. 2d 168, which has no bearing on the issue.

### (2) *Causation in a Collapsing Market*

Defendants contend that the Court's instruction to the jury on corrective disclosures and materialization of the risk failed to make clear that "Defendants' argument was that the collapsing Florida real estate market severed the causal link." (D.E. 666, p. 10.) Defendants' proposed instruction read, in relevant part:

> ... if the loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the Plaintiffs' loss [*101] was caused by the alleged fraud decreases. Plaintiffs must prove that its loss was caused by the alleged fraud as opposed to intervening events.

(D.E. 627.) The Court did not give Defendants' proposed instruction, but its instruction on corrective disclosures and materialization of the risk stated the following:

> Defendants contend that the Plaintiffs' losses were solely due to deteriorating conditions in the Florida real estate market, about which investors were forewarned. Defendants do not have the burden of proving this contention by a preponderance of the evidence; rather, it is Plaintiffs' burden, as stated above, to prove that the corrective disclosures and/or materialization of concealed risks,

and not other factors, were significant contributing causes of their damages.

(D.E. 635, pp. 21-22.) The Court's instructions adequately covered the law and Defendants' argument on causation in a collapsing market. *See Adams*, 946 F.2d at 767.

(3) *Corrective Disclosure & Length of Inflation*

Defendants contend that the Court's failure to give their requested instruction titled "Corrective Disclosure and Length of Inflation" warrants a new trial. Defendants' proposed instruction included the [*102] following:

> If you find by a preponderance of the evidence that an alleged misrepresentation or omission artificially inflated the price of BankAtlantic Bancorp stock, you will also have to determine the length of time during which the inflation existed. To make this determination, you must decide the date on which information curing or correcting the alleged misrepresentation or omission was publicly announced or otherwise effectively disseminated to the market. Dissemination of the allegedly withheld or misrepresented information through a public announcement, a press release, or a press report will correct the previous misrepresentation or omission and terminate the period during which purchasers can seek to hold Defendants liable under the securities laws for the misrepresentation or omission. At that point, subsequent purchasers are charged with knowledge of the true state of affairs and the stock's market price is presumed to reflect its true value.

(D.E. 593-1, p. 14.)

The legal principle embedded in Defendants' requested instruction was sufficiently covered in the Court's instruction on corrective disclosures and the materialization of the risk. The Court instructed the Jury, in [*103] relevant part, that "Plaintiffs must prove by a preponderance of the evidence that a corrective disclosure or materialization of the concealed risk revealed the truth concealed by the misrepresentation or omission to the market *for the first time.*" (D.E. 635, p. 20) (emphasis added). The instruction further informed the jury that the alleged revelations of the truth occurred on April 25 and

26, 2007 and October 25 and 26, 2007. (D.E. 635, pp. 20-21.)

The Court's instruction accurately and adequately advised the Jury that, if they found the Company revealed the truth concealed in the alleged misrepresentations prior to dates of the alleged revelations, they could not find that the misrepresentations caused the share price declines on April 26, 2007 and October 25, 2007. The Court, thus, committed no error in refusing to give the instruction in the language Defendants requested. *See Adams*, 946 F.2d at 767.

(4) *Disaggregation & Damages*

Defendants argue that the Court failed to make clear in its instructions that the Jury "needed to disaggregate non-fraud factors from any supposed loss...." (D.E. 666, p. 12.) During the charge conference, Defendants proposed the following instruction to be [*104] added "to the end of the Court's proposed instructions":

> Defendants contend that the stock price declines that occurred were not caused as a result of any alleged misrepresentations or omissions, but were, instead, caused by deteriorating conditions in the Florida real estate market about which investors were forewarned. Any award of damages must subtract from the price declines the losses caused by such factors, and Plaintiffs carry the burden of proof to eliminate from their damage claim losses cause by non-fraud factors.

(D.E. 628.)

The first sentence of Defendants' requested instruction pertains more specifically to loss causation than to damages. And, in fact, this sentence was included almost verbatim in the Court's instruction to the Jury on loss causation. (D.E. 635, p. 21.) The second part of the requested instruction relates to damages. The Court's instruction to the Jury on damages read, in pertinent part:

> There may be factors other than the alleged fraudulent statements and/or omissions that affected Bancorp's stock price on any given day. For example, market or industry conditions or bad news disclosed by Bancorp that was unrelated to the alleged fraud could have affected [*105] Bancorp's stock price. Defendants are not liable for any share price decline resulting from those other non-fraud related events. Plaintiffs bear the burden of disaggre-

gating (or separating out) any share price declines that were caused by non-fraud related events or establishing that the entire share price decline was caused by the alleged fraud.

Plaintiffs claim that the alleged fraud caused damages in the amount of 37 cents per share on April 26, 2007. Plaintiffs also claim that the alleged fraud caused damages in the amount of $2.93 per share on October 26, 2007.

Defendants claim that Plaintiffs have failed to separate out price declines caused by market conditions, the conditions of the real estate market, and other conditions not related to the alleged fraud.

(D.E. 635, pp. 23-24.)

In line with the Defendants' requested instruction and the applicable law, the Court explicitly instructed the Jury that Plaintiffs could only recover damages actually caused by the misrepresentations and not by non-fraud related events. The instruction also placed the burden squarely on Plaintiffs to disaggregate from Bancorp's share price decline on the days in question the effect of any non-fraud events. [*106] And the Court informed the Jury of Defendants' theory, namely that Plaintiffs failed to disaggregate from the price decline the effect of market conditions. The Court committed no error in substituting language substantially equivalent to Defendants' proposed instruction. *See Adams*, 946 F.2d at 767.

### (5) *$2.93 Damage Instruction*

Defendants argue that the Court's instruction that the Plaintiffs were seeking $2.93 per share in damages warrants a new trial. [40] Defendants correctly point out that Plaintiffs' damages expert testified that, in her opinion, Bancorp stock was artificially inflated by $3.15 in the second part of the class period. Defendants contend that the Court's instruction on Plaintiffs' claimed damages, by not holding them to the $3.15 figure presented by Preston, relieved Plaintiffs of the burden of disaggregating non-fraud factors from their damages claim. Defendants argue that the $2.93 figure was based on speculation and conjecture and amounted to an unsupportable basis for a jury verdict.

> 40    The Court instructed the Jury in relevant part: "Plaintiffs claim that the alleged fraud caused damages in the amount of $2.93 per share on October 26, 2007." (D.E. 635, p. 24.)

