the independent public accountant shall, as soon as practicable, directly report its conclusions to the board of directors.

"(3) Notice to commission; response to failure to notify.-An issuer whose board of directors receives a report under paragraph (2) shall inform the Commission by notice not later than 1 business day after the receipt of such report and shall furnish the independent public accountant making such report with a copy of the notice furnished to the Commission. If the independent public accountant fails to receive a copy of the notice before the expiration of the required 1-business-day period, the independent public accountant shall-

"(A) resign from the engagement; or

"(B) furnish to the Commission a copy of its report (or the documentation of any oral report given) not later than 1 business day following such failure to receive notice.

"(4) Report after resignation.-If an independent public accountant resigns from an engagement under paragraph (3)(A), the accountant shall, not later than 1 business day following the failure by the issuer to notify the Commission under paragraph (3), furnish to the Commission a copy of the accountant's report (or the documentation of any oral report given).

"(c) Auditor Liability Limitation.-No independent public accountant shall be liable in a private action for any finding, conclusion, or statement expressed in a report made pursuant to paragraph (3) or (4) of subsection (b), including any rule promulgated pursuant thereto.

"(d) Civil Penalties in Cease-and-Desist Proceedings.-If the Commission finds, after notice and opportunity for hearing in a proceeding instituted pursuant to section 21C, that an independent public accountant has willfully violated paragraph (3) or (4) of subsection (b), the Commission may, in addition to entering an order under section 21C, impose a civil penalty against the independent public accountant and any other person that the Commission finds was a cause of such violation. The determination to impose a civil penalty and the amount of the penalty shall be governed by the standards set forth in section 21B.

"(e) Preservation of Existing Authority.-Except as provided in subsection (d), nothing in this section shall be held to limit or otherwise affect the authority of the Commission under this title.

"(f) Definition.-As used in this section, the term 'illegal act' means an act or omission that violates any law, or any rule or regulation having the force of law.".

(b) Effective Dates.-The amendment made by subsection (a) shall apply to each annual report-

(1) for any period beginning on or after January 1, 1996, with respect to any registrant that is required to file selected quarterly financial data pursuant to the rules or regulations of the Securities and Exchange Commission; and

(2) for any period beginning on or after January 1, 1997, with respect to any other registrant.

And the Senate agree to the same.

That the House recede from its disagreement to the amendment of the Senate to the title of the bill, and agree to the same.

From the Committee on Commerce, for consideration of the House bill, and the Senate amendment, and modifications committed to conference:

> Thomas Bliley,
> Billy Tauzin,
> Jack Fields,
> Chris Cox,
> Richard F. White,
> Anna G. Eshoo,

As additional conferees from the Committee on the Judiciary, for consideration of the House bill, and the Senate amendment, and modifications committed to conference:

> Bill McCollum,
> Managers on the Part of the House.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Alfonse D'Amato,
Phil Gramm,
Robert F. Bennett,
Rod Grams,
Pete V. Domenici,
Christopher Dodd,
John F. Kerry,
Managers on the Part of the Senate.

## JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 1058) to reform Federal securities litigation, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

### STATEMENT OF MANAGERS-THE "PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995"

The overriding purpose of our Nation's securities laws is to protect investors and to maintain confidence in the securities markets, so that our national savings, capital formation and investment may grow for the benefit of all Americans.

The private securities litigation system is too important to the integrity of American capital markets to allow this system to be undermined by those who seek to line their own pockets by bringing abusive and meritless suits. Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely upon government action. Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs. This legislation seeks to return the securities litigation system to that high standard.

Congress has been prompted by significant evidence of abuse in private securities lawsuits to enact reforms to protect investors and maintain confidence in our capital markets. The House and Senate Committees heard evidence that abusive practices committed in private securities litigation include: (1) the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action; (2) the targeting of deep pocket defendants, including accountants, underwriters, and individuals who may be covered by insurance, without regard to their actual culpability; (3) the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle; and (4) the manipulation by class action lawyers of the clients whom they purportedly represent. These serious injuries to innocent parties are compounded by the reluctance of many judges to impose sanctions under Federal Rule of Civil Procedure 11, except in those cases involving truly outrageous misconduct. At the same time, the investing public and the entire U.S. economy have been injured by the *731 unwillingness of the best qualified persons to serve on boards of directors and of issuers to discuss publicly their future prospects, because of fear of baseless and extortionate securities lawsuits.

In these and other examples of abusive and manipulative securities litigation, innocent parties are often forced to pay exorbitant "settlements." When an insurer must pay lawyers' fees, make settlement payments, and expend management and employee resources in defending a meritless suit, the issuers' own investors suffer. Investors always are the ultimate losers when extortionate "settlements" are extracted from issuers.

This Conference Report seeks to protect investors, issuers, and all who are associated with our capital markets from abusive securities litigation. This legislation implements needed procedural protections to discourage frivolous litigation. It protects outside directors, and others who may be sued for non-knowing securities law violations, from liability for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

damage actually caused by others. It reforms discovery rules to minimize costs incurred during the pendency of a motion to dismiss or a motion for summary judgment. It protects investors who join class actions against lawyer-driven lawsuits by giving control of the litigation to lead plaintiffs with substantial holdings of the securities of the issuer. It gives victims of abusive securities lawsuits the opportunity to recover their attorneys' fees at the conclusion of an action. And it establishes a safe harbor for forward looking statements, to encourage issuers to disseminate relevant information to the market without fear of open-ended liability.

## PRIVATE SECURITIES LITIGATION REFORM

Section 101 contains provisions to reform abusive securities class action litigation. It amends the Securities Act of 1933 (the "1933 Act") by adding a new section 27 and the Securities Exchange Act of 1934 (the "1934 Act") by adding a new section 21D. These provisions are intended to encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class. These provisions are intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel. The legislation also provides that all discovery is stayed during the pendency of any motion to dismiss or for summary judgment. These stay of discovery provisions are intended to prevent unnecessary imposition of discovery costs on defendants.

