UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ERIC SILVERMAN, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | No. 1:07-cv-04507 **(Consolidated)** |
| Plaintiff | ) ) | CLASS ACTION |
| vs. | ) ) ) | Judge St. Eve Magistrate Judge Mason |
| MOTOROLA, INC., et al., | ) ) | |
| Defendants. | ) ) ) | |

DECLARATION OF TOR GRONBORG IN SUPPORT OF CLASS COUNSEL'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, PLAN OF ALLOCATION, AND AWARD OF ATTORNEYS' FEES AND EXPENSES AND REIMBURSEMENT OF THE PLAINTIFFS' EXPENSES PURSUANT TO 15 U.S.C. §78u-4(a)(4)

692730_3

## TABLE OF CONTENTS

    **Page**

I.    PRELIMINARY STATEMENT ........................................................................1

II.    THE LITIGATION ...........................................................................................7

    A.    The Commencement of the Action ........................................................7

    B.    Defendants' Motion to Dismiss the Consolidated Complaint .................8

    C.    Plaintiffs' Motion for Class Certification .............................................9

    D.    Plaintiffs' Motion for Leave to Amend the Consolidated Complaint ...................10

    E.    Fact Discovery ...................................................................................11

        1.    Document Discovery to Defendants ..........................................11

        2.    Depositions ...............................................................................13

        3.    Third Party Discovery ...............................................................14

        4.    In-House Forensic Accounting Experts ....................................17

    F.    Plaintiffs' Discovery of Alleged Disclosure and Accounting Improprieties .........21

    G.    Discovery Disputes ...........................................................................21

        1.    Discovery Disputes with Defendants ........................................22

        2.    Discovery Disputes with Third Parties ......................................25

    H.    Expert Witness Discovery ..................................................................29

    I.    The Fruits of Plaintiffs' Discovery Efforts ........................................32

    J.    Summary Judgment Motions ..............................................................33

    K.    Pre-Trial Motions ..............................................................................33

    L.    Additional Trial Preparation ..............................................................34

III.    THE STRENGTHS AND WEAKNESSES OF THE CASE .........................36

IV.    SETTLEMENT NEGOTIATIONS AND TERMS .......................................38

V.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL ..........................................................................40

692730_3

**Page**

VI.   THE PLAN OF ALLOCATION ................................................................40

    A.   Common Stock................................................................41

    B.   7.5% Notes due 5/15/25 (CUSIP:  620076AH2)...................................44

    C.   6.5% Notes due 11/15/28 (CUSIP:  620076AP4)..................................45

    D.   6.5% Notes due 9/1/25 (CUSIP:  620076AK5)....................................45

692730_3

1. I, TOR GRONBORG, am an attorney duly licensed to practice before all of the courts of the State of California, and I have been admitted in this case *pro hac vice*. I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or, collectively with other counsel to Plaintiffs, "Class Counsel"), and counsel for Macomb County Employees' Retirement System ("Macomb County" or "Lead Plaintiff") and St. Clair Shores Police & Fire Retirement System ("St. Clair") (collectively, "Plaintiffs" or "Class Representatives") and the Class. I have been actively involved in the prosecution and resolution of this action, am familiar with its proceedings and have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the Litigation.

2. I submit this Declaration in support of Plaintiffs' application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for approval of: (a) the Stipulation of Settlement dated as of January 31, 2012 (the "Stipulation")[1], which provides for a cash settlement of $200,000,000 (the "Settlement Amount"); (b) the proposed Plan of Allocation; (c) Class Counsel's application for attorneys' fees and expenses; and (d) reimbursement of Plaintiffs' time and expenses incurred in prosecuting the Litigation.

## I.   PRELIMINARY STATEMENT

3. This case has been zealously litigated from its commencement in August 2007 through settlement, the basic terms of which were not finalized until shortly after the last of a series of mediation sessions held on December 14, 2011. As the Court is aware, this case settled when trial was imminent. At every stage of the Litigation, Defendants aggressively litigated the matter and asserted that they had comprehensive defenses. The settlement was

---

[1]   Capitalized terms not otherwise defined in this Declaration have the same meaning set forth in the Stipulation.

692730_3

achieved only after Class Counsel, *inter alia*: (i) conducted or oversaw detailed investigative interviews of many witnesses, including former employees of Motorola, Inc. ("Motorola" or the "Company"); (ii) successfully opposed Defendants' comprehensive motion to dismiss; (iii) obtained class certification over Defendants' aggressive opposition; (iv) conducted extensive discovery, including the review and analysis of over 3.8 million pages of documents produced by Defendants and numerous third parties; (v) took or defended the depositions of 50 fact witnesses; (vi) responded to discovery propounded by Defendants, including document requests and interrogatories; (vii) filed over 15 complex discovery motions, most of which were decided by this Court after being fully briefed; (viii) responded to two motions for summary judgment, defeating one in its entirety and one in part; (ix) completed expert discovery involving 7 testifying experts in the areas of market efficiency, loss causation, damages, accounting, financial reporting and 3G mobile handset technology, which included working with the experts on their reports and taking or defending the depositions of all 7 experts; (x) fully briefed 7 *Daubert* motions in anticipation of trial; and (xi) comprehensively prepared for trial, including selecting the exhibits to be used and the witnesses to be called at trial, designating deposition testimony, building trial witness files, selecting trial demonstratives, researching and preparing motions *in limine* and drafting *voir dire* questions, jury instructions, the jury verdict form and the joint pre-trial order.

4.     This settlement is the product of hard-fought litigation and takes into consideration the significant risks specific to the case. The settlement is the result of extensive arm's-length negotiations between the parties facilitated by Judge Daniel Weinstein (Ret.), a nationally recognized mediator. These negotiations were conducted by experienced counsel with a firm and full understanding of both the strengths and weaknesses of their respective cases. The settlement for $200,000,000 represents the third largest securities class

692730_3

action settlement ever in the Seventh Circuit and is an extraordinary recovery in light of this being a case in which there was no company financial restatement or other admission and no prior or contemporaneous governmental investigation.

5.    Plaintiffs believe that this settlement represents an excellent result. The substantial discovery, motion practice and trial preparation outlined herein informed Plaintiffs that, while their case had strengths, it also had weaknesses and risks, which had to be, and were, conscientiously evaluated in determining what course of action was in the best interest of the Class.

6.    As set forth below, despite the fact that certain of Plaintiffs' allegations had received support from the documentary evidence as well as deposition testimony, there remained many uncertainties in Plaintiffs' case.

7.    The gravamen of Plaintiffs' Second Amended Complaint for Violation of Federal Securities Laws (the "Complaint") is that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC"), Defendants participated in an allegedly fraudulent scheme to hide from investors delays in Motorola's ability to deliver new 3G handsets to the market, the financial repercussions of those delays and the use of one-time Intellectual Property ("IP") arrangements to conceal those financial repercussions. Plaintiffs alleged that during the Class Period (July 19, 2006 through January 4, 2007, inclusive), Defendants falsely assured investors that Motorola would introduce new, Argon-based 3G handsets for the 2006 holiday selling season, while trumpeting record earnings for the Company and Mobile Devices through a series of misrepresentations and omissions which artificially inflated the price of Motorola securities.

692730_3

8.     Plaintiffs claimed that Defendants' allegedly false and misleading statements caused the Company's stock price to be artificially inflated, reaching a high of $25.64 per share during the Class Period.  This artificial inflation allegedly enabled Defendants to obtain insider trading proceeds and incentive compensation of over $31.25 million during the Class Period.  When the truth about Motorola's business and poor financial results finally reached the market, beginning on November 7, 2006, Motorola's stock price experienced significant declines.

9.     In opting to settle the Litigation, Plaintiffs and their counsel considered the significant risks associated with proving the claims alleged in the Complaint.  For instance, the accounting and disclosure rules applicable to the 3Q06 IP arrangements were subject to varying interpretations.  Defendants contended that their disclosure and accounting of the 3Q06 IP arrangements were neither materially misleading, violated Generally Accepted Accounting Principles ("GAAP") nor made with scienter.  In addition, they argued that their statements regarding the Argon-based 3G handsets were not material or misleading.  They further claimed "good faith" reliance on the accounting and disclosure processes at Motorola. Although Plaintiffs disputed Defendants' assertions, Defendants offered both evidence and legal arguments to bolster their defenses at trial.

10.    The parties also disputed the issue of loss causation.  Defendants asserted an aggressive "truth-on-the-market" defense and suggested that a variety of factors other than the fraud alleged caused Motorola's stock price declines.   While Plaintiffs disputed these contentions, there was a substantial risk of recovering limited or no damages if the jury agreed with *any* of Defendants' arguments. Compounding these factors was a substantial risk that the Court would grant, in whole or in part, Defendants' motion to exclude the opinion and

- 4 -

testimony of Plaintiffs' loss causation and damages expert. This motion was fully briefed and awaiting an evidentiary hearing at the time the parties reached settlement.

11.     The parties also disagreed on the importance and meaning of many of the trial exhibits produced in the Litigation and witness testimony elicited. There was no way to predict which interpretations and inferences a jury would accept. In deciding to settle the Litigation, Plaintiffs weighed the witness testimony and documents they believed supported the allegations against the testimony of other witnesses and documents that Defendants believed undercut those allegations. All of these issues, and the risks attendant to them, were considered by Plaintiffs and their counsel in deciding to settle this Litigation on the agreed terms.

12.     On balance, considering all the circumstances and risks both sides faced were the parties to continue to trial, both Plaintiffs (for themselves and the Class) and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

13.     Class Counsel have prosecuted the Litigation on a wholly contingent basis and have advanced or incurred all litigation expenses. By doing so, Class Counsel shouldered the substantial risk of an unfavorable result. Class Counsel have not yet received any compensation for their effort.

14.     The fee application for 27.5% of the Settlement Amount is fair both to the Class and Class Counsel, and warrants the Court's approval. This fee request is within the range of fee percentages frequently awarded in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, the nature and extent of legal services performed and the fact that the $200 million settlement was not likely at the outset of the case. Both the settlement and the fee request have been independently approved by the Class

- 5 -

692730_3

Representatives, Macomb County and St. Clair. This is the kind of result envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA") and is entitled to significant weight by the Court in awarding fees to counsel.

