**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ERIC SILVERMAN**, On Behalf of Himself and All Others Similarly Situated )<br><br>Plaintiffs, )<br><br>v. )<br><br>**MOTOROLA, INC.**, et al., )<br><br>Defendants. ) | No. 1:07-cv-04507<br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>Judge St. Eve<br>Magistrate Judge Mason |

**REPORT OF PROFESSOR CHARLES SILVER ON ATTORNEYS' FEES**

I, Charles Silver, declare as follows:

**INTRODUCTION AND SUMMARY OF OPINIONS**

The Seventh Circuit has repeatedly held that lawyers representing plaintiff classes are entitled to be compensated at market rates, meaning rates class members would have agreed to pay them at the start of litigation had face-to-face bargaining been possible.[1] Fees actually paid by clients whose own money is on the line provide the best the best evidence of market rates.

---

[1] *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*") ("courts must do their best to award counsel the market price for legal services, in light of the risk on non-payment and the normal rate of compensation in the market at the time"); *In re Synthroid Mktg Litig.*, 325 F.3d 974, 975 (7th Cir. 2003) ("*Synthroid II*") ("A court must give counsel the market rate for legal services. . . ."). *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992). (the "market rate" is "as we have been at pains to stress, [what] the lawyer . . . would have gotten in the way of a fee in an arms' length negotiation, had one been feasible"). *See also In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741, 744 (7th Cir. 2011) (stating, with approval, that "[t]he special master recognized that his task was to estimate the contingent fee that the class would have negotiated with the class counsel at the outset had negotiations with clients having a real stake been feasible.").

For this reason, this opinion surveys the available evidence concerning the fees plaintiffs actually pay in aggregate lawsuits and other contexts.

This opinion also discusses the available evidence relating to fee awards in class actions. *This evidence does not indicate or reflect market rates*, which exist in real transactions that take place between lawyers and clients in the market for legal services. It only demonstrates fee-related practices prevailing in courts, most of which operate outside the Seventh Circuit and are subject to different legal standards. I present this information because judges often want to know how closely they are hewing to the beaten path when setting attorneys' fees, and because the Court considered this information when awarding fees in *AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F.Supp.2d 1028 (N.D. Illinois, 2011).

My review of both market-based evidence and fee awards previously granted by judges presiding over class actions lead me to conclude that Class Counsel's request for 27.5 percent of the recovery falls in the reasonable range. It is impossible to know precisely what fee percentage would have emerged from direct, *ex ante* negotiations, but the available evidence suggests that the fee would have equaled or exceeded the requested amount.

## CREDENTIALS

I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media. I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School. I received tenure in 1991. Since then I have been a Visiting Professor at University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School. A copy of my resume is attached.

From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's Project on the Principles of Aggregate Litigation. The ALI's membership approved the final report in 2009 and the published version appeared in 2010. See ALI, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010). Many courts have cited THE PRINCIPLES with approval, including the U.S. Supreme Court.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for over 15 years. I have published over 50 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report.

Federal and state judges have relied upon my testimony on the reasonableness of settlements and fee awards many times. For example, U.S. District Court Judge Alan S. Gold, of the Southern District of Florida, did so *Allapattah Services, Inc. v. Exxon Corp.*, which settled for over $1 billion. *See Order on Petitions for an Award of Attorneys' Fees, Costs, and Reimbursable Expenses and for Incentive Awards to Named Plaintiffs*, entered in *Allapattah Services, Inc. v. Exxon Corp.*, Case No.: 91-0996-CIV-GOLD/SIMONTON, S.D. Fla. (July 6, 2006). U.S. District Court Judge Melinda Harmon relied on reports I submitted when approving and awarding attorneys' fees in the mammoth $7.2 billion Enron settlement. *See Conclusions of Law, Findings of Fact, and Order re Award of Attorneys' Fees from Settlement Fund*, entered in *In Re Enron Corporation Securities, Derivative & "ERISA" Litigation* (S.D. Texas 2008), available at http://www.txs.uscourts.gov/cgi-bin/notablecases/notablecases.pl?action= chome&caseno=4:01-CV-3624. U.S. District Court Judge Sidney A. Fitzwater did so when approving the settlement in *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (2010), which settled for approximately $100 million. Most recently, Judge Lawrence King of the Southern District of

Florida cited my report when approving a $410 million settlement of litigation against Bank of America relating to overdraft charges. *Order of Final Approval of Settlement, Authorizing Service Awards, Granting Application for Attorneys' Fees, and Overruling Objections to Settlement* entered in *In re Checking Account Overdraft Litigation*, No. 09-md-2036,( S.D. Fla. 2011), available at http://www.bofaoverdraftsettlement.com/CourtDocuments.aspx. All four cases generated enormous fee awards.

Leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004), have cited my work many times. In 2009, the Tort Trial and Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

I have submitted briefs amicus curiae on class action issues to the Supreme Courts of Texas and the United States. (I was a principal author of an amicus brief submitted to the U.S. Supreme Court on behalf of a group of law professors in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), urging affirmance of the Third Circuit's standard for the certification of settlement classes. The Supreme Court affirmed on the issues addressed in the brief.) I have testified before and submitted written comments to the Advisory Committee on the Rules of Practice and Procedure of the Judicial Conference of the United States regarding proposed amendments to the federal class action rule. I have also served as co-counsel or consulting counsel in several class actions and have advised lawyers on aspects of many group lawsuits involving large numbers of clients.

Finally, because the award of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication

4

record, and experience as an expert witness testifying on matters relating to this field. I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association.

## DOCUMENTS REVIEWED

When preparing this Report, I reviewed the documents listed below, all of which were prepared in the course of this lawsuit or relate to it in other ways, unless otherwise noted. I also rely on my knowledge of secondary sources, including articles published in law reviews and other journals, treatises, and other authorities.

- *Memorandum of Points and Authorities in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement*

- *Order Preliminarily Approving Settlement and Providing for Notice*

- *Consolidated Amended Complaint for Violation of the Federal Securities Laws*

- *Second Amended Complaint for Violation of Federal Securities Laws (Redacted)*

- *Order Granting in Part and Denying in Part Plaintiffs' Motion to Compel Defendants to Produce Documents Responsive to Plaintiffs' Fourth Set of Document Requests*

- *Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement, Plan of Allocation, and Award of Attorneys' Fees and Expenses and Reimbursement of Plaintiffs' Expenses Pursuant to 15 U.S.C. §77Z-1(A)(4)*

- *Declaration of Tor Gronborg in Support of Class Counsel's Motion for final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Expenses and Reimbursement of Plaintiffs' Expenses Pursuant to 15 U.S.C. §77Z-1(a)(4)*

- *Declaration of James Haddad in Support of Motion for: (1) Final Approval of the Class Action Settlement; (2) the Plan of Allocation; and (3) Application for an Award of*

*Attorneys' Fees and Expenses*, submitted in *Teimuraz Tsirekidze v. Syntax-Brillian Corp.*, NO.2:07-cv-02204-FJM (D. Ariz., Jan. 8, 2010).

- *Declaration of James Haddad on behalf of the City of St. Clair Shores Police and Fire Retirement System and in Reply to New York State Teachers' Retirement System's Objection to class Lead Plaintiffs' Motion to Require Appeal Bond*, submitted in *In re Krispy Kreme Doughnuts, Inc. Securities Litig.*, No. 1:04-CV-00416, (M.D. N.C. May 2, 2007).

- *Memorandum Opinion and Order Granting Plaintiffs' Motion for Class Certification*

- *Order Awarding Attorneys' Fees and Expenses,* entered in *Teimuraz Tsirekidze v. Syntax-Brillian Corp.*, NO.2:07-cv-02204-FJM (D. Ariz., Feb. 18, 2010).

- *Order Awarding Attorneys' Fees and Reimbursement of Expenses,* entered in *In re Krispy Kreme Doughnuts, Inc. Securities Litig.*, No. 1:04-CV-00416, (M.D. N.C. Feb. 15, 2007).

- *Stipulation of Settlement*

## ANALYSIS

This is a classic common fund settlement of a securities class action that proceeded under the Private Securities Litigation Reform Act of 1995 (PSLRA). Class Counsel's right to compensation for services rendered and expenses incurred arises under the law of restitution. *In re Cont'l Ill. Sec. Litig*, 962 F.2d at 571 ("*Continental Securities*") (Posner, J.) ("basis for an award of fees in a common-fund case is.... restitutionary"). See also Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REVIEW 656 (1991) ("Silver*, Restitutionary Theory*"). Like Seventh Circuit precedent, the law of restitution also entitles lawyers to payment at market rates, referred to in the cases as "usual and customary" or "reasonable and necessary" charges. See Silver, *Restitutionary Theory*, p. 700 ("Quasi-

contractual damages usually equal the reasonable or market value of the service provided. In the words of one commentator, "[q]uasi-contract proceeds on the fiction of an implied promise to pay.... If there were a real promise, it would probably be to pay the market value, and the implied promise is analogized to that.") (quoting Douglas Laycock, MODERN AMERICAN REMEDIES 488 (1985)). My objective in this Report is to estimate the fee terms an actual contract between class members and their lawyers would have contained.

**History of the Litigation**

Actual contracts reflect all the predicted risks, costs, and benefits of litigation. One way to gain information about these considerations is to compare a pending lawsuit with others that came before. A pending case may be more or less risky than others and may therefore merit higher or lower compensation. Comparing cases also enables one to evaluate the quality of the effort class counsel expended and the caliber of the result class counsel obtained. I therefore begin by briefly summarizing the history of this litigation, which the *Memorandum of Points and Authorities in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement* describes in greater detail. In subsequent sections, I compare this lawsuit and the proposed settlement to other securities class actions.

- Litigation commenced on August 9, 2007, when a class action complaint was filed by Eric Silverman.

- On October 16, 2007, the Court appointed the Macomb County Employees' Retirement System (MCERS) to the position of Lead Plaintiff and the law firm of Robbins Geller Rudman & Dowd LLP ("RGRD") as Lead Counsel.

- On December 20, 2007, the Lead Plaintiff filed an amended complaint on behalf of the class.

7

- The Defendants, represented by high-powered counsel, defended the complaint vigorously and filed a motion to dismiss.

- On September 23, 2008, the Court, through Senior Judge James B. Moran, granted the motion to dismiss in part and denied it in part.

- Almost a year later, on August 25, 2009, the Court granted a contested motion for class certification, defining the class to include "[a]ll persons and entities who purchased or otherwise acquired the publicly-traded securities of Motorola, Inc. from July 19, 2006 through January 4, 2007." At the same time, the Court appointed MCERS and the St. Clair Shores Police and Fire Pension System as Class Representatives, and RGRD as Class Counsel.

- The parties then engaged in extensive fact and expert witness discovery and motions practice, which included the examination of more than 3 million pages of documents, the taking or defending of over 50 depositions of fact witnesses and expert witness, a host of contested *Daubert* motions, and two motions for summary judgment.

- Finally, on December 19, 2011, after mediation presided over by Daniel Weinstein, a retired federal judge, the parties agreed to settle the litigation for $200 million. The proposed settlement is now pending.

**Comparison to Other Securities Fraud Class Action Settlements**

In this section, I will compare this lawsuit to other securities class actions, with an eye to evaluating the risk Class Counsel faced, the quality of the effort class counsel expended, and the caliber of the result class counsel obtained.

The Risk Class Counsel Faced

Seventh Circuit case law requires a court setting attorneys' fees to evaluate the risk class

counsel faced *ex ante*, that is, at the time a lawsuit was filed. In this section, I attempt to profile

this risk. As will be clear, when viewed from an *ex ante* perspective, securities class actions are

risky propositions, and this case was riskier than most.

