EXHIBIT 1



In Re: American International Group, Inc Securities Litigation; ALAN ROTH-STEIN, MOLLYE ROTHSTEIN, Objectors - Appellants, MARISA ROTHSTEIN, SHARYN ROTHSTEIN, Objectors, -v.- OHIO PUBLIC EMPLOYEES RETIRE-MENT SYSTEM, STATE TEACHERS RETIREMENT SYSTEM OF OHIO, OHIO POLICE AND FIRE PENSION FUND, Plaintiffs - Appellees, and, PUBLIC EM-PLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO, MICHAEL FEDER, on behalf of himself and all others similarly situated, PUBLIC EMPLOY-EES' RETIREMENT SYSTEM OF MISSISSIPPI, JEROME NOLL, Individually and on behalf of all others similarly situated, STEPHAN FRANK, on behalf of him-self and all others similarly situated, JOSEPH SCUILLA, EUGENE OLSON, ROBERT J. CASEY, II, on behalf of himself and all others similarly situated, LISA M. CROUCH, on behalf of herself and all others similarly situated, MICHAEL CASSIDY, on behalf of herself and all others similarly situated, ANNE E. FLYNN, ROBERT D. JAFFEE IRA ROLLOVER, ROBERT D. & PHYLLIS A. JAFFEE FAMILY FOUNDATION, ROBERT D. JAFFE, as Trustee of the Robert D. Jaffee Revocable Trust, SAN FRANCISCO EMPLOYEES' RETIREMENT SYSTEM, Plaintiffs, -v.- PRICEWATERHOUSECOOPERS LLP, Defendant - Appellee, and, MAURICE GREENBERG, HOWARD SMITH, THOMAS TIZZIO, MARTIN J. SULLIVAN, CHRISTIAN MILTON, FRANK J. HOENEMEYER, AXEL I. FREUDMANN, RICHARD A. GROSIAK, DONALD P. KANAK, PATRICIA R. MCCANN, STARR INTERNATIONAL COMPANY, INC., CORINNE P. GREEN-BERG, MAURICE R. HANK GREENBERG, C.V. STARR & CO., INC., MI-CHAEL J. CASTELLI, CITIGROUP GLOBAL MARKET, FKA SALOMON SMITH BARNEY, GOLDMAN SACHS & CO., JP MORGAN CHASE & CO., MERRILL LYNCH AND COMPANY, MORGAN STANLEY, MICHAEL L. MURPHY, RICHMOND INSURANCE COMPANY, LIMITED, UNION EXCESS REINSURANCE COMPANY, INCORPORATED, EVAN GREENBERG, ELI BROAD, AXA FINANCIAL, INC., WACHOVIA SECURITIES, INC., JOHN A. GRAF, AMERICAN INTERNATIONAL GROUP, INC., GENERAL REINSUR-ANCE CORPORATION, RONALD FERGUSON, JOHN HOULDSWORTH, RICHARD NAPIER, Defendants, and, COMPLETE CLAIMS SOLUTIONS, LLC, Claims Administrator - Appellee.

10-5038

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

452 Fed. Appx. 75; 2012 U.S. App. LEXIS 3304

February 15, 2012, Decided

**NOTICE:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERN-ING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]

Appeal from the United States District Court for the Southern District of New York (Batts, J.).

**COUNSEL:** FOR APPELLANT: N. ALBERT BACHARACH, JR., Gainesville, FL.

FOR APPELLEE: THOMAS G. RAFFERTY, (Antony L. Ryan, on the brief), Cravath, Swaine & Moore LLP, New York, NY, for Defendant-Appellee Pricewater-houseCoopers LLP.

THOMAS A. DUBBS, (Louis Gottlieb, Barry Michael Okun, on the brief), Labaton Sucharow LLP, New York, NY, for Appellees-Plaintiffs Ohio State Funds; Co-Lead Counsel to the Class.

ALAN S. KOPIT, Hahn Loeser & Parks LLP, Cleveland, OH, Special Counsel to the Attorney General of Ohio and the Appellees-Plaintiffs Ohio State Funds; Co-Lead Counsel to the Class.

JUDGES: PRESENT: RICHARD C. WESLEY, SUSAN L. CARNEY, Circuit Judges. ROSLYNN R. MAUSKOPF, District Judge. *

   * Judge Roslynn R. Mauskopf, of the United States District Court for the Eastern District of New York, sitting by designation.

## OPINION

### [*77] SUMMARY ORDER

   UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the United States District Court for the Southern District of New York be AFFIRMED.

   Objector-Appellants, the Rothsteins, appeal from a judgment of the United States District Court for the Southern District of [**2] New York (Batts, J.), overruling their objection and approving a settlement between Plaintiffs-Appellees and Defendants-Appellees. We assume the parties' familiarity with the underlying facts and procedural history.

   The Rothsteins appeal the district court's denial of their objection to the settlement on the basis of a purportedly defective Notice of Settlement. They argue that the Notice of Settlement failed to satisfy the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") because it did not include a statement from each party regarding the amount of damages per share each believed would be recoverable if plaintiffs were to prevail on each claim. The plain language of 15 U.S.C. § 78u-4(a)(7)(B)(ii), on which the Rothsteins rely, however, does not require that the parties provide their respective views about recoverable damages in the event they disagree about the amount recoverable. Rather, the plain language of the PSLRA clearly requires an amount recoverable be provided *only* in the case that the parties agree on that amount. 15 U.S.C. § 78u-4(a)(7)(B)(i). Here, the parties disagreed about damages recoverable, making 15 U.S.C. § 78u-4(a)(7)(B)(ii) rather [**3] than (B)(i) applicable. 15 U.S.C. § 78u-4(a)(7)(B)(ii) only requires parties who disagree regarding the amount of damages per share to provide "a statement from each settling party concerning the issue or issues on which the parties disagree." The Notice of Settlement complied with the PSLRA in this regard. 15 U.S.C. § 78u-4(a)(7)(B)(ii) required no more.

   The Rothsteins' interpretation of the statute contradicts the statute's plain language and finds no support in the precedent of this or any other circuit. We decline to read into the PSLRA a requirement that Congress did not include. *See Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983). The district court properly overruled the Rothsteins' objection.

   For the foregoing reasons, the judgment of the district court is hereby AFFIRMED.

EXHIBIT 2

Westlaw

Not Reported in F.Supp.2d, 2010 WL 2955178 (D.Del.)
**(Cite as: 2010 WL 2955178 (D.Del.))**

**c**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
D. Delaware.
In re INTEL CORP. DERIVATIVE LITIGATION.

Civil Act. No. 09–867–JJF.
July 22, 2010.

Robert D. Goldberg, Esq. of Biggs & Battaglia, Wilmington, DE, for Plaintiff Charles Gilman and Louisiana Municipal Police Employees' Retirement System.

Laurence D. Paskowitz, Esq. of Paskowitz & Associates, New York, NY, Jeffrey C. Block, Esq.; Bryan A. Wood, Esq. and Scott A. Mays, Esq. of Berman Devalerio, Boston, MA, for Plaintiff Charles Gilman and Louisiana Municipal Police Employees' Retirement System.

Joseph H. Weiss, Esq. and David C. Katz, Esq. of Weiss & Lurie, New York, NY, Jules, Brody, Esq. of Stull, Stull & Brody, New York, NY, Seth D. Rigrodsky, Esq. and Brian D. Long, Esq. of Rigrodsky & Long, P.A., Wilmington, DE, for Related Plaintiffs.

Jonathan C. Dickey, Esq. and Marshall R. King, Esq. of Gibson, Dunn & Crutcher LLP, New York, NY, Donald J. Wolfe, Jr. Esq. and Stephen C. Norman, Esq. of Potter Anderson & Corroon LLP, Wilmington, DE, for Nominal Defendant Intel Corporation and Defendants Otellini, Barrett, Pottruck, Shaw, Yoffie, Barshefsky, Plummer, Decker, Bartz, Donahoe and Yeary.

Kim David Staskus, Esq. of Law Office of Kim David Staskus, P.C., San Jose, CA, Collins J. Seitz, Jr., Esq. and Bradley R. Aronstam, Esq. of Connolly, Bove, Lodge & Hutz LLP, Wilmington, DE,

for Defendant D. James Guzy, Sr.

Brian J. Robbins, Esq.; Marc M. Umeda, Esq. and Kevin A. Seely, Esq. of Robbins Umeda LLP, San Diego, CA, for Objector Christine Del Gazio.

*MEMORANDUM OPINION*
FARNAN, District Judge.

**\*1** Pending before the Court is the motion for approval of the Settlement of this derivative action and a request for attorneys' fees and costs by Lead Plaintiffs. In addition, a separate Motion For Final Approval Of Derivative Settlement And An Award Of Attorneys' Fees And Expenses (D.I.72) has been filed by Martin Smilow and the Rosenfeld Family Foundation (the "Related Plaintiffs"), as shareholders of Intel Corporation and parties to the stipulation settling this derivative litigation. For the reasons discussed, the Court will approve the Settlement, award the attorneys' fees requested by counsel and agreed to by Intel Corporation, and grant the Motion filed by the Related Plaintiffs.

Pursuant to Federal Rule of Civil Procedure 23.1, the Court's approval is required to settle a derivative action. To grant its approval, the Court must find that the settlement is "fair, adequate, reasonable and proper, and in the best interests of the class and the shareholders." *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1310, 1317 (3d Cir.1993). In making this determination, the "principle factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978) (citations omitted). In addition, the Court must also consider the following additional factors:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the shareholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2010 WL 2955178 (D.Del.)
**(Cite as: 2010 WL 2955178 (D.Del.))**

establishing damages; (6) the risks of maintaining the derivative action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement agreement in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsch v. Jepson,* 521 F.2d 153, 157 (3d Cir.1975) (quotation omitted); *see also Shlensky,* 574 F.2d at 147 (applying the *Girsh* factors in the context of a shareholder derivative action). Within the context of these factors, the decision to grant or deny approval of a settlement rests within the discretion of the Court. *Shlensky,* 574 F.2d at 147.

After reviewing the proposed Settlement in light of the *Girsh* factors and the applicable case law, the Court finds that the Settlement is fair, adequate and reasonable and in the bests interests of the Company and its shareholders. The Court finds that the *Girsh* factors weigh in favor of the settlement, and in particular, is persuaded that the benefits of the corporate reforms agreed to be undertaken by Intel in connection with the Settlement far outweigh the expenses and risks of maintaining this complex action, including the significant burden of establishing liability required of Lead Plaintiffs in light of the discovery produced to date, as well as the likelihood, that continued litigation of this action would certainly be protracted.

**\*2** In addition, the Court finds, with respect to shareholder reaction, that it is very significant that only a few shareholders have objected to the settlement out of approximately 1.6 million shareholders. [FN1] (D.I.94, 58, 63.) The objections raised essentially fall into two categories, those related to lack of adequate notice of the Settlement, and one challenging the substance of the Settlement on the basis that it does not include a pecuniary gain to Intel.

> FN1. Objectors who challenge the Settlement include Christine Del Gazio, William Kelly Puls, Giles A. Birch and Lisa G.

Mirabile.

With respect to lack of notice, courts have recognized that untimely notice is an attendant risk of owning stock in "street name," and that the ultimate question with respect to notice is " 'not whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement.' " *Fidel v. Farley,* 534 F.3d 508, 514 (6th Cir.2008) (quoting *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir.1993) and collecting cases). In this case, the Court concludes that notice was adequately provided to interested parties, on the whole, and therefore, the lack of timely notice to the few shareholders who have objected is insufficient to withhold the Court's approval of the Settlement.

With respect to the substance of the Settlement, the shareholder objecting challenges the lack of monetary gain to Intel. The proponent of this objection is Dr. Christine Del Gaizo ("Dr. Del Gaizo"), who raises the possibility of recovery to the Company under its officers and directors' insurance policies. However, as counsel for Dr. Del Gaizo recognized at the hearing, the case law does not require a pecuniary gain to Intel, and in the words of counsel for Dr. Del Gaizo, "The Company got a good deal." (Hearing Tr. 7/20/10.) Indeed, Dr. Del Gazio could not identify any additional corporate governance measure that should have been sought from Intel that was not in the Settlement. Further, the Court finds that the corporate governance reforms initiated by Intel as a result of the parties' negotiations and this Settlement have value to both the Company and its shareholders both currently and in the long-term, and that these benefits outweigh the speculative potential of any monetary payment from the relevant insurance policies. In this regard, the Court notes that payment under the insurance policies turns not only on the onerous burden of establishing an antitrust violation in the first instance, but also on the perhaps more difficult burden, of establishing bad faith on the part of In-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2955178 (D.Del.)
(Cite as: 2010 WL 2955178 (D.Del.))

tel's officers and directors. Accordingly, the Court will overrule all of the Objections lodged against the Settlement and approve the Settlement, in its entirety.

In addition, the Court has considered the applications for attorneys' fees and expenses and concludes that they are reasonable and reflective of a substantial benefit rendered to the Company by the efforts of counsel. *Shlensky,* 574 P.2d at 149. In particular, the Court finds that the attorney lodestar, the relevant multipliers and the hours expended by counsel are fair and reasonable, and therefore, the Court will award counsel for both the Lead Plaintiffs and the Represented Plaintiffs the attorneys' fees and costs. Accordingly, the Court will enter the Order proposed by the parties.

### ORDER AND FINAL JUDGMENT

**\*3** The Stipulation of Settlement, dated May 25, 2010 (the "Stipulation") of this derivative action (the "Delaware Action"), and the settlement contemplated thereby (the "Settlement") were presented to the Court at the Settlement Hearing on July 20, 2010, pursuant to the Scheduling Order entered herein on June 3, 2010 (the "Scheduling Order"), The Stipulation was agreed to by the parties to the Delaware Action, by and through their attorneys.

The Court, having determined that notice of the Settlement Hearing was given to Intel shareholders of record in accordance with the Scheduling Order and that said notice was adequate and sufficient; having heard the Parties' support for the Settlement as articulated by their attorneys; having allowed all other persons entitled to be heard an opportunity to be heard on this matter as provided in the notice; and having considered all matters related to this Settlement, hereby

ORDERS, ADJUDGES, and DECREES as follows:

1. Capitalized terms used in this Order and Final Judgment but not defined herein shall have the meanings set forth in the Stipulation.