The [*107] Court's instruction on Plaintiffs' damages claim was not error. The $2.93 instruction was merely a recognition that, under the Exchange Act, damages in a securities fraud case are limited to those actually caused by the misrepresentation. *See* § 78bb; *Robbins*, 116 F.3d at 1447 n.5. Expectation damages are generally not available to a prevailing plaintiff. Though Bancorp's residual decline on October 26, 2007 was, according to Plaintiffs' expert, $3.15 per share, all of which was caused by the revelation of the alleged fraud, the actual decline was $2.93. (Tr. 2596.) Plaintiffs were thus limited to that amount of per-share damages. The Court's instruction as to the amount Plaintiffs claimed in damages was not error.

### D. *Instruction on the Falsity of Alan Levan's Statements*

Defendants argue that the Court committed prejudicial error by instructing the Jury on its pretrial ruling that four statements made by Alan Levan in the July 25, 2007 conference call were false. Defendants argue that the Court erred in its pretrial ruling, that the subject statements were protected by the Reform Act's safe harbor, and that the question of liability regarding those statements should not have been submitted [*108] to the Jury because Plaintiffs failed to prove scienter, loss causation and damages with respect to the statements. Accordingly, Defendants argue that the Court erred in instructing the Jury as to its finding and that such error warrants a new trial.

### (1) *Summary Judgment: Falsity*

Defendants argue that the Court erred in granting Plaintiffs' Motion for Partial Summary Judgment, and, accordingly, its instruction to the Jury on that ruling was prejudicial error. Prior to trial, Plaintiffs moved for partial summary judgment as to the falsity of four statements Alan Levan made during the July 25, 2007 earnings conference call discussing Bancorp's second-quarter 2007 financial results. [41] The exchange that produced those statements proceeded as follows:

> [ANALYST]: [I]s the $135 million in the land loans that you guys are concerned about, are there other portfolios (unintelligible) focus you on the construction portfolio that you feel there might be some risk down the road as well.
>
> ALAN LEVAN: There are no asset classes that we are concerned about in the portfolio as an asset class. You know, we've reported all of the delinquencies that we have, which actually I don't think there are any other [*109] than the ones

that we've, you know, that we've just re-ported to you.

So, the portfolio has always per-formed extremely well, continues to per-form extremely well. And that's not to say that, you know, from time to time there aren't some issues as there always have, even though we've never taken losses in that--we've not taken--I won't say ever taken any losses, because that's probably never going to be a correct statement, but that portfolio has performed extremely well.

The one category that we just are fo-cused on is this land loan builder portfolio because, you know, just from one day to the next, the entire homebuilding industry, you know, went into a state of flux and turmoil and is impacting that particular class. But to our knowledge and in--just thinking through, there are no particular asset classes that we're concerned about other than that one class.

(D.E. 338-20, pp. 22-23) (emphasis in original.) Plain-tiffs argued that no genuine issue of fact existed as to the falsity of the four highlighted statements, and the Court granted summary judgment in their favor on that narrow issue. [42] (*See* D.E. 411.)

41    Plaintiffs' motion had an extremely narrow focus. They stated:

> As noted above, to [*110] es-tablish Defendants' liability under Section 10(b) and Rule 10b-5, Plaintiffs must prove that Defen-dants issued: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2002).... Plaintiffs seek partial summary judgment only as to the first element--falsity--of Levan's July 25, 2007 earnings call state-ments.

(D.E. 237.)

42    These four statements were listed as State-ments 13 through 16 on the verdict form.

The Court did not err in granting summary judgment on this issue. As discussed above, to prevail on a Rule 10b-5 claim, a plaintiff must show that a statement was false or misleading. *Basic Inc.*, 485 U.S. at 238. For a statement to be an actionable misrepresentation, it must be of a definite factual nature. *See Va. Bankshares*, 501 U.S. at 1095. Statements of opinion or belief can be ac-tionable misrepresentations if the plaintiff shows that the speaker falsely stated his belief and shows the factual justification for the statement to be false. *Id.* at 1092. Though Plaintiffs alleged that four separate statements by Alan Levan on July [*111] 25, 2007 were false, the Court examined the statements in two categories because of the near identity of the statements. Specifically, the Court assessed the falsity of Alan Levan's statements that the portfolio had always performed and continued to perform extremely well and his statements that he was not concerned with any class of assets in the construction loan portfolio other than the BLB loans.

As to the first category, Plaintiffs presented undis-puted evidence of the falsity of Alan Levan's statement that the land loans other than the BLB loans had been and were performing extremely well. [43] First, within BankAtlantic, Alan Levan had undisputedly expressed that the land loan portfolio as a whole, including the non-BLB loans, was not performing extremely well, thus demonstrating the falsity of his public assessment regard-ing their performance. (D.E. 338-19.)

43    Defendants argued in their Motion for Re-consideration and again in their Motion for New Trial that when Alan Levan stated in the July 25, 2007 conference call that the other loans in the portfolio were "performing extremely well," he was actually using a banking term of art, referring to loans that are "performing" as opposed [*112] to "non-performing," which is akin to non-accrual status. (D.E. 471, p. 6; D.E. 666, pp. 20-21.) However, at summary judgment (and even in connection with their Motion for Reconsidera-tion), Defendants presented no evidence in sup-port of this argument, let alone evidence that raised a genuine issue of material fact.

Moreover, Plaintiffs presented undisputed evidence of the falsity of the justification for Alan Levan's state-ments. His internal assessment of the poor performance of the BLB and non-BLB loans was based on the many requested extensions of those loans' maturity dates to the Major Loan Committee, indicating poor performance and possible repayment problems. (D.E. 338-14, 15, 16, 17, 18, 83, 84, 104.) Also, by July 25, 2007, two non-BLB loans and one BLB loan were on non-accrual status; four

more non-BLB and one more BLB loan had been down-graded to risk grade 11, indicating that the "asset [was] inadequately protected by the current sound worth and paying capacity of the obligor or collateral pledged"; and six more non-BLB and four more BLB loans had been downgraded to risk grade 10, indicating that they had "potential weaknesses.... If left uncorrected, these potential weaknesses [*113] may result in the deterioration of the repayment prospects for the asset...." (D.E. 338-27 & D.E. 338-2, p. 5669.) Defendants presented no evidence that raised a genuine issue of fact as to the whether the land loans in the portfolio apart from the BLB loans had been and were continuing to perform extremely well as of July 25, 2007.