## THE PROFESSIONAL PLAINTIFF AND LEAD PLAINTIFF PROBLEMS

House and Senate Committee hearings on securities litigation reform demonstrated the need to reform abuses involving the use of "professional plaintiffs" and the race to the courthouse to file the complaint.

Professional plaintiffs who own a nominal number of shares in a wide array of public companies permit lawyers readily to file abusive securities class action lawsuits. Floor debate in the Senate highlighted that many of the "world's unluckiest investors" repeatedly*732 appear as lead plaintiffs in securities class action lawsuits. These lead plaintiffs often receive compensation in the form of bounty payments or bonuses.

The Conference Committee believes these practices have encouraged the filing of abusive cases. Lead plaintiffs are not entitled to a bounty for their services. Individuals who are motivated by the payment of a bounty or bonus should not be permitted to serve as lead plaintiffs. These individuals do not adequately represent other shareholders-in many cases the "lead plaintiff" has not even read the complaint.

The Conference Committee believes that several new rules will effectively discourage the use of professional plaintiffs.

Plaintiff certification of the complaint

This legislation requires, in new section 27(a)(2) of the 1933 Act and new section 21D(a)(2) of the 1934 Act, that the lead plaintiff file a sworn certified statement with the complaint. The statement must certify that the plaintiff: (a) reviewed and authorized the filing of the complaint; (b) did not purchase the securities at the direction of counsel or in order to participate in a lawsuit; and (c) is willing to serve as the lead plaintiff on behalf of the class. To further deter the use of professional plaintiffs, the plaintiff must also identify any transactions in the securities covered by the class period, and any other lawsuits in which the plaintiff has sought to serve as lead plaintiff in the last three years.[1]

Method for determining the "most adequate plaintiff"

The Conference Committee was also troubled by the plaintiffs' lawyers "race to the courthouse" to be the first to file a securities class action complaint. This race has caused plaintiffs' attorneys to become fleet of foot and sleight of hand.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Most often speed has replaced diligence in drafting complaints. The Conference Committee believes two incentives have driven plaintiffs' lawyers to be the first to file. First, courts traditionally appoint counsel in class action lawsuits on a "first come, first serve" basis. Courts often afford insufficient consideration to the most thoroughly researched, but later filed, complaint. The second incentive involves the court's decision as to who will become lead plaintiff. Generally, the first lawsuit filed also determines the lead plaintiff.

The Conference Committee believes that the selection of the lead plaintiff and lead counsel should rest on considerations other than how quickly a plaintiff has filed its complaint. As a result, this legislation establishes new procedures for the appointment of the lead plaintiff and lead counsel in securities class actions in new section 27(a)(3) of the 1933 Act and new section 21D(a)(3) of the 1934 Act.

A plaintiff filing a securities class action must, within 20 days of filing a complaint, provide notice to members of the purported class in a widely circulated business publication. This notice must identify the claims alleged in the lawsuit and the purported class period and inform potential class members that, within 60 days, they may move to serve as the lead plaintiff. Members of the purported*733 class who seek to serve as lead plaintiff do not have to file the certification filing as part of this motion. "Publication" includes a variety of media, including wire, electronic or computer services.[2]

Within 90 days of the published notice, the court must consider motions made under this section and appoint the lead plaintiff. If a motion has been filed to consolidate multiple class actions brought on behalf of the same class, the court will not appoint a lead plaintiff until after consideration of the motion.

The current system often works to prevent institutional investors from selecting counsel or serving as lead plaintiff in class actions.[3] The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the "most adequate plaintiff."

The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions. Institutional investors are America's largest shareholders, with about $9.5 trillion in assets, accounting for 51% of the equity market. According to one representative of institutional investors: "As the largest shareholders in most companies, we are the ones who have the most to gain from meritorious securities litigation."[4]

Several Senators expressed concern during floor consideration of this legislation that preference would be given to large investors, and that large investors might conspire with the defendant company's management. The Conference Committee believes, however, that with pension funds accounting for $4.5 trillion[5] or nearly half of the institutional assets, in many cases the beneficiaries of pension funds-small investors-ultimately have the greatest stake in the outcome of the lawsuit. Cumulatively, these small investors represent a single large investor interest. Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake. The claims of both types of class members generally will be typical.

The Conference Committee recognizes the potential conflicts that could be caused by the shareholder with the "largest financial stake" serving as lead plaintiff. As a result, this presumption may be rebutted by evidence that the plaintiff would not fairly and adequately represent the interests of the class or is subject to unique defenses. Members of the purported class may seek discovery on whether the presumptively most adequate plaintiff would not adequately represent the class. The provisions of the bill relating to the appointment of a lead plaintiff are not intended to affect current law with regard to challenges to the adequacy of the class representative or typicality of the claims among the class.

Although the most adequate plaintiff provision does not confer any new fiduciary duty on institutional investors-and the courts should not impose such a duty-the Conference Committee nevertheless intends that the lead plaintiff provision will encourage institutional investors to take a more active role in securities class action lawsuits. Scholars predict that increasing the role of institutional*734 investors will benefit both injured shareholders and courts: "Institutions with large stakes in class actions have much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were 'fair and reasonable' than is the case

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

with settlements negotiated by unsupervised plaintiffs' attorneys."[6]

Finally, this lead plaintiff provision solves the dilemma of who will serve as class counsel. Subject to court approval, the most adequate plaintiff retains class counsel. As a result, the Conference Committee expects that the plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff. The Conference Committee does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

The Conference Report seeks to restrict professional plaintiffs from serving as lead plaintiff by limiting a person from serving in that capacity more than five times in three years. Institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict. As a result, the Conference Committee grants courts discretion to avoid the unintended consequence of disqualifying institutional investors from serving more than five times in three years. The Conference Committee does not intend for this provision to operate at cross purposes with the "most adequate plaintiff" provision. The Conference Committee does expect, however, that it will be used with vigor to limit the activities of professional plaintiffs.