15.     Class Counsel also seek an award of $4,814,298.54 in expenses reasonably and necessarily committed to the prosecution of the Litigation over the last four years. These expenses include: (i) the substantial fees and expenses of consultants and experts whose services Class Counsel required in the successful prosecution and resolution of this case; (ii) the cost associated with conducting or defending fact and expert witness depositions, which included court reporter and videographer fees and travel expenses; (iii) photocopying, imaging, shipping and managing a database of more than 3.8 million pages of documents; and (iv) online factual and legal research. As will be seen from the discussion of the efforts required by Class Counsel to achieve this settlement, these expenses were reasonable and necessary to obtain the successful result.

16.     Also, as allowed under the PSLRA, Macomb County and St. Clair seek reimbursement for their time and expenses in the amounts of $6,450.00 and $4,350.00, respectively. Their investment of time, effort, and expense greatly contributed to the successful result of the Litigation.

17.     The following is a summary of the principal events which occurred during the course of the Litigation and the legal services provided by Class Counsel. For a summary of Plaintiffs' allegations, *see* the Complaint and this Court's July 25, 2011 Memorandum Opinion and Order. Dkt. Nos. 211, 382.

692730_3

## II.      THE LITIGATION

### A.      The Commencement of the Action

18.      On August 9, 2007, attorneys with Class Counsel, on behalf of Eric Silverman,[2] filed a class action complaint against Motorola and several of its executives: Edward J. Zander, Ronald G. Garriques, David W. Devonshire, Gregory Q. Brown, Daniel M. Moloney, Richard N. Nottenburg and Padmasree Warrior (collectively, the "Individual Defendants").

19.      In all, a total of three actions involving similar claims were filed in this District:

| CASE NAME | CASE NUMBER | DATE FILED |
|---|---|---|
| *Silverman v. Motorola, Inc., et al.* | 07CV4507 | August 9, 2007 |
| *Segal v. Motorola, Inc., et al.* | 07CV4782 | August 23, 2007 |
| *Acheson v. Motorola, Inc., et al.* | 07CV5004 | September 5, 2007 |

20.      On October 9, 2007, Macomb County moved unopposed to consolidate these actions, for its appointment as Lead Plaintiff and for approval of its selection of Robbins Geller[3] as lead counsel and Miller Law LLC ("Miller Law") as liaison counsel. Dkt. Nos. 27-30. No other class member moved for appointment as Lead Plaintiff and no other law firm sought to be lead counsel.

21.      On October 16, 2007, the Court consolidated the *Silverman*, *Segal* and *Acheson* actions, appointed Macomb County as Lead Plaintiff and approved its choice of Robbins Geller as lead counsel and Miller Law as liaison counsel. Dkt. No. 36.

---

[2]      Mr. Silverman passed away in May 2010.

[3]      Until March 2010, Robbins Geller was known as Coughlin Stoia Geller Rudman & Robbins LLP.

- 7 -

22.     On December 20, 2007, after an extensive investigation, which included interviewing dozens of former Motorola employees, Macomb County filed its 63-page Consolidated Amended Complaint for Violation of the Federal Securities Laws ("Consolidated Complaint") against the Company and the Individual Defendants. The Consolidated Complaint detailed violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Dkt. No. 40.

### B.     Defendants' Motion to Dismiss the Consolidated Complaint

23.     On February 13, 2008, Defendants moved to dismiss the Consolidated Complaint. Dkt. No. 47. Defendants' complex motion ran to more than 40 pages of briefing, citing 46 cases and raising more than a dozen legal issues and sub-issues. In sum, Defendants argued that Lead Plaintiff: (i) failed to specify any false or misleading statements or the reasons why they were false or misleading; (ii) improperly sought to establish liability for statements constituting opinions and beliefs as well as forward-looking statements and statements that constituted non-material "puffery" or corporate optimism; (iii) improperly alleged that certain statements were false when in fact they contained no material misrepresentations; (iv) failed to allege any causal link between the misrepresentations and the economic loss; and (v) failed to plead scienter as to any Defendant. Defendants also argued that Lead Plaintiff failed to meet the pleading requirements required for a §20(a) control person claim.

24.     On April 3, 2008, Lead Plaintiff filed its opposition to Defendants' motion to dismiss the Consolidated Complaint. Dkt. No. 51. In its 40-page opposition, Lead Plaintiff argued that each of Defendants' reasons to dismiss the Consolidated Complaint was meritless. Lead Plaintiff argued, *inter alia*, that: (i) it had adequately alleged Defendants' false and misleading statements; (ii) those statements were made with the requisite state of mind; (iii) it

- 8 -

had adequately alleged fraud with particularity against all Defendants; (iv) it had met its burden to provide some indication of loss causation as the Company's stock price declined upon disclosures revealing Defendants' alleged fraud; and (v) had properly alleged a §20(a) control person claim. Lead Plaintiff cited more than 70 cases and made forceful and unique arguments in opposition to Defendants' motion to dismiss, with Class Counsel spending significant time and resources performing the legal research necessary to draft an effective opposition and satisfy the strict pleading burden imposed by the PSLRA. Dkt. No. 51.

25. On May 12, 2008, Defendants filed a reply brief in support of their motion to dismiss the Consolidated Complaint. Dkt. No. 54. Thereafter, on September 23, 2008, the Court granted in part and denied in part Defendants' motion. Dkt. No. 60. Although formal discovery was stayed pending the Court's ruling on Defendants' motion to dismiss, Lead Plaintiff continued its factual investigation of the allegations in preparation for discovery. Immediately following the September 23, 2008 Order, the parties began to meet and confer regarding a pre-trial schedule and fact discovery.

## C. Plaintiffs' Motion for Class Certification

26. On February 27, 2009, Plaintiffs sought the Court's certification of a class comprised of all persons and entities who purchased or otherwise acquired the publicly traded securities of Motorola during the Class Period. Dkt. Nos. 84-85. Further, Macomb County requested that the Court appoint it and St. Clair as class representatives based on their combined purchases of 124,000 shares of Motorola stock during the Class Period.

27. In support of their motion, Plaintiffs retained Professor John D. Finnerty, Ph.D. to conduct an event study on Motorola's stock and to opine on the efficiency of the market for Motorola securities, whether the stock price declines on January 5, 2007 and March 22, 2007 were caused by the Company's disclosures on January 4, 2007 and March 21, 2007,

- 9 -

respectively, and whether the operating results' shortfalls were attributable to the Mobile Devices segment and, specifically, the Argon-based 3G handsets. Dkt. No. 86. Based on his findings, Dr. Finnerty answered both questions in the affirmative. Class Counsel spent substantial time consulting with Dr. Finnerty on his declaration and meeting with him to prepare him for his full-day deposition, as well as preparing the class certification briefing.

28.     On June 22, 2009, Defendants opposed Plaintiffs' motion, which included an expert report by Dr. Kenneth Lehn on the issue of causation. Dkt. No. 102. With the further assistance of Dr. Finnerty and in-house economics professionals, Class Counsel deposed Dr. Lehn regarding the class certification issues. Thereafter, on July 22, 2009, Plaintiffs filed a 25-page reply memorandum in further support of their motion and submitted a second declaration from Dr. Finnerty addressing Defendants' contentions regarding causation. Dkt. No. 122.

29.     On August 25, 2009, the Court granted Plaintiffs' motion. Dkt. No. 140.

**D.      Plaintiffs' Motion for Leave to Amend the Consolidated Complaint**

30.     As a result of uncovering new facts during discovery regarding the 3G handset delays and 3Q06 IP arrangements that were allegedly executed to conceal the financial impact of those delays, Plaintiffs moved for leave to amend the Consolidated Complaint on March 9, 2010 and attached their proposed second amended complaint thereto. Dkt. Nos. 202-204. Plaintiffs sought to conform the Consolidated Complaint to the evidence obtained in discovery regarding Defendants' alleged violations of the Exchange Act, including evidence regarding Defendants' false and misleading statements, scienter and loss causation, and to eliminate allegations of false and misleading statements in the Consolidated Complaint which were no longer relevant based on the Court's ruling on Defendants' motion to dismiss. Plaintiffs also

- 10 -

included Defendants' allegedly false and misleading statements and omissions relating to Motorola's 3G product portfolio, including statements relating to the 3Q06 IP arrangements, and violations of GAAP and SEC rules and regulations concerning accounting and disclosure for the 3Q06 IP arrangements.

31.     Following receipt of the proposed second amended complaint, Defendants opted not to move to dismiss or otherwise challenge the proposed amendment.

32.     On March 10, 2010, the Court granted Plaintiffs' motion and deemed the proposed Complaint filed. Dkt. No. 207. On March 30, 2010, Defendants answered the Complaint. Dkt. No. 220.

### E.     Fact Discovery

#### 1.     Document Discovery to Defendants

33.     On October 20, 2008, Plaintiffs propounded their First Request for Production of Documents and Interrogatories to All Defendants, consisting of 40 discrete requests. Additional document requests were served on all Defendants on March 27, 2009, March 30, 2009, November 4, 2009, December 15, 2009, March 26, 2010 and April 13, 2010. All told, Plaintiffs served 80 discrete requests for documents on Defendants. In addition, Plaintiffs directed interrogatories to Motorola on March 27, 2009 and March 29, 2010, and interrogatories were directed to Defendants Zander, Garriques, Devonshire, Brown, Moloney, Nottenburg and Warrior on March 29, 2010. On March 26, 2010, Plaintiffs served all Defendants with a First Set of Requests for Admission.

34.     Class Counsel engaged in numerous meet-and-confer discussions with Defendants' counsel to discuss their objections to the document requests, interrogatories, and requests for admission, to negotiate the scope of the discovery and to arrange for the production of documents. Given the scope of discovery sought and disputes about relevancy,

- 11 -

692730_3

burden and privilege, this required extensive coordinated efforts and expenditures of substantial time and money on Class Counsel's part.

35.     Prior to producing the requested discovery, Defendants insisted that Plaintiffs stipulate to a confidentiality agreement. The parties engaged in substantial negotiations over the terms of the confidential treatment of documents. On November 14, 2008, Magistrate Judge Milton I. Shadur approved the stipulated confidentiality order. Dkt. No. 73.