One way to appreciate the risk these lawsuits entail is by examining how previous

securities class actions turned out. When attempting to predict the result of a future lawsuit, past

lawsuits are natural sources of relevant information. Plaintiffs' attorneys in diverse practice

areas rely on past results for many purposes, such as whether to take a case or to accept a

settlement offer.

National Economics Research Associates (NERA) tracks the percentage of class actions

dismissed by filing year. In 2000, the most recent year for which all filed cases have already

been resolved, 37% of the cases were dismissed. Jordan Milev, Robert Patton, Svetlana Starykh,

and Dr. John Montgomery, *Recent Trends in Securities Class Action Litigation: 2011 Year-End

Review* at 12 (NERA Dec. 2011) ("*NERA Mid-Year 2011*"), available at

http://www.nera.com/nera-files/PUB_Trends_Year-End_1211_final.pdf. Using this base rate,

and knowing nothing else about this particular securities class action, one would infer that, *ex

ante*, Class Counsel faced a 37% chance of losing outright.

The risk of losing appears to have increased substantially since 2000. For cases filed in

2003, a year in which 95.5% of the cases have already been resolved, the dismissal rate is 41%.

The 2005 results were even worse. With 96.3% of the cases filed that year having been resolved,

the dismissal rate is 49%--just shy of half. For 2006, with 94.7% of the cases resolved, the

dismissal rate is 44.3%. *NERA Mid-Year 2011*, at p. 13, Figure 16. On the basis of these

numbers, one could reasonably infer that an *ex ante* dismissal risk in the range of 40%--45% existed when Class Counsel filed this lawsuit in 2007.

The base rate applies when one has little or no case-specific information that may help one refine the risk.[2] Here, additional information existed, and it showed that this case entailed above-average risk. One important piece of information is that no investigation by the SEC or other public regulator preceded the filing. A second is that Motorola had not restated its financials. A third is that no other law firm with a class action practice competed with Class Counsel for control of this case. A fourth is that important aspects of the fraud were hidden from view, meaning that information about them could only be obtained by means of formal discovery. I discuss the importance of each piece of information in turn.

The absence of a prior or contemporaneous investigation by the SEC or other public regulator made this case especially risky *ex ante* because Class Counsel could not share the workload with a regulator, gain the benefit of information a regulator gathered, or enjoy the enhanced pressure to settle civil claims a regulatory proceeding might generate. The absence of a regulatory proceeding also identified this lawsuit as a long-shot. Like private attorneys, regulators are most likely to initiate investigations and proceedings when frauds are egregious, and they are least likely to do so when the evidence of fraud is mixed or unclear. The SEC's failure to commence an investigation against Motorola indicates that the information available to its analysts did not signal this case as on involving egregious fraud.

The impact of investigations by regulators becomes clear when one compares settlements in cases with and without them. According to NERA, governmental investigations increase settlement amounts by 25%. *See* Ronald Miller, Todd Foster and Elaine Buckberg, *Recent*

---

[2] On the role of base rates in judicial reasoning, see Jonathan J., Koehler, *When Do Courts Think Base Rate Statistics are Relevant?* 42 JURIMETRICS JOURNAL. 373 (2002), available at SSRN: http://ssrn.com/abstract=1432069.

*Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?* (NERA April 2006) ("*Recent Trends, April 2006*") at 8.  When taking a class action in the absence of a governmental proceeding, a law firm must therefore expect a considerably smaller settlement.  I will return to this point when I consider the remarkable result Class Counsel achieved.

Class Counsel also filed this case even though Motorola had not restated its earnings. The company had missed earnings projections and its stock had lost value, but these developments provoked suspicion among neither public officials nor, apparently, many investors.  But for Class Counsel's efforts to uncover the fraud, Motorola would have flown under the radar and avoided detection.

In 2007, the bearing of earnings restatements on *ex ante* risks was clear.  Writing in 2006, Professor John C. Coffee, Jr. observed that

cases involving accounting allegations and restatements appear to have a higher

settlement value than cases lacking these factors.  The PSLRA's "safe harbor" for

forward-looking statements is the most likely (but not the exclusive) cause of this

transition because it requires the plaintiff to prove the defendant's actual

knowledge of the falsity of the forward-looking statement.[3]

To put the matter another way, cases with financial restatements tend to be more valuable than others because they are more likely to survive motions to dismiss, the evidence of defendants' knowledge being clearer.

---

[3] John C. Coffee Jr., Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Columbia Law Review 1534, 1544-1545 (2006) (citing Laura E. Simmons, Cornerstone Research, Post-Reform Act Securities Lawsuits: Settlements Reported Through December 2001, at 6-7 (2002), available at http://securities.stanford.edu/Settlements/REVIEW_1995-2001/Settlements.pdf; and A.C. Pritchard & Hillary A. Sale, What Counts as Fraud? An Empirical Study of Motions to Dismiss Under the Private Securities Litigation Reform Act 24-25 (Univ. of Iowa Coll. of Law Legal Studies, Research Paper No. 05-12, 2003), available at http://ssrn. com/abstract=439503.

The exceptionally risky nature of this case is also reflected in the fact that no other law firm competed with Class Counsel for control. Having read about or participated in several Lead Plaintiff competitions, I can report from personal experience that competition for control is brisk when lawyers think cases have significant potential to generate large recoveries and large awards of attorneys' fees. The likelihood of competition in good cases is enhanced by the PSLRA, which requires that all securities class action filings be publicized. Public notices enable law firms with securities practices to evaluate the merits, to alert investors with sizeable financial stakes, and to compete for control of lucrative cases when such investors are willing to sue. That all other class action law firms chose to pass on this case indicates that they found it too risky to pursue.

Finally, significant evidence bearing on the fraud was uncovered by Class Counsel in the course of discovery and was not apparent at the start of the case. As the Court knows, the PSLRA imposes a stay on discovery and a heightened pleading requirement, according to which a plaintiff must plead with particularity facts sufficient to show the falsity of material statements and the intent to deceive. These requirements place an enormous burden on securities fraud plaintiffs and their attorneys, who must gather the evidence needed to establish wrongdoing without the benefit of access to a defendant's files or personnel.

In this case, Class Counsel took considerable pains to gather information bearing on the merits without access to discovery. They examined "publicly available news articles and reports, public filings, securities analysts' reports and advisories about Motorola, interviews of former employees of Motorola or Freescale, press releases and other public statements issued by the Company, and media reports about the Company." *Consolidated Amended Complaint for*

*Violation of the Federal Securities Laws*, p. 8. They also obtained information from a number of confidential witnesses who worked for Motorola or Freescale, a Motorola spin-off.

Even so, these extensive informal investigative efforts did not enable Class Counsel to uncover significant evidence of fraud that was in Motorola's possession, namely, information relating to certain intellectual property transactions Motorola entered into with Freescale Semiconductor and Qualcomm, Inc. These transactions generated $398.1 million for Motorola, more than 40% of its earnings for 3Q06, allowing Motorola to meet market expectations for the quarter. Reflecting the failure to learn about these transactions, the original class action complaint neither mentioned them nor predicated fraud allegations upon them. But once the evidence was acquired, the settlement value of the case substantially increased.

When assessing the riskiness of this case *ex ante*, one must therefore ignore this particular evidence; because it was hidden, Class Counsel cannot have known about it or have taken it into account when deciding whether to file this case. The fee must be based on the much riskier case that was known to exist in 2007. One must also congratulate Class Counsel on having discovered the intellectual property deals and connected them to the alleged fraud. Class members benefited enormously from these actions.

When this case began in 2007, then, it was exceptionally risky. Although one cannot put a precise number on the probability of securing a recovery, the failure base rate (40%-45%) and the other indicia of risk—no restatement, no competition for control, and hidden evidence—all suggest that the odds strongly favored pre-trial dismissal.

When assessing *ex ante* risks, one must also consider the amount Class Counsel could reasonably have expected to win in the event of a recovery. Although the public perception is that enormous securities fraud settlements are common, the truth is quite the opposite. Most

13

settlements are small. This fact has been documented repeatedly and was well known among lawyers in 2007. According to a NERA report published in 2008, the median settlement amount for a securities class action was $7.0 million in 2005 and 2006 and $9.4 million in 2007.[4] NERA found no evidence of a time-trend:

> Over the 2005-2008 year period, median settlements ranged from $7.0 million to $9.4 million. While median values increased between 2006 and 2007, they dropped between 2007 and 2008, so, at this time, there is no evidence of an increasing trend in median settlements.

Stephanie Plancich and Svetlana Starykh, *2008 Trends in Securities Class Actions*, p. 9 (NERA, Dec. 2008) ("*Trends 2008*").

The average settlement amount typically exceeds the median, reflecting the impact of the small number of extremely large mega-settlements. Because some years close without any mega-settlements, the average recovery also varies greatly. It is, however, always far below $200 million. As NERA explains,

> The average settlement over the years from 2003 to 2008—the post-Sarbanes-Oxley-Act period—has been $45 million, notably higher than the pre-Sarbanes-Oxley average of $17 million and also above the 2008 average of $38 million. The annual average has ranged from $21 million to $82 million over this six-year period.

*Trends 2008*, p. 10.

When an average statistic reflects the influence of a small number of cases that differ greatly from the mean, academics often regard the average as being more reliable when the outliers are removed. After noting this, NERA recalculated the average recovery without the

---

[4] The median is the 50th percentile, meaning that half the cases settled for more than the indicted amount and half settled for less.

mega-settlements. "Removing all settlements of over $1 billion, the 2003-2008 average settlement drops to $26 million, and the range of settlement averages across years becomes much tighter." *Trends 2008*, p. 11.

At this point, one might infer that $26 million would have been a reasonable starting estimate of the recovery in the case, *assuming a recovery was obtained,* when litigation commenced in 2007. I emphasized the qualification in the preceding sentence because it is important to remember that the recovery statistics just set out ignore the many securities class actions that were dismissed and closed with recoveries of $0. The risk of losing outright, discussed above, must be taken into account as well.

It is possible to refine the expected recovery further because recoveries in securities class actions correlate with investors' losses. This adjustment cuts the predictable recovery by more than half. Generally speaking, recoveries increase with losses, but not nearly as fast. "[A] case with investor losses of $100 million is expected to have a settlement that is around $5.1 million, or 5.1% of investor losses. A case with $1 billion in investor losses is expected to settle for $12 million, only 1.2% of losses." *Trends 2008*, p. 13. This relationship has been documented repeatedly across studies and over many years. I do not know how large Class Counsel's estimate of investor losses was back in 2007, but today Class Counsel reports a top-end damages recovery at trial of $1 billion or so. This assumes complete success at trial followed by a claims process in which every class member participates. Taking this estimate as a starting point (even though it reflects an enormous amount of information that was not known in 2007), the predicted recovery (in the event of a win) would have been $12 million.

While recognizing the impossibility of absolute precision, the evidence discussed in this section enables me to provide a ballpark estimate of the recovery Class Counsel might

15

reasonably have expected when this lawsuit was filed in 2007: $6 million-$15.6 million. This conclusion rests on a 40%-50% risk of losing outright (that is, a 50%-60% probability of winning something) multiplied by a predicted recovery in the $12 million-$26 million range. The actual recovery, $200 million, is 33 times better than the $6 million estimate and 13 times better than the $15.6 million estimate. Clearly, the proposed settlement is a spectacular result for the investor class.