2. The Notice of Pendency of Derivative Action, Proposed Settlement of Derivative Action, Settlement Hearing and Right to Appear (the "Notice") has been given to shareholders of Intel Corporation ("Intel" or the "Company") pursuant to and in the manner directed by the Scheduling Order, proof of the mailing of the Notice has been filed with the Court, and full opportunity to be heard has been offered to all parties to the Delaware Action, Intel shareholders, and persons in interest. The form and manner of the Notice is hereby determined to have been the best notice practicable under the circumstances and to have been given in full compliance with and satisfaction of the requirements of Rule 23.1 of the Federal Rules of Civil Procedure and due process.

3. The Settlement is fair, reasonable, adequate and in the best interests of Intel and Intel's shareholders, and it is hereby approved. The Parties are hereby authorized and directed to comply with and to consummate the Settlement in accordance with its terms and provisions, and the Clerk of the Court is directed to enter and docket this Order and Final Judgment in the Delaware Action.

4. The Delaware Action is hereby dismissed with prejudice on the merits as to all Defendants, without costs, except as provided below.

5. All of the Settled Claims by Releasing Persons against Released Persons are completely, fully, finally and forever compromised, settled, released, discharged, extinguished and dismissed with prejudice. For purposes of this Order and Final Judgment, "Released Persons," "Releasing Persons," and "Settled Claims" mean the following:

A. "Released Persons" means each and all of the Individual Defendants, each and all of the current and former officers, directors and employees of Intel, and each and all of their respective agents, representatives, insurers, heirs, executors, personal or legal representatives, estates,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2010 WL 2955178 (D.Del.)
(Cite as: 2010 WL 2955178 (D.Del.))

administrators, predecessors, successors and assigns, and Intel as Nominal Defendant.

*4 B. "Releasing Persons" means each and all of the Delaware Plaintiffs, the Related Plaintiffs, Intel and each and all of the past and present shareholders of Intel, and each and all of their respective officers, directors, employees, heirs, executors, personal or legal representatives, estates, administrators, predecessors, successors and assigns.

C. "Settled Claims" means all claims, demands, rights, actions or causes of action, liabilities, damages, losses, obligations, judgments, suits, fees, expenses, costs, matters and issues of any kind or nature whatsoever, whether known or unknown, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, matured or unmatured, that have been, could have been, or in the future can or might be asserted by any of the Releasing Persons derivatively on behalf of Intel (or by Intel directly) in the Delaware Action or in the Related Actions, or in any other court, tribunal or proceeding (including, but not limited to, any claims arising under federal, state or foreign statutory or common law relating to alleged fraud, misrepresentation, breach of any duty of care or loyalty, negligence, corporate waste or mismanagement, contribution, indemnification, recoupment, disgorgement, or for violations of any antitrust or competition laws or otherwise) whether legal, equitable or any other type, which have arisen, arise now or hereafter arise out of, or relate in any manner to, the allegations, facts, events, practices, conduct, transactions, matters, acts, occurrences, statements, representations, misrepresentations or omissions, or any fees, expenses or costs incurred in prosecuting, defending or settling the Delaware Action or the Related Actions, or any other matter, thing or cause whatsoever, or any series thereof, embraced, involved or set forth in, or referred to or otherwise related, directly or indirectly, in any way to, the Delaware Action or the Related Actions, or the subject mat-

ter of the Delaware Action or the Related Actions, and including, without limitation, any claims of a derivative nature brought on behalf of Intel (or by Intel directly) in any way related to (i) the Settlement, (ii) the fiduciary duties of the Individual Defendants or Released Persons relating to or in connection with the allegations made in the Delaware Complaint or the Related Actions, (iii) any compensation, bonus, or benefits received by any Released Persons relating to or in connection with the allegations made in the Delaware Complaint or the Related Actions; (iv) any disclosures or alleged misrepresentations or omissions that were made or allegedly not made by any of the Released Persons regarding the subject matter of the Delaware Action or the Related Actions, the Settlement or any other matters described or alleged in the Delaware Complaint or the Related Actions or this Settlement, or (v) the conduct alleged in the Antitrust Proceedings; *provided, however,* that the Settled Claims shall not include the right to enforce the terms of the Settlement. Nothing herein shall be construed to release any claim or cause of action asserted (a) by any governmental body in any pending litigation against Intel or (b) by any Intel shareholders in any pending class action against Intel.

*5 6. All claims that have been or could have been asserted by any Individual Defendant or any other Released Person against the Delaware Plaintiffs or the Related Plaintiffs or any of their counsel which arise out of or in any way relate to the institution, prosecution or settlement of the Delaware Action or the Related Actions are completely, fully, finally and forever compromised, settled, released, discharged, extinguished and dismissed with prejudice.

7. The releases contemplated by this Settlement extend to claims that the Releasing Persons do not know or suspect to exist at the time of the release, which if known by the Delaware Plaintiffs, plaintiffs in the Related Actions, or Intel might have affected their decisions to enter into this re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2955178 (D.Del.)
**(Cite as: 2010 WL 2955178 (D.Del.))**

lease, or might have affected any other Intel stockholder's decision not to object to this Settlement. The Releasing Persons will be deemed upon Final Approval by operation of the Order and Final Judgment to have waived and relinquished the provisions, rights and benefits of **§ 1542 of the California Civil Code**, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

In addition, the Releasing Persons will be deemed, upon Final Approval by operation of the Order and Final Judgment, to have waived and relinquished any and all provisions, rights and benefits of any law of any state or territory of the United States, federal law, foreign law or principle of common law, which is similar, comparable or equivalent to **§ 1542 of the California Civil Code**. The Releasing Persons may hereafter discover facts in addition to or different from those now known or believed to be true with respect to the Settled Claims, but the Releasing Persons shall, upon Final Approval by operation of the Order and Final Judgment, be deemed to have completely, fully, finally and forever compromised, settled, released, discharged and extinguished any and all Settled Claims known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery or existence of additional or different facts. The foregoing waiver was separately bargained for and is a key element of the Settlement.

8. The Delaware Plaintiffs, Intel, Intel's past and present shareholders, and anyone claiming through or for the benefit of any of them, are hereby permanently barred from asserting, commencing, prosecuting, assisting, instigating or in any way participating in the commencement, maintenance, or prosecution of any action or other proceeding, in any forum, asserting any Settled Claims.

9. Delaware Plaintiffs' Counsel and Related Plaintiffs' Counsel are hereby awarded attorneys' fees and expenses in the following amounts, which amounts the Court finds to be fair and reasonable and which shall be paid to Delaware Plaintiffs' Counsel and Related Plaintiffs' Counsel in accordance with the terms of the Stipulation:

**\*6** A. to Delaware Plaintiffs' Counsel and to counsel in the Paris Action, collectively, *$1.8 million* in attorneys' fees and expenses; and

B. to Rosenfeld's Counsel, *$850,000.00* in attorneys' fees and expenses.

10. This Order and Final Judgment shall not constitute evidence or admission by any party herein that any acts of wrongdoing have been committed by any of the parties to the Delaware Action and should not be deemed to create any inference that there is any liability therefore.

11. Without affecting the finality of this Order and Final Judgment in any way, the Court reserves jurisdiction over all matters relating to the administration and consummation of the Settlement in accordance with the Stipulation.

D.Del.,2010.
In re Intel Corp. Derivative Litigation
Not Reported in F.Supp.2d, 2010 WL 2955178 (D.Del.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 3

**Westlaw**

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re MARSH & McLENNAN COMPANIES, INC.
SECURITIES LITIGATION.

No. 04 Civ. 8144(CM).
Dec. 23, 2009.

West KeySummary **Compromise and Settlement**
89 ⟳65

89 Compromise and Settlement
   89II Judicial Approval
      89k56 Factors, Standards and Considerations; Discretion Generally
         89k65 k. Securities Law Actions. Most Cited Cases
     Proposed settlement of class action, wherein proposed class members alleged that they were injured by corporation's fraudulent scheme to artificially inflate corporate securities prices by making false and misleading statements about its contingent commission practices, was fair, reasonable, and adequate. The litigation involved complex issues of securities law and insurance industry practice, making it extremely complicated to bring to trial and with significant costs, so considering that class certification was still pending, the proposed settlement was procedurally fair. Moreover, the majority of the proposed class approved of the proposed settle- ment.

DECISION AND ORDER APPROVING THE SETTLEMENT, CERTIFYING THE CLASS FOR SETTLEMENT PURPOSES, APPROVING THE PLAN OF ALLOCATION OF THE SETTLE-MENT FUND, AWARDING ATTORNEYS' FEES, AND REJECTING THE OBJECTIONS
McMAHON, District Judge.
*INTRODUCTION*
**\*1** Lead Plaintiffs the Public Employees Re-

tirement System of Ohio, the State Teachers Retirement System of Ohio and the Ohio Bureau of Workers' Compensation (collectively, the "Ohio Plaintiffs"), and the State of New Jersey, Department of the Treasury, Division of Investment, on behalf of itself and the Common Pension Fund A, the DCP Equity Fund and the Supplemental Annuity Collective Trust Fund (collectively, the "New Jersey Plaintiffs" and, together with the Ohio Plaintiffs, "Lead Plaintiffs"), on behalf of themselves and the Class (as defined herein), move for final approval of a proposed settlement of $400 million (the "Settlement") with Defendants Marsh & McLennan Companies, Inc. ("MMC"), Marsh, Inc. ("Marsh"), Jeffrey Greenberg ("Greenberg") and Roger Egan ("Egan") (collectively, "Defendants"). The Court preliminarily approved the Settlement in its Preliminary Approval Order of November 10, 2009 (Docket No. 301.) Only a handful of Class members have offered any objection to the Settlement. Not one potential Class member has objected to the amount of the Settlement, or to any of the substantive terms of the Settlement. For the reasons stated below, the Court approves the Settlement, concluding that it is fair, reasonable and adequate.

With the approval of Lead Plaintiffs, the law firms of Grant & Eisenhofer, P.A. and Bernstein Liebhard LLP (together, "Lead Counsel"), move for (1) an award of attorneys' fees in the amount of 13.5% of the Settlement amount (the "Fee Application"); (2) reimbursement of $7,848,411.84 of expenses incurred by Lead Counsel in litigating this action; and (3) reimbursement of $214,657.14 of expenses incurred by Lead Plaintiffs ($70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs) in representing the Class (the "PSLRA Award Request").[FN1] For the reasons stated below, the Court grants all three requests.

    FN1. In their brief submitted in support of their request for fees and expenses, Lead Counsel first request an award of $320,000

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

Page 2

for Lead Plaintiffs. (Mem. in Supp. of Lead Counsel's App. for an Award of Attorneys' Fees, Reimbursement of Expenses for Lead Counsel, and an Award of Expenses to Lead Pls., Dec. 18, 2009 ("Fees Br."), at 1.) However, Lead Counsel then state: "Pursuant to the PSLRA, Ohio Plaintiffs and the New Jersey Plaintiffs request an award totaling $214,657.14 to compensate them for their reasonable costs and expenses incurred in managing this litigation and representing the Class," and "request[ ] that the Court award the Ohio Plaintiffs $70,000 and the New Jersey Plaintiffs $ 144,657.14." (*Id.* at 23–25.) Thus, the Court construes the PSLRA Award Request as a request for $214,657.14.

### BACKGROUND
### I. Lead Plaintiffs' Allegations and Claims
Lead Plaintiffs allege that Defendants engaged in a systematic plan to increase insurance placement revenues through improper bid manipulation and illicit client steering, all designed to generate a critical source of income known as "contingent commissions." Lead Plaintiffs further allege that Defendants violated federal securities laws by making materially false and misleading statements about their contingent commission practices, which caused the price of MMC stock to be artificially inflated during the Class Period (as defined herein), and to drop precipitously when the truth about the scheme was finally revealed, causing massive losses to investors.

Lead Plaintiffs brought claims against all Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Lead Plaintiffs also brought a claim against MMC under Section 11 of the Securities Act of 1933. Specifically, Lead Plaintiffs' Second Amended Consolidated Class Action Complaint (the "Amended Complaint") alleges, inter alia, that Defendants lied to the investing public by misrepresenting that: (1) contingent

commission payments played no role in Marsh's recommendations to its clients about which carrier to choose for insurance coverage; (2) contingent commissions were paid in exchange for "services" provided by Marsh to the insurance carriers; and (3) Marsh fully disclosed contingent commissions to its clients. Lead Plaintiffs further allege that when the scheme ultimately was revealed in late 2004, following a suit brought by the New York Attorney General ("NYAG"), and the truth about Defendants' misstatements began to come out, MMC's stock price collapsed and investors suffered billions of dollars in damages.

### II. Procedural Background
**\*2** This Settlement comes about after more than five years of hard-fought litigation. The litigation began on October 15, 2004, when the first of several class-action complaints was filed in the Southern District of New York against MMC, its subsidiary, Marsh, and others, including Greenberg, the former CEO of MMC, and Egan, the former President of Marsh. The complaints were assigned to the late Judge Kram for consolidated pretrial proceedings and the action was styled *In re Marsh & McLennan Companies, Inc. Securities Litigation,* No. 04 Civ. 8144. By Order dated January 26, 2005, Judge Kram appointed the Ohio Plaintiffs and the New Jersey Plaintiffs as Lead Plaintiffs, and Grant & Eisenhofer and Bernstein Liebhard as Lead Counsel.

Lead Plaintiffs filed their Consolidated Class Action Complaint on April 19, 2005. All Defendants moved to dismiss all claims asserted against them. On July 19, 2006, Judge Kram granted in part and denied in part the motions to dismiss. Judge Kram's decision substantially narrowed the claims and allegations asserted against Defendants and dismissed all of the state-law claims. *See In re Marsh & McLennan Cos., Inc. Sec. Litig.,* No. 04 Civ. 8144, 2006 WL 2057194 (S.D.N.Y. July 19, 2006). Lead Plaintiffs filed the Amended Complaint on October 13, 2006, asserting only the claims and allegations that Judge Kram had not dismissed. De-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

fendants answered the Amended Complaint on December 12, 2006.