As to the second category of statements, Plaintiffs presented undisputed evidence that Alan Levan's professed concern with the BLB portion of the construction portfolio, to the exclusion of the balance of the land loan portfolio, was false. First, they presented undisputed evidence that Alan Levan was concerned with the entire land loan portfolio, because he had expressed undifferentiated concern with the performance of the land loan portfolio in its entirety, including both BLB and non-BLB loans, prior to the July 25, 2007 conference call. (*See* D.E. 338-5 & 338-19.)

Plaintiffs also presented undisputed evidence of the falsity of the factual justification for such statements. Alan Levan stated during the conference call that his concern with the performance of the BLB loans was due to the effects of turmoil and flux in the homebuilding industry. (D.E. 338-20, [*114] p. 23.) However, turmoil in the homebuilding industry was having the same effect on all the loans in the land loan portfolio, as evidenced by the negative performance trends and deterioration identified above, which were spread throughout the BLB and non-BLB portions of the land loan portfolio.

In response, Defendants argued that the statements in issue were not material and that they were subject to the protections of the Reform Act's safe harbor, neither of which were in issue in Plaintiffs' motion. As to falsity, Defendants argued that the BLB loans were subject to higher levels of risk than the other land loans and that, months after the July 2007 statements, the BLB loans ultimately suffered greater losses than the non-BLB land loans. These arguments, and the evidence offered in support thereof, failed to meet and rebut Plaintiffs' arguments that the statements were false. That the BLB loans were, perhaps, exposed to greater risk than the non-BLB loans did not raise a genuine issue of fact as to whether Alan Levan was, in fact, concerned with the poor performance of all the land loans. Likewise, the higher losses caused by the BLB loans in the third quarter of 2007 failed to raise [*115] a genuine issue of fact as to

whether the non-BLB loans were performing poorly and causing concern as of July 2007.

In their Motion for Reconsideration, Defendants argued that the four statements were statements of opinion and Plaintiffs, thus, should have and failed to adduce evidence that Alan Levan knew his statements were false. In denying the motion, the Court noted that Alan Levan's state of mind was not relevant to the inquiry, in that whether he acted with scienter was a separate inquiry left to the Jury. The Court also noted that, though the statements contained an evaluative component, they were not statements of pure opinion, but rather were tethered to objective factual justifications. Insofar as these were statements of belief, the falsity of his belief--though not his intent to deceive--was relevant to the falsity inquiry. *See Va. Bankshares*, 501 U.S. at 1092-96. And because, as discussed above, Plaintiffs had presented undisputed evidence to meet that requirement, in the form of emails by Alan Levan expressing his concern with the poor performance of the entire land loan portfolio, Defendants' argument did not warrant reconsideration.

For these reasons, as well as the additional [*116] reasons set forth in the Omnibus Order and Order on Reconsideration, the Court did not err in granting summary judgment to Plaintiffs on the narrow issue of the falsity of these statements. Plaintiffs were entitled to the benefit of the Court's ruling and an appropriate instruction to the Jury, as discussed below.

### (2) Safe Harbor

Defendants argue that the four statements that were the subject of the Court's partial summary judgment for Plaintiffs were protected by the Reform Act's safe harbor and, thus should not have been submitted for the Jury's consideration. They further argue that, because the statements were immunized by the safe harbor, the Court's instruction on its partial summary judgment finding was unduly prejudicial.

Section 27A of the Reform Act provides a safe harbor from Rule 10b-5 liability for certain forward-looking statements. § 78u-5(c)(1). Corporations and individuals may avoid liability under Rule 10b-5 for forward-looking statements that are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." § 78u-5(c)(1)(A)(I). Forward-looking statements [*117] include projections of revenues, income, or other financial items; statements of the plans and objectives of management for future operations; statements of future economic performance; or, any statement of the assumptions underlying or relating to such statements. § 78u-5(i)(1).

Defendants argue that the statements in issue were forward-looking statements. They contend that Alan Levan's answer to the analyst's question was, on the whole, forward-looking, and all statements of historical fact included in his answer also fall within the safe harbor as "assumptions underlying forward-looking statements." (D.E. 666, p. 19.) Defendants broadly assert that "[s]tatements that include both forward-looking and factual factors must be treated as forward-looking." *Id.*

Defendants' contention that the safe harbor applies to all statements which include both forward-looking and non-forward-looking components misinterprets the law in this circuit. In *Harris v. Ivax*, 182 F.3d 799 (11th Cir. 1999), the Eleventh Circuit assessed the applicability of the safe harbor to a variety of allegedly false and misleading statements made by an issuing corporation. One of the allegedly misleading statements was [*118] a list of factors that the company stated "will influence [its] third quarter results." *Id.* at 805. The plaintiffs alleged that the list was misleading in that it did not include the possibility of a goodwill writedown, a circumstance which eventually came to pass and allegedly caused the company's stock price to plummet. The district court ruled that the list was entitled to the protection of the safe harbor.

The Eleventh Circuit affirmed the district court, holding that the list was a "mixed bag," including some sentences that were forward looking and some that were not, but concluding that the list, in its entirety, was to be treated as a forward-looking statement. *Id.* at 806. The court held that "when the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material factor is missing, the entire list of factors is treated as a forward-looking statement." *Id.* at 807. The *Harris* court, however, made clear that its holding pertained only to alleged omissions of material risk factors. *Id.* (noting that "treating mixed lists as forward-looking may open a loophole for *misleading omissions*") (emphasis [*119] added). The court further clarified that, "of course, if any of the individual sentences describing known facts ... were allegedly false, we could easily conclude that the smaller, non-forward-looking statement falls outside the safe harbor." *Id.* at 806.

Plaintiffs allege that the statements in issue were affirmative misrepresentations, not that Alan Levan's answer to the analyst's question was, on the whole, misleading because it omitted a material piece of information. (*See* D.E. 237.) Accordingly, each allegedly false statement must be evaluated to determine whether it is forward looking. *See Harris*, 182 F.3d at 806.

None of the four statements in issue was forward looking. In two of the subject statements, Alan Levan stated that Bancorp was not concerned with any class of loans in the construction portfolio other than the BLB loans. (DX 8, pp. 20-21.) These statements are assertions regarding the absence of *known* risk in the balance of the construction portfolio apart from the BLB portion. Statements regarding the *known* risk of an investment based upon observed facts, the truth of which are discernable at the time they are made, are not forward looking though they touch upon the future. [*120] *See Harris*, 182 F.3d at 805-06. The concept of risk touches upon the future, but whether management *knows* of a certain risk at a given time is ascertainable at that time.