Limitation on lead plaintiff's recovery

This legislation also removes the financial incentive for becoming a lead plaintiff. New section 27(a)(4) of the 1933 Act and section 21D(a)(4) of the 1934 Act limits the class representative's recovery to his or her pro rata share of the settlement or final judgment. The lead plaintiff's share of the final judgment or settlement will be calculated in the same manner as the shares of the other class members. The Conference Committee recognizes that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and grants the courts discretion to award fees accordingly.

## IMPROVEMENTS TO THE SETTLEMENT PROCESS

Restriction on sealed settlement agreements

New section 27(a)(5) of the 1933 Act and section 21D(a)(5) of the 1934 Act generally bar the filing of settlement agreements under seal. The Conference Committee recognizes that legitimate reasons may exist for the court to permit the entry of a settlement or portions of a settlement under seal. A party must show "good cause," i.e., that the publication of a portion or portions of the settlement agreement would result in direct and substantial harm to any party, whether or not a party to the action. The Conference Committee intends "direct and substantial harm" to include proof of reputational injury to a party.

*735 Limitation on attorney's fees

The House and Senate heard testimony that counsel in securities class actions often receive a disproportionate share of settlement awards.

Under current practice, courts generally award attorney's fees based on the so-called "lodestar" approach-i.e., the court multiplies the attorney's hours by a reasonable hourly fee, which may be increased by an additional amount based on risk or other relevant factors.[7] Under this approach, attorney's fees can constitute 35% or more of the entire settlement awarded to the class. The Conference Committee limits the award of attorney's fees and costs to counsel for a class in new section 27(a)(6) of the 1933 Act and new section 21D(a)(6) of the 1934 Act to a reasonable percentage of the amount of recovery awarded to the class. By not fixing the percentage of fees and costs counsel may receive, the Conference Committee intends to give the court flexibility in determining what is reasonable on a case-by-case basis. The Conference Committee does not intend to prohibit use of the lodestar approach as a means of calculating attorney's fees. The provision focuses on the final amount of fees awarded, not the means by which such fees are calculated.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Improved settlement notice to class members

The House and Senate heard testimony that class members frequently lack meaningful information about the terms of the proposed settlement.[8] Class members often receive insufficient notice of the terms of a proposed settlement and, thus, have no basis to evaluate the settlement. As one bar association advised the Senate Securities Subcommittee, "settlement notices provided to class members are often obtuse and confusing, and should be written in plain English." [9] The Senate received similar testimony from a class member in two separate securities fraud lawsuits: "Nowhere in the settlement notices were the stockholders told of how much they could expect to recover of their losses. . . . I feel that the settlement offer should have told the stockholders how little of their losses will be recovered in the settlement, and that this is a material fact to the shareholder's decision to approve or disapprove the settlement."[10]

In new section 27(a)(7) of the 1933 Act and new section 21D(a)(7) of the 1934 Act, the Conference Committee requires that certain information be included in any proposed or final settlement agreement disseminated to class members. To ensure that critical information is readily available to class members, the Conference Committee requires that such information appear in summary form on the cover page of the notice. The notice must contain a statement of the average amount of damages per share that would be recoverable if the settling parties can agree on a figure, or a statement from each settling party on why there is disagreement. It must also explain the attorney's fees and costs sought. The name, telephone number and address of counsel for the class must be provided. Most importantly, the notice must include a brief statement explaining the reason for the proposed settlement.

## *736 MAJOR SECURITIES CLASS ACTION ABUSES

Limits on abusive discovery to prevent "fishing expedition" lawsuits

The cost of discovery often forces innocent parties to settle frivolous securities class actions. According to the general counsel of an investment bank, "discovery costs account for roughly 80% of total litigation costs in securities fraud cases." [11] In addition, the threat that the time of key employees will be spent responding to discovery requests, including providing deposition testimony, often forces coercive settlements.

The House and Senate heard testimony that discovery in securities class actions often resembles a fishing expedition. As one witness noted, "once the suit is filed, the plaintiff's law firm proceeds to search through all of the company's documents and take endless depositions for the slightest positive comment which they can claim induced the plaintiff to invest and any shred of evidence that the company knew a downturn was coming."[12]

The Conference Committee provides in new section 27(b) of the 1933 Act and new section 21D(b)(3) of the 1934 Act that courts must stay all discovery pending a ruling on a motion to dismiss, unless exceptional circumstances exist where particularized discovery is necessary to preserve evidence or to prevent undue prejudice to a party. For example, the terminal illness of an important witness might require the deposition of the witness prior to the ruling on the motion to dis- miss.

To ensure that relevant evidence will not be lost, new section 27(b) of the 1933 Act and new section 21D(b)(3) of the 1934 Act make it unlawful for any person, upon receiving actual notice that names that person as a defendant, willfully to destroy or otherwise alter relevant evidence. The Conference Committee intends this provision to prohibit only the willful alteration or destruction of evidence relevant to the litigation. The provision does not impose liability where parties inadvertently or unintentionally destroy what turn out later to be relevant documents. Although this prohibition expressly applies only to defendants, the Conference Committee believes that the willful destruction of evidence by a plaintiff would be equally improper, and that courts have ample authority to prevent such conduct or to apply sanctions as appropriate.

"Fair share" rule of proportionate liability

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 1:07-cv-04507 Document #: 455-6 Filed: 03/19/12 Page 7 of 17 PageID #:24109

H.R. CONF. REP. 104-369     Page 27

One of the most manifestly unfair aspects of the current system of securities litigation is its imposition of liability on one party for injury actually caused by another. Under current law, a single defendant who has been found to be 1% liable may be forced to pay 100% of the damages in the case. The Conference Committee remedies this injustice by providing a "fair share" system of proportionate liability. As former SEC Chairman Richard Breeden testified, under the current regime of joint and several liability, "parties who are central to perpetrating a fraud often pay little, if anything. At the same time, those whose involvement might be only peripheral and lacked any deliberate and knowing participation in the fraud often pay the most in damages."[13]

The current system of joint and several liability creates coercive pressure for entirely innocent parties to settle meritless claims *737 rather than risk exposing themselves to liability for a grossly disproportionate share of the damages in the case.