36.     The result of the discovery requests set forth in ¶33, *supra*, and ¶¶39-40, *infra*, culminated in the production of approximately 3.8 million pages of documents. Careful examination and analysis of millions of pages of documents required a massive effort by teams of attorneys which analyzed and organized the documents, selected the documents that proved or could undermine Plaintiffs' allegations, identified relevant witnesses and established procedures to identify additional documents and information that had not been produced. It must be stressed here that virtually all of the documents produced by Defendants as well as most of those by third parties, were very complex, highly technical documents regarding the development and performance of the Argon chipset and the 3G handsets utilizing the chipset. Plaintiffs thus spent significant time reviewing dense communications and abstract figures and diagrams in presentations geared towards engineers and salespeople who were experienced and familiar with the terminology and technology involved in mobile handset manufacturing. Throughout the document review process, Plaintiffs had to understand what information the documents conveyed, determine how they were relevant to the alleged fraud and then apply that understanding to other documents that had been produced. In total, Plaintiffs' review, analysis, and organization of the document productions in this case was conducted over the course of 18 months.

- 12 -

2.    **Depositions**

37.    In preparation for trial, Plaintiffs took the deposition of 34 current and former

Motorola employees, directors and 30(b)(6) witnesses in various locations throughout the

United States and Europe.  Those depositions are set forth as follows:

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Rule 30(b)(6)-LJ Issues | 10/28/09 | Chicago, IL |
| Rule 30(b)(6)-3G Issues | 11/10/09 | Chicago, IL |
| Robert Cash | 11/12/09 6/17/10 | Chicago, IL |
| Robert Parker | 11/17/09 | Chicago, IL |
| Jennifer Erickson | 12/16/09 | Chicago, IL |
| Thomas Davis | 1/12/10 | Chicago, IL |
| Paul Smith | 1/19/10 | Chicago, IL |
| Daniel Troutman | 1/30/10 | West Palm Beach, FL |
| Bashar Nejdawi | 2/9/10 | Lake Zurich, IL |
| Kathy Winter | 2/18/10 | Chicago, IL |
| Ed Tharp | 2/23/10 | Chicago, IL |
| Reinaldo More | 2/25/10 | Boca Raton, FL |
| Phillip Gilchrist | 3/11/10 6/17/10 | Chicago, IL |
| Raymond Roman | 3/16/10 | Chicago, IL |
| William Werner | 3/18/10 | Chicago, IL |
| Tracey Koziol | 3/29/10 | Chicago, IL |
| Francis Grever | 3/30/10 | Chicago, IL |
| Edward Gams | 4/6/10 | Tucson, AZ |
| Dennis Strand | 4/9/10 | Chicago, IL |
| Tony Belkin | 4/16/10 | Chicago, IL |
| Padmasree Warrior | 5/5/10 | Chicago, IL |
| Bruce Brda | 5/12/10 | Chicago, IL |
| Richard Nottenburg | 5/19/10 | Boston, MA |
| Teresa Vega | 5/21/10 | London, England |
| Gregory Brown | 5/26/10 | Schaumburg, IL |
| Michael Hickey | 5/27/10 | London, England |
| Daniel Moloney | 5/28/10 | Woodbridge, NJ |
| Henry Goldberg | 6/7/10 | Chicago, IL |
| David Devonshire | 6/9/10 - 6/10/10 | Chicago, IL |
| Ronald Garriques | 6/14/10 - 6/15/10 | Chicago, IL |

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Edward Zander | 6/28/10 - 6/29/10 | Carmel, CA |
| Carol Forsyte | 8/11/10 | Chicago, IL |
| Laurel Meissner | 8/17/10 | Chicago, IL |
| Ronald Kozoman | 12/17/10 | Atlanta, GA |

These depositions were critical in developing evidence concerning the mobile handset business of the Company's Mobile Devices segment, particularly its 3G product portfolio and IP revenue, and establishing Defendants' knowledge of material, non-public facts. The depositions were also critical in establishing the admissibility of documentary evidence. All told, in the Motorola and third party depositions, Plaintiffs marked over 1,000 exhibits. Based on deposition testimony, Class Counsel also continually assessed the sufficiency of Defendants' document productions in order to request additional documents to prove Plaintiffs' case. In sum, Class Counsel took approximately 288 hours of deposition testimony from Motorola witnesses.

38.    In addition to taking depositions, Class Counsel were required to defend the depositions of five individuals from, or associated with, Macomb County and St. Clair:

| DEPONENT | DATE | LOCATION |
|---|---|---|
| David Diegel | 4/7/09 | Mt. Clemens, MI |
| James Haddad | 4/8/09 | St. Clair Shores, MI |
| Gerald Seizert | 4/9/09 | Birmingham, MI |
| David Sowerby | 4/30/09 | Boston, MA |
| Richard Crable | 8/2/10 | Boston, MA |

### 3.    Third Party Discovery

39.    Starting on October 3, 2008, Plaintiffs began issuing subpoenas for documents to dozens of relevant third parties, including Freescale Semiconductor, Inc. ("Freescale") and Qualcomm, Inc. ("Qualcomm"), Motorola customers, the Company's auditors, and securities analysts. The document productions from the third parties exceeded 1.1 million pages. As

- 14 -

with Defendants' production, Class Counsel expended significant resources reviewing and analyzing these documents.

    40.    A list of the third parties subpoenaed by Plaintiffs in this action is set forth below:

| PERSON/ENTITY | SUBPOENA DATE | RELATIONSHIP |
|---|---|---|
| AG Edwards & Sons, Inc. | 2/24/09 | Investment Banker/Securities Analyst |
| AllianceBernstein, LP | 2/6/09 | Investment Banker/Securities Analyst |
| AT&T | 10/3/08 | Customer |
| AT&T Mobility LLC | 10/15/08 | Customer |
| Bernstein Research | 2/5/09 | Investment Banker/Securities Analyst |
| Best Independent Research LLC | 2/5/09 | Investment Banker/Securities Analyst |
| The Blackstone Group, LP | 3/31/09 | Consultant |
| Brian Modoff | 11/24/09 | Investment Banker/Securities Analyst |
| Carl C. Icahn | 4/27/09 | Shareholder |
| The Carlyle Group LP | 3/31/09 | Consultant |
| Cellco Partnership dba Verizon Wireless | 10/10/08 | Customer |
| CIBC World Markets Corp. | 2/5/09 | Investment Banker/Securities Analyst |
| Cowen and Company, LLC | 2/5/09 | Investment Banker/Securities Analyst |
| Credit Suisse USA | 2/5/09 | Investment Banker/Securities Analyst |
| Darryl Armstrong | 11/18/09 | Investment Banker/Securities Analyst |
| Davenport & Company | 2/5/09 | Investment Banker/Securities Analyst |
| Deutsche Bank Securities | 2/5/09 | Investment Banker/Securities Analyst |
| Deutsche Telekom, Inc. | 10/7/08 | Customer |
| Firestone Holdings LLC | 4/20/09 | Consultant |
| Freescale Semiconductor, Inc. | 10/3/08 | Chipset Supplier |
| Genuity Capital Markets | 2/5/09 | Investment Banker/Securities Analyst |
| Hill & Knowlton | 6/15/09 | Public Relations Firm |
| Hilliard Lyons | 2/5/09 | Investment Banker/Securities Analyst |
| HSBC Securities (USA) Inc. | 2/5/09 | Investment Banker/Securities Analyst |
| Icahn Associates Corporation | 4/3/09 | Shareholder |
| Inder M. Singh | 11/18/09 | Investment Banker/Securities Analyst |
| Jefferies & Company, Inc. | 2/5/09 | Investment Banker/Securities Analyst |
| Jeffrey T. Kvaal | 12/10/09 | Investment Banker/Securities Analyst |
| Joele Frank, Wilkinson Brimmer Katcher | 6/15/09 | Public Relations Firm |
| John R. Bucher | 11/19/09 | Investment Banker/Securities Analyst |
| Kaufman Brothers | 2/5/09 | Investment Banker/Securities Analyst |

| PERSON/ENTITY | SUBPOENA DATE | RELATIONSHIP |
|---|---|---|
| KPMG, LLP | 15/15/09 | Auditor |
| Lawrence M. Harris | 11/18/09 | Investment Banker/Securities Analyst |
| Matthew Hoffman | 12/2/09 | Investment Banker/Securities Analyst |
| McKinsey & Company, Inc. | 2/3/09 | Consultant |
| Michael Z. Ounjian | 11/18/09 | Investment Banker/Securities Analyst |
| Morgan Keegan & Co. | 2/5/09 | Investment Banker/Securities Analyst |
| Needham & Company, LLC | 2/5/09 | Investment Banker/Securities Analyst |
| Nextel Retail Stores, LLC | 10/3/08 | Customer |
| Nokia Corporation | 6/17/09 | Competitor |
| Nokia Inc. | 7/15/09 | Competitor |
| NVIDIA Corporation | 3/23/09 | Mobile Devices Parts Supplier |
| Oppenheimer & Co. | 2/5/09 | Investment Banker/Securities Analyst |
| Prudential Equity Group, Inc. | 2/5/09 | Investment Banker/Securities Analyst |
| Qualcomm, Inc. | 12/15/09 | Chipset Supplier |
| RBC Capital Markets | 2/5/09 | Investment Banker/Securities Analyst |
| Sprint Nextel | 11/13/08 | Customer |
| Stephen McGaw | 12/2/09 | Customer |
| T-MOBILE USA, INC. | 11/12/08 10/28/09 | Customer |
| TPG Capital LP | 5/14/09 | Consultant |
| Verizon Communications, Inc. | 10/7/08 | Customer |
| Wall Street Strategies, Inc. | 2/5/09 | Investment Banker/Securities Analyst |
| Wells Fargo Trade Capital | 2/5/09 | Investment Banker/Securities Analyst |

41.    Class Counsel engaged in numerous meet-and-confers with most of the subpoenaed third parties to discuss their objections to the subpoenas, to negotiate the scope of the subpoenas and to arrange for the production of responsive documents. This required extensive coordinated efforts and expenditures of time and resources on Class Counsel's part.

42.    Plaintiffs also conducted the depositions of 11 third party fact witnesses, including Motorola's external auditor, chipset suppliers and customers, as well as market analysts who covered the Company during the Class Period. Those depositions are set forth as follows:

| DEPONENT | DATE | DESCRIPTION | LOCATION |
|---|---|---|---|
| Inder M. Singh | 2/1/10 | Analyst | Florham Park, NJ |

692730_3

| Lawrence N. Harris | 2/4/10 | Analyst | New York, NY |
|---|---|---|---|
| Stephen McGaw | 3/12/10 | Customer (AT&T) | Dallas, TX |
| Jeffrey T. Kvaal | 3/19/10 | Analyst | New York, NY |
| Ralph de la Vega | 4/22/10 | Customer (AT&T) | Atlanta, GA |
| Lou Lutostanki | 4/23/10 | Chipset Supplier (FSL) | Austin, TX |
| Sanjay Jha | 7/13/10 | Chipset Supplier (QCOM) | Libertyville, IL |
| Frank Meehan | 8/5/10 | Customer (H3G) | London, England |
| Dennis Parrott | 8/27/10 | Auditor | Chicago, IL |
| Jens Schulte-Bockum | 9/6/10 | Customer (Vodafone) | Amsterdam, Netherlands |
| David Pratt | 9/16/10 | Auditor | Chicago, IL |

43. As with the Motorola depositions, these depositions were critical in developing evidence regarding Defendants' alleged fraud. This was particularly important because all but two of the third party witnesses resided outside this District and could not be compelled to appear at trial. In sum, Class Counsel took more than 70 hours of third party deposition testimony.