The Quality of the Effort Class Counsel Expended

Robbins Geller Rudman & Dowd LLP ("RGRD") is one of the premier securities class action law firms in the United States. It has a track record of success and a reputational interest in performing at the highest level. In keeping with its history and reputation, RGRD handles more securities class actions than other law firms, year after year. Cornerstone Research found that RGRD represented the most securities fraud plaintiffs in both 2009 and 2010. Cornerstone Research, *Securities Class Action Filings: 2011 Year in Review*, p. 2 ("Cornerstone, *2011 Year in Review*"), available at http://securities.stanford.edu/clearinghouse_research/2011_YIR/ Cornerstone_Research_Filings_2011_YIR.pdf. Securities Class Action Services (SCAS) consistently gives RGRD top marks on many criteria, as shown below.

**SCAS Ranking of Robbins Geller Rudman & Dowd LLP among Law Firms Handling Securities Class Actions**

| Years | Number of Recoveries | Aggregate Recoveries |
|-------|----------------------|----------------------|
| 2003 - 2007 | #1 | #1 |
| 2008 | #1 | #3 |
| 2009 | #1 | #1 |
| 2010 | #1 | #2 |

RGRD also cemented its reputation forever by settling claims arising out of the failure of Enron for a record $7.2 billion, to date the largest recovery in any class action of any type.

Given RGRD's track record and reputation, one expects the firm to do excellent work. And that is just what it did in this case. First, RGRD bore an unusually heavy workload. The firm had to perform an extensive investigation without the benefit of discovery and fend off a motion to dismiss, both of which are predictable features of securities litigation. However, RGRD also prevailed on a contested motion for class certification, dealt with two motions for summary judgment and seven *Daubert* motions, and successfully argued to expand the scope of the lawsuit after digging up evidence of accounting fraud in connection with Motorola's intellectual property transactions. These activities mark this case as one requiring an unusually large commitment of lawyer effort.

Cornerstone Research provides a breakdown of cases showing the stage at which the litigation resolved and other procedural developments. Cornerstone, *2011 Year in Review*, p. 18. For the Court's convenience, a figure from the report is reproduced below. The sample on which the figure and findings are based includes 2,415 class actions, and excludes all IPO Allocation, Analyst, and Mutual Fund filings in Cornerstone's database. As is visually apparent, 25% of the cases were either voluntarily dismissed or resolved before the first ruling on a motion to dismiss. Merely by taking the case that far, RGRD expended more effort than a non-trivial fraction of class actions require. Of the cases that received a first ruling on a dismissal motion, the vast majority (67%) were resolved by dismissal (32%) or settlement (35%) before a summary judgment motion was ruled upon. In other words, *92% of the cases were resolved before they reached the summary judgment stage*. RGRD took this lawsuit to the "Elite Eight."

17

**Figure 16**



PORTION OF RESOLVED CASES ADVANCING TO DIFFERENT LITIGATION STAGES
ALL CIRCUITS: 1996–2011

The numbers in the Seventh Circuit are slightly different but still show that this case required RGRD to make an unusual commitment. Of the 125 Seventh Circuit cases in Cornerstone's dataset, 11% reached the summary judgment stage. Cornerstone, *2011 Year in Review*, p. 30. To my mind, the difference between 8% and 11% is unimportant. Taking all securities class actions or Seventh Circuit cases as the baseline, this case required exceptional effort.

Cornerstone's report does not indicate how many securities class actions are certified over defendants' opposition. However, it is reasonable to infer that this case is unusual in that respect too. In cases brought under the PSLRA, a contest over class certification normally occurs after the motion to dismiss is decided. Therefore, it seems unlikely that a certification

contest occurred in the 25% of the cases that were withdrawn or resolved before a dismissal motion was ruled upon or the 32% of the cases that were dismissed. In 57% of the cases, therefore, it is clear that no battle over class certification occurred. As for the remaining cases, a study published in 1996 by researchers at the Federal Judicial Center found that defendants opposed class certification motions in about half the cases they studied. Thomas E. Willging, Laural L. Hooper, and Robert J. Niemic, *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges*, 71 N.Y.U. L. REVIEW 74, 114 (1996). If one therefore supposes that class certification was challenged in half the remaining cases (21.5%), one concludes that no certification contest occurred in 78.5% of the cases.

Obviously, securities class actions that have both a class certification contest and rulings on multiple motions for summary judgment are even rarer than cases that have only one of these features. It seems unlikely that both occur in the same case more than 5% of the time.

This case also required superior effort because there was no prior or contemporaneous investigation by government regulators. Commentators have criticized securities fraud class actions on the ground that the lawyers who bring the cases free-ride on governmental enforcement efforts. The implication is that the lawyers are not earning their fees because the government is wielding the laboring oar. No such criticism is possible here. RGRD wielded the only oar in the water. Federal regulators missed Motorola's alleged misconduct entirely. RGRD gets sole credit for discovering the fraud, developing the evidence relating to it, taking all other steps needed to move the case toward trial, and negotiating an outstanding settlement.

The specific activities RGRD performed, described in detail in the *Declaration of Tor Gronborg in Support of Class Counsel's Motion for final Approval of Class Action Settlement, Plan of Allocation, Award of Attorneys' Fees and Expenses and Reimbursement of Plaintiffs'*

*Expenses Pursuant to* 15 U.S.C. §77Z-1(a)(4), are truly impressive. The number of depositions, volume of discovery, extensiveness of the briefings, use of in-house forensic accountants, employment and preparation of multiple experts, and many other efforts RGRD made for the benefit of the class bespeak a first-rate lawyering effort.

Of particular relevance is the fact that, when the case settled, RGRD's preparations for trial were considerably advanced. On October 18, 2011, the parties submitted their proposed pre-trial schedule to the Court, and were negotiating the joint pre-trial order at the time the settlement was agreed upon. RGRD had filed motions *in limine* to exclude from the evidentiary record items that were unhelpful or inadmissible. It had started the process of agreeing to exhibits, witness lists, deposition designations, jury instructions, voir dire questions, case statements and itemization of damages. Trial preparation also required RGRD to select its hot documents for use as trial exhibits, to prepare exhibit lists covering thousands of documents, and to create trial demonstratives as well. RGRD had designated deposition testimony for use at trial, a process that required the review and analysis of over 10,000 pages of deposition testimony given by dozens of witnesses.

Few cases of any sort are tried, class actions included. Most settle when trial is only a theoretical possibility. Here, by contrast, RGRD was almost ready to pick a jury and proceed. Given that fewer than 2% of class actions are tried, the only possible conclusion is that this case required RGRD to make an exceptional effort on behalf of the class and to commit an exceptional level of resources.

The expenses incurred, which amount to almost $5 million, reflect the quality of RGRD's effort. A leading academic study of class actions finds that

20

> [c]osts and expenses (collectively "costs") tended to be a small percentage of the
>
> class recovery…. For the 232 cases from 1993 to 2002 for which cost data were
>
> available, mean costs were 2.8 percent of the recovery and median costs were 1.7
>
> percent. For the 304 cases with necessary data from 2003 to 2008, mean costs
>
> were 2.7 percent of the recovery and median costs remained at 1.7 percent.

Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES, 248, 274 (2010) ("*E&M Study*"). Here, the costs are 2.5% of the recovery, in line with the norm. However, the absolute dollar amount is more revealing than the percentage. In the *E&M Study*, the median gross recovery in federal court class actions was $12.5 million and the average was $123.12 million. (As before, the enormous difference reflects the influence of a small number of extremely large recoveries.) It follows that the median out-of-pocket expense was $212,500 and the average was about $3.5 million. In this case, Class Counsel put almost $5 million of their own money at risk with no guarantee of repayment—in addition to the tens of thousands of hours of lawyer time they expended. Few law firms can afford to make so large a commitment to a single case. And, as mentioned, no other law firm even offered to put its bank account on the line in this case. Clearly, RGRD provided first-rate legal representation.

<u>The Caliber of the Result Class Counsel Obtained</u>

The proposed $200 million recovery is far larger than the typical securities class action settlement. This is true in terms of both the absolute dollar amount and the fraction of investors' losses that it recoups.

In sheer dollars, the proposed settlement will tie for the 44th largest in the PSLRA era. Securities Class Action Services, *The SCAS 100 for Q4 2011*, available at

http://drrt.com/drrt/images/uploads/00069795.pdf. To put this accomplishment into proper perspective, it helps to know that more than 3000 securities fraud class actions were initiated during this period. The proposed settlement thus falls into the top 1.5% of all post-PSLRA results. It may also help to consider a statistic published by Cornerstone Research, another economics consulting group. Across Cornerstone Research's database containing more than 1,200 securities class actions initiated after the effective date of the Private Securities Litigation Reform Act of 1995, "more than half of the cases have settled for less than $10 million." Cornerstone Research, *Securities Class Action Settlements—2010 Review and Analysis*, p. 3 ("*Cornerstone 2010 Review and Analysis*"), available at http://securities.stanford.edu/Settlements/REVIEW_1995-2010/Settlements_Through_12_2010.pdf. The proposed settlement is almost literally off the charts.

There have been "mega-fund" securities fraud settlements larger than this one, of course. At $7.2 billion, the Enron case tops the list. But in the securities realm, enormous settlements are even rarer than they once were. No securities class action settlement exceeded $1 billion in 2010. This was the third year in a row without a settlement that large. *Cornerstone 2010 Review and Analysis*, p. 2. Make that four years in a row. No securities class action settlement exceeded $1 billion in 2001, either.

Class action settlements also tend to yield only a few pennies on class members' losses. I mentioned above NERA's finding that the expected recovery is 1.2 cents on the dollar when investor losses are $1 billion. This settlement, by contrast, recovers 17 cents on the dollar, a remarkable result.

22

Using its own methodology, Cornerstone Research found that, from 1996 to 2009, the median settlement recovered 3.4 percent of investors' losses. In 2010, the median recovery generated only 2.8 cents on the dollar of estimated loss. *Cornerstone 2010 Review and Analysis*. p. 5. (These figures reflect gross recoveries in securities fraud class actions, not recoveries net of administrative expenses, attorneys' fees, and litigation costs.) Cornerstone Research also replicated NERA's finding that "settlements as a *percentage* of estimated 'plaintiff-style' damages generally decrease as damages increase," especially in very large cases. When investors' losses exceed $1 billion, Cornerstone Research found recoveries ranging from 0.9 cents to 1.5 cents on the dollar. *Cornerstone 2010 Review and Analysis*, Figure 5. Again, by comparison the 17% recovery in this case is spectacular.

**Reasonableness of Class Counsel's Fee Request**

The preceding section discussed the level of risk RGRD faced in this litigation, the quality of the effort it expended, and the caliber of the result it obtained. In this section, I turn turns directly to the fee RGRD should receive, applying these considerations and others. Drawing on information about real transactions between lawyers and clients in the market for legal services, I conclude that the fee should be percentage of the recovery and that the fee requested, 27.5%, is reasonable. I then buttress this conclusion by examining studies of fee awards and other evidence of judicial fee-related practices.

The Court recently addressed several of the subjects discussed in this section. See *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F.Supp.2d 1028 (N.D. Illinois, 2011) ("*AT&T Mobility*"). For example, the Court held that "[t]he Seventh Circuit has directed

district courts to estimate the market price for legal services in calculating an appropriate attorneys' fee." 792 F.Supp.2d at 1033.[5]

### The Fee Should Be a Contingent Percentage of the Recovery

In *AT&T Mobility*, the Court applied the percentage-of-the-fund method when calculating the fee award and abjured the use of a lodestar cross-check. Because the decision not to use the lodestar method seems to have been fact-specific to that case, I start by explaining why the percentage-of-the-fund method should also be used here.

The most straightforward reason is simple. The Seventh Circuit has recognized that the contingent percentage fee is the dominant form of compensation in plaintiff representations where fees are set by the private market. *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the market rate.") (emphasis in original). Therefore, if the Court wishes to mimic the market, the Court should use the contingent percentage approach as well.