With the discovery stay lifted, the parties proceeded to conduct extensive and vigorously contested fact discovery. Given the intensity of discovery, Judge Kram appointed a Special Master, L. Peter Parcher, to hear and rule on disputed discovery issues. Lead Plaintiffs brought twenty such motions to the Special Master and Defendants brought five, on which the Special Master issued twenty opinions. (Fees Br. at 6.)

Lead Plaintiffs and Defendants each retained an expert to address Lead Plaintiffs' motion for class certification, with each side filing detailed initial and rebuttal expert witness submissions. As discovery continued, Lead Plaintiffs retained six experts to address liability, damages and causation issues, and Defendants retained two experts. The parties exchanged lengthy, detailed initial reports from all of the experts, and rebuttal reports from four experts. By the time the parties had agreed in principle to settle, both Lead Plaintiffs and Defendants had already deposed one of the other side's expert witnesses. Both sides were preparing their other expert witnesses for depositions, which were set to continue the same week the parties reached their agreement to settle.

Lead Plaintiffs moved for certification of a class of purchasers of MMC securities from October 14, 1999 through October 13, 2004. Defendants opposed that motion. The class certification issues were hotly contested, and numerous briefs were filed on the certification question. At the time the parties agreed to settle, the Court had not yet ruled on Lead Plaintiffs' class certification motion. On November 10, 2009, at the request of Lead Plaintiffs and Defendants, the Court certified the Class for settlement purposes only in the Preliminary Approval Order.

*3 At all times, the parties sharply disputed the merits of the case, class certification and damages. Defendants denied, and still deny, each claim al-

leged against them. Defendants asserted, and still assert, that they made no material misrepresentations or omissions and that, even if they did, they did so without intent such that they are not liable under the federal securities laws. Further, Defendants maintain that, even if they were found liable, the amount of the damages suffered by the Class is negligible or nonexistent.

Through an experienced mediator, the Honorable Daniel Weinstein (the "Mediator")—a retired Judge of the Superior Court of California—Lead Counsel engaged in intensive, arm's-length negotiations with Defendants over a one-and-a-half year period, with the aim of settling the issues in dispute and achieving the best relief possible consistent with the interests of the Class. Formal mediation sessions were held on April 7, 2008, February 4, 2009 and October 14-15, 2009. The mediation sessions involved sophisticated demonstrative aides and written and oral presentations to Judge Weinstein, as well as separate sessions with an independent damages expert retained for the sole purpose of advising the Mediator. On November 10, 2009, a settlement was reached.

**III. Summary of the Settlement**

The Settlement is the result of several rounds of mediation between Lead Plaintiffs and Defendants, conducted before the Mediator. Judge Weinstein has submitted a declaration attesting to his belief that the Settlement is a fair and reasonable resolution of this matter, taking into account the complexities of the issues involved, the strengths and weaknesses of each side's position and the uncertainty of continued litigation. (*See* Decl. of Judge Weinstein, Dec. 18, 2009, ¶ 14.)

The Settlement provides for the payment of $400 million for the benefit of Lead Plaintiffs and the Class into a settlement fund (the "Settlement Fund"). Additionally, the Stipulation and Agreement of Settlement, dated November 10, 2009 (Docket No. 300) (the "Stipulation") allows Lead Counsel to request an attorneys' fee of up to 13.5% of the Settlement Fund and reimbursement of ex-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

penses of up to $13 million, as well as to request reimbursement for class representative expenses incurred by Lead Plaintiffs.

**IV. Notice of Settlement**

Pursuant to the Preliminary Approval Order, Lead Plaintiffs provided notice of the Settlement to Class members in several significant ways: (1) Lead Plaintiffs, through their claims agent, caused the Court-approved Notice of Proposed Settlement (the "Notice") to be mailed by first-class mail, postage prepaid, to all reasonably identifiable Class members and their nominees (Joint Decl. of Keith M. Fleischman & Stanley D. Bernstein, Dec. 18, 2009 ("Joint Decl."), ¶ 96; Aff. of Charlene Young, Dec. 18, 2009 ("Young Aff"), ¶ 11); (2) Lead Plaintiffs caused a copy of the Summary Notice of Proposed Settlement (the "Summary Notice") to be published in the national edition of *The Wall Street Journal* (Joint Decl. ¶ 97; Young Aff. ¶ 6); (3) Lead Plaintiffs caused a copy of the Notice to be transmitted over *Business Wire* (Joint Decl. ¶ 98; Young Aff. ¶ 6); and (4) Lead Plaintiffs established the website www.MMCSecuritiesLitigation.com, on which was published the Notice, the Proof of Claim and Release Form (the "Proof of Claim"), various Court documents and additional information regarding the Settlement (Joint Decl. ¶ 99; Young Aff. ¶ 7). The Notice described the terms of the Settlement; explained the claims and defenses in the lawsuit; provided instructions for Class members to exclude themselves from the Settlement or to object to any part of the Settlement; provided detailed information about the final Settlement fairness hearing on December 23, 2009 (the "Settlement Fairness Hearing"); and provided contact information for the claims agent and Lead Plaintiffs' counsel, among other things.

**V. Objections Received**

*4 Lead Plaintiffs have received only seven objections from potential Class members. (Joint Decl. ¶ 115.) In addition, twenty potential Class members have asked to be excluded from the Settlement. (*Id.* ¶ 113; Young Aff. ¶ 14.)

*DISCUSSION*

**I. The Settlement Is Fair, Reasonable and Adequate**

There is a "strong judicial policy in favor of settlements, particularly in the class action context." *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir.1998). "Settlement approval is within the Court's discretion, which should be exercised in light of the general judicial policy favoring settlement." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y.1999) (internal quotations omitted). In a class-action settlement, there is a presumption of fairness, reasonableness and adequacy when the settlement is the product of "arms-length negotiations between experienced, capable counsel after meaningful discovery." *Id.* at 280 (*citing Manual for Complex Litigation* (Third) § 30.42 (1995)).

**A. Standards for Approval of a Class–Action Settlement**

In evaluating a proposed settlement under Federal Rule of Civil Procedure 23, the Court must determine whether the settlement, taken as a whole, is fair, reasonable and adequate. *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir.1995); *see In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 WL 2591402, at *10 (S.D.N.Y. Nov. 12, 2004). It is well-established that courts in this Circuit examine the fairness, adequacy and reasonableness of a class-action settlement according to the "*Grinnell* factors":

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litiga-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

tion.

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974) (citations omitted). "In finding that a settlement is fair, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.' " *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 456 (S.D.N.Y.2004) (quoting *Thompson v. Metro. Life Ins. Co.,* 216 F.R.D. 55, 61 (S.D.N.Y.2003)). In deciding whether to approve a settlement, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another." *White v. First Am. Registry, Inc.,* No. 04 Civ. 1611, 2007 WL 703926, at *2 (S.D.N.Y. Mar. 7, 2007).

**B. Application of the *Grinnell* Factors Supports Approval of the Settlement**

**1. The Complexity, Expense and Likely Duration of the Litigation**

*5 "[I]n evaluating the settlement of a *securities* class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain." *In re Sumitomo,* 189 F.R.D. at 281 (emphasis in original) (internal quotations omitted). This is certainly true with respect to the claims in this case.

This litigation involved not only complex issues of securities law, but also specific issues involving the highly regulated insurance industry and its use and understanding of contingent commissions. These industry-specific issues were complex enough to require Lead Plaintiffs to hire two industry experts, at significant expense, to assist Lead Counsel during most of the five years of the litigation. (*See* Joint Decl. ¶ 74.)

This case would have been extremely complicated to bring to trial, with the prospects for Lead

Plaintiffs and the Class being highly uncertain. Even the most optimistic estimates did not have trial commencing until early 2011, with the Class not receiving any recovery until at least 2013. There would have been significant additional resources and costs expended to litigate the case through trial and through the inevitable appeals of any judgment that might have been entered against Marsh. The Settlement, by contrast, provides certain and substantial recompense to Class members now, and avoids their having to await the uncertain outcome of what would have been a lengthy trial and appeals process.

Thus, the complexity, expense and uncertainty of the litigation supports approval of the Settlement.

**2. The Reaction of the Class to the Settlement**

The Class's reaction to the Settlement also supports approval. Lead Counsel provided Notice by mail and by publication to all ascertainable Class members, and a website was established to handle inquiries. As the Court remarked at the preliminary approval hearing on November 10, 2009, the quality of the Notice provided by Lead Counsel is exceptionally high. Lead Counsel have received only seven purported objections and twenty requests for exclusion. This is an extremely strong indication of the fairness of the Settlement.[FN2]

> FN2. Counsel disagree over whether the requests for exclusion (which come from a group of entities represented by the same lawyer) were great enough to trigger Marsh's right to walk away from the Settlement. But in exchange for an opportunity to convince these opt-outs of the error of their ways, Marsh has decided not to exercise any right it might have to walk away, and has asked the Court to approve the Settlement. The Court has today signed an order giving these twenty opt-outs additional time to rethink their position.

**3. The Stage of the Proceedings and the Amount**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

**of Discovery Completed**

At the time of the Settlement, the parties had just completed merits discovery and were in the process of conducting expert depositions. (Joint Decl. ¶ 76.) The parties had already exchanged expert reports and rebuttal reports. (*Id.* ¶ 74.) By this time, Lead Plaintiffs had, inter alia, (1) inspected, reviewed and analyzed over thirty-four million pages of documents produced by Defendants; (2) subpoenaed 100 non-parties and inspected, reviewed and analyzed over two million pages produced by non-parties; (3) taken and defended over 100 depositions; and (4) researched the applicable law concerning Lead Plaintiffs' claims and potential defenses thereto, as well as numerous pretrial issues.

*6 The advanced stage of the litigation and extensive amount of discovery completed weigh heavily in favor of approval. The parties' counsel were clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and to evaluate the fairness of the proposed Settlement. *See In re Lloyd's Am. Trust Fund. Litig.,* No. 96 Civ. 1262, 2002 WL 31663577, at *15 (S.D.N.Y. Nov. 26, 2002); *see also In re Sumitomo,* 189 F.R.D. at 281–82 (finding that the stage of the proceedings "strongly" favored approval of settlement reached after "[p]laintiffs had conducted extensive discovery, investigation and analyses, and the proceedings were in the advanced stage of pointing or preparing for trial"). This is not a case where the parties engaged only in "settlement discovery." Thus, this *Grinnell* factor strongly supports approval.

**4. The Risks of Establishing Liability**

There is some risk that Lead Plaintiffs ultimately might have failed to establish Defendants' liability. Courts have acknowledged that "the legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,* No. 02 Civ. 5575, 2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) (citations omitted). For example, with respect to the Rule

10b–5 claims, Lead Plaintiffs may have had difficulty proving that Defendants acted with scienter, or that the alleged decline in MMC's stock price was due entirely to the conduct alleged in the Amended Complaint and not to other unrelated factors.

**5. The Risks of Establishing Damages**

If there is anything in the world that is uncertain when a case like this one is taken to trial, it is what the jury will come up with as a number for damages. On damages, this case would have ended up as a classic "battle of the experts." There is the undeniable risk that a "jury could be swayed by experts for the Defendants, who [c]ould minimize the amount of Plaintiffs' losses." *Maley v. Del Global Tech. Corp.,* 186 F.Supp.2d 358, 365 (S.D.N.Y.2002); *see Strougo v. Bassini,* 258 F.Supp.2d 254, 259 (S.D.N.Y.2003); *In re Lloyd's,* 2002 WL 31663577, at *21. The risk that Lead Plaintiffs would be unable to establish damages exceeding the $400 million that the Settlement provides to the Class supports approval of the Settlement. Even if Lead Plaintiffs were successful in establishing liability, they have avoided substantial risks in proving damages by virtue of this proposed Class Settlement.

**6. The Risk of Maintaining the Class Action Through Trial**

There is also the risk that the Court might have denied Lead Plaintiffs' motion for class certification, and thereby precluded any recovery for the Class whatsoever. At the time of the Settlement, the class certification motion was pending before the Court. Defendants had vigorously contested class certification, arguing, inter alia, that Lead Plaintiffs are not entitled to the "fraud-on-the-market" presumption. The briefing was voluminous, intense and complex. Had the Court rejected Lead Plaintiff's motion, no class action could have been maintained. Although Defendants have stipulated to certification of the Class for purposes of the Settlement, there would have been no such stipulation had Lead Plaintiffs brought this case to trial. Thus,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

the uncertainty surrounding class certification supports approval of the Settlement. *See In re AOL*, 2006 WL 903236, at *12 (finding that risk of plaintiffs' not succeeding in certifying class supported approval of settlement); *In re Global Crossing*, 225 F.R.D. at 460 (same).

**7. The Ability of Defendants to Withstand a Greater Judgment**

*7 It is undeniable that the current economic climate is not strong. Marsh's financial condition undoubtedly has been adversely affected by the economic turmoil of the past year. Moreover, the value of MMC stock has not recovered since the alleged wrongdoing giving rise to this litigation. In October 2004, during the five days following the announcement of the NYAG's lawsuit, the value of MMC stock dropped from $46.01 per share to $24.10. (Am.Compl.¶ 10.) MMC stock is currently trading even lower, at approximately $22 per share. There exists the legitimate concern that Defendants might not be able to pay an award higher than the Settlement, even if Lead Plaintiffs were to prevail at trial. Accordingly, this factor supports approval of the Settlement.

**8. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

The determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum ." *In re Michael Milken & Assocs. Sec. Litis.*, 150 F.R.D. 57, 66 (S.D.N.Y.1993); *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litis.*, 718 F.Supp. 1099, 1103 (S.D.N.Y.1989). Rather, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.1972) "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455 & n. 2 ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hun-

dredth or even a thousandth part of a single percent of the potential recovery.")

The Settlement is well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation. A recovery totaling $400 million is an excellent result when success on the claims asserted is uncertain, class certification is being vigorously challenged, and the condition of the economy and of MMC in particular is questionable. Accordingly, the eighth and ninth *Grinnell* factors support approval of the Settlement.