The other two statements concern the past and present performance of the construction portfolio; Alan Levan stated that the portfolio had always performed extremely well and "continues to perform extremely well." (DX 8, p. 20.) These statements, too, are expressions of observed facts, rather than assumptions or any kind of prediction. *See Harris*, 182 F.3d at 806. And the truth of these statements was also discernable at the time they were made. Accordingly, these statements do not fall under the protection of the Reform Act's safe harbor.

### (3) Scienter

Defendants argue that Plaintiffs failed to satisfy their burden of proof as to whether Alan Levan acted with scienter in making the four statements in issue. Accordingly, these statements could not support a finding of liability and should not have been submitted to the Jury.

To prove scienter, a plaintiff must show that the defendant made the alleged misrepresentations with "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). [*121] It is not enough for plaintiffs to prove that the defendant acted negligently. *Id.* at 214. A plaintiff must prove either that the defendant acted with the "intent to deceive, manipulate, or defraud," or that he acted with "severe recklessness." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999). Severe recklessness is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that defendant must have been aware of it.

*Id.* at 1282 n.18. Due to the difficulty of proving a defendant's state of mind in fraud cases, circumstantial evi-

dence of scienter may be sufficient to support the inference that he acted with the requisite intent. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n.30, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983).

Though Defendants contend that Plaintiffs "failed to satisfy their burden of showing scienter" with respect to these statements, that question was for the Jury to resolve, because Plaintiffs presented sufficient evidence to support a [*122] finding of scienter. For example, Plaintiffs presented evidence that Alan Levan was aware of the significant deterioration of the land loan portfolio--including the non-BLB loans--before the July 2007 conference call, but chose to disclose only the issues with the BLB segment of the portfolio. Alan Levan also acknowledged the importance of investor conference calls as an opportunity for analysts to get information directly from management. (Tr. 3312.) Defendants' contention that the Court's instruction on the falsity of the July 25, 2007 statements was in error because of a failure of proof as to scienter, thus, fails.

*(4) Loss Causation and Damages*

Defendants argue that Plaintiffs failed to present evidence linking Statements 13 through 16 to a loss. Because Plaintiffs failed to prove loss causation and damages with respect to these statements, they should not have been submitted for consideration to the Jury and the Court's instruction regarding their falsity was prejudicial error.

As discussed above, the Court finds that there was insufficient evidence to support the Jury's finding of loss causation and damages with respect to Statement 10. And though the Jury's damages finding was connected [*123] only with Statement 10, the Court further clarified that the loss causation problems with Statement 10 similarly afflict Statements 13 through 16. Thus, should the Court of Appeals reverse the Court's ruling on the sufficiency of the evidence of loss causation and damages as to Statement 10, the same conclusion would follow with respect to Statements 13 through 16. And, accordingly, Defendants would not be entitled to a new trial on this basis.

*(5) Prejudice of Court's Instruction*

Defendants argue that the Court's instruction to the Jury on its partial summary judgment ruling for Plaintiffs prejudiced the Jury such that it could not independently assess other questions of liability. The Court disagrees.

First, the Court precluded disclosure of the pretrial ruling until closing argument. (Tr. 123-26.) Though Plaintiffs mentioned the Court's ruling in connection with the four subject statements, it was not a prominent feature of their closing argument and they made no argument or implication that the Jury should draw inferences as to any other issues from the ruling. (*See* Tr. 4061, 4102-04 & 4255.) Then, the Court read to the Jury, as part of its final instructions, a carefully constructed [*124] paragraph explaining the limited nature of the pretrial ruling. The instruction to the Jury on this point read:

> Prior to trial, the Court also made a narrow ruling that four statements made by Alan Levan during a July 25, 2007 conference call were objectively misleading or false. You must also accept that these statements were, in fact, misleading or false. However, the Court has not made any determination regarding whether those statements were material, whether they were made with scienter, or whether they caused Bancorp's share price to decline. The Plaintiffs still must prove, and you will need to decide, the remaining elements of their claims with respect to these statements.
>
> These statements are entries 13, 14, 15, and 16 on the Table that is attached to the Verdict Form.

(D.E. 635, p. 30.)

There is no indication that Defendants suffered undue prejudice as a result of this instruction. The Court clearly instructed the Jury on the narrowness of its ruling, and the Court presumes the Jury followed its instructions as to this and every other matter. *See Johnson v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002). Indeed, the Jury's findings strongly indicate that this presumption is correct. [*125] For example, the Jury found no § 10(b) violation as to Statements 8, 9, and 18, all attributed to Alan Levan. (D.E. 665.) So it cannot be said that the instruction prejudiced the Jury against Alan Levan. [44]

> 44 In fact, as explained above, the Jury found for Defendants on the majority of the issues.

Further, the Jury's findings regarding Statements 13 through 16 are essentially superfluous to the conditional judgment. As discussed above, the award of damages in the amount of $2.41 per share is tied to Statement 10. A finding of no § 10(b) violation as to Statements 13 through 16 would not have affected the conditional judgment. [45]

> 45 By the same token, there would be no prejudice to Defendants even if the Plaintiffs' Motion for Partial Summary Judgment was wrongly de-

cided. Nevertheless, the ruling on Plaintiffs' Motion for Partial Summary Judgment was extremely narrow and, as set forth above, was warranted based on the parties' briefing of the motion and supporting evidence.

For the reasons stated above, in the event the Court's ruling on Defendants' Motion for Judgment as a Matter of Law is vacated or reversed, Defendants should not be entitled to a new trial.

**V. Conclusion**

Accordingly, it [*126] is

ORDERED AND ADJUDGED that Defendants' Motion for Judgement as a Matter of Law (D.E. 669) is GRANTED. The Court will separately enter its Final Judgment in accordance with this Order and the Jury's Verdict. It is further

ORDERED AND ADJUDGED that Defendants' Motion for a New Trial (D.E. 666) is CONDITIONALLY DENIED. It is further

ORDERED AND ADJUDGED that all pending motions are DENIED AS MOOT. It is further

ORDERED AND ADJUDGED that, in order for the Court to undertake its mandatory review of the record to determine whether sanctions for abusive litigation are appropriate under Federal Rule of Civil Procedure 11, the parties shall file their respective motions for sanctions, if any, within ten days hereof. The opposing party shall respond within ten days thereafter. Any replies shall be filed no later than five days after the filing of a response.

DONE AND ORDERED in Chambers at Miami, Florida this 25th day of April, 2011.