In many cases, exposure to this kind of unlimited and unfair risk has made it impossible for firms to attract qualified persons to serve as outside directors. Both the House and Senate Committees repeatedly heard testimony concerning the chilling effect of unlimited exposure to meritless securities litigation on the willingness of capable people to serve on company boards. SEC Chairman Levitt himself testified that "there [were] the dozen or so entrepreneurial firms whose invitations [to be an outside director] I turned down because they could not adequately insure their directors . . . . [C]ountless colleagues in business have had the same experience, and the fact that so many qualified people have been unable to serve is, to me, one of the most lamentable problems of all."[14] This result has injured the entire U.S. economy.

Accordingly, the Conference Committee has reformed the traditional rule of joint and several liability. The Conference Report specifically applies this reform to the liability of outside directors under Section 11 of the 1933 Act,[15] because the current imposition of joint and several liability for non-knowing Section 11 violations by outside directors presents a particularly glaring example of unfairness. By relieving outside directors of the specter of joint and several liability under Section 11 for non-knowing conduct, Section 201 of the Conference Report will reduce the pressure placed by meritless litigation on the willingness of capable outsiders to serve on corporate boards.

In addition, Section 201 will provide the same "fair share" rule of liability, rather than joint and several liability, for all 1934 Act cases in which liability can be predicated on non-knowing conduct.[16]

In applying the "fair share" rule of proportionate liability to cases involving non-knowing securities violations, the Conference Committee explicitly determined that the legislation should make no change to the state of mind requirements of existing law. Accordingly, the definition of "knowing" conduct in the Conference Report is written to conform to existing statutory standards, and Section 201 of the Conference Report makes clear that the "fair share" rule of proportionate liability does not create any new cause of action or expand, diminish, or otherwise affect the substantive standard for liability in any action under the 1933 Act or the 1934 Act. This section of the Conference Report further provides that the standard of liability in any such action should be determined by the pre-existing, unamended statutory provision that creates the cause of action, without regard to this provision, which applies solely to the allocation of damages.

The Conference Report imposes full joint and several liability, as under current law, on defendants who engage in knowing violations of the securities laws. Defendants who are found liable but have not engaged in knowing violations are responsible only for their share of the judgment (based upon the fact finder's apportionment of responsibility), with two key exceptions. First, all defendants are jointly and severally liable with respect to the claims of certain plaintiffs. Such plaintiffs are defined in the Conference Report as those who establish that (i) they are entitled to damages *738 exceeding 10% of their net worth, and (ii) their net worth is less than $200,000. The $200,000 net worth test does not reflect a judgment by the Conference Committee that investors who fall below this standard are "small," unsophisticated, or in need of or entitled to any special protection under the securities laws. Second, if a defendant cannot pay their allocable share of the damages due to insolvency, each of the other defendants must make an additional payment-up to 50% of their own liability-to make up the shortfall in the plaintiff's recovery.

The Conference Committee recognizes that private parties may wish to allocate attorney's fees and costs according to a formula negotiated previously by contract. Accordingly, the Conference Report provides that where authorized by con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

http://web2.westlaw.com/print/printstream.aspx?mt=Westlaw&prft=HTMLE&vr=2....    3/15/2012

tract a prevailing defendant may recover attorney's fees and costs. The Conference Report does not change the enforceability of indemnification contracts in the event of settlement.

Attorneys' fees awarded to prevailing parties in abusive litigation

The Conference Committee recognizes the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims. The Conference Committee seeks to solve this problem by strengthening the application of Rule 11 of the Federal Rules of Civil Procedure in private securities actions.

Existing Rule 11 has not deterred abusive securities litigation.[17] Courts often fail to impose Rule 11 sanctions even where such sanctions are warranted. When sanctions are awarded, they are generally insufficient to make whole the victim of a Rule 11 violation: the amount of the sanction is limited to an amount that the court deems sufficient to deter repetition of the sanctioned conduct, rather than imposing a sanction that equals the costs imposed on the victim by the violation. Finally, courts have been unable to apply Rule 11 to the complaint in such a way that the victim of the ensuing lawsuit is compensated for all attorneys' fees and costs incurred in the entire action.

The legislation gives teeth to Rule 11 in new section 27(c) of the 1933 Act and new section 21D(c) of the 1934 Act by requiring the court to include in the record specific findings, at the conclusion of the action, as to whether all parties and all attorneys have complied with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure.

These provisions also establish the presumption that the appropriate sanction for filing a complaint that violates Rule 11(b) is an award to the prevailing party of all attorney's fees and costs incurred in the entire action. The Conference Report provides that, if the action is brought for an improper purpose, is unwarranted by existing law or legally frivolous, is not supported by facts, or otherwise fails to satisfy the requirements set forth in Rule 11(b), the prevailing party presumptively will be awarded its attorneys' fees and costs for the entire action. This provision does not mean that a party who is sanctioned for only a partial failure of the complaint under Rule 11, such as one count out of a 20-count complaint, must pay for all of the attorney's fees and costs associated with the action. The Conference Committee expects that courts will *739 grant relief from the presumption where a de minimis violation of the Rule has occurred. Accordingly, the Conference Committee specifies that the failure of the complaint must be "substantial" and makes the presumption rebuttable.

For Rule 11(b) violations involving responsive pleadings or dispositive motions, the rebuttable presumption is an award of attorneys' fees and costs incurred by the victim of the violation as a result of that particular pleading or motion.