44. In lieu of deposing every securities analyst who covered Motorola, Plaintiffs also negotiated and obtained declarations from certain analysts and entities. These declarations assured that an appropriate foundation was laid to introduce relevant analyst reports at trial.

### 4. In-House Forensic Accounting Experts

45. In order to conduct effective discovery and prepare for trial, Class Counsel employed highly specialized in-house forensic accounting professionals to provide investigative accounting, auditing and financial expertise to Class Counsel throughout the pendency of this case. Chris Yurcek, CPA and Terry Koelbl, CPA, (collectively, the "Forensic Accountants"), provided the majority of forensic accounting services in this case. They worked side-by-side with Class Counsel in case investigation and evaluation, developing and drafting complaint allegations, responding to motions and assisting with document discovery, depositions, summary judgment, case mediation and trial preparation.

692730_3

46.     Mr. Yurcek is a Director of the firm's forensic accounting department. He is a Certified Public Accountant and has been designated by the American Institute of Certified Public Accountants ("AICPA") as Certified in Financial Forensics (CFF). Mr. Yurcek has over 20 years of public accounting and consulting experience, including extensive experience in forensic accounting and fraud investigations, auditing at both national and local CPA firms, complex business litigation and bankruptcy fraud consulting. Mr. Yurcek is an active member of the AICPA, the California Society of Certified Public Accountants ("CalCPA") and the Association of Certified Fraud Examiners.

47.     Mr. Koelbl is a forensic accountant in the firm's forensic accounting department. He is a Certified Public Accountant licensed to practice in the state of California with over 10 years of public accounting, auditing and forensic accounting experience – including over five years of experience directly related to the investigation of securities fraud. He is a Certified Fraud Examiner, holds a CFF certification from the AICPA and has an MBA. Prior to joining the firm, he was an auditor for the public accounting firm of Ernst & Young LLP. He is an active member of AICPA, the CalCPA and the Association of Certified Fraud Examiners.

48.     The Forensic Accountants, *inter alia*, reviewed Motorola's publicly available SEC filings and analyst reports, analyzing and cataloguing the Company's disclosures regarding 3G handsets and IP revenue dating back several years prior to the Class Period. They also performed extensive research of authoritative literature and industry trends and practices relating to the accounting and disclosure of IP revenue. This information was used in evaluating the allegations in the Consolidated Complaint and in developing the allegations in the Complaint.

- 18 -

692730_3

49.     The Forensic Accountants assisted in identifying accounting issues and developing and drafting document discovery necessary to successfully prosecute the case's accounting and financial allegations, and assisted in discovery negotiations and motion practice to that end. The Forensic Accountants also assisted in determining the sufficiency of the Company's and KPMG LLP's ("KPMG") document productions. They provided evidence that key missing documents existed and assisted Class Counsel throughout extensive motion practice to obtain these missing documents, successfully defeating Defendants' and KPMG's relevance and privilege claims regarding documents related to the 3Q06 IP arrangements and the Public Company Accounting Oversight Board ("PCAOB") privilege issues.

50.     The Forensic Accountants reviewed and analyzed the voluminous productions of accounting and finance-related documents obtained from Motorola and KPMG. The results of this analysis and review were critical to developing evidence for the accounting issues in the case. After a detailed analysis of the working papers produced by the auditor and the related documents produced by the Company, the Forensic Accountants determined that Motorola had likely misled or withheld important information concerning the 3Q06 IP arrangements from its auditors. This information was used in the depositions of KPMG auditors to successfully attack Motorola's assertion that its auditors knew of and approved the Company's allegedly improper accounting and disclosure of the 3Q06 IP arrangements. This information was also used by Plaintiffs' accounting expert and would be used at trial to demonstrate that Defendants failed to properly account for and disclose the 3Q06 IP arrangements under the applicable accounting and disclosure rules.

51.     A significant portion of the Forensic Accountants' time was spent assisting and preparing Class Counsel and Plaintiffs' testifying experts on key accounting issues for expert

- 19 -

692730_3

reports, depositions, and trial. Specifically, the Forensic Accountants worked extensively with Plaintiffs' accounting expert, D. Paul Regan, CPA, in order to assist with the preparation of his reports and his deposition, and provided key assistance in opposing Defendants' motion to limit Mr. Regan's testimony at trial. Class Counsel also deposed numerous accounting, auditing and finance professionals employed by Motorola and KPMG. The Forensic Accountants played a critical role in this deposition process. They assisted in identifying key deponents, clarifying deposition objectives, explaining complex audit and accounting principles, selecting deposition exhibits, developing extensive deposition outlines and attending many depositions in order to evaluate testimony and confer with Class Counsel in real-time. As a result, Class Counsel was more effective during depositions, eliciting significant testimony helpful to Plaintiffs' case.

52. The Forensic Accountants also analyzed Defendants' accounting expert's reports, evaluating the assertions and theories advanced and identifying the portions of her opinions that should be challenged at deposition, or by motion *in limine*. They assisted in preparing extensive outlines for this expert's deposition, reviewing her prior case testimony and publications, selecting deposition exhibits, attending the deposition and assisted in preparing the motion *in limine*. As a result, Plaintiffs believe they had a solid basis to significantly narrow the opinions that Defendants' accounting expert could have credibly advanced at trial, mitigating potentially damaging testimony.

53. In addition, the Forensic Accountants assisted with summary judgment and trial preparation. They provided valuable assistance with the selection of potential trial exhibits and deposition testimony excerpts for both summary judgment and trial purposes. The Forensic Accountants also aided in the design and development of demonstrative and summary exhibits to be used at trial to assist the jury.

- 20 -

54. The Forensic Accountants' substantial efforts in this case were instrumental in achieving the outstanding settlement of the Litigation.

**F.     Plaintiffs' Discovery of Alleged Disclosure and Accounting Improprieties**

55. In late 2009, while the parties were engaged in discovery, Class Counsel identified a single document produced by Defendants that suggested they had violated GAAP and SEC rules and regulations with regard to royalty revenue and profit. The document indicated that Motorola's royalty revenue and profit was dramatically higher in 3Q06 versus royalty revenue and profits in 2Q06 and 3Q05. When Class Counsel requested that Defendants produce related documents, Defendants vehemently denied their relevancy to Plaintiffs' case. Even after Plaintiffs served their Fourth Request of Documents to all Defendants on December 15, 2009, specifically targeted at documents regarding Motorola's royalty revenue, Defendants objected to producing responsive documents on the basis of relevancy. As described herein, Plaintiffs were forced to seek the Court's assistance in compelling production of materials on January 28, 2010. Dkt. Nos. 173-176.

56. While Defendants remained steadfast in their claims that the 3Q06 IP arrangements were irrelevant, on February 24, 2010, the Court found that Defendants had brought forth no evidence contradicting Plaintiffs' theory that the royalty revenue was used to conceal the financial impact of the 3G delays and held that Plaintiffs were permitted to seek specific discovery concerning these issues. Dkt. No. 200.

**G.     Discovery Disputes**

57. The parties litigated numerous complex discovery disputes during the litigation. Prior to filing or responding to motions to compel and other motions, the details of which are outlined below, Class Counsel spent thousands of hours analyzing the documents in

- 21 -

an effort to narrow the scope of discovery disputes while still aggressively pursuing the discovery rights of the Class. Class Counsel also spent many hours preparing for meet-and-confer conferences with counsel for Defendants and third parties, conducting those conferences and preparing correspondence memorializing those conversations.

58.    Due to the high number and the complexity of the disputes regarding documents and depositions, the parties filed more than 15 motions related to discovery, the vast majority of which were fully briefed, heard and then decided by the Court.

### 1.    Discovery Disputes with Defendants

59.    On June 23, 2009, Plaintiffs moved to compel Motorola and the Individual Defendants to produce documents responsive to Request Nos. 42 and 45 of Plaintiffs' Corrected Second Request of Documents to All Defendants. Dkt. Nos. 106-107. On May 8, 2009, Defendants had objected to producing documents responsive to those requests primarily on the grounds of relevance. Request No. 42 was for documents concerning the potential sale of the Mobile Devices segment, including documents regarding the valuation of any business segment of the Company. In their opposition, Defendants claimed that nothing regarding the potential sale of the Mobile Devices business was at issue in the Consolidated Complaint. Dkt. No. 111. Plaintiffs maintained that Motorola's failure to adequately and timely develop a 3G handset portfolio led to the Company's decline – and perhaps ultimately to the decision to spin-off the entire Mobile Devices segment. Request No. 45 was for all documents concerning Carl Icahn's communications with Motorola, which Defendants argued was overly broad and already covered by other requests. On July 24, 2009, following full briefing, the Court ordered the production of certain documents related to Request No. 42. Dkt. No. 129.

60.    On December 23, 2009, Plaintiffs moved to compel Motorola and the Individual Defendants to produce documents pertaining to the Company's decision to

- 22 -

terminate its chip supply agreement with Freescale in October 2008 and any actual or contemplated legal proceedings by it against Freescale. Dkt. Nos. 158, 160. Defendants refused to produce the requested documents based on relevance grounds. Based on the discovery that had already taken place, Plaintiffs were able to establish that the factors that led to the discord between Motorola and Freescale originated during the Class Period and, thus, were relevant. On January 20, 2010, after full briefing, the Court ordered Defendants to produce documents related to any actual or contemplated legal proceedings against Freescale and to review the files of certain current and former Motorola employees and to produce documents relating to Freescale's inability to timely provide Argon chipsets to Motorola during the Class Period that may have led to the Company's decision to terminate its supply agreement with Freescale. Dkt. No. 172.