Reflecting this simple point, the Seventh Circuit has repeatedly urged district court judges to use the contingent percentage approach. For example, in *Continental Securities,* 962 F.2d at 572-573, Chief Judge Posner wrote:

The judicial task might be simplified if the judge and the lawyers bent their efforts

on finding out what the market in fact pays not for the individual hours but for the

---

[5] *See In re Continental Illinois Securities Litigation,* 962 F.2d 566, 568 (7th Cir. 1992) ("*Continental Securities*") ("[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price. *It is to determine what the lawyer would receive if he were selling his services in the market* rather than being paid by court order.") (Chief Judge Richard A. Posner, emphasis added); *In the Matter of Continental Illinois Securities Litigation,* 985 F.2d 867, 868 (7th Cir. 1993) ("[C]lass counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.") (Chief Judge Posner); *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001) ("[W]hen deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.") (Judge Frank Easterbrook, emphasis added); *In re Synthroid Marketing Litigation*, 325 F.3d 974, 975 (7th Cir. 2003) ("*Synthroid II*") ("A court must give counsel the market rate for legal services.").

ensemble of services rendered in a case of this character. This was a contingent fee suit that yielded a recovery for the "clients" (the class members) of $45 million. The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client. Suppose a large investor had sued Continental for securities fraud, and won $45 million. What would its lawyers have gotten pursuant to their contingent fee contract? We know that in personal-injury suits the usual range for contingent fees is between 33 and 50 percent but we also know that in large commercial litigation with prospects of multimillion dollar recoveries the percentage frequently is tapered-it might be 33 percent of the first million, 25 percent of the next million, and so on down. The class counsel did not present and the judge did not ask for testimony or statistics concerning the fee arrangementsin commercial litigation comparable to the present suit. Yet it might be quicker and easier to generate such evidence than it would be to hassle over every item or category of hours and expense and what multiple to fix and so forth.

The Seventh Circuit has also used the percentage-of-the-fund approach itself when setting fees. In *Synthroid II*, the panel led by Judge Easterbrook fixed the fee itself instead of remanding the case to the trial court. It awarded consumer class counsel 30% of the first $10 million and 25% of the next $10 million, 22% of the next $26 million, and 15% of all amounts over that. Given the $88 million recovery, the total award came to 19.9% of the fund. Judge Easterbrook did not even consider using the lodestar approach. 325 F.3d at 980.

The Seventh Circuit's rejection of the lodestar is entirely consistent with its commitment to mimicking the market. Having followed the literature on fee-related practices and discussed

matters relating to fees with lawyers for years, I am confident that the lodestar method is rarely used in contingent representations in the private sector. Given this, there is little or no prospect that the lodestar method would have been the form of compensation agreed to had class members and Class Counsel been able to bargain directly. Everything I know about the market for legal services leads me to conclude that they would have used contingent percentage compensation.

The PSLRA also supports the use of the contingent percentage method. Because *AT&T Mobility* was not a securities case, the Court had no occasion to consider this. However, the text of the statute reflects Congress' expectation that the reasonableness of fee awards would be determined on a percentage basis. The statute provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount" recovered for the class. 15 U.S.C. §78u-4(a)(6). The statute does not mention the lodestar.

<u>In the Market for Legal Services, Contingent Fees Normally Exceed 25% of the Recovery</u>

In *AT&T Mobility*, 792 F.Supp.2d at 1030, the Court observed that, under Seventh Circuit case law, "[t]he object in awarding a reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible" (quoting *Continental Securities*, 962 F.2d at 572)). Even so, reading the opinion, I infer that the parties gave the Court no information about the fees that arm's-length negotiations between clients and lawyers typically yield. In other words, they gave the Court no information about the private market. Instead, they appear to have directed the Court's attention to empirical studies of fee awards and to awards granted in particular cases. These sources provide little information about the rates clients and lawyers employ when setting fees *ex ante* in representations where lawyers receive contingent fees from plaintiffs' recoveries.

26

That said, a good deal is known about the fees clients actually pay and lawyers actually receive in contingent fee representations. In this section, I survey the waterfront of contingent fee representations, including non-class aggregate lawsuits, contingent fee representations involving sophisticated clients, and other contingent fee representations.

Contingent Fees in Mass Actions

Clients and lawyers often set fees contractually in contexts where the lawyers represent large numbers of clients with related claims. Examples of these cases, called "mass actions," include asbestos lawsuits, defective products litigation, pollution cases, and mass accidents and disasters, such as hotel fires and airplane crashes. Mass actions arguably provide the best evidence of the fees claimants would voluntarily offer and lawyers would voluntarily accept at the outset of class litigation.

Mass actions resemble class actions in important respects. First, they bring together multitudes of clients whose claims are factually and legally related. When an explosion occurs, for example, issues relating to the blast—why it happened, when it happened, how large it was, etc.—are common to all persons claiming injuries. The defendant's legal responsibilities are likely to present common questions as well, such as whether the defendant had a duty of care and, if so, whether the conduct satisfied it. Second, mass tort cases and class actions both usually involve corporations and insurers on the defense side, for the simple reason that the liabilities are too great to be satisfied by individuals. Often, the parties on the defense side possess tremendous resources and significant experience in litigation.

Mass actions also provide valuable information about fees because lawyers compete for the opportunity to represent clients when news of a mass tort breaks. Although lawyers were once prohibited from advertising, they now make their willingness to represent mass tort victims

widely known. A person injured by an oil spill, exposure to a toxic drug, or any other mass tort

can find lots of lawyers just by doing a "Google" search. Because advertising is widespread and

the pool of lawyers willing to handle mass actions is deep, one expects the market to price

lawyers' services efficiently.

Having reviewed the literature on mass actions and participated as a consultant in many

group lawsuits, I can confidently report that contingent fees of 33%-40% are common in mass

actions and that higher fees often prevail. I start with my anecdotal knowledge, meaning

knowledge that rests on reports of fees in cases I read about or participated in personally. Here is

a small number of examples.

- Approximately 1,700 plaintiffs alleging asbestos-related personal injuries each agreed to pay fees in the range of 33 to 40 percent, with expenses separately reimbursed.

- Six hundred plaintiffs who suffered property damage as a result of an explosion at a natural gas storage facility agreed to pay fees of 33 percent of the recovery, plus expenses.

- Approximately 60,000 plaintiffs who suffered property damage as a result of defective polybutylene plumbing agreed to pay fee of 40 percent of the recovery, plus expenses.

- In litigation alleging person injuries stemming from the use of prescription drugs, such as Fen-Phen, Vioxx, or Paxil, fees range from 33 percent to 40 percent, with expenses separately reimbursed.

- In a follow up to a class action lawsuit against TransUnion, more than 60,000 clients who accused TransUnion of using their credit information unlawfully agreed to pay fees and expenses exceeding 40 percent.

These examples are neither isolated nor idiosyncratic. Their typicality is reinforced by

large numbers of anecdotal reports covering decades. In the Dalkon Shield litigation conducted

in the early 1990s, thousands of claimants signed contingent fee arrangements providing for fees

between one-quarter and one-half of the recovery, with most charging one-third. *In re A.H.*

*Robins Co., Inc.*, 182 B.R. 128, 131 (E.D.Va. 1995). In the aftermath of the terrorist attacks on

September 11, 2001, thousands of rescue and clean-up workers hired lawyers on terms requiring

them to pay one-third of their recoveries. Mireya Navarro, *Sept. 11 Workers Agree to Settle Health Lawsuits*, New York Times, November 19, 2010, available at http://www.nytimes.com/2010/11/20/nyregion/20zero.html. In 2010, thousands of clients with claims against BP arising out of the Deepwater Horizon catastrophe promised to pay contingent fees in the range of 40%-50%. Martha Neil, *Frustration Over Uncontained Gulf Oil Spill—and Tort Claim Contingency Fees of Up to 50 Percent*, ABA JOURNAL (May 24, 2010), available at http://www.abajournal.com/news/article/frustration_over_uncontained_gulf_oil_spill--and_tort_legal_fees_of_up_to_5/. Except for airplane crash litigation, which I discuss below, I cannot recall hearing of a mass tort case in which the fees fell below 25%. In most such cases, the percentages are considerably higher.

Studies of litigation costs in mass tort cases reach conclusions consistent with my observations. A study of asbestos litigation by the Institute for Civil Justice at RAND examined over 3,000 claims that closed before August, 1982. It found that plaintiffs' legal fees and other litigation expenses consumed an average of about 42 percent of plaintiffs' gross recoveries. James S. Kaklik, et al., COSTS OF ASBESTOS LITIGATION Table S.2 (RAND 1983). A second RAND study of asbestos cases reported legal fees and expenses consumed 39 percent of plaintiffs' gross recoveries. James S. Kakalik et al., VARIATION IN ASBESTOS LITIGATION COMPENSATION AND EXPENSES xviii Figure S.1 (RAND 1984).[6] Researchers familiar with mass

---

[6] In the authors' words:

> We have concluded that legal fees in tried [asbestos] cases were typically 33 to 45 percent of total compensation, and averaged about 39 percent. Other expenses in tried cases ranged from 1 to 12 percent of recovery, but were generally about 6 percent.
>
> Plaintiffs' legal fees as a percentage of compensation were lower for settled cases; they typically ran from 28 percent to 40 percent with an average of 34 percent. Other expenses on settled claims averaged approximately 5 percent of the recovery, though on occasion they were much higher or lower.
>
> In summary, the average plaintiff litigation expenses (including both legal fees and other expenses) were 39 percent of total compensation for all 1980-1982 closed claims combined.

tort lawsuits involving other products report similar rates. Consider the following statement by Professor Lester Brickman, who otherwise disagrees with me on just about everything:

> "In these nonclass aggregate litigations, lawyers solicit or otherwise obtain hundreds and even thousands of clients who have similar claims against a single defendant, and typically charge contingency fees ranging from one-third to forty percent. Indeed, forty percent appears to have become the standard contingency fee in nonclass mass tort litigation.

Lester Brickman, *Anatomy of an Aggregate Settlement: The Triumph of Temptation over Ethics*, 79 GEORGE WASHINGTON LAW REVIEW 700, 706 (2011).

The only mass tort area in which lower charges prevail, to my knowledge, is litigation arising out of commercial airplane disasters. A footnote to ABA Formal Opinion 94-389 reports that "[i]n cases where airline insurers voluntarily sent out the 'Alpert letter' which makes an early settlement offer and concedes all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery." ABA Formal Opinion 94-389, n. 13 (1994) (citing L. Kriendler, *The Letter: It Shouldn't be Sent*, 12 THE BRIEF 4, 38 (November 1982)). Market forces explain these lower percentages, as, in the same footnote, the ABA opinion observes. When a defendant concedes liability and puts a settlement offer on the table from the get-go, risks fall and the market pays contingent fee lawyers less for handling cases.

In this case, of course, Motorola denied liability completely. The fees in this case should therefore exceed those lawyers receive for working on uncontested injury matters stemming from commercial aircraft disasters.

---

*Id.*, at 83-84.

30

Taking mass tort cases as a guide, then, the available evidence indicates that Class Counsel's request for payment of 27.5 percent of the recovery is reasonable.

### Contingent Fees in Conventional Plaintiff Representations

The conventional wisdom, shared by many judges and academic commentators, is that the standard contingent fee in conventional plaintiff representations is one-third of the recovery. This belief is so widespread that explaining the stability of high contingent percentage fees has become a major project for academics. See, e.g., Eyal Zamir, Barak Medina, and Uzi Segal, *The Puzzling Uniformity of Lawyers' Contingent Fee Rates: An Assortative Matching Solution* (draft of January 16, 2012), available at http://ssrn.com/abstract=1986491.