**C. The Proposed Settlement Is Procedurally Fair**

"In addition to ensuring the substantive fairness of the settlement through full consideration of the *Grinnell* factors, the Court must also 'ensure that the settlement is not the product of collusion.' " *In re Global Crossing*, 225 F.R.D. at 461 (*quoting In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y.1998)). However, "As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." *Banyai v. Mazur*, No. 00 Civ. 9806, 2007 WL 927583, at *12 (S.D.N.Y. Mar.27, 2007) (approving settlement reached after months of good-faith, arm's-length negotiations) (*quoting In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104, 132 (S.D.N.Y.1997)).

*8 Where, as here, "the settlement is the result of arm's length negotiations conducted by experienced counsel after adequate discovery and the settlement provokes only minimal objections, then it is entitled to '[a] strong initial presumption of fairness.' " *In re Global Crossing*, 225 F.R.D. at 461 (citation omitted). As set forth in Lead Counsel's Joint Declaration, Lead Counsel entered into this Settlement after conducting extensive discovery and arm's-length negotiations, based on their good-faith belief that the Settlement is in the best interests of the Class. The Settlement was the result of protracted, difficult negotiations that stretched out over a year and a half. Moreover, those negoti-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

ations were conducted with the assistance of Judge Weinstein, a highly regarded mediator with extensive experience in securities litigation, who has submitted a declaration in support of the Settlement. There is no reason to doubt that the Settlement is procedurally fair.

## II. Certification of a Settlement Class Is Appropriate Under Rule 23

The Preliminary Approval Order certified the Class pursuant to Rules 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired MMC securities between October 14, 1999 and October 13, 2004 (the "Class Period"), and that claim to have suffered losses as a result of such purchase or acquisition. The Class excludes the following: (1) MMC, Marsh and their officers, directors, employees, affiliates, parents, subsidiaries, representatives, predecessors and assigns; (2) Greenberg and Egan and their immediate families, employees, affiliates, representatives, heirs, predecessors, successors and assigns, as well as any entity in which either Greenberg or Egan has a controlling interest; and (3) those persons that would otherwise be members of the Class but that submit valid and timely requests for exclusion in accordance with the Preliminary Approval Order. The Court also certified Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, for purposes of Settlement only, pursuant to Rule 23.

The Second Circuit has long acknowledged the propriety of certifying a class solely for purposes of a class-action settlement. *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982). Classes certified for settlement purposes, like all other classes, must meet the requirements of Rule 23(a) and at least one of three requirements set forth in Rule 23(b). *See In re Prudential Sec. Inc. Ltd. P'ships Litis.,* 163 F.R.D. 200, 205–10 (S.D.N.Y.1995).

### A. The Requirements of Rule 23(a) Are Satisfied

Certification under Rule 23(a) is proper if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the class representatives will fairly and adequately protect the interests of the class.

### 1. The Settlement Class Is Sufficiently Numerous

*9 Rule 23(a)(1) requires a showing that the Class is so numerous that joinder of all members is impracticable. Numerosity is generally presumed when a class consists of forty or more members. *See Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76, 84 (S.D.N.Y.2007) (*quoting Teachers Ret. Sys. v. ACLN Ltd.,* No. 01 Civ. 11814, 2004 WL 2997957, at *3 (S.D.N.Y. Dec.27, 2004)).

At the time of the Amended Complaint, MMC was the largest insurance broker in the United States, and one of the largest in the world, with approximately $11 billion in annual revenues. (Am.Compl.¶ 43.) MMC has traded on the NYSE during all relevant times, and undoubtedly has had millions of shares outstanding at any given time. Further, Lead Plaintiffs have caused the Notice to be mailed to thousands of potential Class members or nominees, and there have been over 7,000 viewers at the Settlement website. (Young Aff. ¶ 8.) In short, the numerosity of the Class cannot seriously be disputed.

### 2. There Are Questions of Law or Fact Common to the Class

Rule 23(a)(2) requires a showing that common issues of fact or law affect all Class members. "The commonality requirement, particularly in securities fraud litigation, is generally considered a low hurdle easily surmounted. Commonality does not demand that every question of law or fact be common to every class member, but instead merely re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

Page 9

quires that the claims arise from a common nucleus of operative facts. *In re Omnicom Group, Inc. Sec. Litig.,* No. 02 Civ. 4483, 2007 WL 1300781, at *3 (S.D.N.Y. Apr. 30, 2007) (internal quotations and citations omitted); *In re Vivendi,* 242 F.R.D. at 84 (stating that commonality requirement is applied "permissively" in securities litigation). In fact, a single common question may be sufficient to satisfy the commonality requirement. *See, e.g., German v. Fed. Home Mortgage Loan Corp.,* 885 F.Supp. 537, 553 (S.D.N.Y.1995). Where, as here, plaintiffs allege that class members have been injured by the same fraudulent scheme, the commonality requirement is satisfied. *See, e.g., Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65, 68–69 (S.D.N.Y.2000); *In re Towers Fin. Corp. Noteholders Litis.,* 177 F.R.D. 167, 170 (S.D.N.Y.1997).

Here, Lead Plaintiffs allege that they and all Class members were injured by a fraudulent scheme to artificially inflate and maintain the price of MMC securities, and that Defendants engaged in manipulative and deceptive acts in furtherance of that scheme by, among other things, making false and misleading statements about the nature of their contingent commission practices and revenues. Common questions include (1) whether Defendants engaged in a fraudulent scheme; (2) whether Defendants acted with scienter; (3) whether Defendants' acts affected the market for MMC securities; and (4) whether Defendants' conduct had the effect of concealing the circumstances that bore on the ultimate loss. There are clearly sufficient common questions to satisfy Rule 23(a)(2).

**3. Lead Plaintiffs' Claims Are Typical of Those of the Class**

*10 Rule 23(a)(3) requires that Lead Plaintiffs' claims be "typical" of those of the Class, Lead plaintiffs' claims are typical where, as here, they "arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *In re Vivendi,* 242 F.R.D. at 85 (*quoting Marisol A. v. Giuliani,* 929 F.Supp. 662. 691 (S.D.N.Y.1996)). Typicality thus embraces the

principle that class representatives "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individual actions." *In re NASDAQ,* 172 F.R.D. at 126 (internal quotations and citation omitted).

"Typical" does not mean "identical." *See In re Omnicom,* 2007 WL 1300781, at *4; *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 200 (S.D.N.Y.1992). Accordingly, the "typicality requirement is not defeated by minor variations in the fact patterns of individual class member[s'] claims." *Abdul–Malik v. Coombe,* No. 96 Civ. 1021, 1996 WL 706914, at *3 (S.D.N.Y. Dec.6, 1996). Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct. *See, e.g., In re Baldwin–United Corp. Litig.,* 122 F.R.D. 424, 428 (S.D.N.Y.1986); *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981).

Lead Plaintiffs' claims are typical of those of the Class because their claims arise out of the same course of conduct—Defendants' alleged participation in the fraudulent scheme to artificially inflate and maintain the price of MMC securities. Lead Plaintiffs, like the members of the Class they represent, purchased MMC securities during the Class Period and suffered significant losses as a result of the violations of the federal securities laws alleged in the Amended Complaint. Lead Plaintiffs stand in the same position as other investors who purchased MMC securities during the Class Period, having suffered the same type of injury (purchasing MMC securities at artificially inflated prices and suffering losses when the fraud was revealed) as a result of Defendants' conduct. Such a showing is sufficient to meet the typicality requirement of Rule 23(a)(3).

**4. Lead Plaintiffs Have Fairly and Adequately Protected the Interests of the Class**

Rule 23(a)(4) is satisfied if "the representative

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

parties will fairly and adequately protect the interests of the class." Courts consider two factors in measuring adequacy of representation: (1) whether the claims of the lead plaintiffs conflict with those of the class; and (2) whether the lead plaintiffs' counsel is qualified, experienced and generally able to conduct the litigation. *See In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992); *In re Oxford Health Plans,* 191 F.R.D. 369, 376 (S.D.N.Y.2000). As many courts have observed, "the issues of typicality and adequacy tend to merge because they 'serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.' " *In re Vivendi,* 242 F.R.D. at 85 (*quoting Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

*11 As discussed above, Lead Plaintiffs and the members of the Class they represent were injured by the same wrongful course of conduct. Accordingly, it is in Lead Plaintiffs' interest to vigorously prosecute this action on behalf of the Class. Lead Counsel are experienced securities class action law firms and they have more than adequately represented the interests of the Class. Accordingly, Lead Plaintiffs and Lead Counsel meet the requirements of Rule 23(a)(4).

**B. The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Both requirements are satisfied here.

**1. Common Questions of Law or Fact Predominate**

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy

can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. Paine Webber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). "Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *In re Prudential,* 163 F.R.D. at 206 (*quoting Dura–Bilt,* 89 F.R.D. at 93). Accordingly, as the Supreme Court has noted, "Predominance is a test readily met in certain cases alleging ... securities fraud." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

Here, the critical issues for establishing Defendants' liability include whether the Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. Each of these issues is susceptible of generalized proof and, accordingly, the predominance requirement of Rule 23(b)(3) is satisfied. *See, e.g., In re Salomon Analyst Metromedia,* 236 F.R.D. 208, 218 (S.D.N.Y.2006).

**2. A Class Action Is the Superior Method of Adjudication**

The last prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. A class action is particularly appropriate for addressing the claims at issue in this case. Lead Plaintiffs represent a Class consisting of a large number of investors in MMC securities whose individual damages are likely small enough to render individual litigation prohibitively expensive. Superiority is readily found where, as here, "the alternatives [to a class action] are either no recourse for thousands of stockholders ... or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green v. Wolf Corp.,* 406 F.2d 291, 301

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

(2d Cir.1968).

*12 Rule 23(b)(3) specifies four factors that a court should consider in determining whether a class action is superior to other methods of adjudication: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Each of these factors weighs in favor of certification of the Settlement Class.

Class members have limited interest in individually controlling the prosecution or defense of separate actions given the prohibitive cost of instituting individual actions for securities fraud. Accordingly, the courts recognize that a class action is uniquely suited to resolving securities claims. *See In re Vivendi,* 242 F.R.D. at 91; *see also Green,* 406 F.2d at 296. This point is underscored by the fact that, to date, only a small number of Class members have opted out of this class action. Further, concentrating litigation in a single forum plainly has a number of benefits, including eliminating the risk of inconsistent adjudications and promoting the fair and efficient use of the judicial system, and "the Southern District of New York is well known to have expertise in securities law." *Albert Fadem Trust v. Duke Energy Corp.,* 214 F.Supp.2d 341, 344 (S.D.N.Y.2002). Finally, in determining whether a class action is a superior method of adjudication, a court must also consider "the management difficulties likely to be encountered if the action is continued as a class suit, such as the burden of complying with Rule 23's notice requirements." *In re Vivendi,* 242 F.R.D. at 107. Securities class actions are routinely certified and raise no unusual manageability issues. Indeed, as shown below, the streamlined and timely manner by which Lead Plaintiffs identified and notified Class members of the Settlement demonstrates that class treatment here is manageable and efficient.

**III. Transmission of the Notice to the Class Satisfied Both the Preliminary Approval Order and Applicable Law**

Rule 23(c) (2)(B) requires that notice of class certification must be served on all class members who can be identified through reasonable efforts. Further, Rule 23(e)(1) instructs courts to "direct notice in a reasonable manner to all class members who would be bound by the proposal." Such notice to class members need only be reasonably calculated under the circumstances to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections. *See Thompson v. Metro. Life Ins. Co.,* 216 F.R.D. 55, 67 (S.D.N.Y.2003) ("Although no rigid standards govern the contents of notice to class members, the notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." (internal quotations and citations omitted)).

*13 As with the notice approved by the court in *Thompson,* the Notice provided to Class members here provided, "in language easily understandable to a layperson, the essential terms of the settlement, including the claims asserted; who would be covered by the settlement; how to participate in or opt-out of the settlement; the settlement benefits; the contact information of the lawyers representing the class members and the amount sought for named Class members; how to object to the settlement and the time and place of the Court's scheduled fairness hearing if an objector or his counsel wished to appear; and who to contact if further information is sought." *Id.* at 68 (citations omitted). Indeed, as the Court stated at the preliminary approval hearing, the Notice provided by Lead Counsel was among the best the Court has encountered.

The Preliminary Approval Order authorized Lead Plaintiffs to retain Rust Consulting, Inc. as the Claims Administrator, and directed the Claims Ad-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

ministrator to (1) cause the Notice and Proof of Claim to be mailed, by first-class mail, postage prepaid, by November 13, 2009, to all reasonably identifiable Class members; and (2) cause the Summary Notice to be published in the *Wall Street Journal* and transmitted over *Business Wire*. In addition, the Preliminary Approval Order directed Lead Counsel to file proof of the publication of the Summary Notice and mailing of the Notice with the Court at least three days before the Settlement Fairness Hearing. Lead Plaintiffs have fully complied with these requirements. (Joint Decl. ¶¶ 96–98; Young Aff. ¶¶ 6, 7, 11.) This is sufficient to satisfy Rule 23. Accordingly, the form and manner of Notice provided to Class members satisfies both the Preliminary Approval Order and Rule 23.

## IV. The Plan of Allocation Is Reasonable, Fair and Equitable

"When formulated by competent and experienced class counsel, an allocation plan need have only a 'reasonable, rational basis.' " *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 462 (S.D.N.Y.2004) (*quoting In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001)). In determining whether a plan of allocation is fair, courts look largely to the opinion of counsel. *See In re Painewebber Ltd. P'ships. Litig.,* 171 F.R.D. 104, 133 (S.D.N.Y.1997).

The Plan of Allocation (the "Plan") in this case meets these standards of rationality and reasonableness. As set forth in the Joint Declaration, the Plan is the product of Lead Counsel's investigation, discovery and consultation with their damages expert. In developing the Plan, Lead Counsel and their experts considered numerous factors, including (1) the volume of publicly traded MMC securities purchased, acquired or sold during the Class Period; (2) the time period in which an MMC security was purchased or acquired, or an MMC put option was sold; (3) whether the security was held until after the end of the Class Period or whether it was sold during the Class Period, and if so, when it was sold and at what price; (4) the artificial inflation in the

price of MMC securities (or "artificial deflation" for put options) allegedly attributable to Defendants' misstatements; and (5) the type of security involved. The Court concludes that the Plan is rational and reasonable.