/s/ Ursula Ungaro

URSULA UNGARO

UNITED STATES DISTRICT JUDGE

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE CAREMARK INTERNATIONAL,
INC. SECURITIES LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

This Document Relates to:
All Actions

Case No. 94 C 4751

Honorable Paul E. Plunkett

FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE

The Stipulation of Settlement dated September 24, 1997
("Stipulation") between and among Plaintiffs and Defendants
provides for the Settlement of the Litigation on behalf of
Plaintiffs and all Class Members with Defendants subject to
approval by this Court of its terms and to the entry of this
Judgment.[1]    Pursuant to an Order dated September 26, 1997
("Preliminary Approval Order") the Court scheduled a hearing to
consider the approval of the Stipulation and the Settlement
reflected therein, and directed that notice of the proposed
Settlement and hearing be mailed to all members of the Class.

In accordance with the Stipulation and the Preliminary
Approval Order, Caremark caused to be mailed to the Class, a notice
(the "Notice") dated October 10, 1997, and caused to be published
in the national edition of The Wall Street Journal a summary notice
(the "Summary Notice") of the proposed Settlement of the Litigation
and of the opportunity to appear and/or object to the Settlement.

---

[1]    All capitalized terms have the meaning or definition set
forth in the Stipulation.

Affidavits and/or declarations of mailing of the Notice and publication of the Summary Notice have been filed with the Court. The affidavits or declarations of mailing filed with this Court demonstrate compliance with this Court's orders with respect to the Notice and Summary Notice and, further, that the best notice practicable under the circumstances was in fact given.

Plaintiffs and Defendants have applied to the Court for approval of the terms of the Stipulation and for the entry of this Judgment. Pursuant to the Notice and Summary Notice, and upon notice to all parties, a Hearing was held before this Court on December 15, 1997, to consider, among other things, whether the Settlement should be approved by this Court as fair, reasonable, and adequate and whether the application of Plaintiffs' Counsel for the payment of Attorneys' Fees and Expenses is reasonable and should be approved by this Court.

NOW THEREFORE, GOOD CAUSE APPEARING, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. The Court has jurisdiction over the subject matter of this Litigation and all Parties to this Litigation, including all Class Members.

2. The Stipulation is the product of good faith arm's length negotiations by the Parties thereto, each of whom was represented by experienced counsel.

3. The Notice and Summary Notice provided to potential members of the Class constitute the best notice practicable under

the circumstances, including individual notice to all members of the Class who could be identified by reasonable effort. Said notice constituted valid, due, and sufficient notice of these proceedings and of the matters set forth therein, including the proposed settlement set forth in the Stipulation, to members of the Class, and fully satisfied the requirements of due process, Rule 23 of the Federal Rules of Civil Procedure, and any other applicable law.

4. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this Court hereby approves the Settlement set forth in the Stipulation and finds that said Settlement is, in all respects, fair, reasonable, and adequate, and the Parties to the Stipulation are hereby directed to consummate and perform its terms.

5. Except as to any individual claim of those persons (identified on Exhibit 1 hereto) who have validly and timely requested exclusion from the Class, this Court hereby dismisses with prejudice and without costs (except as otherwise provided in the Stipulation) the Litigation against Defendants.

6. Upon the Effective Date, each and every Class Member who has not timely and validly requested exclusion, whether or not such Class Member has filed a Proof of Claim, are and will be deemed to have conclusively released the Settled Claims as against the Released Parties.

7. Class Members who have validly and timely requested exclusion may pursue their own individual remedies, if any.

8. All Class Members who have not timely and validly requested exclusion are hereby forever barred and enjoined from commencing or prosecuting any action or other proceeding in any court of law or equity, arbitration tribunal, or administrative forum, directly, representatively or derivatively, asserting against any of the Settled Claims against any of the Released Parties.

9. Upon the Effective Date, each Class Member individually, completely, voluntarily, knowingly, unconditionally and forever releases and discharges Plaintiffs and Plaintiffs' Counsel from every and all asserted or potential, separate, joint, individual claim, class claim, or other claims, actions, rights, causes of action, demands, liabilities, losses and damages of every kind and nature, anticipated or unanticipated, direct or indirect, fixed or contingent, known or unknown, under federal, state or common law or any other law or regulation, or at equity, against Plaintiffs and Plaintiffs' Counsel or any of them, that are based upon or arise out of the institution, prosecution, assertion, or resolution of the Litigation or the Settled Claims.

10. Upon the Effective Date, each Defendant and the other Released Parties will be deemed to have, and by operation of this Judgment will have, fully, finally, and forever released and discharged each and all of the Class Members and Plaintiffs' Counsel from all claims (including "Unknown Claims"), arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement, or resolution of the Litigation

Doc#: 86747 Ver:1 2215:1016

4

or the Settled Claims, except that nothing herein releases any claim arising out of a violation of the Stipulation or a violation by Plaintiffs or Plaintiffs' Counsel of the Confidentiality Orders in place in the Litigation.

11. The law firms representing Plaintiffs and the Class are hereby awarded, from the Settlement Fund, attorneys' fees in the amount of ___33___ % of the Settlement Fund, and the reimbursement of their expenses in the amount of $411,434.04. Both amounts are to be paid in accordance with the terms and conditions of the Stipulation. Plaintiffs' Co-Lead Counsel are ordered to distribute the fees to all Plaintiffs' Counsel in accordance with Co-Lead Counsel's determination, in their discretion, of each firm's respective contribution to the results obtained for the Class.

12. Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over (a) implementation of this Settlement and any award from or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Net Settlement Fund; (c) hearing and determination of applications for Attorneys' Fees and Expenses (including fees and costs of experts and/or consultants) in the Litigation; (d) all parties hereto for the purpose of enforcing and administering the Stipulation; and (e) other matters related or ancillary to the foregoing.

13. In the event that the Settlement does not become effective in accordance with the terms of the Stipulation or in the

event that the Settlement Fund, or any portion thereof, is returned to the Defendants, then this Judgment will be rendered null and void to the extent provided by and in accordance with the Stipulation and will be vacated and, in such event, all orders entered and releases delivered in connection herewith will be null and void to the extent provided by and in accordance with the Stipulation.

IT IS SO ORDERED.

DATED: Dec 15 1997

THE HONORABLE PAUL E. PLUNKETT
UNITED STATES DISTRICT JUDGE

Doc#: 16747 Ver: 1 22th:1016

6

7

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 2653354 (E.D.N.Y.), Fed. Sec. L. Rep. P 95,781

Page 1

**(Cite as: 2010 WL 2653354 (E.D.N.Y.))**

▷
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.
In re COMVERSE TECHNOLOGY, INC. SECUR-
ITIES LITIGATION.