A party may rebut the presumption of sanctions by providing that: (i) the violation was de minimis; or (ii) the imposition of fees and costs would impose an undue burden and be unjust, and it would not impose a greater burden for the prevailing party to have to pay those same fees and costs. The premise of this test is that, when an abusive or frivolous action is maintained, it is manifestly unjust for the victim of the violation to bear substantial attorneys' fees. The Conference Committee recognizes that little in the way of justice can be achieved by attempting to compensate the prevailing party for lost time and such other measures of damages as injury to reputation; hence it has written into law the presumption that a prevailing party should not have the cost of attorney's fees added as insult to the underlying injury. If a party successfully rebuts the presumption, the court then impose sanctions consistent with Rule 11(c)(2).[18] The Conference Committee intends this provision to impose upon courts the affirmative duty to scrutinize filings closely and to sanction attorneys or parties whenever their conduct violates Rule 11(b).

Limitation on attorney's conflict of interest

The Conference Committee believes that, in the context of class action lawsuits, it is a conflict of interest for a class action lawyer to benefit from the outcome of the case where the lawyer owns stock in the company being sued. Accordingly, new section 27(a)(8) of the 1933 Act and new section 21D(a)(9) requires the court to determine whether a lawyer

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

who owns securities in the defendant company and who seeks to represent the plaintiff class in a securities class action should be disqualified from representing the class.

Bonding for payment of fees and expenses

The house hearings on securities litigation reform revealed the need for explicit authority for courts to require undertakings for attorney's fees and costs from parties, or their counsel, or both, in order to ensure the viability of potential sanctions as a deterrent to meritless litigation.[19] Congress long ago authorized similar undertakings in the express private right of action in Section 11 of the 1933 Act and in Sections 9 and 18 of the 1934 Act. The availability of such undertakings in private securities actions will be an important means of ensuring that the provision of the Conference Report authorizing the award of attorneys' fees and costs under Rule 11 will not become, in practice, a one-way mechanism only usable to sanction parties with deep pockets.[20]

The legislation expressly provides that such undertakings may be required of parties' attorneys in lieu of, or in addition to, the parties themselves. In this regard, the Conference Committee intends to preempt any contrary state bar restrictions that much inhibit*740 attorneys' provision of such undertakings in behalf of their clients. The Conference Committee anticipates, for example, that where a judge determines to require an undertaking in a class action, such an undertaking would ordinarily be imposed on plaintiffs' counsel rather than upon the plaintiff class, both because the financial resources of counsel would ordinarily be more extensive than those of an individual class member and because counsel are better situated than class members to evaluate the merits of cases and individual motions. This provision is intended to effectuate the remedial purposes of the bill's Rule 11 provision.

### REQUIREMENTS FOR SECURITIES FRAUD ACTIONS

Heightened pleading standard

Naming a party in a civil suit for fraud is a serious matter. Unwarranted fraud claims can lead to serious injury to reputation for which our legal system effectively offers no redress. For this reason, among others, Rule 9(b) of the Federal Rules of Civil Procedure requires that plaintiffs plead allegations of fraud with "particularity." The Rule has not prevented abuse of the securities laws by private litigants.[21] Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits.[22] The House and Senate hearings on securities litigation reform included testimony on the need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits.

The Conference Committee language is based in part on the pleading standard of the Second Circuit. The standard also is specifically written to conform the language to Rule 9(b)'s notion of pleading with "particularity."

Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.[23] The plaintiff must also specifically plead with particularity each statement alleged to have been misleading. The reason or reasons why the statement is misleading must also be set forth in the compliant in detail. If an allegation is made on information and belief, the plaintiff must state with particularity all facts in the plaintiff's possession on which the belief is formed.

Loss causation

The Conference Committee also requires the plaintiff to plead and then to prove that the misstatement or omission alleged in the complaint actually caused the loss incurred by the plaintiff in new Section 21D(b)(4) of the 1934 Act. For example, the plaintiff would have to prove that the price at which the plaintiff bought the stock was artificially inflated as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the result of the misstatement or omission.

## *741 DAMAGES

Written interrogatories

In an action to recover money damages, the Conference Committee requires the court to submit written interrogatories to the jury on the issue of defendant's state of mind at the time of the violation. In expressly providing for certain interrogatories, the Committee does not intend to otherwise prohibit or discourage the submission of interrogatories concerning the mental state or relative fault of the plaintiff and of persons who could have been joined as defendants. For example, interrogatories may be appropriate in contribution proceedings among defendants or in computing liability when some of the defendants have entered into settlement with the plaintiff prior to verdict or judgment.

Limitation on "windfall" damages

The current method of calculating damages in 1934 Act securities fraud cases is complex and uncertain. As a result, there are often substantial variations in the damages calculated by the defendants and the plaintiffs. Typically, in an action involving a fraudulent misstatement or omission, the investor's damages are presumed to be the difference between the price the investor paid for the security and the price of the security on the day the corrective information gets disseminated to the market.

Between the time a misrepresentation is made and the time the market receives corrected information, however, the price of the security may rise or fall for reasons unrelated to the alleged fraud. According to an analysis provided to the Senate Securities Subcommittee, on average, damages in securities litigation comprise approximately 27.7[24] of market loss. Calculating damages based on the date corrective information is disclosed may end up substantially overestimating plaintiff's damages.[25] The Conference Committee intends to rectify the uncertainty in calculating damages in new section 21D(e) of the 1934 Act by providing a "look back" period, thereby limiting damages to those losses caused by the fraud and not by other market conditions.

This provision requires that plaintiff's damages be calculated based on the "mean trading price" of the security. This calculation takes into account the value of the security on the date plaintiff originally bought or sold the security and the value of the security during the 90-day period after dissemination of any information correcting the misleading statement or omission. If the plaintiff sells those securities or repurchases the subject securities during the 90-day period, damages will be calculated based on the price of that transaction and the value of the security immediately after the dissemination of corrective information.

## SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS

The muzzling effect of abusive securities litigation

Abusive litigation severely affects the willingness of corporate managers to disclose information to the marketplace. Former SEC Chairman Richard Breeden testified in a Senate Securities Subcommittee hearing on this subject: "Shareholders are also damaged *742 due to the chilling effect of the current system on the robustness and candor of disclosure. . . . Understanding a company's own assessment of its future potential would be among the most valuable information shareholders and potential investors could have about a firm."[26]

Fear that inaccurate projections will trigger the filing of securities class action lawsuit has muzzled corporate management. One study found that over two-thirds of venture capital firms were reluctant to discuss their performance with analysts or the public because of the threat of litigation.[27] Anecdotal evidence similarly indicates corporate counsel advise clients to say as little as possible, because "legions of lawyers scrub required filings to ensure that disclosures are as mil-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

quetoast as possible, so as to provide no grist for the litigation mill."[28]

Technology companies-because of the volatility of their stock prices-are particularly vulnerable to securities fraud lawsuits when projections do not materialize. If a company fails to satisfy its announced earnings projections-perhaps because of changes in the economy or the timing of an order or new product-the company is likely to face a lawsuit.

A statutory safe harbor for forward-looking statements

The Conference Committee has adopted a statutory "safe harbor" to enhance market efficiency by encouraging companies to disclose forward-looking information. This provision adds a new section 27A to the 1933 Act and a new section 21E of the 1934 Act which protects from liability in private lawsuits certain "forward-looking" statements made by persons specified in the legislation.[29]

The Conference Committee has crafted a safe harbor that differs from the safe harbor provisions in the House and Senate passed bills. The Conference Committee safe harbor, like the Senate safe harbor, is based on aspects of SEC Rule 175 and the judicial created "bespeaks caution" doctrine. It is a bifurcated safe harbor that permits greater flexibility to those who may avail themselves of safe harbor protection. There is also a special safe harbor for issuers who make oral forward-looking statements.

The first prong of the safe harbor protects a written or oral forward-looking statement that is: (i) identified as forward-looking, and (ii) accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those projected in the statement.

Under this first prong of the safe harbor, boilerplate warnings will not suffice as meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those projected in the statement. The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business.

As part of the analysis of what constitutes a meaningful cautionary statement, courts should consider the factors identified in the statements. "Important" factors means the stated factors identified in the cautionary statement must be relevant to the projection*743 and must be of a nature that the factor or factors could actually affect whether the forward-looking statement is realized.

The Conference Committee expects that the cautionary statements identify important factors that could cause results to differ materially-but not all factors. Failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor. The Conference Committee specifies that the cautionary statements identify "important" factors to provide guidance to issuers and not to provide an opportunity for plaintiff counsel to conduct discovery on what factors were known to the issuer at the time the forward-looking statement was made.

The use of the words "meaningful" and "important factors" are intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind of the defendant. The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.

Courts may continue to find a forward-looking statement immaterial-and thus not actionable under the 1933 Act and the 1934 Act-on other grounds. To clarify this point, the Conference Committee includes language in the safe harbor provision that no liability attaches to forward-looking statements that are "immaterial."

The safe harbor seeks to provide certainty that forward-looking statements will not be actionable by private parties under certain circumstances. Forward-looking statements will have safe harbor protection if they are accompanied by a meaningful cautionary statement. A cautionary statement that misstates historical facts is not covered by the Safe harbor, it is not sufficient, however, in a civil action to allege merely that a cautionary statement misstates historical facts. The

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff must plead with particularity all facts giving rise to a strong inference of a material misstatement in the cautionary statement to survive a motion to dismiss.

The second prong of the safe harbor provides an alternative analysis. This safe harbor also applies to both written and oral forward-looking statements. Instead of examining the forward-looking and cautionary statements, this prong of the safe harbor focuses on the state of mind of the person making the forward-looking statement. A person or business entity will not be liable in a private lawsuit for a forward-looking statement unless a plaintiff proves that person or business entity made a false or misleading forward-looking statement with actual knowledge that it was false or misleading. The Conference Committee intends for this alternative prong of the safe harbor to apply if the plaintiff fails to prove the forward-looking statement (1) if made by a natural person, was made with the actual knowledge by that person that the statement was false or misleading; or (2) if made by a business entity, was made by or with the approval of an executive officer of the entity with actual knowledge by that officer that the statement was false or misleading.

*744 The Conference Committee recognizes that, under certain circumstances, it may be unwieldy to make oral forward-looking statements relying on the first prong of the safe harbor. Companies who want to make a brief announcement of earnings or a new product would first have to identify the statement as forward-looking and then provide cautionary statements identifying important factors that could cause results to differ materially from those projected in the statement. As a result, the Conference Committee has provided for an optional, more flexible rule for oral forward-looking statements that will facilitate these types of oral communications by an issuer while still providing to the public information it would have received if the forward-looking statement was written. The Conference Committee intends to limit this oral safe harbor to issuers or the officers, directors, or employees of the issuer acting on the issuer's behalf.

This legislation permits covered issuers, or persons acting on the issuer's behalf, to make oral forward-looking statements within the safe harbor. The person making the forward-looking statement must identify the statement as a forward-looking statement and state that results may differ materially from those projected in the statement. The person must also identify a "readily available" written document that contains factors that could cause results to differ materially. The written information identified by the person making the forward-looking statement must qualify as a "cautionary statement" under the first prong of the safe harbor (i.e., it must be a meaningful cautionary statement or statements that identify important factors that could cause actual results to differ materially from those projected in the forward-looking statement.) For purposes of this provision, "readily available" information refers to SEC filed documents, annual reports and other widely disseminated materials, such as press releases.

Who and what receives safe harbor protection

The safe harbor provision protects written and oral forward-looking statements made by issuers and certain persons retained or acting on behalf of the issuer. The Conference Committee intends the statutory safe harbor protection to make more information about a company's future plans available to investors and the public. The safe harbor covers underwriters, but only insofar as the underwriters provide forward looking information that is based on or "derived from" information provided by the issuer. Because underwriters have what is effectively an adversarial relationship with issuers in performing due diligence, the use of the term "derived from" affords underwriters some latitude so that they may disclose adverse information that the issuer did not necessarily "provide." The Conference Committee does not intend the safe harbor to cover forward-looking information made in connection with a broker's sales practices.