61.     As discussed above, on January 28, 2010, Plaintiffs moved to compel Motorola and the Individual Defendants to produce documents relating to the 3Q06 IP arrangements. Dkt. No. 173. Defendants had withheld the documents on the basis that they were not relevant to Plaintiffs' allegations. The parties fully briefed the matter and, on February 24, 2010, the Court found the 3Q06 IP arrangements to be relevant and ordered Defendants to search the files of certain current and former Motorola employees and to produce documents concerning the disclosure and accounting of the 3Q06 IP arrangements. Dkt. No. 200.

62.     On March 29, 2010, Plaintiffs were also forced to move the Court to compel the depositions of Motorola witnesses Teresa Vega, Mike Hickey and Rash Sahota who were located in the United Kingdom or, to the extent that defense counsel had improperly accepted subpoenas on their behalf, to execute Letters Rogatory under the Hague Convention to obtain testimony from them. Dkt. No. 218. Based on Defendants' counsel's agreement, after the

- 23 -

692730_3

motion was filed, the witnesses were made available for deposition without the need for Letters Rogatory.

63.     On June 10, 2010, Defendants moved the Court for a protective order seeking the Court's advance ruling on whether waiving attorney-client privilege in connection with the disclosure of a particular transaction also waived privilege as to the negotiations underlying that transaction. Dkt. No. 283. In their opposition filed on June 17, 2010, Plaintiffs argued that because the terms of and accounting for the 3Q06 IP arrangements were integrally related to any decision regarding their disclosure, waiving attorney-client privilege as to their disclosure also waived it as to their accounting. Dkt. No. 288. On July 1, 2011, the Court denied Defendants' motion as seeking an improper advisory opinion. Dkt. No. 300.

64.     On June 17, 2010, Plaintiffs moved the Court to compel Motorola to produce documents related to the 3Q06 IP arrangements that had been withheld as privileged because (i) the documents contained business, not legal, advice; (ii) Defendants waived privilege by placing their documents evidencing reliance on counsel for the accounting and disclosure of the 3Q06 IP arrangements at issue in the litigation; and (iii) Defendants waived privilege by asserting reliance on counsel as an affirmative defense to scienter. Dkt. No. 290. After full briefing and conducting an *in camera* review, the Court on July 7, 2010 ordered Defendants to produce a document that contained only business advice and, based on Defendants' representations in their briefing, forbade them from asserting an advice-of-counsel defense with respect to their accounting for the 3Q06 IP arrangements. Dkt. No. 304.

65.     On July 8, 2010, Plaintiffs moved to compel defendants to produce documents responsive to Request No. 69, which sought flight logs recording Zander's and Garriques' travel on Motorola owned or leased aircraft during the Class Period. Dkt. Nos. 306-307. Before any further briefing could be filed, the Court, on July 12, 2010, ordered Plaintiffs to

- 24 -

identify the specific dates for which they sought flight logs and for Defendants to then produce the flight logs for those dates. Dkt. No. 311.

66.     On November 15, 2010, Defendants moved the Court to quash, or in the alternative, for a protective order regarding Plaintiffs' subpoena to Mr. Kozoman, arguing that Plaintiffs were barred from conducting further fact discovery because fact discovery had closed on June 30, 2010. Dkt. Nos. 343-344. Plaintiffs explained in their opposition on November 21, 2010, that the subpoena to Mr. Kozoman was warranted because Defendants' proffered accounting expert, Ms. Axelson, interviewed Mr. Kozoman after the fact discovery cutoff and relied on facts from that interview in her expert report. Dkt. No. 350. Before briefing was completed, the Court on November 23, 2010 ordered Defendants to produce Mr. Kozoman for a deposition. Dkt. No. 353.

67.     In addition to the issues culminating in motion practice, the parties engaged in numerous discovery disputes that were resolved without Court intervention. However, the foregoing provides poignant insight into the complexity of the discovery disputes between the parties in this action, how hard fought the disputes were and the lengths Plaintiffs were compelled to go to in order to obtain sufficient discovery from Defendants.

## 2.     Discovery Disputes with Third Parties

68.     In addition to disputes with Defendants, every third party served with a subpoena by Plaintiffs objected, requiring Class Counsel to devote many hours to negotiating the scope of those productions. With the majority of the third parties, Plaintiffs were able to successfully resolve issues concerning the scope of the documents produced, depositions to be given in this matter, and the providing of electronic data, if any, without court intervention. With some third parties, however, the Court's assistance was necessary.

- 25 -

692730_3

69.     On August 21, 2009, Plaintiffs retained counsel in the Western District of
Texas and moved in the federal court to compel Freescale to produce documents responsive to
Plaintiffs' subpoena. Dkt. No. 1 in Civil Action No. A09mc635LY. Freescale refused to
produce any documents, arguing that Motorola possessed the requested documents and
Plaintiffs should compel Motorola to produce them first. Because neither entity had produced
the relevant documents by the time depositions were imminent, Plaintiffs were forced to seek
intervention with Judge Lee Yeakel in the Western District of Texas. Ultimately, after the
motion to compel was filed, Plaintiffs and Freescale resolved the dispute, and Freescale
produced the requested documents before Judge Yeakel was required to issue an order on
Plaintiffs' motion.

70.     While Plaintiffs were negotiating the scope of their document requests with
Freescale, they also had to negotiate a separate confidentiality and protective order specific to
Freescale's document production that the Court entered on October 23, 2009. Dkt. No. 151.

71.     On December 17, 2009, AT&T Mobility LLC ("AT&T") filed a motion to
quash Plaintiffs' subpoenas for the depositions of its Chief Executive Officer, Ralph de la
Vega, and its Senior Vice President for Wireless Strategy, Stephen McGaw, arguing that it
was unduly burdensome to subject senior executives to deposition. Dkt. No. 153. AT&T
argued that its lower level employees were more available and more appropriate to depose,
hence these high-level executives should not be subjected to unnecessary depositions that only
served as harassment. Plaintiffs, in their opposition on December 31, 2009, argued that
AT&T failed to establish that it would be unduly burdensome to depose Mr. de la Vega and
Mr. McGaw. Dkt. No. 162. In addition, based on documents produced by both Motorola and
AT&T, Plaintiffs showed that, unlike other AT&T employees, Mr. de la Vega and Mr.
McGaw participated in key discussions and communications with the Individual Defendants

- 26 -

and thus possessed intimate information about the Company's 3G failures. On January 13, 2010, the Court granted in part and denied in part AT&T's motion to quash, allowing Plaintiffs to depose Mr. de La Vega for two hours and Mr. McGaw for three hours. Dkt. No. 167.

72.     On February 17, 2010, Plaintiffs had to move for clarification and/or modification of the Court's January 13, 2010 Order in order to address Defendants' assertion that they were entitled to one-half of the deposition time for Mr. de la Vega and Mr. McGaw. Dkt. No. 187. On February 18, 2010, the Court confirmed that Plaintiffs were entitled to depose the AT&T executives for two and three hours, respectively, and Defendants were allotted an additional hour for each of them. Dkt. No. 197. As with all the third parties deposed by Plaintiffs, Class Counsel were able to elicit critical testimony from Mr. de la Vega and Mr. McGaw in support of their claims.

73.     On March 23, 2010, Plaintiffs requested that the Court issue Letters Rogatory under the Hague Convention to obtain testimony from Jens Schulte-Bockum of Vodafone Group, Plc ("Vodafone") and Frank Meehan of Hutchison Whampoa Limited. Dkt. No. 213. On April 5, 2010, the Court granted Plaintiffs' request, permitting them to obtain key testimony from Motorola's top 3G vendors in Europe relating to the Company's 3G portfolio problems. Dkt. No. 226.

74.     On March 24, 2010, Plaintiffs moved to compel Qualcomm to produce documents relating to the $275 million IP licensing agreement it entered into with Motorola in 3Q06. Dkt. No. 216. The Court did not ultimately have to rule on the motion, however, as Qualcomm agreed to produce the requested documents rather than challenge the motion. Concurrently, Plaintiffs were also able to obtain a certification from Qualcomm that the

- 27 -

documents it produced were admissible business records pursuant to Federal Rule of Evidence 902(11).

75.     On May 6, 2010, KPMG, David Pratt and Dennis Parrott moved to quash or modify the subpoenas Plaintiffs served on them and for a protective order based on the PCAOB privilege created pursuant to 15 U.S.C. §7215 (b)(5)(A) of the Sarbanes-Oxley Act of 2002 ("Section 105(b)(5)(A)"). Dkt. Nos. 237-240. In an issue of first impression, KPMG claimed that the privilege protected all aspects of a PCAOB inspection, including internal KPMG documents and the identity of any KPMG client who was the subject of a PCAOB inspection. The Center for Audit Quality, an industry group, filed an amicus brief in support of KPMG on May 12, 2010. Dkt. No. 253. In their opposition filed May 17, 2010, Plaintiffs explained that under the plain language of Section 105(b)(5)(A), the PCAOB privilege was far more limited than represented by KPMG and the Center for Audit Quality. Dkt. No. 261. On June 29, 2010, the Court issued an Order rejecting KPMG's interpretation of the privilege, finding that the statute's plain language only protected documents specifically prepared for or by the PCAOB and ordering the production of all other documents related to the 3Q06 IP arrangements. Dkt. No. 294.

76.     On May 10, 2010, Plaintiffs moved to compel KPMG to produce documents related to Motorola's accounting and disclosure of the 3Q06 IP arrangements. Dkt. Nos. 241-242. In its opposition filed on May 17, 2010, KPMG maintained that all the workpapers relating to the 3Q06 IP arrangements had been produced and that none of the other workpapers were relevant to the litigation. Dkt. No. 258. Defendants filed a memorandum in support of KPMG's argument on May 17, 2010. Dkt. No. 259. In their reply filed on May 24, 2010, Plaintiffs detailed their efforts to minimize KPMG's burden and identified the specific documents related to the 3Q06 IP arrangements that appeared to be missing. Dkt. No. 269.

- 28 -

On May 26, 2010, KPMG moved to strike Plaintiffs' reply, or in the alternative, for leave to file a surreply to address the new facts that Plaintiffs raised in their reply. Dkt. No. 278. On May 27, 2010 the Court granted KPMG leave to file a surreply, which it did on June 3, 2010, reiterating why none of the unproduced workpapers were relevant to the 3Q06 IP arrangements. Dkt. Nos. 281-282. On June 30, 2010, the Court ordered KPMG to produce the additional workpapers that were related to the 3Q06 IP arrangements. Dkt. No. 299.