Empirical studies show that although one-third fees are common, the conventional wisdom overstates their frequency. Contingent percentage fees vary in size, both within practice areas and across them. Generally speaking, they range from a low of 20 percent in automobile accident cases that settle even before complaints are filed to a high of 50 percent in medical malpractice cases. The variation reflects, among other things, the differing risks and costs that different lawsuits entail.

Both the prevailing rates in personal injury lawsuits and the variation in charges were documented by a RAND report published in 1991. The authors of this study interviewed a structured random sample of approximately 2770 persons who suffered accident-related injuries, 387 of whom had hired attorneys. Looking solely at the members of this group who agreed to pay contingent fees, they found that "[t]he median fee ratio for those who agreed to a fixed amount was 33 percent (mean = 29 percent)." Deborah R. Hensler et al., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 135-36 & tbl.5.11 (RAND 1991), available at http://www.rand.org/pubs/reports/2006/R3999.pdf.

31

Herbert Kritzer is the country's leading empirical researcher of attorneys' fees in plaintiff representations. In an article based on a sample of 989 representations in Wisconsin, he reports that in slightly more than half the cases the client agreed to pay a one-third contingent fee. Herbert M. Kritzer, *Investing in Contingency Fee Cases*, WISCONSIN LAWYER 11, 12 (August 1997). Many other clients agreed to pay contingent percentages that varied in size according to the stage litigation reached before ending. The figure reproduced below, taken from the same article, shows the range of percentages agreed to for each stage of litigation. As is visually apparent, fees below 25% are exceptional.



Figure 2: Contingency Fees
Offered at Each Stage of Disposition

Source: Herbert M. Kritzer, *Investing in Contingency Fee Cases,* WISCONSIN LAWYER 11, 12 (August 1997).

A RAND study of federal lawsuits found that, of the cases in which contingent fees were paid, the percentage was 33% over half the time, less than 33% about a quarter of the time, and more than 33% in the remainder. See Herbert M. Kritzer, *Seven Dogged Myths Concerning Contingency Fees*, 80 WASHINGTON UNIVERSITY LAW QUARTERLY 739, 760 (2002)

(summarizing data reported in James S. Kakalik et al., An Evaluation of Judicial Case Management under the Civil Justice Reform Act (1996)).

Most recently, Nora Engstrom published two articles studying law firms she describes as "settlement mills." These firms advertise heavily and handle large volumes of small claims. According to Professor Engstrom, "every one of the twelve settlement mills [she] studied charges a tiered contingency fee," and most charge "at least 33%--and perhaps as high as 40%." Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 New York University Law Review 805, 846 (2011).

Plainly, if one takes the private market in conventional contingent fee representations as a guide, one must set the fee above 25%.

Contingent Fees Paid By Sophisticated Business Clients

Commentators often criticize fees in conventional tort cases. They contend that the market fails to price legal services correctly because the clients are unsophisticated, the lawyers possess better information and have more experience bargaining, and the market is noncompetitive. In my opinion, these criticisms ring hollow. First, the legal services market is highly competitive, as Judge Easterbrook observed in *Synthroid II*.[7] Second, in many competitive markets, sellers are pressured to offer customers efficient prices, despite information asymmetries and bargaining advantages. Third, as the article cited above by Zamir, Medina, and Segal indicates, explanations exist for high contingent fees that are consistent with the enhancement of clients' welfare.

---

[7]325 F.3d 974, 979 (7th Cir. 2003) ("No law firm supplies more than a tiny fraction of the nation's legal services (even of the specialized submarket in big-stakes litigation). The Herfindahl-Hirschmann Index in this market is minuscule, and no evidence in this record implies that law firms have conspired to reduce competition.") The Hirschmann-Herfindahl Index is "a metric commonly used by the US Department of Justice to assess the potentially anti-competitive effects of concentration within an industry." James D. Cox, *The Oligopolistic Gatekeeper: The U.S. Accounting Profession*, Duke Law School Research Paper No. 117, p. 272 (August 2006).

33

Still, assuming the criticisms have merit, one would think that the market in which sophisticated business clients hire lawyers provides more reliable evidence of the fees lawyers should receive. Business clients can shop for lawyers and compare rates, are experienced negotiators, and have good information. The fees they pay should therefore reflect the value of the services lawyers provide.

Unfortunately, it is hard to know the fee levels that prevail in this market segment. There are few empirical studies of the fees businesses and other sophisticated clients agree to pay when acting as plaintiffs in litigation.[8] No databases collect this information, and businesses that sue as plaintiffs rarely make their fee agreements public. Consequently, most of what we know about the contingent fees sophisticated clients pay is drawn from anecdotal reports. Businesses also frequently use hybrid arrangements that combine guaranteed payments with contingent bonuses.[9] These arrangements hold few lessons for class actions because lawyers representing plaintiff classes must work on straight contingency. That said, the limited evidence available on the use of pure contingent fees by sophisticated clients shows that marginal percentages tend to be high.

Academic researchers have recently begun to study contingent fees used in intellectual property cases, especially cases involving patent infringement.[10] Reports of high percentages in this area abound. The most famous such instance involved NTP Inc. and Research In Motion Ltd., the company that manufactures the popular Blackberry. NTP promised its law firm, Wiley

---

[8] I have studied the costs insurance companies incur defending liability suits empirically using a large database of closed claims in Texas. See Bernard Black, David A. Hyman, Charles Silver and William M. Sage, *Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004*, 10 AMERICAN LAW AND ECONOMICS REVIEW 185 (2008).

[9] In a recent case against Bank of American, a group of bankruptcy creditors with about $58 million at stake agreed to pay a law firm $1 million upfront and 5 percent of the net recovery. Petra Pasternak, *It's BIG, You're in Charge! Firm Picked for Pending Case Against BofA, Citi*, CORPORATE COUNSEL (Online) April 9, 2010.

[10] See David L. Schwartz,, *The Rise of Contingent Fee Representation in Patent Litigation* (draft of March 5, 2012) ("Schwartz, *Contingent Fee Representation in Patent Litigation*"), available ssrn.com/abstract=1990651

Rein & Fielding ("WRF"), a one-third contingent fee. When the case settled for $612.5 million, WRF received more than $200 million in fees, a 33% contingency. Yuki Noguchi *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03. Another famous case involved the law firm of Dickstein Shapiro, which was reported to be entitled to a fee of $90 million under a *partial* contingent fee agreement,[11] if a $501 million jury award against Boston Scientific Corp. stood up on appeal. Martha Neil, *Dickstein Contingent-Fee Payout Could Be $600K Per Partner*, ABA JOURNAL (May 20, 2008). In another instance, the Texas law firm of McKool Smith won a $200 million jury verdict against Microsoft for Toronto-based i4i Inc. Penalties and interest added $90 million to the total. The firm's share, under another *partial* contingent fee agreement,[12] was reported to be $60 million, again assuming the verdict held up. Cheryl Hall, *Patents and patience pay off for Dallas law firm McKool Smith*, THE DALLAS MORNING NEWS, March 27, 2010.

In a draft article, Assistant Professor David L. Schwartz reports findings based on interviews with 44 experienced lawyers who represent plaintiffs in patent cases and his review of 42 contingent fee agreements. His conclusion: The percentages are high.

On the whole, the contingent rates [in patent cases] are similar to the "one third" that a stereotypical contingent personal injury lawyer charges. There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate. Of the agreements using a flat fee …, the mean rate was 38.6% of the recovery. The graduated rates typically set milestones such as "through close of

---

[11] In a partial contingent fee agreement, the contingent bonus, usually but not necessarily a percentage of the recovery, applies on top of other guaranteed compensation, such as a fixed payment upfront or a discounted hourly rate. Because guaranteed compensation is unavailable in class actions, partial contingent fee agreements provide no guidance for fee percentages in securities class actions.

[12] See preceding footnote.

> fact discovery," "through trial," and "through appeal," and tied rates to recovery
> dates. As the case continued, the lawyer's percentage increased. Of the
> agreements reviewed for this Article which used graduated rates, the average
> percentage upon filing was 28% and the average through appeal was 40.2%.

Schwartz, *Contingent Fee Representation in Patent Litigation*, at 27.

Schwartz's findings are consistent with anecdotal reports from other sources. For example, the author of a blog on patent litigation writes of contingent fee arrangements as follows:

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does
> not pay any legal fees for the representation. Instead, the law firm only gets paid
> from damages obtained in a verdict or settlement. Typically, the law firm will
> receive between 33-50% of the recovered damages, depending on several
> factors—a strictly results-based system.

Mark Cutler, *Contingent Fee Patent Litigation, and Other Options*, Patent Litigation, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).

An example of the use of scaled contingent percentages in patent litigation appears in *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, LLP, et al.*, 105 S.W.3d 244 (Tex. Appls.—Houston, 2003), which involved a sophisticated client with an enormous intellectual property claim. The decision reports that the plaintiff agreed to pay his attorneys a scale of contingent percentages. "Under the fee agreement, Tanox agreed to pay the Lawyers a contingency fee pursuant to a sliding scale: 25% of the first $32 million recovered by Tanox, 33 1/3 % of recovery from $32 million to $60 million, 40% of recovery from $60 million to $200 million, and 25% of recovery over $200 million." *Id.* at 248-249. The agreement also contained other

provisions favorable to the lawyers, including a promise of "$100 million if they obtained a permanent injunction." "The total fees Tanox agreed to pay the Lawyers were capped at $500 million and the total fees derived from royalties were capped at $300 million." *Id.* at 249. Like NTP in the *Blackberry* litigation, Tanox agreed to pay both a high percentage and a potentially enormous amount.

The payment of high contingent fees in patent cases is not a new phenomenon. In 1993, THE AMERICAN LAWYER ran a cover story featuring patent contingency litigator Gerald Hosier, who reportedly made over $150 million in a single year, "more than the draws of all the equity partners at New York's Cravath, Swaine & Moore and Chicago's Winston & Strawn combined." Stewart Yerton, *The Sky's the Limit*, THE AMERICAN LAWYER (May 1993). An article published in 1997 reported that attorney Alfred Engelberg began handling patent cases on contingency in 1985. In an interview, Engelberg stated that he "ha[d] been involved in seven contingent patent challenges over the last 10 years ... and ha[d] received remuneration in excess of $100 million. On an hourly basis, even if the cases had been fully staffed, the cases would have produced a total of no more than ten to fifteen million dollars in billing." P.L. Skip Singleton, Jr., *Justice For All: Innovative Techniques for Intellectual Property Litigation*, 37 IDEA 605, 610 (1997). Clearly, in the segment of the market where sophisticated businesspeople hire lawyers to handle patent cases on contingency, successful lawyers earn enormous premiums over their normal hourly rates. The reason is obvious. When waging patent cases on contingency, lawyers must incur large risks and high costs, so clients must promise them hefty returns.

Turning from patent lawsuits to business representations more generally, many examples show that high percentage compensation is common. A famous case from the 1980s involved the Texas law firm of Vinson & Elkins (V&E). ETSI Pipeline Project (EPP) hired V&E to sue

37

Burlington Northern Railroad and other defendants, alleging a conspiracy on their part to prevent

EPP from constructing a $3 billion coal slurry pipeline. In a sworn affidavit, Harry Reasoner,

V&E's managing partner, described the financial relationship between EPP and V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as
> they were incurred, but all legal fees were contingent upon a successful outcome. We
> were paid 1/3 of all amounts received by way of settlement or judgment. We litigated the
> matter for 5 years. At the conclusion, we had settled with all defendants for a total of
> $634,900,000.00. As a result, a total of $211,633,333.00 was paid as contingent legal
> fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System*

*Securities Litigation,* MDL No. 551 (D. Arizona, Nov. 30, 1990).