## V. Attorneys' Fees

**\*14** Lead Counsel (1) submit their Fee Application for an award of attorneys' fees in the amount of 13.5% of the Settlement Fund; (2) petition for reimbursement of litigation expenses in the amount of $7,848,411.84; and (3) make, on behalf of Lead Plaintiffs, a PSLRA Award Request for reimbursement of class representative expenses totaling $214,657.14–$70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs. For the reasons stated below, the Court grants these requests.

## A. Lead Counsel Are Entitled to an Award of Attorneys' Fees and Reimbursement of Expenses from the Settlement Fund

Pursuant to the "equitable" or "common fund" doctrine, established more than a century ago in *Trustees v. Greenough,* 105 U.S. 527, 532–33, 26 L.Ed. 1157 (1881), attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work. *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 584–85 (S.D.N.Y.2008). The Supreme Court has recognized that a lawyer who recovers a common fund for the benefit of persons other than his client is entitled to a reasonable attorney's fee from the fund as a whole. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). Fees and expenses are paid from the common fund so that all class members contribute equally toward the costs associated with litigation pursued on their behalf. *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 47 (2d Cir.2000).

Courts traditionally have used two methods to calculate reasonable attorneys' fees in common fund cases: the "percentage method" and the "lodestar method." *Id.* The percentage method is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

the simpler method of the two and involves award-ing counsel a percentage of the recovery as a fee. *Id.* The lodestar method requires the court to scru-tinize the fee petition to ascertain the number of hours reasonably billed, then multiply that figure by an appropriate hourly rate. *Id.*

Although district courts may use both methods when approving an award of attorneys' fees, the Second Circuit encourages using the lodestar meth-od only as a cross-check for the percentage method. *Id.* at 50; *see Strougo v. Bassini,* 258 F.Supp.2d 254, 263 (S.D.N.Y.2003). Indeed, the percentage method continues to be the trend of district courts in this Circuit and has been expressly adopted in the vast majority of circuits, *See In re Telik,* 576 F.Supp.2d at 586 & n. 6 (collecting cases). Further, the percentage method comports with the PSLRA, which provides that "attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable *percentage* of the amount of any damages and prejudgment in-terest actually paid to the class." *See* 15 U.S.C. § 78u-4(a)(6) (emphasis added).

Whether determined by lodestar or percentage, the fees awarded in common fund cases must be "reasonable" under the circumstances. *Goldberger,* 209 F.3d at 47. "What constitutes a reasonable fee is properly committed to the sound discretion of the district court, and will not be overturned absent an abuse of discretion." *Id.* (internal citation omitted). The Second Circuit has instructed that, in exer-cising their discretion:

*15 [D]istrict courts should continue to be guided by the traditional criteria in determining a reason-able common fund fee, including: "(1) the time and labor expended by counsel; (2) the mag-nitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality of the rep-resentation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

*Id.* at 50 (quoting *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 724 F.Supp. 160,

163 (S.D.N.Y.1989)). In applying these criteria, "a Court essentially makes no more than a qualitative assessment of a fair legal fee under all the circum-stances of the case." *See In re Union Carbide,* 724 F.Supp. at 166. In this case, the fee requested by Lead Counsel is warranted under either the percent-age or lodestar method.

**B. The Requested Attorneys' Fees Are Reason-able Under the Percentage of the Fund Method**

The requested fee of 13.5% of the Settlement Fund is reasonable. Lead Counsel vigorously pur-sued this litigation over the course of five years. The requested fee represents only 0.44% the total value of Lead Counsel's lodestar. When considering percentage fee awards in securities class actions settled in the $100–$600 million range, Lead Coun-sel's request for 13.5% of the $400 million Settle-ment Fund is at the low end of the spectrum in this Circuit and elsewhere. *See, e.g., In re Initial Pub. Offering Sec. Litig.,* Master File No. 21 MC 92, 2009 WL 3397238 (S.D.N.Y. Oct. 5, 2009) ($586 million; 33.33%); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* No. 03 MDL 1529, 2006 U.S. Dist. LEXIS 84621 (S.D.N.Y. Nov. 16, 2006) ($455 million; 21.4%); *In re Qwest Commc'ns Int'l. Inc. Sec. Litig.,* No. 01 Civ. 01451, 2006 U.S. Dist. LEXIS 71267 (D.Colo. Sept.28, 2006) ($400 mil-lion; 15%); *In re Lucent Techs., Inc. Sec. Litis.,* 327 F.Supp.2d 426 (D.N.J.2004) ($517 million; 17%); *In re BankAmerica Corp. Sec. Litis.,* 228 F.Supp.2d 1061 (E.D.Mo.2002) ($490 million; 18%); *In re Prison Realty Sec. Litis.,* No. 3:99–0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) ($104 million; 30%); *In re Ikon Office Solutions, Inc. Sec. Litis.,* 194 F.R.D. 166 (E.D.Pa.2000) ($111 million; 30%); *Kurzweil v. Philip Morris Cos., Inc.,* Nos. 94 Civ. 2373, 2546, 1999 WL 1076105 (S.D.N.Y. Nov.30, 1999) ($124 million; 30%); *In re Pruden-tial Sec. Inc. Ltd. P'ships Litig. .,* 912 F.Supp. 97 (S.D.N.Y.1996) ($110 million; 27%).

Further, Lead Counsel have based their fee re-quest on the percentage method because Lead Plaintiffs chose the percentage method for determ-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

ining the fees that Lead Counsel could seek. (Decl. of Carol G. Jacobson, Dec. 18, 2009, ¶ 22; Decl. of Dennis P. Smith, Dec. 18, 2009, ¶ 16.) Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable. *See In re Cendant Corp. Litig.,* 264 F.3d 201, 282 (3d Cir.2001); *In re Lucent,* 327 F.Supp.2d at 433–34; *In re Global Crossing Sec. & ERISA Litis.,* 225 F.R.D. 436, 466 (S.D.N.Y.2004) (citing *In re Cendant* for proposition that "in class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable").

**\*16** Indeed, public policy considerations support fee awards where, as here, large public pension funds, serving as lead plaintiffs, conscientiously supervised the work of lead counsel, and gave their endorsement to lead counsel's fee request. *See In re WorldCom. Inc. Sec. Litis.,* 388 F.Supp.2d 319, 356 (S.D.N.Y.2005) (finding that when "class counsel in a securities lawsuit have negotiated an arm's length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight").

Moreover, the requested fee award is plainly warranted and reasonable in light of the six *Goldberger* criteria.

**C. The Fee Application Is Reasonable Under the *Goldberger* Factors**

**1. Lead Counsel's Time, Labor and Lodestar Are Reasonable**

The first *Goldberger* factor for determining a fee's reasonableness is "the time and labor expended by counsel." 209 F.3d at 50. Similarly, the first step of the lodestar analysis is to multiply the number of hours reasonably expended in the litigation

by each attorney by the appropriate hourly rate for that attorney. *Strougo,* 258 F.Supp.2d at 263. Lead Counsel have unquestionably expended an enormous amount of time over the course of five years to bring this case to a resolution. As set forth in the Joint Declaration, through November 2009, Lead Counsel have collectively spent 309,537.80 hours of attorney and litigation support time valued at $119,556,484.25, and have advanced or incurred $7,848,411.84 in expenses to litigate this case. The requested 13.5% fee represents a multiplier of 0.44—in other words, a negative multiplier—that is amply justified by application of the relevant factors.

**(a) Lead Counsel's Hours Are Reasonable**

Where the lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger,* 209 F.3d at 50. The Court concludes that the hours Lead Counsel expended in litigating this action are plainly reasonable given the magnitude and complexity of the case, the fierce defenses mounted and the relatively late stage at which the Settlement was reached.

The extensive history of this litigation, the nature of the services performed, and the time expended by each attorney or other professional, are set forth in depth in the Joint Declaration and other papers submitted by Lead Counsel. All of merits discovery has been completed, including the production, review and analysis of over thirty-six million pages produced by Defendants and third parties, as well as the taking of ninety and defending of twenty depositions. Numerous procedural and substantive motions were fully briefed and argued. A substantial portion of complex expert discovery has been completed. (Joint Decl. ¶¶ 44, 68, 70, 73–76 .) Lead Counsel supervised and managed every aspect of this litigation. (*Id.* ¶ 131.) They in turn were supervised closely by Lead Plaintiffs—in effect, by the Attorneys General of Ohio and New Jersey—who exercised their oversight responsibilities zealously and with an eye to keeping fees as low

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

as possible, given the nature and duration of this action.

*17 Given the five years over which this case has been pending, Lead Counsel's zealous prosecution of the litigation, Lead Counsel's success in overcoming Defendants' motions to dismiss, the briefing and affidavits submitted regarding class certification, and the expansive nature of discovery, with the corresponding intense and lengthy disputes that arose and required resolution by the Court-appointed Special Master, the Court concludes that the total hours billed by Lead Counsel are reasonable.

**(b) Lead Counsel's Hourly Rates Are Reasonable**

In a lodestar analysis, the appropriate hourly rates are those rates that are normally charged in the community where counsel practices—that is, the market rate. *Luciano v. Olsten Corp.,* 109 F.3d 111, 115–16 (2d. Cir.1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.' " (*quoting Blum v. Stenson,* 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984))). Thus, awards in comparable cases are an appropriate measure of the market value of counsel's time. Courts in this Circuit and around the country have repeatedly found rates similar to those charged by Lead Counsel to be reasonable in other securities class actions. In short, a market check and substantial precedent demonstrates that the rates used by Lead Counsel in calculating their lodestars are reasonable.

**2. The Magnitude and Complexity of the Litigation Support the Requested Fee**

The second *Goldberger* factor—the magnitude and complexity of the case—also supports the requested fee award. A securities fraud class action's magnitude and complexity must be evaluated in comparison to similarly complex cases. *See In re Bristol–Myers Squibb Sec. Litig.,* 361 F.Supp.2d 229, 234 (S.D.N.Y.2005). Shareholder class actions are notoriously complex and difficult to prove.

This action is an example of large-scale, highly complex litigation. At $400 million, the Settlement is one of the top twenty-five recoveries for shareholders in lawsuits of this nature in American history. Complex, fact-intensive pleadings were prepared and filed; multiple motions to dismiss were filed and opposed; Lead Counsel reviewed more than thirty-six million pages in electronic and paper discovery produced by Defendants; over 100 third parties were subpoenaed; 110 depositions were taken and defended; and Lead Counsel pursued class certification and engaged in attendant fact and expert discovery, which included reports and testimony from multiple experts concerning complex damage and loss causation theories and analyses. (Joint Decl. 31–34, 44, 70.)

In addition, throughout the course of the litigation, many disputes among the parties have required judicial interaction and resolution. Numerous hearings were conducted before the Special Master, either in person or telephonically. The negotiations relating to this Settlement spanned one and a half years, and included three sessions with the Mediator and countless phone conferences and meetings. In sum, considering the magnitude and complexity of this case, the 13.5% Fee Application is reasonable.

**3. The Risks of the Litigation Support the Requested Fee**

*18 The Second Circuit has identified "the risk of success as perhaps the foremost factor to be considered in determining [a reasonable award of attorneys' fees]." *See Goldberger,* 209 F.3d at 54 (internal quotations omitted). While risk is measured as of when the case is filed, *id.* at 55, changes in the law during the course of litigation can increase those risks considerably. During the course of this litigation, significant changes occurred in the well-established standards governing the critical issue of class certification. *See, e. g., Miles v. Merrill Lynch & Co.,* 471 F.3d 24 (2d Cir.2006).

Courts in this Circuit have long recognized that the risk associated with a case bears heavily upon

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

the determination of an appropriate fee award. *See In re Am. Bank Note Holographies, Inc. Sec. Litig.,* 127 F.Supp.2d 418, 432–33 (S.D.N.Y.2001) ("[It is] appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award."); *In re Warner Commc'ns Sec. Litig.,* 618 F.Supp. 735, 747 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986) ("Numerous cases have recognized that the attorneys' contingent fee risk is an important factor in determining the fee award.").

Enormous risk is inherent in massive and highly complex cases like this one. As noted above, there is great uncertainty in taking a case such as this to a jury trial in what would have been a battle of the experts.

**(a) Risk of Non–Payment**

Lead Counsel pursued this case for five years on an entirely contingent basis, without receiving any reimbursement and with the ever-present and substantial risk of non-payment. In numerous class actions, including complex securities cases, plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever. *See, e.g., State Univs. Ret. Sys. of Ill, v. AstraZeneca PLC,* No. 08 Civ. 3185, 2009 U.S.App. LEXIS 13674 (2d Cir. June 25, 2009) (affirming district court's dismissal of securities class action); *Freedman v. Value Health, Inc.,* 34 F. App'x 408 (2d Cir.2002) (affirming district court's grant of summary judgment in favor of defendants in securities class action); *Steinberg v. Ericsson LM Tel. Co.,* No. 07 Civ. 9615, 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) (dismissing securities class action). Here, Lead Counsel worked for five years on this large, complex case on a wholly contingent fee basis, facing the real and heightened risk that they would receive nothing for their efforts. Accordingly, the Court finds that the risk of non-payment weighs in favor of granting Lead Counsel's Fee Application.

**(b) Risks of Establishing Liability and Maintaining the Class Action Through Trial**

In assessing the risk of establishing liability, the Court must balance the benefits afforded to the Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation. Courts have recognized the considerable risks of failing to recover anything in securities class actions. *See In re AOL Time Warner, Inc.,* No. 02 Civ. 5575, 2006 WL 903236, at *11–12 (S.D.N.Y. Apr. 6, 2006).

**\*19** Throughout the course of this litigation, Lead Counsel encountered the risks of developing law in the areas of loss causation, pleading requirements and class certification jurisprudence. *See, e.g., Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Miles,* 471 F.3d 24. The risks of this case for Lead Counsel increased with those legal developments.