No. 06–CV–1825 (NGG)(RER).
June 24, 2010.

Christopher Joseph Keller, Labaton Sucharow & Rudoff LLP, Nancy Kaboolian, Abbey Spanier Rodd & Abrams, LLP, New York, NY, for Plaintiffs.

Joseph S. Allerhand, Weil, Gotshal & Manges, LLP, Donald A. Corbett, Dickstein Shapiro Morin & Oshinsky LLP, Edward M. Spiro, Jeremy Hugh Temkin, Morville, Abramowitz, Grand, Iason, David S. Hoffner, Guy Petrillo, Robert W. Topp, Donald Scott Smedley, Dechert LLP, Joel M. Cohen, Clifford Chance U.S. LLP, Solomon N. Klein, Thomas Philip Puccio, Law Office of Solomon N. Klein, Seth T. Taube, Baker Botts, LLP, Yehudis Shalva Lewis, Kramer Levin Naftalis & Frankel LLP, Alex Jason Kaplan, Saima S. Ahmed, Steven Bierman, Sidley Austin LLP, New York, NY, for Defendants.

**MEMORANDUM**
NICHOLAS G. GARAUFIS, District Judge.
**\*1** The court issues this Memorandum to explain its award of fees in the Judgment and Order of Dismissal entered in this case on June 23, 2010.

**I. BACKGROUND**
The court assumes the parties' familiarity with the background of this case, and only recites the facts necessary to address Lead Counsel's motion for an award of attorneys' fees (Docket Entry # 331).

This case arises out of allegedly unlawful stock option awards made to officers of Comverse Technology, Inc. ("Comverse"). Beginning on April 16, 2006, Comverse stockholders filed five putative class actions against Comverse and certain Comverse officers (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. On March 2, 2007, the court consolidated these actions and appointed Menora Mitvachim Pension Funds, Ltd. and Menora Mitvachim Insurance Co. (the "Menora Group") as Lead Plaintiff, in accordance with the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(a)(3)(B)(I). (Docket Entry # 65.) The Menora Group is represented by Pomerantz Haudek Grossman & Gross LLP ("Lead Counsel").

On December 16, 2009, the Menora Group entered into a Stipulation of Settlement with Defendants. (Docket Entry # 323 ("Stipulation").) Under the Stipulation, Comverse agreed to pay a total of $165 million to a class consisting of all purchasers of Comverse common stock during the period April 30, 2001 through January 29, 2008, in exchange for the release and discharge of all claims based upon Comverse's acts during the class period. (*See* Stipulation ¶¶ 1.8, 2.2, 5.2; Declaration of Patrick V. Dahlstrom in Support of Final Approval of Settlement (Docket Entry # 333) ("Dahlstrom Decl.") ¶ 97.) Defendant Kobi Alexander, a former Comverse officer, agreed to pay $60 million to the class, resulting in a total recovery of $225 million (the "Settlement Amount"). (Stipulation ¶ 2.3.)

On April 2, 2010, the court entered an order preliminarily approving the settlement, certifying a class for settlement purposes, and scheduling a fairness hearing. (Docket Entry # 329 ("Preliminary Approval Order").) The Preliminary Approval Order directed Lead Counsel to provide notice of the settlement and the fairness hearing to potential class members. (Preliminary Approval Order ¶ 9.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2653354 (E.D.N.Y.), Fed. Sec. L. Rep. P 95,781
**(Cite as: 2010 WL 2653354 (E.D.N.Y.))**

Through a claims administrator, Lead Counsel mailed a Notice of Pendency and Settlement of Class Action to more than 204,000 potential class members, and also posted summary notice in the *Wall Street Journal* and in the Israeli financial paper *Globes*. (*See* Pls. Reply Mem. in Opposition to Objections (Docket Entry # 342) ("Pls. Reply Mem.") 1); Affidavit of Michael Rosenbaum (Docket Entry # 336 ("Rosenbaum Aff.").)

The retainer agreement between Lead Counsel and the Menora Group permitted Lead Counsel to request attorneys fees up to 30% of any eventual recovery. (Pls. Mem. in Support of Attorneys' Fees Award (Docket Entry # 334) ("Pls. Fee Mem.") 7.) After the parties reached settlement, the Menora Group and Lead Counsel began "vigorous negations" over the fee award. (Decl. of Assaf David–Margalit (Docket Entry # 335) ¶ 8.) The Menora Group also consulted with independent counsel regarding an appropriate fee award for Lead Counsel. (*Id.*) The Notice of Pendency informed potential class members that Lead Counsel would apply for attorneys' fees not in excess of 27% of the Settlement Amount. (Rosenbaum Aff. Ex. A.) On May 10, 2010, Lead Counsel filed a motion requesting, *inter alia,* an award of attorneys' fees in the amount of 25% of the Settlement Amount. (Docket Entry # 331.)

*2 The court received three objections to the settlement. One of these was withdrawn. Another objection, filed by a repeat pro se litigant, was patently frivolous. (*See* Docket Entry # 330.) The only cognizable objection was filed by the Pennsylvania State Employees' Retirement System ("SERS"). (Docket Entry # 344 ("SERS Ltr.").) SERS argued that Lead Counsel's fee request was too large, and suggested instead that the court "award no more than is absolutely required to provide reasonable compensation to counsel." [FN1] (SERS Ltr. 7.)

> FN1. SERS does not object to the proposed settlement of the class action, to the proposed Plan of Allocation, to Lead Counsel's request for an award of unreimbursed

expenses, or to Lead Counsel's request for a compensatory award to Lead Plaintiff.

This court held the fairness hearing on June 21, 2010. No parties objected at the hearing.

## II. DISCUSSION

### A. Calculating Appropriate Fees in Common Fund Cases

Attorneys who recover a common fund for the benefit of a class of injured plaintiffs "are entitled to a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Res.,* 209 F.3d 43, 47 (2d Cir.2000). "What constitutes a reasonable fee is properly committed to the sound discretion of the district court, and will not be overturned absent an abuse of discretion, such as a mistake of law or a clearly erroneous factual finding." *Id.* (internal citation omitted). In exercising this discretion,

[D]istrict courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

*Id.* at 50 (quoting *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F.Supp. 160, 163 (S.D.N.Y.1989)).