The Conference Committee adopts the SEC's present definition, as set forth in Rule 175, of forward-looking information, with certain additions and clarifying changes. The definition covers: (i) certain financial items, including projections of revenues, income and earnings, capital expenditures, dividends, and capital structure; (ii) management's statement of future business plans and objectives,*745 including with respect to its products or services; and (iii) certain statements made in SEC required disclosures, including management's discussion and analysis and results of operations; and (iv) any statement disclosing the assumptions underlying the forward-looking statement.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Conference Committee has determined that the statutory safe harbor should not apply to certain forward-looking statements. Thus, the statutory safe harbor does not protect forward-looking statements: (1) included in financial statements prepared in accordance with generally accepted accounting principles; (2) contained in an initial public offering registration statement; (3) made in connection with a tender offer; (4) made in connection with a partnership, limited liability company or direct participation program offering; or (5) made in beneficial ownership disclosure statements filed with the SEC under Section 13(d) of the 1934 Act.

At this time, the Conference Committee recognizes that certain types of transactions and issuers may not be suitable for inclusion in a statutory safe harbor absent some experience with the statute. Although this legislation restricts partnerships, limited liability companies and direct participation programs from safe harbor protection, the Conference Committee expects the SEC to consider expanding the safe harbor to cover these entities where appropriate. The legislation authorizes the SEC to adopt exemptive rules or grant exemptive orders to those entities for whom a safe harbor should be available. The SEC should consider granting exemptive orders for established and reputable entities who are excluded from the safe harbor.

Moreover, the Committee has determined to extend the statutory safe harbor only to forward-looking information of certain established issuers subject to the reporting requirements of section 13(a) or section 15(d) of the 1934 Act. Except as provided by SEC rule or regulation, the safe harbor does not extend to an issuer who: (a) during the three year period preceding the date on which the statement was first made, has been convicted of a felony or misdemeanor described in clauses (i) through (iv) of Section 15(b)(4) or is the subject of a decree or order involving a violation of the securities laws; (b) makes the statement in connection with a "blank check" securities offering, "rollup transaction," or "going private" transaction; or (c) issues penny stock.

The Committee intends for its statutory safe harbor provisions to serve as a starting point and fully expects the SEC to continue its rulemaking proceedings in this area. The SEC should, as appropriate, promulgate rules or regulations to expand the statutory safe harbor by providing additional exemptions from liability or extending its coverage to additional types of information.

This legislation also makes clear that nothing in the safe harbor provision imposes any duty to update forward-looking statements.

The Conference Committee does not intend for the safe harbor provisions to replace the judicial "bespeaks caution" doctrine or to foreclose further development of that doctrine by the courts.

*746 The safe harbor and stay of discovery

The legislation provides that, on any motion to dismiss the compliant based on the application of the safe harbor, the court shall consider the statements cited in the complaint and statements identified by the defendant in its moving papers, including any cautionary statements accompanying the forward-looking statement that are not subject to material dispute. The applicability of the safe harbor provisions under subsection (c)(1)(B) shall be based on the "actual knowledge" of the defendant and does not depend on the use of cautionary language. The applicability of the safe harbor provisions under subsections (c)(1)(A)(I) and (c)(2) shall be based upon the sufficiency of the cautionary language under those provisions and does not depend on the state of mind of the defendant. In the case of a compliant based on an oral forward-looking statement in which information concerning factors that could cause actual results to differ materially is contained in a "readily available" written document, the court shall consider statements in the readily available written documents.

INAPPLICABILITY OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) TO PRIVATE SECURITIES ACTIONS.

The SEC has supported removing securities fraud as a predicate offense in a civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). SEC Chairman Arthur Levitt testified: "Because the securities laws gen-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

erally provide adequate remedies for those injured by securities fraud, it is both necessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO."[30]

The Conference Committee amends section 1964(c) of title 18 of the U.S. Code to remove any conduct that would have been actionable as fraud in the purchase or sale of securities as racketeering activity under civil RICO. The Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action. In addition, the Conference Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

## AUDITOR DISCLOSURE OF CORPORATE FRAUD

The Conference Report requires independent public accountants to adopt certain procedures in connection with their audits and to inform the SEC of illegal acts. These requirements would be carried out in accordance with generally accepted auditing standards for audits of SEC registrants-as modified from time to time by the Commission-on the detection of illegal acts, related party transactions and relationships, and evaluation of an issuer's ability to continue as a going concern.

The Conference Committee does not intend to affect the Commission's authority in areas not specifically addressed by this provision. The Conference Committee expects that the SEC will continue its longstanding practice of looking to the private sector to set *747 and to improve auditing standards. The SEC should not act to "modify" or "supplement" generally accepted auditing standards for SEC registrants until after it has determined that the private sector is unable or unwilling to do so on a timely basis. The Conference Committee intends for the SEC to have discretion, however, to determine the appropriateness and timeliness of the private sector response. The SEC should act promptly if required by the public interest or for the protection of investors.

## FOOTNOTES

*748 From the Committee on Commerce, for consideration of the House bill, and the Senate amendment, and modifications committed to conference:
  Thomas Bliley,
  Billy Tauzin,
  Jack Fields,
  Chris Cox,
  Richard F. White,
  Anna G. Eshoo,
As additional conferees from the Committee on the Judiciary, for consideration of the House bill, and the Senate amendment, and modifications committed to conference:
  Bill McCollum,
  Managers on the Part of the House.

  Alfonse D'Amato,
  Phil Gramm,
  Robert F. Bennett,
  Rod Grams,
  Pete V. Domenici,
  Christopher Dodd,
  John F. Kerry,
  Managers on the Part of the Senate.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1 This certification should not be construed to waive the attorney-client privilege.

2 The notice provisions in this subsection do not replace or supersede other notice provisions provided in the Federal Rules of Civil Procedure.