77.     On September 7, 2010, Plaintiffs sought clarification from the Court regarding its June 30, 2010 Order because, upon Plaintiffs' request that KPMG confirm that the PCAOB's 2007 Inspection Report was referring to Motorola as "Issuer C" and that the Company's 3Q06 IP arrangements were the transactions at issue, KPMG had taken the position that such information was protected by the PCAOB privilege. Dkt. No. 323. In KPMG's opposition filed on September 13, 2010, it argued that the PCAOB should be the one required to identify Issuer C because the PCAOB conducted the inspection and issued the report. Dkt. No. 334. Before additional briefing could be filed, the Court granted Plaintiffs' motion on September 14, 2010, ordering KPMG to make a witness available for questioning pursuant to Federal Rule of Civil Procedure 30(b)(6) to determine whether the 2007 PCAOB Report addressed the 3Q06 IP arrangements and whether Issuer C was Motorola. Dkt. No. 335.

**H.     Expert Witness Discovery**

78.     To assist Class Counsel in investigating and proving the complex issues involved in this matter, including loss causation and the Class's damages, the services of certain experts and consultants were required.

79.     Plaintiffs utilized the services of the well-known economic consulting firm, Compass Lexecon LLC ("Compass Lexecon"), to review documents and provide analyses in

- 29 -

692730_3

connection with determining and proving loss causation and damages. Compass Lexecon's economic analysis was integral to demonstrating Plaintiffs' economic losses.

80.     Plaintiffs designated Chetan Sharma as a mobile handset technology expert to explain the process of developing and launching a handset on new technology and the meaning and importance of 3G technology to the wireless industry. He provided a 32-page detailed report describing the processes of conceiving, building and testing a handset, the importance of the baseband processor to the design and development of a handset, the dominance of 3GPP1 and the evolution to LTE. He also provided a 5-page rebuttal report to respond to Defendants' industry expert, Mr. John Strand. Mr. Sharma spent many hours preparing his reports, as well as several days preparing for and providing deposition testimony. Further, he spent significant time assisting Class Counsel in analyzing Defendants' expert reports and preparing counsel to depose Defendants' experts.

81.     In addition, Plaintiffs designated William H. Lehr, Ph.D. as an industry expert to explain the conditions in the mobile handset markets, and specifically the 3G handset market, during the Class Period as well as in the preceding and following years. Dr. Lehr provided a 47-page detailed report analyzing the growth of the 3G handset market and the likely impact on a handset manufacturer of failing to address the 3G market opportunity during the Class Period. He also provided a 21-page rebuttal report to respond to Defendants' industry expert, Mr. Strand. Dr. Lehr and his staff spent numerous hours preparing his reports, as well as several days preparing for and providing deposition testimony. Further, Dr. Lehr and his staff spent significant time assisting Class Counsel in analyzing Defendants' expert reports, preparing counsel to depose Defendants' experts and on the *Daubert* motions in advance of trial.

692730_3

82.     Plaintiffs designated John D. Finnerty, Ph.D. as a loss causation and damages expert to test the efficiency of the market for Motorola's stock, to conduct an event study of Motorola's stock, to calculate the dollar amount of the inflation per share that was removed from Motorola's stock price following each of the alleged disclosure dates and to opine on whether Motorola's stock was efficient and whether the stock price declines on each of the alleged disclosure dates was statistically significant and caused by Motorola's disclosures about the alleged fraud.  Dr. Finnerty also assisted Plaintiffs in preparing and analyzing damages estimates in connection with the settlement mediations.  In addition to his report in connection with class certification, Dr. Finnerty provided a 62-page detailed report opining that Motorola's stock was efficient during the Class Period, the November 7, 2006, January 4, 2007 and March 21, 2007 disclosures were statistically significant, the associated price declines in Motorola stock prices were caused by the revelation of Motorola-specific, fraud-related news and the Company's shareholders lost up to $3.63 per share as a result of the disclosures.  He also provided a 25-page rebuttal report responding to Defendants' loss causation expert, Dr. Lehn.  Dr. Finnerty and his staff spent hundreds of hours preparing his reports, as well as several days preparing for and providing deposition testimony.  Further, Dr. Finnerty and his staff spent significant time assisting Class Counsel in analyzing Defendants' expert reports, preparing counsel to depose Defendants' experts, and on the *Daubert* motions in advance of trial.

83.     Plaintiffs designated Mr. D. Paul Regan as an accounting expert concerning Motorola's business and financial reporting during the year ended December 31, 2006.  Mr. Regan provided a 57-page detailed report opining that Motorola's Mobile Devices segment did not meet managements' plan and was forecasted to suffer material operating earnings losses during Q306 and Q406, Motorola violated GAAP when it recognized revenue on the

- 31 -

3Q06 IP arrangements and Motorola violated GAAP and SEC rules when it failed to properly disclose the 3Q06 IP arrangements in its 3Q06 Form 10-Q. He also provided a 23-page rebuttal report responding to Defendants' accounting expert, Michele Axelson. Mr. Regan and his staff also spent hundreds of hours preparing his reports, as well as numerous days preparing for and providing deposition testimony. Further, Mr. Regan and his staff spent significant time assisting Class Counsel in analyzing Defendants' expert reports and preparing counsel to depose Defendants' experts.

84. On November 10, 2010, Plaintiffs served subpoenas on all of Defendants' experts, seeking information and materials related to their proposed testimony. Plaintiffs expended substantial time negotiating the scope of each expert's production and reviewing the information produced.

85. On December 10, 2010, Plaintiffs responded to Defendants' subpoenas to Mr. Sharma, Dr. Lehr, Dr. Finnerty and Mr. Regan. They also produced documents on behalf of their designated experts.

86. The chart below lists the date and place of the expert witness depositions taken or defended by Class Counsel:

| DEPONENT | DATE | LOCATION |
|---|---|---|
| Chetan Sharma (Plaintiffs' Expert) | 12/13/10 | San Diego, CA |
| William Lehr (Plaintiffs' Expert) | 12/16/10 | San Diego, CA |
| John Finnerty (Plaintiffs' Expert) | 12/22/10 | New York, NY |
| Kenneth Lehn (Defendants' Expert) | 1/6/11 | Washington, DC |
| Michele Axelson (Defendants' Expert) | 1/14/11 | Washington, DC |
| John Strand (Defendants' Expert) | 1/20/11 | Washington, DC |
| D. Paul Regan (Plaintiffs' Expert) | 1/24/11 | San Francisco, CA |

## I. The Fruits of Plaintiffs' Discovery Efforts

87. The evidence developed by Class Counsel in discovery supported Plaintiffs' allegations that Motorola was misleadingly assuring investors it would close the technology

- 32 -

gap with its competitors by introducing new, Argon-based 3G handsets for the 2006 holiday selling season and falsely reporting record earnings during the Class Period. Further, the evidence uncovered by Class Counsel in discovery allowed Plaintiffs to plead additional allegations regarding the false and misleading statements and omissions relating to Motorola's 3G business problems in the Complaint, including the related theories of liability based on misleading statements and omissions regarding the 3Q06 IP arrangements.

88.     As demonstrated in Plaintiffs' opposition to Defendants' motions for summary judgment, the documentary and testimonial evidence developed was critical to proving Defendants' public statements were materially misleading when made. *See, e.g.*, Dkt. No. 374 at 10-16, 20-25 (Plaintiffs' opposition to Defendants' second motion for summary judgment). The evidence developed by Class Counsel was also critical in proving Defendants' scienter and establishing that the damages suffered by investors were the result of the alleged fraud. *Id.* at 10-16, 25-49.

### J.     Summary Judgment Motions

89.     Plaintiffs opposed Defendants' two complex summary judgment motions, filing upwards of 118 pages of briefing and citing to over 198 exhibits, the testimony of 37 witnesses and 85 cases. As a result of the legal arguments made and admissible evidence introduced, Plaintiffs fully defeated all challenges to the liability of Defendants Motorola, Zander, Garriques and Devonshire under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiffs also successfully demonstrated Defendant Nottenburg's liability under §20(a).

### K.     Pre-Trial Motions

90.     After the Court denied Defendants' second motion for summary judgment, Class Counsel spent several months preparing for trial. Class Counsel's trial preparation

692730_3

efforts are difficult to quantify because it included not only all the items discussed in the preceding sections, but also hours of analyzing issues specifically relevant to trial.

91.     First, after spending substantial time reviewing the reports and testimony of Defendants' designated experts for trial, Plaintiffs moved to exclude the opinions which would not be of assistance to a jury and which did not meet the standards set forth in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702 and 403.

92.     On November 14, 2011, Plaintiffs moved to exclude certain opinions of each of Defendants' proposed experts. Dkt. Nos. 400-410. Plaintiffs also had to reply to the points Defendants raised in their oppositions. Dkt. Nos. 432-434. These motions were largely predicated on the extensive deposition testimony Class Counsel took from each expert, and involved unique and novel issues of law and fact.

93.     Defendants also moved to exclude the testimony of each of Plaintiffs' proposed experts. Dkt. Nos. 411-415. As a result, Plaintiffs spent substantial time and effort reviewing and researching Defendants' motions, memoranda and exhibits to adequately respond to them. *See* Dkt. Nos. 423-426. At the time the parties agreed upon a settlement, all of these motions were pending.

### L.     Additional Trial Preparation

94.     Beginning in September 2011, Class Counsel began negotiating with Defendants' counsel concerning the exchange of exhibits, witness lists, deposition designations, motions *in limine*, jury instructions, *voir dire* questions, case statements and itemization of damages. On October 18, 2011, the parties submitted their proposed pre-trial schedule to the Court. Dkt. No. 393. Prior to the settlement, Class Counsel spent substantial time preparing the aforementioned materials to be exchanged in early 2012.

- 34 -

95.     This preparation included re-reviewing tens of thousands of pages of documents and carefully selecting the ones to be used as trial exhibits. Class Counsel created lengthy, detailed exhibit lists, identifying thousands of documents that supported Plaintiffs' allegations, summarizing those documents and identifying the foundation that would permit each document to be received into evidence. Class Counsel had begun selecting and creating trial demonstratives as well.

96.     Class Counsel also designated deposition testimony for every individual that was deposed in the Litigation. In doing so, Class Counsel reviewed and analyzed more than 10,000 pages of deposition testimony elicited from percipient and expert witnesses in this case, and carefully evaluated their testimony in light of Plaintiffs' claims and Defendants' asserted defenses.