Several things about this example are noteworthy. First, the contingency fraction was

one-third of the recovery in a massive case. Second, V&E bore no liability for out-of-pocket

expenses. The percentage was high even though, by comparison to securities fraud class actions,

where lawyers advance costs and bear the risk associated with them under the end of litigation,

the deal was favorable to the law firm. Third, the case was enormous, ultimately generating a

recovery about 3 times as large as the common fund here. Fourth, the client was a sophisticated

business with access to the best lawyers in the country. No claim of pressure or undue influence

by V&E could possibly be made.

If lawyers who write about fee arrangements in business cases can be believed, high

contingent percentages remain common today. In 2011, THE ADVOCATE, a journal produced by

the Litigation Section of the State Bar of Texas, published a symposium entitled "Commercial

Law Developments and Doctrine." It included an article on alternative fee arrangements, according to which:

> A pure contingency fee arrangement is the most traditional alternative fee
> arrangement. In this scenario, a firm receives a fixed or scaled percentage of any
> recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the
> contingency is approximately 33%, with the client covering litigation expenses;
> however, firms can also share part or all of the expense risk with clients. Pure
> contingency fees, which are usually negotiated at approximately 40%, can be
> useful structures in cases where the plaintiff is seeking monetary or monetizable
> damages. They are also often appropriate when the client is an individual, start up,
> or corporation with limited resources to finance its litigation. Even large clients,
> however, appreciate the budget certainty and risk-sharing inherent in a contingent
> fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOC. (TEXAS) 20 (2011).

A recent case shows, in monetary terms, that lawyers who handle business disputes on contingency can earn enormous premiums over their hourly rates. In 2012, the U.S. Court of Appeals for the Tenth Circuit issued an opinion in a case involving a dispute over the fee a business client owed to the law firm of Susman & Godfrey (Susman). Susman had handled an oil and gas matter for the client on the following terms. "Under the Fee Agreement, [the client] agreed to pay Susman 30% 'of the sum recovered by settlement or judgment,'" subject to caps based on when the lawsuit was resolved. *"[T]he Fee Agreement capped fees at $50 million if the case settled within one year after the action was filed."* *Grynberg Production Corp. v. Susman*

*Godfrey, L.L.P.*, No. 10-1248, (10th Cir. February 16, 2012), available at

http://law.justia.com/cases/federal/appellate-courts/ca10/10-1248/10-1248-2012-02-16.html.

The fee agreement thus entitled Susman to be paid $50 million for a year or so of work—and that

is what an arbitrator decided Susman should receive (subject to an offset of less than $2 million

that, for present purposes, is irrelevant).

Moving closer to the securities litigation context, examples of high contingent fees can be

found in reported cases involving business clients who retained lawyers to participate on their

behalf in class actions. One such instance is described in *Synthroid II*. There, financial

intermediaries with tens of millions of dollars at stake agreed to pay outside law firms fees

averaging 22 percent of the recovery *even though a settlement was already on the table when the

lawyers were hired*. The lawyers' job was merely to garner as much as possible of the settlement

fund for the clients, not to litigate the case. Given the lack of risk of non-payment, the size of the

percentage reflects well on the 27.5% fee requested by the lawyers in this case, who bore an

enormous risk of non-payment and incurred sizeable expenses on behalf of the class.

More information can be found in an expert report Professor John C. Coffee, Jr. filed in

*In re: High Fructose Corn Syrup Antitrust Litigation*. According to Professor Coffee, the two

named plaintiffs, Zarda Enterprises and Publix Supermarkets Inc., agreed to pay fees of 30% and

"more than 25%," respectively. In the same case, an opt-out claimant, Gray & Co, agreed to pay

its attorney 33%-40% of the recovery, depending on the time of settlement. Three other

corporate class members, Honickman Group, The Coca-Cola Company, and Admiral Beverage

Corporation, submitted affidavits stating that they would have paid at least a 25% fee.

*Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup Antitrust

Litigation*, M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2. In the same lawsuit, class counsel

40

submitted a list showing the contingent percentage fees agreed to by 6 named plaintiffs, all of which were businesses that purchased corn syrup. The percentages ranged from 20% to 33%, often varying with the duration of the lawsuit. *Plaintiffs' Supplemental Memorandum on Attorneys' Fees in Common-Fund Cases*, Exhibit E, submitted in *In re: High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004).

Although the information presented in this section is admittedly anecdotal, its cumulative weight is impressive and it supports a straightforward conclusion. Class Counsel's request for 27.5% of the recovery is at the low end of the range of percentages used in business lawsuits where lawyers represent plaintiffs on contingency.

Given the preceding, it comes as no surprise that one of the Lead Plaintiffs in this case, the City of St. Clair Shores Police & Fire Retirement System, supported a 25% fee award in a prior case. See *Declaration of James Haddad in Support of Motion for: (1) Final Approval of the Class Action Settlement; (2) the Plan of Allocation; and (3) Application for an Award of Attorneys' Fees and Expenses*, submitted in *Teimuraz Tsirekidze v. Syntax-Brillian Corp.*, NO.2:07-cv-02204-FJM (D. Ariz., Jan. 8, 2010). Twenty-five percent is a fee that many reasonable business people have paid lawyers handling important matters on contingency. In another case, the same entity supported a fee of 23.5%, having used outside counsel to negotiate the amount. *Declaration of James Haddad on behalf of the City of St. Clair Shores Police and Fire Retirement System and in Reply to New York State Teachers' Retirement System's Objection to class Lead Plaintiffs' Motion to Require Appeal Bond*, submitted in *In re Krispy Kreme Doughnuts, Inc. Securities Litig.*, No. 1:04-CV-00416, (M.D. N.C. May 2, 2007). This amount was also reasonable. Class Counsel have represented to me that the Lead Plaintiffs also support

the fee request in this case, which falls in the same general range as the percentages used previously.

#### Empirical Studies of Fee Awards in Class Actions

As mentioned, studies of fee awards in class actions do *not* provide direct evidence of market rates set on an *ex ante* basis by real clients and lawyers. They show only how judges regulate fees, and judges often depart markedly from market-based rates and practices. Consider the so-called "mega-fund rule," according to which the fee percentage must be capped at a low level when the recovery is very large. The private market rejects this rule, as shown by the examples discussed in the preceding section. Judge Easterbrook recognized this in *Synthroid I*. He criticized the mega-fund rule, noting that "[p]rivate parties would never contract for such an arrangement" because it would encourage cheap settlements. *Synthroid I*, 264 F.3d at 718. Even so, many judges have applied the mega-fund rule. As a result, they have biased court-awarded fees downward relative to actual market rates.

Judges have not applied the mega-fund rule uniformly, however. In some enormous cases, they have awarded fees at percentages resembling those prevailing in the marketplace. The table below lists all class actions I have found with recoveries of $100 million or more and fees equal to or greater than 20%. As can be seen, many class actions with settlements of at least $200 million have fee awards of 27.5% or more. The un-weighted average for the entire group of cases in the table is 26.44%, just below the 27.5% requested here. As these cases establish, the Court can award a fee based on a market rate in this mega-fund settlement without leaving the beaten path.

42

### TABLE 2: MEGA-FUND CLASS ACTIONS WITH LARGE PERCENTAGE FEE AWARDS

| | Case | Recovery (millions) | Fee Award Percentage |
|---|---|---|---|
| 1 | *Allapattah Services, Inc. v. Exxon Corp.*, Case No.: 91-0996-CIV-GOLD/SIMONTON, S.D. Fla. (July 6, 2006) | $1060 | 31.33% |
| 2 | *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112 (N.D. Ill. Feb. 10, 2000) | $697 | 25% |
| 3 | *In re Fructose Antitrust Litig.*, MDL No. 1087, Master File No. 94-1577 (C.D. Ill. Oct. 4, 2004) | $531 | 25% |
| 4 | *In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 5 | *In re Adelphia Communs. Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) | $455 | 21.40% |
| 6 | *In Re Checking Account Overdraft Litigation*, 1:09-md-02036-JLK, (S.D. Fla., Nov 22, 2011). | $410 | 30% |
| 7 | *In re Freddie Mac Sec. Litig.*, No. 03-CV-4261 (JES), (S.D.N.Y. Oct. 27, 2006) | $410 | 20% |
| 8 | *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 9 | *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M:02-cv-01486-PJH, MDL-02-1486 (N.D. Cal. Nov. 1, 2006) | $326 | 25% |
| 10 | *Cooper v. IBM Personal Pension Plan*, 2005 WL 1981501 (S.D. Ill. 2005)[1] | $314 | 28.30% |
| 11 | *In re Williams Sec. Litig.*, No. 02-cv-072-SPF-FHM (N.D. Okla. Feb. 12, 2007) | $311 | 25% |
| 12 | *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (S.D.N.Y. June 2003) | $300 | 28% |
| 13 | *In re DaimlerChrysler AG Sec. Litig.*, No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004) | $300 | 22.50% |
| 14 | *In re Enron Corp. Sec. and ERISA Litig.*, MDL 1446, Case 4:01-cv-03913 (S.D. Tex. July 24, 2006) | $264 | 20% |
| 15 | *In re* Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig., MDL No. 834 (D. Ariz. July 24, 1990)[2] | $250 | 26.60% |
| 16 | *In re Comverse Technology, Inc. Securities Litig.*, 2010 WL 2653354, 6 (E.D.N.Y., 2010) | $225 | 25% |
| 17 | *In re Buspirone Antitrust Litig.*, No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[3] | $220 | 33.30% |

| | | | |
|---|---|---|---|
| 18 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30% |
| 19 | *In re Waste Mgmt., Inc. Sec. Litig.*, No. 97-7709, 21 Class Action Rep. 263 (N.D. Ill. filed Sept. 17, 1999) | $220 | 20.80% |
| 20 | *In re Washington Mutual, Inc. Sec. Litg., No. 2:08-md-01919 MJP* (W.D. Wash. Nov. 4, 2011) | $208.5 | $21% |
| 21 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30% |
| 22 | *In re Rite Aid Corp. Sec. Litig. (Rite Aid I)*, 146 F.Supp.2d 706 (E.D.Pa.2001) | $193 | 25% |
| 23 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.* , No. 91-05637 (116th Dist. Ct, Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 24 | *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D.Tex.1999)[4] | $190 | 25% |
| 25 | *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D. Okla. Jan. 2, 1990) | $185 | 30% |
| 26 | *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000)[5] | $185 | 40% |
| 27 | *In re Dollar Gen. Corp. Sec. Litig.*, No. 01-388 Order (M.D. Tenn. filed May 24, 2002) | $162 | 21.60% |
| 28 | *Schwartz v. TXU Corp.*, Nos. 3:02–CV–2243–K, 2005 WL 3148350 (N.D.Tex. Nov.5, 2005) | $150 | 22.2% |
| 29 | *In re Coordinated Pretrial Proceedings In Petroleum Prods. Antitrust Litig.*, No. MDL 150, 1994 WL 675265 (C.D. Cal. Aug. 11, 1994) | $140 | 21% |
| 30 | *Carpenters Health v. Coco-Cola Co.*, 587 F.Supp.2d 1266 (N.S. Ga. 2008) | $138 | 21% |
| 31 | *In re Computers assocs. Class Action Sec. Litig.*, CV-98-4839 (TCP) (E.D. NY 2003)[6] | $136 | 25% |
| 32 | *In re Informix Corp. Sec. Litig.*, Master File No. C-97-1289-CRB (N.D.Cal. Nov. 2, 1999) | $132 | 30% |
| 33 | *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36% |
| 34 | *In re Rite Aid Corp. Sec. Litig. (Rite Aid II)*, 362 F.Supp.2d 587 (E.D.Pa.2005) | $126 | 25% |
| 35 | *In re Infant Formula Antitrut.*, MDL No. 878, (N.D. Fla. Sept. 7, 1993) | $125 | 25% |
| 36 | *PaineWebber Ltd. P'ships Litig. v. Geodyne Res., Inc.*, 999 F. Supp. 719 (S.D.N.Y. 1998) | $125 | 20.80% |
| 37 | *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30% |