In sum, the risks associated with this litigation support the reasonableness of Lead Counsel's Fee Applicartion.

**4. The Quality of Lead Counsel's Representation of the Class Supports the Fee Application**

The fourth *Goldberger* factor is the "quality of representation" delivered in the litigation. 209 F.3d at 50. To evaluate the quality of representation, courts in the Second Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litis.,* 249 F.R.D. 124, 141 (S.D.N.Y.2008).

There is no doubt that Lead Counsel has immense experience in complex federal civil litigation, particularly the litigation of securities and other class actions. Both Grant & Eisenhofer and Bernstein Liebhard have received significant recognition for their work in these areas.

Another consideration for assessing the quality of services rendered by Lead Counsel is the quality of opposing counsel. Here, all Defendants were represented by first-rate attorneys who vigorously contested Lead Plaintiffs' claims and allegations. Ac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

cordingly, the Court concludes that the quality of Lead Counsel's representation of the Class supports the Fee Application.

**5. The Fee Request Is Fair and Reasonable in Relation to the Settlement Amount**

In determining whether the Fee Application is reasonable in relation to the settlement amount, the Court compares the Fee Application to fees awarded in similar securities class-action settlements of comparable value. As demonstrated above, when compared with fee requests in securities class-action settlements ranging from $100–$600 million, Lead Counsel's requested fee of 13.5% of the $400 million Settlement Fund is at the low end of the spectrum. *See supra* Discussion V.B.; *In re Ikon,* 194 F.R.D. at 194 ("Percentages awarded have varied considerably, but most fees appear to fall in the range of nineteen to forty-five percent."). Thus, the Court finds that Lead Counsel's fee request is fair and reasonable in relation to the $400 million Settlement.

**6. Public Policy Considerations Support the Requested Fee**

Public policy is the sixth factor a court considers in determining the reasonableness of a fee request. *Goldberger,* 209 F.3d at 50. "Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Merrill Lynch,* 249 F.R.D. at 141–42; *see In re World-Com,* 388 F.Supp.2d at 359 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.") Moreover, "public policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC." *In re Bristol–Myers,* 361 F.Supp.2d at 236.

**\*20** Here, Lead Counsel's willingness to assume the risks of this litigation resulted in a substantial benefit to a large Class of purchasers of MMC securities, and Lead Counsel must be ad-

equately compensated for their efforts. Further, Lead Counsel seek a fee that is substantially less than their accrued lodestar. Public policy considerations favor granting the Fee Application,

**D. A "Cross–Check" of Lead Counsel's Lodestar Demonstrates the Reasonableness of the Requested Fee**

In *Goldberger,* the Second Circuit held that even in cases in which the percentage method is chosen, "documentation of hours" remains "a [useful] 'cross-check' on the reasonableness of the requested percentage." 209 F.3d at 50. However, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court .... Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case ...." *Id.* (internal citation omitted).

Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors. *See id.* at 47; *Savoie v. Merchs. Bank,* 166 F.3d 456, 460 (2d Cir.1999). In this case, the cumulative lodestar reported by Lead Counsel is $119,556,484.25. (Fees Br. at 22.) The percentage fee requested represents a negative multiplier of 0.44 to the lodestar. Thus, not only are Lead Counsel not receiving a premium on their lodestar, their fee request amounts to a deep discount from their lodestar. The lodestar "cross-check" therefore unquestionably supports the requested percentage fee award of 13.5%.

**E. The Expenses Incurred by Lead Counsel Were Reasonable and Necessary to the Effective Prosecution of this Action**

Counsel who create a common fund are entitled to the reimbursement of expenses that they advance to a class. Lead Counsel requests reimbursement of $7,848,411.84 in expenses advanced or incurred by Lead Counsel while litigating this action. Those expenses relate principally to electronic document hosting, retention of a battery of highly regarded

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

and experienced experts, legal research and photo-copying services, deposition expenses, as well as travel expenses related to extensive discovery, set-tlement negotiations and mediations, court appear-ances and depositions. (*See* Decl. of Stanley D. Bernstein, Dec. 18, 2009 (summarizing and cat-egorizing Lead Counsel's expenses); Decl. of Keith M. Fleischman, Dec. 18, 2009 (same).)

After reviewing the requested expenses, the Court finds that they were necessary litigation ex-penses that were reasonably incurred, reasonably related to the interests of the members of the Class, and adequately documented. The fact that Lead Plaintiffs, who have reviewed the requested ex-penses, believe that this payment represents fair and reasonable compensation to Lead Counsel, further supports the reasonableness of Lead Counsel's re-quest for reimbursement. Accordingly, the Court grants Lead Counsel's petition for reimbursement of expenses in the amount of $7,848,411.84.

**F. Lead Plaintiffs Are Entitled to an Award of Reasonable Costs and Expenses**
*21 The PSLRA states that "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class," 15 U.S.C. § 78u–4(a)(4); *see Hicks v. Stanley,* No. 01 Civ. 10071, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005) ("Courts in this Cir-cuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses in-curred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litiga-tion and to incur such expenses in the first place.").

Here, the Ohio Plaintiffs and the New Jersey Plaintiffs have been actively involved in this action since its inception. Pursuant to the PSLRA, the Ohio Plaintiffs and the New Jersey Plaintiffs re-quest an award totaling $214,657.14–$70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs—to compensate them for their

reasonable costs and expenses incurred in managing this litigation and representing the Class. (Fees Br. at 23–25.)

Lead Plaintiffs have pursued their claims against Defendants for five years. These large insti-tutional investors have actively and effectively ful-filled their obligations as representatives of the Class. As set forth in the Joint Declaration and in the other papers submitted by Lead Plaintiffs, they (1) reviewed and approved the complaints and other pleadings filed in this action; (2) had extensive and regular telephonic, email, and in-person communic-ations with Lead Counsel regarding strategy and developments in the case; (3) reviewed and com-mented on Lead Counsel's submissions to the Court, the Special Master and the Mediator; (4) oversaw and assisted their own personnel in re-sponding to discovery requests, including requests for production of documents and interrogatories; (5) reviewed and approved responses and objec-tions to discovery requests drafted by Lead Coun-sel; (6) proffered several representatives to give de-position testimony; (7) reviewed and approved the retention of experts and consultants; and (8) fully participated in all mediation sessions and settlement discussions on behalf of the Class. These are pre-cisely the types of activities that support awarding reimbursement of expenses to class representatives.

The Notice provided to Class members stated that Lead Plaintiffs would apply to the Court for approval of their PSLRA Award Request. To date, only one objection to this request has been re-ceived. (Fees Br. at 25) The Court thus awards the Ohio Plaintiffs $70,000 and the New Jersey Plaintiffs $144,657.14 as compensation for their reasonable costs and expenses incurred in repres-enting the Class.

**VI. Objections Received**
Pursuant to the Preliminary Approval Order, Rust Consulting, Inc., the Claims Administrator, implemented an extensive notice program to poten-tial Class members. The Claims Administrator mailed a total of 596,517 copies of the Notice and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

Proof of Claim (together, the "Notice Packet") to potential Class Members. (Young Aff. ¶ 11.) The Claims Administrator also had the Summary Notice published in the national edition of *The Wall Street Journal* and had a copy of the Summary Notice transmitted over *Business Wire.* (*Id.* Ex. B.)

**\*22** Through these efforts, the Claims Administrator reached hundreds of thousands of Class members, fully informing them of the Settlement terms and their rights, including the right to object to the Settlement or any part of it (including the Plan of Allocation, Lead Counsel's application for attorneys' fees and reimbursement of expenses, and reimbursement of costs and expenses for Lead Plaintiffs). Only *seven* potential Class members have objected. (Lead Pls.' Mem. in Resp. to Objections, Dec. 18, 2009, at 1.) These seven objections represent a mere 0.0012% of the Notices mailed to potential Class members.

Of these seven objectors, only one complied with the Notice's clearly stated procedures for filing a proper objection. That single objection was filed by Edward F. Siegel, Esq. ("Siegel") on behalf of purported Class member Hermine Union ("Ms. Union" or "Objector Union"). (Objection of Hermine Union, Dec. 14, 2009 ("Union Objection") (Docket No. 303).) That objection has been withdrawn. (Docket No. 330.)

**A. Any Suggestion That the Requested Fee Award Is "Unreasonable" and "Excessive" Is Meritless**
One objector, James M. McCague, asserts that the requested fee award is unreasonable. (*See* Decl. of Brian S. Cohen, Dec. 18, 2009 ("Cohen Decl."), Ex. 10 (McCague objection).) That is simply not so. The law in this Circuit is clear: a district court must consider several specific factors in determining the reasonableness of a fee award for class counsel. *See Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir.2000). After considering those factors, the Court has little trouble rejecting McCague's objection. *Cf. In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 378 (D.D.C.2002) (rejecting

broad, unsupported objections because "[they] are of little aid to the Court in determining whether these settlements are fair, adequate, and reasonable."

The Court-approved Notice clearly describes the massive efforts engaged in by Lead Counsel in litigating the action. The Notice explains, inter alia, the extensive and vigorously contested fact discovery (including the review of over thirty-six million pages of documents), the huge number of depositions taken and defended, the intensive class certification motion practice, and the thorough expert witness work.

Mr. McCague acknowledges these efforts, but complains that he does not understand why counsel needed to take all the actions listed. (*Id.*) The Court easily concludes that Lead Counsel's efforts were necessary for the zealous and effective prosecution of this action on behalf of the Class.

That only two objections to the fee request were received, and just one continues to be pressed, is powerful evidence that the requested fee is fair and reasonable. *See In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 912 F.Supp. 97, 103 (S.D.N.Y.1996) (concluding that a single "isolated expression of opinion" should be considered "in the context of thousands of class members who have not expressed themselves similarly"); *In re Crazy Eddie Sec. Litig.,* 824 F.Supp. 320, 327 (E.D.N.Y.1993) (finding fact that "only one person has opposed the fee" to support its reasonableness). The reaction by members of the Class is entitled to great weight by the Court. The Notice was sent to hundreds of thousands of prospective Class members. Only two objections relating to the Fee Application were submitted. That strongly supports a finding that the request is fair and reasonable.

**B. The Remaining Objections to the Notice Program Are Meritless**
**\*23** Six people challenge the Notice on the ground that it was not "timely received." None of these individuals filed proper objections. Both the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

Notice and Summary Notice informed the Class that any objection to the Settlement must be filed with the Court and served on Lead Counsel no later than December 14, 2009. The Notice states that an objector must "include ... proof of the number of MMC securities ... purchased and sold during the Class Period." (Notice at 19.) Objectors William N. Weld ("Weld"), John F. Mencer ("Mencer"), Robert G. Coplin ("Coplin"), McCague, Thomas and Carolynn Kane ("the Kanes"), and an unidentified individual claiming via email that he/she did not receive the Notice until December 14, 2009 ("Anonymous"), failed to include this information. (*See* Cohen Decl. Exs. 7–12 (copies of objections of Weld, Mencer, Coplin, McCague, the Kanes, and Anonymous).)

Even if their objections had been proper, however, they are meritless. As the Court recognized in the Preliminary Approval Order, the Notice plan satisfied due process. Notice was first mailed on November 13, 2009. Objections were due thirty days later on December 14, 2009. Courts have repeatedly found such a time period to constitute sufficient notice. *See, e.g., Miller v. Republic Nat'l Life Ins. Co.,* 559 F.2d 426, 429–30 (5th Cir.1977) (concluding, in securities fraud class action, that a period of "almost four weeks between the mailing of the notices and the settlement hearing" was adequate time, particularly when only one class member objected to the timing); *In re BankAmerica Corp. Sec. Litig.,* 210 F.R.D. 694, 707–08 (E.D.Mo.2002) (finding that timing of notice comported with due process where "[t]here were three to four weeks between the mailing of class notice and the last date to object") (*citing Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 120–21 (8th Cir.1975) (finding nineteen-day notice period sufficient, particularly when case had been ongoing for two years)); *see also Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1374–75 (9th Cir.1993) (holding that initial notice sent thirty-one days before deadline for written objections was adequate); *In re AOL Time Warner S'holder Derivative Litig.,* No. 02 Civ. 6302, 2006 WL 2572114

(S.D.N.Y. Sept. 6, 2006) (finding distribution of notice thirty-four days before the deadline for objections was adequate).

It is well-established class-action jurisprudence in this Circuit that courts focus the due process lens on the notice efforts made by counsel, not whether class members actually received notice. *See In re "Agent Orange" Prod. Liab. Litis.,* 818 F.2d 145, 168 (2d Cir.1987) (determining that class notice was adequate and rejecting the proposition that actual notice had to be given to each and every class member); *see also Buxbaum v. Deutsche Bank AG,* 216 F.R.D. 72, 80 (S.D.N.Y.2003) ("It is widely recognized that for the due process standard to be met it is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected.") (internal quotations and citation omitted). As the Second Circuit recently held:

> **\*24** Because notice of the settlement was reasonably provided through individually mailed notice to all known and reasonably identifiable class members, publication in several major newspapers, and entered on the district court's docket sheet, actual notice was not necessary and the notice provided here was sufficient. It is clear that for due process to be satisfied, not every class member need receive actual notice, as long as class counsel "acted reasonably in selecting means likely to inform persons affected."

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litis.,* 271 F. App'x 41, 44 (2d Cir.2008) (*quoting Weigner v. City of N.Y.,* 852 F.2d 646, 649 (2d Cir.1988)).

In this case, a total of 596, 517 Notice Packets were mailed to potential Class members. (Young Aff. ¶¶ 5, 9–10.) In addition, Summary Notice was transmitted over *Business Wire* on November 16, 2009, and a copy of the Summary Notice was published in the national edition of *The Wall Street Journal* the next day. (*Id* . ¶ 6.) The Court easily concludes that the Class as a whole had adequate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
(Cite as: 2009 WL 5178546 (S.D.N.Y.))

Page 21

notice.