Courts use two methods to calculate appropriate fees: the "percentage method" and the "lodestar method." Under the percentage method, the court simply awards counsel a reasonable percentage of the recovery as a fee. The lodestar method requires the court to scrutinize the fee petition to ascertain the number of hours reasonably billed, then multiply that figure by an appropriate hourly rate. *Id.* at 47. "The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2010 WL 2653354 (E.D.N.Y.), Fed. Sec. L. Rep. P 95,781
**(Cite as: 2010 WL 2653354 (E.D.N.Y.))**

incentive for the efficient prosecution and early resolution of litigation." *Wal–Mart Stores. Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 122 (2d Cir.2005) (internal citations omitted). The lodestar method, by contrast, "creates an incentive for attorneys to bill as many hours as possible, to do unnecessary work, and for these reasons also can create a disincentive to early settlement." *McDaniel v. County of Schenectady,* 595 F.3d 411, 418 (2d Cir.2010). The Second Circuit therefore encourages district courts to use the lodestar method primarily as a "cross-check" for the percentage method. *Goldberger,* 209 F.3d at 50. Any percentage award, however, must still be assessed for reasonableness using the *Goldberger* criteria.

**\*3** An additional consideration obtains when the lead counsel and lead plaintiff in a PSLRA class action enter into a fee agreement. In such circumstances, the Second Circuit directs district courts to:

[G]ive serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable. In many cases, the agreed-upon fee will offer the best indication of a market rate,

thus providing a good starting position for a district court's fee analysis. *In re Nortel Networks Corp. Sec. Litig.,* 539 F.3d 129, 133–134 (2d Cir.2008); *see also In re Cendant Corp. Litig.,* 264 F.3d 201, 282 (3d Cir.2001) ("[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel.").

**B. Application of the *Goldberger* Factors to Lead Counsel's Fee Application**

*1. The Requested Fee in Relation to the Settlement*

When determining whether a fee request is

reasonable in relation to a settlement amount, "the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value." *In re Marsh & McLennan Cos., Inc. Sec. Litig.,* No. 04 Civ. 8144 (McMahon, J.), 2009 U.S. Dist. LEXIS 120953, at \*56 (S.D.N.Y.Decl.23, 2009); *see also re Nortel Networks,* 539 F.3d at 134. Lead Counsel's request for 25% of the Settlement Amount is consistent with, or lower than, the fee awards in other "megafund" securities fraud actions in this Circuit. *See In re Initial Pub. Offering Sec. Litig.,* 671 F.Supp.2d 467, 516 (S.D.N.Y.2009) (awarding lead counsel 33.3% of \$586 million settlement); *In re Oxford Health Plans, Inc. Sec. Litig.,* MDL Dkt. No. 1222 (Brieant, J.), 2003 U.S. Dist. LEXIS 26795, at \*13–14 (S.D.N.Y. June 12, 2003) (28% of \$300 million); *Kurzweil v. Philip Morris Cos.,* Nos. 94 Civ. 2373, 94 Civ. 2546 (Mukasey, J.), 1999 U.S. Dist. LEXIS 18378, at \*2 (S.D.N.Y. Nov. 30, 1999) (30% of \$124 million); *In re Prudential,* 912 F.Supp. 97, 104 (S.D.N.Y.1996) (27% of \$ 110 million); *In re Priceline.com,* No. 00 Civ. 1884 (Covello, J.), 2007 U.S. Dist. LEXIS 52538, at \*12–13 (D.Conn. July 20, 2007) (30% of \$80 million). This suggests, at the very least, that Lead Counsel's request is not unreasonable.

This court is aware that other courts have adopted a "sliding-scale" approach to fee awards in megafund cases in order to prevent "unwarranted windfalls" to class counsel. *See, e.g., In re Indep. Energy Holdings PLC,* No. 00 Civ. 6689 (Scheindlin, J.), 2003 U.S. Dist. LEXIS 17090, at \*20 (S.D.N.Y. Sept. 29, 2003) ("The percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be overcompensated to the detriment of the class members they represent."). The logic of this approach is appealing, if not altogether airtight: for example, it ignores the possibility that a sliding scale may actually harm class members by reducing attorneys' in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2010 WL 2653354 (E.D.N.Y.), Fed. Sec. L. Rep. P 95,781
**(Cite as: 2010 WL 2653354 (E.D.N.Y.))**

centive to accept greater risk in pursuit of above-average recoveries.

   *4 But whatever the merits of the sliding-scale method, its underlying rationale—to avoid awarding unearned or unanticipated benefits to class counsel—is inapplicable in this case. It was clear when Comverse's financial troubles were first announced that the potential recovery in any successful lawsuit against Comverse would be substantial. (*See, e.g.,* Amended Compl. (Docket Entry # 74) ¶¶ 152–60.) Nonetheless, the Menora Group and Lead Counsel contracted at the outset of this litigation for a fee award as high as 30% of the eventual recovery. After the settlement amount had been determined, the Menora Group negotiated a 25% fee request. The fact that this fee request is the product of arm's-length negotiation between Lead Counsel and the lead plaintiff is significant. Whether a court uses the percentage or lodestar method, its primary goal when awarding fees is to approximate the prevailing market rate for counsel's services. *See Goldberger,* 209 F.3d at 52 ("[M]arket rates, where available, are the ideal proxy for [class counsel's] compensation'); *In re Nortel Networks,* 539 F.3d at 133–134; *McDaniel,* 595 F.3d at 420; *cf. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 184 (2d Cir.2008) (awards in fee-shifting cases should approximate market rates). Because attorneys and clients ordinarily strike their bargain prior to litigation (*i.e.,* when the risk of loss still exists), an ex ante fee agreement is the best indication of the actual market value of counsel's services. *See In re Synthroid Mktg. Litig.,* 264 F.3d 712, 719 (7th Cir.2001) (opinion of Easterbrook, J.); *In re Nortel Networks,* 539 F.3d at 133–134 ("In many cases, the agreed-upon fee will offer the best indication of a market rate"). Presumably, the Menora Group's decision not to negotiate for a sliding-scale fee award was based on its assessment of the risks of the litigation, Lead Counsel's competence, the rates of settlement in comparable securities actions, and all the other considerations that clients ordinarily take into account when contracting for attorney services on an open market.

The court sees no need to impose its own ex post assessment of Lead Counsel's value when the retainer and fee agreements speak for themselves.