3 See Elliott J. Weiss and John S. Beckerman, " Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions," 104 Yale L.J. 2053 (1995).

4 See testimony of Maryellen Anderson, Investor and Corporate Relations Director of the Connecticut Retirement & Trust Funds and Treasurer of the Council of Institutional Investors before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, July 21, 1993.

5 See The Brancato Report on Institutional Investment, "Total Assets and Equity Holdings," Vol. 2, Ed. 1.

6 See "Let the Money do the Monitoring," note 3, supra.

7 See generally Majority Staff Report, May 17, 1994 at page 81 et seq.

8 See testimony of Patricia Reilly before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993.

9 See NASCAT Analysis of Pending Legislation on Securities Fraud Litigation, Hearing on Securities Litigation Reform Proposals: Subcommittee on Securities, Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

10 See testimony of Patricia Reilly, note 8 supra.

11 See testimony of former SEC Commissioner J. Carter Beese, Jr., Chairman of the Capital Markets Regulatory Reform Project Center for Strategic and International Studies, before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995 (citing testimony of Philip A. Lacavara before the Telecommunications and Finance Subcommittee of the House Committee on Energy and Commerce, hearing on H.R. 3185.)

12 See testimony of Richard J. Egan, Chairman of the Board of EMC Corporation before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, June 17, 1993. See also testimony of Dennis Bakke, President and CEO, AES Corporation, before the Telecommunications and Finance Subcommittee of the House Committee on Commerce, January 19, 1995.

13 See testimony of Hon. Richard Breeden, former Chairman, Securities and Exchange Commission, before the Subcommittee on Telecommunications and Finance, House Commerce Committee, February 10, 1995. See also testimony of Daniel Gelzer, id. at 274.

14 See testimony of Hon. Arthur Levitt, Chairman, Securities and Exchange Commission, before the Subcommittee on Telecommunications and Finance of the House Commerce Committee, February 10, 1995, at 192. See also id. at 116, 126 (testimony of Dennis W. Bakke, Chairman and CEO, AES Corporation); id. at 137-8 (testimony of James Kimsey, Chairman, America Online).

15 The Conference Report makes no change in the law with respect to Section 11 claims against other types of defendants. Section 11 expressly provides for a right of contribution, see Section 11(f), and this right has been construed to es-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

tablish contribution and settlement standards like those set forth in the Conference Report. This section has no effect on the interpretation of Section 11(f) with respect to defendants other than outside directors.

16 See Section 16(b) (short-swing transactions) and Section 18 (liability for misleading statements).

17 See, e.g., testimony of Saul S. Cohen, Rosenman & Colin, before the Telecommunications and Finance Subcommittee of the House Committee on Commerce, February 10, 1995. ("In our experience, Rule 11 has been largely ineffective in deterring strike suits. As a general matter, courts rarely grant Rule 11 sanctions in all but the most egregious circumstances".)

18 Rule 11(c)(2) limits sanctions to "what is sufficient to deter the repetition of such conduct or comparable conduct by others similarly situated".

19 See testimony of John Olson, Chairman, American Bar Association Business Law Section, before the Subcommittee on Telecommunications and Finance, House Commerce Committee, February 10, 1995.

20 See id.

21 See, e.g., testimony of Saul S. Cohen, Rosenman & Colin, before the Telecommunications and Finance Subcommittee of the House Committee on Commerce at 234-35 (February 10, 1995).

22 See id.

23 For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

24 The percentages of damages as market losses in the analysis ranged from 7.9% to 100% See Princeton Venture Research, Inc., "PVR Analysis, Securities Law Class Actions, Damages as a Percent of Market Losses," June 15, 1993.

25 See Lev and de Villiers, "Stock Price Crashes and 10b-5 Damages: A Legal, Economic and Policy Analysis," Standford Law Review, 7, 9-11 (1994).

26 See testimony of Hon. Richard C. Breeden, former Chairman, SEC, before the Securities Subcommittee of the Senate Committee on Banking, Housing, and Urban Affairs, April 6, 1995.

27 See testimony of the National Venture Capital Association before the Securities Subcommittee on the Senate Committee on Banking, Housing, and Urban Affairs, March 2, 1995.

28 See testimony of Hon. J. Carter Beese, former SEC Commissioner, at id.

29 The concept of a safe harbor for forward-looking statements made under certain conditions is not new. In 1979, the SEC promulgated Rule 175 to provide a safe harbor for certain forward looking statements made with a "reasonable basis" and in "good faith." This safe harbor has not provided companies meaningful protection from litigation. In a February 1995 letter to the SEC, a major pension fund stated: "A major failing of the existing safe harbor is that while it may provide theoretical protection to issuers from liability when disclosing projections, it fails to prevent the threat of frivolous lawsuits that arises every time a legitimate projection is not realized." See February 14, 1995 letter from the California Public Employees' Retirement System to the SEC. Courts have also crafted a safe harbor for forward-looking statements or projections accompanied by sufficient cautionary language. The First, Second, Third, Sixth and Ninth Circuits

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

have adopted a version of the "bespeaks caution" doctrine. See, e.g., In re Worlds of Wonder Securities Litigation, 35 F. 3d 1407 (9th Cir. 1994); Rubinstein v. Collins, 20 F.3d 169 (5th Cir. 1994): Kline v. First Western Government Securities, Inc., 24 F. 3d 480 (3d Cir. 1994); Sinay v. Lamson & Sessions Company, 948 F.2d 1037 (6th Cir. 1991); I. Meyer Pincus & Associates v. Oppenheimer & Co., Inc., 936 F.2d 759 (2d Cir. 1991); Romani v. Shearson Lehman Hutton, 929 F.2d 875 (1st Cir. 1991); Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986); In re Donald J. Trump Casino, 7 F.3d 357 (3d Cir. 1993).

30 See testimony of Hon. Arthur Levitt, Chairman, SEC, before the Telecommunications and Finance Subcommittee of the House Commerce Committee, February 10, 1995.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.