97.     Class Counsel's trial preparation also involved an extensive review of the documents and testimony associated with potential trial witness. Class Counsel reviewed the witness's deposition testimony, the testimony of other witnesses relevant to that witness's testimony, the deposition exhibits presented to that witness and exhibits listed on Plaintiffs' trial exhibit list that were not shown to the witness at deposition but might be relevant to his or her trial testimony. Class Counsel then prepared Plaintiffs' witness list and began to assemble witness files for the more than 44 witnesses whose testimony would be relied upon at trial.

98.     Class Counsel researched and drafted the motions *in limine* they planned to file and prepared to defend those they anticipated Defendants would file. Class Counsel also began researching and drafting the jurisdiction and case statement, *voir dire* questions, jury instructions and jury verdict form. Further, counsel for both parties were in the process of negotiating the joint pre-trial order at the time the settlement was agreed upon.

- 35 -

692730_3

99.    Class Counsel spent substantial time preparing for trial, holding numerous in-depth internal meetings to discuss trial logistics and strategy and coordinating with experts and jury consultants.    As part of this process, Class Counsel's information technology department began preparing a trial database that included the videotaped depositions and all exhibits anticipated to be used at trial.

## III.    THE STRENGTHS AND WEAKNESSES OF THE CASE

100.    Although Plaintiffs believe that their case is meritorious and that the Class would ultimately prevail in establishing both liability and damages, they also understand that their case had weaknesses and that a number of factors made the outcome of a trial uncertain. For instance, while Plaintiffs firmly believed that the documentary and testimonial evidence they intended to offer at trial fully supported their claims, there is no way of predicting which interpretations, inferences or testimony a jury would accept.    Further, Defendants have adamantly denied any culpability throughout the litigation and were prepared to mount aggressive defenses that could potentially bar a Class recovery.    If the jury sided with Defendants on even one of their defenses, the Class could recover nothing.

101.    For example, Defendants were prepared to aggressively argue and present supporting evidence at trial that the alleged misrepresentations relating to the Argon-based 3G handsets and the 3Q06 IP arrangements were true and, in any event, not made with the requisite intent.    Although Plaintiffs believed they had sufficient documentary evidence to demonstrate that the alleged misrepresentations were false, Defendants could reasonably contend that such documents were, in fact, never seen by the Individual Defendants. Defendants were also prepared to argue at trial that the reports actually received by the Individual Defendants demonstrated that the alleged misrepresentations were truthful and thus their representations could not have been made with scienter.

- 36 -

102.     In addition, Defendants intended to present aggressive arguments with respect to materiality, asserting, for instance, that the Argon-based 3G handsets could not have been material to investors because they constituted just a fraction of the total volume of handsets sold by Motorola in 4Q06 and thus had an immaterial impact on the Company's financial results for that quarter. Plaintiffs' ability to demonstrate materiality otherwise hinged on the testimony of their accounting expert, Mr. Regan. Prior to the settlement, Defendants had moved to exclude Mr. Regan's testimony. In the event the Court sided with Defendants, they might have prevailed on this issue.

103.     Defendants were also prepared to argue that the misrepresentations and omissions concerning the 3Q06 IP arrangements were not false and misleading because, under GAAP and the SEC rules, the accounting and disclosure requirements were subject to varying interpretations and thus Defendants could not have been reckless in failing to adhere to these rules. Defendants further claimed good faith reliance on the accounting and disclosure processes at Motorola, which a jury could rely upon in finding in Defendants' favor. And Defendants likely would contend that Plaintiffs could not meet their burden to demonstrate that Defendants knew or were reckless in not knowing that Motorola's disclosure and accounting of the deals was false or misleading. Although Plaintiffs disagreed with Defendants' assertions, Defendants offered both persuasive evidence and legal argument to bolster their defenses. All of these issues of proof as to liability posed substantial risks to recovery at trial.

104.     Even if Plaintiffs succeeded in proving liability, a major risk going forward related to Plaintiffs' ability to prove loss causation and damages. Defendants would have been able to argue and provide supporting evidence at trial that there were no "corrective" disclosures directly related to any of the alleged misstatements or omissions during the Class

- 37 -

Period. Indeed, Defendants intended to assert a persuasive truth-on-the-market defense. Even if Plaintiffs could demonstrate loss causation, Defendants would still offer evidence that the Company's stock price declines were primarily caused by factors other than the alleged fraud, undercutting Plaintiffs' damages estimates. While Plaintiffs disagreed with and had evidence to refute all of Defendants' contentions concerning loss causation, there was a significant risk of recovering limited or no damages if the Court or jury agreed with *any* of Defendants' arguments.

105. Because the determination of loss causation and damages is a complicated process requiring expert testimony, compounding the above factors was a risk that the Court would grant Defendants' motion to exclude the opinion and testimony of Plaintiffs' loss causation and damages expert at trial. This motion was fully briefed and awaiting an evidentiary hearing shortly before the parties reached settlement. Even if Plaintiffs' expert survived Defendants' *Daubert* motion, the loss causation and damage assessments of the parties' experts at trial would vary substantially, reducing this crucial element to a "battle of experts." One cannot predict which expert's testimony or methodology a jury would find reliable. If the jury agreed with Defendants, Plaintiffs would have had their damages significantly reduced or their claims fail as a matter of law.

## IV.    SETTLEMENT NEGOTIATIONS AND TERMS

106. The parties began settlement discussions in the summer of 2009, pursuant to the Court's June 19, 2009 Order. The parties retained Judge Daniel Weinstein (Ret.), a nationally recognized mediator with extensive experience in securities cases. At his direction, the parties submitted a Joint Mediation Statement in September 2009. Plaintiffs also submitted a preliminary damages analysis of the losses suffered by Motorola's shareholders in January 2010. Counsel for all parties attended the first formal mediation session on February

- 38 -

11, 2010, during which the parties gave aggressive, detailed and thoughtful presentations on the perceived strengths and weakness of their respective cases. Although the first attempt at mediation was unsuccessful, the parties agreed to continue to communicate with one another and Judge Weinstein regarding mediation issues and potential settlement.

107.    On June 4, 2010, counsel for all parties attended a second formal mediation session. Despite continued good-faith efforts, the parties were again unable to resolve the matter, but agreed to continue the mediation process with Judge Weinstein. A third formal mediation was held on April 7, 2011 with only Defendants' counsel and counsel for Defendants' insurers in attendance, as requested by Judge Weinstein. No resolution was reached but the parties continued informal settlement negotiations independently and with Judge Weinstein. On August 4, 2011, the parties held a fourth formal mediation session. Counsel for all parties attended, as did James Haddad, Chairman of the Board of Directors and representative of St. Clair. Failing again to resolve the case, both parties intensified their trial preparation efforts.

108.    On December 14, 2011, pursuant to this Court's Order, counsel for all parties participated in a fifth mediation session with Judge Weinstein. Subsequent to the mediation, Judge Weinstein issued a proposal to settle the Litigation for $200,000,000, which the parties accepted on December 19, 2011 – only months before Class Counsel was scheduled to relocate to Chicago to prepare for trial. On December 20, 2011, the parties advised the Court of the tentative settlement.

109.    Over the next month and a half, the parties worked diligently to document the settlement and prepare preliminary approval papers, negotiating the details of a very complex stipulation of settlement. On February 2, 2012, the parties presented the Stipulation of Settlement and preliminary approval papers to the Court. Dkt. Nos. 445-448. On February

- 39 -

692730_3

16, 2012, the Court held a preliminary approval hearing and granted preliminary approval of the settlement as well as the form and manner of notice of the settlement to the Class. Dkt. No. 450.

110.    The settlement agreement resolves the claims of the Class against all Defendants and settles this Litigation for $200,000,000 in cash.

111.    The settlement is a result of vigorous arm's-length negotiations.  In Class Counsel's judgment, the compromise embodied in the Stipulation represents an extremely successful resolution of a very complex class action.

## V.    THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS APPROVAL

112.    Plaintiffs believe they would have prevailed on the merits at trial. Defendants were just as adamant that Plaintiffs would not have.  There was a very real risk that Plaintiffs would not have convinced a jury that Defendants acted with scienter or that the alleged misrepresentations and omissions were materially false or misleading when made. Moreover, given that the Court had not yet ruled on the parties' *Daubert* motions, Plaintiffs' ability to introduce evidence at trial to establish materiality, loss causation and damages was uncertain.

113.    Having considered the foregoing, and evaluating Defendants' defenses, it is the informed judgment of Class Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed settlement of this matter before this Court is fair, reasonable and adequate, and in the best interest of the Class.

## VI.    THE PLAN OF ALLOCATION

114.    The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution from the Net

- 40 -

692730_3

Settlement Fund and who submit a valid and timely Proof of Claim and Release form ("Authorized Claimant") under the Plan of Allocation described below. The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her or its transactions in Motorola publicly traded securities during the Class Period.

115.    For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Class Counsel conferred with their damage expert, Dr. Finnerty, who concluded that only the Motorola securities described below were damaged by the matters alleged by the Plaintiffs in the Litigation and the Plan of Allocation reflects an assessment of the damages that they believe could have been recovered by Class Members had Plaintiffs prevailed at trial.

116.    In the unlikely event there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim, as defined below. If, however, and as is more likely, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants. Payment in this manner shall be deemed conclusive against all Authorized Claimants.

117.    A claim will be calculated as follows:

### A.    Common Stock

The allocation below for common stock is based on market adjusted price declines as well as the statutory Private Securities Litigation Reform Act of 1995 ("PSLRA") 90-day look-back amount:

- 41 -

1.    For shares of Motorola common stock purchased, or acquired, on or between July 19, 2006 through November 6, 2006, the claim per share is as follows:

(a)    If sold prior to November 7, 2006, the claim per share is zero.

(b)    If sold on or between November 7, 2006 through January 4, 2007, the claim per share is the lesser of: (i) $1.07 (November 7, 2006 Price Decline), or (ii) the difference between the purchase price and the sales price.

(c)    If sold on or between January 5, 2007 through March 21, 2007, the claim per share is the lesser of: (i) $2.43 (November 7, 2006 and January 5, 2007 Price Declines), or (ii) the difference between the purchase price and the sales price.

(d)    If retained at the end of March 21, 2007 and sold on or before June 18, 2007, the claim per share is the least of: (i) $3.63 (November 7, 2006, January 5, 2007 and March 22, 2007 Price Declines); or (ii) the difference between the purchase price and the sales price; or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

(e)    If retained on June 19, 2007, the claim per share is the lesser of: (i) $3.63 (November 7, 2006, January 5, 2007 and March 22, 2007 Price Declines), or (ii) the difference between the purchase price per share and $17.98 per share.