| 38 | *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475-NRB (S.D.N.Y.2005) | $120 | 28% |
|---|---|---|---|
| 39 | *Hershey, et al, v. Pacific Investment Management Company LLC*, No. 1:05-cv-04681 (N.D. Ill. May 2, 2011)[7] | $120 | 28% |
| 40 | *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 | 27.50% |
| 41 | *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30% |
| 42 | *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D.Tex. Apr. 9, 2010) | $110 | 30% |
| 43 | *In re Cardizem CD Antitrust Litig.*, No. 99-MD-1278, at 18-20 (E.D.Mich. Nov. 26, 2002) | $110 | 30% |
| 44 | *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F.Supp. 97 (S.D.N.Y.1996) | $110 | 27% |
| 45 | *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323 (S.D.Fla.2001) | $110 | 25% |
| 46 | *In re DPL Inc. Sec. Litig.*, 307 F.Supp.2d 947 (S.D. Ohio 2004) | $110 | 20% |
| 47 | *In re Methionine Antitrust Litig.*, No. C 99-3491, MDL No. 00-1311 (N.D. Cal. Oct. 3, 2002) | $107 | 23.30% |
| 48 | *In re Automotive Refinishing Paint Antitrust* Litigation, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 49 | *Haynes v. Shoney's*, No. 89-30093-RV, 1993 WL 19915 (N.D. Fla. Jan. 25, 1993)[8] | $105 | 23.20% |
| 50 | *In re Prison Realty Sec. Litig.*, Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30% |
| 51 | *Ingram v. Coca-Cola, Corp.*, 200 F.R.D. 685 (N.D. Ga. 2001)[9] | $104 | 20% |
| 52 | *Baird v. Thomson Consumer Elecs.*, No. 00-761 (Ill. Cir. Court. Madison Co. June 15, 2001) (Matoesian, J.) | $100 | 22% |
| 53 | *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160 (3d Cir. 2006) | $100 | 21.25% |
| 54 | Stop N Shop Supermarket Company, et. al. v. SmithKline Beecham Corp., Civil Action No. 03-CV-4578 (E.D. Pa. 2005) | $100 | 20% |

[1] The Court awarded a graduated amount ranging from 17–29% of the recovery. After an appeal reversed a portion of the award, this table reflects the actual settlement and fee realized.

[2] The Court awarded an increasing graduated amount (25% of the first $150 million and 29% for any amount above). This table reflects the values realized.

[3] The global settlement was in excess of $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

[4] The Court awarded 25% in five settlements and a 15% fee award in two others (reasoning that the litigation was not as arduous in one and not as successful in the other). Class counsel agreed not to seek attorneys' fees from a final fund. This table lists $190 million, the total recovery from all settlements.

[5] While technically not a class action, this case is equivalent to a class-action in which the fee was negotiated *ex ante*.

[6] The settlement fund was paid in shares of stock. Attorneys were given a percentage of this stock as their fee.

[7] The attorneys' fees was not part of the final judgment. There is a notice requesting 20% fees and a final judgment approving settlement.

[8] This amount reflects the cash relief. Non-cash relief was valued at $30 million.

[9] The fund amount excludes $10 million in a "Promotional Achievement Fund" and $43.5 million in "future pay equity adjustments."

In *AT&T Mobility,* 792 F.Supp.2d at 1033, the Court reviewed two recent academic studies of fee awards in class actions, one by Professors Theodore Eisenberg and Geoffrey Miller and a second by Professor Brian Fitzpatrick. Although the studies are excellent, the manner in which they present their findings reflects and implicitly legitimates the mega-fund rule. They do this by breaking out fee percentages by the amount of the recovery and showing that, as recoveries increase, fee percentages decline. Because both the private market and Seventh Circuit cases reject the mega-fund rule, the documented tendency of many judges to apply that rule has no bearing on what the fee should be in this case.

Breaking out fee percentages by recovery level can also mislead readers for another reason. Seventh Circuit case law requires judges to set fees at rates like those real clients and lawyers agree to *ex ante*, that is, when lawsuits begin. However, *at the start of litigation, the actual recovery is both unknown and unknowable.* The outcome, which may take years to achieve, can only be guessed. Consequently, the temptation to regard any case as a mega-fund case must be resisted. Except in rare cases where plaintiffs and their lawyers have strong reasons at the start of litigation to expect to recover hundreds of millions or billions of dollars, they would expect a modest settlement and would set fees accordingly.

When litigation commenced in this case in 2007, the parties would reasonably have predicted a recovery in the $6 million-$15.6 million range, for reasons previously explained: important evidence of accounting fraud was hidden; Motorola did not restate its earnings; no governmental investigation was pending; and no other class action law firm wanted the case. Under Seventh Circuit case law, which requires judges to take account of *ex ante* risks when setting fees, the right question is: What fee arrangements do real clients and lawyers use in cases of this size? The best evidence, discussed above, shows that they use high percentages.

47

In cases with typical recoveries, judges recognize this, routinely awarding fees above 25%. A recent NERA report provides a picture of the distribution of fee and cost awards in securities class action by size of recovery. For convenience, the figure is reproduced below. In cases with typical recoveries below $100 million, median fees range from 33.3% to 27%. Even in cases with settlements between $100 and $500 million, the median fee award was 22.2%. *NERA Mid-Year 2011*" at 27. Although NERA did not provide a median fee award for all cases combined, given the distribution of recoveries, which tilts strongly toward the small end of the scale, it surely exceeds 27.5%.



Source: Jordan Milev, Robert Patton, Svetlana Starykh, and Dr. John Montgomery, *Recent Trends in Securities Class Action Litigation: 2011 Year-End Review* at 12 (NERA Dec. 2011).

Median fees are reported in the studies the Court reviewed in *AT&T Mobility*. Professor Fitzpatrick finds mean and median fee awards of 24.7% and 25.0%, respectively, in securities

class actions resolved in 2006 and 2007. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 811, 839 (2010). For securities class action settlements in the Seventh Circuit, he reports mean and median fees of 27.4% and 29.0%, respectively. Professors Eisenberg and Miller report mean and median fee percentages of 23% and 25%, respectively, for all securities cases in their dataset. *E&M Study*, p. 262, Table 5.

## CONCLUSION

In academic writings, lectures, expert reports, and testimonial appearances, I have encouraged judges and policymakers to set fees in class actions at market rates. I have also mined the literature on attorneys' fees for evidence showing what market rates tend to be. The evidence I have seen leads me to conclude that class members would agree to pay their lawyers 25% or more of their recoveries, if they could hire them directly. I conclude, for all the reasons discussed above, that Class Counsel's request for 27.5% of the $200 million recovery is reasonable.

## COMPENSATION

I received a flat fee of $35,000 for preparing this Report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

March 15, 2012
_____
Date

_____
Charles Silver

# CHARLES SILVER

Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure
Co-Director, Center on Lawyers, Civil Justice and the Media
School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

Charles Silver holds the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the School of Law at the University of Texas at Austin. He has published widely in law reviews and peer-reviewed journals. His articles use economic theory, philosophical and doctrinal reasoning, and empirical methodologies to shed light on issues arising in the areas of civil procedure, liability insurance, and the professional regulation of attorneys. He has written about group lawsuits (including class actions and other mass proceedings), attorneys' fees (including contractual compensation arrangements, common fund fee awards, and statutory fee awards), and professional responsibility (focusing on lawyers involved in civil litigation on behalf of plaintiffs and defendants). In recent years, as Co-Director of the Center on Lawyers, Civil Justice and the Media at the University of Texas, he has worked with a group of empirical researchers on a series of studies of medical malpractice litigation in Texas. The research group's findings are to appear in a book with the working title "To Sue is Human" on Yale University Press.

Professor Silver served as Associate Reporter on the Principles of the Law of Aggregate Litigation, published by the American Law Institute in 2010.

Professor Silver has given many presentations at academic conferences, including programs sponsored by the American Law and Economics Association, the Conference on Empirical Legal Studies, the Law & Society Association, RAND, and the Searle Center on Law, Regulation and Economic Growth. He has also spoken at faculty colloquia at law schools across the U.S.

Professor Silver often consults with attorneys and serves as an expert witness. He has strong ties with all segments of the litigating bar. On the plaintiffs' side, he submitted an expert report on attorneys' fees in the massive Enron settlement and served as professional responsibility advisor to the private attorneys who handled the State of Texas' lawsuit against the tobacco industry. On the defense side, he advises on the responsibilities of lawyers retained by insurance carriers to defend liability suits against policyholders. Professor Silver has also testified to legislative committees and submitted amicus curiae briefs to courts on topics ranging from class certification to lawyers' fiduciary duties to medical malpractice litigation.

In 2009, the Tort Trial & Insurance Practice Section (TIPS) of the ABA awarded Professor Silver the Robert B. McKay Law Professor Award for outstanding scholarship on tort and insurance law.

## ACADEMIC EMPLOYMENTS

UNIVERSITY OF TEXAS SCHOOL OF LAW

| | |
|---|---|
| Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure | 2004-present |
| Co-Director, Center on Lawyers, Civil Justice, and the Media | 2001-present |
| Robert W. Calvert Faculty Fellow | 2000-2004 |
| Cecil D. Redford Professor | 1994-2004 |
| W. James Kronzer Chair in Trial & Appellate Advocacy | Summer 1994 |
| Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow | 1991-1992 |
| Assistant Professor | 1987-1991 |

HARVARD LAW SCHOOL

| | |
|---|---|
| Visiting Professor | Fall 2011 |

VANDERBILT UNIVERSITY LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 2003 |

UNIVERSITY OF MICHIGAN LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 1994 |

UNIVERSITY OF CHICAGO

| | |
|---|---|
| Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy | 1983-1984 |

## EDUCATION

JD 1987, Yale Law School
MA 1981, University of Chicago (Political Science)
BA 1979, University of Florida (Political Science)

## SPECIAL PROJECTS

Associate Reporter, Principles of the Law of Aggregate Litigation, American Law Institute (2010) (with Samuel Issacharoff (Reporter), Robert Klonoff and Richard Nagareda (Associate Reporters)).

Co-Reporter, Practical Guide for Insurance Defense Lawyers, International Association of Defense Counsel (2002) (with Ellen S. Pryor and Kent D. Syverud) (published on the IADC website in 2003 and revised and distributed to all IADC members as a supplement to the Defense Counsel J. in January 2004).

## BOOKS UNDER CONTRACT

*To Sue is Human: Medical Malpractice Litigation in Texas 1988-2005* (coauthored with Bernard Black, David Hyman, William Sage and Kathryn Zeiler), Yale University Press (in progress).

*Professional Responsibilities of Insurance Defense Counsel* (coauthored with William T. Barker), Lexis Nexis Matthew Bender (in progress)

*Law of Class Actions and Other Aggregate Litigation* (1st Edition sole authored by Richard Nagareda; 2nd Edition coauthored with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley), Foundation Press (in progress)

*Health Law and Economics* (coedited with Ronen Avraham and David Hyman), Edward Elgar (in progress)

## PUBLICATIONS AND RECENTLY PRESENTED WORKS IN PROGRESS

1.  "Philosophers and Fiduciaries" (in progress) (presented at several law schools).