It must be noted that certain objectors received Notice later than others because they held their shares in "street name"—i.e., in the name of a nominee/brokerage house. Pursuant to the Preliminary Approval Order, the Claims Administrator used "reasonable efforts to give notice to nominee purchasers such as brokerage firms and other Persons that purchased or otherwise acquired MMC securities during the Class Period as record owners but not as beneficial owners." (Preliminary Approval Order at 4; see Young Aff. ¶¶ 3–4, 10.) In addition, the Preliminary Approval Order provides that "Such nominee purchasers are directed within seven (7) days of their receipt of the Notice to forward copies of the Notice and Proof of Claim to their beneficiaries that are Members of the Class." (Preliminary Approval Order at 4–5.)

That certain objectors' brokers failed to comply with the Preliminary Approval Order and forward their clients the necessary paperwork in a timely fashion is no fault of Lead Counsel. That is the risk a shareholder takes in registering his or her securities in street name. Moreover, "notice provided to the class members' nominees—i.e., the brokerage houses—has been deemed sufficient even if brokerage houses failed to timely forward the notice to the beneficial owners." *Fidel v. Farley,* 534 F.3d 508, 514 (6th Cir.2008) (citing *DeJulius v. New England Health Care Employees Pension Fund,* 429 F.3d 935, 936, 945–47 (10th Cir.2005) (finding notice sufficient where two beneficial owners received notice of class settlement two weeks after deadline for filing objections and on the same day as the final fairness hearing); *Silber v. Mabon,* 18 F.3d 1449, 1453–54 (9th Cir.1994) (finding notice adequate where 1,000 beneficial owners received notice after the opt-out deadline as a result of late response of brokerage house); *Torrisi,* 8 F.3d at 1374–75 (concluding notice was sufficient where notice was mailed to some beneficial owners after deadline for filing objections had passed).

**\*25** Accordingly, the Court rejects the remaining objections to the timeliness of the Notice program.

**C. The Single Objection to the Format of the Claim Form Is Meritless**

Only one objector challenges the Proof of Claim form, arguing that it is unreasonably burdensome and complex, and should be filled out by the lawyers and not the potential Class members. (*See* Cohen Decl. Ex. 11 (objection of the Kanes).) The Proof of Claim form simply asks Class members to list purchases, sales and holdings of MMC stock within the Class Period. Without that necessary information, the Claims Administrator could not calculate claimants' distributions. The single objector's claim that the lawyers should fill out the Proof of Claim form and that potential Class members should simply verify the information does not comport with the long-approved procedures for the efficient management of class-action settlement distributions. *See In re WorldCom. Inc. Sec. Litig.,* No. 02 Civ. 3288, 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) (holding that "[t]he [one] objection to the length and complexity of the proof of claim form is ... meritless," as "the information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds").

**D. The Single Objection to the Exclusion of Former Employees Is Meritless**

One objector claims that it is "unfair" to exclude former employees from the Settlement Class. (*See* Cohen Decl. Ex. 7 (Weld objection).) Yet Lead Plaintiffs have always asserted—in the Amended Complaint, Lead Plaintiffs' class certification motion and the Stipulation of Settlement—that the wrongful conduct underlying their claims against Defendants were engaged in on a company-wide basis and ingrained in Marsh's business model. Accordingly, the Class definition has always excluded MMC and Marsh employees, and the sole objection to the definition's exclusion of former employees is rejected.

*CONCLUSION*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)
**(Cite as: 2009 WL 5178546 (S.D.N.Y.))**

For the reasons stated above, the Court (1) approves the Settlement; (2) grants Lead Counsel's Fee Application of 13.5% of the Settlement Fund; (3) grants Lead Counsel's request for reimbursement of expenses in the amount of $7,848,411.84; and (4) grants Lead Plaintiffs' PSLRA Award Request for expenses totaling $214,657.14 ($70,000 for the Ohio Plaintiffs and $144,657.14 for the New Jersey Plaintiffs).

S.D.N.Y.,2009.
In re Marsh & McLennan Companies, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2009 WL 5178546 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 4

Westlaw.

H.R. CONF. REP. 104-369, H.R. Conf. Rep. No. 369, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 730, 1995 WL 709276 (Leg.Hist.)

**\*730 P.L. 104-67, PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995**

SECURITIES LITIGATION REFORM

DATES OF CONSIDERATION AND PASSAGE

House: March 7, 8, December 5, 1995
Senate: June 22, 23, 26, 27, 28, December 5, 1995
Cong. Record Vol. 141 (1995)
Senate Report (Banking, Housing, and Urban Affairs Committee) No. 104-98,
June 19, 1995
(To accompany S. 240)
House Conference Report No. 104-369,
Nov. 28, 1995
(To accompany H.R. 1058)

HOUSE CONFERENCE REPORT NO. 104-369
November 28, 1995

**\*0 Mr. Bliley, from the committee of conference, submitted the following**

CONFERENCE REPORT

[To accompany H.R. 1058]

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 1058), to reform Federal securities litigation, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate to the text of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) Short Title.-This Act may be cited as the "Private Securities Litigation Reform Act of 1995".
(b) Table of Contents.-The table of contents for this Act is as follows:

Sec. 1. Short title; table of contents.

TITLE I-REDUCTION OF ABUSIVE LITIGATION

Sec. 101. Private securities litigation reform.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Alfonse D'Amato,
Phil Gramm,
Robert F. Bennett,
Rod Grams,
Pete V. Domenici,
Christopher Dodd,
John F. Kerry,
Managers on the Part of the Senate.

### JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 1058) to reform Federal securities litigation, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

### STATEMENT OF MANAGERS-THE "PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995"

The overriding purpose of our Nation's securities laws is to protect investors and to maintain confidence in the securities markets, so that our national savings, capital formation and investment may grow for the benefit of all Americans.

The private securities litigation system is too important to the integrity of American capital markets to allow this system to be undermined by those who seek to line their own pockets by bringing abusive and meritless suits. Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely upon government action. Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs. This legislation seeks to return the securities litigation system to that high standard.

Congress has been prompted by significant evidence of abuse in private securities lawsuits to enact reforms to protect investors and maintain confidence in our capital markets. The House and Senate Committees heard evidence that abusive practices committed in private securities litigation include: (1) the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action; (2) the targeting of deep pocket defendants, including accountants, underwriters, and individuals who may be covered by insurance, without regard to their actual culpability; (3) the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle; and (4) the manipulation by class action lawyers of the clients whom they purportedly represent. These serious injuries to innocent parties are compounded by the reluctance of many judges to impose sanctions under Federal Rule of Civil Procedure 11, except in those cases involving truly outrageous misconduct. At the same time, the investing public and the entire U.S. economy have been injured by the *731 unwillingness of the best qualified persons to serve on boards of directors and of issuers to discuss publicly their future prospects, because of fear of baseless and extortionate securities lawsuits.

In these and other examples of abusive and manipulative securities litigation, innocent parties are often forced to pay exorbitant "settlements." When an insurer must pay lawyers' fees, make settlement payments, and expend management and employee resources in defending a meritless suit, the issuers' own investors suffer. Investors always are the ultimate losers when extortionate "settlements" are extracted from issuers.

This Conference Report seeks to protect investors, issuers, and all who are associated with our capital markets from abusive securities litigation. This legislation implements needed procedural protections to discourage frivolous litigation. It protects outside directors, and others who may be sued for non-knowing securities law violations, from liability for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

damage actually caused by others. It reforms discovery rules to minimize costs incurred during the pendency of a motion to dismiss or a motion for summary judgment. It protects investors who join class actions against lawyer-driven lawsuits by giving control of the litigation to lead plaintiffs with substantial holdings of the securities of the issuer. It gives victims of abusive securities lawsuits the opportunity to recover their attorneys' fees at the conclusion of an action. And it establishes a safe harbor for forward looking statements, to encourage issuers to disseminate relevant information to the market without fear of open-ended liability.

## PRIVATE SECURITIES LITIGATION REFORM

Section 101 contains provisions to reform abusive securities class action litigation. It amends the Securities Act of 1933 (the "1933 Act") by adding a new section 27 and the Securities Exchange Act of 1934 (the "1934 Act") by adding a new section 21D. These provisions are intended to encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class. These provisions are intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel. The legislation also provides that all discovery is stayed during the pendency of any motion to dismiss or for summary judgment. These stay of discovery provisions are intended to prevent unnecessary imposition of discovery costs on defendants.

## THE PROFESSIONAL PLAINTIFF AND LEAD PLAINTIFF PROBLEMS

House and Senate Committee hearings on securities litigation reform demonstrated the need to reform abuses involving the use of "professional plaintiffs" and the race to the courthouse to file the complaint.

Professional plaintiffs who own a nominal number of shares in a wide array of public companies permit lawyers readily to file abusive securities class action lawsuits. Floor debate in the Senate highlighted that many of the "world's unluckiest investors" repeatedly**732** appear as lead plaintiffs in securities class action lawsuits. These lead plaintiffs often receive compensation in the form of bounty payments or bonuses.

The Conference Committee believes these practices have encouraged the filing of abusive cases. Lead plaintiffs are not entitled to a bounty for their services. Individuals who are motivated by the payment of a bounty or bonus should not be permitted to serve as lead plaintiffs. These individuals do not adequately represent other shareholders-in many cases the "lead plaintiff" has not even read the complaint.

The Conference Committee believes that several new rules will effectively discourage the use of professional plaintiffs.

Plaintiff certification of the complaint

This legislation requires, in new section 27(a)(2) of the 1933 Act and new section 21D(a)(2) of the 1934 Act, that the lead plaintiff file a sworn certified statement with the complaint. The statement must certify that the plaintiff: (a) reviewed and authorized the filing of the complaint; (b) did not purchase the securities at the direction of counsel or in order to participate in a lawsuit; and (c) is willing to serve as the lead plaintiff on behalf of the class. To further deter the use of professional plaintiffs, the plaintiff must also identify any transactions in the securities covered by the class period, and any other lawsuits in which the plaintiff has sought to serve as lead plaintiff in the last three years.[1]

Method for determining the "most adequate plaintiff"

The Conference Committee was also troubled by the plaintiffs' lawyers "race to the courthouse" to be the first to file a securities class action complaint. This race has caused plaintiffs' attorneys to become fleet of foot and sleight of hand.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Most often speed has replaced diligence in drafting complaints. The Conference Committee believes two incentives have driven plaintiffs' lawyers to be the first to file. First, courts traditionally appoint counsel in class action lawsuits on a "first come, first serve" basis. Courts often afford insufficient consideration to the most thoroughly researched, but later filed, complaint. The second incentive involves the court's decision as to who will become lead plaintiff. Generally, the first lawsuit filed also determines the lead plaintiff.

The Conference Committee believes that the selection of the lead plaintiff and lead counsel should rest on considerations other than how quickly a plaintiff has filed its complaint. As a result, this legislation establishes new procedures for the appointment of the lead plaintiff and lead counsel in securities class actions in new section 27(a)(3) of the 1933 Act and new section 21D(a)(3) of the 1934 Act.

A plaintiff filing a securities class action must, within 20 days of filing a complaint, provide notice to members of the purported class in a widely circulated business publication. This notice must identify the claims alleged in the lawsuit and the purported class period and inform potential class members that, within 60 days, they may move to serve as the lead plaintiff. Members of the purported*733 class who seek to serve as lead plaintiff do not have to file the certification filing as part of this motion. "Publication" includes a variety of media, including wire, electronic or computer services.[2]

Within 90 days of the published notice, the court must consider motions made under this section and appoint the lead plaintiff. If a motion has been filed to consolidate multiple class actions brought on behalf of the same class, the court will not appoint a lead plaintiff until after consideration of the motion.

The current system often works to prevent institutional investors from selecting counsel or serving as lead plaintiff in class actions.[3] The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the "most adequate plaintiff."

The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions. Institutional investors are America's largest shareholders, with about $9.5 trillion in assets, accounting for 51% of the equity market. According to one representative of institutional investors: "As the largest shareholders in most companies, we are the ones who have the most to gain from meritorious securities litigation."[4]

Several Senators expressed concern during floor consideration of this legislation that preference would be given to large investors, and that large investors might conspire with the defendant company's management. The Conference Committee believes, however, that with pension funds accounting for $4.5 trillion[5] or nearly half of the institutional assets, in many cases the beneficiaries of pension funds-small investors-ultimately have the greatest stake in the outcome of the lawsuit. Cumulatively, these small investors represent a single large investor interest. Institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake. The claims of both types of class members generally will be typical.

The Conference Committee recognizes the potential conflicts that could be caused by the shareholder with the "largest financial stake" serving as lead plaintiff. As a result, this presumption may be rebutted by evidence that the plaintiff would not fairly and adequately represent the interests of the class or is subject to unique defenses. Members of the purported class may seek discovery on whether the presumptively most adequate plaintiff would not adequately represent the class. The provisions of the bill relating to the appointment of a lead plaintiff are not intended to affect current law with regard to challenges to the adequacy of the class representative or typicality of the claims among the class.

Although the most adequate plaintiff provision does not confer any new fiduciary duty on institutional investors-and the courts should not impose such a duty-the Conference Committee nevertheless intends that the lead plaintiff provision will encourage institutional investors to take a more active role in securities class action lawsuits. Scholars predict that increasing the role of institutional*734 investors will benefit both injured shareholders and courts: "Institutions with large stakes in class actions have much the same interests as the plaintiff class generally; thus, courts could be more confident settlements negotiated under the supervision of institutional plaintiffs were 'fair and reasonable' than is the case

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

with settlements negotiated by unsupervised plaintiffs' attorneys."[6]

Finally, this lead plaintiff provision solves the dilemma of who will serve as class counsel. Subject to court approval, the most adequate plaintiff retains class counsel. As a result, the Conference Committee expects that the plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff. The Conference Committee does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

The Conference Report seeks to restrict professional plaintiffs from serving as lead plaintiff by limiting a person from serving in that capacity more than five times in three years. Institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict. As a result, the Conference Committee grants courts discretion to avoid the unintended consequence of disqualifying institutional investors from serving more than five times in three years. The Conference Committee does not intend for this provision to operate at cross purposes with the "most adequate plaintiff" provision. The Conference Committee does expect, however, that it will be used with vigor to limit the activities of professional plaintiffs.