   Using the lodestar as a cross-check confirms the reasonableness of Lead Counsel's request. Lead Counsel expended 43,573 hours of attorney and support time valued at rates ranging from $125 to $880 per hour, generating a $20,245,585 lodestar figure. (Dahlstrom Decl. Ex. B.) Although high, these rates are not extraordinary for top New York law firms. *See In re Gilat Satellite Networks, Ltd.,* No. 02 Civ. 1510 (Sifton, J.), 2007 U.S. Dist. LEX-IS 68964, at *54 (E.D.N.Y. Sept. 18, 2007) (citing cases).[FN2] The hours Lead Counsel expended on this action are reasonable given the magnitude and complexity of the case. (*See* Dahlstrom Decl. ¶ 137; *see also Goldberger v. Integrated Res.,* 209 F.3d at 50 (where lodestar method is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.").

>    FN2. *See also* Nathan Koppel, *Lawyers Gear Up Grand New Fees,* Wall St. J., Aug. 22, 2007, *available at* http:// online.wsj.com/article/SB1187751888284050 48.html (last visited June 23, 2010).

   *5 Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar. *Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1974). The requested fee in this case represents a lodestar multiplier of 2.78. This multiplier is well within the range awarded in comparable settlements. *See Welch & Forbes, Inc. v. Cendant Corp.,* 243 F.3d 722, 742 (3d Cir.2001) (surveying cases with recoveries over $100 million and finding lodestar multiplier of 1.35 to 2.99 common); *Kurzweil,* 1999 U.S. Dist. LEXIS 18378, at *8 (noting that multipliers between 3 and 4.5 are common in federal securities cases, and awarding 25% attorneys' fee); *In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y.1998) ("multipliers of between 3 and 4.5 have become

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2653354 (E.D.N.Y.), Fed. Sec. L. Rep. P 95,781
**(Cite as: 2010 WL 2653354 (E.D.N.Y.))**

common").

### 2. *The Risk of the Litigation*

The risk of the litigation is often cited as one of the most important *Goldberger* factors. *See, e.g., In re Bristol–Myers Squibb Sec. Litig.,* 361 F.Supp.2d 229, 233 (S.D.N.Y.2005). "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation. In particular, securities actions have become more difficult from a plaintiff's perspective in the wake of the [Private Securities Litigation Reform Act]." *In re Metlife Demutualization Litig.,* 689 F.Supp.2d 297, 361 (E.D.N.Y.2010) (quotations and citations omitted).

Lead Counsel invested tens of thousands of hours of attorney time and over $1.6 million of its own money to litigate this case. (Dahlstrom Decl. Ex. C.) It did so despite the fact that the Menora Group faced serious challenges with respect to establishing liability and damages. Had the litigation proceeded, the Menora Group would have faced conflicting evidence concerning the materiality of the alleged misstatements regarding backdated options, the *scienter* claims against the Compensation/ Audit Committee defendants, and loss causation for the interim partial disclosures. (*See* Dahlstrom Decl. ¶¶ 99–117.) Even if liability was established, there was also a substantial risk that the jury would award damages lower than those calculated by the Menora Group's expert. There was also a risk that Comverse's deteriorating cash condition would make it unable to pay a substantial settlement. (*Id.* ¶¶ 120–25.) In short, a positive outcome was by no means guaranteed.

### 3. *The Time and Labor Expended By Counsel and the Magnitude and Complexities of the Litigation*

This case, while perhaps not as enormous as some other recent securities class actions, was large, protracted, and bitterly contested. Lead Counsel expended 43,573 hours on the litigation. Among other things, Lead Counsel: reviewed seven million pages of documents, as well as SEC filings, analyst reports, and public filings in nine other se-

curities cases; filed multiple complex pleadings; briefed oppositions to protective-order motions, a motion for class certification, papers in support of the settlement, and six motions to dismiss; successfully appealed a Report and Recommendation; deposed 10 Comverse employees, defended three depositions, and interviewed 30 former Comverse employees throughout the United States and Israel; and prepared and reviewed highly complex accounting and damages analyses with the aid of experts. (Dahlstrom Decl. ¶ 137.) These efforts were hardly makework, given the uncertainty of key issues relating to liability and damages. Lead Counsel also engaged in lengthy, contentious settlement and mediation sessions over the course of a eighteen months. (*Id.* ¶¶ 74–98.) The results of this labor speak for themselves: as of May 2010, this settlement is the second largest securities class action settlement involving options backdating claims. (Pls. Fee Mem. 5.)

### 4. *The Quality of Lead Counsel's Representation*

**\*6** To evaluate the quality of representation in common-fund litigations, courts in this Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Merrill Lynch Tyco Research Sec. Litig.,* 249 F.R.D. 124, 141 (S.D.N.Y.1998). As outlined above, the recovery in this case is one of the highest ever achieved in this type of securities action. Lead Counsel has extensive experience in complex federal civil litigation, including securities fraud class actions. (Dahlstrom Decl. Ex. A.) The court also notes that, throughout this litigation, it has been impressed by Lead Counsel's acumen and diligence. The briefing has been thorough, clear, and convincing, and as far as the court can tell, Lead Counsel has not taken short cuts or relaxed its efforts at any stage of the litigation.

### 5. *Public Policy Considerations*

Private securities class actions are "a most effective weapon in the enforcement of the securities laws and are a necessary supplement to [SEC] action." *Eichler v. Berner,* 472 U.S. 299, 105 S.Ct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2653354 (E.D.N.Y.), Fed. Sec. L. Rep. P 95,781
**(Cite as: 2010 WL 2653354 (E.D.N.Y.))**

2622, 86 L.Ed.2d 215 (1985) (internal quotation marks and citation omitted). For these reasons, "public policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC." *Bristol–Myers Squibb,* 361 F.Supp.2d at 236; *see also In re WorldCom, Inc. Sec. Litig.,* 388 F.Supp.2d 319, 359 (S.D.N.Y.2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

A 25% fee award in a $225 million settlement is certainly sufficient incentive to pursue securities cases of this magnitude. And while it may be that a lower percentage would also be sufficient, this court will not pretend that it has the expertise necessary to divine the ideal percentage or construct an accurate sliding fee scale. This court is particularly unwilling to undertake such an endeavor in a case where the fee award was set on the open market, and where an improperly calibrated fee would provide a disincentive to future counsel to take risks and pursue large class settlements that the SEC cannot.

**III. CONCLUSION**
For the foregoing reasons, this court finds that Lead Counsel's request for a fees award in the amount of 25% of the Settlement Amount is fair and reasonable under *Goldberger* and the prevailing law in this Circuit.

E.D.N.Y.,2010.
In re Comverse Technology, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2010 WL 2653354 (E.D.N.Y.), Fed. Sec. L. Rep. P 95,781

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

8