2.    For shares of Motorola common stock purchased, or acquired, on or between November 7, 2006 through January 4, 2007, the claim per share is as follows:

(a)    If sold prior to January 5, 2007, the claim per share is zero.

(b)    If sold on or between January 5, 2007 through March 21, 2007, the claim per share is the lesser of: (i) $1.36 (January 5, 2007 Price Decline); or (ii) the difference between the purchase price and the sales price.

- 42 -

(c)  If retained at the end of March 21, 2007 and sold on or before June 18, 2007, the claim per share is the least of: (i) $2.56 (January 5, 2007 and March 22, 2007 Price Declines); or (ii) the difference between the purchase price and the sales price; or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

(d)  If retained on June 19, 2007, the claim per share shall is the lesser of: (i) $2.56 (January 5, 2007 and March 22, 2007 Price Declines); or (ii) the difference between the purchase price per share and $17.98 per share.

## PSLRA NINETY-DAY LOOK-BACK TABLE

| Date | Closing Price | Average Closing Price |
|---|---|---|
| 22-Mar-07 | $17.50 | $17.50 |
| 23-Mar-07 | $17.75 | $17.63 |
| 26-Mar-07 | $17.91 | $17.72 |
| 27-Mar-07 | $17.77 | $17.73 |
| 28-Mar-07 | $17.73 | $17.73 |
| 29-Mar-07 | $17.71 | $17.73 |
| 30-Mar-07 | $17.67 | $17.72 |
| 2-Apr-07 | $17.56 | $17.70 |
| 3-Apr-07 | $17.67 | $17.70 |
| 4-Apr-07 | $17.72 | $17.70 |
| 5-Apr-07 | $17.59 | $17.69 |
| 9-Apr-07 | $17.65 | $17.69 |
| 10-Apr-07 | $17.68 | $17.69 |
| 11-Apr-07 | $17.49 | $17.67 |
| 12-Apr-07 | $17.52 | $17.66 |
| 13-Apr-07 | $17.74 | $17.67 |
| 16-Apr-07 | $17.82 | $17.68 |
| 17-Apr-07 | $17.95 | $17.69 |
| 18-Apr-07 | $18.22 | $17.72 |
| 19-Apr-07 | $18.08 | $17.74 |
| 20-Apr-07 | $18.21 | $17.76 |
| 23-Apr-07 | $17.89 | $17.77 |
| 24-Apr-07 | $17.64 | $17.76 |
| 25-Apr-07 | $17.91 | $17.77 |
| 26-Apr-07 | $17.90 | $17.77 |
| 27-Apr-07 | $17.57 | $17.76 |
| 30-Apr-07 | $17.33 | $17.75 |
| 1-May-07 | $17.46 | $17.74 |
| 2-May-07 | $17.56 | $17.73 |
| 3-May-07 | $17.73 | $17.73 |

- 43 -

| Date | Closing Price | Average Closing Price |
|---|---|---|
| 4-May-07 | $18.08 | $17.74 |
| 7-May-07 | $18.08 | $17.75 |
| 8-May-07 | $17.70 | $17.75 |
| 9-May-07 | $17.90 | $17.76 |
| 10-May-07 | $17.95 | $17.76 |
| 11-May-07 | $18.32 | $17.78 |
| 14-May-07 | $18.16 | $17.79 |
| 15-May-07 | $17.92 | $17.79 |
| 16-May-07 | $18.22 | $17.80 |
| 17-May-07 | $18.60 | $17.82 |
| 18-May-07 | $18.79 | $17.85 |
| 21-May-07 | $18.90 | $17.87 |
| 22-May-07 | $18.92 | $17.89 |
| 23-May-07 | $18.68 | $17.91 |
| 24-May-07 | $18.26 | $17.92 |
| 25-May-07 | $18.39 | $17.93 |
| 29-May-07 | $18.30 | $17.94 |
| 30-May-07 | $18.28 | $17.95 |
| 31-May-07 | $18.19 | $17.95 |
| 1-Jun-07 | $18.36 | $17.96 |
| 4-Jun-07 | $18.30 | $17.97 |
| 5-Jun-07 | $18.31 | $17.97 |
| 6-Jun-07 | $18.13 | $17.97 |
| 7-Jun-07 | $17.69 | $17.97 |
| 8-Jun-07 | $17.89 | $17.97 |
| 11-Jun-07 | $17.81 | $17.97 |
| 12-Jun-07 | $17.77 | $17.96 |
| 13-Jun-07 | $18.07 | $17.96 |
| 14-Jun-07 | $18.27 | $17.97 |
| 15-Jun-07 | $18.35 | $17.98 |
| 18-Jun-07 | $18.13 | $17.98 |
| 19-Jun-07 | $18.08 | $17.98 |

**B.**     **7.5% Notes due 5/15/25 (CUSIP: 620076AH2)**

For Motorola 7.5% Notes due 5/15/25 purchased, or acquired, on or between

July 19, 2006 through January 4, 2007, the claim per note shall be as follows:

(a)     If sold prior to March 22, 2007, the claim per note is zero.

(b)     If retained at the end of March 21, 2007, the claim per unit of

note is the lesser of: (i) $9.80; or (ii) the difference between the purchase price and

$1,105.00.

- 44 -

C. **6.5% Notes due 11/15/28 (CUSIP: 620076AP4)**

For Motorola 6.5% Notes due 11/15/28 purchased, or acquired, on or between July 19, 2006 through January 4, 2007, the claim per note shall be as follows:

       (a)     If sold prior to March 22, 2007, the claim per note is zero.

       (b)     If retained at the end of March 21, 2007, the claim per unit of note is the lesser of: (i) $10.00; or (ii) the difference between the purchase price and $1,010.00.

D. **6.5% Notes due 9/1/25 (CUSIP: 620076AK5)**

For Motorola 6.5% Notes due 9/1/25 purchased, or acquired, on or between July 19, 2006 through January 4, 2007, the claim per share shall be as follows:

       (a)     If sold prior to March 22, 2007, the claim per note is zero.

       (b)     If retained at the end of March 21, 2007, the claim per unit of note is the lesser of: (i) $9.50; or (ii) the difference between the purchase price and $1,010.00.

Note: The distribution for Note claims shall not exceed 2% of the Net Settlement Fund.

118.    For Class Members who held Motorola publicly traded securities at the beginning of the Class Period or made multiple purchases or sales during the Class Period, the First-In, First-Out ("FIFO") method will be applied to such holdings, purchases, acquisitions, and sales for purposes of calculating a claim. Under the FIFO method, sales of Motorola publicly traded securities during the Class Period will be matched, in chronological order, first against the same type of Motorola publicly traded securities (*i.e.*, common stock or the same issuance of Note) held at the beginning of the Class Period. The remaining sales of the same type of Motorola publicly traded securities during

- 45 -

the Class Period will then be matched, in chronological order, against the same type of Motorola publicly traded securities purchased or acquired during the Class Period.

119.    A Class Member will be eligible to receive a distribution from the Net Settlement Fund only if a Class Member had a net overall loss, after all profits from transactions in all Motorola publicly traded securities described above during the Class Period are subtracted from all losses. However, the proceeds from sales of a security which have been matched against the same type security held at the beginning of the Class Period will not be used in the calculation of such net loss. No distributions will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00.

120.    The Court has reserved jurisdiction to allow, disallow, or adjust the claim of any Class Member on equitable grounds.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of March, 2012, at San Diego, California.

_____
TOR GRONBORG

- 46 -

692730_3

CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 19, 2012.

s/ Tor Gronborg
TOR GRONBORB

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: TorG@rgrdlaw.com

# Mailing Information for a Case 1:07-cv-04507

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John Joseph Barber**
  jbarber@tdrlawfirm.com,edocket@tdrlawfirm.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David K. Cole**
  courtnotification@mayerbrown.com

- **Michael J. Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J. Timothy Eaton**
  teaton@shefskylaw.com,sfdocket@shefskylaw.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **James R. Figliulo**
  jfigliulo@fslegal.com

- **Jennifer L. Gmitro**
  JGmitro@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **David Hall**
  dhall@rgrdlaw.com

- **Mark H Horwitch**
  mhorwitch@tdrlawfirm.com,edocket@tdrlawfirm.com

- **Stephanie D. Jones**
  sjones@fslegal.com

- **Robert J. Kopecky**
  rkopecky@kirkland.com

- **M. Sean Laane**
  sean.laane@aporter.com

- **Scott R. Lassar**
  slassar@sidley.com,efilingnotice@sidley.com

- **Daniel E. Laytin**
  dlaytin@kirkland.com

- **Kim Ann Leffert**
  courtnotification@mayerbrown.com

- **Erin K. Lynch**
  elynch@shefskylaw.com,sfdocket@shefskylaw.com

- **Richard A. Maniskas**
  sradcliffe@glancylaw.com

- **John C Massaro**
  john_massaro@aporter.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,JRamirez@millerlawllc.com

- **Matthew P Montgomery**
  mattm@csgrr.com

- **Ivy T Ngo**
  ingo@rgrdlaw.com

- **Keith F. Park**
  keithp@rgrdlaw.com

- **David A Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Joseph Russello**
  jrussello@csgrr.com

- **Stephen M Sacks**
  stephen_sacks@aporter.com

- **Jeffrey Charles Sharer**
  jsharer@sidley.com,efilingnotice@sidley.com

- **Michael P. Sheehan**
  msheehan@shefskylaw.com,sfdocket@shefskylaw.com

- **Anne J. Sidrys**
  anne.sidrys@kirkland.com,kimberly.love@kirkland.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan G Taylor**
  SusanT@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James W. Thomas , Jr**
  james.thomas@aporter.com,elissa.spencer@aporter.com,matthew.roessing@aporter.com

- **Matthew E Van Tine**
  mvantine@millerlawllc.com,mvt@vantine.us

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Joseph          I. Goldstein**
Murphy & McGonigle
555 13th Street, N.W.
#410 W
Washington, DC 20004

**Jerry          A Isenberg**
Murphy & McGonigle
555 13th Street, N.W.
#410 W
Washington, DC 20004

**D          Seamus Kaskela**
Schiffrin Barroway Topaz & Kessler LLP
280 King of Prussia Road
Radnor, PA 19087

**Michael          Kelley**
Sidley and Austin
555 West Fifth Street
40th Floor
Los Angeles, CA 90013