2.  "Does Tort Reform Affect Physician Supply? Evidence from Texas," (with David A. Hyman and Bernard Black) (in progress) (presented at Petrie Flom Center, Harvard Law School).

3.  "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt," (coauthored with David A. Hyman), 46 New England Law Review 101 (forthcoming 2012) (invited symposium).

4.  "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?", Chicago-Kent L. Rev. (forthcoming 2012) (coauthored with David A. Hyman) (invited paper prepared for Conference on Medical Malpractice and Compensation in Global Perspective, Institute for European Tort Law, Vienna, Austria, Dec. 2, 2010).

5.  "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press (forthcoming 2012) (with David A. Hyman).

6.  "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (in preparation) (with Bernard Black, David A. Hyman, Myungho Paik, and William Sage), available at http://ssrn.com/abstract=1635882.

7.  "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas, 1988-2007" (with Bernard Black, David A. Hyman, Myungho Paik, and William Sage), available at http://ssrn.com/abstract=1605331.

8.  "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. (2011) (invited symposium on legal ethics).

9. "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium on legal ethics).

10. "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard Black and David A. Hyman) (peer reviewed).

11. "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

12. "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard Black and David A. Hyman) (peer reviewed).

13. "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited ABA symposium on access to justice).

14. "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

15. "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black) (peer-reviewed).

16. "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue) (peer-reviewed).

17. "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 The Advocate 25 (2008) (with David A. Hyman and Bernard Black) (invited symposium).

18. "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 Amer. Law & Econ. Rev. 185 (2008) (with Bernard Black, David A. Hyman, and William M. Sage) (peer-reviewed).

19. "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 DePaul L. Rev. 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

20. "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 33 Geneva Papers on Risk and Insurance: Issues and Practice 177-192 (2008) (with David A. Hyman, Bernard S. Black, William M. Sage and Kathryn Zeiler) (peer-reviewed).

21. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 J. Legal Stud. S9 (2007) (with Bernard Black, David A. Hyman, William Sage, and Kathryn Zeiler) (peer-reviewed).

22.   "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," J. Empirical Legal Stud. 3-68 (2007) (with Bernard Black, David A. Hyman, William M. Sage, and Kathryn Zeiler) (peer-reviewed).

23.   "The Allocation Problem in Multiple-Claimant Representations," 14 S. Ct. Econ. Rev. 95 (2006) (with Paul Edelman and Richard Nagareda) (peer-reviewed).

24.   "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, "Report on Contingent Fees in Class Action Litigation," 25 Rev. of Litig. 459 (2006)).

25.   "In Texas, Life is Cheap," 59 Vanderbilt L. Rev. 1875 (2006) (with Frank Cross) (invited symposium).

26.   "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 Vanderbilt L. Rev. 1085 (2006) (with David A. Hyman) (invited symposium).

27.   "A Rejoinder to Lester Brickman: On the Theory Class's Theories of Asbestos Litigation," 32 Pepperdine L. Rev. 765 (2005).

28.   "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII Widener L. J. 121 (2005) (with David A. Hyman) (invited symposium).

29.   "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard Black, David A. Hyman, and William S. Sage) (peer-reviewed).

30.   "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

31.   "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?," 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

32.   "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

33.   "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

34.   "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

35.   "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

36.    "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

37.    "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

38.    "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

39.    "A Critique of *Burrow v. Arce*," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

40.    "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

41.    "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).

42.    "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

43.    "What's Not To Like About Being A Lawyer?," 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

44.    "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

45.    "The Aggregate Settlement Rule and Ideals of Client Service," 41 S. Tex. L. Rev. 227 (1999) (with Lynn A. Baker) (invited symposium).

46.    "Representative Lawsuits & Class Actions," in Int'l Ency. Of L. & Econ., B. Bouckaert & G. De Geest, eds., (1999) (peer-reviewed).

47.    "Preliminary Thoughts on the Economics of Witness Preparation," 30 Tex. Tech L. Rev. 1383 (1999) (invited symposium).

48.    "The Lost World: Of Politics and Getting the Law Right," 26 Hofstra L. Rev. 773 (1998) (invited symposium).

49.    "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 Conn. Ins. L. J. 205 (1998) (invited symposium).

50.    "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 Va. L. Rev. 1465 (1998) (with Lynn A. Baker).

51.    "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 G'town J. Legal Ethics 959 (1998) (with David A. Hyman) (invited symposium).

52.  "Mass Lawsuits and the Aggregate Settlement Rule," 32 Wake Forest L. Rev. 733 (1997) (with Lynn A. Baker) (invited symposium).

53.  "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 Fordham L. Rev. 233 (1996) (invited symposium).

54.  "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6-3 Coverage 47 (May/June 1996) (with Michael Sean Quinn).

55.  "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6-2 Coverage 21 (Jan./Feb. 1996) (with Michael Sean Quinn).

56.  "Bargaining Impediments and Settlement Behavior," in Dispute Resolution: Bridging the Settlement Gap, D.A. Anderson, ed. (1996) (with Samuel Issacharoff and Kent D. Syverud).

57.  "The Legal Establishment Meets the Republican Revolution," 37 S. Tex. L. Rev. 1247 (1996) (invited symposium).

58.  "Do We Know Enough About Legal Norms?" in Social Rules: Origin; Character; Logic; Change, D. Braybrooke, ed. (1996).

59.  "The Professional Responsibilities of Insurance Defense Lawyers," 45 Duke L. J. 255 (1995) (with Kent D. Syverud), reprinted in Ins. L. Anthol. (1996) and 64 Def. L. J. 1 (Spring 1997).

60.  "Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers," 5-6 Coverage 1 (Nov./Dec.1995) (with Michael Sean Quinn).

61.  "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 Tex. L. Rev. 1203 (1994) (with Ellen Smith Pryor).

62.  "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 Tex. L. Rev. 1583 (1994), reprinted in Practising Law Institute, Insurance Law: What Every Lawyer and Businessperson Needs To Know, Litigation and Administrative Practice Course Handbook Series, PLI Order No. H0-000S (1998).

63.  "Thoughts on Procedural Issues in Insurance Litigation," VII Ins. L. Anthol. (1994).

64.  "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 Clearinghouse Rev. 114 (June 1994) (with Stephen Yelenosky).

65.  "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 Tex. Rev. of Litig. 301 (1993).

66. "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 Va. L. Rev. 1585 (1991), reprinted in VI Ins. L. Anthol. 857-870 (1992).

67. "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 Tex. L. Rev. 865 (1992).

68. "Comparing Class Actions and Consolidations," 10 Tex. Rev. of Litig. 496 (1991).

69. "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 Cornell L. Rev. 656 (1991).

70. "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 L. & Phil. 381 (1987) (peer-reviewed).

71. "Justice In Settlements," 4 Soc. Phil. & Pol. 102 (1986) (with Jules L. Coleman) (peer-reviewed).

72. "Negative Positivism and the Hard Facts of Life," 68 The Monist 347 (1985) (peer-reviewed).

73. "Utilitarian Participation," 23 Soc. Sci. Info. 701 (1984) (peer-reviewed).

74. "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 Pop. Res. & Pol. Rev. 255 (1984) (with Robert Y. Shapiro) (peer-reviewed).

## NOTABLE SERVICE ACTIVITIES

Associate Reporter, American Law Institute Project on the Principles of Aggregate Litigation

Interested Party, Statistical Information Task Force, National Association of Insurance Commissioners, Model Medical Malpractice Closed Claim Reporting Law

Invited Academic Member, American Bar Association/Tort & Insurance Practice Section Task Force on the Contingent Fee

Chair, Dean Search Committee, School of Law, University of Texas at Austin

Chair, Budget Committee, School of Law, University of Texas at Austin

Coordinator, General Faculty Colloquium Series, School of Law, University of Texas at Austin

Sole Drafter, Assessment Report for the Juris Doctor Program at the School of Law, University of Texas at Austin, for the Commission on Colleges of the Southern Association of Colleges and Schools

**RECENT AWARDS**

Robert B. McKay Law Professor Award, Tort Trial & Insurance Practice Section, American Bar Association (2009)

Faculty Research Grants, University of Texas at Austin (various years)

**MEMBERSHIPS**

American Bar Foundation

Texas Bar Foundation (Life Fellow)

State Bar of Texas (admitted 1988)

Tort Trial and Insurance Practice Section, American Bar Association

Society for Empirical Legal Studies

American Law and Economics Association

American Association for Justice

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 19, 2012.

s/ Tor Gronborg
TOR GRONBORG

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail:TorG@rgrdlaw.com

# Mailing Information for a Case 1:07-cv-04507

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John Joseph Barber**
  jbarber@tdrlawfirm.com,edocket@tdrlawfirm.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David K. Cole**
  courtnotification@mayerbrown.com

- **Michael J. Dowd**
  miked@rgrdlaw.com,debg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J. Timothy Eaton**
  teaton@shefskylaw.com,sfdocket@shefskylaw.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **James R. Figliulo**
  jfigliulo@fslegal.com

- **Jennifer L. Gmitro**
  JGmitro@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Deborah R. Gross**
  debbie@bernardmgross.com

- **David Hall**
  dhall@rgrdlaw.com

- **Mark H Horwitch**
  mhorwitch@tdrlawfirm.com,edocket@tdrlawfirm.com

- **Stephanie D. Jones**
  sjones@fslegal.com

- **Robert J. Kopecky**
  rkopecky@kirkland.com

- **M. Sean Laane**
  sean.laane@aporter.com

- **Scott R. Lassar**
  slassar@sidley.com,efilingnotice@sidley.com

- **Daniel E. Laytin**
  dlaytin@kirkland.com

- **Kim Ann Leffert**
  courtnotification@mayerbrown.com

- **Erin K. Lynch**
  elynch@shefskylaw.com,sfdocket@shefskylaw.com

- **Richard A. Maniskas**
  sradcliffe@glancylaw.com

- **John C Massaro**
  john_massaro@aporter.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,ajewell@millerlawllc.com,LFanning@millerlawllc.com,JRamirez@millerlawllc.com

- **Matthew P Montgomery**
  mattm@csgrr.com

- **Ivy T Ngo**
  ingo@rgrdlaw.com

- **Keith F. Park**
  keithp@rgrdlaw.com

- **David A Rosenfeld**
  drosenfeld@csgrr.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Joseph Russello**
  jrussello@csgrr.com

- **Stephen M Sacks**
  stephen_sacks@aporter.com

- **Jeffrey Charles Sharer**
  jsharer@sidley.com,efilingnotice@sidley.com

- **Michael P. Sheehan**
  msheehan@shefskylaw.com,sfdocket@shefskylaw.com

- **Anne J. Sidrys**
  anne.sidrys@kirkland.com,kimberly.love@kirkland.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Susan G Taylor**
  SusanT@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James W. Thomas , Jr**
  james.thomas@aporter.com,elissa.spencer@aporter.com,matthew.roessing@aporter.com

- **Matthew E Van Tine**
  mvantine@millerlawllc.com,mvt@vantine.us

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Joseph          I. Goldstein**
Murphy & McGonigle
555 13th Street, N.W.
#410 W
Washington, DC 20004

**Jerry          A Isenberg**
Murphy & McGonigle
555 13th Street, N.W.
#410 W
Washington, DC 20004

**D          Seamus Kaskela**
Schiffrin Barroway Topaz & Kessler LLP
280 King of Prussia Road
Radnor, PA 19087

**Michael          Kelley**
Sidley and Austin
555 West Fifth Street
40th Floor
Los Angeles, CA 90013