### Limitation on lead plaintiff's recovery

This legislation also removes the financial incentive for becoming a lead plaintiff. New section 27(a)(4) of the 1933 Act and section 21D(a)(4) of the 1934 Act limits the class representative's recovery to his or her pro rata share of the settlement or final judgment. The lead plaintiff's share of the final judgment or settlement will be calculated in the same manner as the shares of the other class members. The Conference Committee recognizes that lead plaintiffs should be reimbursed for reasonable costs and expenses associated with service as lead plaintiff, including lost wages, and grants the courts discretion to award fees accordingly.

### IMPROVEMENTS TO THE SETTLEMENT PROCESS

### Restriction on sealed settlement agreements

New section 27(a)(5) of the 1933 Act and section 21D(a)(5) of the 1934 Act generally bar the filing of settlement agreements under seal. The Conference Committee recognizes that legitimate reasons may exist for the court to permit the entry of a settlement or portions of a settlement under seal. A party must show "good cause," i.e., that the publication of a portion or portions of the settlement agreement would result in direct and substantial harm to any party, whether or not a party to the action. The Conference Committee intends "direct and substantial harm" to include proof of reputational injury to a party.

### *735 Limitation on attorney's fees

The House and Senate heard testimony that counsel in securities class actions often receive a disproportionate share of settlement awards.

Under current practice, courts generally award attorney's fees based on the so-called "lodestar" approach-i.e., the court multiplies the attorney's hours by a reasonable hourly fee, which may be increased by an additional amount based on risk or other relevant factors.[7] Under this approach, attorney's fees can constitute 35% or more of the entire settlement awarded to the class. The Conference Committee limits the award of attorney's fees and costs to counsel for a class in new section 27(a)(6) of the 1933 Act and new section 21D(a)(6) of the 1934 Act to a reasonable percentage of the amount of recovery awarded to the class. By not fixing the percentage of fees and costs counsel may receive, the Conference Committee intends to give the court flexibility in determining what is reasonable on a case-by-case basis. The Conference Committee does not intend to prohibit use of the lodestar approach as a means of calculating attorney's fees. The provision focuses on the final amount of fees awarded, not the means by which such fees are calculated.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Improved settlement notice to class members*

The House and Senate heard testimony that class members frequently lack meaningful information about the terms of the proposed settlement.[8] Class members often receive insufficient notice of the terms of a proposed settlement and, thus, have no basis to evaluate the settlement. As one bar association advised the Senate Securities Subcommittee, "settlement notices provided to class members are often obtuse and confusing, and should be written in plain English." [9] The Senate received similar testimony from a class member in two separate securities fraud lawsuits: "Nowhere in the settlement notices were the stockholders told of how much they could expect to recover of their losses. . . . I feel that the settlement offer should have told the stockholders how little of their losses will be recovered in the settlement, and that this is a material fact to the shareholder's decision to approve or disapprove the settlement."[10]

In new section 27(a)(7) of the 1933 Act and new section 21D(a)(7) of the 1934 Act, the Conference Committee requires that certain information be included in any proposed or final settlement agreement disseminated to class members. To ensure that critical information is readily available to class members, the Conference Committee requires that such information appear in summary form on the cover page of the notice. The notice must contain a statement of the average amount of damages per share that would be recoverable if the settling parties can agree on a figure, or a statement from each settling party on why there is disagreement. It must also explain the attorney's fees and costs sought. The name, telephone number and address of counsel for the class must be provided. Most importantly, the notice must include a brief statement explaining the reason for the proposed settlement.

### *736 MAJOR SECURITIES CLASS ACTION ABUSES

*Limits on abusive discovery to prevent "fishing expedition" lawsuits*

The cost of discovery often forces innocent parties to settle frivolous securities class actions. According to the general counsel of an investment bank, "discovery costs account for roughly 80% of total litigation costs in securities fraud cases." [11] In addition, the threat that the time of key employees will be spent responding to discovery requests, including providing deposition testimony, often forces coercive settlements.

The House and Senate heard testimony that discovery in securities class actions often resembles a fishing expedition. As one witness noted, "once the suit is filed, the plaintiff's law firm proceeds to search through all of the company's documents and take endless depositions for the slightest positive comment which they can claim induced the plaintiff to invest and any shred of evidence that the company knew a downturn was coming."[12]

The Conference Committee provides in new section 27(b) of the 1933 Act and new section 21D(b)(3) of the 1934 Act that courts must stay all discovery pending a ruling on a motion to dismiss, unless exceptional circumstances exist where particularized discovery is necessary to preserve evidence or to prevent undue prejudice to a party. For example, the terminal illness of an important witness might require the deposition of the witness prior to the ruling on the motion to dis- miss.

To ensure that relevant evidence will not be lost, new section 27(b) of the 1933 Act and new section 21D(b)(3) of the 1934 Act make it unlawful for any person, upon receiving actual notice that names that person as a defendant, willfully to destroy or otherwise alter relevant evidence. The Conference Committee intends this provision to prohibit only the willful alteration or destruction of evidence relevant to the litigation. The provision does not impose liability where parties inadvertently or unintentionally destroy what turn out later to be relevant documents. Although this prohibition expressly applies only to defendants, the Conference Committee believes that the willful destruction of evidence by a plaintiff would be equally improper, and that courts have ample authority to prevent such conduct or to apply sanctions as appropriate.

*"Fair share" rule of proportionate liability*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT 5**

Westlaw.

S. REP. 104-98, S. Rep. No. 98, 104TH Cong., 1ST Sess. 1995, 1995 U.S.C.C.A.N. 679, 1995 WL 372783 (Leg.Hist.)

**\*679** P.L. 104-67, PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

DATES OF CONSIDERATION AND PASSAGE

House: March 7, 8, December 5, 1995
Senate: June 22, 23, 26, 27, 28, December 5, 1995
Cong. Record Vol. 141 (1995)
Senate Report (Banking, Housing, and Urban Affairs Committee) No. 104-98,
June 19, 1995
(To accompany S. 240)
House Conference Report No. 104-369,
Nov. 28, 1995
(To accompany H.R. 1058)

SENATE REPORT NO. 104–98
June 19, 1995

Mr. D'Amato, from the Committee on Banking, Housing, and Urban Affairs, submitted the following

REPORT

together with

ADDITIONAL VIEWS

[To accompany S. 240]

**\*680** The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (S. 240), to amend the Securities Exchange Act of 1934 to establish a filing deadline and to provide certain safeguards to ensure that the interests of investors are well protected under the implied private action provisions of the Act, having considered the same, reports favorably thereon with an amendment in the nature of a substitute, and recommends that the bill as amended do pass.

CONTENTS

|                                                          | Page |
| -------------------------------------------------------- | ---- |
| History of the legislation                               | 1    |
| Purpose and summary                                      | 4    |
| Purpose and scope of the legislation:                    |      |
| Background                                               | 8    |
| Elimination of abusive practices in securities litigation | 10   |

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of illegal acts, related party transactions and relationships, and evaluation of an issuer's ability to continue as a going concern.

The Committee does not intend to affect the Commission's authority in areas not specifically addressed by this provision. The Committee expects that the SEC will continue its long-standing *703 practice of looking to the private sector to set and to improve auditing standards. The SEC should not act to "modify" or "supplement" generally accepted auditing standards for SEC registrants until after it has determined that the private sector is unable or unwilling to do so on a timely basis. The Committee intends for the SEC to have discretion, however, to determine the appropriateness and timeliness of the private sector response. The SEC should act promptly if required by the public interest or for the protection of investors.

SECTION-BY-SECTION ANALYSIS OF S. 240 THE "PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995"

Section 1. Short title; table of contents

Section 1 provides that S. 240 may be cited as the "Private Securities Litigation Reform Act of 1995" (the "Act") and sets out a table of contents for the Act.

## TITLE I–REDUCTION OF ABUSIVE LITIGATION

Section 101. Elimination of certain abusive practices

Section 101(a) amends the Securities Exchange Act of 1934 (the "1934 Act") by adding a new paragraph (8) to Section 15(c), prohibiting brokers or dealers or any associated persons from soliciting or receiving any type of fee or remuneration for assisting an attorney in obtaining representation of any person in private actions under the Securities Act of 1933 (the "1933 Act") or the 1934 Act.

Section 101(b) amends Section 20 of the 1933 Act by adding a new subsection (f) and Section 21 of the 1934 Act by adding a new subsection (i), requiring the court to determine whether a plaintiff's attorney who owns, or has a beneficial interest in, securities that are the subject of litigation has a disqualifying conflict of interest.

Section 101(c) amends Section 20 of the 1933 Act by adding a new subsection (g) and Section 21(d) of the 1934 Act by adding new paragraph (4), prohibiting the payment of attorneys' fees or expenses incurred by private parties out of funds disgorged as the result of action by the Securities and Exchange Commission (the "Commission" or "SEC"), except as otherwise ordered by the court upon motion by the Commission and, in the case of SEC administrative actions, by order of the Commission.

Section 102. Securities class action reform

Section 102(a) establishes five new recovery rules for private class actions under the 1933 and 1934 Acts. Section 102(a)(1) of the Act amends Section 20 of the 1933 Act by adding a new subsection (h) and Section 102(a)(2) of the Act amends Section 21 of the 1934 Act by adding new subsection (j).

The first rule requires every plaintiff seeking to serve as a representative party on behalf of a class to file a sworn certification with the complaint, stating: (i) the plaintiff reviewed the complaint and authorized its filing; (ii) the plaintiff did not purchase the securities at the direction of counsel or to participate in a lawsuit; (iii) the plaintiff is willing to serve as a representative party on behalf of the class; (iv) the plaintiff's transactions during the class period in the security that is the subject of the complaint; (v) other lawsuits*704 in which the plaintiff has sought to serve as representative party in the prior three years; and (vi) the plaintiff will not receive any bonus for serving as the class representative. This certification will not be construed to waive the attorney-client privilege.

The second rule limits the class representative's recovery to his or her pro rata share of the settlement or final judgment. The court may also reimburse the class representative for "reasonable costs and expenses," including lost wages directly relating to the representation of the class.

The third rule prohibits the filing of settlements under seal except if "good cause" is shown, i.e., publication of a portion or portions of the settlement agreement would result in direct and substantial harm to a party.

The fourth rule limits the award of fees and expenses to counsel for a plaintiff class to a reasonable percentage of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

amount of recovery awarded to the class.

The fifth rule specifies the information that must be included in any proposed or final settlement agreement disseminated to the class. The rule requires the settling parties, if they can agree, to state the average amount of damages per share that would be recoverable if the plaintiff prevailed. If the parties cannot agree, each party must provide a statement on the issues on which they disagree. Such statements are inadmissible in any court action or administrative proceeding unless the action or proceeding concerns the statement itself. The rule also requires the parties or counsel who intend to seek an award of attorneys' fees or costs to state the amount sought–on an average per share basis–and to provide an explanation supporting the fees and costs sought. Any settlement agreement must also include the name, telephone number, and address of plaintiff class counsel who will answer questions from class members, and a brief statement explaining the reasons for the proposed settlement. The required information must appear, in summary form, on a cover page. The court may order disclosure of additional information.

Section 102(b)(1) amends the 1933 Act by adding a new subsection (i) to Section 20, and Section 102(b)(2) amends the 1934 Act by adding a new subsection (k) to Section 21; establishing procedures for the appointment of the lead plaintiff in class actions. A plaintiff filing a securities class action must, within 20 days of filing a complaint, provide notice to members of the purported class in a widely circulated business publication. This notice must: (i) identify the claims alleged in the lawsuit and the purported class period, and (ii) inform potential class members that, within 60 days, they may move to serve as the lead plaintiff. The notice provisions in this subsection do not replace or supersede other notice provisions provided in the Federal Rules of Civil Procedure.

Within 90 days of the published notice, the court must consider motions made under this section and appoint the lead plaintiff. If a motion has been filed to consolidate multiple class actions brought on behalf of the same class, the court shall not appoint a lead plaintiff until after consideration of any such motion. In appointing the lead plaintiff, the court shall presume that the "most adequate plaintiff" is the member of the purported class (who has moved for such appointment and otherwise satisfies *705 Rule 23 of the Federal Rules of Civil Procedure) with the largest financial interest in the relief sought by the class. This presumption may be rebutted by evidence that the plaintiff would not fairly and adequately represent the interests of the class or is subject to unique defenses.

Members of the purported class may seek discovery into whether the presumptively most adequate plaintiff would not adequately represent the class. Subject to court approval, the most adequate plaintiff shall retain class counsel.

Section 103. Sanctions for abusive litigation

Section 103(a) amends Section 20 of the 1933 Act by adding a new subsection (j) and Section 103(b) amends Section 21 of the 1934 Act by adding a new subsection (l), requiring the court (i) to make specific findings, upon adjudication of a private action, regarding compliance by all parties and all attorneys with each requirement of Rule 11(b), and (ii) to impose sanctions for any violations. In imposing sanctions for failure of the complaint to comply with Rule 11(b), the court will presume that the appropriate sanction is the reasonable attorneys' fees and expenses of the opposing party. This presumption may be rebutted by evidence that the imposition of sanctions would impose an undue burden on the violator or that the Rule 11 violation was de minimis.

Section 104. Requirements for securities fraud actions

Section 104(a)(1) amends Section 20 of the 1933 Act by adding a new subsection (k) and (l) and adds a new Section 36(c) to the 1934 Act, (i) requiring the court to stay discovery during the pendency of any motion to dismiss the complaint, unless particularized discovery is needed to preserve evidence or prevent undue prejudice, and (ii) prohibiting parties from wilfully destroying or altering evidence they know is relevant to the allegations in the complaint.

Section 104(b) amends the 1934 Act by adding a new Section 36, establishing pleading standards for Section 10(b) actions alleging untrue statements or omissions of a material fact. The complaint must specifically identify each misleading statement and the reason or reasons why it is misleading. In any private action to recover money damages, the plaintiff must, for each misstatement or omission, specifically allege facts giving rise to a strong inference that the defendant acted with the required state of mind.

This section also requires plaintiffs to show "loss causation," i.e., that the alleged violation caused plaintiff's loss. The defendant may mitigate the damages arising from such loss by showing that unrelated factors contributed to the loss.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.